UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    v.

JONA RECHNITZ,

        Defendant.

16-CR-389 (AKH)

# SENTENCING MEMORANDUM
# OF JONA RECHNITZ

COOLEY LLP

Of Counsel:

Alan Levine
Nicholas Flath
  55 Hudson Yards
  New York, NY 10001-2157
  (212) 479-6000

Daniel Grooms (*pro hac vice*)
  1299 Pennsylvania Avenue NW
  Suite 700
  Washington, DC 20004
  (202) 776-2042

*Attorneys for Defendant*

# Table of Contents

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

I.     PERSONAL HISTORY ............................................................................................... 4

    A.    Jona's Childhood and Education ..................................................................... 4

    B.    Jona's Career and Life on the Upper West Side ............................................. 5

    C.    Jona's Offense Conduct and Plea of Guilty ................................................... 6

    D.    Jona's Cooperation with the Government ....................................................... 8

    E.    Jona's Remarkable Record of Good Works ................................................... 9

II.    SENTENCING GUIDELINES ................................................................................... 15

III.   § 5K1.1 FACTORS ..................................................................................................... 16

    A.    The Significance and Usefulness Of Jona's Cooperation .................................. 16

    B.    The Truthfulness, Completeness, and Reliability of Jona's Information
        And Testimony ............................................................................................. 18

    C.    The Nature and Extent of Jona's Assistance ...................................................... 19

    D.    Injuries Jona Suffered Resulting From His Assistance ........................................ 21

        1.    Notoriety ............................................................................................ 21

        2.    Ostracism ........................................................................................... 24

        3.    Intimidation in the Courtroom ............................................................ 28

    E.    The Timeliness of Jona's Assistance .................................................................. 29

IV.    SENTENCING FACTORS IN 18 U.S.C. § 3553(A) ................................................ 30

V.     RESTITUTION ............................................................................................................ 35

CONCLUSION .......................................................................................................................... 40

## PRELIMINARY STATEMENT

Before this Court for sentencing is defendant Jona Rechnitz, who, under the circumstances, made an extraordinary decision to admit his criminal responsibility for honest services bribery, and then provided extraordinary public assistance to the United States Attorney's Office (the "Government") as a cooperating witness, leading the Government to describe him as "one of the single most important and prolific white collar cooperating witnesses in the recent history of the Southern District of New York."  Gov't Mem. in Supp. of Downward Departure Pursuant to Section 5K1.1 dated Oct. 16, 2019, ECF No. 70, at 1 (herein, "5K1.1 Motion").  Giving full meaning to the statute's admonition to impose a just sentence sufficient "to promote respect for the law" (18 U.S.C. § 3553 (a)(2)(A)), we submit this Court should impose a non-custodial sentence of time served with an appropriate fine, order of restitution and supervised release.

Jona, now a father of six children, was a young man of 26 when he took on the New York real estate community with the goal of becoming a big man in the community, and there was no expense too grand in his effort to impress and no line he was unwilling to cross in pursuing an ill-conceived strategy to establish himself as a go-to person in the wider community and to attract the wealthy as his investors.  Over a period of several years, he misused his financial resources to compromise the judgment of much older and more senior New York City Police officers and a union leader.  But, when he realized that the Government was focused on police corruption, he made a life-changing decision to approach the Government through counsel and proffer his criminal activities, and ultimately, to plead guilty to one count of conspiracy to commit honest services fraud for bribing police and public officials and by delivering a commercial bribe to a union leader on behalf of a hedge fund.  While he recognized the implications to his faith of the decision to cooperate with the Government, he never could have envisioned the torrent of scorn, abuse and public shame, and downright intimidation that he and his family would experience from

the day that cooperation became public up through and including the present.  The community's opprobrium and the reaction of the banking community to the guilty plea forced him to abandon significant financial stakes in pending real estate investments.  And, the shunning by his community literally drove him out of town, as he relocated this family to his hometown of Los Angeles.

The defendant recognizes the shamefulness of his conduct.  "[T]his [the conduct] is something that of course disgusts me looking back on it now," he said in one of the three trials at which he testified.  App. Ex. 45, Transcript in *United States v. Seabrook*, No. 16 Cr. 467 (AKH) ("Seabrook II Tr.") at 948:18-19.  The letters filed with this memorandum are filled with attestations by family, friends, and clergy to the defendant's understanding of the severity and import of his conduct and the hypocrisy that conduct demonstrated.  From the day that "[the defendant] decided to move forward and get [his] life in order" (*Id.* at 949:22-23), his confession, public and private, has been without limitation.  In addition to that genuine remorse, this defendant has been the subject of public shame from his admissions of responsibility during his nineteen days on the witness stand and from over 250 days of news articles calling him out for public ridicule.  Defense lawyers always tell the Court that their client has suffered enough from the public rebuke of a conviction, but those words take on new meaning in the present circumstances.

As more fully described here and in the Government's motion for departure pursuant to 5K1.1, superlatives are inadequate to describe the full extent and value of the defendant's cooperation.  From the day that he pleaded guilty in June 2016 until his last day on the witness stand in December 2018, the defendant spent a total of 80 days being interviewed by the Government and preparing for his testimony and an additional 19 days on the witness stand.  (This count does not include the travel to and from the West Coast to attend those 80 sessions and 19

trial days.)  The nineteen trial days involved three separate criminal trials, the bulk of the days on relentless cross-examination.  But the full-time commitment to the Government over the two and one-half years only tells a portion of the story.  It is the value of that cooperation that is exceptional, by any measure.  As the Government's 5K1.1 Motion details, the defendant told of criminal activity that the Government did not know about without him and other activity that it could not prove without him.  All of that information and ultimate testimony was candid and truthful.  Unlike many cooperating witnesses, he did not shave the truth to present himself in a more favorable light and he was not caught in any half-truths on cross-examination.  All in, some fifteen separate defendants were punished based on his cooperation.

Finally, not only is the value of the defendant's cooperation exceptional, but it is the example that cooperation sets for the community that, we respectfully submit, calls for a non-custodial sentence of time served.  It is rare for the Government to obtain cooperation from a participating defendant for the crime of union corruption, and prosecuting police corruption has been even more rare in this city in the last 50 years.  His cooperation exposed multiple breaches of the public trust by police officers, public officials and one of the city's most prominent union officials.  The criminal justice system depends on live witnesses to prosecute these difficult cases. Deterrence has been achieved by the Government's prosecution of these fifteen individuals.  More importantly, involved in the defendant's criminal activities were many different constituencies that, to put it mildly, discourage cooperation with the Government.  Promoting respect for the rule of law is the cornerstone value of the federal criminal justice system. As we will argue below, it is this defendant's sentence which this Court should use to promote that respect above all else.

## I.     Personal History

### A.     Jona's Childhood and Education

Jona was born in Los Angeles in 1982, the middle of three children.   Pre-Sentence Investigation Report ("PSR") ¶ 88.   His father Robert is a successful real estate developer in California.   *Id.* ¶ 89.   His mother, Melanie, writes that Jona "grew up with loving parents and two siblings, and was surrounded by four grandparents, each one teaching him about giving, sharing and kindness towards others."   App. Ex. 20, M. Rechnitz Ltr. at 1.[1]   These lessons sank in; his brother, Jared, writes that "[f]amily is and always has been [Jona's] number one priority," and "[i]t is because of Jona, that every member of my family ends any phone call with each other with, 'I love you', before hanging up."   App. Ex. 18, Jared Rechnitz Ltr. at 1.   One of Jona's teachers, Danny Rotenberg, also recognized that Jona "was always a caring and thoughtful boy, who would make sure that all his peers would be treated with care."   App. Ex. 25, D. Rotenberg Ltr. at 1.

Jona grew up in a traditional Orthodox Jewish home, and religion has always been, and continues to be, very important to him.   PSR ¶ 110.

Jona's childhood was privileged; he attended private school through the twelfth grade.   *Id.* ¶¶ 90, 107.   As a child, Jona knew that his family was successful and prominent in the community. His father gave extensively to charity and was respected in the community.   Indeed, Jona recalls people regularly coming to his father for advice and to settle disputes.   *See* App. Ex. 46, Transcript in *United States v. Grant and Reichberg*, No. 16 Cr. 468 (GHW) ("Reichberg Tr.") at 2379:6-11.

In 2002, Jona moved to New York City for college.   He attended Yeshiva University and graduated in 2006.   PSR ¶ 104.

---

[1] Jona has submitted 27 letters in support, and several additional exhibits, as exhibits to the accompanying Appendix (each referred to herein as "App. Ex. ___").

In 2004, while studying abroad in Israel, Jona met Rachel Kahn.  Jona and Rachel soon fell in love, and were married in 2005.  They have been together ever since, and have six children together–the oldest is thirteen, the youngest less than one year.  Rachel does not work outside the family home.  *See id.* ¶ 92.

**B.      Jona's Career and Life on the Upper West Side**

In 2006, after college, Jona began working in the real estate industry in New York, determined to become a successful businessman in his own right.  *Id.* ¶¶ 115-120.  As he described it, "I wanted to one day become my own boss and have my own company and own many trophy buildings throughout New York."  App. Ex. 45, Seabrook II Tr. at 567:20-21.

Jona began his career as an intern at a commercial real estate firm in New York, working as a broker's assistant.  PSR ¶¶ 119-120. After a year, Jona left to start his own residential real estate firm (Broad Properties), which failed.  *Id.* ¶¶ 116-117.

Jona got a job with Africa Israel USA in 2007, as the personal assistant to the CEO.  *Id.* ¶¶ 115-116.  Jona worked for four years at Africa Israel, learning to evaluate real estate prospects and developing financial models, and rose to become Director of Acquisitions and Dispositions by the time he left in 2010.

In 2010, Jona started JSR Capital LLC, his own business, and began syndicating real estate deals.  *Id.* ¶¶ 113-114.  Jona would identify an opportunity, then find investors who were interested in participating.  JSR's acquisitions included a medical center in the Bronx, which JSR renovated and filled with tenants; two townhouses in the East Village, which JSR remodeled and converted into a multi-unit rental property; and a building in midtown, which JSR intended to convert into luxury condominiums.  He achieved notable success.

