UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     v.

JONA RECHNITZ,

           Defendant.

16-CR-389 (AKH)

**MEMORANDUM OF JONA RECHNITZ IN RESPONSE
TO THE COURT'S OCTOBER 30 ORDER**

COOLEY LLP

Of Counsel:

Alan Levine
Nicholas Flath
  55 Hudson Yards
  New York, NY 10001-2157
  (212) 479-6000

Daniel Grooms (*pro hac vice*)
  1299 Pennsylvania Avenue NW
  Suite 700
  Washington, DC 20004
  (202) 776-2042

*Attorneys for Defendant*

**Table of Contents**

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ....................................................................................................................... 2

ARGUMENT ............................................................................................................................ 3

I.      THE LOSS OF COBA'S INVESTMENT WAS NOT FORESEEABLE, AND
       RECHNITZ WAS NOT THE PROXIMATE CAUSE OF THAT LOSS ....................... 3

       A.     Rechnitz Thought Platinum Was Successful And Hoped That A Profitable
             Investment By COBA Would Help Build His Relationships With Both
             Seabrook And Huberfeld ........................................................................................ 3

             1.     Rechnitz believed Platinum to be a large, successful fund, backed
                     by savvy investors. ..................................................................................... 4

             2.     Rechnitz did not know Platinum was facing a liquidity shortage ............. 6

             3.     Rechnitz's knowledge of Seabrook's willingness to take a payment
                     is not indicative of "reckless indifference." ............................................... 8

       B.     The Separate, Independent Fraud at Platinum Partners was the Proximate
             Cause of COBA's Losses ........................................................................................ 9

II.     RECHNITZ HAS ACCEPTED RESPONSIBILITY AND WILL MAKE AN
      UNCONDITIONAL PAYMENT TO COBA ............................................................... 14

CONCLUSION ...................................................................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*United States v. Archer*,
   671 F.3d 149 (2d Cir. 2011)...................................................................................13

*United States v. Calderon*,
   ___ F.3d ____, 2019 WL 6482379 (2d Cir. Dec. 3, 2019).........................................11, 12, 13

*United States v. Paul*,
   634 F.3d 668 (2d Cir. 2011)...................................................................................13

*United States v. Speakman*,
   594 F.3d 1165 (10th Cir. 2010) ..............................................................................13

**Statutes**

18 U.S.C. § 3663A.....................................................................................................9, 12, 13

## PRELIMINARY STATEMENT

Jona Rechnitz, a cooperating witness, has expressed sincere remorse for his crime.  In anticipation of his sentencing, only a single issue requires further briefing: the amount of the resulting losses.  This issue affects both the sentencing guideline range and restitution.  We respectfully submit that, consistent with the determination of United States Probation ("Probation") in the Pre-Sentence Investigation Report ("PSIR"), the cognizable losses are $1,206,000, representing the conceded losses suffered by the New York Police Department ($6,000) as well as the fees earned by Platinum Partners ("Platinum") as a result of the investment by the Correction Officers' Benevolent Association ("COBA") in Platinum.

Rechnitz is not responsible for the loss of $19 million of COBA's investment.  The loss of that investment was a result of a separate and independent fraud committed by Platinum's principals, as alleged by the Securities and Exchange Commission when it put Platinum into receivership in December 2016, and as alleged by the grand jury in its indictment against the Platinum officers.  Platinum's officers concealed their fraud from Platinum's investors and from the public, and their conduct–not predictable market forces–resulted in the demise of the two Platinum funds and the loss of COBA's investment.  There is no basis or evidence that Rechnitz knew Platinum was propped up through fraud, let alone that it was facing a redemption crisis, was invested in dangerously illiquid assets, or was anything other than a large, stable, and profitable fund.  In fact, far from being an expert on hedge funds, Rechnitz was a generalist dealmaker, whose livelihood relied on his reputation and track record of success.  In this instance, Rechnitz hoped to build long-term influence with Seabrook, and an unsuccessful investment by COBA would have jeopardized that relationship, as well as Rechnitz's other relationships with high-ranking officials in the NYPD and in New York City government.  While Rechnitz knew about and facilitated (and has acknowledged the criminality of) Huberfeld's payment to Seabrook, that payment was not an

immediate and unconditional kickback, but was instead to be paid out of profits-further evidence that Rechnitz anticipated and hoped for a successful investment by COBA.  Rechnitz thus is not the proximate cause of the loss of COBA's investment and, we submit, under the law, cannot be held responsible for it.

