UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

UNITED STATES OF AMERICA.                          :

   V.                                              :      16 CR 389 (AKH)

JONA RECHNITZ,                                     :

                  Defendant.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x


**MEMORANDUM OF LAW IN SUPPORT OF COBA'S MOTION
FOR RESTITUTION UNDER THE CRIME VICTIMS' RIGHTS ACT**


Christopher Gunther
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
Christopher.Gunther@Skadden.com

*Attorney for The New York City Correction
Officers' Benevolent Association*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ...............................................................................................1

ARGUMENT...............................................................................................................................3

    I.      THE CVRA GIVES COBA STANDING TO BRING THIS MOTION
          AND THIS COURT JURISDICTION TO RULE ON IT ......................................3

    II.     BECAUSE RECHNITZ'S RELATIVE CULPABILITY WAS AT LEAST
          EQUAL TO HIS CO-CONSPIRATORS, THERE IS NO BASIS TO
          REDUCE HIS RESTITUTION TO A FRACTION OF COBA'S LOSS ...............4

    III.    RECHNITZ'S FINANCIAL CLAIMS HAVE BEEN UNDERMINED BY
          NEW INFORMATION .........................................................................................7

CONCLUSION...........................................................................................................................11

# TABLE OF AUTHORITIES

## CASES

*Fed. Ins. Co. v. United States*, 882 F.3d 348 (2d Cir. 2018) ................................................. 3, 4, 7

*United States v. Desnoyers*, 708 F.3d 378 (2d Cir. 2013) ............................................................ 4

*United States v. Grant*, 235 F.3d 95 (2d Cir. 2000)...................................................................... 8

*United States v. Grigsby*, 665 F. App'x 701 (10th Cir. 2016) ...................................................... 8

*United States v. Thompson*, 792 F.3d 273 (2d Cir. 2015)............................................................. 9

*United States v. Troper*, No. 09-cr-0057 (LAK), 2017 WL 1167330 (S.D.N.Y. Mar. 28, 2017) .. 8

## STATUTES

18 U.S.C. § 3664.................................................................................................................. 4, 7, 9

18 U.S.C. § 3771.................................................................................................................. 1, 3, 4

## OTHER AUTHORITIES

Amy E. Lerman, Officer Health and Wellness: Results From the California Correctional Officer
    Survey 4 (2017)................................................................................................................... 9

Steven J. Stack & Olga Tsoudis, *Suicide Risk Among Correctional Officers: A Logistic
    Regression Analysis*, 3 Archives of Suicide Research 183 (1997) ............................................ 9

## PRELIMINARY STATEMENT

The New York City Correction Officers' Benevolent Association, Inc. ("COBA") respectfully submits this memorandum of law in support of its motion for restitution pursuant to 18 U.S.C. 3771(d)(3) of The Crime Victims' Rights Act ("CVRA").  At Jona Rechnitz's sentencing on December 19, 2019, the Court orally imposed $10 million in restitution to COBA and a payment schedule of $500,000 per year.  It appears that the government has not yet submitted, and the Court has not yet signed, a written order of restitution as contemplated at the sentencing hearing.

Before the Rechnitz sentencing, the Court already had made Murray Huberfeld and Norman Seabrook each jointly and severally responsible for $19 million in restitution, the full losses suffered by COBA's members.  COBA appreciates these orders, but full payment remains doubtful.  Seabrook appears to lack financial means and has been sentenced to 58-month term of imprisonment.  Huberfeld is challenging his restitution order on appeal, also faces years of imprisonment and has obtained a stay of his payment obligations.  Altogether, COBA has recouped less than $5 million to date: an initial $4 million payment, followed by another $750,00, both from Huberfeld.

At the sentencing of Rechnitz—who may hold substantial assets—the Court appeared poised to once again order $19 million in restitution, joint and several.  However, the government made an extraordinary plea for leniency described by the Court as "the most emotional and extensive" Your Honor has ever heard from a prosecutor on behalf of a cooperating witness.  (Dec. 19, 2020 Tr. at 61:21-22).  The government argued that the Court had discretion to impose just a fractional amount of restitution, based on the dubious claim that Rechnitz was perhaps less culpable than Huberfeld and Seabrook.  (*Id*. at 34:13-16).  The Court

1

relied on this argument and orally imposed 53 percent restitution ($10 million), noting that

COBA had invested $10 million in Platinum Partners during Rechnitz's active involvement in

the bribery scheme.

