UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,
                                            :
              Plaintiff,
                                  :    16-CR-389 (AKH)
   - against -
                                          :
JONA RECHNITZ,
                                          :
              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF COBA'S MOTION
## FOR RESTITUTION UNDER THE CRIME VICTIMS' RIGHTS ACT

Christopher J. Gunther
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1 Manhattan West
New York, NY 10001-8602
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
Christopher.Gunther@Skadden.com

*Attorney for The New York City Correction Officers' Benevolent Association*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT..........................................................................................................................4

    I.    BECAUSE RECHNITZ'S RELATIVE CULPABILITY WAS AT LEAST EQUAL TO HIS CO-CONSPIRATORS, THERE IS NO BASIS TO REDUCE HIS RESTITUTION TO A FRACTION OF COBA'S LOSS...............4

    II.    RECHNITZ'S FINANCIAL CLAIMS HAVE BEEN UNDERMINED BY NEW INFORMATION ........................................................................................7

CONCLUSION.....................................................................................................................12

# TABLE OF AUTHORITIES

## CASES

*In re Jadelle Jewelry & Diamonds, LLC*,
No. 2:20-bk-13530-BR (Bankr. C.D. Cal. Jun. 23, 2020) ................................................. 3, 9, 10

*In re N.Y.C. Correction Officer's Benevolent Ass'n*,
No. 20-1400 (2d Cir. May 25, 2020) ............................................................................................ 2

*United States v. Desnoyers*, 708 F.3d 378 (2d Cir. 2013) ............................................................ 4

*United States v. Grant*, 235 F.3d 95 (2d Cir. 2000) .................................................................... 11

*United States v. Grigsby*, 665 F. App'x 701 (10th Cir. 2016) ..................................................... 11

*United States v. Huberfeld*, No. 19-436 (2d Cir. Aug. 4, 2020) .................................................... 1

*United States v. Rechnitz*, 16-cr-389 (SDNY June 6, 2016) ......................................................... 1

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) .................................................................... 6

*United States v. Thompson*, 792 F.3d 273 (2d Cir. 2015) ............................................................ 9

*United States v. Troper*, No. 09-cr-0057 (LAK),
2017 WL 1167330 (S.D.N.Y. Mar. 28, 2017) .............................................................................. 11

## STATUTES

18 U.S.C. § 3664 ....................................................................................................................... 4, 7

## OTHER AUTHORITIES

Amy E. Lerman, Officer Health and Wellness:
Results From the California Correctional Officer Survey 4 (2017) ........................................... 10

Jan Ransom, *Virus Raged at City Jails,
Leaving 1,259 Guards Infected and Six Dead*, N.Y. Times, May 20, 2020 ................................ 10

Steven J. Stack & Olga Tsoudis, *Suicide Risk Among Correctional Officers:
A Logistic Regression Analysis*, 3 Archives of Suicide Research 183 (1997) ............................ 10

**PRELIMINARY STATEMENT**

Pursuant to the scheduling order issued on July 31, 2020 (ECF No. 93), the New York City Correction Officers' Benevolent Association, Inc. ("COBA") respectfully submits this Memorandum of Law in support of its motion under the Crime Victims' Rights Act ("CVRA").

It is undisputed that Jona Rechnitz designed and executed a criminal scheme that has left COBA and its annuity fund with $14.01 million in outstanding loss.[1] This loss is borne by thousands of officers who have seen their retirement funds shrink by as much as 20 percent. Norman Seabrook will not make these victims whole because he lacks funds, which is why Rechnitz was able to entice Seabrook to sell out those he was elected to serve. Murray Huberfeld is wealthy but managed to have his restitution order vacated on appeal because of a clever plea deal to an offense that somehow failed to identify COBA as a victim. *United States v. Huberfeld*, No. 19-436 (2d Cir. Aug. 4, 2020) (Dkt. 202-1) (reversing $19 million restitution order).[2] COBA's remaining hope is Rechnitz. COBA seeks, therefore, to remedy two flaws in the restitution order against Rechnitz in the effort to restore its members' retirement.[3]

---

[1] As a result of the criminal scheme and the resulting government investigation, COBA lost an additional $3.02 million in legal fees. (ECF No. 83-1 at 3.)

