UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
:
UNITED STATES OF AMERICA                  :
:   **OPINION & ORDER**
:   **GRANTING MOTION FOR**
-against-                                 :   **RESTITUTION**
:
:   16 Cr. 389 (AKH)
:
JONA RECHNITZ,                            :
:
                      Defendant.          :
:
-------------------------------------------------------------- X

ALVIN K. HELLERSTEIN, U.S.D.J.:

    The New York City Correction Officers' Benevolent Association, Inc. ("COBA") moves for restitution under the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, seeking the immediate payment of COBA's unpaid loss, approximately $14 million.[1] *See* ECF No. 81. Rechnitz's appeal from his sentence was pending at the time the motion was filed, and I ruled that I had been divested of jurisdiction to rule on the motion. *See* ECF No. 90. COBA petitioned the Second Circuit to issue a writ of mandamus to allow me to consider its motion, and its petition was granted. The Second Circuit returned jurisdiction to the district court with a mandate to "reconsider its assessment of [Rechnitz]'s culpability and financial conditions in light of the new evidence presented by [COBA] and any other [relevant] factors." Mandate (ECF No. 104) at 2. Rechnitz then petitioned the Second Circuit to order that COBA's motion be heard by a different judge and to reverse my ruling refusing to give confidential treatment to the details of financial contributions to Rechnitz by his family and friends. *See* ECF No. 134. The Second

---

[1] In anticipation of sentencing, Huberfeld entered into an agreement with COBA to pay it $7 million over a three-year span, by December 31, 2022. COBA represents that it has received approximately $5 million, and $14.01 is due to it. *See* Oral Arg. Tr. at 4:10–23.

Circuit denied Rechnitz's motion to transfer the case to a different judge but granted his motion for confidential treatment. *See* ECF No. 145.

Pursuant to the Mandate of the Second Circuit, I have reconsidered my assessment of Rechnitz's culpability and financial condition. I grant COBA's motion for full restitution. Since a reliable picture of Rechnitz's financial condition remains elusive and prevents me from imposing a rational payments schedule, judgment may now be entered in favor of COBA and against Rechnitz in the full amount of COBA's remaining loss, $12.01 million.

**BACKGROUND**

On June 8, 2016, Jona Rechnitz pleaded guilty to one count of conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 1349. *See generally* ECF No. 43. The Information alleged that, beginning in 2013, Rechnitz engaged in a bribery scheme involving Norman Seabrook, then the president of COBA, and Murray Huberfeld, a principal of Platinum Partners L.P. ("Platinum"), a hedge fund. Pursuant to the bribery scheme, Seabrook caused COBA to invest $20 million, substantially all of COBA's pension fund including reserves, in three tranches over the course of 2014 into Platinum. In exchange for the investment, Seabrook was promised a share of the yearly revenue that Platinum expected to gain from the investment. Rechnitz arranged the bribe of Seabrook on behalf of Platinum. Seabrook 2nd Trial ("Trial") Tr. at 648, 650. Seabrook's cut, to be given to him at the end of the year, was estimated to be $100,000. *Id*. at 648. Huberfeld, however, did not pay Seabrook $100,000 as promised, claiming that "the fund did not perform as expected and that he did not do as well as he had thought." *Id*. at 684. Through Rechnitz, Huberfeld and Seabrook settled at $60,000, with a promise of $100,000 per year thereafter, one-half percent of COBA's

continuing investment of $20 million, payable quarterly. *Id*. Rechnitz advanced the $60,000 bribe to Seabrook on December 11, 2014, *id.* at 694, and Huberfeld reimbursed Rechnitz with Platinum's funds, disguised as payment for courtside basketball tickets, *id*. at 687.

Rechnitz's own testimony at Seabrook's retrial shows that he was the architect and prime mover of the bribery scheme. He identified Seabrook to Huberfeld as a potential institutional investor in Platinum Partners, *id*. at 634:8–10, offered to approach Seabrook on behalf of Huberfeld, *id*. at 634:14–16, suggested and negotiated the bribe with Seabrook, *id*. at 641:5–10, advanced the bribe money, *id*. at 697:25–98:1, and hand-delivered the $60,000 bribe in cash in December 2014, stashed inside a Ferragamo men's handbag, *id*. at 709:15–17. $19 million of COBA's $20 million investment in Platinum Partners was lost when Platinum, soon thereafter, became unable to pay its debts and filed for bankruptcy protection. The prosecutions of Rechnitz, Seabrook, and Huberfeld followed in due course.

