# SHER TREMONTE LLP

January 14, 2026

**BY ECF**

The Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

      Re: *United States v. Jona Rechnitz*, 16 Cr. 389 (KPF)

Dear Judge Failla:

      I represent Jona Rechnitz. On behalf of my client, please accept this letter in lieu of a formal sentencing submission in connection with Mr. Rechnitz's resentencing, scheduled for February 24, 2026.

      Mr. Rechnitz pleaded guilty to a cooperation agreement nearly a decade ago, for conduct that took place years before that. He testified in three separate trials for the government. He endured ostracism from his community, threats, and harassment, which have continued to this day. Mr. Rechnitz has struggled to rebuild his life based on the very public notoriety of his crimes and the intense personal criticism relating to his cooperation. The uncertainty of his case and the specter of surrendering to federal prison have hung over his head for that entire time.

      Further, while he has waited for his case to resolve—as it has gone up to the Second Circuit and back *four* times—the co-conspirators against whom he testified have had their sentences reduced through resentencings, sentence reductions, and early release.[1] The sentence originally imposed on him by Judge Hellerstein—five months' incarceration and five months' home detention—is now roughly equivalent to that imposed on Murray Huberfeld, against whom Mr. Rechnitz testified at trial, a disparate outcome that this Court has an opportunity to remedy.

      Finally, Mr. Rechnitz promptly paid in full the restitution ordered by this Court. I respectfully submit that he has been punished enough for his conduct and a sentence of

---

[1] Norman Seabrook's original sentence was recently reinstated by the Second Circuit. *United States v. Seabrook*, No. 23-6279, 2025 WL 3484616 (2d Cir. Dec. 4, 2025).

Hon. Katherine Polk Failla
January 14, 2026
Page 2

time served, with no supervision to follow, is sufficient and not greater than necessary to meet the goals of sentencing set forth in 18 U.S.C. § 3553(a).

I attach hereto the following exhibits: A letter from Mr. Rechnitz to the Court (Ex. A); updated letters of support from certain friends and family members who wrote for Mr. Rechnitz's original sentencing and two new letters from Mr. Rechnitz's rabbi and from an organization in Israel to which Mr. Rechnitz has devoted significant charity work (Ex. B); the government's motion for a downward departure pursuant to U.S.S.G. § 5K1.1, filed in connection with Mr. Rechnitz's original sentencing (Ex. C); Mr. Rechnitz's original sentencing submission and accompanying appendices, which include letters of support (minus two letters on which we no longer rely) and select news articles (Ex. D).[2]

*Offense Conduct*

On the relevant facts of the offense conduct, I respectfully refer the Court to the government's § 5K1.1 motion, attached hereto as Exhibit C. I highlight here several facts that are significant in evaluating that conduct.

The government's investigation of the various schemes involving Mr. Rechnitz revealed that he did not personally profit from his offense conduct. *Id.* at 15 n.4, 18. With respect to the bribery scheme at issue in this case, Mr. Rechnitz served as the "facilitator and matchmaker" between Norman Seabrook, then President of COBA, and Murray Huberfeld, the founder of the Platinum Partners hedge fund ("Platinum"). *Id.* at 19. The purpose of this scheme was to pay Seabrook to induce COBA to invest millions of dollars of union money in Platinum, which was then looking to acquire more institutional investors. *Id.* at 17. Mr. Rechnitz wanted to facilitate this unlawful arrangement, again, not for personal profit, but based on a misguided and concededly immature desire "to become a *macher* by currying the favor of older, more established men." *Id.* Mr. Rechnitz brokered the initial meeting between Seabrook and Huberfeld, and in March 2014, COBA invested $10 million in one of Platinum's funds. *See* Ex. D, Sentencing Submission of Jona Rechnitz (ECF. 71) at 9-10. Mr. Rechnitz was involved only in the initial investment of $10 million and was unaware of two subsequent investments of $5 million each. *Id.* After facilitating the initial meeting between Seabrook and Huberfeld in March, Mr. Rechnitz had no further involvement in additional dealings between COBA and Platinum and ultimately faded from an active role in the scheme besides delivering a $60,000 bribe payment to Seabrook in December of that year. *Id.* at 10; Ex. C at 18. In lieu of payment for his role, Mr. Rechnitz requested that Huberfeld make donations to certain charitable organizations to which Mr. Rechnitz had some connection. Ex. C at 18.

---

[2] The page numbers of these exhibits referenced herein correspond to the ECF pagination.

