# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA          :

   -v.-          :

JONA RECHNITZ,          :          16 Cr. 389 (AKH)

             :

        Defendant.

             :
------------------------------------------------------------x

## THE GOVERNMENT'S MEMORANDUM IN SUPPORT OF A DOWNWARD DEPARTURE PURSUANT TO SECTION 5K1.1 OF THE U.S. SENTENCING GUIDELINES AND GENERAL SENTENCING MEMORANDUM

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
Attorney for the
United States of America

Martin S. Bell
Russell Capone
Jessica Lonergan
Lara Pomerantz
Kimberly J. Ravener
Assistant United States Attorneys
- Of Counsel -

# I.    PRELIMINARY STATEMENT

Jona S. Rechnitz is to be sentenced on November 1, 2019.  The Government respectfully submits this writing to advise the Court of the pertinent facts concerning the assistance that Rechnitz rendered in the investigation and prosecution of numerous public corruption and fraud defendants.  In light of these facts, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the United States Sentencing Guidelines, for the Court to sentence Rechnitz in light of the factors set forth in Section 5K1.1(a)(1)(B)(5) of the Guidelines.

When the Government so moves at the sentencing proceeding, it will do so with particular enthusiasm.  Since making the determination to cooperate fully with the Government in the spring of 2016, Rechnitz has been, without exaggeration, one of the single most important and prolific white collar cooperating witnesses in the recent history of the Southern District of New York.  By every metric by which one measures a cooperating witness, Rechnitz has been both extraordinary and exemplary.  His assistance has been of extraordinary value.  He has performed and, as set forth below, endured in exemplary fashion as a testifying witness.  And he has adhered to his end of an agreement with the Government that requires him to be truthful and law abiding at all times.

It is worth, even in this preliminary statement, addressing each of these elements of Rechnitz's cooperation more fully.  First, his assistance substantially aided the Government in the investigation and prosecution of numerous, significant public corruption and fraud cases, including the successful prosecutions of the

former president of New York City's correction officers' union, the co-founder of a
New York-based hedge fund, the former Executive Officer of the Chief of
Department's Office in the New York City Police Department ("NYPD"), a former
regional appointed municipal chaplain and self-styled liaison to the NYPD, a former
Harlem restauranteur, and the chief executive of a national sports ticket resale
company.  His work separately although less directly contributed to a vital
investigation and set of prosecutions of corrupt individuals within the NYPD's Gun
Licensing Division, a unit charged with approving civilian gun permits that, in the
wake of Rechnitz's cooperation and the prosecutions that followed, has undergone
sweeping and needed reforms.

Second, Rechnitz performed superbly as a witness.  He testified at three high-
profile trials, during which he endured the active enmity of the gallery, the scrutiny
and, often, ridicule of the local media, and harassment from within his community.
He was subject to literally weeks of cross-examination by attorneys, including some
of the leading lights of the criminal defense bar, whose objective was nothing short
of turning him inside out and exposing every suspect pocket of his life to the
harshness of daylight.

And throughout his cooperation, the information he has provided has been
truthful, candid, and corroborated by other evidence, and he has otherwise adhered
scrupulously to the terms of the agreement he signed with the Government.  He has
participated with the Government in over 80 discrete meeting sessions since his
cooperation commenced in 2016, the majority of which required him to travel to

New York City from his home on the West Coast, which he did without reimbursement or complaint.

The Government is mindful that Rechnitz was in a position to cooperate regarding a broad range of subject matters in part because, for several years beginning when he was 26 years old in 2008, Rechnitz rode a wave of unbridled ambition and a seemingly limitless sense of entitlement through a series of misdeeds. Rechnitz had been a brazen criminal, and the seriousness of his crimes of conviction cannot, and should not, be minimized. Having been introduced to the world of municipal bribery by Jeremy Reichberg, a Borough Park community figure who had already cultivated extensive corrupt relationships with police officers for his own personal purposes, Rechnitz married his substantial personal means to Reichberg's eye for opportunities to cozy up, through illicit means, to those who occupy New York's corridors of power. The Court, having heard Rechnitz's testimony on this score at the second trial of Norman Seabrook, is familiar with what followed. Rechnitz and Reichberg engaged in a number of behaviors that blew clear past the line into illegality and others that, at best, were severely distasteful and tiptoed right up to that line. Reichberg and Rechnitz bribed high-level members of the NYPD in exchange for police action as opportunities arose, a scheme that came to include the highest ranking uniformed officer in the Department. Rechnitz facilitated a kickback arrangement between Seabrook, the union leader, and Murray Huberfeld, a well-heeled friend who was affiliated with a respected but, unbeknownst to the public, troubled hedge fund. Rechnitz and

3

Reichberg made ethically and legally dubious forays into political fundraising, meeting separately with the Westchester County Executive and a representative for the future Mayor of New York City and securing from each a pay-for-play understanding with respect to political donations and future municipal action. Rechnitz violated local election law by using straw donors to raise money in the city election. He lied in the course of soliciting investors to certain of his business ventures, lied in order to qualify for both a gun permit and personal health insurance, and lied in order to gain parking privileges to which he was not entitled.

The list of transgressions, as Rechnitz himself has ruefully acknowledged on numerous occasions while meeting with law enforcement, was both stupefying and senseless. But in May 2016, Rechnitz made the decision to accept responsibility for them and cooperate with the investigation. Despite having not been charged with any crimes to that point, Rechnitz initially sat for three full day-long debriefing sessions with the United States Attorney's Office to catalogue his misdeeds. He did so faithfully, accurately, and thoroughly, beginning a series of literally dozens of proffer sessions with the Government. These sessions were the backbone of a process of fruitful and inarguably successful cooperation that lasted more than three years. More than simply fueling a boom of related prosecutions, Rechnitz's cooperation exposed the sordid underbelly of multiple New York City institutions, exposed serious crimes, and held powerful people who fell short of their obligations to the broader public to account.

Rechnitz's importance to those resulting prosecutions cannot be overstated. The Government would not have been able to prosecute *United States* v. *Norman Seabrook and Murray Huberfeld*, 16 Cr. 467 (AKH) without facts Rechnitz provided the Government and his eventual testimony at two separate trials. The Government would not have been able to prosecute *United States* v. *Reichberg, Grant, and Harrington*, 16 Cr. 468 (GHW), which concerned police bribery at executive decision-making levels, without Rechnitz's proffer and testimonial contributions to its November 2018 trial. Rechnitz also contributed significantly to the prosecution of *United States v. Villanueva et al.*, 16 Cr. 342 (SHS), involving corruption in the NYPD gun licensing division. Rechnitz also provided information that aided in the resolution of other cases, including that of two corrupt businessmen with whom Rechnitz and others connected to him had collectively invested millions of dollars, and was prepared to testify at a fourth trial. As set forth in greater detail below, Rechnitz also provided facts that could have given rise to other major public corruption prosecutions. To the extent the other cases did not develop, that reflects no fault of Rechnitz in his role as a cooperating witness, but rather challenges inherent in bringing such cases due to the state of the governing law and other issues surrounding the individual cases. In sum, Rechnitz was an indispensable contributor to a number of major prosecutions and investigations brought by the Government.

We write to provide the Court with the Government's assessment of the defendant's cooperation, violations of law, and any incidents of misconduct since he

began his cooperation – of which there were none. We also will convey our assessment of how Rechnitz compares to other cooperators with whom we have worked in terms of the value and extent of his cooperation. On that scale, we rate Rechnitz's cooperation as exceptionally valuable and deserving of great weight in the determination of his sentence.

Rechnitz's cooperation, and overall case, defy easy comparison in the recent history of this Office. One useful and important data point that one can apply is that of Todd Howe, whose information led to the prosecution of the Governor of New York's right-hand associate in *United States* v. *Joseph Percoco*, 16 Cr. 776 (VEC), and New York State's one-time highest-paid public employee, former SUNY Polytechnic President Alain Kaloyeros, in *United States* v. *Alain Kaloyeros*, 16 Cr. 776 (VEC), among others, in separate corruption trials. Like Rechnitz, Howe had a substantial array of criminal baggage. He pled guilty to an Information that charged him with three separate criminal schemes: (i) participation in a bribery and honest services fraud scheme involving Percoco, (ii) participation in a conspiracy, along with Kaloyeros and several real estate executives, to rig government contracts for large New York State economic development projects in Western New York, and (iii) embezzlement from his employer and related tax evasion. Howe also engaged in various smaller-scale frauds and deceptions, from refusing to pay vendors to double-billing clients on travel expenses to depositing an empty envelope into an ATM machine and then falsely claiming to the bank that the envelope had contained a $45,000 check (which conduct had resulted in a previous guilty plea).