While Jona pursued his career in real estate, he and Rachel made a life together in Manhattan, and Jona strove to get involved with his community.  Rabbi Steven Burg, who became

friends with Jona through their shared work for the Simon Wiesenthal Center, came to value Jona's advice and guidance.  App. Ex. 3, S. Burg Ltr. at 1.  Another friend, Rabbi Steven Weil, writes that Jona and Rachel were "pillars in starting a community" close to Yeshiva University "that exploded and became an anchor for thoughtful young Jews," including Rabbi Weil's own children.  App. Ex. 27, S. Weil Ltr. at 1.  Jona's brother Jared also recalls that Jona used to stay up on the phone at late hours, helping with others' personal and business disputes, or "just to make peace between them," often for the benefit of schools and synagogues.  App. Ex. 18, Jared Rechnitz Ltr. at 2.  Jona's former neighbors in Manhattan, Mariam and Shea Schwebel, attest to the way in which he managed to "juggle his time with his family, friends and community all the while making everyone around him feel good in his presence."  App. Ex. 26, M. and S. Schwebel Ltr. at 2.

### C.       Jona's Offense Conduct and Plea of Guilty

However, the business career that Jona was building was not without its perils.  Jona ultimately veered off a path of integrity and into a world where he was unable to distinguish between right and wrong.  Our client has written the Court a letter, and his immediate family have also written to the Court.  These letters offer the Court an explanation for the conduct and need not be repeated here.

By May 2016, Jona realized that he needed to reset his life.[2]  He retained counsel and within weeks accepted the Government's offer that he enter into a cooperation agreement, which provided for a plea of guilty to a one-count Information.  That Information summarizes Jona's criminal offenses; it charges a single-count, multi-object conspiracy to commit honest-services wire fraud

---

[2] In early 2015, Jona was interviewed by the NYPD Internal Affairs Bureau ("IAB") regarding his connections with the NYPD.  In each of three meetings with them, he concealed his activities with the NYPD, and, concerned about that investigation, he deleted emails from his computer, destroyed a cell phone, bought a new computer and destroyed his old one.  *See generally* 5K1.1 Motion at 22.

(18 U.S.C. §§ 1343, 1346, 1349).  *See generally* PSR ¶ 11.  The conspiracy involved two distinct courses of conduct.

The first course of conduct was Jona's collaboration with Jeremy Reichberg to provide gifts and other benefits to corrupt members of the New York City Police Department ("NYPD") and public officials in return for various privileges.  *See generally id.* ¶¶ 12-30; 5K1.1 Motion at 12-15; *id.* at 19-20.  Reichberg marketed himself as an expediter and NYPD liaison.  PSR ¶ 13.  After meeting through a mutual contact (*id.* ¶¶ 13, 55), Jona and Reichberg embarked on a plan to cultivate relationships with senior NYPD officers and public officials by bestowing benefits to them, largely financed by Jona.  *Id.* ¶ 15.  In return for these benefits, the NYPD officials gave Jona and Reichberg parking placards, influence in promotion decisions, escorts through traffic (including, on one occasion, a partial lane closure of the Lincoln Tunnel), rides in police vehicles, and assistance in private disputes.  *Id.* ¶¶ 18, 20, 22, 24, 26.  For their part, the political officials also gave favors to Jona and Reichberg in exchange for the benefits they received, including favorable treatment from the New York City Department of Buildings, and appointments as police chaplains in Westchester County.  *Id.* ¶¶ 29, 30.

The second course of conduct involved Jona's facilitation of a payment from Murray Huberfeld (a founder and co-owner of the Platinum Partners hedge fund), to Norman Seabrook, (President of the Correction Officers' Benevolent Association ("COBA")), in return for the investment of some of COBA's pension fund in Platinum Partners.  *See generally id.* ¶¶ 33-43; 5K1.1 Motion at 5-19.  Jona was friends with Huberfeld, and in late 2013, Huberfeld asked him to help find institutional investors willing to invest in Platinum Partners.  PSR ¶ 35.  Soon thereafter, Jona learned that Seabrook (whom he had met through contacts at the NYPD) was interested in profiting personally from his power to direct COBA's pension fund investments.  *Id.*  Rechnitz

introduced Huberfeld and Seabrook, letting Huberfeld know that Seabrook would expect a kickback. *Id.* ¶ 36. After facilitating the initial meeting between Huberfeld and Seabrook, Rechnitz had no further involvement in Platinum Partners securing an investment by COBA. *Id.* Rechnitz did not see any documents suggesting that Platinum Partners was in financial danger or that it was not a suitable investment for a benefit pension plan. *See* 5K1.1 Motion at 18.

COBA invested $10 million in Platinum Partners in March 2014, $5 million in June 2014, and $5 million in August 2014, or a total of $20 million. PSR ¶ 39. Platinum Partners earned $1.2 million in investment and management fees from this investment. *Id.* ¶ 48.

In December 2014, Seabrook sought to receive the kickback. Huberfeld told Jona to pay Seabrook $60,000, and told Jona to submit a fake invoice for tickets to New York Knicks basketball games to Platinum Partners so he could be repaid covertly. *Id.* ¶ 40. On December 11, 2014, Jona met Seabrook in Manhattan and handed him a men's handbag containing $60,000 in cash. *Id.* ¶ 41. Jona was then repaid by Platinum Partners based on the fake Knicks invoice. *Id.* Jona did not profit personally from the kickback scheme. *Id.* ¶ 43. When Huberfeld insisted on paying something, Jona asked him to instead donate to charitable causes to which Jona was attached. 5K1.1 Motion at 17.

COBA ultimately lost $19 million of its $20 million total investment due to unrelated fraud activities within Platinum Partners. PSR ¶ 48.

### D.    Jona's Cooperation with the Government

Jona's active service as a cooperator extended from June 2016 until the end of December 2018. The reliable information he gave the Government led to criminal charges against Jeremy Reichberg and officers Michael Harrington and James Grant of the NYPD, as well as against Norman Seabrook and Murray Huberfeld. Jona then testified in three lengthy criminal trials, resulting in convictions of Reichberg and Seabrook, guilty pleas by Huberfeld and Harrington, and

the acquittal of Grant.  In addition, Jona's information, and threat of testimony, also assisted the Government in its investigation of corruption in the NYPD handgun licensing division and in the prosecution of two Ponzi schemes.  As described more fully below and in the Government's 5K1.1 Motion, the "significance and usefulness of Jona's cooperation is, perhaps in both its breadth and its depth, without peer among white collar cooperating witnesses in the recent history of the Southern District of New York."  5K1.1 Motion at 36; *see generally* Part III, *infra* (applying 5K1.1 factors).

### E.    Jona's Remarkable Record of Good Works

Jona's parents are role models of generosity, and he has striven to follow their example. He has a drive to help those around him, and eschews publicity of his good acts.  Rabbi Haskel Lookstein, who officiated Jona's wedding, writes that Jona "tries to avoid any kind of public behavior," and his good deeds are "done anonymously."  App. Ex. 16, H. Lookstein Ltr. at 2. Rabbi Steven Weil, a family friend, concurs: "[a]nytime that Jona has financially supported [charitable] projects, he has asked for anonymity.  This is something that he was taught by his parents and grandparents."  App. Ex. 27, S. Weil Ltr. at 2.  Rachel sums it up best: "he is innately a very good person with a very big heart, probably the biggest heart of anyone I know.  He would and does do anything in his power, and even beyond his power, to help others, regardless of whether it's a family member, friend or total stranger."  App. Ex. 21, Rachel Rechnitz Ltr. at 2.

Many of the letters in support attest to Jona and Rachel's remarkable practice of opening up their home to the lonely and friendless for the weekly Sabbath meal, and on holidays.  Jona's brother, Jared, writes that Jona and Rachel's weekly Sabbath table "was filled with guests who may not have been invited out, were forgotten about, or were alone," including "widows, orphans, divorcees, people new to the community, foreigners, and just people who were in need."  App. Ex. 18, Jared Rechnitz Ltr. at 2.  Mariam and Shea Schwebel, neighbors of the Rechnitz family on the

Upper West Side, echo this sentiment, writing that "lonely people including many who had moved to New York from Jona's hometown in Los Angeles, found a home in the Rechnitz's," where they could enjoy "a homemade meal for the Sabbath."  App. Ex. 26, M. and S. Schwebel Ltr. at 1.  One such repeat guest was the son of Moise Hendeles, a family friend from Los Angeles, who was single and alone in New York.  App. Ex. 9, M. Hendeles Ltr. at 1.  Another was a man named Ari, who was alone after having gone through a divorce.  As Jona's brother-in-law Joshua Kahn writes, Jona invited Ari in "simply because he knows that Ari does not otherwise have others who will do so."  App. Ex. 13, J. Kahn Ltr. at 1.  Ari himself writes that Jona helped him out a lot in difficult times, "by his open invitation to me, to spend every single Jewish holidays with him and his family, just so I do not feel lonely."  App. Ex. 8, A. Gross Ltr. at 3.  Jona's father-in-law, David Kahn, writes that Jona recently hosted a holiday meal at which the guests included a family with a nine-year old daughter who had just completed chemotherapy.  This family told David that Jona's and Rachel's was "the only home they felt comfortable going to and being themselves."  App. Ex. 10, D. Kahn Letter at 1.

Another common thread among the letters is Jona's remarkable history of emotional and financial support for the sick and the grieving.  Rabbi Lookstein, who knew Jona in Manhattan, writes that "[w]hen friends of his have had medical issues, he has gone out of his way to find the best doctors and sometimes he even goes to the doctor with them.  When there is loss in a family, he is one of those who will provide food for the family and try everything possible to make things easier in their recovery from the loss."  App. Ex. 16, H. Lookstein Ltr. at 2. Here are just a few examples of such kindnesses:

- As Jona's mother Melanie writes, when his aunt was diagnosed with a terminal illness, Jona "took it upon himself to research alternate options in both the United States and abroad," and "[h]is tireless efforts led to a treatment plan that extended my sister's life."  App. Ex. 20, M. Rechnitz Ltr. at 1.