Finally, the Court has indicated that the absence of a voluntary payment by Rechnitz to COBA undercuts his expressed remorse.  Rechnitz did not address the possibility of a payment to COBA in his primary sentencing brief, although a discussion with COBA concerning the possibility of such a payment had taken place prior to the submission of that brief.  The Court's order has clarified its view of such a payment.  Accordingly, Rechnitz is committing to pay COBA $1.2 million in a series of installments, and, as of this filing, has already transmitted the first installment of $240,000.

## BACKGROUND

In June 2016, following a series of proffers with the Government which he had initiated without any pending criminal charges, Jona Rechnitz pleaded guilty to an information charging him with a single count of conspiracy to commit honest services wire fraud, pursuant to a cooperation agreement.  Rechnitz's sentencing is scheduled for December 19, 2019.

On October 15, 2019, Probation disclosed the PSIR.  On October 16, 2019, the Government filed its Memorandum in Support of a Downward Departure Pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines and General Sentencing Memorandum (the "5K1.1 Motion") (ECF No. 70). On October 21, 2019, Rechnitz filed his sentencing memorandum (ECF No. 71).

On October 21, 2019, COBA submitted a victim impact statement to the Court, together with a memorandum of law in support of restitution.[1]

---

[1] COBA did not file their submission on the docket.

2

On October 30, 2019, the Court issued an order (ECF No. 73) (the "Order").  The Order: (I) required Rechnitz to disclose additional information to Probation; (II) stated that the Court declined to accept paragraphs 52 and 53 of the PSIR and intended to find at sentencing that Rechnitz would be "jointly and severally liable, with Seabrook and Huberfeld, for COBA's loss of $19 million;" and (III) indicated that "the absence of any offer by Rechnitz to reimburse COBA for its loss qualifies his acceptance of responsibility."

On October 31, 2019, the Court granted Rechnitz's request for an extension, permitting him to respond to points (II) and (III) of the Order by November 27.  (ECF No. 75).  On November 22, 2019, Rechnitz provided the requested financial information to Probation.  The same day, the Court granted Rechnitz a further extension, permitting him to respond to points (II) and (III) of the Order by December 6, 2019.  (ECF No. 77).

## ARGUMENT

I.  **The Loss of COBA's Investment Was Not Foreseeable, And Rechnitz Was Not The Proximate Cause of That Loss**

Jona Rechnitz objects, on both factual and legal grounds, to the Court's announced intention to order restitution of $19 million and to use $19 million, rather than $1.2 million, as the basis for the loss calculations pursuant to the U.S. Sentencing Guidelines (the "Guidelines").  *See generally* Order at 2-3.  These objections should not be read as undermining Rechnitz's acknowledgement, and sincere remorse, for having facilitated Platinum's bribe of COBA (discussed in Point III, *infra*).  Rather, these objections are necessary based on Rechnitz's role in the offense and the applicable law.

### A.  **Rechnitz Thought Platinum Was Successful And Hoped That A Profitable Investment By COBA Would Help Build His Relationships With Both Seabrook And Huberfeld**

As a factual matter, the Court errs in rejecting Probation's conclusion (PSIR ¶¶ 52-54), that

3

the reasonably foreseeable loss of the bribery offense in which Jona Rechnitz participated with

Murray Huberfeld and Norman Seabrook should reflect the total of the intended fees associated

with the investment rather than the full loss of the underlying investment.  As the Government

stated in the 5K 1.1 Motion (p. 18), and as Probation recounted in paragraph 52 of the PSIR,