COBA recognizes that the duty to impose sentence is difficult and that the Court

had to weigh the government's § 5K1.1 letter when determining the length of Rechnitz's

incarceration.  Yet when it comes to restitution, leniency for Rechnitz means severity for

COBA's members: the losses here are their retirement nest eggs.  COBA respectfully submits

that a finding of lesser relative culpability on the part of Rechnitz is at odds with his role as the

defendant who conceived of the bribery scheme, facilitated it with his own funds and personally

delivered the bribe, all to pull as much COBA money into Platinum Partners as possible.  In

short, Rechnitz is at least as blameworthy as Huberfeld and Seabrook, if not more so.  The Court

should make Rechnitz jointly and severally responsibility for the full unpaid amount of COBA's

loss: $14.25 million.[1]

The payment schedule for Rechnitz's restitution is also critically important to

COBA.  The Court found Rechnitz's various representations about his financial condition

unreliable, particularly given his exorbitant spending habits.  (Dec. 19, 2020 Tr. at 40:15-16).

Since Rechnitz's sentencing hearing, additional reasons have emerged to reject Rechnitz's

financial claims, as described below.  The Court should order Rechnitz to make immediate

payment of all restitution, and should afford Rechnitz relief from immediate payment only if he

can reliably demonstrate true need for more time to pay.

---

[1]   This increased repayment amount posts no risk of granting COBA a windfall.  Under *United States v. Nucci,* COBA cannot obtain double recovery in the context of restitution.  364 F.3d 419, 423 (2d Cir. 2004).  Should one of Rechnitz's fellow defendants make COBA whole, Rechnitz's obligation will also terminate.

**ARGUMENT**

**I.     THE CVRA GIVES COBA STANDING TO BRING THIS MOTION AND THIS COURT JURISDICTION TO RULE ON IT**

COBA has standing to move for an order of restitution under the CVRA.  The Act provides a crime victim "[t]he right to full and timely restitution as provided in law."  18 U.S.C. § 3771(a)(6).  "By vesting a *right* in victims to obtain restitution . . . the CVRA confers standing on victims to seek restitution on their own behalf . . . ."  *Fed. Ins. Co. v. United States*, 882 F.3d 348, 359 (2d Cir. 2018) (emphasis in original).  The CVRA provides that the right to restitution "shall be asserted in the district court in which a defendant is being prosecuted for the crime or, if no prosecution is underway, in the district court in the district in which the crime occurred."  § 3771(d)(3).  The Act further states that "[t]he district court shall take up and decide any motion asserting a victim's right forthwith" and allows victims to seek a writ of mandamus from the Court of Appeals in the event the motion is denied.  *Id.*

The Court's oral imposition of sentence upon Rechnitz presents no barrier to the Court's consideration of COBA's motion.  First, the steps for finalizing restitution have not yet taken place.  It appears from the ECF docket that no restitution order has been submitted by the government or approved by the Court.  Also, the Court has not issued Rechnitz's Judgment and Commitment order, and so Rechnitz has not yet filed a notice of appeal.  In addition, while COBA had the opportunity to address the Court through its president, Elias Husamudeen, at sentencing, this was not through counsel and came before the government's unexpected suggestion that Rechnitz was less culpable than Huberfeld and Seabrook.  The government had not made this argument previously.  Indeed, even Rechnitz himself did not claim lesser relative culpability in his restitution submission filed before sentencing.

Second, even if Rechnitz's sentence had become final, the statutory restrictions against reopening a sentence do not apply to COBA's motion under the CVRA. In *Fed. Ins. Co. v. United States*, the Second Circuit held that the limitations in 18 U.S.C. § 3771(d)(5) did not impede the Court of Appeals from considering a mandamus application for restitution under the CVRA. 882 F.3d at 365. The logic of *Fed. Ins. Co.* is that the CVRA affords a victim the right to move for restitution even where sentence already has been imposed. Thus, this Court likewise retains jurisdiction to consider COBA's CVRA motion for restitution.