[2] The Second Circuit's decision reversing the Huberfeld restitution order does not affect the legal basis for imposing restitution against Rechnitz. Unlike Huberfeld, Rechnitz pleaded guilty to an offense identifying COBA as the victim. *See* Information at ¶¶ 2-3, *United States v. Rechnitz*, 16-cr-389 (S.D.N.Y. June 6, 2016) (ECF No. 1) (alleging a scheme to deprive COBA of its president's honest services). In the same way, in its summary order affirming Seabrook's judgment of conviction, the Second Circuit did not disturb the restitution order against Seabrook.

[3] The sole effort Rechnitz has made to repair the damage he did to COBA was a check for $240,000, less than 2 percent of COBA's losses. This, as then-president Elias Husamudeen noted, was delivered without any consultation as to what this payment would mean for Rechnitz's ongoing obligations or guarantees that COBA would be made whole. (Dec. 20, 2019 Tr. at 38-39.)

First, the Court capped Rechnitz's restitution at $10 million, or 53 percent of COBA's loss, based on the erroneous suggestion by the government that Rechnitz may have been less culpable than his co-conspirators.[4]  Notably, the government has since abandoned its error.  When COBA filed its CVRA motion in this Court—contending that there was no basis in the record to conclude Rechnitz was less culpable—the government did not oppose the motion.  Nor did the government oppose COBA's mandamus petition, which took the same position in the Second Circuit.  Letter at 1, *In re N.Y.C. Correction Officer's Benevolent Ass'n*, No. 20-1400 (2d Cir. May 25, 2020) (Dkt. 25).  Indeed, this Court likewise appears to have recognized this flaw: in denying COBA's CVRA motion without prejudice, for lack of jurisdiction, Your Honor found "it is a compelling point, that Rechnitz, as the arranger of the bribe underlying the conspiracy, was just as responsible to make full restitution for COBA's loss as Huberfeld, the bribe-giver, and Seabrook, the bribe-taker."  (ECF No. 90 at 2-3.)  Rechnitz stands alone in continuing to claim lesser culpability.[5]  Now that the Second Circuit has returned jurisdiction to this Court, the mistake is ripe for correction by removing the $10 million cap and ordering restitution in the full uncompensated amount of $14.01 million.

Second, and perhaps more important, the restitution order allows Rechnitz to make restitution payments at $500,000 per year for the next 20 years.  Rechnitz had the burden of proving his financial condition required extended payment terms.  But Your Honor rightly

---

[4] The prosecutor did not actually assert at sentencing that Rechnitz was less culpable than his codefendants, much less offer any facts or legal analysis that would support such a conclusion.  Rather, the prosecutor summarily suggested that relative culpability might be a statutory basis for reducing Rechnitz's restitution obligation.

[5] Yet it is telling that Rechnitz did not argue lesser culpability in his various presentencing submissions to the Probation Department and this Court, or during his or his counsel's oral remarks at the sentencing hearing.  Nor did the government argue lesser culpability in its several presentence submissions addressing Rechnitz's conduct and potential restitution at length.

concluded at the sentencing hearing that Rechnitz's representations about his financial condition were unreliable, particularly given his exorbitant spending habits. (Dec. 20, 2019 Tr. at 40:15-16.) And a stream of subsequent developments have undermined Rechnitz's claimed need for time. When initially addressing COBA's CVRA motion, this Court found that COBA had provided "information elicited in a California litigation, post-sentencing, that raises serious doubt about the truth of Rechnitz's claim that he cannot afford to make payments more quickly than $500,000 per year, or in an amount more than $10 million in total." (ECF No. 90 at 2.) Since then, in an involuntary bankruptcy proceeding against Rechnitz's jewelry business, the presiding Bankruptcy Judge has found that Rechnitz obstructed the bankruptcy trustee, acted in bad faith, and pursued a "pattern of stonewalling in order to resist any and all efforts to provide vital information." Mem. Decision at 8, *In re Jadelle Jewelry & Diamonds, LLC*, No. 2:20-bk-13530-BR (Bankr. C.D. Cal. June 23, 2020) (ECF No. 83.)