On December 20, 2020, I sentenced Rechnitz. I already had sentenced Seabrook and Huberfeld to 58- and 30-months' imprisonment respectively, and ordered each to pay full restitution of $19 million, jointly and severally. Rechnitz had given substantial cooperation to the Government in several prosecutions, additional to the prosecutions of Seabrook and Huberfeld, and the Government moved for appropriate sentencing consideration in light of that cooperation. Rechnitz Sentencing Tr. (ECF No. 80) at 42–43.

I remarked at Rechnitz's sentencing that I considered his culpability equal to that of Huberfeld and Seabrook. Rechnitz was the arranger; Huberfeld was the bribe-giver; and Seabrook was the bribe-taker. *Id* at 11–13. Because Huberfeld had pleaded guilty and Seabrook was convicted after trial, and because Huberfeld was not guilty of a breach of trust, I accepted a guideline explanation for the sentencing differential between Seabrook and Huberfeld.

Huberfeld Sentencing Tr. (16 Cr. 467, ECF No. 300) at 42. As to Rechnitz, I considered that, because of his substantial cooperation, he was entitled to a discount of the sentence I gave to Huberfeld. Rechnitz Tr. at 83–84.[2] Following further discussions with government and defence counsel, I gave Rechnitz 5 months of custody and three years of supervised release.

With respect to restitution, Rechnitz argued at sentencing that there was a lack of causation between his conduct and COBA's loss. *Id.* at 21. I rejected his argument, ruling that Rechnitz's conduct "caused the closing of the eyes of those who had to make the investment," and directly and proximately harmed COBA as a crime victim. *Id.* at 26:13–19 ("[B]y making a bribe and inducing an investment, that all the normal attributes that go into an investment of fiduciary funds were overlooked and disregarded because . . . the agreement to pay a commission that would be in direct proportion to how much would be invested . . . caused the closing of the eyes of those who had to make the investment.").

The government argued for a $10 million cap on Rechnitz's restitution obligation, citing his extensive cooperation with the Government, the financial condition he presented, and the $10 million initial investment by Seabrook after he agreed to accept Rechnitz's offer of a bribe. I held Rechnitz liable for COBA's entire $19 million loss but, considering Huberfeld's joint and several liability for the full $19 million and the amplitude of assets that Huberfeld owned or controlled, I capped Rechnitz restitution obligation at $10 million, and imposed a payment obligation payment of "$500,000 per year, payable in equal monthly instalments, due on the last day of each month." *See* Judgment (ECF No. 84) at 5.

---

[2] The Second Circuit reversed Huberfeld's sentence. The Second Circuit held that Huberfeld had no restitution obligation to COBA since his plea of guilty was to a $60,000 fraud against Platinum Partners, and not to a $19 million fraud against COBA. *See* 16 Cr. 467, ECF No. 333. Huberfeld ultimately was sentenced by Hon. Lewis J. Liman to seven months' confinement and restitution of $60,000 to Platinum Partners. *See id.*, ECF No. 402.

On February 27, 2020, COBA moved for restitution under the CVRA. However, Rechnitz's appeal had divested me of jurisdiction, and I denied the motion. On COBA's petition, the Second Circuit issued a writ of mandamus, and returned jurisdiction to me so that the district court can "reconsider its assessment of [Rechnitz]'s culpability and financial condition in light of the new evidence presented by [COBA] and any other [relevant] factors." *Id.* Pursuant to the mandate, I ordered Rechnitz to disclose current and reliable information as to his financial condition, to identify those of his family and friends who were giving him money to pay his very substantial debts, and to disclose the information to COBA, the moving party. *See* ECF No. 124. Rechnitz resisted, claiming privacy, *see* ECF No. 127, and again petitioned for mandamus and a change of sentencing judge. On July 1, 2021, the Second Circuit granted Rechnitz's claim for financial privacy and denied his petition for my recusal. *See* ECF No. 140. Rechnitz offered an ex parte disclosure, but I declined to consider ex parte information. I held oral argument on COBA's motion for full restitution on August 3, 2021.