Hon. Katherine Polk Failla
January 14, 2026
Page 3

As is now well known, approximately two years later, Platinum collapsed and declared bankruptcy amid SEC and Department of Justice investigations, and $19 million of the $20 million investment was lost. Ex. D, at 10. In December 2016, numerous officers at the fund, including one of its founders and its chief investment officer, were indicted on securities fraud charges in the Eastern District of New York. *United States v. Nordlicht*, 16-CR-640 (BMC) (E.D.N.Y.). It is undisputed that Mr. Rechnitz knew nothing about any financial malfeasance at Platinum. To the contrary, he believed Platinum was a "financially sound company" and a "very solid hedge fund." Government Ltr. to Hon. Alvin K. Hellerstein, dated Dec. 6, 2019, ECF No. 78 at 2. Mr. Rechnitz had relatives who invested in Platinum (and, indeed, lost substantial sums when the fund collapsed). *Id.* The government's investigation found no evidence that suggested that Mr. Rechnitz was aware of Platinum's liquidity crisis or that he "knew that Huberfeld was willing to pay a bribe 'in order to satisfy a liquidity shortage' at Platinum." *Id.* Finally, Mr. Rechnitz attempted to steer COBA to invest in the most conservative of Platinum's investment vehicles, which he believed was consistent with COBA's prior investments. *Id.* He was not aware that Platinum presented the riskier option to COBA, nor that Seabrook's attorneys counseled him against the investment. *Id.* at 3. This Court cited these facts in holding that COBA's losses were not reasonably foreseeable to Mr. Rechnitz for purposes of restitution. Tr. of Oral Decision at 5-7, 12, *United States v. Rechnitz*, 16-CR-389 (KPF) (S.D.N.Y. Oct. 16, 2024).

*Mr. Rechnitz's Cooperation, Sentencing, and Post-Sentencing Life*

At sentencing, the government moved – with "particular enthusiasm" – for a downward departure pursuant to U.S.S.G. § 5K1.1, noting that Mr. Rechnitz was "one of the single most important and prolific white collar cooperating witnesses in the recent history of the Southern District of New York," whose cooperation had been "extraordinary and exemplary." Ex. C at 2. Mr. Rechnitz began proffering and cooperating with the government before any charges were filed against him and provided information "faithfully, accurately, and thoroughly." *Id.* at 5. In addition to attending dozens of proffer sessions (more than *eighty* in total), Mr. Rechnitz testified at three trials: the trial of Seabrook and Huberfeld before Judge Carter; the retrial of Seabrook before Judge Hellerstein; and the trial of Jeremy Reichberg and James Grant before Judge Woods. *Id.* at 25-31. During his testimony, Mr. Rechnitz endured threats of violence, ostracism, and public condemnation. *See* Ex. D, Appendix II (ECF No. 71-1) (examples of press coverage); *see also* Ex. C at 39-43 (describing news coverage, physical threats made during the *Reichberg* trial, and additional harassment).[3] As the government noted, "Rechnitz testified amidst the collapse of the life he had known, a collapse that was public and prolonged in ways that . . . distinguish him from other cooperating witnesses." Ex. C at 43.

---

[3] By Mr. Rechnitz's count, approximately 675 articles were published about his case.

While sentencing should bring closure, both to the defendant and the victims, regrettably, in this case, Mr. Rechnitz's original sentencing in December 2019 was only the beginning of a protracted battle over restitution and a period of intense and unfair attacks on him and his character. Mr. Rechnitz was sentenced to ten months, to be split between five months' incarceration and five months' home detention, and that sentence has been hanging over his head for more than five years, while the restitution issue, and ultimately a related recusal issue, was litigated multiple times in the district court, in mandamus petitions brought by COBA and by Mr. Rechnitz, and in a direct appeal to the Second Circuit that resulted in vacatur of Mr. Rechnitz's sentencing and remand to this Court.

To obtain closure on the restitution issue, Mr. Rechnitz proposed to bifurcate it from his resentencing and have the Court decide it first, *see* ECF No. 225, and Mr. Rechnitz's legal position was ultimately vindicated, though as he notes in his letter to the Court, he is keenly aware of the losses and harm to individual COBA members, to which he fully admits he contributed. *See* Ex. A, Letter of Jona Rechnitz at 2-3. On October 16, 2024, this Court ordered Mr. Rechnitz to pay restitution in the amount of $1,206,000 (minus what Mr. Rechnitz had already paid), and within a matter of days, he had satisfied his restitution obligation to COBA. COBA then again petitioned for mandamus to the Second Circuit, which ultimately denied the petition and affirmed this Court's order. *In re N.Y.C. Corr. Officers' Benevolent Ass'n, Inc.*, No. 24-3096 (2d Cir. Apr. 15, 2025). The mandate was returned to this Court on June 9, 2025. *United States v. Rechnitz*, 16-CR-389 (KPF) (S.D.N.Y. June 9, 2025), ECF No. 249.