Unlike Rechnitz, Howe testified at only one trial because of a revelation –
made during his cross-examination at the Percoco trial – that, while cooperating, he
had made suspect challenges to credit card charges in an attempt to obtain
reimbursement for a hotel stay and transportation.  The Government, in an
abundance of caution, sought Howe's remand after this revelation, and he was
incarcerated on consent.  He remained in jail for the next five months as the *Percoco*
and *Kaloyeros* trials continued – the latter taking place without Howe's testimony
because of the damage stemming from those new facts.  Howe was released after
five months, and subsequent investigation showed that Howe's credit card
activities, while reckless, were not necessarily criminal.[1]

At Howe's sentencing, the Honorable Valerie E. Caproni, United States
District Judge, imposed a sentence of time served (*i.e.*, five months) with five years'
probation.  Judge Caproni noted the seriousness of Howe's public corruption
offenses, and further noted that Howe had "live[d] a life of one fraud after another
in the years leading up to the case."[2]   But she also heavily weighed that Howe had
taken responsibility for his crimes, unlike the defendants he testified against, and
been a useful cooperator notwithstanding the self-inflicted damage caused by the
credit card charges.  Given Howe's checkered past, Judge Caproni determined that
the Probation Office's recommendation of three years' supervised release might not
be "sufficient time to ensure that the habits that Mr. Howe is building are entirely

---

[1] *United States* v. *Todd Howe*, 16 Cr. 632 (VEC), April 5, 2019 Sentencing
Transcript (attached as Exhibit A), at 29-30.
[2] *Id.* at 31.

internalized." Accordingly, she suspended the submission of sentence and placed the defendant on five years' probation – as opposed to supervised release – so as to be able to hold the full weight of his potential sentence over him were he to stray and violate the terms of his probation.[3] This was important because of Howe's near-brush with crime even while cooperating.

Rechnitz differs from Howe in several material respects. First, Howe committed his series of offenses largely in his forties and fifties after an already successful career in government and lobbying. While no excuse, it is undoubtedly relevant that Rechnitz began his hubristic foray into corruption in his twenties, early in his professional life and motivated by the need to be successful and important.

Second, Rechnitz's cooperation was *more* helpful – it led to a broader array of successful public corruption prosecutions than Howe's. He also testified at *three* vigorously contested trials and his testimony spanned over a month in total, whereas Howe testified at one trial over parts of two weeks.

Third, unlike Howe, Rechnitz's cooperation was unblemished. He successfully adhered to the conditions of his agreement with the Government, and did not damage his own utility as a witness for more than three years. In every respect, Rechnitz can be described as a more productive cooperator than Howe, his most proximate peer in prior misbehavior. Moreover, as discussed further herein,

---

[3] *Id*. at 34.

Rechnitz has to endure numerous unusual conditions that distinguish him from most cooperating witnesses.

Rechnitz may also be compared to David Villanueva, another cooperating witness and perhaps *the* major figure in the NYPD gun license scandal in connection with which Rechnitz provided information. Villanueva pleaded guilty to a five-count information detailing approximately four different corrupt schemes to dole out gun licenses while a sergeant at the NYPD. In exchange for gifts and tens of thousands of dollars in cash, Villanueva approved hundreds of gun license applications, renewals for those applications, and requests to upgrade licenses to full concealed carry licenses for individuals regardless of their need for a gun license – and in some cases despite significant red flags that made those individuals inappropriate candidates to traverse the City of New York with concealed weapons.

Like Rechnitz, Villanueva cooperated extensively and successfully. He provided information that led to the prosecution of two NYPD colleagues and other corrupt gun license expediters; testified at two trials; and had an unblemished record during the course of his extensive cooperation. Unlike Rechnitz, Villanueva was a public official, and to that extent should have been held to a still higher standard. Villanueva's crimes were arguably as serious as or more serious than Rechnitz's – his level of culpability, given his status as a police officer, was, on some level, higher. Villanueva's cooperation was comparable, but somewhat less extensive than Rechnitz's. Villanueva was ultimately sentenced to four months in prison, largely on account of his cooperation, by the Honorable Sidney H. Stein.

Sentencing courts are confronted, in cases involving successful cooperators, with fundamental questions. Among these are to what degree a just sentencing outcome must recognize years of wrongdoing that took place before what is often substantial, even laudable cooperation. As to Rechnitz, the Government respectfully submits that Rechnitz's cooperation has been of a caliber such that, if genuine leniency is ever available, it should be available in this case. This Court and others sentenced certain of Rechnitz's co-conspirators in a way that reflects the seriousness of the offenses and the need to deter the population from going down a similar path. The crimes, as detailed below, merited that message. But to the extent that the governing statutes require that the sentence *also* must consider the "history and characteristics of the defendant," it must consider the superlative work Rechnitz has done to begin to make things right and see his cooperation through.

And perhaps most profoundly here, to the extent that the same provisions require a sentence that "promote[s] respect for the law," the sentence should reflect Rechnitz's having come forward, taken responsibility, and cooperated fully with the Government. Indeed, in a case involving a highly visible cooperator as this one, it is absolutely vital that the message be sent to the next potential cooperating witness in a hard-to-prosecute corruption investigation that courts will heavily count their willingness to come forward in resolving their sentences.

The Government therefore respectfully submits that the principal consideration that drives Rechnitz's sentence should be his cooperation, and the need to promote respect for law by not discouraging similarly situated cooperating

witnesses from coming forward.  Accordingly, the Government respectfully moves for a downward departure pursuant to Section 5K1.1 of the Guidelines.

## II.   RECHNITZ'S CRIMES OF CONVICTION AND RELATED BAD CONDUCT

As this Court heard during Rechnitz's testimony at the retrial of *United States* v. *Norman Seabrook* (hereinafter "*Seabrook II*"), Rechnitz was, in 2008, a young, upstart real estate businessman from Los Angeles who had moved to New York to begin his career.  At around this time, he met Jeremy Reichberg, a self-styled community organizer and self-appointed liaison between the Orthodox Jewish community in Borough Park, Brooklyn and local law enforcement. Reichberg was a so-called "expediter" who dealt principally in assisting people in his community in their dealings with various local government entities, including the police.  Reichberg already had years-long relationships with various on-the-rise NYPD officials.  Within weeks of their meeting, Rechnitz joined Reichberg in providing occasional meals and donations to the NYPD Football Team at the behest of several well placed officers.  And they would ask those officers for occasional favors, such as arranging for a police escort through the Lincoln Tunnel for Rechnitz's boss.

From this beginning developed the first of a number of ultimately corrosive and criminal relationships between Rechnitz, then in his 20s, and older, much more established men.  At earlier proceedings, this Court accurately characterized Norman Seabrook's accepting a bribe payment to betray his union as a crime of

11

hubris and Murray Huberfeld's furnishing that bribe so as to buoy the hedge fund he had started as a crime of greed. For his part, Rechnitz's crimes appear to have chiefly been crimes of ambition. Rechnitz saw ways to cozy up to the established and powerful – a seemingly infinitely connected community activist, a series of powerful police officers, one of the city's most powerful union leaders, a hedge fund magnate, the Westchester County Executive, New York City's Public Advocate and eventual Mayor – in order to make himself look impressive to others and to become established and influential himself. He had a ready-made mentor in building such relationships in Reichberg, who himself sought to monetize the same relationships as an expediter.

### A. The Advanced Stages of the Police Bribery Scheme

Between 2013 and early 2015, Rechnitz and Reichberg escalated their criminal activity significantly. Several developments fueled this intensification. First, several of the police officers whom Rechnitz and Reichberg had built relationships with ascended to positions of power. Michael Harrington, whom Reichberg had known for years, became the Executive Officer to the Chief of Department. Through this relationship, Rechnitz and Reichberg came to lavish gifts upon, and develop a relationship with Harrington's new boss and the highest ranking uniformed officer in the NYPD, Philip Banks. James Grant, a former Brooklyn captain, rose through the ranks such that he was eligible for a promotion to Commanding Officer of the Upper East Side's 19th Precinct in Manhattan, a promotion that Reichberg and Rechnitz helped secure through their lobbying of

Banks and Harrington.  The Presentence Report ("PSR") will list an array of other police relationships that Reichberg and Rechnitz cultivated during this period of time, but the positioning of Banks, Harrington, and Grant in 2013 through 2014 led to the greatest number of opportunities to lavish gifts on high-level officers and receive favors for themselves, their friends and associates, and their business clients.