- When Mariam and Shea Schwebel's infant grandchild became ill, Jona and Rachel supported the family emotionally during the long and terrible illness, "and were there for them when the baby eventually passed away, which is something even their longtime friends were not emotionally able to do during that very trying time." App. Ex. 26, M. and S. Schwebel Ltr. at 1-2.

- When Mariam Schwebel's father passed away shortly before Rosh Hashanah, Jona arranged for meals to be sent to the family for the holiday.  *Id.* at 2.

- When Rachel's grandfather died, Jona arranged and paid for Fred Kahn (Rachel's brother) and his family of nine to fly from Israel to America so they could attend the funeral and observe Passover with the rest of the grieving family.  App. Ex. 13, J. Kahn Ltr. at 1.  Rachel's mother (Jona's mother-in-law) writes: "this was the greatest act of Chesed, kindness, sensitivity and generosity that anyone has ever done for me."  App. Ex. 10, D. Kahn Ltr. at 1.

- When Fred and Adi Kahn's son (Jona's nephew) suffered severe burns as a toddler, Jona offered emotional support and arranged for food to be brought to the family. Fred and Adi write that Jona "knew exactly what we needed without me having to ask."  App. Ex. 12, F. and A. Kahn Ltr. at 2.

- In 2014, Jona learned that the sister of his friend Brocha Chana Metzger had died suddenly, leaving her husband and six children.  Jona immediately arranged for the devastated family to travel to Florida over the Passover holiday to help them take their mind off their tragedy, even though he "barely knew" the family.  Ms. Metzger writes that Jona's "incredible kindness was beyond anything we had seen."  App. Ex. 17, B. Metzger Ltr. at 1.

- David Alvarez, who was the doorman of the apartment building where Jona lived, was surprised and touched when Jona was one of the handful of people who attended Alvarez's mother's funeral in 2016.  App. Ex. 2, D. Alvarez Ltr. at 1.

- Joshua Goldman, who runs a transportation company in Los Angeles, and used to arrange rides for the Rechnitz family when they would visit from New York, writes that Jona offered financial and emotional support to him and his wife in caring for their special-needs child, and also over the last two years, as Joshua's wife has undergone multiple surgeries.  Joshua writes that Jona "is truly a sincere and caring person that does tremendous kindness and compassion with joy and gladness. . . . [he] is one of a kind as far as helping and caring for his fellow human being."  App. Ex. 7, J. Goldman Ltr. at 1.

- Alejandro Cadena and his wife were casual acquaintances of Jona and Rachel. When Alejandro's father-in-law suffered clinical brain death in Los Angeles in early 2019, hospital staff told Alejandro and his wife that life support would have to be disconnected, contrary to Jewish law.  App. Ex. 4, A. Cadena Ltr. at 1.  Mutual friends suggested that Alejandro and his wife call Jona.  When he got the call, Jona dropped his own affairs and spent days at the hospital with the Cadena family,

helping them in their effort to keep Alejandro's father-in-law alive.  When he died naturally soon thereafter, Jona arranged for the elderly grandfather to fly from Israel to attend the funeral, even helping with a visa application and a companion ticket for a caregiver.  Alejandro writes that Jona was an "angel" and a "true hero."  *Id.* at 2. Perhaps more importantly, Jona (by his generosity and care) was served as a positive example of observant Judaism for secular members of Alejandro's family, bringing them closer together.  *Id.* at 3.

Jona also has helped friends, and friends of friends, who have fallen on hard times.  Rabbi Burg, who came to know Jona through Jona's involvement in the Simon Wiesenthal Center, writes that "Jona's office [in Manhattan] became the stop for anyone that was in distress and required charity.  It was as if he did not know how to say no when someone was in in need."  App. Ex. 3, S. Burg Ltr. at 1.  Rabbi Weil shares the same sentiment, writing that he and Jona have "discussed and worked on finding employment for a number of individuals who were in economic dire straits."  App. Ex. 27, S. Weil Ltr. at 2.  One beneficiary of Jona's generosity was the son of Martin Klein, a friend of Jona's.  When Martin's son was unable to find work, Jona stepped in and offered him a job in his own office.  Martin writes that his son "was happy for the first time in many years."  App. Ex. 14, M. Klein Ltr. at 1.

Another beneficiary was Rabbi Danny Rotenberg, who had taught Jona as a boy, and who later supervised the teenage Jona as a camp counselor.  When Rabbi Rotenberg moved to New York to seek better care for his special-needs son in a Jewish environment, Jona helped connect him to schools.  But, in New York, Rabbi Rotenberg was unable to find work as a teacher.  He writes: "I cannot relate to you the feeling of working my entire life and now left with no options." When Jona learned of Rabbi Rotenberg's difficulty, he decided, "without a moment's thought" to hire Rabbi Rotenberg himself, to enable him to support his family.  App. Ex. 25, D. Rotenberg Ltr. at 2.

Jona also helped out his doorman David Alvarez, paying a large bill on Alvarez's behalf and refusing to accept anything in exchange, and later helping Alvarez secure legal advice to avoid being evicted.  App. Ex. 2, D. Alvarez Ltr. at 1-2.

Notably, Jona also took it upon himself to offer emotional support to Alisa Adler, who had been criminally charged in the District of New Jersey for perpetrating a fraud.  *See generally United States v. Adler*, No. 17 Cr. 510 (CCC).  As Ms. Adler writes, "at the time, Jona made himself tremendously accessible to hear me out and help me see things that I could not see. Jona was immensely influential in making the decisions I needed to in order to move myself forward and accept responsibility."  App. Ex. 1, A. Adler Ltr. at 1.  Ms. Adler ultimately pleaded guilty and was sentenced to a term of imprisonment.  She credits Jona with helping her make the decision to "become accountable for my actions," and also notes that he helped her pay for her legal fees and rallied friends to help her make restitution to her victims.  *Id.* at 1-2.  Her Rabbi, Mordechai Rindenow, has also written about Jona's assistance to Ms. Adler, writing that he "was very impressed with Jona's willingness to assist my client in a process to fully come to terms with the realities of my client's participation in the crime that was committed."  App. Ex. 24, M. Rindenow Ltr. at 1.

Jona has also given generously, both financially, and of his time, to philanthropic causes. Rabbi Lookstein writes that Jona was "extremely generous with his funds and his time to provide relief to those who suffered from [Hurricane Sandy]."  App. Ex. 16, H. Lookstein Ltr. at 2; App. Ex. 20, M. Rechnitz Ltr. at 1.  Jona also has partnered with others to raise money for poor families on the west side of Manhattan for Rosh Hashanah and Passover.  App. Ex. 16, H. Lookstein Ltr. at 2.  Mariam and Shea Schwebel, Jona's former neighbors, add that Jona also convinced others to donate to the holiday food fund as well.  App. Ex. 26, M. and S. Schwebel Ltr. at 1.  Finally, Jona's

friend Brocha Chana Metzger writes that, for many years, month after month, Jona paid for a private car service to facilitate distribution of food to the needy of New York, through the Chabad Relief Project. Jona "did this quietly and without fanfare," and apart from the Chabad staff and the car service, "no one knew who the benefactor was." App. Ex. 17, B. Metzger Ltr. at 1.

Last, perhaps Jona's most meaningful and extraordinary act of private charity has been his and Rachel's decision to essentially adopt a young man from a broken home. This was Abraham ("Avi") Levy, who had lost contact with his parents and moved into the dormitory at the Yeshiva University High School for Boys when Jona met him, by chance, at a restaurant near Yeshiva University, where Avi was trying to find something to eat. This coincidental meeting became life-changing for both men. As Avi writes, Jona "saved my life." App. Ex. 15, A. Levy Ltr. at 1. Over the next few years–as Avi studied abroad in Israel, then went to college, and began to look for work–Jona and Rachel have been his benefactors, paying whatever he needed without hesitation, inviting him in to celebrate the holidays with them, and treating him "like part of the family." Now, Avi supports himself, and credits his present success to Jona having served as his "guardian angel." Jona's brother-in-law Joshua Kahn writes that "Jona does not discuss what he does for Avi or why, but simply includes him as if Avi was his brother." App. Ex. 13, J. Kahn Ltr. at 1. Indeed, Jona's charity towards Avi has been so private that even his sister-in-law, Adi Kahn, a social worker who met Avi's estranged family through her work, did not know that Jona was Avi's benefactor until a year after coming into contact with the family. *See* App. Ex. 12, F. and A. Kahn Ltr. at 2.

These are just a few examples of Jona's private charity and selflessness. During a time when Jona had plenty of money, he was unstinting in giving largely to anyone who seemed to need help, and with no expectation of public recognition or accolades of any kind. These acts of charity

pre-date the unmasking of Jona's criminal conduct by years.  They are not belated attempts to manufacture a record of charity to build a record for leniency; they attest to a fundamental generosity in Jona's character.  Now, even though (as his father Robert writes) Jona's lifestyle is "much more humble" than it used to be, "[h]e is still a friend that anyone can lean on."  App. Ex. 22, Robert Rechnitz Ltr. at 1.