> It bears noting that Rechnitz did not appear to know that Platinum
> was a fraud, or even that it was a bad investment. Aside from the
> bare fact of his being a generally sophisticated dealmaker with a
> financial background of his own, no evidence squarely shows that
> Rechnitz knew – as e-mails show Huberfeld assuredly did – that
> Platinum Partners was itself in grave financial danger at the time the
> scheme was concocted. Similarly, there is no evidence that Rechnitz
> received warnings that the hedge fund investment was not suitable
> for a benefit pension plan, akin to the warnings that Seabrook
> received from his union's attorneys and his [*sic*] from his fellow
> COBA board members in convincing them to invest. Rechnitz's role
> was as a facilitator and matchmaker, not someone deeply and
> consistently involved in the details of the fraud.

The Court disagrees with this conclusion based on the following factual inferences: (1) that

Rechnitz "had to know Platinum Partners was a high-risk fund with assets substantially invested

in illiquid securities;" (2) that Rechnitz knew Huberfeld was willing to pay a bribe to obtain funds

"to satisfy a liquidity shortage;" and (3) that Rechnitz's knowledge of Seabrook's willingness to

take a bribe displays "reckless indifference" to the suitability of Platinum as an investment for

COBA.  Order at 2-3.  The record evidence does not support any of these three inferences.

> ### 1.   Rechnitz believed Platinum to be a large, successful fund, backed by
> ### savvy investors.

The Court asserts that Jona Rechnitz "had to know that Platinum Partners was a high-risk

fund."  Order at 2.  To the contrary, as the Court acknowledges, Rechnitz believed Platinum to be

a "financially sound company."  Seabrook II Tr. at 642:15-17.  He believed it had over "a billion

dollars" in investments (Reichberg Tr. at 3266:15-17) and thought that it was a "very solid hedge

fund, as did many other sophisticated investors."  *Id.* at 3359:13-17.  Rechnitz's recollection of

Platinum's size and stability is consistent with Platinum's own representations. *See* Indictment in *United States v. Nordlicht et al.*, E.D.N.Y. No. 16-CR-640 (ECF No. 001) ("Nordlicht Indictment") ¶¶ 1, 47 (assets under management in the value arbitrage fund were reportedly $757 million at the end of 2013, and by 2016, Platinum was reporting a total of $ 1.7 billion in assets under management in both its funds).

Moreover, as he disclosed to the Government during proffer sessions, Rechnitz' view of Platinum as a successful hedge fund was based, in part, on his understanding that several of his family members had invested in Platinum, including one close relative who, alone, had invested more than $10 million.

The Court also asserts that Rechnitz had to know that Platinum was "substantially invested in illiquid securities." Order at 2. But there is no record evidence establishing that Rechnitz knew the specifics of Platinum's investments, let alone that those investments were in illiquid securities. *Cf.* Seabrook I Tr. at 1216:12-17 ("[T]he only real exposure I've had to hedge funds . . . was when [Huberfeld and I] sat and spoke about these specific cases.  I can't speak in general about hedge funds."). Instead, Rechnitz appears to have relied on Platinum's historical returns, as relayed to him by Huberfeld. *See* Seabrook I Tr. at 700:3-9. Those returns were largely "positive," and Huberfeld explained to Rechnitz that even the "down years" were "healthy for a fund." *Id.* Huberfeld's representations to Rechnitz were consistent with Platinum's representations to its investors generally, which included that its credit opportunity fund had achieved annualized returns of 10.25 percent from August 2007 through December 2015. *See* Nordlicht Indictment ¶ 3. In fact, the illiquidity of many of Platinum's investments was one of the facts concealed by Platinum from its investors and from the public. *See, e.g. id.* ¶¶ 43-49 (describing Platinum's overvaluation of, and misrepresentations concerning, illiquid assets). While Rechnitz was "pretty

5

familiar" with Platinum and its offices, that familiarity appears to have been based on having taken several tours of Platinum's offices with potential investors and having been introduced to Platinum personnel, rather than on having reviewed written due diligence or evaluated Platinum's investment strategies. *See generally* Seabrook II Tr. at 642:15-643:23.