## II.   BECAUSE RECHNITZ'S RELATIVE CULPABILITY WAS AT LEAST EQUAL TO HIS CO-CONSPIRATORS, THERE IS NO BASIS TO REDUCE HIS RESTITUTION TO A FRACTION OF COBA'S LOSS

Under the Mandatory Victim Restitution Act ("MVRA"), this Court may either "make each defendant liable for payment of the full amount of restitution or . . . apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." § 3664(h). In apportioning restitution, the district court must give a full explanation for how it arrived at the division and amount of the restitution ordered. *See, e.g.*, *United States v. Desnoyers*, 708 F.3d 378, 390 (2d Cir. 2013) (vacating and remanding a restitution order where the district court did not fully explain why it picked a particular apportionment plan and restitution amount).

On the facts here, the government erred by urging the Court to consider relative culpability as a basis to impose on Rechnitz a fraction of the $19 million restitution ordered against Huberfeld and Seabrook. The entire bribery scheme was Rechnitz's idea. It was Rechnitz who set these events into motion by identifying Seabrook as an investor and offering to approach him on behalf of Huberfeld. (Seabrook 2d Trial Tr. at 634:6-16.) It was Rechnitz who suggested the bribe, and negotiated it with Seabrook. (*Id*. at 636:2-6; 648:10-13.) And, it was

4

Rechnitz who financed the bribe, putting up his own money to pay it, and who executed the bribe by delivering a luxury bag of cash as well as hospitality to keep Seabrook happy and engaged in the scheme.  (*Id*. at 696-97, 712:1-2.)  As this Court noted, it was this bribe that Rechnitz facilitated which warped Seabrook's view of the Platinum Partners investment and led to COBA's $19 million loss.  (Dec. 19, 2020 Tr. at 13:1-4.)  Rechnitz was the opposite of a bit player.  He was the prime mover, cheerleader and principal actor in the bribe that blinded Seabrook to his fiduciary obligations to protect the assets COBA's members relied on for their retirement.  If anything, Rechnitz has *greater* culpability than his partners in crime.[2]

The Court set restitution at $10 million since this was the amount "they were discussing when [Rechnitz] and Seabrook came to terms on the bribe," (Dec. 19, 2020 Tr. at 39:21-23), and because the $10 million COBA investment in Platinum Partners was the amount Rechnitz sought.  (*Id.* at 39:9-18).  Yet Rechnitz's testimony at Seabrook's second trial indicated that $20 million was the number Rechnitz and Seabrook discussed when Seabrook first agreed to the bribe.  Seabrook agreed with Rechnitz to a kickback of $100,000 to $150,000 based on COBA investing $20 million.  (Seabrook 2d Trial Tr. at 648:5-9.)

Rechnitz and Huberfeld had other discussions that demonstrated that Rechnitz intended to elicit at least $20 million in investment from COBA.  In December 2014, Huberfeld told Rechnitz that Seabrook would be receiving only $60,000 based on the fund's performance. (Seabrook 2d Trial Tr. at 684:3-5,10-14.)  Anticipating a negative reaction, Huberfeld and Rechnitz agreed to a new method for paying the kickbacks that would yield $100,000 for

---

[2]   Near the start of sentencing, this Court asked "What's the relative culpability of a person who facilitates a bribe, the person who gives the bribe, and the person who takes the bribe?"  (Dec. 19, 2020 Tr. at 29:13-20.)  The government declined to provide an answer.  It should be noted that Rechnitz not only facilitated and gave the bribe, he also originated the whole scheme and urged it forward.

Seabrook, if $20 million was invested.  (*Id*. at 684-85.)  Although Rechnitz testified that he

thought at the time that COBA had only $15 million invested with Platinum, he brought the new

kickback scheme to Seabrook.  (*Id*. at 908:10-11, 709:19-25.)  Thus, every payment plan

Huberfeld and Rechnitz agreed to and pitched to Seabrook was based on a $20 million COBA

investment.  This makes sense because Rechnitz sought to work with Huberfeld to extract as

much as possible from COBA from the start.  During the December 2013 trip to the Dominican

Republic, Seabrook initially suggested a COBA investment of $5 to $7 million. (*Id*. at 638:17-

20.)  When Rechnitz reported back to Huberfeld after that trip, though, Rechnitz made it clear

that he saw this as merely the first installment, since the investment would "start[] with 5 to $7

million just initially, and *it would grow over time.*"  (*Id*. at 641:8-9 (emphasis added.))