This is the man COBA will be forced to chase until 2040 to protect its members' retirement—a serial fraudster with an undeniable track record of concealing his finances and resisting courts' every effort to get an truthful accounting of his assets. It is now appropriate to craft an order that will allow COBA to act decisively to protect its members' future. The Court should order Rechnitz to make immediate payment of all restitution because he has failed in his obligation to provide a full and honest accounting of his finances to this Court.

## **ARGUMENT**

I. **BECAUSE RECHNITZ'S RELATIVE CULPABILITY WAS AT LEAST EQUAL TO HIS CO-CONSPIRATORS, THERE IS NO BASIS TO REDUCE HIS RESTITUTION TO A FRACTION OF COBA'S LOSS**

Under the Mandatory Victim Restitution Act ("MVRA"), this Court may either "make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h). In apportioning restitution, the District Court must give a full explanation for how it arrived at the division and amount of the restitution ordered. *See, e.g.*, *United States v. Desnoyers*, 708 F.3d 378, 390 (2d Cir. 2013) (vacating and remanding a restitution order where the district court did not fully explain why it picked a particular apportionment plan and restitution amount).

Here, the government erred by urging the Court to find Rechnitz, the architect of the bribe, less culpable than his co-conspirations, and responsible for only a fraction of COBA's loss. Rechnitz set these events into motion by identifying Seabrook as an investor and offering to approach him on behalf of Huberfeld. (Seabrook 2d Trial Tr. at 634:6-16.) Rechnitz suggested the bribe and negotiated it with Seabrook. (*Id*. at 636:2-6; 648:10-13.) And Rechnitz financed the bribe, putting up his own cash, which he personally stuffed in a luxury bag and delivered to Seabrook. All the while, Rechnitz kept Seabrook happy and involved in the scheme by wining and dining and even paying for a vacation. (*Id*. at 696-97, 712:1-2.)

As this Court noted, it was this bribe that Rechnitz facilitated which warped Seabrook's view of the Platinum Partners investment and led to COBA's $19 million loss. (Dec. 20, 2019 Tr. at 13:1-4.) Rechnitz was the opposite of a bit player. He was the prime mover,

4

cheerleader and principal actor in the bribe that blinded Seabrook to his fiduciary obligations to protect the assets COBA's members relied on for their retirement. Rechnitz is at least as culpable as his partners in crime.[6]

This Court set restitution at $10 million on the ground that this was the amount "they were discussing when [Rechnitz] and Seabrook came to terms on the bribe," (Dec. 20, 2019 Tr. at 39:21-23), and because the $10 million COBA investment in Platinum Partners was the amount Rechnitz sought. (*Id.* at 39:9-18.) Yet Rechnitz's testimony at Seabrook's second trial indicated that $20 million was the number Rechnitz and Seabrook discussed when Seabrook first agreed to the bribe. Seabrook agreed with Rechnitz to a kickback of $100,000 to $150,000 based on COBA investing $20 million. (Seabrook 2d Trial Tr. at 648:5-9.)

Rechnitz and Huberfeld had other discussions that demonstrated that Rechnitz intended to elicit at least $20 million in investment from COBA. In December 2014, Huberfeld told Rechnitz that Seabrook would be receiving only $60,000 based on the fund's performance. (Seabrook 2d Trial Tr. at 684:3-5,10-14.) Anticipating a negative reaction, Huberfeld and Rechnitz agreed to a new method for paying the kickbacks that would yield $100,000 for Seabrook, if $20 million was invested. (*Id.* at 684-85.) Although Rechnitz testified that he thought at the time that COBA had only $15 million invested with Platinum, he brought the new kickback scheme to Seabrook. (*Id.* at 908:10-11, 709:19-25.) Thus, every payment plan Huberfeld and Rechnitz agreed to and pitched to Seabrook was based on a $20 million COBA investment. This makes sense because Rechnitz sought to work with Huberfeld to extract as