## DISCUSSION

My task under the Second Circuit mandate is to "reconsider [the court's] assessment of [Rechnitz]'s culpability and financial condition in light of the new evidence presented by [COBA] and any other factors found relevant." Rechnitz argues that such a review is untimely since motions for reconsideration must be filed within 14 days after a court order, and COBA's motion was made more than 60 days after Rechnitz's sentencing.[3] But COBA's

---

[3] The Court's Local Civil Rule 6.3 reads:

> *Unless otherwise provided by the Court or by statute or rule . . . , a notice of motion for reconsideration or reargument of a court order determining a motion shall be served within fourteen (14) days after the entry of the Court's determination of the original motion, or in the case of a court order resulting in a judgment, within fourteen (14) days after the entry of the judgment.*

S.D.N.Y. L. Civ. R. 6.3 (emphasis added).

motion for restitution was filed pursuant to the CVRA, and not as a motion for reconsideration. It is not time-bound.[4]

The CVRA guarantees to crime victims "full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6). Procedurally, the rights may be asserted by "Motion for Relief and Writ of Mandamus," "in the district court in which a defendant is being prosecuted for the crime . . . ." 18 U.S.C. § 3771(d)(3). The CVRA does not impose a date by which a crime victim must make a motion for full and timely restitution. *See generally* 18 U.S.C. § 3771. Although Section 3771(d)(5)(B) of the CVRA permits a victim to re-open a plea or sentence "only if . . . the victim petitions the court of appeals for a writ of mandamus within 14 days," the last paragraph of Section 3771(d)(5) provides that the limits on relief set forth in that paragraph "do[] not affect the victim's right to restitution as provided in title 18, United States Code." According to the Second Circuit, "the most straightforward reading of that sentence is that petitions seeking restitution are exempted from *all* of the section's limitations, including its fourteen-day deadline for seeking mandamus to reopen a sentence." *Fed. Ins. Co. v. United States*, 882 F.3d 348, 363 (2d Cir. 2018) (emphasis added); *see also* S.D.N.Y. L. Civ. R. 6.3 (imposing the 14-day time frame "[u]nless otherwise provided by the Court or by statute or rule").

COBA's motion for restitution under the CVRA is its first such motion, and this will be my first ruling on its substance.[5] The Second Circuit's mandate orders me to make such a ruling. Rechnitz's argument of untimeliness is denied.

---

[4] Rechnitz made essentially the same argument to the Second Circuit. The Second Circuit held that COBA's motion was not untimely ("First, we decline to dismiss the CVRA petition as untimely." Mandate, ECF No. 104, at 2.).

[5] Rechnitz argues that, because COBA made a number of pre-sentence submissions seeking full restitution, COBA's right under the CVRA "was fully vindicated." Opp'n Br. at 14. However, pre-sentence submissions are not motions under the CVRA. The probation report is required to discuss victim impacts, and customarily seeks the views of crime victims. *Cf.* Fed. R. Crim. P. 32(d)(2)(B) ("The presentence report must also contain the following . . . (B) information that assesses any financial, social, psychological, and medical impact on any

6

I.        **COBA is Entitled to Full and Immediate Restitution.**

COBA moves for full and immediate restitution of the balance of COBA's loss approximately in the amount of $14 million.[6] COBA argues that (i) Rechnitz's relative culpability is at least equal to his co-conspirators', and (ii) that new information, since sentencing, confirms that Rechnitz's argument is baseless that he lacks financial ability to pay his just debts. Oral Arg. Tr., ECF No. 152, at 5:20–6:17; 14:12–16:6. Indeed, Rechnitz offers no reliable information why he cannot pay COBA while, at the same time, collateralizing new loans of millions of dollars and maintaining a sybaritic lifestyle.