Meanwhile, the ostracism and harassment that Mr. Rechnitz experienced because of his cooperation has continued, albeit in different forms, as he reports in his letter to the Court and as confirmed by the letter of his rabbi, Dovid Sochet, and updated letters from family members and others who know him. *See* Ex. B, Additional Letters. At the same time, Mr. Rechnitz has had to organize his activities and business pursuits around the continued restrictions of his bond, though even more taxing for him has been the uncertainty of when his life might be interrupted by a surrender date. Altogether, Mr. Rechnitz's efforts to move beyond his past and rebuild his life have faced significant headwinds.

Yet, Mr. Rechnitz has managed to make great strides in rehabilitating himself. He has built a new life in Los Angeles; has rededicated himself to devoting his time and attention to his wife, Rachel, and their six children, *see id.* (Ltrs. of Robert Rechnitz & Jared Rechnitz); is an active member of his synagogue, *id.* (Ltr. of Rabbi Dovid Sochet); and has been engaged in productive business and charitable pursuits, including working as a promoter for the boxer Floyd Mayweather and working with Mr. Mayweather to support victims of the October 7, 2023 terrorist attacks in Israel, *id.* (Ltrs. of Mordechai Fried & Rabbi Steven Burg). Perhaps more importantly, he has matured from the ambitious young man in his twenties and early thirties who engaged in the offense

Hon. Katherine Polk Failla
January 14, 2026
Page 5

conduct. Now over forty, Mr. Rechnitz is focused on his family, his faith, and restoring his good name. *See generally* Ex. A (Ltr. of Jona Rechnitz).

### *A Non-Custodial Sentence Is Warranted*

While it is unusual for a defendant to ask a judge to revisit the sentencing decision of another judge, in so many ways this is a highly unusual case. The grounds for a non-custodial sentence set forth in Mr. Rechnitz's original sentencing submission, and confirmed by the government's 5K1.1 motion, hold true to this day: He is a first-time offender who provided extraordinary cooperation and has demonstrated a commitment to turning his life around. Several additional factors that have emerged since the 2019 sentencing make the appropriateness of a sentence of time served even more pronounced than they were when Mr. Rechnitz was originally sentenced.

*First*, Mr. Rechnitz has stayed true to the promises he made at his last sentencing to turn over a new leaf and to continue to assist the government whenever possible. He has led a law-abiding life ever since he made the decision to cooperate with the government more than a decade ago. He has worked in the jewelry business, in real estate, and as a promotor for Mr. Mayweather. He has also focused on helping his local community in Los Angeles and the broader worldwide Jewish community. As Rabbi Sochet recounts, even when Mr. Rechnitz has been limited in his ability to contribute to charitable causes because of the lingering financial difficulties from this case, he has nonetheless taken an active role in organizing events and fundraising efforts at his synagogue, while intervening personally to resolve disputes in the community. Ex. B (Ltr. of Rabbi Dovid Sochet). As detailed in the letters of Mordechai Fried and Rabbi Steven Burg, Mr. Rechnitz leveraged his connections and resources to provide support to victims of terrorism and first responders in Israel since the October 7 attacks. *Id.* (Ltrs. of Mordechai Fried and Rabbi Steven Burg).

In addition to working to rebuild his life, Mr. Rechnitz has continued to assist the government, cooperating with an investigation by the U.S. Attorney's Office for the Central District of California. As has been discussed in more detail in sealed filings in this Court and in the Second Circuit, Mr. Rechnitz was a witness in an investigation concerning individuals he encountered through his work in the jewelry business, who, he learned, were involved in financial crimes. Mr. Rechnitz's assistance was helpful to the government, and notably, he provided it although he had already been sentenced but was not yet subject to any supervision term requiring further cooperation. In other words, he did not do it because he had to, but because he chose to. This cooperation was consistent with the manner in which Mr. Rechnitz has come to see his alignment with the goals of law enforcement as a critical part of his own personal rehabilitation and redemption.

All of the things that Mr. Rechnitz has done since his sentencing, especially in the face of still significant challenges related to his involvement in the offense conduct and his cooperation, warrant a reduction in the sentence originally imposed by Judge

Hon. Katherine Polk Failla
January 14, 2026
Page 6

Hellerstein. *See* U.S.S.G. § 1B1.10, cmt. (n.1(B) (iii)) ("The court may consider post sentencing conduct of the defendant that occurred after imposition of the term of imprisonment in determining. whether a reduction in the defendant's term of imprisonment is warranted.").