The list of the favors and gifts known to the Government, in large part thanks to Rechnitz's cooperation, is long.  Among other things, Reichberg and Rechnitz provided officers with free or nearly free trips to numerous vacation destinations, including Punta Cana, Las Vegas, and Los Angeles, and to sporting events like the BCS National Championship Game in Florida – sometimes on private jets, and usually at luxury hotels.  On a few occasions, Reichberg and Rechnitz arranged for prostitutes to be available to the travelers, both in the United States and abroad.  Banks received a luxury tour through Israel.  Banks and Harrington received thousands of dollars in regular meals at high-end kosher steakhouses in Manhattan.  Rechnitz and Reichberg rented out a suite at the Meadowlands for their officer contacts and their families at a New England Patriots – New York Jets game during a brief period when the Jets were competitive enough to make that event a hot ticket.  Reichberg steered $70,000 worth of business to a private security business run by Harrington's family and friends, and Rechnitz paid for hotel accommodations for a trip to Chicago Harrington took with family members and friends.  Harrington and Banks received expensive hockey and

basketball tickets.  Rechnitz provided Banks with what amounted to a $20,000 gift disguised as a successful "investment" on his behalf.  Grant received numerous home improvements, including new railings and windows, along with luxury lodging during a vacation in Rome.  Reichberg and Rechnitz visited three Staten Island-based officers on Christmas day, bearing video game systems and high-end collectible dolls for their children.  All told, Rechnitz and Reichberg arranged for some $225,000 worth of gifts to be bestowed on their stable of officers over the life of the conspiracy – the bulk of that accounted for by a handful of larger gifts such as the private jet trips, and most of it concentrated within the 2013-2015 window.  In return, Reichberg and Rechnitz received police-related favors, including (i) a parking placard, (ii) Grant's promotion and that of other officers known to Reichberg, (iii) the dispatch of a police boat to a private event Reichberg hosted, (iv) the dispatch of a police *helicopter* to a private event Reichberg hosted, (v) assistance in applying for gun permits they likely were not eligible for,[4] (vi) personal rides in police vehicles (for example, to the airport, with lights and sirens blaring), (vii) favorable treatment to individuals who had been ticketed or arrested in order to

---

[4] As part of their effort to obtain gun permits, Reichberg and Rechnitz got Rechnitz put on the payroll of the diamond business belonging to an associate.  Rechnitz did not actually work for the associate, but used his purported employment with a risky business as a partial justification in applying for the firearm license.  That application, of course, was fraudulent.  Rechnitz also used the diamond company's health care plan to obtain health care for a period of two years instead of setting up a health care plan through his own business.  Rechnitz appears to have used the diamond company's health care insurance out of sheer laziness, and it is not believed that he profited significantly, if at all, from using it instead of applying for health insurance for and through his own business entity.

benefit Reichberg's business, and (viii) police action in addressing private disputes. In early 2015, some weeks after Banks abruptly resigned from his position as Chief of Department, Reichberg and Rechnitz were recorded on a judicially authorized wiretap, lamenting that they did not get even more for their investment in Banks and Harrington.

The police bribery scheme was serious, not least because wrongdoing of this nature has a real impact on the broader community. Every police officer in New York City takes an oath to "protect the lives and property of all citizens of New York City by treating every citizen with courtesy, professionalism, and respect, and to enforce the laws impartially." And Reichberg and Rechnitz's conduct served to substantially undercut the public's faith in NYPD and its commitment to do those things -- most of all, its commitment to "enforce the laws impartially." Any loss of faith in the police is a tragedy in its own right. It also has ripples on the way that citizens interact with police, and on the way that individual officers view their superiors' conduct and, consequently, their own responsibilities. These costs, while difficult to quantify, are real.

## B. *The Seabrook Bribery Scheme*

A second reason why Rechnitz and Reichberg's criminal activities increased beginning in 2013 is that toward the end of that year, Banks introduced them to his friend, Norman Seabrook, the longtime president of the Correction Officers Benevolent Association ("COBA"). Seabrook was an influential and effective union leader whose compensation was not commensurate with his power. At around that

time, Murray Huberfeld, a Rechnitz family friend and the founder of the Platinum
Partners hedge fund, voiced to Rechnitz that he was looking for large, institutional
investors to recruit to the fund. Rechnitz, in his seemingly boundless quest to
become a *macher* by currying the favor of older, more established men, identified a
situation in which he could solidify his place within the good graces of two powerful
figures at once.

Having presided over *Seabrook II*, the Court knows what happened next.
Rechnitz approached Huberfeld and proposed what would ultimately become a long-
term bribery scheme that yielded only one bribe payment before law enforcement
intervened. Rechnitz then recruited Seabrook to the scheme while they were
vacationing in Punta Cana. A criminal understanding congealed as Rechnitz
shuttled back and forth between the two in the ensuing days once they returned to
the United States. Under the agreed-upon scheme, Seabrook would induce COBA
to invest millions of dollars of union money in Platinum Partners, and at the end of
each year, Seabrook would receive a kickback based on how well the investment
performed.

Over the ensuing months, Rechnitz and Jeremy Reichberg continued to
nurture the relationship with Seabrook (including taking him, all expenses paid, on
the trip to Israel with Banks), and Seabrook used his considerable influence at the
union to steer three investments worth a combined $20 million into Platinum
Partners, including $15 million in retirement benefit funds and $5 million in dues
money that kept basic operations at COBA online. At the end of the first year,

when Seabrook demanded payment, Huberfeld and Rechnitz worked out a scheme in which they would fraudulently induce Platinum Partners into "reimbursing" Rechnitz for $60,000 of dollars in Knicks season tickets Rechnitz had not, in fact, conveyed to Platinum Partners.  Rechnitz would then pay Seabrook the same amount out of pocket -- $60,000 in cash, which he memorably delivered to the union president on December 11, 2014 in a black Salvatore Ferragamo men's handbag.

In early 2015, wiretap conversations show that Reichberg and Huberfeld worked actively to secure more union millions for the fund, while Rechnitz – out of town in Los Angeles, and fresh from having personally disappointed Seabrook with less bribe money than originally expected – faded from an active role in the scheme. Eventually, when Seabrook's activities came under scrutiny as a result of a state court lawsuit, and the investigation into Seabrook became overt, the scheme ended. Months later, Platinum Partners went bankrupt, the apparent result of conduct that was eventually charged in the Eastern District of New York as an unrelated fraud, and $19 million of the $20 million was lost.

Rechnitz did not profit personally from his role in the scheme – he saw the greater long-term benefit in solidifying his place in the confidence of both Huberfeld and Seabrook.  When Huberfeld insisted on providing payment, Rechnitz had him write checks to certain charitable causes to which Rechnitz had attached himself, including his son's school and a charitable organization, the selection of which was inspired by the wife of a friend and prominent New York City attorney who had battled cancer.

17

It bears noting that Rechnitz did not appear to know that Platinum was a fraud, or even that it was a bad investment. Aside from the bare fact of his being a generally sophisticated dealmaker with a financial background of his own, no evidence squarely shows that Rechnitz knew – as e-mails show Huberfeld assuredly did – that Platinum Partners was itself in grave financial danger at the time the scheme was concocted. Similarly, there is no evidence that Rechnitz received warnings that the hedge fund investment was not suitable for a benefit pension plan, akin to the warnings that Seabrook received from his union's attorneys and his from his fellow COBA board members in convincing them to invest.[5] Rechnitz's role was as a facilitator and matchmaker, not someone deeply and consistently involved in the details of the fraud.

But no matter what the outcome of the investment was, or how foreseeable that outcome was, the bribe scheme was a triumph of greed over responsibility, and a serious crime. Rechnitz facilitated the offense knowing that it was wrong and knowing that it would result in Seabrook's betraying the tens of thousands of members of his union.

---

[5] The evidence indicated that at the time the plan was hatched, Rechnitz wanted COBA to invest in the more conservative of the two investment products Huberfeld was offering, presumably in the specific hope that the investment would succeed and the union would be protected, and then he later got notice that COBA had invested in the riskier product buried within an e-mail thread confirming the more significant news that COBA had agreed to place up to $10 million into the fund.