## II.   Sentencing Guidelines

Probation calculates a Guidelines range of 78-97 months (Offense Level 28; Criminal History Category I).  *See* PSR ¶¶ 58-81.  Probation reaches this result, in part, by calculating the offense level for the honest services bribery of public officials using a loss figure of $400,339.50, reflecting $125,339.50 in bribes paid to NYPD officers and, notably, $275,000 in payments to political figures.  *Id.* ¶47.  The inclusion of *both* categories of bribes results in a 12-level increase in the offense level pursuant to §§ 2C1.1(b)(2) and 2B1.1(b)(1)(G).  *Id.* ¶ 62.  We concur with this calculation as a technical matter under the Guidelines.[3]

Probation recommends a sentence of 36 months, recognizing that the Guidelines range in this case is greater than necessary to accomplish the objectives of sentencing.  *Id.* at p. 32. Critically, Probation explicitly does not take into account the substantial assistance provided by Jona or the Government's 5K1.1 Motion.  *Id.*

---

[3] We submit, however, that the inclusion of the $275,000 in payments to political figures in Jona's guideline calculation results in inequity.  Jona and Jeremy Reichberg both were involved in the political bribery scheme (as were the public officials), and Jona testified about it during the Reichberg trial.  *See* App. Ex. 49, Reichberg Tr. at 2580:5-19 ($100,000 for the Bill de Blasio mayoral campaign); *id.* at 2587:9-2590:14 ($50,000 to the Campaign For One New York and $102,000 for the New York Senate Democrats campaign); *id.* at 2610:17-2611:12 ($15,000 to Robert Astorino's reelection campaign); *id.* at 2614:20-2615:14 (Rolex watch for Astorino).  Yet, through no fault of Jona's, none of the political figures were criminally charged.  *See* 5K1.1 Motion at 31-32.  And Reichberg, whom both the Government and Probation agree was the more culpable member of the conspiracy (*See* PSR ¶ 49 and p. 31), was sentenced based on a total loss amount that omitted the political contributions, including only the payments and gifts to the NYPD. *See* App. Ex. 49, Sentencing Transcript dated May 13, 2019, *United States v. Reichberg*, No. 16 Cr. 468 (GHW) at 25:4.  As a result, the total loss amount for purposes of Reichberg's guideline range was less than $150,000 and thus 4 levels lower on the Guidelines under § 2B1.1(b)(1)(E) than the portion of Jona's guidelines attributable to the bribery scheme.

### III.   § 5K1.1 Factors

Based on Jona's extraordinary cooperation, the Government has moved for a downward departure pursuant to § 5K1.1.  By any reasonable measure, Jona's substantial assistance is exceptional in virtually every respect.  Jona's information and testimony has been uniquely valuable, and Jona has endured, without complaint, a heavy burden in fulfilling his obligations, suffering ostracism, intimidation, and public scorn.  Based on an application of the facts relating to Jona's substantial assistance to these § 5K1.1 factors, as well as to the factors in 18 U.S.C. § 3553(a) (discussed in Point IV, *infra*), we submit that the Court should impose a non-custodial sentence of time served.

### A.   The Significance and Usefulness Of Jona's Cooperation

As noted in the Preliminary Statement, the Government acknowledges Jona as "without exaggeration, one of the single most important and prolific white collar cooperating witnesses in the recent history of the Southern District of New York."  5K1.1 Motion at 1.  The Government further notes that "his assistance fueled a one-man boom in significant and successful investigations and prosecutions."  *Id.* at 36.  Jona's assistance encompassed seven different areas of criminal conduct:

- Jona and Murray Huberfeld's payment of a kickback to Norman Seabrook to induce him to cause COBA to invest in Platinum Partners;

- Jona and Jeremy Reichberg's bribery of senior NYPD officers, including James Grant and Michael Harrington, in exchange for favors and special treatment;

- Jona's contributions (including straw donations) to the Bill de Blasio campaign, and to causes championed by de Blasio, in the expectation of special treatment for himself and Reichberg;

- Jona's donations to Robert Astorino's reelection campaign and part payment for a Rolex watch, in exchange for Jona's and Reichberg's appointments as chaplains in the Westchester County Police Department;

- Jona's loans to, and brokering of loan transactions with, Hamlet Peralta to fund what Rechnitz thought was a wholesale liquor business but which was, in fact, a Ponzi scheme;

- Jona's brokering of loans to Jason Nissen to fund what Rechnitz thought was a wholesale ticket-selling business but which was, in fact a Ponzi scheme;

- Jona's knowledge of corruption in the NYPD handgun licensing division.

*See generally id.* at 23-26.

Jona's cooperation on these seven subjects bore fruit, in the form of numerous convictions and pleas of guilty. As summarized by the Government (*id.*), Jona's cooperation was a factor in fourteen convictions and pleas of guilty, plus one consensual forfeiture:

| # | Name | Description | Index # | Outcome | Sentence |
|---|------|-------------|---------|---------|----------|
| 1 | Murray Huberfeld | Hedge Fund Partner | 16-Cr-467 | Plea | 30 mos. |
| 2 | Norman Seabrook | President of COBA | 16-Cr-467 | Convicted | 58 mos. |
| 3 | Jeremy Reichberg | Expediter | 16-Cr-468 | Convicted | 48 mos. |
| 4 | Michael Harrington | NYPD Chief | 16-Cr-468 | Plea | - |
| 5 | Hamlet Peralta | Ponzi schemer | 16-Cr-354 | Plea | 60 mos. |
| 6 | Jason Nissen | Ponzi schemer | 17-Cr-477 | Plea | 27 mos. |
| 7 | David Villanueva | NYPD Sergeant | 16-Cr-342 | Cooperated | 4 mos. |
| 8 | "Shaya" Lichtenstein | Expediter | 16-Cr-342 | Plea | 32 mos. |
| 9 | Richard Ochetal | NYPD Officer | 16-Cr-342 | Cooperated | Time Served |
| 10 | John Chambers | Attorney | 17-Cr-396 | Plea | 366 days |
| 11 | Paul Dean | Participant in gun bribery | 17-Cr-398 | Plea | 18 mos. |
| 12 | Robert Espinel | Participant in gun bribery | 17-Cr-398 | Plea | 366 days |
| 13 | Gaetano Valastro | Expediter | 17-Cr-398 | Plea | Pending |
| 14 | Frank Soohoo | Expediter | 16-Cr-342 | Plea | Time Served |
| 15 | Robert Astorino | Westchester Cty. Exec. | 19-Misc-283 | Stip. | Forfeit Rolex |

In addition to these convictions and the forfeiture, Jona's public testimony concerning public corruption has been useful in and of itself. As detailed in the PSR, Jona provided information to the Government, and testified, about having provided gifts and other benefits to senior officers in the NYPD, including Philip Banks (Chief of Department), James Grant (Commanding Officer of 19th Precinct–Upper East Side), David Colon (Chief of Community

Affairs), Stephen McAllister (NYPD Inspector, and later head of Floral Park Police Department), Michael Milici (NYPD Detective), Andrew Capul, Eddie Gardner, James McCarthy, and Eric Rodriguez (NYPD officers).  Many of these officers were administratively disciplined prior to Jona's plea of guilty and cooperation, but Jona's testimony exposed their corruption to the public and, as the Government states, was "ultimately beneficial to the cause of making the next would-be NYPD bribe taker or bribe giver think twice."  5K1.1 Motion at 31.

The same is true of Jona's testimony concerning his political donations.  Jona testified about how he had bundled "straw" donations for Bill de Blasio's mayoral campaign, and had made explicit to de Blasio's lead fundraiser, Ross Offinger, that he and Jeremy Reichberg expected special treatment from the city in exchange for their contributions.  While no charges resulted from Jona's information concerning political corruption, this public testimony concerning cash-for-favors from City Hall should have a valuable deterrent effect.

**B.    The Truthfulness, Completeness, and Reliability of Jona's Information And Testimony**

Once his cooperation began, Jona was "at all times forthright about his crimes and those of others," and over "literally weeks of cross-examination . . . he was never revealed to have told the Government anything but the truth."  5K1.1 Motion at 43.  His information was true, complete, reliable, and useful to the Government.  Two separate juries–the jury in the second Seabrook trial and the jury in the Reichberg-Grant trial–credited Jona's information enough to convict Seabrook and Reichberg.  And the threat of Jona's testimony was sufficiently compelling to convince Huberfeld to acknowledge his misconduct and plead guilty after the first trial, and for Officer Harrington to plead guilty prior to trial.[4]

---

[4] While Officer Grant was acquitted, as the Government indicates, "the trial outcome should not be held against Rechnitz in any way," in part because Rechnitz was closer to Reichberg than he was to Grant.  5K1.1 Motion at 30.

And, unlike Todd Howe, whom the Government cites as the recent cooperator most comparable to Jona, his cooperation was unblemished by any misconduct of any kind. *Cf. id.* at 6-7 (describing Howe's remand after making suspect challenges to credit card charges).

### C.   The Nature and Extent of Jona's Assistance

Jona proffered to the Government about each of the seven subjects listed above, and was the key Government witness in three trials (the trial of Seabrook and Huberfeld in October and November 2017; the retrial of Seabrook in August 2018; and the trial of Grant and Reichberg in November and December 2018).   By every possible metric, Jona's cooperation was an extraordinary endurance challenge.

As the Government explains, Jona met or spoke with the Government on eighty occasions over the two-and-a-half year period between May 2016 and the end of 2018. 5K1.1 Motion at 36-37.  Cooley's records reveal that these eighty sessions took a total of more than four hundred hours of time: an average of five hours per meeting.  These sessions included substantive proffers as well as prep sessions in advance of Jona's testimony in the three trials.

In addition to these eighty meetings, Jona spent nineteen days testifying: six days in the first trial of Seabrook and Huberfeld, three days in the second Seabrook trial, and ten days in the Grant and Reichberg trial.  According to Cooley's records, these nineteen trial days represented another roughly one hundred and fifty hours–an average of almost eight hours each trial day.  In the first trial, Jona spent four days being cross-examined by two seasoned members of the defense bar: Henry Mazurek (on behalf of Murray Huberfeld) and Paul Schectman (on behalf of Norman Seabrook).  *See* 5K1.1 Motion at 38.  In the second trial, Mr. Schectman crossed Jona again.  And in the third trial, two other defense lawyers took a marathon cross-examination of Jona.  Jeremy Reichberg's counsel, Susan Necheles, crossed Jona for eight days.  *Id.*  Officer Grant's attorney,

John Meringolo, also took a turn cross-examining Jona.  As the Government highlights, Jona was "publicly mocked, harangued, and called names for days on end."  *Id.*

Combining the eighty days of proffers and prep sessions, and the nineteen days of testimony, Jona spent approximately 100 days out of the roughly two and a half years between May 9, 2016, and December 31, 2018, carrying out his responsibilities as a cooperator: more than one day out of ten.