The only record evidence shedding light on Rechnitz's awareness of the risk profiles of Platinum's products shows that Rechnitz did what he could to encourage COBA to invest in what he understood to be the more conservative of Platinum's two funds– the credit opportunity fund ("PPCO"). *See* Seabrook II Tr. at 646:4-15. In particular, in the December 2013 meetings where Rechnitz introduced Seabrook to Huberfeld, he was "insistent" that Seabrook only consider the PPCO. *Id.* at 649:16-23. During his testimony, Rechnitz explained that he knew Seabrook was "nervous" that COBA not lose money, and therefore "if there was a less risky fund I thought that, number one, that would be better, and number two, based on the returns [Seabrook] had told me they were making to date on other investments, that fit in line with the types and rates of return they were already receiving." *Id.* at 650:6-13; *see also* Seabrook I Tr. at 702:6-701:21. After these meetings, Platinum sent Rechnitz what he understood to be subscription materials for the PPCO fund, which he then forwarded to Seabrook. *See id.* at 709:4-710:17.[2]

### 2.     Rechnitz did not know Platinum was facing a liquidity shortage.

The Court asserts that Jona Rechnitz had to know that Huberfeld "was willing to pay a bribe to obtain funds to satisfy a liquidity shortage." Order at 2 (citing, *inter alia*, Seabrook II Tr. at 621:18-23). The inference that Rechnitz knew about a "liquidity shortage" appears to be based

---

[2] While Rechnitz apparently later received at least one e-mail which showed that COBA ultimately chose to invest in Platinum's Value Arbitrage fund, rather than the PPCO, he received this e-mail after he understood that COBA's administrative team had begun coordinating with Platinum, during a time when his own chance to shape the fund's decision had passed. While Rechnitz was excited that COBA had decided to invest, he did not pay attention to the fact that COBA had invested in PPVA rather than PPCO. *See generally* Seabrook II Tr. at 655:6-656:11.

primarily on the following testimony:

> Q. And what did Mr. Huberfeld tell you about Platinum Partners' business needs?
>
> A. He had told me that he was sick and tired of dealing with private individuals investing in the fund; that the individuals put money in; they make a little money; they take their money out.  There was too much volatility, and he was looking for unions or pension funds or city type of funds that would be more patient, long-term money.

Seabrook II Tr. at 621:16-23.

Nothing about this conversation would have tipped Rechnitz off that Platinum was facing a "liquidity shortage."  Instead, Huberfeld only emphasized the workaday headaches of managing the fund and the desire for institutional money from public pension and sovereign funds, a goal of all hedge funds.  Perhaps the best evidence of Rechnitz's mindset following this conversation is his response to Huberfeld: that he "had relationships with different branches in the city," and could probably make introductions to the Comptroller's office, COBA, and the NYPD.  Seabrook II Tr. at 622:1-6.  This reaction shows that Rechnitz was not concerned about Platinum's liquidity; instead, he was looking ahead to a future in which he would be a valuable deal-maker, brokering profitable and mutually beneficial investments for his contacts in city government and the NYPD with a profitable fund.  This mindset–a focus on long-term mutually beneficial relationships–is evident from Rechnitz's description of his reaction when he learned COBA had invested in Platinum: "[t]his was a very big moment for me.  I had now introduced two very important people in my life where I think I would get a *long-term benefit*, and it was working.  I was very much excited."  Seabrook II Tr. at 656:12-19 (emphasis added).  Rechnitz wanted the COBA investment to be the first in many successful deals.  If he had known that Platinum was facing a crisis, he never would have staked his nascent influence with Seabrook on the idea of COBA investing in Platinum, as that would have jeopardized everything he was hoping to achieve.