Rechnitz then worked with Huberfeld to facilitate this growth: after COBA put in

its first $10 million, Huberfeld said that he wanted to get "real money from [COBA], 20 million,

50 million, 100 million."  (Seabrook 2d Trial Tr. at 657:1-2.)  Rechnitz obliged.  When the

prosecutor asked if, "to get more money from Mr. Seabrook, [Rechnitz] endeavor[ed] to continue

to impress him," Rechnitz responded "yes."  (*Id*. at 657:5-6.)  Rechnitz intended to push as much

of COBA's retirement funds to Platinum Partners as he could get Seabrook to invest and as much

as Rechnitz could get away with through the bribery scheme he conceived.  As the Court wrote

in its October 30, 2019 Order, "Rechnitz' testimony shows clearly that he knew that Norman

Seabrook, for a bribe, was willing to place *all, or at the very least a substantial portion,* of the

[COBA] pension funds in Platinum Partners ."  (Dkt. 73 at 3 (emphasis added.))

In sum, the record cannot support a finding that Rechnitz was less culpable than

Huberfeld or Seabrook.  This is especially so when one considers that $10 million in restitution

by Rechnitz would represent barely more than half of COBA's $19 million in total losses, and

only two thirds of the amount that Rechnitz knew COBA invested.  Rechnitz was not half as culpable as Huberfeld or Seabrook.  Rechnitz was, at the very least, equally culpable, and his restitution obligation should be joint and several liability for $14.25 million, the full unpaid balance of COBA's loss.

## III.   RECHNITZ'S FINANCIAL CLAIMS HAVE BEEN UNDERMINED BY NEW INFORMATION

At Rechnitz's sentencing hearing, the Court was troubled by the state of the record regarding his financial condition.  The Court observed that it could not rely on the financial information provided by Rechnitz and that his living expenses were exorbitant.  Nevertheless, the Court gave Rechnitz the benefit of the doubt in fashioning a repayment plan of $500,000 per year.  (Dec. 19, 2020 Tr. at 41:4-9.)  But, since sentencing, new information has emerged further undermining Rechnitz's already doubtful claim to need an extended period of 20 years to make restitution payments. Chasing payments to COBA through the year 2040 provides dim hope to COBA.

The MVRA provides that "[t]he court may . . . accept notification of a material change in the defendant's economic circumstances . . . from the victim."  18 U.S.C. § 3664(k).  Once a court receives this notification, it "may, on . . . the motion of . . . the victim, adjust the payment schedule, or require immediate payment in full, as the interests of justice require."  *Id.*[3]

---

[3]   Where a restitution order is deficient in light of the obligations of the MVRA, the CVRA is the proper mechanism for challenging that order.  *See Fed. Ins. Co.*, 882 F.3d at 359 (noting that the CVRA is the only tool for vindicating restitution rights provided by the MVRA).

*(cont'd)*

Here, Rechnitz did not fully disclose his financial circumstances at sentencing, and newly uncovered information suggests he can make COBA whole on a shorter timeline.[4]

Rechnitz's financial disclosures appeared incomplete even at sentencing. There, the Court noted that Rechnitz claimed to be the "majority owner of a real estate acquisition management and development firm [which] remains active and . . . owns and/or controls more than one property." Yet Rechnitz provided no details about the properties controlled. (Dec. 19, 2020 Tr. at 40-41.) Rechnitz also indicated that he had no salary, and was using $35,000 to $50,000 a month in personal loans from his business, Jadelle Jewelry and Diamonds, LLC, to cover living expenses. These expenses, the court noted in turn, "show[ed] a degree of lavishness that is hard to understand in relationship to [Rechnitz's] debts," including, $17,000 per month in rent and $5,000 in groceries and supplies. (*Id* at 40:7-12.) Altogether, this Court stated that it did not get "a sense of reliability from the figures given," (*Id*. at 40:19-20), and concluded that "that nothing [in Rechnitz's] financial statements is reliable." (*Id*. at 41:3.)