---

[6] Near the start of sentencing, this Court asked "What's the relative culpability of a person who facilitates a bribe, the person who gives the bribe, and the person who takes the bribe?" (Dec. 20, 2019 Tr. at 29:13-20.) The government declined to provide an answer, and it is difficult to imagine one that leaves Rechnitz, the bribe's architect and executor, less culpable than his co-conspirators.

much as possible from COBA from the start.  During the December 2013 trip to the Dominican Republic, Seabrook initially suggested a COBA investment of $5 to $7 million.  (*Id*. at 638:17-20.)  When Rechnitz reported back to Huberfeld after that trip, though, Rechnitz made it clear that he saw this as merely the first installment, since the investment would "start[] with 5 to $7 million just initially, and *it would grow over time.*"  (*Id*. at 641:8-9 (emphasis added).)

Rechnitz then worked with Huberfeld to facilitate this growth: after COBA put in its first $10 million, Huberfeld said that he wanted to get "real money from [COBA], 20 million, 50 million, 100 million."  (Seabrook 2d Trial Tr. at 657:1-2.)  Rechnitz obliged.  When the prosecutor asked if, "to get more money from Mr. Seabrook, [Rechnitz] endeavor[ed] to continue to impress him," Rechnitz responded "yes."  (*Id*. at 657:5-6.)  Rechnitz intended to push as many correction officers' retirement funds to Platinum Partners as he could get Seabrook to invest, and as much as Rechnitz could get away with, through the bribery scheme he conceived.  As the Court wrote in its October 30, 2019 Order, "Rechnitz' testimony shows clearly that he knew that Norman Seabrook, for a bribe, was willing to place *all, or at the very least a substantial portion,* of the [COBA] pension funds in Platinum Partners ."  (Dkt. 73 at 3 (emphasis added).)

In sum, the record cannot support a finding that Rechnitz was less culpable than Huberfeld or Seabrook.  This is especially so when one considers that $10 million in restitution by Rechnitz would represent barely more than half of COBA's $19 million in total losses, and only two-thirds of the amount that Rechnitz *knew* COBA invested.

Without reduced culpability, Rechnitz is subject to the general rule "that '[i]n each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant.'"  *United States v. Reifler*, 446 F.3d 65, 113 (2d Cir. 2006)

6

(alteration in original) (quoting 18 U.S.C. § 3664(f)(1)(A)).  Here, it was undisputed that COBA's full losses were $19 million, and Rechnitz must therefore be held responsible for the full unpaid balance of those losses, i.e., $14.01 million.

## II. RECHNITZ'S FINANCIAL CLAIMS HAVE BEEN UNDERMINED BY NEW INFORMATION

The payment schedule for Rechnitz's restitution is critically important to COBA. The MVRA provides that "[t]he burden of demonstrating the financial resources of the defendant . . . shall be on the defendant." 18 U.S.C. § 3664(e).  This makes good sense because the defendant is in the best position to marshal his financial assets, liabilities and records.  The MVRA further provides that "[t]he court may . . . accept notification of a material change in the defendant's economic circumstances . . . from the victim." 18 U.S.C. § 3664(k).  Once a court receives this notification, it "may, on . . . the motion of . . . the victim, adjust the payment schedule, *or require immediate payment in full,* as the interests of justice require." *Id.* (emphasis added).

At Rechnitz's sentencing hearing, the Court was troubled by Rechnitz's representation of his financial condition.  The Court noted that Rechnitz claimed to be the "majority owner of a real estate acquisition management and development firm [which] remains active and . . . owns and/or controls more than one property."  Yet Rechnitz provided no details about the properties controlled.  (Dec. 20, 2019 Tr. at 40-41.)  Rechnitz also indicated that he had no salary, and was using $35,000 to $50,000 a month in personal loans from his business, Jadelle Jewelry and Diamonds, LLC, to cover living expenses.  These expenses, the Court observed, "show[ed] a degree of lavishness that is hard to understand in relationship to [Rechnitz's] debts," including, $17,000 per month in rent and $5,000 in groceries and supplies. (*Id* at 40:7-12.) Altogether, this Court stated that it did not get "a sense of reliability from the figures given," (*id*.