    a.    **Relative Culpability.**

As the Second Circuit explained, "the CVRA's reference to restitution is a purely procedural one, intended to facilitate a victim's ability to participate directly in the criminal process." *Federal Insurance*, 882 F.3d at 358. The substantive provisions governing restitution to crime victims are provided in the Mandatory Victim Restitution Act ("MVRA"). *See id.* Under the MVRA, "[i]f the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h). The MVRA further instructs that the court shall order the full amount of the restitution to the victim "without consideration of economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A); *Federal*

---

victim . . . ."); Carrie L. Mulholland, *Sentencing Criminals: The Constitutionality of Victim Impact Statements*, 60 Mo. L. Rev. 731, 735 (1995) ("Congress also enacted the Victim and Witness Protection Act of 1982 to 'enhance and protect the necessary role of crime victims and witnesses in the criminal justice process.' This Act amended the Federal Rules of Criminal Procedure to require the inclusion of victim impact as part of the presentence report submitted to the sentencing authority." (citations omitted)). It was not intended to limit a crime-victim's right to file motions under the CVRA and have it considered on its merits.

[6] See N. 1, *supra*. To date, according to COBA's representation, it has been paid approximately $5 million and seeks restitution of $14.01 million.

*Insurance*, 882 F.3d at 357 ("The MVRA, adopted in 1996, changed preexisting substantive entitlements by . . . requiring convicted criminals to make payments of restitution to victims of certain specified crimes without consideration of the defendant's economic circumstances."). The defendant's economic circumstances—including projected earnings, other income, and any financial obligations—are relevant only to the "manner in which, and the schedule according to which, the restitution is to be paid." 18 U.S.C. § 3664(f)(2).

Interpreting the MVRA, courts of appeals including the Second Circuit repeatedly recognize a district court's wide discretion in either imposing on a defendant the full amount of losses suffered by victims or apportioning a lesser amount among the defendant and any co-conspirators to reflect their relative culpability and financial circumstances. *See, e.g.*, *United States v. Ketabchi*, 832 F. App'x 41, 49 (2d Cir. 2020) ("[Defendant] submits first that the court should have apportioned a lesser amount to him to reflect his lesser role in the scheme and his economic circumstances. But the MVRA plainly vests discretion in a court not to do so."); *United States v. Gozes-Wagner*, 977 F.3d 323, 346 (5th Cir. 2020) ("Thus, not only was the court bound to render a restitution award against Gozes-Wagner, there is no doubt that it had the authority to hold her jointly and severally liable for the full loss to Medicaid that occurred during her participation in the conspiracy."); *United States v. Squirrel*, 588 F.3d 207, 212 (4th Cir. 2009) ("However, in cases involving multiple defendants, 18 U.S.C. § 3664(h) explicitly gives a district court discretion as to whether joint and several liability should apply or whether liability should be apportioned among the defendants"); *United States v. Woodard*, 208 F.3d 219 (8th Cir. 2000) (finding that, although the district court could have apportioned restitution liability, the district court did not abuse its discretion in ordering a defendant to pay the full amount).

8

At sentencing, I held Rechnitz jointly and severally liable, with Huberfeld and Seabrook, for COBA's loss, but limited Rechnitz's payments in ways that I did not do with Huberfeld and Seabrook. I considered that Huberfeld had the means readily to pay the entire loss, and ordered such restitution. *See* Huberfeld Sentencing Tr. at 63. I considered that Seabrook had little or no means to pay and ordered his restitution to run at the rate of 10 per cent of his net income following the completion of his custody and during the period of his supervised release. *See* Seabrook Sentencing Tr. at 57. By capping Rechnitz's payment obligation to $10 million, payable during his supervised release at the rate of $500,000 per year, I considered that he could make such payments and that, if he failed to do so, he would be violating a condition of supervised release and risking additional periods of jail. Rechnitz Sentencing Tr. at 87:3–11. I considered that between Huberfeld's obligation, well supported by his assets, and Rechnitz's obligation, full restitution would be made to COBA in a relatively short period.

My considerations did not turn out. The Second Circuit reversed my order as to Huberfeld's restitution, holding that the Government's choice of the crime to which Huberfeld had pleaded guilty — a fraud of $60,000 against Platinum Partners to cover the bribe to Seabrook, and not a $19 million fraud against COBA — absolved Huberfeld from a restitution obligation to COBA. *See United States v. Seabrook*, 968 F.3d 224 (2d Cir. 2020).