*Second*, the facts relating to Mr. Rechnitz's co-conspirators have changed in material ways that the Court should take into account in resentencing him; specifically, the defendants against whom Mr. Rechnitz cooperated all ended up serving far less time than originally imposed or expected. Thus, while Mr. Rechnitz's split ten-month sentence might have been within the range of reasonable sentences when compared with his co-conspirators at the time of sentencing, it now would constitute an anomalous disparity.

Murray Huberfeld, originally sentenced to thirty months, was resentenced to seven months by Judge Liman on remand from the Second Circuit. *See United States v. Seabrook*, No. 16-CR-467, ECF No. 402.

Jeremy Reichberg was sentenced to forty-eight months, with a surrender date of August 14, 2019, which Judge Woods declined to postpone. *See United States v. Reichberg*, No. 16-CR-489 (GHW) (S.D.N.Y. June 4, 2019), ECF No. 611. He was released from prison in September 2020 on a medical furlough. *See* Bruce Golding, *Ex DeBlasio donor released from prison on medical furlough*, N.Y. Post, Sept. 18, 2020, https://nypost.com/2020/09/18/ex-de-blasio-donor-jeremy-reichberg-released-from-prison/. Thus, Mr. Reichberg served approximately thirteen months' incarceration.

Finally, in response to the reduction in sentence for Huberfeld, Judge Hellerstein granted Norman Seabrook a sentence modification pursuant to 18 U.S.C. § 3582(c), reducing his fifty-eight month sentence to twenty-one months. *United States v. Seabrook*, No. 16-CR-467 (S.D.N.Y. Feb. 23, 2023), ECF No. 459. Nearly three years after his release from custody, the Second Circuit reversed Judge Hellerstein's grant of compassionate release and remanded the case with instructions to reinstate the original sentence. *United States v. Seabrook*, No. 23-6279, 2025 WL 3484616 (2d Cir. Dec. 4, 2025). The case was reassigned to this Court and currently pending is a motion to reduce Mr. Seabrook's sentence pursuant to Amendment 821 to the U.S. Sentencing Guidelines. *Seabrook*, No. 16-CR-467 (S.D.N.Y. Jan. 8, 2026), ECF No. 476.

Whatever ultimately happens with Mr. Seabrook's sentence, it is clear that the mosaic of comparative sentences in this case has changed dramatically since Mr. Rechnitz's sentencing in 2019. The split sentence Judge Hellerstein imposed—five months' incarceration and five months' home confinement—may have been reasonable when compared with the original sentences for his co-conspirators of 58, 48, and 30 months, respectively. But that sentence is now *roughly equivalent* to Huberfeld's and not far off from the period of time Reichberg ultimately served. While still below the actual sentences of imprisonment of his co-conspirators, it is not the kind of reduction typically

Hon. Katherine Polk Failla
January 14, 2026
Page 7

granted in cases of substantial assistance in this District, especially for such an "extraordinary and exemplary" cooperator. Ex. C at 2. A sentence of time served will bring Mr. Rechnitz's sentence in line with the sentences actually served by the other defendants in this case. Mr. Rechnitz's Sentencing Guidelines are now lower because he is a zero-point offender. Thus, while Probation originally calculated the applicable Guidelines to be 78-97 months, they are now 63 to 78 months—a 15 month reduction at the low end.

*Third*, the sheer length of time that has passed augurs in favor of a non-custodial sentence. Under a variety of legal doctrines, courts have recognized that the purposes of sentencing diminish over time and imposing a sentence long after the offense conduct has concluded risks interrupting a person's rehabilitation. In *United States v. Ray*, 578 F.3d 184 (2d Cir. 2009), the Second Circuit held that a fifteen-year delay in sentencing violated due process. As the court stated:

> The delay of fifteen years between our order remanding this case for resentencing and the time when Ray was resentenced is, without doubt, extraordinary-a fact that does not alone mandate the result we reach today, but that weighs in favor of it. In that time, Ray has undergone what appears to be a complete rehabilitation: she has remarried, raised a family, built a career, paid income taxes, and obtained higher education. To remove her from her current life and compel her to reside for six months in a halfway house would undermine her successful rehabilitation. In this regard, we agree with the observations of the Eighth Circuit that "a defendant should be allowed to do his time, live down his past, and reestablish himself. Permitting a sentence to go unexecuted does not encourage rehabilitation."

*Id.* at 201 (quoting *Shelton v. Ciccone*, 578 F.2d 1241, 1245 (8th Cir. 1978)) (footnote omitted). The Circuit accordingly vacated the defendant's sentence, which was six months in a halfway house. *Id.* Mr. Rechnitz does not contend that his resentencing violates the Due Process Clause, but the concerns that animated the Circuit's decision in *Ray* about threatening incarceration against someone who has "lived openly under [his] own name" and reintegrated into society, *id.* (alteration and internal quotation marks omitted), are present here.