### C. Political Bribery

A third reason why Rechnitz and Reichberg's criminal activity increased in 2013 is that there was an open mayoral election in New York City, leading Reichberg and Rechnitz to seek power in the political realm.  Rechnitz and Reichberg were introduced to then-candidate Bill de Blasio's chief fundraiser, Ross Offinger, and promised to back the mayor financially, through their own individual donations and through substantial fundraising as "bundlers," provided that "anytime we would call with any issues, …we would have access, we would have good response, and we expected results."  (Tr. 603).  Rechnitz and his wife gave de Blasio the maximum amount permitted under the law, and Rechnitz also gave through straw donors, an illegal practice under local election law.  In addition to accounting for over $100,000 in donations to de Blasio's campaign, Rechnitz also, after the election, gave over $150,000 to political causes de Blasio championed, including the Senate Democrats and the Campaign for One New York.  In return, Reichberg and Rechnitz called upon Offinger as foretold.

At trial, Rechnitz testified about instances in which he asked Offinger for favorable treatment from the City.  Some of these efforts got Rechnitz meetings that the general public would not have expected but still did not achieve the desired ends; others were more successful.  (*See* Tr.  605-09 (cataloguing various requests and their outcomes, including securing a delayed deadline for Rechnitz's wife's cousin to close her preschool as ordered by a City department and rectifying a water

19

bill issue at a property affiliated with Reichberg)).  Rechnitz also paid for Offinger's stay at a hotel in the Dominican Republic.

Rechnitz and Reichberg also reached a similar understanding with Robert Astorino, the Westchester County Executive, the chief executive of the most populous county in the state north of New York City.  Astorino, who was running for re-election in 2014 and seen as a rising star in state politics, accepted some $15,000 in donations from the pair, around which time Astorino helped arrange for the two to be named Westchester County Police Chaplains – a title that came with no clerical responsibilities for Reichberg and Rechnitz, who were not rabbis, but which entitled them to parking placard privileges.[6]  Rechnitz also paid for all but $1,800 of a nearly $8,000 Rolex Submariner watch for Astorino later in the same year.  Astorino subsequently surrendered that watch to federal authorities as the investigation of the activities of Rechnitz and Reichberg intensified.

### D. Other Uncharged Acts During the Relevant Period[7]

Rechnitz's day job during the time of the conduct charged was as a syndicator of real estate deals through his business, JSR Capital.  But during the same period of time, JSR Capital engaged in a side business that also proved problematic, "hard-

---

[6] One of the NYPD officers whom Reichberg and Rechnitz bestowed benefits on early in the conspiracy, Steven McAllister, eventually retired from the Department in order to take a position as Police Commissioner of the Village of Floral Park, a small municipality just outside of Queens.  Once there, McAllister also appointed Rechnitz and Reichberg to hollow religiously oriented positions in that jurisdiction. These positions, too, came with parking placards.

[7] This section refers to conduct that, while uncharged, still bears upon Rechnitz's personal characteristics and is appropriately considered in that way by the Court.

money lending."  As Rechnitz explained during his trial testimony, his hard money

lending business involved making short term loans available to business partners at

higher-than-normal interest rates, and recruiting investors – mostly friends and

family members – to invest in making those loans with the promise of swift,

substantial returns.  (Tr. 737).  Between 2013 and 2015, Rechnitz recruited

investors into two relevant loan arrangements of this type – the alcohol resale

business of a Harlem-based restauranteur named Hamlet Peralta, whom Rechnitz

had been introduced to by one of his stable of police officials, Chief David Colon, and

National Event Company, the sports and concert ticket resale business of Jason

Nissen, with whom Rechnitz shared Knicks season tickets.  Rechnitz invested, and

got associates of his to invest, in both businesses.  Rechnitz induced his associates

to invest through a number of representations, some of which were false.  Among

other things, Rechnitz omitted that he was receiving commissions for recruiting

them, and he exaggerated his own personal stake in the ventures.

The effect of these representations was magnified when it turned out that

both Peralta and Nissan's businesses were kept afloat by Ponzi scheme tactics.

Rechnitz did not appear to be aware of those frauds – on the contrary, Rechnitz lost

money in at least one scheme, and wiretapped conversations between Rechnitz and

Reichberg chronicle their frantic attempts to recoup the Peralta investments and do

not show that they were aware of the overall fraud.  Nissen's fraud was not

discovered until 2017, when he self-reported and surrendered to authorities, and his

account did not incriminate Rechnitz.  But people whom Rechnitz had lured into

investing through misrepresentations and omissions about his own activity lost money, including one particularly egregious instance in which one of Rechnitz's friends lost over $2 million. (Tr. 832, 853-60).[8]  Both Peralta and Nissen were prosecuted for fraud in this district, and Rechnitz's cooperation touched these cases in ways discussed *infra*.

Finally, when Rechnitz was approached by law enforcement on three occasions in 2015, he attempted to "wiggle his way out" of the clear trouble he was in by being untruthful in responding to questions about his relationships with police officers, Norman Seabrook, and Murray Huberfeld.  (Tr. 555-58).  Wiretapped conversations reveal efforts on his part and Reichberg's to discuss how to respond to the investigation, and efforts to coach business contacts and family members on how to avoid deepening his problems if contacted.  Rechnitz also destroyed a laptop and a phone in a somewhat uneven and incomplete bid to destroy evidence that incriminated him.  (Tr. 736).[9]

---

[8] Rechnitz's inducement, through fraud, of these investments is not an offense to which he pled guilty as part of his agreement with the Government, although he did disclose the conduct in his early meetings with the Government.  (*See generally* GX 1601).  Rechnitz's agreement did immunize him from prosecution for conduct related to the Peralta scheme; the Nissen business was not known to be a Ponzi scheme to either Rechnitz or the Government until 2017, when Nissen self-reported.
[9] Rechnitz later provided the Government with substantial electronic evidence that incriminated him and others, including a telephone, and hundreds of pictures of him, Reichberg, and their police and political contacts.

## III.   RECHNITZ'S COOPERATION WITH LAW ENFORCEMENT

Provisions (a)(1)-(5) of section 5K1.1 of the United States Sentencing Guidelines provide a non-exclusive list of factors that the Court can consider in determining an appropriate reduction in sentence. The Government has organized its information regarding Rechnitz's cooperation in light of those enumerated Guidelines considerations.

### A. *The Significance and Usefulness of the Defendant's Assistance*

Rechnitz's cooperation led to some of the more important public corruption prosecutions in recent years, along with successful prosecutions for fraud. Rechnitz's cooperation also contributed to other important investigations that did not lead to prosecutions, though not for reasons that were at all Rechnitz's fault.

#### 1.   Norman Seabrook and Murray Huberfeld

Rechnitz's cooperation led directly to the convictions of COBA's powerful president, Norman Seabrook, and multi-millionaire businessman Murray Huberfeld before this Court. Seabrook and Huberfeld were initially tried on charges of conspiracy to commit honest services fraud and honest services fraud in connection with the Platinum Partners bribery scheme before the Honorable Andrew L. Carter, Jr. At the conclusion of that trial, the jury was unable to reach a verdict. The subsequent retrial presided over by this Court ended with guilty verdicts against Seabrook on both counts. In between the two trials, Huberfeld pled guilty to conspiring to defraud Platinum Partners of the $60,000 obtained via the false

Knicks season ticket invoice in order to reimburse Rechnitz for Seabrook's bribe payment.

Rechnitz's contributions to the Seabrook and Huberfeld prosecutions cannot be overstated. As a fundamental matter, the case could not have been charged without him. Although the Government was actively investigating the circumstances under which COBA had invested millions of dollars with Platinum Partners, most of the actual contours of the bribery scheme were unknown to the Government before Rechnitz provided them. The personal involvement of Murray Huberfeld, the terms of the understanding between the co-conspirators, and virtually every detail of the events of December 11, 2014 – the day Seabrook received his first bribe payment – were all brought to the Government's attention by Rechnitz in his initial round of proffer sessions with the U.S. Attorney's Office, the Federal Bureau of Investigation, and the NYPD's Internal Affairs Bureau. None of these details were memorialized in e-mails the Government obtained separately via search warrant, and wiretap monitoring on Reichberg and Rechnitz's phone did not begin until January 2015 – *after* the payoff of Seabrook. The few calls relevant to the COBA bribery scheme after that point, which the Government played at both Seabrook trials, were sufficiently oblique as to be of limited probative value on their own. Insider information was vital to prosecution of these crimes. Rechnitz provided it, and made the prosecution possible.