The raw time that Jona spent with the Government and testifying is only part of the story. To escape shunning and harassment that he received in New York as a result of his outing as a cooperating witness, Jona moved to Los Angeles in June 2017.  *See* Point III.D., *infra*.  This move occurred just as the Government was beginning to prepare for the first trial, meaningfully increasing the burden of his cooperation.  The majority of Jona's meetings with the Government, and all of his days testifying, occurred thereafter.  As the Government explains, Jona often took the red-eye from Los Angeles in order to participate in witness prep sessions in person in New York, never complaining about the burden or expense, and never seeking reimbursement.  *See* 5K1.1 Motion at 37.  It is not just Jona who suffered from the grueling burden of trial: Rachel writes that it took "quite a toll" on her and the children to have Jona away, sometimes for weeks at a time.  App. Ex. 21, Rachel Rechnitz Ltr. at 1.

Each of Jona's meetings and trial days in New York represented a day when he could not pursue a new career in Los Angeles, or care for his family.  Essentially, for the fifteen months of trial prep and trial time from summer 2017 until December 2018, Jona served as an unpaid employee of the Government.  He returned to New York on demand, focusing solely on his primary

responsibility of serving truthfully and honestly as a cooperating witness, and bore this burden stoically.[5]

Jona also provided meaningful corroborating documentation and other evidence to the Government when available.  This included dozens of incriminating pictures and video clips of Jona, co-conspirators, and persons of interest, tens of thousands of emails, and Jona's cellular phone.  5K1.1 Motion at 43-44.

### D.      Injuries Jona Suffered Resulting From His Assistance

Before Jona pleaded guilty, he understood that by admitting to criminal conduct and cooperating with the Government, he would likely face alienation from his community.  But neither he nor counsel ever imagined the extent of the ostracism, intimidation, and the public scorn which ensued.  The Government recognizes that Jona's significant work as a cooperator occurred "amidst the collapse of the life he had known."  5K1.1 Motion at 42.

### 1.      Notoriety

The Government notes that Jona was front-page news in the New York City tabloid press during his criminal testimony.  5K1.1 Motion at 38-39.  This is true, but not complete; news coverage about Jona has been constant, not just during his testimony.  From the time that the media first learned Jona's name in spring 2016, until the present, Jona has appeared more than six hundred and fifty times in prominent newspapers.  While interest spiked during the first reporting of the investigation and during each of the three trials, a baseline level of interest meant that in almost every single month, Jona was mentioned at least once or twice in major publications.  Indeed, over the past two and a half years, articles reporting on Jona have appeared in major newspapers on two hundred and fifty separate days–more than eight months of coverage.

---

[5] The full burden of cooperation must account for the additional time spent in transit and exhausted from the redeye.

The remarkable and persistent press interest in Jona is not just a consequence of his decision to commit newsworthy crimes.  If Jona had taken a plea of guilty without an agreement to cooperate, the details of many of his crimes would never have been made public.  He would have been quickly sentenced and would have disappeared from the headlines (as did many of the police officers who quietly retired or proclaimed their innocence in the media).  Instead, Jona chose to cooperate.  As a result, as early as June 9, 2016, when Huberfeld and Seabrook were arrested based on criminal complaints which themselves were based in large part on Jona's detailed narrative of their criminal scheme, reporters immediately deduced that Jona was a cooperating witness.  From then until the present, news articles have been able to report the crimes of Jona, Huberfeld, Seabrook, Reichberg, and the police officers in such detail *only* because of Jona's cooperation.  Jona's cooperation thus has been a churning engine of headlines for the last two and a half years.

The New York Post, in particular, has focused on Jona, writing about him more than two hundred times, and repeatedly denigrating Jona's decision to cooperate by labelling him a "rat" and a "snitch"–most recently doing so the day the Government filed its 5K1.1 Motion.  *See* App. Ex. 29, Kaja Whitehouse, *NYPD Briber Rats on Partner*, N.Y. POST, Mar. 31, 2017, at 10; App. Ex. 30, Kaja Whitehouse, *Feds Push On With Blas-Pal Corruption Probe*, N.Y. POST, Apr. 1, 2017, at 6 (calling Jona a "real-estate-investor turned-government-snitch"); App. Ex. 31, Kaja Whitehouse, *'Cop-Bribe' Figure 'Fesses to Ponzi*, N.Y. POST, May 12, 2017, at 22 (calling Jona "[Peralta's] former partner-turned-rat"); App. Ex. 32, Kaja Whitehouse, *De Blas' Felon Friend A Mall Rat*, N.Y. POST, May 27, 2017 at 6 (same); App. Ex. 40, Stephanie Pagones and Bruce Golding, *Banks' Statement – Scandal Cop Denies Bribes*, N.Y. POST, Jan. 1, 2019, at 8 (reporting Banks's assertion that "Rechnitz failed in his first attempt to become a government snitch"); App.

Ex. 42, Emily Saul, *DeB Rat Donor's Leniency Bid*, N.Y. POST, Oct. 17, 2019, at 4 ("He's the Big

Apple's best rat"); *see also* App. Ex. 43, Stephen Rex Brown, *A Good, Dirty Rat*, DAILY NEWS,

Oct. 17, 2019, at 18.

The Post also has run articles about events of Jona's life which are not, in themselves,

newsworthy.  Every incident, often crediting anonymous tips, further vilified Jona:

- In November 2016, the Post reported that Jona had attended a baseball game, writing that Jona's "good fortune left some cops fuming."  App. Ex. 28, Shawn Cohen and Larry Celona, *Bribe Cad at Series*, N.Y. POST, Nov. 1, 2016, at 22.

- In July, 2017, the Post reported that Jona had "high-tailed it out of New York" and "headed back to his native California."  App. Ex. 33, Kaja Whitehouse, *NYPD Briber Ditches NYC*, N.Y. POST, July 10, 2017, at 15.

- In October 2017, the Post reported that members of Jona's synagogue in Los Angeles had been angered by a donation Jona had made.  The article characterized Jona as a "crooked supporter of Mayor de Blasio" and a "disgraced real-estate developer."  App. Ex. 34, Kaja Whitehouse, *Blas Bribe Pal Angers LA Congregants Shul'd be a$hamed*, N.Y. POST, Oct. 4, 2017, at 21.

- In a lengthy article from the same time period, the Post reported on Jona and Rachel's social media posts dating back to 2012.  The article quoted Rachel's Facebook posts, reported about Jona's father, and described Jona's real estate work from years earlier.  App. Ex. 37, Melissa Klein, *Jona Bought Key to the City: Blas Donor Conquered Gotham With His Wallet*, N.Y. POST, Oct. 29, 2017, at 4.

- In January 2018, the Post reported that Jona had unsuccessfully attempted to broker a meeting between Mayor de Blasio and Prime Minister Benjamin Netanyahu of Israel in September 2014.  The Post quoted a mayoral spokesman for the statement that "like many other things involving this individual, the possibility of it appears to have been a figment of his imagination."  App. Ex. 38, Graham Rayman and Jillian Jorgensen, *Blas-Bibi Meet Got Rech'd – Epic Fail By Dirty Donor Jona*, N.Y. POST, Jan. 4, 2018, at 16.

- Finally, in February 2019, the Post reported that Jona had made a routine travel request to the Court, as required under his bail conditions.  Ap. Ex. 41, Priscilla DeGregory, *Rechnitz Travel Plea*, N.Y. POST, Feb. 14, 2019, at 9.

The effect of all this press coverage has been to destroy Jona's reputation in New York City much more completely than would have been possible had he taken a quiet plea of guilty and then dropped out of the news cycle.[6]

### 2. Ostracism

A second consequence of Jona's cooperation has been his expulsion from his Upper West Side community, and to a lesser extent, from his community in Los Angeles.  *See* PSR ¶¶ 57, 100.  A major component of the disapproval of the community stems from Jona's decision to cooperate with the secular Government against "fellow Jews."  App. Ex. 9, M. Hendeles Ltr. at 2. Jona had many mutual friends with Murray Huberfeld, against whom he testified, and many of them sided with Huberfeld, lobbying others in the community to ostracize him from public life. Rabbi Steven Burg, Jona's friend from New York, writes that "Jona has faced tremendous communal pressure regarding his decision to testify."  App. Ex. 3, S. Burg Letter at 2.  Jona's brother Jared sums it up: "[t]he past few years have been a personal hell for Jona, and he has paid the price for his actions tenfold."  App. Ex. 18, Jared Rechnitz Ltr. at 2.

The Upper West Side was where Jona lived since moving to New York City, and where he hoped to raise his own children.  That hope is gone now.  Mariam and Shea Schwebel write that, in the synagogue, "Jona was forbidden from being called up to the Torah and was asked to step down from organizations he had helped build and support.  He went from being the most sought after guest to being literally shunned and even yelled at by acquaintances."  App. Ex. 26, M. and S. Schwebel Ltr. at 3.  Jona was also harassed and intimidated in his daily life in Manhattan: "If

---

[6] The investigatory work that went into the writing of these articles also took its toll on Jona, his family, and his friends.  The reporters "made calls to my friends, my family, and waited outside my home for me to walk outside." App. Ex. 19, Jona Rechnitz Ltr. at 2.  Rachel writes that the publicity in the Post and "having reporters outside the building" was one of the factors that led her to fear for her children's safety in New York.  App. Ex. 21, Rachel Rechnitz Ltr. at 1.

he dared enter a restaurant to order dinner, pictures quickly circulated of him, demeaning him as if he had no right to live." App. Ex. 18, Jared Rechnitz Ltr. at 2. Jona "could not go anywhere without receiving a dirty look or a malicious comment." *Id.* at 2. Rabbi Burg writes about one such example he experienced: less than a year ago, someone confronted Rabbi Burg and reproached him after seeing him eat in a restaurant with Jona. App. Ex. 3, S. Burg Ltr. at 2. Alisa Adler, the woman whom Jona counseled as she confronted her own criminal charges, learned about Jona through gossip on the Upper West Side even before she met him in person. She recalls the intensity of the hate for him as prompting her to leave a social gathering on one occasion because "it was so painful to hear someone else speak recklessly without abandon about someone they supposedly were friendly with." App. Ex. 1, A. Adler Ltr. at 2.