It is true, as the Court points out, that Rechnitz knew Huberfeld was willing to pay for the facilitation of a large institutional investment. *See* Order at 2 (citing, *inter alia*, Seabrook II Tr. at 600:21-601). But there is no evidence in the record that Rechnitz viewed Huberfeld's willingness to pay a commission as signaling the existence of a liquidity crisis at Platinum. Instead, it is more likely that Rechnitz inferred that Huberfeld was willing to pay a commission because he (and Platinum) would personally benefit from charging fees to COBA. Indeed, when Huberfeld and Rechnitz later discussed the specifics of the commission for Seabrook, Huberfeld explained that it would be calculated as a portion of the fees Platinum anticipated earning, and then sketched out a calculation that (while Rechnitz cannot remember it clearly) assumed strong and consistent returns. *See* Seabrook II Tr. at 641:3-642:4. Rechnitz took from his conversations with Huberfeld that COBA would earn profits from the investment, that Huberfeld would have a patient, long-term institutional investor and would benefit personally, that Seabrook would benefit personally, and that he (Rechnitz) would have facilitated it all, raising his stature and his influence. Rechnitz's facilitation of the payment to Seabrook was a crime, but the record reflects he sincerely believed that Platinum was a reliable and profitable fund.

### 3.   Rechnitz's knowledge of Seabrook's willingness to take a payment is not indicative of "reckless indifference."

The Court also points out that Jona Rechnitz knew Seabrook was willing to take a "bribe." Order at 3 (citing, *inter alia*, Seabrook II Tr. at 635:3-24). While Rechnitz knew Seabrook expected a payment, this does not permit the inference that Rechnitz displayed reckless indifference to the suitability of Platinum as an investment for COBA. Rather, Rechnitz's goal was to cultivate long-term successful relationships with both Huberfeld and Seabrook, and he "wanted [Seabrook] to make money and look good in front of his union as well." Reichberg Tr. at 3359:1-17. It would not have served that long-term plan for Rechnitz to induce COBA to make

8

a risky investment that would be likely to lose money for the union. Rechnitz knew that any losses COBA suffered would likely destroy his relationship with Seabrook and with the senior officers of the NYPD who were close to Seabrook. To execute on his strategy of building long-term influence, it was critical that Rechnitz build a track record of success. Rechnitz's insistence on not receiving a personal commission, and instead asking Huberfeld to donate to charitable institutions (Seabrook II Tr. at 647:7-24; *id.* at 719:9-720:12), is consistent with this understanding of his state of mind–he saw COBA's investment in Platinum not as a chance to stake his relationships on a chance at short-term gain, but rather as a step in his long-term plan of building influence with both Huberfeld and Seabrook and the NYPD.

The structure of the anticipated payment to Seabrook further undercuts the inference that Rechnitz was recklessly indifferent. As noted above (*supra* I.A.2), as Huberfeld explained it to Rechnitz, the payment to Seabrook would be calculated as a portion of the fees Platinum expected to earn from the COBA investment. *See* Seabrook II Tr. at 641:3-642:4 (Huberfeld would pay Seabrook 10% out of Platinum's 20% profit interest from COBA's investment). The payment was not immediate and unconditional, but rather a long-term incentive, strictly tied to the success of COBA's investment in Platinum. It was more of a commission than a kickback. Rechnitz would have understood from this anticipated structure that COBA would earn profits, that Huberfeld and Seabrook would both benefit, and Rechnitz's own personal influence would grow as a result.

### B.     The Separate, Independent Fraud at Platinum Partners was the Proximate Cause of COBA's Losses

Even if the Court's factual findings concerning Jona Rechnitz's state of mind were warranted (and they are not, as discussed in I.A, *supra*), the Court's anticipated determination that Rechnitz would therefore be responsible, both under the Sentencing Guidelines and under the Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A ("MVRA"), for the full $19

million lost by COBA, would be based on a false premise.