A February 10, 2020 complaint filed in the Superior Court of California reflects that this Court's intuition was accurate. The complaint alleges that Rechnitz was able to provide a $400,000 2012 Bugatti sports car and $7,000,000 in diamonds as collateral for loans from Victor Norval totaling $5,800,000. (Ex. B., ¶ 16-18, 29.) Also, the complaint alleges that

---

[4]   The failure to fully disclose financial resources at sentencing makes their discovery a material change in economic circumstances. In *United States v. Grant*, the court observed that "[s]urely . . . there would be a remedy that would permit the gathering of assets that were unknown to the authorities as the result of a defendant's dishonesty." 235 F.3d 95, 100 (2d Cir. 2000). The Tenth Circuit approved of this reasoning in *United States v. Grigsby*, holding that "[w]here . . . the court finds that a defendant failed to disclose (or knowingly concealed) assets at sentencing that would affect his ability to pay restitution, on later discovery of those assets, the court may modify its order of restitution as the interests of justice require . . . ." 665 F. App'x 701, 708 (10th Cir. 2016); see *United States v. Troper*, No. 09-cr-0057 (LAK), 2017 WL 1167330, at *4 n.12 (S.D.N.Y. Mar. 28, 2017) ("This Court agrees with the Tenth Circuit [on the logic of Grigsby].")

Rechnitz then took back the diamonds, liquidating both them and the $5,800,000 loan.  (*Id.* ¶ 31, 35.)  The complaint further includes a copy of an executed security agreement reflecting Rechnitz's agreement to secure a portion of his loans to Norval with the Bugatti sports car and jewelry.  (Ex. B., Ex. A.)  Nothing in the discussion of Rechnitz's finances or ability to repay COBA suggest that these millions of dollars in diamonds and loans were considered as his order of restitution was fashioned.

      The "primary and overarching goal of the MVRA is to make victims of crime whole [and] to compensate these victims for their losses and to restore the[m] to their original state of well-being."  *United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015) (alteration in original) (citation omitted).  Accordingly, on the receipt of new information, the MVRA gives this Court the discretion to "adjust [a restitution] payment schedule . . . as the interests of justice require." § 3664(k).  Here, greater restitution payments are essential as COBA struggles to recover in the wake of Rechnitz, Seabrook and Huberfeld's fraud.  Their scheme inflicted a double blow: COBA lost $15 million from its members' retirement funds and $4 million from its operating funds.  (Ex. A, ¶ 4, 5.)  Every member of COBA's Annuity Fund, almost 10,000 correction officers, lost 20 percent of their retirement annuity because of this scheme.  Some faced individual losses of almost $12,000.  (Dec. 19, 2020 Tr. at 36, 4-11.)  Correction officers perform extraordinarily challenging work.  They already face rates of suicide substantially higher than the general population. Steven J. Stack & Olga Tsoudis, *Suicide Risk Among Correctional Officers: A Logistic Regression Analysis*, 3 Archives of Suicide Research 183 (1997).  They also deal with rates of PTSD that exceed even those of combat veterans.  Amy E. Lerman, Officer Health and Wellness: Results From the California Correctional Officer Survey 4 (2017).  It is

tragic for COBA's members to survive such a daunting career only to find their retirement jeopardized by fraud.

COBA too has been harmed. Dealing with this fraud and its fallout has taken thousands of hours that could have been devoted to providing members with services. (Ex. A, ¶ 21.) The $4 million loss from its operating fund also has taken a toll: before the fraud, COBA operated from 75 Broadway in the heart of downtown Manhattan. Afterward, it was forced to relocate to a windowless basement in Queens. (Ex. A, ¶ 25.)

As an organization for the law enforcement community, COBA sympathizes with the need to promote cooperation from men like Rechnitz. It also is sensitive to the value in allowing a father to return to his family and restart his life. Accordingly, as COBA's President Elias Husamudeen stated at sentencing, COBA has no interest in further prison time. All COBA sought was "restorative justice of a direct kind." (Dec. 19, 2020 Tr. at 38, 1- 3.) Immediate restitution would support COBA's mission and its members' retirements. The Court should make restitution payable immediately, and should not allow more time for repayment unless and until Rechnitz reliably demonstrates a need for extended payment terms.

## **CONCLUSION**

For the reasons set forth above, the Court should order defendant Jona Rechnitz to

be jointly and severally responsible for immediate repayment of the balance of COBA's loss:

$14.25 million.

Dated: February 27, 2020

Respectfully submitted,

/s/ Christopher Gunther

Christopher Gunther
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
Christopher.Gunther@Skadden.com

*Attorney for The New York City Correction
Officers' Benevolent Association*