7

at 40:19-20), and concluded "that nothing [in Rechnitz's] financial statements is reliable." (*Id*. at 41:3.) Nevertheless, the Court gave Rechnitz the benefit of the doubt in fashioning a repayment plan of $500,000 per year. (Dec. 20, 2019 Tr. at 41:4-9.)

After sentencing, new information emerged from California lawsuits that further undermined Rechnitz's already doubtful financial representations. This Court's concerns about Rechnitz's dishonest representations were first confirmed in a February 10, 2020 complaint filed in the Superior Court of California. The complaint alleged that Rechnitz was able to provide a $400,000 2012 Bugatti sports car and $7,000,000 in diamonds as collateral for loans from Victor Norval totaling $5,800,000. (ECF No. 83-2 at 7-9.) The complaint also alleged that Rechnitz subsequently took back the diamonds, liquidating them and the $5,800,000 loan. (*Id*. ¶ 31, 35.) The complaint further included a copy of an executed security agreement reflecting Rechnitz's agreement to secure a portion of his loans to Norval with the Bugatti sports car and jewelry. (ECF No. 83-2 at 21-23) This Court noted that these allegations "raise[] serious doubts about the truth of Rechnitz's" financial statements before this Court. (ECF No. 90 at 2.)[7] As this Court noted, the information "raises serious doubt about the truth of Rechnitz's claim that he cannot afford to make payments more quickly than $500,000 per year, or in an amount more than $10 million in total." (ECF No. 90 at 2.)

Rechnitz's deceptions have continued. On June 23, 2020, counsel for Jadelle Jewelry & Diamonds, LLC., one of Rechnitz's businesses (Dec. 20, 2019 Tr. at 40:5-6) indicated

---

[7] Rechnitz has previously emphasized that the California lawsuit contains only allegations, and that the assets alleged might not be useable to pay Rechnitz's restitution debts. (ECF No. 85 at 12-13.) As this Court has noted, this is not the point. This information is important not because it provides a forensic accounting of Rechnitz's resources, but because it suggests that Rechnitz's disclosures to this Court were incomplete and may have misrepresented his ability to pay even more substantially than this Court already suspected.

in that entity's bankruptcy proceedings that it would not be filing the list of creditors required by bankruptcy law because the individual who would have to prepare that information had been advised to assert his or her Fifth Amendment rights. Statement Re Creditor List at 1, *In re Jadelle Jewelry & Diamonds, LLC*, No. 2:20-bk-13530-BR (ECF No. 72.)

On June 30, 2020, Judge Barry Russell of the United States Bankruptcy Court for the Central District of California, in a decision denying a motion to stay bankruptcy proceedings against Jadelle Jewelry & Diamonds, LLC, made numerous references to Rechnitz's bad faith. Judge Russell found that "the chapter 7 trustee is in fact *seeking the truth* about the debtor's assets, and the Motion for Stay is an attempt by the debtor, and ultimately by the Rechnitzs, *to obstruct the trustee in the exercise of his statutory duties*." Mem. Decision at 4, *In re Jadelle Jewelry & Diamonds, LLC*, No. 2:20-bk-13530-BR (ECF No. 83) (emphasis added). Judge Russell then described the "debtor's continued bad faith allegations" in the bankruptcy proceedings and decried "the debtor's pattern of stonewalling in order to resist any and all efforts to provide vital information regarding its creditors." *Id.* at 6, 8.

"The 'primary and overarching goal of the MVRA is to make victims of crime whole' [and] to 'compensate these victims for their losses and to restore the[m] to their original state of well-being.'" *United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015) (alteration in original) (citation omitted). COBA's members lost $15 million from their retirement funds, and COBA lost $4 million from its operating funds. (ECF No. 83-1 at 2.) Every member of COBA's Annuity Fund, almost 10,000 correction officers, lost 20 percent of their retirement annuity because of this scheme. Some faced individual losses of almost $12,000. (Dec. 20, 2019 Tr. at 36, 4-11.) Correction officers perform extraordinarily challenging work. They already face rates of suicide substantially higher than the general population. Steven J. Stack &