Rechnitz now seeks a windfall from the outcome of Huberfeld's case. Such an outcome would create a gross injustice, both to COBA and to the respect that people should have for the criminal law. See 18 U.S.C. § 3553(a)(1)–(7) (describing considerations for sentencing).

Rechnitz's testimony at the Seabrook trial shows that he was both the architect and executor of the bribery scheme. He identified Seabrook to Huberfeld as an investor, Trial Tr. at 634:8–10 ("I was hoping to accomplish further excelling [on a trip to Punta Cana] our

9

relationship . . . , and I also had a plan to approach Norman [Seabrook] about potentially investing in Platinum."); offered to approach Seabrook on behalf of Huberfeld, *id.* at 634:14–16 ("Murray and I had previously spoken about his need for institutional investors, and I told him that I would approach Norman."); suggested and negotiated the bribe with Seabrook, *id.* at 641:5–10 ("I told [Huberfled] that I had a good conversation with Norman and that Norman would be setting up a meeting when we got back to introduce the fund to COBA, and that he was talking about starting with 5 to $7 million just initially, and it would grow over time, and that we would have to figure out a formula of how much money Norman would make for the investment."); fronted the bribe money, *id.* at 697:25–98:1 ("I opened up my safe, and I took out $60,000 in cash.  I stuffed it into the bag."); hand-delivered the bribe, *id.* at 709:15–17 ("So I got in the car and I gave Norman the bag and I told him that this was $60,000, and I know it's not exactly what he's expecting."); and continued wining and dining Seabrook to maintain the scheme, *id.* at 896:3–7 ("Q. You had dinner with Mr. Seabrook and others, then you drove to a Torah ceremony?  A. That was after giving him the bag, yes.  Q. And then you went to a cigar bar?  A. Yes.").

   The Government represented, in support of Rechnitz's argument at sentencing, that a limit of $10 million in restitution obligations was fair because that was the amount "they were discussing when [Rechnitz] and Seabrook came to terms on the bribe."  Rechnitz Sentencing Tr. at 39:21–23.  My re-assessment of the record in response to the Second Circuit mandate shows just the opposite, that the bribe was for Seabrook to invest $20 million, and more if he had it, and that Rechnitz was the prime mover in arranging the bribe.

   Rechnitz testified that in December 2014, Huberfeld told him that Seabrook would be paid only $60,000 because Platinum had not performed as anticipated.  Trial Tr. at

684:3–5, 684:10–14. Anticipating Seabrook's ire, Rechnitz arranged, and Huberfeld and Seabrook agreed, to pay Seabrook $100,000 per year if $20 million was invested. *Id*. at 684–85. Huberfeld told Rechnitz that he wanted to get "real money from [COBA], 20 million, 50 million, 100 million." *Id*. at 657:1–2. When the Government asked Rechnitz whether, "to get more money from Mr. Seabrook, [Rechnitz] endeavor[ed] to continue to impress him," Rechnitz responded "yes." *Id*. at 657:5–6.

Rechnitz argued at sentencing that he was ignorant of the $20 million that COBA ultimately invested, but in his own words on cross-examination in the Seabrook trial he recalled this number "very clearly." *Id*. at 884:20–25 ("What I remember *very clearly* is that the example that Mr. Huberfeld gave was $20 million, and the bottom line, which is what I remember *very clearly*, was that Norman can expect 100 to 150,000. The actual math in between I may have made a mistake on, but the $20 million amount and the 100 to $150,000 amount was *very clear*." (emphasis added)); *see also id*. at 885:6–10 ("What I remember very clearly is Murray gave me an example if COBA were to invest $20 million, and through his example of projected returns, it would come out for Norman he should expect 100 to 150,000 as the kickback."); *id*. at 886:1–4 ("I remember the $20 million, I remember Murray giving me examples if the fund makes one month 20 percent, one month 50 percent, that it equals 100 to 150,000 was an expected amount to be paid to Norman.").