Similarly, courts have recognized the "common law doctrine of credit for time served," which posits that "where a prisoner is discharged from a penal institution, without any contributing fault on his part, and without violation of conditions of parole, . . . his sentence continues to run while he is at liberty." *United States v. Nouri*, No. 07 CR. 1029 DC, 2015 WL 3900436, at *6 (S.D.N.Y. June 24, 2015) (quoting *White v. Pearlman*, 42 F.2d 788, 789 (10th Cir. 1930)). As Judge Chin discussed in *Nouri*—

ultimately declining to apply the doctrine where there had been a mere two-year delay in sentencing—the Second Circuit has applied credit for time served at liberty but has not expressly addressed the common law doctrine. *Id.* ("The Second Circuit has granted credit for time at liberty-sparingly-without explicitly discussing the doctrine. *See United States v. Greenhaus*, 89 F.2d 634 (2d Cir.1937) (per curiam) (awarding credit for time when defendant was erroneously discharged but not awarding credit for time when defendant was being held in state house of detention resisting order of recommitment); *see also Kiendra v. Hadden*, 763 F.2d 69, 72–73 (2d Cir.1985) (awarding credit where the Court intended for defendant's state and federal sentences to run concurrently and federal marshals erroneously refused to accept defendant when he was released from state custody)."). Here, the Court need not formally apply the common law doctrine of credit for time served at liberty, but the same concerns about not interrupting a defendant's rehabilitation are present in the cases applying it, even in the absence of finding a due process violation.[4] The ten years that have passed simply diminish the need to impose further punishment to achieve the goals of sentencing and risk interrupting and undermining the rehabilitative work Mr. Rechnitz has done over the past decade.

*Finally*, at the time of the prior sentencing, the question of restitution was still very much up in the air and, as the Court well knows, consumed several additional years of litigation. Mr. Rechnitz stands before the Court at resentencing having made restitution in the full amount he legally owed. To be sure, that is a significantly smaller number than COBA sought and that Judge Hellerstein initially imposed. But Mr. Rechnitz should not be punished for not paying more than his legal obligation.

I raise this because of concerning remarks the Court made at oral argument in October 2024, in which it suggested in might increase Mr. Rechnitz's sentence because he would be paying a lower amount of restitution. *See* Oral Arg. Tr. 52:1-10, *United States v. Rechnitz*, 16-CR-389 (KPF) (S.D.N.Y. Oct. 9, 2024). Respectfully, while "the need to provide restitution to any victims of the offense" is one of the § 3553(a) factors, it would be anomalous to punish a defendant *more* severely because of a harm that was *not* reasonably foreseeable to him. And it would be plainly inappropriate to punish Mr. Rechnitz for seeking to vindicate a legal right, and in the absence of any "identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding" justifying a more severe punishment. *North Carolina v. Pearce*, 395 U.S.

---

[4] Judge Chin discussed in *Nouri* whether mere negligence is sufficient to apply the doctrine or whether a court must find fault on the part of the government, and ultimately concluded that some fault by the government is required. *Id.* at *7. Here, while the government is certainly not responsible for the entirety of the delay, significant time did pass due to the government's shift in position on Mr. Rechnitz's recusal motion between the district court and appellate proceedings (only to abandon its defense of Judge Hellerstein's impartiality at oral argument) and, as the Court knows from Mr. Rechnitz's sealed filings, some delay in the resentencing is attributable to the government, albeit not the U.S. Attorney's Office for the Southern District of New York.

Hon. Katherine Polk Failla
January 14, 2026
Page 9

711, 726 (1969).  Mr. Rechnitz's payment of the restitution the Court imposed weighs instead in favor of a *reduced* punishment.

### *No Further Supervision Is Necessary*

Mr. Rechnitz has been on pretrial supervision for ten years without a single violation.  Supervised release is not needed to assist in his rehabilitation.  There is no reason to impose any further supervision.

### *Conclusion*

I respectfully submit that, under the particular circumstances of this case, enough is enough.  It is time to close the book on this long-running saga.  A sentence of time served, with no further supervision, is sufficient to achieve the goals of sentencing under 18 U.S.C. § 3553(a).  Any further punishment would be greater than necessary.

Respectfully submitted,

/s/*Noam Biale*
Noam Biale
SHER TREMONTE LLP

*Attorneys for Jona Rechnitz*

cc:	All counsel of record (by ECF)