Just as Rechnitz's information was needed in order to complete the picture of the bribery scheme at a sufficient level to charge it, and even though Rechnitz's

information led to the discovery of helpful corroborating evidence – the surveillance footage, license plate reader information, and the discovery of the Ferragamo bag at Seabrook's house, for example – Rechnitz's testimony was absolutely necessary to prove up the scheme at trial.  In many public corruption cases, there are few genuine factual disputes.  Corruption trials often come down to questions of intent – for example, whether a particular generally agreed upon sequence of events necessarily spells out a *quid pro quo* arrangement as understood in the minds of the participants.  This was the rare case that centered on genuine disputes about whether events actually took place – including whether Seabrook had actually received a luxury men's handbag full of cash at all.  Without Rechnitz's testimony, the Government simply could not have proven that he did.

As it happened, Rechnitz testified against Seabrook twice.  In all, across the two trials, Rechnitz testified for nine days.  At the conclusion of the first trial, published reports indicated the jury was two votes shy of conviction on the bribery conspiracy count.  *See* Whitehouse, Kaja and Laura Italiano, "Norman Seabrook's bribery case declared a mistrial," *The New York Post*, Nov. 16, 2017, https://nypost.com/2017/11/16/norman-seabrooks-bribery-case-declared-a-mistrial/, *last accessed Aug. 31, 2019*.  After the second jury voted to convict, jurors interviewed about the case specifically said that they had found Rechnitz credible.  Juror No. 3 noted that it had been a tough case, but, "The look in [Rechnitz's] eyes said he was broken, so I don't think he was lying anymore."  *See* Brown, Stephen Rex, "Norman Seabrook found guilty on both counts in corruption trial," *The New York Daily*

*News*, Aug. 15, 2018, https://www.nydailynews.com/new-york/ny-metro-norman-seabrook-verdict-20180814-story.html, *last accessed Aug. 31, 2019*.  Put simply, Rechnitz's testimony was invaluable to the Government's ultimate ability to secure a conviction at trial against Seabrook.  And Rechnitz's testimony at the first trial – and the resulting near-conviction of Murray Huberfeld at that point – was key to the Government's ability to secure a guilty plea from Huberfeld before the retrial.

This Court ultimately sentenced Seabrook to 58 months in custody, and Huberfeld to 30 months.  These stout sentences were massive signals to the broader community that crimes of betrayal and dishonesty will be taken seriously by the criminal justice system, and the significance of Rechnitz's contributions should be evaluated in light of the achievement that these sentences represented.

At the height of his powers, just before his arrest, Seabrook had been among the most powerful non-elected persons in New York City.  Seabrook had come to exert "extraordinary control" over the New York City Correction Department, wielding substantial political clout in Manhattan and Albany alike but also blocking needed reforms in a way that "fed a culture of violence and corruption" at Rikers Island.  Schirtz, Michael and Michael Winerip, "At Rikers Island, Union Chief's Clout Is a Roadblock to Reform," *The New York Times*, Dec. 14, 2014, https://www.nytimes.com/2014/12/15/nyregion/at-rikers-a-roadblock-to-reform.html, *last accessed Aug. 31, 2019*.  Huberfeld was a titan of industry, having both presided over the Kosher Delight empire and co-founded a once-respected hedge fund at different stages in his career.  By virtue of Huberfeld's substantial wealth, he and

26

his family's foundations were also fixtures within New York City's philanthropic scene. The convictions and sentences of Seabrook and Huberfeld, made possible by Rechnitz's cooperation, sent a resounding message that no one is so powerful as to be above the law.

        2.     Jeremy Reichberg, Michael Harrington, and James Grant

Rechnitz's cooperation was similarly important to the prosecution of the police bribery scheme. On the same day that Seabrook and Huberfeld were formally charged, a grand jury in this district returned an indictment in *United States* v. *Michael Harrington et al*, 16 Cr. 468 (GHW), which charged Michael Harrington, the former Executive Officer at the NYPD Chief of Department's Office, former 19th Precinct Commanding Officer James Grant, and Jeremy Reichberg with conspiracy, bribery, and honest services fraud offenses. (Reichberg was later charged, via superseding indictment, with obstruction of justice for attempting to have his brother conceal evidence against him on the day of his arrest.) Prior to trial, Harrington pled guilty before the Honorable Gregory H. Woods to misapplication of resources in connection with a program receiving federal funds, a felony offense. After a two month trial, Reichberg was found guilty of conspiracy to commit honest services wire fraud, honest services wire fraud, conspiracy to commit bribery, and obstruction of justice, and Grant was acquitted of each of the counts he faced.[10]

---

[10] Reichberg was found not guilty of a single bribery count specifically limited to his interactions with Grant.

As with *Seabrook*, the police bribery case could not reasonably have been charged in the form that it was without Rechnitz. The bribery conduct at issue was a patchwork of individual incidents – identifiable quids and quos – spread out over the course of more than seven years. Rechnitz's information allowed to find corroboration for individual incidents, made us aware of new ones that fit the illegal retainer pattern, and provided credible evidence of the "pro" – the link – between the gifts he and Reichberg gave to officers and the acts those officers performed in return. In particular, Rechnitz provided a first-hand account of conversations he had with Reichberg that evinced the criminal understanding between the two that formed the backbone of the conspiracy. This account elevated the proof from a circumstantial chain of benefits and favors to something more coherent and suitable for prosecution as a common scheme.

Reichberg and Grant faced trial beginning in November 2018 before Judge Woods. From the beginning of trial, the defense hinged not on whether the transactions had taken place, but on whether the requisite shared criminal understanding existed between and among the alleged co-conspirators, including the defendants. As a result, the very backbone of the Government's presentation of evidence was Rechnitz's testimony, a reality reflected in the fact that Reichberg's counsel *alone* cross-examined him for in excess of eight days. In total, Rechnitz testified for 11 days. In the end, the jury convicted Reichberg and acquitted Grant. Reichberg's conviction would not have been possible without Rechnitz's testimony.

The case was extremely important, both in leading to convictions and in its broader ramifications. In the later stages of the investigation, the NYPD began to take action against some of the involved officers, and then-Police Commissioner William Bratton stated publicly that "you'd probably have to go back to the Knapp Commission days" to find a scandal of this dimension within the annals of the NYPD. *See* Cohen, Shawn and Bruce Golding, "Bratton admits NYPD corruption scandal is historically bad," *The New York Post*, Apr. 14, 2016, https://nypost.com/2016/04/14/bratton-admits-nypd-corruption-scandal-is-historically-bad/ (last accessed Aug. 31, 2019). Bratton reasoned that what distinguished this case was its focus on the senior leadership of the department. The revelation of corruption of leadership at the highest levels – women and men who are vetted repeatedly during their ascent through the ranks and who generally adhere most scrupulously to the oath they swear – is a rare event in the NYPD. It is rare because of the celebrated integrity of the NYPD's leadership, but it is also rare because such schemes are profoundly difficult to prove. It is particularly challenging to investigate and prosecute such schemes where, as here, they involve somewhat diffuse conduct and a broad set of actors, as the list of police officers implicated went significantly further than Harrington, Grant, and Banks. And when such schemes are uncovered, and leading individuals are prosecuted and convicted, an important message is sent: that corruption at the police department's upper registers uniquely damages the public's faith in the institution and will not be tolerated.

29

As for Grant, the trial outcome should not be held against Rechnitz in any way.  Only a subset of the quids and quos pertained to Grant.  Further, experience has taught that convicting individual police officers – men and women who have dangerous and important jobs, and in whom many of us are naturally inclined to invest substantial trust – is difficult, particularly where, as here, the jury heard substantial evidence that aside from the bribery activities described in the indictment and reflected in the evidence and testimony, Grant was an accomplished officer.  Rechnitz was, of course, closer to Reichberg than he was to Grant, and for a substantially longer period of time.  Rechnitz testified, without exaggerating and to the extent that he could, about the sporadic sequence of benefits and favors involving Grant, and the jury found the line between conviction and acquittal somewhere between the unavoidable deluge of information concerning Reichberg and the thinner, but still substantial, amount of information concerning Grant.

None of this should detract from the Court's assessment of Rechnitz's cooperation with respect to the police bribery case.  Judge Woods sentenced Reichberg to 48 months' imprisonment – a substantial sentence on par with this Court's sentences of Seabrook and Huberfeld.  Harrington – a less culpable figure than either Reichberg or Grant – received a favorable plea agreement and a non-custodial sentence for his crime, but nevertheless carries a federal felony conviction for the crime that ended his career as a once highly decorated NYPD official.  And although the jury determined to acquit Grant, the trial brought the unseemly aspects of his conduct as a police official to light, including his assistance in

Reichberg and Rechnitz's effort to obtain gun permits, and his receipt of thousands of dollars in travel accommodations and home improvements from the same men. This airing was healthy, and ultimately beneficial to the cause of making the next would-be NYPD bribe taker or bribe giver think twice.