Prior to the news breaking about Jona's criminal trouble, Jona and his wife had been active parents in their children's school. Jona had been on the board of directors, and his wife had been president of the PTA. After the news broke, community pressure resulted in both of them resigning their posts to avoid embarrassing the organization. Jona writes that he "cannot stress the amount of pain and suffering that we received during this time. Unimaginable pain." App. Ex. 19, Jona Rechnitz Ltr. at 2.

In June 2017, Jona and Rachel resolved to move to Los Angeles permanently to escape the hateful treatment they were receiving in Manhattan. *Id.* Rachel writes that this was necessary to protect their children and spare them from continuing to live in a hurtful environment. App. Ex. 21, Rachel Rechnitz Ltr. at 1. But "[e]ven once he moved to Los Angeles, the attacks did not stop." App. Ex. 18, Jared Rechnitz Ltr. at 3. The harassment began when they found a house to rent. Their landlord, Joseph Englanoff, writes that, within days of meeting Jona, he was receiving calls from prominent individuals in the community asking in strong terms that he "shun" Jona,

saying "'don't you dare rent to him . . . you realize he cooperated.'"  App. Ex. 6, J. Englanoff Ltr. at 1.  Others in Los Angeles confronted Jona and Rachel directly in public, aggressively taking photos and videos of them "to shame him and Rachel for being out in any way."  App. Ex. 18, Jared Rechnitz Ltr. at 3. Joshua Goldman, who runs a transportation company in Los Angeles, writes that Jona "has also gone through much suffering at the hands of certain members of the Jewish Community in Los Angeles who have ridiculed him and vindictively punished him unnecessarily and added insult and injury to him over and above the shame he has endured."  App. Ex. 7, J. Goldman Ltr. at 2.[7]

Perhaps the most distressing incident of harassment occurred in October 2017, in the synagogue Jona and his family have attended in Los Angeles for three generations.  App. Ex. 18, Jared Rechnitz Ltr. at 3.  This was mere weeks before the trial of Murray Huberfeld was to commence.  For the Yom Kippur service, Jona donated anonymously to buy an honor for his father.  *Id.*  "One member of the congregation made it his business to figure out who had purchased the honor, and then proceeded to leave services in the middle, subsequently going to a different synagogue to spread the word of Jona's donation to purchase the honor."  *Id.* at 4.  Soon thereafter, the Post reported the incident.  *Id.*; *see* Kaja Whitehouse, *Blas Bribe Pal Angers LA Congregants Shul'd be a$hamed*, N.Y. POST, Oct. 4, 2017, at 21 (quoting an anonymous source as saying "I think that [Jona's] ruined so many peoples' lives and he's sitting here just trying to pretend that nothing is wrong").  As family friend Moise Hendeles writes, the Post article "caused much embarrassment to our synagogue's reputation and to its members."  Mr. Hendeles believes that the

---

7 The shaming of Jona has also extended to the digital world.  Avi Levy, the boy from a broken home whom Jona supported for years, writes that "[p]eople who know he has helped me have said nasty things to me about him," including on Twitter.  App. Ex. 15, A. Levy Letter at 3.  And a prominent blog (lostmessiahdotcom.wordpress.com) has written dozens of posts critical of Jona over the years since his decision to testify became public.

tipper called the Post "because he was upset that Jona was willing to testify against a fellow Jew." App. Ex. 9, M. Hendeles Ltr. at 2.

The disruption in the synagogue and tip to the Post was part of a campaign to harass Jona in the lead up to his anticipated testimony in the trial of Murray Huberfeld. Other troubling incidents of intimidation occurred both before and after his testimony. Jona writes that there were "threats and private investigators after me," as well as "[t]hreatening voice messages, windows smashed at home, windows smashed in my car several times and my parents cars on the same day at their home, [and] people following me and sitting outside of my home in Los Angeles for periods of time." App. Ex. 19, Jona Rechnitz Ltr. at 1. At the time, Jona suspected that these incidents of harassment were instigated by supporters of Murray Huberfeld, and were intended to deter him from testifying at the upcoming trial; accordingly, Jona reported the incidents to the FBI. The Government has now confirmed that Jona's suspicion was correct: the FBI verified, among other things, that the vehicle that had shadowed Jona's residence was owned by persons with connections to Huberfeld. *See* 5K1.1 Motion at 41.

Jona's whole family and social circle have felt the effects of this ostracism and intimidation. Rachel "has been shunned by many former friends, his kids have been looked down upon, and many venomous remarks have been spat at [Jona's] parents." App. Ex. 18, Jared Rechnitz Ltr. at 2. Rachel herself writes that "[t]here are so many people that I have to avoid or feel uncomfortable with, having them talk behind my back." App. Ex. 21, Rachel Rechnitz Ltr. at 1. Jared still lives in New York, and has been affected "terribly." App. Ex. 18, Jared Rechnitz Ltr. at 2. He has had difficulty dating, as "people were very quick to approach whoever I was dating at the time, or her parents, and let them know what a horrible person my brother is, or that they should stay away from my family." *Id.* Jared writes, "[a]s difficult as this has been for me, it has been worse for me

27

to see the tremendous burden of guilt Jona feels for having brought this upon us.  So much so, that I have kept many of these instances from him to this day."  *Id.*

### 3.    Intimidation in the Courtroom

During Jona's testimony in the October-November 2017 trial of Huberfeld, and during the November-December 2018 trial of Reichberg, the courtrooms were packed with their supporters. *See* 5K1.1 Motion at 39.

Huberfeld's supporters were members of Jona's own social circle on the Upper West Side, many of whom he recognized.  During his testimony, they audibly reacted to his answers, requiring Judge Carter to repeatedly admonish the gallery to quiet down.  *See* App. Ex. 44, Transcript in *United States v. Seabrook*, No. 16 Cr. 467 (ALC) ("Seabrook I Tr.") at 914:20-915:1; 1071:14-25; 1249:23-24; 1337:4-5; 1400:7-13; 1405:24-25; 1447:1-4.  The audience's show of support for Huberfeld was intended to intimidate Jona and make him reconsider his decision to cooperate.  In that respect, it failed.  But Jona was nevertheless shaken.

The audience was even more hostile during the Reichberg trial.  Supporters packed the courtroom, holding up signs depicting a Rabbi in an effort to intimidate Jona.  *See* 5K1.1 Motion at 39.  Early in Jona's testimony, the Court agreed to allow Jona to take his breaks in the robing room, after audience members made a point of crowding him and staring him down each time he walked to the back of the courtroom.  *See* 5K1.1 Motion at 39-40; App. Ex. 46, Reichberg Tr. at 2454:23-2455:19.  At another point during his testimony, a member of the audience mouthed the word "liar" to Jona repeatedly.  *Id*. at 2715:9-2717:4.  Most memorably, on November 27, 2018, a member of the defense team for Officer Grant asserted that Jona was a "disgrace" as he walked into the courtroom in the morning, prompting the Court to send the jury home for the day.  *See generally id.* at 2725:21-2726:17; 2736:19-22.  The Court also, as in the Huberfeld trial, had to

repeatedly admonish the gallery to keep quiet during Jona's testimony.  *See id.* at 2983:16-17; 2994:2-9516; 4002:23-04:11; 4282:20-24.

Ari Gross, a frequent guest of the Rechnitz family at their holiday celebrations, reports that during the lead-up to the Huberfeld trial, friends of Huberfeld attempted to intimidate him into testifying falsely that Jona had committed bank fraud in connection with a commercial lease in Brooklyn, in order to discredit Jona.  *See* App. Ex. 8, A. Gross Ltr. at 2.  Ari also saw first-hand how friends of Huberfeld and Reichberg spread the word in the community "that no one is allowed to go to court to support Mr. Jona." *Id.* at 4.  When Ari himself came to the courtroom, friends of Reichberg "harassed [him] with great hostility," in front of the FBI agents.  *Id.*  Ari tried to get one former friend of Jona's to come to court to support Jona, but he declined, saying that he was "too scared from the community, and his kids won't be able to get married with community members." Another former friend "stopped talking to me, and ignores my calls until this day, for the only crime I committed, that I came to court to show support for Mr. Jona." *Id.*

### E.     The Timeliness of Jona's Assistance

Jona's assistance came without being charged.  As the Government itself acknowledges, Jona's assistance saved substantial time and resources in advancing the grand jury investigation. Thus, it was timely enough to result in the substantial number of prosecutions of other defendants referenced above.  *See* Point V.A, *supra*.  Moreover, Jona did not wait for the Government to bring charges against him; he voluntarily began proffering on his own.  As a result, as the Government acknowledges, his own charges "came pursuant to an already secured cooperation agreement." 5K1.1 Motion at 43.  His cooperation could hardly have been more timely, meriting consideration in the analysis of the § 5K1.1 factors, and also demonstrating Jona's genuine remorse and acceptance of responsibility.

## IV.    Sentencing Factors in 18 U.S.C. § 3553(a)

Title 18, United States Code, Section 3553(a) establishes the factors the Court must consider in imposing sentence.  Ultimately, "the court shall impose a sentence sufficient, but not greater than necessary, to comply with [these purposes]."  18 U.S.C. § 3553(a).  Here, the Court must balance the objectives of punishment and deterrence with that of promoting respect for the law.  We submit that only one sentence–a non-custodial sentence of time served–successfully strikes the appropriate balance.  Any sentence of imprisonment would be "greater than necessary" to accomplish the statutory objectives.