The Court necessarily bases its determination of loss on the inference that COBA lost $19 million due to foreseeable risks inherent in the investment, rather than due to the independent, fraudulent acts of Platinum's principals. *See* Order at 3 (concluding that Rechnitz displayed "reckless indifference" to the suitability of Platinum as an investment). The Court's focus on the extent of Rechnitz's knowledge concerning the risks attendant to an investment in a hedge fund (Order at 2-3) would be relevant if those were the risks that came to pass and resulted in the loss of COBA's investment. But this is not what the factual record reflects. The evidence that exists in the public record reflects that Platinum Partners was not offering an investment but rather was perpetrating a fraud upon those who believed they were investing with them. The SEC alleged the same basic facts in shutting down the funds and appointing a Receiver in December 2016. *See generally* Complaint in *Securities and Exchange Commission v. Platinum Management (NY) LLC et al.*, E.D.N.Y. No. 16-CV-6848 (KAM) (ECF No. 001). The United States Department of Justice reached this conclusion and pursued a criminal prosecution on this basis. A grand jury returned an indictment on this basis, in which it is alleged that Platinum undertook a variety of behind-the-scenes maneuvers to obscure that, by the time COBA invested in 2014, concealed from investors and the public was the fact that Platinum was satisfying investor redemption requests with new investor funds rather than genuine investment returns and was hiding the extent of its losses through a variety of other improper machinations. *See generally* Nordlicht Indictment ¶¶ 1-72. While the acquittals of some of Platinum's principals for this criminal charge means that *they* will not be held criminally responsible for it, the only evidence available is that a fraud did occur.

For this Court to find that the loss of COBA's funds was reasonably foreseeable to Jona Rechnitz, it would have to determine either that Rechnitz was aware of the Platinum Partners fraud

at the time he participated in the bribe payment that induced the investment or that the loss of the investment was due not to fraud but to an otherwise foreseeable investment risk.  As to the former, there is no evidence whatsoever that Rechnitz was aware of the separate criminal scheme at Platinum Partners.  *See* 5K1.1 Motion at 18.  As to the latter, the record in this case does not permit a factual determination that the loss of COBA's investment was due to investment risk rather than fraud.  Were this Court to seek to determine the cause the loss of COBA's investment, it should conduct a fact-finding proceeding in an effort to distinguish the true cause of the loss. Making a factual finding without doing so, we submit, would be error.  Conducting such a proceeding without affording Rechnitz the opportunity to receive discovery and adduce facts establishing the independent fraud at Platinum Partners as the proximate cause of the loss would deny him his due process rights at sentencing.  All of that information would be exculpatory in this case in that it would tend to undermine, and in fact disprove, the factual conclusion that the COBA investment was lost due to foreseeable risks attributable to the nature of the investment.

As the Second Circuit recently confirmed, the Court cannot impose liability for restitution absent a finding of proximate causation.  *See United States v. Calderon*, ___ F.3d ____, 2019 WL 6482379 (2d Cir. Dec. 3, 2019).[3]  In the present case, that finding would require a determination of the actual cause of the loss of COBA's investment.  Absent that determination, the Court would be basing restitution liability solely on the conclusion that, *but for* the bribe at issue, the COBA investment in Platinum Partners would not have occurred, without considering whether the proximate cause of the loss was the fact of the investment itself or, instead, an intervening and independent fraud.  Every court to consider the question has required a finding of proximate causation, as well as "but for" causation, in establishing loss.  To do otherwise here would be error.

---

[3] The Second Circuit decided *Calderon* after Rechnitz had filed his original sentencing submission.

*See generally* Def's Sentencing Mem. at 38-39; *see Calderon*, 2019 WL 6482379, at *15.

In *Calderon*, the Second Circuit reversed a restitution order after finding that the defendants had defrauded U.S. financial institutions, and those financial institutions had suffered losses, but the defendants' fraud had not proximately caused the resulting harm. In that way, *Calderon* is strikingly similar to this case. The *Calderon* defendants committed fraud that induced conduct with particular risks that could have resulted in losses; specifically, they fraudulently altered documents provided to U.S financial institutions to render them compliant with letters of credit issued by foreign banks. 2019 WL 6482379, at *5-6. These fraudulent alterations caused the banks to make advance payments while concealing two risks: (1) that the issuing banks would refuse to honor the letters of credit because the underlying documentation was in fact non-conforming, and (2) that the United States government would decline to compensate the victims for any loss, due to the non-conforming documentation. *Id.* at *16. The Second Circuit found that neither of these two risks actually materialized. Instead, ultimately, the foreign issuing banks failed during the global financial crisis, as a result of risks that had nothing to do with the defendants' fraud. *Id.* Accordingly, the defendants' fraud was not the proximate cause of the loss and restitution was not permissible under the MVRA.