9

Olga Tsoudis, *Suicide Risk Among Correctional Officers: A Logistic Regression Analysis*, 3 Archives of Suicide Research 183 (1997). They also deal with rates of PTSD that exceed even those of combat veterans. Amy E. Lerman, *Officer Health and Wellness: Results From the California Correctional Officer Survey* 4 (2017). COBA's members have also been disproportionately affected by COVID-19. As early as May 20, the New York Times reported that "[t]he coronavirus has wreaked havoc on New York City's 9,680 correction officers and their supervisors," leaving 1,259 infected and six dead. Jan Ransom, *Virus Raged at City Jails, Leaving 1,259 Guards Infected and Six Dead*, N.Y. Times, May 20, 2020. It is tragic for COBA's members to survive such a daunting career only to find their retirement jeopardized by fraud. That fraud was the brainchild of Jona Rechnitz.

COBA, too, has been harmed. Dealing with this fraud and its fallout has taken thousands of hours that could have been devoted to providing members with critical services. (ECF No. 83-1 at 4.) The $4 million loss from its operating fund also has taken a toll: before the fraud, COBA operated from 75 Broadway in the heart of downtown Manhattan. Afterward, it was forced to relocate to a windowless basement in Queens. (ECF No. 83-1 at 5.) Finally, COBA has been forced to spend $3.02 million in legal fees dealing with the bribery scheme initiated by Rechnitz and the resulting government investigation. Footnote 1, *supra*.

Immediate repayment is also important given the risk that Rechnitz will continue to conceal and dissipate assets. In denying Jadelle Jewelry's request for a stay of bankruptcy proceedings, Judge Russell concluded that "[i]t appears that the assets *may have been dissipated by the Rechnitzs* and that there may be millions of dollars in missing jewelry, which the Court considers to be in dire need of investigation by the chapter 7 trustee." Mem. Decision at 9, *In re Jadelle Jewelry & Diamonds, LLC*, No. 2:20-bk-13530-BR (ECF No. 83) (emphasis added).

10

Judge Russell thus denied the stay, noting that "Time is not on the side of . . . the debtor's creditors . . . . It is crucial for the trustee complete to his efforts to determine the existence, nature, amount and current location of the debtor's assets so that he may marshal them and, if necessary, institute litigation to recover them." *Id.* at 8-9.  So too here: time is not on the side of COBA's members.  Every day their retirement losses remain unpaid is a day that their future security is in doubt.  The Court should make restitution payable immediately because Rechnitz had failed his obligation to present an honest accounting of his finances to this Court.

Courts have found the reassessment of a defendant's restitution schedule is appropriate when, as here, there is evidence that he presented his finances dishonestly.  *See, e.g.*, *United States v. Grant*, 235 F.3d 95, 100 (2d Cir. 2000) ("[S]urely . . . there would be a remedy that would permit the gathering of assets that were unknown to the authorities as the result of a defendant's dishonesty."); *United States v. Grigsby*, 665 F. App'x 701, 708 (10th Cir. 2016) ("[W]here . . . the court finds that a defendant failed to disclose (or knowingly concealed) assets at sentencing that would affect his ability to pay restitution, on later discovery of those assets, the court may modify its order of restitution as the interests of justice require . . . ."); *United States v. Troper*, No. 09-cr-0057 (LAK), 2017 WL 1167330, at *4 n.12 (S.D.N.Y. Mar. 28, 2017) ("This Court agrees with the Tenth Circuit [on the logic of Grigsby].")  Having engaged in such deception, Rechnitz should bear the consequences and be ordered to make immediate payment of restitution.

## **CONCLUSION**

For the reasons set forth above, the Court should order defendant Jona Rechnitz to make immediate repayment of the balance of COBA's loss: $14.01 million.

Dated: August 7, 2020

Respectfully submitted,

/s/ Christopher J. Gunther

Christopher J. Gunther
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1 Manhattan West
New York, NY 10001-8602
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
Christopher.Gunther@Skadden.com

*Attorney for The New York City Correction Officers' Benevolent Association*