The record evidence establishes that Rechnitz was the arranger and prime mover of the bribery conspiracy and sought to extract as much money as possible from COBA, and not just $10 million. The bribery scheme that Rechnitz devised led to a $19 million loss to COBA's retirement funds. Rechnitz is, and should be held, fully responsible for the unpaid balance of COBA's loss.

11

Rechnitz argues that Platinum Partners was a legitimate investment, and that he should not be liable for the outcome of the investment.  That argument is unavailing.  In *United States v. Calderon*, 944 F.3d 72 (2d Cir. 2019), on which Rechnitz relies, two exporters of agricultural goods were given letters of credit by the bank of a Russian importer.  The exporters presented the letters of credit to two American banks—the "confirming" banks on the letters of credit issued by the Russian bank—to obtain payment, assigning to the American banks the letters of credit.  The letters of credit were backed by bills of lading, which were falsified by the exporters to show that the goods had been shipped in conformity with the contract of sale.  The American banks called upon the Russian bank to honor the letters of credit that it had issued, but the Russian bank defaulted. The American banks then were paid by the Department of Agriculture (USDA), under a guarantee that it had issued through a government program to encourage American banks to facilitate the export of American agricultural products.

The exporters were convicted of wire fraud, and the Department of Agriculture sought restitution of its loss as a victim under the MVRA.  The Second Circuit, reversing the district court, held that the Department of Agriculture's loss was caused, not by the falsified documents, but by the world-wide recession that caused the failure of the Russian Bank.  The Second Circuit ruled that the two risks that defendants' falsifications were intended to resolve—non-payment because of non-conforming documents and declination by the U.S.D.A to pay the guarantee—did not "even arguably materialize[]." *Id.* at 96.  Rather, "the foreign banks defaulted on their obligations due to their financial inability to fulfill them following a global financial crisis.  The fraudulent shipping documents had no bearing whatsoever on the foreign banks' potential to default . . .." *Id*.  Indeed, the credit-worthiness of the Russian bank had been "*pre-approved"* by the USDA and by the confirming banks.  *Id.*

12

The instant case is different. The key question *Calderon* posed, consistent with this Circuit's prior rulings on the MVRA, was to what *kind* of loss the offense conduct exposed the victims. Thus, the operative inquiries here are to what kind of loss Rechnitz exposed COBA by bribing Seabrook to invest with Platinum Partners, and what kind of loss was within the zone of risk in such a transaction. Rechnitz exposed COBA to the risk that Seabrook, motivated by the bribe, would forego the level of caution required of someone in his position. Platinum Partners' collapse was a financial collapse, a risk that is inherent in all investments, particularly an investment in a hedge fund. Seabrook caused COBA to invest in Platinum Partners, not because it was the best investment COBA should make, but because he accepted a bribe to make that investment. Rechnitz's arrangement of the bribe induced Seabrook to invest, and lose, COBA's funds. As the Second Circuit reasoned in *United States v. Paul*, 634 F.3d 668, 678 (2d Cir. 2011), "[t]he fact that independent market forces may have contributed" to the loss suffered "is irrelevant to the restitution calculation" where the underlying fraud induces payment in a manner that may give the victim an overly sunny view of the security of such payment.

COBA's financial loss was caused by a corrupted financial decision, a decision made not because of a rational and deliberate investment evaluation, but because of the dilution of prudence induced by a bribe. In *Calderon*, the domestic banks "had pre-approved the relevant foreign banks for participation in the[] transactions" on the basis of their creditworthiness. *Calderon*, 944 F.3d at 96. The defendants' introduction of altered documents did not affect the creditworthiness of the defendant. The losses came about, not because of altered documents, but because of a world-wide collapse of credit. COBA's loss was "based only on the actual loss caused by the scheme," *Calderon*, 944 F.3d at 94 (quoting *United States v. Lacey*, 699 F.3d 710, 721 (2d Cir. 2012)); it followed directly from the investment Rechnitz caused to happen and was

13

"the kind[] of harm[] he risked by his conduct."[7]  *Id.* at 95.  Rechnitz is jointly and severally liable with Seabrook for COBA's loss, $19 million, less amounts recovered.

    b.  **Rechnitz's Financial Conditions and His Payments Schedule.**

The MVRA provides that "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and "[t]he burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents, shall be on the defendant."  18 U.S.C. § 3664(e).  Upon the receipt of "a notification of a material change in the defendant's economic circumstances," the court may, "on . . . the motion of . . . the victim, adjust the payment schedule, or require immediate payment in full, as the interests of justice require."  18 U.S.C. § 3664(k).