3. The De Blasio Campaign Investigation

Rechnitz's information with respect to his and Reichberg's involvement with Ross Offinger and Bill de Blasio's campaign was also useful. That information constituted some, but not all, of the conduct at issue in a broader inquiry as to circumstances in which Mayor de Blasio and others solicited donations from individuals who sought official favors from the City, after which the Mayor or individuals working for him made or directed inquiries to relevant city agencies on behalf of those donors.

On March 16, 2017, then-Acting United States Attorney Joon H. Kim announced that the investigation would conclude without charges. The decision not to charge should not be interpreted as a determination that Rechnitz was not forthcoming. On the contrary, Rechnitz's information was generally corroborated by other evidence uncovered during the investigation, including the accounts of other witnesses. Rather, as U.S. Attorney Kim noted in a statement released at the time of the declination, the decision not to go forward reflects, among other challenges, "the high burden of proof, the clarity of existing law, [...] recent changes in the law, and the particular difficulty in proving criminal intent in corruption schemes where

there is no evidence of personal profit."[11]  None of these factors were under Rechnitz's control.

### 4.  The Robert Astorino Fundraising Investigation

Similarly, the Government did not ultimately pursue charges with respect to Rechnitz and Reichberg donations to the Astorino Campaign, Rechnitz's provision of the Rolex watch to Astorino himself, and Rechnitz and Reichberg's appointments at Westchester County Police Chaplains.  And here, too, that is not the result of a determination that Rechnitz's information was not forthcoming.

Here, however, the Government can point to an additional tangible gain from Rechnitz's cooperation.  On or about June 24, 2016, FBI agents were able to take possession of the Rolex watch after serving a subpoena on Mr. Astorino.  On or about June 10, 2019, the Government and Astorio entered into a stipulation wherein Astorino consented to the forfeiture of the Rolex watch to the federal government.  *See In re One Rolex Submariner Watch*, 19 Misc. 283 (DLC), Dkt. No. 2.  That watch, upon the successful conclusion of administrative forfeiture proceedings, will be sold, and the proceeds absorbed into the Department of Justice's Asset Forfeiture Fund, which among other things, pays for the costs associated with forfeiture operations across the department and pays certain general investigative expenses.

---

[11] "Acting United States Attorney Joon H. Kim Statement on the Investigation into City Hall Fundraising," March 16, 2017, https://www.justice.gov/usao-sdny/pr/acting-us-attorney-joon-h-kim-statement-investigation-city-hall-fundraising, *last accessed* Aug. 31, 2019.

5.  Hamlet Peralta

Rechnitz also provided assistance that led to the very first arrest to arise

from the investigation, *United States* v. *Hamlet Peralta*, 16 Cr. 354 (KBF).

Although not the front page news that the Seabrook or Reichberg prosecutions

made, the Ponzi scheme run by Hamlet Peralta was significant in its own right.

Peralta solicited more than $12 million from various investors by falsely

representing that the funds would be used to purchase wholesale liquor for resale,

with the profits to lead to high rates of return for the investors.  In truth, Peralta

used no more than $700,000 to purchase alcohol, and the rest of the money was

used either to repay other investors or enrich himself.

Rechnitz – both a victim of the fraud and recruiter of other victims under

false pretenses – provided information and e-mails that assisted the Government in

understanding how Peralta's business worked.  He was slated to testify against

Peralta as part of his cooperation, and spent several lengthy sessions with the

Government preparing for that testimony.  Peralta then pled guilty four days before

the start of trial, obviating the need for Rechnitz's testimony.  At the time that

Peralta pleaded guilty, Rechnitz's 3500 material had been provided to him and he

was well aware that Rechnitz was about to testify against him.  His conviction,

therefore, should be credited, in part, to Rechnitz's cooperation.  Peralta was

sentenced to five years' imprisonment.

6.  Jason Nissen

Once the National Event Company's $70 million resale ticket fraud was uncovered, and owner Jason Nissen arrested, Rechnitz provided extensive information concerning his understanding of how *that* business worked.  Nissen pled guilty to the wire fraud charge contained in an information in *United States* v. *Jason Nissen*, 17 Cr. 477 (PAE).  After Nissen's plea, the Honorable Paul A. Engelmayer ordered the Government to undertake an investigation of whether the defendant or persons close to him received a personal financial benefit from the funds that Nissen had fraudulently obtained, as opposed to money that had gone to business expenses and/or the repayment of other investors.  As part of his cooperation, Rechnitz provided information to the AUSAs tasked with that assignment.  Nissen was sentenced to 27 months' imprisonment.

7.  The NYPD's Gun Licensing Division

Rechnitz's cooperation also assisted in a badly needed cleanup at the NYPD's Licensing Division, the bureau that vets and approves handgun permits in New York City.  Rechnitz gave information regarding how Grant had used his contacts at the NYPD's Licensing Division – including Sergeant David Villanueva – to attempt to smooth the path for approval of his and Reichberg's gun licenses.  After the announcement of the arrests of Grant and Reichberg for conduct that included gun permit mischief, Villanueva and other Licensing Division personnel who had previously accepted bribes from corrupt expediter Alex "Shaya" Lichtenstein decided to stop accepting his bribes.  Lichenstein attempted to reach out to new

34

partners in the NYPD, one of whom contacted the relevant authorities immediately. This launched a broader inquiry that resulted in the arrests and convictions of Villanueva, Lichtenstein, and numerous other corrupt police officers and expediters.

In this way, Rechnitz should also receive some credit for contributing to the Government's successful spin-off investigation of the Licensing Division and the network of expediters who transacted with it. These investigations resulted in the successful prosecutions of *United States* v. *Alex ("Shaya") Lichtenstein*, 16 Cr. 342 (SHS) (32 month sentence after guilty plea on bribery charges relating to serial bribery of licensing division officers); *United States* v. *David Villanueva*, 16 Cr. 342 (SHS) (four month sentence, discussed *supra*, for cooperating police official who received bribes); *United States* v. *Richard Ochetal*, 16 Cr. 342 (SHS) (time served for police officer who received bribes and testified at trial as cooperator); *United States* v. *John Chambers*, 17 Cr. 396 (WHP) (one year and one day sentence for corrupt attorney who facilitated gun license bribes); *United States* v. *Paul Dean*, 17 Cr. 398 (ER) (18 month sentence for participation in gun license approval-related bribery); *United States* v. *Robert Espinel*, 17 Cr. 398 (ER) (one year and one day sentence for participation in gun license approval-related bribery); *United States* v. *Gaetano Valastro*, 17 Cr. 398 (ER) (sentence pending for former officer and expediter who received bribes); and *United States* v. *Frank Soohoo*, 16 Cr. 342 (SHS) (sentence of time served for corrupt gun license expediter).

Rechnitz's cooperation led to an overdue shining of light on a dysfunctional corner of the NYPD, one that has, as a result, undergone substantial reforms and

been fully re-evaluated and re-staffed. In addition, because Villanueva was the
corrupt official who Grant used to approve gun licenses for Reichberg and Rechnitz,
had Villanueva proceeded to trial, Rechnitz would likely have been called to testify
against him. Ultimately, of course, Villanueva also cooperated, and, as noted above,
was ultimately sentenced to four months in prison.

* * *

In conclusion, the significance and usefulness of Rechnitz's cooperation is,
perhaps in both its breadth and its depth, without peer among white collar
cooperating witnesses in the recent history of the Southern District of New York.
From COBA's union leadership to City Hall, from the Westchester County
Executive's Office to One Police Plaza, to two multimillion dollar Ponzi-style
schemes, Rechnitz's cooperation reverberated profoundly. It is difficult to describe
precisely how valuable Rechnitz's cooperation was, but may it suffice to say that his
assistance fueled a surge in significant and successful investigations and
prosecutions between 2016 and the present, and perhaps more importantly exposed
a wide swath of wrongdoing and held powerful, wayward interests to account.