As noted above, Probation has recommended a sentence of 36 months of incarceration, representing a variance of 42 months below the low end of the Guidelines range, even without taking into consideration any of Jona's cooperation or the Government's 5K1.1 Motion.  Once that extraordinary level of substantial assistance and all of the circumstances around it are taken into account, a non-custodial sentence of time served would fully reflect all of the considerations in § 3553(a).  A sentence of imprisonment would, we submit, only undermine the objectives of § 3553(a), deterring individuals like Jona from accepting responsibility and cooperating, to the ultimate harm of the justice system.

There is no need for further deterrence.  Jona writes that he feels shame for his crimes, that it "eats me alive each and every day," and is "always on my mind for the past 4 years."  App. Ex. 19, Jona Rechnitz Letter at 1.  He goes on to write that "[a]s a supposed religious man, I have been a disgrace to my religion."  *Id.* at 2.  He has learned that "doing the right thing isn't always the easiest, but it is the only choice," and is resolved to continue doing the right thing for his family and his community.  *Id.* at 2, 4.  He now reflects before acting, "to see if it is something my parents, my family, and G-d would approve of."  *Id.* at 2.  Rachel, who has been at his side throughout, writes that "I can see that my husband has become a much better, humble, more open and truthful

person," who is "much more involved as a father and as a husband," has "revamped his priorities," and has exhibited "dramatic changes" for the better since resolving to cooperate with the Government.  App. Ex. 21, Rachel Rechnitz Ltr. at 1.  The Government also has witnessed Jona's shame and remorse: "Rechnitz's expressions of regret and embarrassment that he lost his footing on a moral level square with sentiments that he has expressed to us during his prep sessions, and in a fashion that we credit."  5K1.1 Motion at 47.[8]

Jona has also experienced more than sufficient punishment over the past several years of cooperation with the Government.  As a high-profile cooperating witness, Jona has been forced to re-live, and re-tell, every incident of the offense (and every other embarrassing episode of his life), over the eighty days of proffers with the Government, and the nineteen grueling days of trial, thereby repeatedly experiencing a painful public repentance before the eyes of the packed courtroom and the entire city, as reported in the press.  Jona writes of the "disgusting feeling" he had waking up each morning during his testimony in the trials, sometimes for a week and a half straight.  App. Ex. 19, Jona Rechnitz Ltr. at 2.  Moreover, the decision to cooperate fundamentally altered the story of his life in a way that a private and quiet plea of guilty never would have. Formerly a fixture of the Upper West Side Jewish community, with leadership roles in his children's school and his synagogue, he has now been forced to retreat to his hometown, living close to his parents in Los Angeles, in fear of being accosted on the street by friends of the men he cooperated against.  And formerly unknown to the public, he is now known in New York as a "rat"

---

[8] Jona's repentance is also demonstrated by his renewed dedication to his family.  Jona writes that the highlight of his week "used to be sitting in the NYPD Headquarters like a big Macher," but today, "my highlight is walking to Synagogue with my children every week, and I let them know it every time we walk."  App. Ex 19, Jona Rechnitz Ltr. at 3.  Rachel also attests to Jona's renewed focus on the family, writing that Jona "has become a much better, humble, more open and truthful person," and is now "much more involved as a father and as a husband."  App. Ex. 21, Rachel Rechnitz Ltr. at 1.

and a "snitch," whose every embarrassing episode has been reported in the tabloid press, no matter how insignificant.

Balanced against these punishments, a non-custodial sentence of time served communicates and promotes respect for the law.  Indeed, Jona's acceptance of responsibility and full and complete cooperation is the ultimate expression of respect for the law.  By contrast, a sentence of imprisonment would undermine, not further, the objectives of sentencing.  The deterrence that would be conveyed from a sentence of imprisonment would not invoke fear in those contemplating a criminal act; rather, it would discourage cooperation with the Government. If such offenders see that even Jona's singular and extraordinary cooperation nonetheless results in imprisonment, they will infer that the justice system is fundamentally unmoved by a defendant's choice to affirmatively assist the Government in the prosecution of others.  They will conclude that cooperation was not worth it for Jona and likewise would not be for them.  Such a message would harm the Government in its investigation and prosecution of criminal activity, particularly involving corruption and fraud.  Future offenders in Jona's position will have received the message that, rather than atone for their conduct by assisting the Government to the maximum extent they are able, they should instead keep quiet, hold out, see what the Government is able to prove, and ultimately find themselves at worst in a similar position as if they had cooperated.  Depriving the Government of the principal mechanism available to obtain insider cooperation–the prospect of a substantially different and better outcome at the time of sentencing that reflects the extent of that cooperation–will thwart the ends of justice and ultimately will allow future wrongdoers to escape accountability.

The Government notes the importance of fully crediting Jona's assistance, as only a non-custodial sentence of time served would do, and the reality that this case is perhaps unique in the

significance of the message the Court can send.  "This, too, is promoting respect for the law.  This is a message that will encourage rather than dissuade the next cooperating witness . . . .  And, crucially, it is a message that can *only* be sent in this case – in which Rechnitz's cooperation has been highly visible, its fruits have been meaningful, and its caliber has been nothing short of historic."  5K1.1 Motion at 49.

It also is not solely Jona and future offenders who must receive a message from this Court's sentence.  Senior public officials and the community at large must also hear it, particularly here, where, during the trials of Seabrook and Huberfeld, and Grant and Reichberg, the Mayor and his representatives repeatedly denigrated Jona to the press, asserting that he was a liar whose testimony should not be credited.[9]  This Court's sentence should reinforce the finality of the juries' verdicts, which, in fact, vindicated Jona as a truthful witness.  Similarly, Jona's abuse and ostracism at the hands of the community–again not as a result of his offense but as a result of his cooperation with the Government–demonstrates the need for the Court to use this sentence to deliver a message encouraging cooperation and respect for the law.

The risk of removing or diminishing the incentive for acceptance of responsibility and cooperation is particularly acute in the context of the environments in which these crimes were committed.  With regard to matters of public corruption, particularly involving law enforcement and union corruption, experience has taught us that a wall of silence hangs over and ultimately

---

[9] *See, e.g.*, App. Ex. 35, Jillian Jorgensen, *Zips Lips, Gives Press the Slip*, DAILY NEWS, Oct. 28, 2017, at 5 (quoting de Blasio spokesman as saying "If Jona Rechnitz says he bought the mayor, he is a liar.  If he says he had unfettered access, he is a liar.  The only thing Jona Rechnitz can say honestly is that he is a failed fixer of grand delusion just trying to save his own skin."); App. Ex. 36, William Neuman, *De Blasio Calls Donor Who Said Money Bought Him Access A "Liar"*, NEW YORK TIMES, Oct. 29, 2017 at A25 (quoting de Blasio as saying "You have heard a lot of tales the last few days. . . .  Jona Rechnitz has had his turn.  Now it's my turn to tell you the truth.  Jona Rechnitz is a liar and a felon.  It's as simple as that."); App. Ex. 39, Jillian Jorgensen and Greg B. Smith, *Bill's Email Trash*, DAILY NEWS, Dec. 1, 2018 at 2 (quoting de Blasio as calling Jona "a very troubled person who has committed crimes and has lied incessantly.").

shields these types of crimes from detection.  Investigations too often falter in the face of this silence, and the only reliable mechanism for breaking that wall is a cooperator with inside information.  That was the case with Jona, and, as long as cooperation is appropriately valued as mitigation at the time of sentencing, it will continue to be the case.  The alternative is to allow this conduct to remain unpunished and, particularly in the context of public officials and law enforcement most of all, corruption that goes unaddressed obliterates respect for the law and those charged with enforcing it.

The Court also must consider the need to avoid unwarranted disparities among similarly situated defendants.  In this instance, the unwarranted error would be to treat Jona as similarly situated to defendants who did not agree to plead guilty at the earliest stages of an investigation and who did not then provide the Government with years of cooperation in the form of a full, complete and truthful accounting and extensive testimony.  In considering the other defendants in this case, the Court is presented with defendants who did none of those things.  Indeed, the Court finds only individuals who were held accountable precisely because Jona made the decision to accept responsibility and assist the Government.  The Government has provided examples of cooperators in other cases who were more closely situated to Jona, such as Todd Howe and David Villanueva.  5K1.1 Motion at 6-9.  Yet, by the Government's own acknowledgement, the value of Jona's cooperation far outstripped those individuals'.  *Id.*  Further, unlike Howe, Jona never undermined his own credibility with post-offense conduct.  *Id.* at 7.  In the words of the Government, Jona's cooperation was unblemished (*Id.*) and exemplary (*Id.* at 1).  Todd Howe was in custody prior to sentencing for approximately five months because he violated his cooperation agreement and still received a sentence of time served.  *Id.* at 7.  David Villanueva, an NYPD officer whose prosecution can be traced back to Jona's cooperation, also was distinct from Jona in

that he was a public official. Villanueva was sentenced to four months of imprisonment. *Id.* at 9.

A greater sentence for Jona in this case would produce an unwarranted disparity; indeed, those

sentences reflect the appropriateness of a non-custodial sentence of time served in this case.

Finally, the Court, in imposing sentence, should take into account the need to provide

restitution to the victims of the offense. The appropriate and lawful amount of restitution in this

case is addressed further below, but any sentence of imprisonment not only would defeat Jona's

efforts to rebuild his life, it would prevent him from satisfying any restitution order imposed as

part of the sentence. To whatever extent this Court seeks to restore or repair the harm caused by

the crimes that have come before it, a sentence of imprisonment for Jona would undermine that

end.

## V.      Restitution

Probation has calculated the appropriate total amount of restitution as $1,206,000. *See*

PSR ¶¶ 53, 143. We agree with that calculation, which is based on a loss of $6,000 by the NYPD

and $1,200,000 by COBA.[10] The COBA loss amount is based on management fees charged by

Platinum Partners. *See id.* ¶ 53.