Here, the bribe inducing the investment, and Rechnitz's participation in that act, can be considered the but-for cause of at least $15 million of COBA's $20 million investment,[4] just as the fraudulent acts of the defendants in *Calderon* were but-for causes of the victim banks' decisions to

---

[4] The Court's analysis overlooks that Rechnitz's testimony shows he only was directly involved in two of the three investments by COBA in Platinum, totaling $15 million. Rechnitz knew of the initial $10 million investment, and of a subsequent $5 million investment, but had no firsthand knowledge or involvement in the third investment of $5 million. *See* Seabrook II Tr. at 656:7-11 (first investment); *id.* at 681:11-21 (second investment); *cf. id.* at 682:13-22 ("Q. Now, after you learned about the second investment, the $5 million, did you learn any further investments into Platinum Partners by COBA that year?  A. No."); *id.* at 736:13-17 ("Q. Did either Mr. Huberfeld or Mr. Seabrook or Mr. Reichberg tell you about that third investment as it was happening?  A. No.  Q. Did anyone?  A. No."). Rechnitz is thus not even the actual cause of the third investment of $5 million, let alone the proximate cause.

proceed with the transactions with the foreign banks.  *Id.*at *16.  As in *Calderon*, the defrauded parties ultimately suffered injury.  However, the risk that materialized (the loss of $19 of the $20 million COBA investment) was not a result of Platinum (or, for that matter, any hedge fund) not being a suitable investment for a pension fund like COBA.  Nor did COBA lose its money due to investment risks or other market forces that could reasonably be foreseen at the time the investments were made.  Instead, COBA lost its money because of the separate and unforeseeable fraud of Platinum's principals.  This dynamic–the materialization of a separate and unforeseeable risk independent of the offense at issue–is precisely what occurred in *Calderon*, and what the Second Circuit found to be beyond the scope of the restitution provided for by the MVRA.

The prior Second Circuit decisions in *United States v. Paul*, 634 F.3d 668 (2d Cir. 2011), and *United States v. Archer*, 671 F.3d 149 (2d Cir. 2011), are consistent with this principle that defendants are liable only for losses proximately caused by their actual and intended course of criminal conduct.  *Paul* and *Archer* both involved defendants who were convicted of fraud offenses that were part of a broader fraud scheme *for which they were also culpable.  See* 634 F.3d at 677; 671 F.3d at 172.  Neither involved a separate fraud scheme perpetrated by other actors not including the defendant and of which the defendant was unaware.  Indeed, the decisions of two other circuits confirm this rule.  In *United States v. Burns*, the Seventh Circuit found plain error in the failure of the sentencing court to establish the proximate cause of the loss at issue and that such cause was known to or foreseeable by the defendant.  843 F.3d 679, 689 (7th Cir. 2016); *see also United States v. Speakman*, 594 F.3d 1165, 1171-72 (10th Cir. 2010) (rejecting restitution pursuant to the MVRA without a determination of proximate causation).  In sum, where, as in this case, two frauds occur in succession, a defendant to the initial fraud may not be held responsible for a loss resulting from the subsequent fraud unless he was party to the second fraud or, at minimum, aware

of it.  Neither is true in the present case.

Finally, the Court mistakes the basis for the loss determination of approximately $1.2 million in investment fees found in paragraph 53 of the PSIR.  *See* Order at 3.  While this amount is based on the investment fees attributable to COBA's investment with Platinum Partners, it is not premised on the amount of gain to Platinum Partners but rather on the fact that, at the time the investment was wrongly induced by the bribe, it was reasonably foreseeable to the participants in the offense that the investment would deprive COBA of that amount of money.  This loss was not a result of the subsequent fraud at Platinum Partners but was instead directly and proximately a result of the investment produced by the bribe payment. Accordingly, Rechnitz does not dispute legal responsibility for this amount of loss, both for purposes of the Sentencing Guidelines and for restitution.