Rechnitz has paid only $240,000 of COBA's loss.  He continues to refuse to disclose his finances fully, and he continues to engage in substantial transactions requiring large amounts of assets which are inconsistent with the poverty he asserts.  The financial information he provided to the probation officer and to this court is totally unreliable.

COBA has uncovered information from court filings showing substantial and unexplained assets of Rechnitz, more than he admitted at sentencing.  *See* 11 U.S.C. § 3664(k); *United States v. Grant*, 235 F.3d 95, 99–101 (2d Cir. 2000) (affirming the district court's order under Section 3664(k) finding the release of additional funds in the defendant's inmate account constituted a material change in the defendant's economic circumstances and justified modification of the restitution requirement).  A complaint in California Superior Court alleges,

---

[7] The proximate causation inquiry with respect to Rechnitz is distinguishable from Huberfeld's case.  *See United States v. Seabrook*, 968 F.3d 224 (2d Cir. 2020).  Huberfeld had pleaded guilty to defrauding Platinum Partners, but not COBA.  The Second Circuit held that he was not obligated under the criminal law to give restitution to COBA.  The Second Circuit held that Huberfeld's "conviction was for a scheme that was outside of the uncharged, overarching scheme of defrauding COBA."  *Id.* at 236 n.8.  Here, in contrast, Rechnitz pleaded guilty to "defrauding COBA."  *See* Information, ECF No. 1; Rechnitz Plea Tr., ECF No. 43.

and supports the allegations with documentary proofs, that Rechnitz in March 2019 gave a $400,000 Bugatti sports car and $7,000,000 in diamonds as collateral for borrowings totaling $5,800,000. *See* ECF No. 83, Ex. B. Rechnitz did not disclose how he acquired the Bugatti or diamonds or how he paid for them. A defendant who protests that he cannot pay a just debt should not be expected to have a Bugatti sports car or $7,000,000 in diamonds, or create a $5,800,000 indebtedness. COBA has also produced bankruptcy court filings showing that, between 2018 and October 2020, one of Rechnitz's businesses "sent wire transfers in the aggregate amount of $2,329,500" to accounts he controlled, wire transfers that were not disclosed to the Court at the time of sentencing. *See* Presentence Investigation Report ("PSR") at ¶¶ 121–42.

These findings raise serious questions about Rechnitz's honesty and credibility.[8] This is the same man who told me at trial that he is ashamed of his behavior, that he has learned his lesson, and that he will henceforth lead an honorable life. *See* Rechnitz Sentencing Tr. at 67:17–20 ("I did all of these horrible things without worrying about God or the consequences that come with this sort of behavior. I cannot express to your Honor how ashamed I am for desecrating my religion.").

In response, Rechnitz claims that he owned neither the sports car nor the diamonds, and that, as he stated in his sealed letter, the Bugatti sports car belongs to Floyd Mayweather, the well-known boxer, and the diamonds in question were stolen from him. *See*

---

[8] The Bankruptcy Judge presiding over the case cited numerous examples of Rechnitz's misrepresentation and bad faith. *See In re Jadelle Jewelry & Diamonds, LLC*, No. 2:20-bk-13530-BR (Bankr. C.D. Cal. June 23, 2020), ECF No. 83 at 9 (noting, among other things, that "the assets may have been dissipated by the Rechnitzs and that there may be millions of dollars in missing jewelry, which the Court considers to be in dire need of investigation by the chapter 7 trustee"). The direct and cross examinations described at length Rechnitz's dishonest dealings. *See United States v. Seabrook*, No. 16 Cr. 467 (AKH), 2021 WL 2709360, at *4 (S.D.N.Y. July 1, 2021); *United States v. Seabrook*, 467 F. Supp. 3d 171, 173 (S.D.N.Y.), *aff'd*, 814 F. App'x 661 (2d Cir. 2020).