### B. The Nature and Extent of the Defendant's Assistance

The Guidelines call upon the Court to evaluate not merely the importance of
the defendant's assistance, but also what the defendant actually did in order to
provide it. Here, too, Rechnitz's value was as great or greater than nearly any other
recent white collar cooperating witness. Between 2016 and the present, Rechnitz
met or spoke to the Government on more than 80 discrete days that the

Government has been able to tally – many of those being full day sessions in conference rooms at the U.S. Attorney's Office of debrief proffers at the outset of his cooperation and full-day prep sessions in anticipation of his testimony at the trials at which he appeared as a witness. When he was not in New York, he was teleconferencing in from Los Angeles. When he was in New York, he was there without complaint. Frequently, Rechnitz would arrive for his sessions with the Government having just disembarked the redeye flight from California. He never asked to be reimbursed for his travel.

Rechnitz's testimony was also remarkable. Rechnitz was called as a witness at three separate trials. At each trial, Rechnitz had to explain to a jury of his peers the various ways in which he had gone astray during the years of his criminal partnership with Jeremy Reichberg. Every distasteful detail had to be presented on direct examination, from his bribery conduct, to his provision of prostitutes for various officers, to his dubious business practices. In a city that takes both religion and parking quite seriously, Rechnitz had to tell jurors how he had made a mockery of his faith by taking on chaplaincy positions he had no qualifications to hold in order to secure a parking placard. Rechnitz had to look those same jurors in the eye and tell them how he referred friends of his to Reichberg in order to skirt *their* obligations to serve as jurors. And so on. In Rechnitz's case, there was a palpable awkwardness as Rechnitz walked them through years of distasteful details of his own life and schemes, a factual cocktail that seemed almost engineered to provoke active disdain from jurors who, unlike the Government, had not seen Rechnitz hold

his head and weep in conference rooms as he bemoaned his foolishly spent younger years.

The direct testimony was, in that sense, difficult.  The cross-examinations were still more so.  Rechnitz's central role at trial was made clear when he was subject lengthy cross-examinations that rehashed the embarrassing already brought out and sought to raise new ones in an effort to discredit him as a witness.  At the first *Seabrook* trial, before Judge Carter, Rechnitz was cross-examined for parts of four days out of a total of six on the witness stand, by some of our district's better practitioners of that art.  At the retrial before this Court, the cross-examination was more economical but no less lacerating as Rechnitz was grilled about friends he had betrayed and ways in which he had attempted to make himself seem more successful and important than he in fact was over the years.  In the Reichberg trial before Judge Woods, Rechnitz's cross-examiners were even more unrelenting, as Rechnitz's cross-examination *alone* went on for more than eight trial days.  Without exaggeration, and largely because his past made it possible, Rechnitz was publicly mocked, harangued, and called names for days on end.  Attorneys went so far as to chastise him for taking one of his children to a baseball game while awaiting sentencing.[12]

The pressure of the testimony was substantially amplified by the attention it received in the media.  As had been the case in the advanced stages of the investigation, Rechnitz's name and picture were front and center in New York City's

---

[12] *See Seabrook I* Tr. at 1206.

tabloid press, amidst breathless, sensationalized and often inaccurate coverage of
his past misdeeds. The following representative examples came the morning after
the first hour of Rechnitz's testimony in *Seabrook I*:



Further, at the *Reichberg* trial, Rechnitz testified before a particularly hostile
gallery, so much so that Judge Woods had to take action on multiple occasions. In
the Seabrook trials, particularly the first one, the gallery had been merely filled
with supporters of the defendants from the community, including numerous
members of the defendants' social and professional circles. Reichberg's trial was
another story. At different points during the Reichberg trial, Judge Woods had to
admonish the gallery not to display, in the direction of the witness box, pictures of a
rabbi that had been distributed among Reichberg's supporters. On several
occasions early in Rechnitz's testimony, his efforts to exit the courtroom were
impeded by men from the community who stood in his way and stared him down;

eventually, Judge Woods granted a Government request to allow Rechnitz to take his breaks in the robing room in order to avoid a physical confrontation.

All of this detail serves a relatively simple point: Rechnitz not only testified at considerable length, but did so under a kind of duress that is atypical of the experience of cooperating witnesses.

### C. Unusual Circumstances Endured by The Defendant

In a related vein, the Guidelines ask the Court to consider "any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his cooperation." U.S.S.G. § 5K1.1(a)(4). To be clear, Rechnitz is not in the category of cooperating witnesses who find their lives and those of their families threatened by the violent gang members or narcotrafficking defendants they testify against. But Rechnitz's experience also differed significantly from the average white collar cooperator in several respects that the Court should consider.

First, Rechnitz needed to obtain rabbinical permission in order to even come forward to the Government when he chose to. (*See* Reichberg Tr. at 2716). The Government understands this requirement to have its roots in the religious and cultural notion of *mesirah*, which anchors a prohibition against informing on fellow Jewish persons in the teachings of the Talmud. Bluntly put, when Rechnitz commenced his cooperation, Rechnitz had to deal with the likelihood that significant portions of his community would see him as having shifted from one disgraceful mode of conduct – his lawless conduct alongside Jeremy Reichberg for several years – to an even worse one as a betrayer of his community and faith.

Second, Rechnitz experienced actual harassment as a result of his cooperation – particularly in the weeks before he was scheduled to testify against Huberfeld in the first trial. Among other things, Rechnitz reported, and the FBI verified, that (1) Rechnitz was approached in a hostile manner by an associate of Huberfeld's at a school event he attended for one of his children, (2) Rechnitz's residence was shadowed by a vehicle on multiple occasions, the owner of which traced back to persons with connections to Huberfeld, and (3) both before and after his testimony, Rechnitz received several unsettling anonymous phone calls and e-mails. The thrust of some of these communications was not an overt threat to harm Rechnitz or members of his family, but rather an effort to put Rechnitz in a state of guilt-related anxiety about testifying against Huberfeld.

To this end, one of the more chilling instances of harassment involved the leaking of activities within his synagogue to the *New York Post*. On October 4, 2017 – weeks before Rechnitz was due to testify against Huberfeld at the first trial – the Post reported that, according to "sources," Rechnitz and his father gave substantial donations in order to perform certain honors at Yom Kippur services that year, and his fellow congregants resented it. The report also gratuitously named individuals whom Rechnitz had brought to the synagogue as guests in recent weeks. *See* Whitehouse, Kaja, "De Blasio donor angers temple-goers with $30K donation," *The New York Post*, Oct. 4, 2017, https://nypost.com/2017/10/04/de-blasio-donor-angers-temple-goers-with-30k-donation// (last accessed Aug. 31, 2019). To Rechnitz, the disclosure of these private activities to the Post struck him as he imagined they

were intended to – as a particularly personal and violating brushback pitch from persons within his own faith community.

All of these atypical wrinkles were layered atop an unprecedented level of media attention. When news of the investigation into Reichberg and Rechnitz first broke, before anyone had been charged, the topic ran on the front page of the *New York Post* for eight straight days, the first of a number of waves of publicity. Seemingly each day trumpeted a new angle, many of them salacious – from the involvement of prostitutes to the involvement of high-level NYPD officials and the Mayor of New York. Rechnitz's name and picture were plastered on every story, and each emphasized the most scandalous details.

Needless to say, Rechnitz reached a level of infamy that is rare even in New York before making a single public appearance in court as a witness, and testified amidst a suffocating media crush. Rechnitz needed an FBI escort just to get into court. That attention, of course, gravely affected what legitimate businesses he had, as banking institutions severed their ties to his real estate syndication company and business contacts shunned him.

In sum, Rechnitz testified amidst the collapse of the life he had known, a collapse that was public and prolonged in ways that further distinguish him from other cooperating witnesses.

D. *The Truthfulness, Completeness, and Reliability of Any Information or Testimony Provided by the Defendant, and the Timeliness of His Assistance*

As noted earlier, Rechnitz was not candid when first approached by law enforcement.  He lied in order to obfuscate his connections to Seabrook and the officers he and Reichberg had cultivated.  Once his formal cooperation commenced, however, Rechnitz gave information both on previously known subjects of investigation and on subjects that were new to the Government.  The information he provided was corroborated by other evidence, including the statements of others.  Rechnitz was at all times forthright about his crimes and those of others, and it is perhaps most telling that over the literal weeks of cross-examination he endured over the course of three trials spread out over more than a calendar year, he was never revealed to have told the Government anything but the truth.

Rechnitz's formal cooperation was sufficiently timely to charge each of the cases referenced herein, and his own charges came pursuant to an already secured cooperation agreement.  The Government intends to move, at the time of sentencing, for the Court to award him the "third point" pursuant to U.S.S.G. 3E1.1(b), because he pled sufficiently early for the Government to avoid preparing for trial and allocate its resources efficiently.