This Court has twice previously indicated that it may order restitution in this case in the

amount of $19,000,000 to COBA. *See* App. Ex. 48, Sentencing Transcript dated Feb. 12, 2019, in

*United States v. Huberfeld*, No. 17 Cr. 467 (AKH) at 63:5 ("I order restitution in the amount of

$19 million jointly and severally with Seabrook and with Rechnitz"); App. Ex. 47, Sentencing

Transcript dated Feb. 8, 2019, in *United States v. Seabrook*, 16 Cr. 467 (AKH) at 56:22-57:1 ("I

order restitution joint and severally with the other defendants involved in joint criminal activity

---

[10] It appears COBA already has secured a recovery in excess of this amount from one of the three participants in the offense, Murray Huberfeld. *See* App. Ex. 48, Sentencing Transcript dated Feb. 12, 2019, in *United States v. Huberfeld*, No. 16 Cr. 467 (AKH) at 6:18. If accurate, COBA could not now recover that money a second time from Jona.

that includes Mr. Huberfeld and Mr. Rechnitz, and perhaps Mr. Reichberg, I don't know, to be jointly and severally liable for $19 million.").  Regardless of the outcomes with regard to other defendants, a restitution order requiring Jona to pay the total amount of COBA's losses would constitute error.  Specifically, although COBA's investment was secured through the offense at hand, the loss of that investment is attributable not to any foreseeable risk but rather to the independent and unforeseeable fraudulent acts of Platinum Partners.   The Government acknowledges that "Rechnitz did not appear to know that Platinum was a fraud, or even that it was a bad investment."  5K1.1 Motion at 18; PSR ¶ 52.  Accordingly, COBA's lost investment does not place it within the statutory definition of a "victim" for the amount of that loss in the context of this sentencing.

The Mandatory Victims' Restitution Act of 1996, 18 U.S.C. § 3663A ("MVRA"), provides that a sentencing court shall order the defendant to "make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1).  A "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."  18 U.S.C. § 3663A(a)(2).  Courts have grappled with the reach of restitution over time, but it remains the case that "the loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order."  *Hughey v. United States*, 495 U.S. 411, 420 (1990); *see also In re Local # 46 Metallic Lathers Union*, 568 F.3d 81, 85 (2d Cir. 2009) ("the district court's statutory authority to award restitution under the MVRA is limited to awards to victims of the offense of conviction."); *United States v. Archer*, 671 F.3d 149, 170 (2d Cir. 2011)

(making clear that the question the district court must answer is whether the losses at issue were caused by the defendant's offense of conviction).

Restitution has been found unlawful where the defendant was convicted of one offense and then held responsible for causing a loss to another party through other conduct not part of that offense. *See Metallic Lathers Union*, 568 F.3d at 87 (rejecting restitution absent proof the loss was directly caused by the specific offense of conviction). In the context of a broader scheme or conspiracy, the Second Circuit has extended the definition of the offense for the purposes of restitution to encompass losses that were the product of an overarching fraudulent scheme. *See United States v. Paul*, 634 F.3d 668, 677 (2d Cir. 2011); *see also Archer*, 671 F.3d at 172 (the conduct producing the loss must be "an integral part of the single scheme"); *United States v. Oladimeji*, 463 F.3d 152, 159 (2d Cir. 2006). To our knowledge, however, no court has imposed restitution on a defendant where the loss was a product of the independent acts of others, separate from and not contemplated within the scheme that resulted in the offense of conviction and not foreseeable to the defendant.

We do not dispute that the purpose of the offense of conviction was to secure COBA's investment in Platinum Partners, and even though it was Murray Huberfeld and Norman Seabrook who principally stood to gain from the investment, Jona was a member of the conspiracy that sought to and did induce the investment. It is also accurate that there existed some risk of loss from investing in a hedge fund. It is error, however, to stop at this point in the analysis and impose restitution on this basis, because the investment in the hedge fund, no matter how risky, was not the proximate cause of the loss in this instance. It is evident from the Government's statements in this case as well as its prosecution of Mark Nordlicht and others that there exists substantial evidence that Platinum Partners engaged in a subsequent, separate, and independent fraud that in

fact deprived COBA of its investment.  Accordingly, the intervening and proximate cause of COBA's loss was the conduct of Platinum Partners.

Finding that COBA's funds would not have been invested in Platinum Partners absent the offense of conviction is insufficient to support restitution.  The statutory requirement for restitution is not simply a "but for" test.  *See In re Rendon Galvis*, 564 F.3d 170, 175 (2d Cir. 2009) (citing *In re Antrobus*, 519 F.3d 1123, 1126 (10th Cir. 2008)).  Restitution, to be lawful, requires proximate causation.  It is commonly accepted and a basic concept of law that an intervening event can break the chain of causation, but courts specifically have considered and confirmed that an intervening act may interrupt the chain of causation in the context of the MVRA and restitution. The Tenth Circuit, for example, reversed and remanded a restitution order because the district court failed to establish that the defendant's conduct was more than the "but for" cause of a purported victim's loss and specifically that it was the proximate cause of the loss.  *United States v. Speakman*, 594 F.3d 1165, 1171-72 (10th Cir. 2010); *see also United States v. Burns*, 843 F.3d 679, 689 (7th Cir. 2016) (finding plain error and reversing and remanding a Guidelines calculation and restitution order where the district court failed to establish proximate causation by the conduct of a defendant who fraudulently induced an investment in what ultimately was determined to be a Ponzi scheme absent a finding of the defendant's awareness of that separate fraud).  In *Speakman*, the court stated, "for purposes of determining if an individual is a 'victim' under the MVRA, an individual will be 'proximately harmed as a result of' the defendant's crime if either there are no intervening causes, or, if there are any such causes, if those causes are directly related to the defendant's offense."  594 F.3d at 1172; *see also United States v. Robertson*, 493 F.3d 1322, 1334 (11th Cir. 2007); *United States v. Cutter*, 313 F.3d 1, 7 (1st Cir. 2002); *United States v Wilfong*, 551 F.3d 1182, 1187 (10th Cir. 2008) ("the 'main inquiry for causation in restitution cases [is]

whether there was an intervening cause and, if so, whether this intervening cause was directly related to the offense conduct'" (quoting *United States v. De La Fuente*, 353 F.3d 766, 772 (9th Cir. 2003))); *United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 928 (9th Cir. 2001) ("Defendant's conduct need not be the sole cause of the loss, but any subsequent action that contributes to the loss, such as an intervening cause, must be directly related to the defendant's conduct.").

As the conduct of Platinum Partners was the intervening cause of the loss of the COBA investment, the question thus turns to whether that fraud was directly, or indeed in any way, related to Jona's conduct. It was not. Jona had no role at Platinum Partners, and unlike Murray Huberfeld, he had no inside knowledge of its operations or its struggles. The touchstone of liability for the acts of others is reasonable foreseeability. Losses caused by the acts of others that are not foreseeable are, by definition, not within the scope of the offense for which the defendant is responsible and thus not a permissible basis for punishment or a restitution order against that defendant. This is the case with regard to Jona and Platinum Partners and the loss of COBA's investment.

In this way, the course of events with the COBA investment is fundamentally different from the events of other cases such as *Paul* where the intervening event is part of the defendant's overarching course of conduct or a result of the risk assumed and contemplated by the defendant in the course of his fraud. Platinum Partners was an independent actor, engaged in a separate, unforeseeable course of conduct with which Jona had no part and of which he had no knowledge. Their conduct was a separate and intervening cause of the harm to COBA, and that conduct broke any chain of causation between the acts for which Jona stands convicted and the harm to COBA.[11]

---

[11] Indeed, although some of Platinum Partners' principals were criminally charged in the Eastern District of New York, one (SanFilippo) was acquitted by the jury, another (Levy) was acquitted in a post-trial ruling, and the third

There is no suggestion that Jona was part of any greater fraud scheme with Platinum Partners, and, unlike Murray Huberfeld, there is no basis to conclude he somehow knew of the separate, ongoing fraud at Platinum Partners.  Indeed, the Government specifically notes that Jona "did not appear to know that Platinum was a fraud, or even that it was a bad investment," and even tried to steer COBA towards the more conservative of the two investment products offered.  5K1.1 Motion at 18 and 18 n. 5.  Accordingly, COBA's investment loss was neither proximately caused by the offense of which Jona was convicted nor reasonably foreseeable to him.

## **CONCLUSION**

Accordingly, and for all of the reasons stated above, this Court should take into account all aspects of Jona Rechnitz's conduct, including both the offense and his subsequent acts of extraordinary substantial assistance, and should impose a non-custodial sentence of time served.

---

(Nordlicht) was granted a new trial, in a ruling now being appealed.  *See generally* Mem. Dec. and Order dated Sep. 27, 2019, in *U.S. v. Nordlicht*, E.D.N.Y. No. 16 Cr. 640 (BMC) (ECF No. 800).  While the full cause or causes of the failure of Platinum Partners presents a complicated factual question which may never be fully resolved, we do know that the Government prosecuted it as a fraud.  Regardless, Jona's own lack of knowledge and involvement as established by his public testimony and the Government's observations in its 5K1.1 Motion should be sufficient to show that it was not reasonably foreseeable that his actions would cause the loss of COBA's full investment.  Should the Court disagree, we submit that further discovery and fact-finding would be necessary.

New York, New York
Dated: October 21, 2019

Respectfully submitted,

COOLEY LLP

By:      /s Alan Levine
　　　　Alan Levine
　　　　Nicholas Flath
　　　　　　55 Hudson Yards
　　　　　　New York, NY 10001-2157
　　　　　　(212) 479-6000

　　　　Daniel Grooms (*pro hac vice*)
　　　　　　1299 Pennsylvania Avenue NW
　　　　　　Suite 700
　　　　　　Washington, DC 20004
　　　　　　(202) 776-2042

　　　　*Attorneys for Defendant*