## II.    Rechnitz Has Accepted Responsibility And Will Make An Unconditional Payment To COBA

The Order concluded by stating that "the absence of any offer by Rechnitz to reimburse COBA for its loss qualifies his acceptance of responsibility."  Order at 4.  In fact (not previously disclosed), Jona Rechnitz did initiate discussions with COBA to explore the possibility of his making voluntary payments to COBA, even before submitting his October 2019 sentencing memorandum and before Probation had reached the findings on restitution that it included in the PSIR.  Following the Order, Rechnitz has committed to make an unconditional and voluntary payment to COBA in the full amount of his conceded restitution obligation of $1.2 million.

As a factual matter, Rechnitz must address the Order's misapprehension that Rechnitz never offered to reimburse COBA for its loss.  In fact, Rechnitz did make an offer through counsel. On August 5, 2019, after having received a demand letter from COBA, Rechnitz's counsel met with Marc Alain Steier, the Director of Legal Affairs at COBA, along with COBA's outside

14

counsel, Nathaniel Charny.  We explained that Rechnitz was prepared to make a payment to COBA but such a payment would be far less than Huberfeld's payment as Rechnitz had far fewer assets than Huberfeld, and the great wealth COBA believed Rechnitz had was exaggerated, as they had learned at the trial.  We offered as part of the discussions to provide COBA counsel with a confidential look at Rechnitz's financial statement and hoped to persuade them that Rechnitz would contribute what he could afford.  COBA's representatives responded that any payment by Rechnitz that was not comparable to the payment made by Huberfeld ($7 million in the aggregate) would be viewed as inadequate and suspicious and would result in COBA's filing of a victim impact statement.  In the course of this discussion, COBA's representatives expressed that their constituents bore substantial personal animosity to Rechnitz and made veiled but credible threats about his safety if sentenced to prison.

Under those circumstances, when the time came to prepare for sentencing, after consulting with counsel, Rechnitz decided not to pursue further the notion of a voluntary restitution payment. Rechnitz did not want his actions to be interpreted as an attempt to buy his way out of the consequences of his acknowledged criminal misconduct rather than as a sign of sincere remorse. In addition, Rechnitz understood that the Court would make a determination as to the appropriate amount of restitution at the time of sentencing, and he did not want to preempt that legal determination.

The Court's statement in its Order has been helpful in clarifying that the Court would view a voluntary restitution payment as a necessary corollary of Rechnitz's remorse for what he did. Accordingly, counsel can inform the Court that Rechnitz has made an initial payment of $240,000 to COBA as of this filing and intends to make four subsequent and equivalent annual payments of $240,000 for a total of $1.2 million.  Jona Rechnitz concurs with Probation that he is responsible

15

for $1.2 million of COBA's loss and accepts responsibility for it.  Even though he does not have

those resources, he went out and borrowed that money personally and made an immediate payment

and obligated himself to make those payments irrespective of this current ability to do so.  So he

has gone beyond what he can actually afford to step up and accept responsibility for his share of

what COBA lost.

## CONCLUSION

Accordingly, the Court should calculate the Sentencing Guidelines and order restitution

consistent with the recommendations of Probation and should find that Jona Rechnitz has fully

accepted responsibility for his actions.

Dated:  New York, New York                          Respectfully submitted,
         December 6, 2019

                                                    COOLEY LLP

                                                    By:     /s Alan Levine
                                                    _____
                                                        Alan Levine
                                                        Nicholas Flath
                                                            55 Hudson Yards
                                                            New York, NY 10001-2157
                                                            (212) 479-6000

                                                        Daniel Grooms (*pro hac vice*)
                                                            1299 Pennsylvania Avenue NW
                                                            Suite 700
                                                            Washington, DC 20004
                                                            (202) 776-2042
                                                            *Attorneys for Defendant*