Sealed Letter from Jona Rechnitz, Aug. 6, 2021.[9] He presents no evidence in support of these claims. Nor does he explain how he could put up in collateral a Bugatti that he claims not to own, or non-existing diamonds that he says were stolen from him.

A defendant has the burden of proof to show his financial resources. *See* 18 U.S.C. § 3664(e) ("The burden of demonstrating the financial resources of the defendant . . . shall be on the defendant."). Rechnitz fails to carry that burden. He does not even attempt to explain the status of the $5,800,000 loan proceeds or the $2,329,500 wire transfers made to his bank accounts between 2018 and October 2020. Rechnitz references certain sealed submissions in the Seabrook case which, he says, "addressed the issue of the diamonds and the Bugatti." Oral Arg. Tr. at 26:23. The sealed submissions at issue are two letters that the Government submitted in May 2020, apprising the Court of the status of an ongoing federal investigation. The two letters do not discuss the sports car or the diamonds, and do not provide clarity as to their status.

The new information casts considerable doubt on the accuracy of Rechnitz's financial information presented to me at sentencing. For instance, the status of certain contemporary artworks and a prime Manhattan property located on Madison Avenue remains just as unclear as it was at the time of sentencing. *See* Memorandum by Johnny Y. Kim, United States Probation Officer, Jan. 11, 2021 ("Probation Memorandum") at 3 (noting the status of the artworks and property as "unresolved aspects" of Rechnitz's financial status from the Presentence Investigation Report). Rechnitz claims, without submitting a shred of evidentiary

---

[9] Rechnitz's own defense suggests a "material change" of economic circumstances warranting an adjustment of the payment schedule. According to his sealed letter, the "millions of dollars in diamonds" allegedly stolen from him had "been recovered and [were] being held as evidence" as of August 27, 2020. *See id.* at 2 (quoting *In re Jadelle Jewelry & Diamonds, LLC*, No. 20-BK-13530 (C.D. Cal. Aug. 27, 2020), ECF No. 152 at 1). The recovery of millions of dollars in allegedly stolen diamonds certainly constitutes a material change in one's finances. *Cf. United States v. Gilmartin*, 2018 WL 2059650, at *3, *aff'd*, 803 F. App'x 538 (finding defendant's receipt of "over $35,000 in annual Social Security benefits" a "material change" under Section 3664(k)).

proof, that the artworks and property belong to others. What is evident to the Court is that Rechnitz was able to collateralize a $1,180,000 loan with the artworks and property. *See* PSR at ¶ 129; Probation Memorandum at 3. It defies logic that Rechnitz could secure a large personal loan against assets he does not own.[10] The Probation Officer's observation captures the nebulous state of Rechnitz's financial affairs quite succinctly:

> It is difficult to comprehend how [Rechnitz] is paying $17,000 per month in rent when he is earning $220,000 per year (or $18,333.33 per month) and facing mounting financial obligations related to loan repayments and pending civil suits. Frankly, it is unclear how [Rechnitz] was able to secure a lease for his Beverly Hills residence given his [reported] financial status.

Probation Memorandum at 4.

All these circumstances make it clear that Rechnitz's representations at sentencing, that he cannot afford to pay anything substantial to COBA, are not credible. The new information supplied by COBA and Rechnitz's persistent lack of candor and cooperation compel the conclusion that Rechnitz has the ability to pay his debt to COBA, immediately and fully. I need not impose any payment schedule as a condition of supervised release; COBA itself has the willingness and ability to pursue Rechnitz. COBA shall have judgment for the balance due to COBA, in the amount of $12 million.

## CONCLUSION

The Court has reconsidered its assessment of Rechnitz's culpability and financial conditions pursuant to the Second Circuit's mandate. For the foregoing reasons, COBA's

---

[10] The record indicates that "no repayments have been made by [Rechnitz]" on the loan at issue. *See* PSR at ¶ 127.

motion is granted, and it shall have judgment against Rechnitz in the amount of $12 million. The clerk shall terminate ECF No. 81.

        SO ORDERED.

Dated:      November 9, 2021
              New York, New York

                                              ALVIN K. HELLERSTEIN
                                              United States District Judge