In addition to his debriefs and his testimony, Rechnitz also provided the Government with considerable evidence that it was able to use during its prosecutions.  Among these were documents and dozens of pictures of himself and

43

co-conspirators and persons of interest, including the relevant officers, politicians, and other prominent persons. He turned over, and the Government made use of, video he recorded of himself and Reichberg, including on the Christmas morning when they delivered gifts to police officers' homes, and the various parking-related credentials that he had received from Philip Banks and others. He made tens of thousands of emails available to the Government, which tracked many of the schemes that were eventually charged, as well as the full contents of a cellular phone.

All told, over the course of the three and one half years of cooperation with the Government, Jona Rechnitz has done virtually everything that the United States Attorney's Office and the law enforcement agencies working with it have asked him to do.

## IV.  OTHER SENTENCING CONSIDERATIONS

### A. Sentences of Similarly Positioned Defendants

One of the chief reasons that the current sentencing regime, including the Guidelines, exists, is to avoid unwarranted sentencing disparities between similarly situated defendants.   Precise comparators for Rechnitz are rare – it is not every day that one comes across the same combination of (1) prior bad conduct, (2) significant, far-reaching cooperation, and (3) personal toll in undertaking that cooperation. Further, it is generally rare for the Government to successfully develop cooperating witnesses in public corruption cases.

The Government can offer the following data points:

- *United States* v. *Todd Howe*, 16 Cr. 632 (VEC). Noted *supra*. Howe, who had committed myriad frauds in addition to the corruption-related crimes of conviction, testified at one trial and experienced a near-detour into criminality that prevented him from testifying at a second. His assistance contributed to the convictions of Joseph Percoco, Alain Kaloyeros, and several co-conspirator businessmen. Howe was sentenced to probation, having been detained for five months' imprisonment after his cooperation went awry.

- *United States* v. *David Villanueva and Richard Ochetal*, 16 Cr. 342 (SHS). Also noted *supra*. Villanueva's assistance, which included testimony at two trials, contributed to the successful prosecutions of Reichberg and several police officers and corrupt expediters. Villanueva was sentenced to four months' imprisonment. Ochetal, a lower-ranking officer, cooperated even earlier than Villanueva did, making the latter's prosecution possible, and later testified at the Reichberg trial. He received a sentence of time served in September.

- *United States* v. *Thomas Gassnola*, 18 Cr. 252 (LAK). Gassnola cooperated in wide-ranging NCAA corruption scandal, in connection with which he and co-conspirators funneled illicit payments to the families of amateur student-athletes bound for NCAA schools to ensure that the students matriculated at schools sponsored by Adidas, the apparel

company. The scheme involved three different colleges, and plans involving a fourth were thwarted only by the betrayal of one of the co-conspirators. He pled guilty to wire fraud conspiracy and testified at the trial of three co-defendants last year. On September 10, 2019, Gassnola was sentenced to time served (e.g., no incarceration) and a one year term of supervised release.

- *United States* v. *Unnamed Cooperating Witness ("Defendant-1").*[13] Defendant-1 participated in a significant bribery and money laundering scheme, and was also understood to have committed tax and embezzlement misconduct, along with failing to disclose required information in another official proceeding. Unlike Rechnitz, Defendant-1 did not have to testify at trial (although the witness was willing), nor did any charged cases result directly from the cooperation. Defendant-1 received a sentence of time served with a probationary period.

- *United States* v. *James David Williams*, 16 Cr. 436 (KMW). Between 2002 and 2016, Williams and his co-conspirators defrauded investors in connection with various film projects and laundered the proceeds, committed aggravated identity theft in furtherance of a separate fraud, made false statements to the Government (necessitating a second guilty plea), and engaged in some 20 years of other petty fraud offenses. He did

---

[13] The referenced defendant's cooperation is not publicly known, and thus the witness is not named here. The Government can, at the Court's request, provide the defendant's name and docket number under seal and ex parte upon request.

not testify at trial, although he was willing to do so.  Williams received a

time served sentence, having spent 9 months in jail.

B.  Section 3553 Factors

Under the statute, the Court must determine a sentence that reflects the

seriousness of the offense, promotes respect for the law, provides just punishment

for the offense, and takes into account Rechnitz's history and characteristics,

protects the public from further crimes of the defendant, and deters criminal

conduct.

The Government notes that it is difficult to imagine Rechnitz offending again.

As an initial matter, the publicity that accompanied his case and those he became

involved in rendered him radioactive to potential criminal partners.  Most criminals

would be highly reluctant to engage in their activities with someone who has

already aroused this much attention.  But perhaps more importantly, it is difficult

to imagine Rechnitz taking up the same course again given the remorse he has

exhibited in proffer sessions with us, and while testifying, regret that goes beyond

merely having committed crimes.  When asked whether he was proud of being able

to secure the Westchester County Police Chaplain position, Rechnitz was blunt.

"Not at all […] I made a mockery of my religion, I made a mockery of the

chaplaincy, and it's humiliating."  Seabrook II Tr. at 615.  Rechnitz's expressions of

regret and embarrassment that he lost his footing on a moral level square with

sentiments that he has expressed to us during his prep sessions, and in a fashion

that we credit.  They cohere with a viewpoint that he has voiced repeatedly to us

47

and during his testimony – that his lawless adventures in impressing his way up the ladder were stupid, childish, and criminal.  Further, Rechnitz has seen his former colleagues in criminality – the people he literally broke bread with while committing these offenses – fall one by one.  Rechnitz has been duly deterred.

The cause of *general* deterrence has also been served already by the stout sentences handed to Rechnitz's senior partners in crime, including Reichberg, Seabrook, and Huberfeld.  We respectfully submit that the collective impact of this suite of cases has already been to send a message that bribery will not be tolerated. Each of those convictions and sentences received substantial public attention.  Here, more so than in most cases, there is reason to believe that general deterrence has already been effected.  Likewise, the criminal justice system has expressed its righteous view of the seriousness of the offenses through the other defendants. Jeremy Reichberg, who never took actual responsibility or expressed genuine remorse for his actions, was a key participant in (if not the driving, orchestrating intellect of) the entire crime spree.  He has surrendered to the Bureau of Prisons, and will spend the next four years in federal prison.  Seabrook and Huberfeld's sentences in the same ballpark reflect their status as the defining poles of one of the more infamous bribery schemes in recent memory.

That leaves the need to promote respect for the law and the need to provide *just* punishment.  The Government respectfully submits that a just punishment, in this case, should reflect Rechnitz's extraordinary cooperation.  Likewise, promoting respect for the law, in this instance, is more effectively achieved through sending a

48

vital message that the Reichberg, Seabrook, and Huberfeld sentences could not send, a message that speaks directly to the next Jona Rechnitz: that it is always, always worth it to stop digging. That there is some salvation in attempting to turn things around and committing to set things right. And that when people make that decision to cooperate, accept responsibility, plead guilty willingly and early, and embark upon a path of redemption, when they both perform extraordinarily in doing so in a process that takes years beyond what is expected of most similarly situated people, a system that values *just* punishment will fully and properly consider all of this in imposing a fair sentence.

This, too, is promoting respect for the law. This is a message that will encourage rather than dissuade the next potential cooperating witness, and consequently, enable just and right outcomes in cases well beyond even the scope of Jona Rechnitz's cooperation. It is a message that will send ripples well beyond the world affected by his admittedly serious crimes. And, crucially, it is a message that can *only* be sent in this case – in which Rechnitz's cooperation has been highly visible, its fruits have been meaningful, and its caliber has been nothing short of historic.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully moves for a downward departure in sentence, pursuant to Rule 5K1.1 of the Sentencing Guidelines, and further respectfully requests the imposition of a sentence driven

principally by Jona Rechnitz's extraordinary cooperation – a sentence sufficient, but

not greater than necessary, to achieve the statutory goals of sentencing.

Dated: New York, New York
       October 16, 2019

                                        Respectfully submitted,

                                        GEOFFREY S. BERMAN
                                        United States Attorney

                          By:    _____
                                        Martin S. Bell
                                        Russell Capone
                                        Jessica Lonergan
                                        Lara Pomerantz
                                        Kimberly J. Ravener
                                        Assistant United States Attorneys
                                        Southern District of New York
                                        (212) 637-2463/2247/1038/2343/2358

cc:    Alan Levine, Esq.
       Daniel Grooms, Esq.
       Nicholas Flath, Esq.