# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     v.

JONA RECHNITZ,

         Defendant.

16-CR-389 (AKH)

# SENTENCING MEMORANDUM
# OF JONA RECHNITZ

COOLEY LLP

Of Counsel:

Alan Levine
Nicholas Flath
  55 Hudson Yards
  New York, NY 10001-2157
  (212) 479-6000

Daniel Grooms (*pro hac vice*)
  1299 Pennsylvania Avenue NW
  Suite 700
  Washington, DC 20004
  (202) 776-2042

*Attorneys for Defendant*

**Table of Contents**

**Page**

PRELIMINARY STATEMENT ............................................................................................... 1

I. PERSONAL HISTORY ............................................................................................. 4

  A. Jona's Childhood and Education ................................................................... 4

  B. Jona's Career and Life on the Upper West Side ........................................... 5

  C. Jona's Offense Conduct and Plea of Guilty ................................................. 6

  D. Jona's Cooperation with the Government ..................................................... 8

  E. Jona's Remarkable Record of Good Works .................................................. 9

II. SENTENCING GUIDELINES ............................................................................... 15

III. § 5K1.1 FACTORS ................................................................................................. 16

  A. The Significance and Usefulness Of Jona's Cooperation ......................... 16

  B. The Truthfulness, Completeness, and Reliability of Jona's Information
   And Testimony ............................................................................................ 18

  C. The Nature and Extent of Jona's Assistance .............................................. 19

  D. Injuries Jona Suffered Resulting From His Assistance ............................... 21

    1. Notoriety ......................................................................................... 21

    2. Ostracism ........................................................................................ 24

    3. Intimidation in the Courtroom ........................................................ 28

  E. The Timeliness of Jona's Assistance .......................................................... 29

IV. SENTENCING FACTORS IN 18 U.S.C. § 3553(A) .............................................. 30

V. RESTITUTION ........................................................................................................ 35

CONCLUSION .................................................................................................................. 40

## PRELIMINARY STATEMENT

Before this Court for sentencing is defendant Jona Rechnitz, who, under the circumstances, made an extraordinary decision to admit his criminal responsibility for honest services bribery, and then provided extraordinary public assistance to the United States Attorney's Office (the "Government") as a cooperating witness, leading the Government to describe him as "one of the single most important and prolific white collar cooperating witnesses in the recent history of the Southern District of New York."  Gov't Mem. in Supp. of Downward Departure Pursuant to Section 5K1.1 dated Oct. 16, 2019, ECF No. 70, at 1 (herein, "5K1.1 Motion").  Giving full meaning to the statute's admonition to impose a just sentence sufficient "to promote respect for the law" (18 U.S.C. § 3553 (a)(2)(A)), we submit this Court should impose a non-custodial sentence of time served with an appropriate fine, order of restitution and supervised release.

Jona, now a father of six children, was a young man of 26 when he took on the New York real estate community with the goal of becoming a big man in the community, and there was no expense too grand in his effort to impress and no line he was unwilling to cross in pursuing an ill-conceived strategy to establish himself as a go-to person in the wider community and to attract the wealthy as his investors.  Over a period of several years, he misused his financial resources to compromise the judgment of much older and more senior New York City Police officers and a union leader.  But, when he realized that the Government was focused on police corruption, he made a life-changing decision to approach the Government through counsel and proffer his criminal activities, and ultimately, to plead guilty to one count of conspiracy to commit honest services fraud for bribing police and public officials and by delivering a commercial bribe to a union leader on behalf of a hedge fund.  While he recognized the implications to his faith of the decision to cooperate with the Government, he never could have envisioned the torrent of scorn, abuse and public shame, and downright intimidation that he and his family would experience from

the day that cooperation became public up through and including the present. The community's opprobrium and the reaction of the banking community to the guilty plea forced him to abandon significant financial stakes in pending real estate investments. And, the shunning by his community literally drove him out of town, as he relocated this family to his hometown of Los Angeles.

The defendant recognizes the shamefulness of his conduct. "[T]his [the conduct] is something that of course disgusts me looking back on it now," he said in one of the three trials at which he testified. App. Ex. 45, Transcript in *United States v. Seabrook*, No. 16 Cr. 467 (AKH) ("Seabrook II Tr.") at 948:18-19. The letters filed with this memorandum are filled with attestations by family, friends, and clergy to the defendant's understanding of the severity and import of his conduct and the hypocrisy that conduct demonstrated. From the day that "[the defendant] decided to move forward and get [his] life in order" (*Id.* at 949:22-23), his confession, public and private, has been without limitation. In addition to that genuine remorse, this defendant has been the subject of public shame from his admissions of responsibility during his nineteen days on the witness stand and from over 250 days of news articles calling him out for public ridicule. Defense lawyers always tell the Court that their client has suffered enough from the public rebuke of a conviction, but those words take on new meaning in the present circumstances.

As more fully described here and in the Government's motion for departure pursuant to 5K1.1, superlatives are inadequate to describe the full extent and value of the defendant's cooperation. From the day that he pleaded guilty in June 2016 until his last day on the witness stand in December 2018, the defendant spent a total of 80 days being interviewed by the Government and preparing for his testimony and an additional 19 days on the witness stand. (This count does not include the travel to and from the West Coast to attend those 80 sessions and 19

trial days.) The nineteen trial days involved three separate criminal trials, the bulk of the days on relentless cross-examination. But the full-time commitment to the Government over the two and one-half years only tells a portion of the story. It is the value of that cooperation that is exceptional, by any measure. As the Government's 5K1.1 Motion details, the defendant told of criminal activity that the Government did not know about without him and other activity that it could not prove without him. All of that information and ultimate testimony was candid and truthful. Unlike many cooperating witnesses, he did not shave the truth to present himself in a more favorable light and he was not caught in any half-truths on cross-examination. All in, some fifteen separate defendants were punished based on his cooperation.

Finally, not only is the value of the defendant's cooperation exceptional, but it is the example that cooperation sets for the community that, we respectfully submit, calls for a non-custodial sentence of time served. It is rare for the Government to obtain cooperation from a participating defendant for the crime of union corruption, and prosecuting police corruption has been even more rare in this city in the last 50 years. His cooperation exposed multiple breaches of the public trust by police officers, public officials and one of the city's most prominent union officials. The criminal justice system depends on live witnesses to prosecute these difficult cases. Deterrence has been achieved by the Government's prosecution of these fifteen individuals. More importantly, involved in the defendant's criminal activities were many different constituencies that, to put it mildly, discourage cooperation with the Government. Promoting respect for the rule of law is the cornerstone value of the federal criminal justice system. As we will argue below, it is this defendant's sentence which this Court should use to promote that respect above all else.

## I.     Personal History

### A.     Jona's Childhood and Education

Jona was born in Los Angeles in 1982, the middle of three children. Pre-Sentence Investigation Report ("PSR") ¶ 88. His father Robert is a successful real estate developer in California. *Id.* ¶ 89. His mother, Melanie, writes that Jona "grew up with loving parents and two siblings, and was surrounded by four grandparents, each one teaching him about giving, sharing and kindness towards others." App. Ex. 20, M. Rechnitz Ltr. at 1.[1] These lessons sank in; his brother, Jared, writes that "[f]amily is and always has been [Jona's] number one priority," and "[i]t is because of Jona, that every member of my family ends any phone call with each other with, 'I love you', before hanging up." App. Ex. 18, Jared Rechnitz Ltr. at 1. One of Jona's teachers, Danny Rotenberg, also recognized that Jona "was always a caring and thoughtful boy, who would make sure that all his peers would be treated with care." App. Ex. 25, D. Rotenberg Ltr. at 1.

Jona grew up in a traditional Orthodox Jewish home, and religion has always been, and continues to be, very important to him. PSR ¶ 110.

Jona's childhood was privileged; he attended private school through the twelfth grade. *Id.* ¶¶ 90, 107. As a child, Jona knew that his family was successful and prominent in the community. His father gave extensively to charity and was respected in the community. Indeed, Jona recalls people regularly coming to his father for advice and to settle disputes. *See* App. Ex. 46, Transcript in *United States v. Grant and Reichberg*, No. 16 Cr. 468 (GHW) ("Reichberg Tr.") at 2379:6-11.

In 2002, Jona moved to New York City for college. He attended Yeshiva University and graduated in 2006. PSR ¶ 104.

---

[1] Jona has submitted 27 letters in support, and several additional exhibits, as exhibits to the accompanying Appendix (each referred to herein as "App. Ex. __").

In 2004, while studying abroad in Israel, Jona met Rachel Kahn.  Jona and Rachel soon fell in love, and were married in 2005.  They have been together ever since, and have six children together–the oldest is thirteen, the youngest less than one year.  Rachel does not work outside the family home.  *See id.* ¶ 92.

### B.    Jona's Career and Life on the Upper West Side

In 2006, after college, Jona began working in the real estate industry in New York, determined to become a successful businessman in his own right.  *Id.* ¶¶ 115-120.  As he described it, "I wanted to one day become my own boss and have my own company and own many trophy buildings throughout New York."  App. Ex. 45, Seabrook II Tr. at 567:20-21.

Jona began his career as an intern at a commercial real estate firm in New York, working as a broker's assistant.  PSR ¶¶ 119-120. After a year, Jona left to start his own residential real estate firm (Broad Properties), which failed.  *Id.* ¶¶ 116-117.

Jona got a job with Africa Israel USA in 2007, as the personal assistant to the CEO.  *Id.* ¶¶ 115-116.  Jona worked for four years at Africa Israel, learning to evaluate real estate prospects and developing financial models, and rose to become Director of Acquisitions and Dispositions by the time he left in 2010.

In 2010, Jona started JSR Capital LLC, his own business, and began syndicating real estate deals.  *Id.* ¶¶ 113-114.  Jona would identify an opportunity, then find investors who were interested in participating.  JSR's acquisitions included a medical center in the Bronx, which JSR renovated and filled with tenants; two townhouses in the East Village, which JSR remodeled and converted into a multi-unit rental property; and a building in midtown, which JSR intended to convert into luxury condominiums.  He achieved notable success.

While Jona pursued his career in real estate, he and Rachel made a life together in Manhattan, and Jona strove to get involved with his community.  Rabbi Steven Burg, who became

friends with Jona through their shared work for the Simon Wiesenthal Center, came to value Jona's advice and guidance. App. Ex. 3, S. Burg Ltr. at 1. Another friend, Rabbi Steven Weil, writes that Jona and Rachel were "pillars in starting a community" close to Yeshiva University "that exploded and became an anchor for thoughtful young Jews," including Rabbi Weil's own children. App. Ex. 27, S. Weil Ltr. at 1. Jona's brother Jared also recalls that Jona used to stay up on the phone at late hours, helping with others' personal and business disputes, or "just to make peace between them," often for the benefit of schools and synagogues. App. Ex. 18, Jared Rechnitz Ltr. at 2. Jona's former neighbors in Manhattan, Mariam and Shea Schwebel, attest to the way in which he managed to "juggle his time with his family, friends and community all the while making everyone around him feel good in his presence." App. Ex. 26, M. and S. Schwebel Ltr. at 2.

### C. Jona's Offense Conduct and Plea of Guilty

However, the business career that Jona was building was not without its perils. Jona ultimately veered off a path of integrity and into a world where he was unable to distinguish between right and wrong. Our client has written the Court a letter, and his immediate family have also written to the Court. These letters offer the Court an explanation for the conduct and need not be repeated here.

By May 2016, Jona realized that he needed to reset his life.[2] He retained counsel and within weeks accepted the Government's offer that he enter into a cooperation agreement, which provided for a plea of guilty to a one-count Information. That Information summarizes Jona's criminal offenses; it charges a single-count, multi-object conspiracy to commit honest-services wire fraud

---

[2] In early 2015, Jona was interviewed by the NYPD Internal Affairs Bureau ("IAB") regarding his connections with the NYPD. In each of three meetings with them, he concealed his activities with the NYPD, and, concerned about that investigation, he deleted emails from his computer, destroyed a cell phone, bought a new computer and destroyed his old one. *See generally* 5K1.1 Motion at 22.

(18 U.S.C. §§ 1343, 1346, 1349).  *See generally* PSR ¶ 11.  The conspiracy involved two distinct courses of conduct.

The first course of conduct was Jona's collaboration with Jeremy Reichberg to provide gifts and other benefits to corrupt members of the New York City Police Department ("NYPD") and public officials in return for various privileges.  *See generally id.* ¶¶ 12-30; 5K1.1 Motion at 12-15; *id.* at 19-20.  Reichberg marketed himself as an expediter and NYPD liaison.  PSR ¶ 13.  After meeting through a mutual contact (*id.* ¶¶ 13, 55), Jona and Reichberg embarked on a plan to cultivate relationships with senior NYPD officers and public officials by bestowing benefits to them, largely financed by Jona.  *Id.* ¶ 15.  In return for these benefits, the NYPD officials gave Jona and Reichberg parking placards, influence in promotion decisions, escorts through traffic (including, on one occasion, a partial lane closure of the Lincoln Tunnel), rides in police vehicles, and assistance in private disputes.  *Id.* ¶¶ 18, 20, 22, 24, 26.  For their part, the political officials also gave favors to Jona and Reichberg in exchange for the benefits they received, including favorable treatment from the New York City Department of Buildings, and appointments as police chaplains in Westchester County.  *Id.* ¶¶ 29, 30.

The second course of conduct involved Jona's facilitation of a payment from Murray Huberfeld (a founder and co-owner of the Platinum Partners hedge fund), to Norman Seabrook, (President of the Correction Officers' Benevolent Association ("COBA")), in return for the investment of some of COBA's pension fund in Platinum Partners.  *See generally id.* ¶¶ 33-43; 5K1.1 Motion at 5-19.  Jona was friends with Huberfeld, and in late 2013, Huberfeld asked him to help find institutional investors willing to invest in Platinum Partners.  PSR ¶ 35.  Soon thereafter, Jona learned that Seabrook (whom he had met through contacts at the NYPD) was interested in profiting personally from his power to direct COBA's pension fund investments.  *Id.*  Rechnitz

introduced Huberfeld and Seabrook, letting Huberfeld know that Seabrook would expect a kickback. *Id.* ¶ 36. After facilitating the initial meeting between Huberfeld and Seabrook, Rechnitz had no further involvement in Platinum Partners securing an investment by COBA. *Id.* Rechnitz did not see any documents suggesting that Platinum Partners was in financial danger or that it was not a suitable investment for a benefit pension plan. *See* 5K1.1 Motion at 18.

COBA invested $10 million in Platinum Partners in March 2014, $5 million in June 2014, and $5 million in August 2014, or a total of $20 million. PSR ¶ 39. Platinum Partners earned $1.2 million in investment and management fees from this investment. *Id.* ¶ 48.

In December 2014, Seabrook sought to receive the kickback. Huberfeld told Jona to pay Seabrook $60,000, and told Jona to submit a fake invoice for tickets to New York Knicks basketball games to Platinum Partners so he could be repaid covertly. *Id.* ¶ 40. On December 11, 2014, Jona met Seabrook in Manhattan and handed him a men's handbag containing $60,000 in cash. *Id.* ¶ 41. Jona was then repaid by Platinum Partners based on the fake Knicks invoice. *Id.* Jona did not profit personally from the kickback scheme. *Id.* ¶ 43. When Huberfeld insisted on paying something, Jona asked him to instead donate to charitable causes to which Jona was attached. 5K1.1 Motion at 17.

COBA ultimately lost $19 million of its $20 million total investment due to unrelated fraud activities within Platinum Partners. PSR ¶ 48.

### D. Jona's Cooperation with the Government

Jona's active service as a cooperator extended from June 2016 until the end of December 2018. The reliable information he gave the Government led to criminal charges against Jeremy Reichberg and officers Michael Harrington and James Grant of the NYPD, as well as against Norman Seabrook and Murray Huberfeld. Jona then testified in three lengthy criminal trials, resulting in convictions of Reichberg and Seabrook, guilty pleas by Huberfeld and Harrington, and

the acquittal of Grant.  In addition, Jona's information, and threat of testimony, also assisted the Government in its investigation of corruption in the NYPD handgun licensing division and in the prosecution of two Ponzi schemes.  As described more fully below and in the Government's 5K1.1 Motion, the "significance and usefulness of Jona's cooperation is, perhaps in both its breadth and its depth, without peer among white collar cooperating witnesses in the recent history of the Southern District of New York."  5K1.1 Motion at 36; *see generally* Part III, *infra* (applying 5K1.1 factors).

### E.       Jona's Remarkable Record of Good Works

Jona's parents are role models of generosity, and he has striven to follow their example. He has a drive to help those around him, and eschews publicity of his good acts.  Rabbi Haskel Lookstein, who officiated Jona's wedding, writes that Jona "tries to avoid any kind of public behavior," and his good deeds are "done anonymously."  App. Ex. 16, H. Lookstein Ltr. at 2. Rabbi Steven Weil, a family friend, concurs: "[a]nytime that Jona has financially supported [charitable] projects, he has asked for anonymity.  This is something that he was taught by his parents and grandparents."  App. Ex. 27, S. Weil Ltr. at 2.  Rachel sums it up best: "he is innately a very good person with a very big heart, probably the biggest heart of anyone I know.  He would and does do anything in his power, and even beyond his power, to help others, regardless of whether it's a family member, friend or total stranger."  App. Ex. 21, Rachel Rechnitz Ltr. at 2.

Many of the letters in support attest to Jona and Rachel's remarkable practice of opening up their home to the lonely and friendless for the weekly Sabbath meal, and on holidays.  Jona's brother, Jared, writes that Jona and Rachel's weekly Sabbath table "was filled with guests who may not have been invited out, were forgotten about, or were alone," including "widows, orphans, divorcees, people new to the community, foreigners, and just people who were in need."  App. Ex. 18, Jared Rechnitz Ltr. at 2.  Mariam and Shea Schwebel, neighbors of the Rechnitz family on the

Upper West Side, echo this sentiment, writing that "lonely people including many who had moved to New York from Jona's hometown in Los Angeles, found a home in the Rechnitz's," where they could enjoy "a homemade meal for the Sabbath." App. Ex. 26, M. and S. Schwebel Ltr. at 1. One such repeat guest was the son of Moise Hendeles, a family friend from Los Angeles, who was single and alone in New York. App. Ex. 9, M. Hendeles Ltr. at 1. Another was a man named Ari, who was alone after having gone through a divorce. As Jona's brother-in-law Joshua Kahn writes, Jona invited Ari in "simply because he knows that Ari does not otherwise have others who will do so." App. Ex. 13, J. Kahn Ltr. at 1. Ari himself writes that Jona helped him out a lot in difficult times, "by his open invitation to me, to spend every single Jewish holidays with him and his family, just so I do not feel lonely." App. Ex. 8, A. Gross Ltr. at 3. Jona's father-in-law, David Kahn, writes that Jona recently hosted a holiday meal at which the guests included a family with a nine-year old daughter who had just completed chemotherapy. This family told David that Jona's and Rachel's was "the only home they felt comfortable going to and being themselves." App. Ex. 10, D. Kahn Letter at 1.

Another common thread among the letters is Jona's remarkable history of emotional and financial support for the sick and the grieving. Rabbi Lookstein, who knew Jona in Manhattan, writes that "[w]hen friends of his have had medical issues, he has gone out of his way to find the best doctors and sometimes he even goes to the doctor with them. When there is loss in a family, he is one of those who will provide food for the family and try everything possible to make things easier in their recovery from the loss." App. Ex. 16, H. Lookstein Ltr. at 2. Here are just a few examples of such kindnesses:

- As Jona's mother Melanie writes, when his aunt was diagnosed with a terminal illness, Jona "took it upon himself to research alternate options in both the United States and abroad," and "[h]is tireless efforts led to a treatment plan that extended my sister's life." App. Ex. 20, M. Rechnitz Ltr. at 1.

- When Mariam and Shea Schwebel's infant grandchild became ill, Jona and Rachel supported the family emotionally during the long and terrible illness, "and were there for them when the baby eventually passed away, which is something even their longtime friends were not emotionally able to do during that very trying time." App. Ex. 26, M. and S. Schwebel Ltr. at 1-2.

- When Mariam Schwebel's father passed away shortly before Rosh Hashanah, Jona arranged for meals to be sent to the family for the holiday. *Id.* at 2.

- When Rachel's grandfather died, Jona arranged and paid for Fred Kahn (Rachel's brother) and his family of nine to fly from Israel to America so they could attend the funeral and observe Passover with the rest of the grieving family. App. Ex. 13, J. Kahn Ltr. at 1. Rachel's mother (Jona's mother-in-law) writes: "this was the greatest act of Chesed, kindness, sensitivity and generosity that anyone has ever done for me." App. Ex. 10, D. Kahn Ltr. at 1.

- When Fred and Adi Kahn's son (Jona's nephew) suffered severe burns as a toddler, Jona offered emotional support and arranged for food to be brought to the family. Fred and Adi write that Jona "knew exactly what we needed without me having to ask." App. Ex. 12, F. and A. Kahn Ltr. at 2.

- In 2014, Jona learned that the sister of his friend Brocha Chana Metzger had died suddenly, leaving her husband and six children. Jona immediately arranged for the devastated family to travel to Florida over the Passover holiday to help them take their mind off their tragedy, even though he "barely knew" the family. Ms. Metzger writes that Jona's "incredible kindness was beyond anything we had seen." App. Ex. 17, B. Metzger Ltr. at 1.

- David Alvarez, who was the doorman of the apartment building where Jona lived, was surprised and touched when Jona was one of the handful of people who attended Alvarez's mother's funeral in 2016. App. Ex. 2, D. Alvarez Ltr. at 1.

- Joshua Goldman, who runs a transportation company in Los Angeles, and used to arrange rides for the Rechnitz family when they would visit from New York, writes that Jona offered financial and emotional support to him and his wife in caring for their special-needs child, and also over the last two years, as Joshua's wife has undergone multiple surgeries. Joshua writes that Jona "is truly a sincere and caring person that does tremendous kindness and compassion with joy and gladness. . . . [he] is one of a kind as far as helping and caring for his fellow human being." App. Ex. 7, J. Goldman Ltr. at 1.

- Alejandro Cadena and his wife were casual acquaintances of Jona and Rachel. When Alejandro's father-in-law suffered clinical brain death in Los Angeles in early 2019, hospital staff told Alejandro and his wife that life support would have to be disconnected, contrary to Jewish law. App. Ex. 4, A. Cadena Ltr. at 1. Mutual friends suggested that Alejandro and his wife call Jona. When he got the call, Jona dropped his own affairs and spent days at the hospital with the Cadena family,

helping them in their effort to keep Alejandro's father-in-law alive. When he died naturally soon thereafter, Jona arranged for the elderly grandfather to fly from Israel to attend the funeral, even helping with a visa application and a companion ticket for a caregiver. Alejandro writes that Jona was an "angel" and a "true hero." *Id.* at 2. Perhaps more importantly, Jona (by his generosity and care) was served as a positive example of observant Judaism for secular members of Alejandro's family, bringing them closer together. *Id.* at 3.

Jona also has helped friends, and friends of friends, who have fallen on hard times. Rabbi Burg, who came to know Jona through Jona's involvement in the Simon Wiesenthal Center, writes that "Jona's office [in Manhattan] became the stop for anyone that was in distress and required charity. It was as if he did not know how to say no when someone was in in need." App. Ex. 3, S. Burg Ltr. at 1. Rabbi Weil shares the same sentiment, writing that he and Jona have "discussed and worked on finding employment for a number of individuals who were in economic dire straits." App. Ex. 27, S. Weil Ltr. at 2. One beneficiary of Jona's generosity was the son of Martin Klein, a friend of Jona's. When Martin's son was unable to find work, Jona stepped in and offered him a job in his own office. Martin writes that his son "was happy for the first time in many years." App. Ex. 14, M. Klein Ltr. at 1.

Another beneficiary was Rabbi Danny Rotenberg, who had taught Jona as a boy, and who later supervised the teenage Jona as a camp counselor. When Rabbi Rotenberg moved to New York to seek better care for his special-needs son in a Jewish environment, Jona helped connect him to schools. But, in New York, Rabbi Rotenberg was unable to find work as a teacher. He writes: "I cannot relate to you the feeling of working my entire life and now left with no options." When Jona learned of Rabbi Rotenberg's difficulty, he decided, "without a moment's thought" to hire Rabbi Rotenberg himself, to enable him to support his family. App. Ex. 25, D. Rotenberg Ltr. at 2.

Jona also helped out his doorman David Alvarez, paying a large bill on Alvarez's behalf and refusing to accept anything in exchange, and later helping Alvarez secure legal advice to avoid being evicted.  App. Ex. 2, D. Alvarez Ltr. at 1-2.

Notably, Jona also took it upon himself to offer emotional support to Alisa Adler, who had been criminally charged in the District of New Jersey for perpetrating a fraud.  *See generally United States v. Adler*, No. 17 Cr. 510 (CCC).  As Ms. Adler writes, "at the time, Jona made himself tremendously accessible to hear me out and help me see things that I could not see. Jona was immensely influential in making the decisions I needed to in order to move myself forward and accept responsibility."  App. Ex. 1, A. Adler Ltr. at 1.  Ms. Adler ultimately pleaded guilty and was sentenced to a term of imprisonment.  She credits Jona with helping her make the decision to "become accountable for my actions," and also notes that he helped her pay for her legal fees and rallied friends to help her make restitution to her victims.  *Id.* at 1-2.  Her Rabbi, Mordechai Rindenow, has also written about Jona's assistance to Ms. Adler, writing that he "was very impressed with Jona's willingness to assist my client in a process to fully come to terms with the realities of my client's participation in the crime that was committed."  App. Ex. 24, M. Rindenow Ltr. at 1.

Jona has also given generously, both financially, and of his time, to philanthropic causes. Rabbi Lookstein writes that Jona was "extremely generous with his funds and his time to provide relief to those who suffered from [Hurricane Sandy]."  App. Ex. 16, H. Lookstein Ltr. at 2; App. Ex. 20, M. Rechnitz Ltr. at 1.  Jona also has partnered with others to raise money for poor families on the west side of Manhattan for Rosh Hashanah and Passover.  App. Ex. 16, H. Lookstein Ltr. at 2.  Mariam and Shea Schwebel, Jona's former neighbors, add that Jona also convinced others to donate to the holiday food fund as well.  App. Ex. 26, M. and S. Schwebel Ltr. at 1.  Finally, Jona's

friend Brocha Chana Metzger writes that, for many years, month after month, Jona paid for a private car service to facilitate distribution of food to the needy of New York, through the Chabad Relief Project.  Jona "did this quietly and without fanfare," and apart from the Chabad staff and the car service, "no one knew who the benefactor was."  App. Ex. 17, B. Metzger Ltr. at 1.

Last, perhaps Jona's most meaningful and extraordinary act of private charity has been his and Rachel's decision to essentially adopt a young man from a broken home.  This was Abraham ("Avi") Levy, who had lost contact with his parents and moved into the dormitory at the Yeshiva University High School for Boys when Jona met him, by chance, at a restaurant near Yeshiva University, where Avi was trying to find something to eat.  This coincidental meeting became life-changing for both men.  As Avi writes, Jona "saved my life."  App. Ex. 15, A. Levy Ltr. at 1.  Over the next few years–as Avi studied abroad in Israel, then went to college, and began to look for work–Jona and Rachel have been his benefactors, paying whatever he needed without hesitation, inviting him in to celebrate the holidays with them, and treating him "like part of the family."  Now, Avi supports himself, and credits his present success to Jona having served as his "guardian angel."  Jona's brother-in-law Joshua Kahn writes that "Jona does not discuss what he does for Avi or why, but simply includes him as if Avi was his brother."  App. Ex. 13, J. Kahn Ltr. at 1.  Indeed, Jona's charity towards Avi has been so private that even his sister-in-law, Adi Kahn, a social worker who met Avi's estranged family through her work, did not know that Jona was Avi's benefactor until a year after coming into contact with the family.  *See* App. Ex. 12, F. and A. Kahn Ltr. at 2.

These are just a few examples of Jona's private charity and selflessness.  During a time when Jona had plenty of money, he was unstinting in giving largely to anyone who seemed to need help, and with no expectation of public recognition or accolades of any kind.  These acts of charity

14

pre-date the unmasking of Jona's criminal conduct by years.  They are not belated attempts to manufacture a record of charity to build a record for leniency; they attest to a fundamental generosity in Jona's character.  Now, even though (as his father Robert writes) Jona's lifestyle is "much more humble" than it used to be, "[h]e is still a friend that anyone can lean on."  App. Ex. 22, Robert Rechnitz Ltr. at 1.

## II.    Sentencing Guidelines

Probation calculates a Guidelines range of 78-97 months (Offense Level 28; Criminal History Category I).  *See* PSR ¶¶ 58-81.  Probation reaches this result, in part, by calculating the offense level for the honest services bribery of public officials using a loss figure of $400,339.50, reflecting $125,339.50 in bribes paid to NYPD officers and, notably, $275,000 in payments to political figures.  *Id.* ¶47.  The inclusion of *both* categories of bribes results in a 12-level increase in the offense level pursuant to §§ 2C1.1(b)(2) and 2B1.1(b)(1)(G).  *Id.* ¶ 62.  We concur with this calculation as a technical matter under the Guidelines.[3]

Probation recommends a sentence of 36 months, recognizing that the Guidelines range in this case is greater than necessary to accomplish the objectives of sentencing.  *Id.* at p. 32.  Critically, Probation explicitly does not take into account the substantial assistance provided by Jona or the Government's 5K1.1 Motion.  *Id.*

---

[3] We submit, however, that the inclusion of the $275,000 in payments to political figures in Jona's guideline calculation results in inequity.  Jona and Jeremy Reichberg both were involved in the political bribery scheme (as were the public officials), and Jona testified about it during the Reichberg trial.  *See* App. Ex. 49, Reichberg Tr. at 2580:5-19 ($100,000 for the Bill de Blasio mayoral campaign); *id.* at 2587:9-2590:14 ($50,000 to the Campaign For One New York and $102,000 for the New York Senate Democrats campaign); *id.* at 2610:17-2611:12 ($15,000 to Robert Astorino's reelection campaign); *id.* at 2614:20-2615:14 (Rolex watch for Astorino).  Yet, through no fault of Jona's, none of the political figures were criminally charged.  *See* 5K1.1 Motion at 31-32.  And Reichberg, whom both the Government and Probation agree was the more culpable member of the conspiracy (*See* PSR ¶ 49 and p. 31), was sentenced based on a total loss amount that omitted the political contributions, including only the payments and gifts to the NYPD.  *See* App. Ex. 49, Sentencing Transcript dated May 13, 2019, *United States v. Reichberg*, No. 16 Cr. 468 (GHW) at 25:4.  As a result, the total loss amount for purposes of Reichberg's guideline range was less than $150,000 and thus 4 levels lower on the Guidelines under § 2B1.1(b)(1)(E) than the portion of Jona's guidelines attributable to the bribery scheme.

## III.   § 5K1.1 Factors

Based on Jona's extraordinary cooperation, the Government has moved for a downward departure pursuant to § 5K1.1.   By any reasonable measure, Jona's substantial assistance is exceptional in virtually every respect.   Jona's information and testimony has been uniquely valuable, and Jona has endured, without complaint, a heavy burden in fulfilling his obligations, suffering ostracism, intimidation, and public scorn.   Based on an application of the facts relating to Jona's substantial assistance to these § 5K1.1 factors, as well as to the factors in 18 U.S.C. § 3553(a) (discussed in Point IV, *infra*), we submit that the Court should impose a non-custodial sentence of time served.

### A.    The Significance and Usefulness Of Jona's Cooperation

As noted in the Preliminary Statement, the Government acknowledges Jona as "without exaggeration, one of the single most important and prolific white collar cooperating witnesses in the recent history of the Southern District of New York."  5K1.1 Motion at 1.  The Government further notes that "his assistance fueled a one-man boom in significant and successful investigations and prosecutions."  *Id.* at 36.  Jona's assistance encompassed seven different areas of criminal conduct:

- Jona and Murray Huberfeld's payment of a kickback to Norman Seabrook to induce him to cause COBA to invest in Platinum Partners;

- Jona and Jeremy Reichberg's bribery of senior NYPD officers, including James Grant and Michael Harrington, in exchange for favors and special treatment;

- Jona's contributions (including straw donations) to the Bill de Blasio campaign, and to causes championed by de Blasio, in the expectation of special treatment for himself and Reichberg;

- Jona's donations to Robert Astorino's reelection campaign and part payment for a Rolex watch, in exchange for Jona's and Reichberg's appointments as chaplains in the Westchester County Police Department;

- Jona's loans to, and brokering of loan transactions with, Hamlet Peralta to fund what Rechnitz thought was a wholesale liquor business but which was, in fact, a Ponzi scheme;

- Jona's brokering of loans to Jason Nissen to fund what Rechnitz thought was a wholesale ticket-selling business but which was, in fact a Ponzi scheme;

- Jona's knowledge of corruption in the NYPD handgun licensing division.

*See generally id.* at 23-26.

Jona's cooperation on these seven subjects bore fruit, in the form of numerous convictions and pleas of guilty. As summarized by the Government (*id.*), Jona's cooperation was a factor in fourteen convictions and pleas of guilty, plus one consensual forfeiture:

| # | Name | Description | Index # | Outcome | Sentence |
|---|------|-------------|---------|---------|----------|
| 1 | Murray Huberfeld | Hedge Fund Partner | 16-Cr-467 | Plea | 30 mos. |
| 2 | Norman Seabrook | President of COBA | 16-Cr-467 | Convicted | 58 mos. |
| 3 | Jeremy Reichberg | Expediter | 16-Cr-468 | Convicted | 48 mos. |
| 4 | Michael Harrington | NYPD Chief | 16-Cr-468 | Plea | - |
| 5 | Hamlet Peralta | Ponzi schemer | 16-Cr-354 | Plea | 60 mos. |
| 6 | Jason Nissen | Ponzi schemer | 17-Cr-477 | Plea | 27 mos. |
| 7 | David Villanueva | NYPD Sergeant | 16-Cr-342 | Cooperated | 4 mos. |
| 8 | "Shaya" Lichtenstein | Expediter | 16-Cr-342 | Plea | 32 mos. |
| 9 | Richard Ochetal | NYPD Officer | 16-Cr-342 | Cooperated | Time Served |
| 10 | John Chambers | Attorney | 17-Cr-396 | Plea | 366 days |
| 11 | Paul Dean | Participant in gun bribery | 17-Cr-398 | Plea | 18 mos. |
| 12 | Robert Espinel | Participant in gun bribery | 17-Cr-398 | Plea | 366 days |
| 13 | Gaetano Valastro | Expediter | 17-Cr-398 | Plea | Pending |
| 14 | Frank Soohoo | Expediter | 16-Cr-342 | Plea | Time Served |
| 15 | Robert Astorino | Westchester Cty. Exec. | 19-Misc-283 | Stip. | Forfeit Rolex |

In addition to these convictions and the forfeiture, Jona's public testimony concerning public corruption has been useful in and of itself. As detailed in the PSR, Jona provided information to the Government, and testified, about having provided gifts and other benefits to senior officers in the NYPD, including Philip Banks (Chief of Department), James Grant (Commanding Officer of 19th Precinct–Upper East Side), David Colon (Chief of Community

Affairs), Stephen McAllister (NYPD Inspector, and later head of Floral Park Police Department), Michael Milici (NYPD Detective), Andrew Capul, Eddie Gardner, James McCarthy, and Eric Rodriguez (NYPD officers). Many of these officers were administratively disciplined prior to Jona's plea of guilty and cooperation, but Jona's testimony exposed their corruption to the public and, as the Government states, was "ultimately beneficial to the cause of making the next would-be NYPD bribe taker or bribe giver think twice." 5K1.1 Motion at 31.

The same is true of Jona's testimony concerning his political donations. Jona testified about how he had bundled "straw" donations for Bill de Blasio's mayoral campaign, and had made explicit to de Blasio's lead fundraiser, Ross Offinger, that he and Jeremy Reichberg expected special treatment from the city in exchange for their contributions. While no charges resulted from Jona's information concerning political corruption, this public testimony concerning cash-for-favors from City Hall should have a valuable deterrent effect.

## B. The Truthfulness, Completeness, and Reliability of Jona's Information And Testimony

Once his cooperation began, Jona was "at all times forthright about his crimes and those of others," and over "literally weeks of cross-examination . . . he was never revealed to have told the Government anything but the truth." 5K1.1 Motion at 43. His information was true, complete, reliable, and useful to the Government. Two separate juries–the jury in the second Seabrook trial and the jury in the Reichberg-Grant trial–credited Jona's information enough to convict Seabrook and Reichberg. And the threat of Jona's testimony was sufficiently compelling to convince Huberfeld to acknowledge his misconduct and plead guilty after the first trial, and for Officer Harrington to plead guilty prior to trial.[4]

---

[4] While Officer Grant was acquitted, as the Government indicates, "the trial outcome should not be held against Rechnitz in any way," in part because Rechnitz was closer to Reichberg than he was to Grant. 5K1.1 Motion at 30.

And, unlike Todd Howe, whom the Government cites as the recent cooperator most comparable to Jona, his cooperation was unblemished by any misconduct of any kind. *Cf. id.* at 6-7 (describing Howe's remand after making suspect challenges to credit card charges).

### C.     The Nature and Extent of Jona's Assistance

Jona proffered to the Government about each of the seven subjects listed above, and was the key Government witness in three trials (the trial of Seabrook and Huberfeld in October and November 2017; the retrial of Seabrook in August 2018; and the trial of Grant and Reichberg in November and December 2018).   By every possible metric, Jona's cooperation was an extraordinary endurance challenge.

As the Government explains, Jona met or spoke with the Government on eighty occasions over the two-and-a-half year period between May 2016 and the end of 2018. 5K1.1 Motion at 36-37.  Cooley's records reveal that these eighty sessions took a total of more than four hundred hours of time: an average of five hours per meeting.  These sessions included substantive proffers as well as prep sessions in advance of Jona's testimony in the three trials.

In addition to these eighty meetings, Jona spent nineteen days testifying: six days in the first trial of Seabrook and Huberfeld, three days in the second Seabrook trial, and ten days in the Grant and Reichberg trial.  According to Cooley's records, these nineteen trial days represented another roughly one hundred and fifty hours–an average of almost eight hours each trial day.  In the first trial, Jona spent four days being cross-examined by two seasoned members of the defense bar: Henry Mazurek (on behalf of Murray Huberfeld) and Paul Schectman (on behalf of Norman Seabrook).  *See* 5K1.1 Motion at 38.  In the second trial, Mr. Schectman crossed Jona again.  And in the third trial, two other defense lawyers took a marathon cross-examination of Jona.  Jeremy Reichberg's counsel, Susan Necheles, crossed Jona for eight days.  *Id.*  Officer Grant's attorney,

John Meringolo, also took a turn cross-examining Jona. As the Government highlights, Jona was "publicly mocked, harangued, and called names for days on end." *Id.*

Combining the eighty days of proffers and prep sessions, and the nineteen days of testimony, Jona spent approximately 100 days out of the roughly two and a half years between May 9, 2016, and December 31, 2018, carrying out his responsibilities as a cooperator: more than one day out of ten.

The raw time that Jona spent with the Government and testifying is only part of the story. To escape shunning and harassment that he received in New York as a result of his outing as a cooperating witness, Jona moved to Los Angeles in June 2017. *See* Point III.D., *infra*. This move occurred just as the Government was beginning to prepare for the first trial, meaningfully increasing the burden of his cooperation. The majority of Jona's meetings with the Government, and all of his days testifying, occurred thereafter. As the Government explains, Jona often took the red-eye from Los Angeles in order to participate in witness prep sessions in person in New York, never complaining about the burden or expense, and never seeking reimbursement. *See* 5K1.1 Motion at 37. It is not just Jona who suffered from the grueling burden of trial: Rachel writes that it took "quite a toll" on her and the children to have Jona away, sometimes for weeks at a time. App. Ex. 21, Rachel Rechnitz Ltr. at 1.

Each of Jona's meetings and trial days in New York represented a day when he could not pursue a new career in Los Angeles, or care for his family. Essentially, for the fifteen months of trial prep and trial time from summer 2017 until December 2018, Jona served as an unpaid employee of the Government. He returned to New York on demand, focusing solely on his primary

responsibility of serving truthfully and honestly as a cooperating witness, and bore this burden stoically.[5]

Jona also provided meaningful corroborating documentation and other evidence to the Government when available.  This included dozens of incriminating pictures and video clips of Jona, co-conspirators, and persons of interest, tens of thousands of emails, and Jona's cellular phone.  5K1.1 Motion at 43-44.

### D.      Injuries Jona Suffered Resulting From His Assistance

Before Jona pleaded guilty, he understood that by admitting to criminal conduct and cooperating with the Government, he would likely face alienation from his community.  But neither he nor counsel ever imagined the extent of the ostracism, intimidation, and the public scorn which ensued.  The Government recognizes that Jona's significant work as a cooperator occurred "amidst the collapse of the life he had known."  5K1.1 Motion at 42.

### 1.      Notoriety

The Government notes that Jona was front-page news in the New York City tabloid press during his criminal testimony.  5K1.1 Motion at 38-39.  This is true, but not complete; news coverage about Jona has been constant, not just during his testimony.  From the time that the media first learned Jona's name in spring 2016, until the present, Jona has appeared more than six hundred and fifty times in prominent newspapers.  While interest spiked during the first reporting of the investigation and during each of the three trials, a baseline level of interest meant that in almost every single month, Jona was mentioned at least once or twice in major publications.  Indeed, over the past two and a half years, articles reporting on Jona have appeared in major newspapers on two hundred and fifty separate days–more than eight months of coverage.

---

[5] The full burden of cooperation must account for the additional time spent in transit and exhausted from the redeye.

The remarkable and persistent press interest in Jona is not just a consequence of his decision to commit newsworthy crimes. If Jona had taken a plea of guilty without an agreement to cooperate, the details of many of his crimes would never have been made public. He would have been quickly sentenced and would have disappeared from the headlines (as did many of the police officers who quietly retired or proclaimed their innocence in the media). Instead, Jona chose to cooperate. As a result, as early as June 9, 2016, when Huberfeld and Seabrook were arrested based on criminal complaints which themselves were based in large part on Jona's detailed narrative of their criminal scheme, reporters immediately deduced that Jona was a cooperating witness. From then until the present, news articles have been able to report the crimes of Jona, Huberfeld, Seabrook, Reichberg, and the police officers in such detail *only* because of Jona's cooperation. Jona's cooperation thus has been a churning engine of headlines for the last two and a half years.

The New York Post, in particular, has focused on Jona, writing about him more than two hundred times, and repeatedly denigrating Jona's decision to cooperate by labelling him a "rat" and a "snitch"–most recently doing so the day the Government filed its 5K1.1 Motion. *See* App. Ex. 29, Kaja Whitehouse, *NYPD Briber Rats on Partner*, N.Y. POST, Mar. 31, 2017, at 10; App. Ex. 30, Kaja Whitehouse, *Feds Push On With Blas-Pal Corruption Probe*, N.Y. POST, Apr. 1, 2017, at 6 (calling Jona a "real-estate-investor turned-government-snitch"); App. Ex. 31, Kaja Whitehouse, *'Cop-Bribe' Figure 'Fesses to Ponzi*, N.Y. POST, May 12, 2017, at 22 (calling Jona "[Peralta's] former partner-turned-rat"); App. Ex. 32, Kaja Whitehouse, *De Blas' Felon Friend A Mall Rat*, N.Y. POST, May 27, 2017 at 6 (same); App. Ex. 40, Stephanie Pagones and Bruce Golding, *Banks' Statement – Scandal Cop Denies Bribes*, N.Y. POST, Jan. 1, 2019, at 8 (reporting Banks's assertion that "Rechnitz failed in his first attempt to become a government snitch"); App.

Ex. 42, Emily Saul, *DeB Rat Donor's Leniency Bid*, N.Y. POST, Oct. 17, 2019, at 4 ("He's the Big

Apple's best rat"); *see also* App. Ex. 43, Stephen Rex Brown, *A Good, Dirty Rat*, DAILY NEWS,

Oct. 17, 2019, at 18.

    The Post also has run articles about events of Jona's life which are not, in themselves,

newsworthy.  Every incident, often crediting anonymous tips, further vilified Jona:

- In November 2016, the Post reported that Jona had attended a baseball game, writing that Jona's "good fortune left some cops fuming."  App. Ex. 28, Shawn Cohen and Larry Celona, *Bribe Cad at Series*, N.Y. POST, Nov. 1, 2016, at 22.

- In July, 2017, the Post reported that Jona had "high-tailed it out of New York" and "headed back to his native California."  App. Ex. 33, Kaja Whitehouse, *NYPD Briber Ditches NYC*, N.Y. POST, July 10, 2017, at 15.

- In October 2017, the Post reported that members of Jona's synagogue in Los Angeles had been angered by a donation Jona had made.  The article characterized Jona as a "crooked supporter of Mayor de Blasio" and a "disgraced real-estate developer."  App. Ex. 34, Kaja Whitehouse, *Blas Bribe Pal Angers LA Congregants Shul'd be a$hamed*, N.Y. POST, Oct. 4, 2017, at 21.

- In a lengthy article from the same time period, the Post reported on Jona and Rachel's social media posts dating back to 2012.  The article quoted Rachel's Facebook posts, reported about Jona's father, and described Jona's real estate work from years earlier.  App. Ex. 37, Melissa Klein, *Jona Bought Key to the City: Blas Donor Conquered Gotham With His Wallet*, N.Y. POST, Oct. 29, 2017, at 4.

- In January 2018, the Post reported that Jona had unsuccessfully attempted to broker a meeting between Mayor de Blasio and Prime Minister Benjamin Netanyahu of Israel in September 2014.  The Post quoted a mayoral spokesman for the statement that "like many other things involving this individual, the possibility of it appears to have been a figment of his imagination."  App. Ex. 38, Graham Rayman and Jillian Jorgensen, *Blas-Bibi Meet Got Rech'd – Epic Fail By Dirty Donor Jona*, N.Y. POST, Jan. 4, 2018, at 16.

- Finally, in February 2019, the Post reported that Jona had made a routine travel request to the Court, as required under his bail conditions.  Ap. Ex. 41, Priscilla DeGregory, *Rechnitz Travel Plea*, N.Y. POST, Feb. 14, 2019, at 9.

The effect of all this press coverage has been to destroy Jona's reputation in New York City much more completely than would have been possible had he taken a quiet plea of guilty and then dropped out of the news cycle.[6]

### 2. Ostracism

A second consequence of Jona's cooperation has been his expulsion from his Upper West Side community, and to a lesser extent, from his community in Los Angeles. *See* PSR ¶¶ 57, 100. A major component of the disapproval of the community stems from Jona's decision to cooperate with the secular Government against "fellow Jews." App. Ex. 9, M. Hendeles Ltr. at 2. Jona had many mutual friends with Murray Huberfeld, against whom he testified, and many of them sided with Huberfeld, lobbying others in the community to ostracize him from public life. Rabbi Steven Burg, Jona's friend from New York, writes that "Jona has faced tremendous communal pressure regarding his decision to testify." App. Ex. 3, S. Burg Letter at 2. Jona's brother Jared sums it up: "[t]he past few years have been a personal hell for Jona, and he has paid the price for his actions tenfold." App. Ex. 18, Jared Rechnitz Ltr. at 2.

The Upper West Side was where Jona lived since moving to New York City, and where he hoped to raise his own children. That hope is gone now. Mariam and Shea Schwebel write that, in the synagogue, "Jona was forbidden from being called up to the Torah and was asked to step down from organizations he had helped build and support. He went from being the most sought after guest to being literally shunned and even yelled at by acquaintances." App. Ex. 26, M. and S. Schwebel Ltr. at 3. Jona was also harassed and intimidated in his daily life in Manhattan: "If

---

[6] The investigatory work that went into the writing of these articles also took its toll on Jona, his family, and his friends. The reporters "made calls to my friends, my family, and waited outside my home for me to walk outside." App. Ex. 19, Jona Rechnitz Ltr. at 2. Rachel writes that the publicity in the Post and "having reporters outside the building" was one of the factors that led her to fear for her children's safety in New York. App. Ex. 21, Rachel Rechnitz Ltr. at 1.

he dared enter a restaurant to order dinner, pictures quickly circulated of him, demeaning him as if he had no right to live." App. Ex. 18, Jared Rechnitz Ltr. at 2. Jona "could not go anywhere without receiving a dirty look or a malicious comment." *Id.* at 2. Rabbi Burg writes about one such example he experienced: less than a year ago, someone confronted Rabbi Burg and reproached him after seeing him eat in a restaurant with Jona. App. Ex. 3, S. Burg Ltr. at 2. Alisa Adler, the woman whom Jona counseled as she confronted her own criminal charges, learned about Jona through gossip on the Upper West Side even before she met him in person. She recalls the intensity of the hate for him as prompting her to leave a social gathering on one occasion because "it was so painful to hear someone else speak recklessly without abandon about someone they supposedly were friendly with." App. Ex. 1, A. Adler Ltr. at 2.

Prior to the news breaking about Jona's criminal trouble, Jona and his wife had been active parents in their children's school. Jona had been on the board of directors, and his wife had been president of the PTA. After the news broke, community pressure resulted in both of them resigning their posts to avoid embarrassing the organization. Jona writes that he "cannot stress the amount of pain and suffering that we received during this time. Unimaginable pain." App. Ex. 19, Jona Rechnitz Ltr. at 2.

In June 2017, Jona and Rachel resolved to move to Los Angeles permanently to escape the hateful treatment they were receiving in Manhattan. *Id.* Rachel writes that this was necessary to protect their children and spare them from continuing to live in a hurtful environment. App. Ex. 21, Rachel Rechnitz Ltr. at 1. But "[e]ven once he moved to Los Angeles, the attacks did not stop." App. Ex. 18, Jared Rechnitz Ltr. at 3. The harassment began when they found a house to rent. Their landlord, Joseph Englanoff, writes that, within days of meeting Jona, he was receiving calls from prominent individuals in the community asking in strong terms that he "shun" Jona,

saying "'don't you dare rent to him . . . you realize he cooperated.'"  App. Ex. 6, J. Englanoff Ltr. at 1.  Others in Los Angeles confronted Jona and Rachel directly in public, aggressively taking photos and videos of them "to shame him and Rachel for being out in any way."  App. Ex. 18, Jared Rechnitz Ltr. at 3. Joshua Goldman, who runs a transportation company in Los Angeles, writes that Jona "has also gone through much suffering at the hands of certain members of the Jewish Community in Los Angeles who have ridiculed him and vindictively punished him unnecessarily and added insult and injury to him over and above the shame he has endured."  App. Ex. 7, J. Goldman Ltr. at 2.[7]

Perhaps the most distressing incident of harassment occurred in October 2017, in the synagogue Jona and his family have attended in Los Angeles for three generations.  App. Ex. 18, Jared Rechnitz Ltr. at 3.  This was mere weeks before the trial of Murray Huberfeld was to commence.  For the Yom Kippur service, Jona donated anonymously to buy an honor for his father.  *Id.*  "One member of the congregation made it his business to figure out who had purchased the honor, and then proceeded to leave services in the middle, subsequently going to a different synagogue to spread the word of Jona's donation to purchase the honor."  *Id.* at 4.  Soon thereafter, the Post reported the incident.  *Id.*; *see* Kaja Whitehouse, *Blas Bribe Pal Angers LA Congregants Shul'd be a$hamed*, N.Y. POST, Oct. 4, 2017, at 21 (quoting an anonymous source as saying "I think that [Jona's] ruined so many peoples' lives and he's sitting here just trying to pretend that nothing is wrong").  As family friend Moise Hendeles writes, the Post article "caused much embarrassment to our synagogue's reputation and to its members."  Mr. Hendeles believes that the

---

7 The shaming of Jona has also extended to the digital world. Avi Levy, the boy from a broken home whom Jona has supported for years, writes that "[p]eople who know he has helped me have said nasty things to me about him," including on Twitter.  App. Ex. 15, A. Levy Letter at 3.  And a prominent blog (lostmessiahdotcom.wordpress.com) has written dozens of posts critical of Jona over the years since his decision to testify became public.

tipper called the Post "because he was upset that Jona was willing to testify against a fellow Jew." App. Ex. 9, M. Hendeles Ltr. at 2.

The disruption in the synagogue and tip to the Post was part of a campaign to harass Jona in the lead up to his anticipated testimony in the trial of Murray Huberfeld. Other troubling incidents of intimidation occurred both before and after his testimony. Jona writes that there were "threats and private investigators after me," as well as "[t]hreatening voice messages, windows smashed at home, windows smashed in my car several times and my parents cars on the same day at their home, [and] people following me and sitting outside of my home in Los Angeles for periods of time." App. Ex. 19, Jona Rechnitz Ltr. at 1. At the time, Jona suspected that these incidents of harassment were instigated by supporters of Murray Huberfeld, and were intended to deter him from testifying at the upcoming trial; accordingly, Jona reported the incidents to the FBI. The Government has now confirmed that Jona's suspicion was correct: the FBI verified, among other things, that the vehicle that had shadowed Jona's residence was owned by persons with connections to Huberfeld. *See* 5K1.1 Motion at 41.

Jona's whole family and social circle have felt the effects of this ostracism and intimidation. Rachel "has been shunned by many former friends, his kids have been looked down upon, and many venomous remarks have been spat at [Jona's] parents." App. Ex. 18, Jared Rechnitz Ltr. at 2. Rachel herself writes that "[t]here are so many people that I have to avoid or feel uncomfortable with, having them talk behind my back." App. Ex. 21, Rachel Rechnitz Ltr. at 1. Jared still lives in New York, and has been affected "terribly." App. Ex. 18, Jared Rechnitz Ltr. at 2. He has had difficulty dating, as "people were very quick to approach whoever I was dating at the time, or her parents, and let them know what a horrible person my brother is, or that they should stay away from my family." *Id.* Jared writes, "[a]s difficult as this has been for me, it has been worse for me

to see the tremendous burden of guilt Jona feels for having brought this upon us.  So much so, that I have kept many of these instances from him to this day."  *Id.*

### 3.  Intimidation in the Courtroom

During Jona's testimony in the October-November 2017 trial of Huberfeld, and during the November-December 2018 trial of Reichberg, the courtrooms were packed with their supporters.  *See* 5K1.1 Motion at 39.

Huberfeld's supporters were members of Jona's own social circle on the Upper West Side, many of whom he recognized.  During his testimony, they audibly reacted to his answers, requiring Judge Carter to repeatedly admonish the gallery to quiet down.  *See* App. Ex. 44, Transcript in *United States v. Seabrook*, No. 16 Cr. 467 (ALC) ("Seabrook I Tr.") at 914:20-915:1; 1071:14-25; 1249:23-24; 1337:4-5; 1400:7-13; 1405:24-25; 1447:1-4.  The audience's show of support for Huberfeld was intended to intimidate Jona and make him reconsider his decision to cooperate.  In that respect, it failed.  But Jona was nevertheless shaken.

The audience was even more hostile during the Reichberg trial.  Supporters packed the courtroom, holding up signs depicting a Rabbi in an effort to intimidate Jona.  *See* 5K1.1 Motion at 39.  Early in Jona's testimony, the Court agreed to allow Jona to take his breaks in the robing room, after audience members made a point of crowding him and staring him down each time he walked to the back of the courtroom.  *See* 5K1.1 Motion at 39-40; App. Ex. 46, Reichberg Tr. at 2454:23-2455:19.  At another point during his testimony, a member of the audience mouthed the word "liar" to Jona repeatedly.  *Id.* at 2715:9-2717:4.  Most memorably, on November 27, 2018, a member of the defense team for Officer Grant asserted that Jona was a "disgrace" as he walked into the courtroom in the morning, prompting the Court to send the jury home for the day.  *See generally id.* at 2725:21-2726:17; 2736:19-22.  The Court also, as in the Huberfeld trial, had to

repeatedly admonish the gallery to keep quiet during Jona's testimony. *See id.* at 2983:16-17; 2994:2-9516; 4002:23-04:11; 4282:20-24.

Ari Gross, a frequent guest of the Rechnitz family at their holiday celebrations, reports that during the lead-up to the Huberfeld trial, friends of Huberfeld attempted to intimidate him into testifying falsely that Jona had committed bank fraud in connection with a commercial lease in Brooklyn, in order to discredit Jona. *See* App. Ex. 8, A. Gross Ltr. at 2. Ari also saw first-hand how friends of Huberfeld and Reichberg spread the word in the community "that no one is allowed to go to court to support Mr. Jona." *Id.* at 4. When Ari himself came to the courtroom, friends of Reichberg "harassed [him] with great hostility," in front of the FBI agents. *Id.* Ari tried to get one former friend of Jona's to come to court to support Jona, but he declined, saying that he was "too scared from the community, and his kids won't be able to get married with community members." Another former friend "stopped talking to me, and ignores my calls until this day, for the only crime I committed, that I came to court to show support for Mr. Jona." *Id.*

### E. The Timeliness of Jona's Assistance

Jona's assistance came without being charged. As the Government itself acknowledges, Jona's assistance saved substantial time and resources in advancing the grand jury investigation. Thus, it was timely enough to result in the substantial number of prosecutions of other defendants referenced above. *See* Point V.A, *supra.* Moreover, Jona did not wait for the Government to bring charges against him; he voluntarily began proffering on his own. As a result, as the Government acknowledges, his own charges "came pursuant to an already secured cooperation agreement." 5K1.1 Motion at 43. His cooperation could hardly have been more timely, meriting consideration in the analysis of the § 5K1.1 factors, and also demonstrating Jona's genuine remorse and acceptance of responsibility.

## IV.    Sentencing Factors in 18 U.S.C. § 3553(a)

Title 18, United States Code, Section 3553(a) establishes the factors the Court must consider in imposing sentence.  Ultimately, "the court shall impose a sentence sufficient, but not greater than necessary, to comply with [these purposes]."  18 U.S.C. § 3553(a).  Here, the Court must balance the objectives of punishment and deterrence with that of promoting respect for the law.  We submit that only one sentence–a non-custodial sentence of time served–successfully strikes the appropriate balance.  Any sentence of imprisonment would be "greater than necessary" to accomplish the statutory objectives.

As noted above, Probation has recommended a sentence of 36 months of incarceration, representing a variance of 42 months below the low end of the Guidelines range, even without taking into consideration any of Jona's cooperation or the Government's 5K1.1 Motion.  Once that extraordinary level of substantial assistance and all of the circumstances around it are taken into account, a non-custodial sentence of time served would fully reflect all of the considerations in § 3553(a).  A sentence of imprisonment would, we submit, only undermine the objectives of § 3553(a), deterring individuals like Jona from accepting responsibility and cooperating, to the ultimate harm of the justice system.

There is no need for further deterrence.  Jona writes that he feels shame for his crimes, that it "eats me alive each and every day," and is "always on my mind for the past 4 years."  App. Ex. 19, Jona Rechnitz Letter at 1.  He goes on to write that "[a]s a supposed religious man, I have been a disgrace to my religion."  *Id.* at 2.  He has learned that "doing the right thing isn't always the easiest, but it is the only choice," and is resolved to continue doing the right thing for his family and his community.  *Id.* at 2, 4.  He now reflects before acting, "to see if it is something my parents, my family, and G-d would approve of."  *Id.* at 2.  Rachel, who has been at his side throughout, writes that "I can see that my husband has become a much better, humble, more open and truthful

person," who is "much more involved as a father and as a husband," has "revamped his priorities," and has exhibited "dramatic changes" for the better since resolving to cooperate with the Government. App. Ex. 21, Rachel Rechnitz Ltr. at 1. The Government also has witnessed Jona's shame and remorse: "Rechnitz's expressions of regret and embarrassment that he lost his footing on a moral level square with sentiments that he has expressed to us during his prep sessions, and in a fashion that we credit." 5K1.1 Motion at 47.[8]

Jona has also experienced more than sufficient punishment over the past several years of cooperation with the Government. As a high-profile cooperating witness, Jona has been forced to re-live, and re-tell, every incident of the offense (and every other embarrassing episode of his life), over the eighty days of proffers with the Government, and the nineteen grueling days of trial, thereby repeatedly experiencing a painful public repentance before the eyes of the packed courtroom and the entire city, as reported in the press. Jona writes of the "disgusting feeling" he had waking up each morning during his testimony in the trials, sometimes for a week and a half straight. App. Ex. 19, Jona Rechnitz Ltr. at 2. Moreover, the decision to cooperate fundamentally altered the story of his life in a way that a private and quiet plea of guilty never would have. Formerly a fixture of the Upper West Side Jewish community, with leadership roles in his children's school and his synagogue, he has now been forced to retreat to his hometown, living close to his parents in Los Angeles, in fear of being accosted on the street by friends of the men he cooperated against. And formerly unknown to the public, he is now known in New York as a "rat"

---

[8] Jona's repentance is also demonstrated by his renewed dedication to his family. Jona writes that the highlight of his week "used to be sitting in the NYPD Headquarters like a big Macher," but today, "my highlight is walking to Synagogue with my children every week, and I let them know it every time we walk." App. Ex 19, Jona Rechnitz Ltr. at 3. Rachel also attests to Jona's renewed focus on the family, writing that Jona "has become a much better, humble, more open and truthful person," and is now "much more involved as a father and as a husband." App. Ex. 21, Rachel Rechnitz Ltr. at 1.

and a "snitch," whose every embarrassing episode has been reported in the tabloid press, no matter how insignificant.

Balanced against these punishments, a non-custodial sentence of time served communicates and promotes respect for the law. Indeed, Jona's acceptance of responsibility and full and complete cooperation is the ultimate expression of respect for the law. By contrast, a sentence of imprisonment would undermine, not further, the objectives of sentencing. The deterrence that would be conveyed from a sentence of imprisonment would not invoke fear in those contemplating a criminal act; rather, it would discourage cooperation with the Government. If such offenders see that even Jona's singular and extraordinary cooperation nonetheless results in imprisonment, they will infer that the justice system is fundamentally unmoved by a defendant's choice to affirmatively assist the Government in the prosecution of others. They will conclude that cooperation was not worth it for Jona and likewise would not be for them. Such a message would harm the Government in its investigation and prosecution of criminal activity, particularly involving corruption and fraud. Future offenders in Jona's position will have received the message that, rather than atone for their conduct by assisting the Government to the maximum extent they are able, they should instead keep quiet, hold out, see what the Government is able to prove, and ultimately find themselves at worst in a similar position as if they had cooperated. Depriving the Government of the principal mechanism available to obtain insider cooperation–the prospect of a substantially different and better outcome at the time of sentencing that reflects the extent of that cooperation–will thwart the ends of justice and ultimately will allow future wrongdoers to escape accountability.

The Government notes the importance of fully crediting Jona's assistance, as only a non-custodial sentence of time served would do, and the reality that this case is perhaps unique in the

significance of the message the Court can send. "This, too, is promoting respect for the law. This is a message that will encourage rather than dissuade the next cooperating witness . . . . And, crucially, it is a message that can *only* be sent in this case – in which Rechnitz's cooperation has been highly visible, its fruits have been meaningful, and its caliber has been nothing short of historic." 5K1.1 Motion at 49.

It also is not solely Jona and future offenders who must receive a message from this Court's sentence. Senior public officials and the community at large must also hear it, particularly here, where, during the trials of Seabrook and Huberfeld, and Grant and Reichberg, the Mayor and his representatives repeatedly denigrated Jona to the press, asserting that he was a liar whose testimony should not be credited.[9] This Court's sentence should reinforce the finality of the juries' verdicts, which, in fact, vindicated Jona as a truthful witness. Similarly, Jona's abuse and ostracism at the hands of the community–again not as a result of his offense but as a result of his cooperation with the Government–demonstrates the need for the Court to use this sentence to deliver a message encouraging cooperation and respect for the law.

The risk of removing or diminishing the incentive for acceptance of responsibility and cooperation is particularly acute in the context of the environments in which these crimes were committed. With regard to matters of public corruption, particularly involving law enforcement and union corruption, experience has taught us that a wall of silence hangs over and ultimately

---

[9] *See, e.g.*, App. Ex. 35, Jillian Jorgensen, *Zips Lips, Gives Press the Slip*, DAILY NEWS, Oct. 28, 2017, at 5 (quoting de Blasio spokesman as saying "If Jona Rechnitz says he bought the mayor, he is a liar. If he says he had unfettered access, he is a liar. The only thing Jona Rechnitz can say honestly is that he is a failed fixer of grand delusion just trying to save his own skin."); App. Ex. 36, William Neuman, *De Blasio Calls Donor Who Said Money Bought Him Access A "Liar"*, NEW YORK TIMES, Oct. 29, 2017 at A25 (quoting de Blasio as saying "You have heard a lot of tales the last few days. . . . Jona Rechnitz has had his turn. Now it's my turn to tell you the truth. Jona Rechnitz is a liar and a felon. It's as simple as that."); App. Ex. 39, Jillian Jorgensen and Greg B. Smith, *Bill's Email Trash*, DAILY NEWS, Dec. 1, 2018 at 2 (quoting de Blasio as calling Jona "a very troubled person who has committed crimes and has lied incessantly.").

shields these types of crimes from detection.  Investigations too often falter in the face of this silence, and the only reliable mechanism for breaking that wall is a cooperator with inside information.  That was the case with Jona, and, as long as cooperation is appropriately valued as mitigation at the time of sentencing, it will continue to be the case.  The alternative is to allow this conduct to remain unpunished and, particularly in the context of public officials and law enforcement most of all, corruption that goes unaddressed obliterates respect for the law and those charged with enforcing it.

The Court also must consider the need to avoid unwarranted disparities among similarly situated defendants.  In this instance, the unwarranted error would be to treat Jona as similarly situated to defendants who did not agree to plead guilty at the earliest stages of an investigation and who did not then provide the Government with years of cooperation in the form of a full, complete and truthful accounting and extensive testimony.  In considering the other defendants in this case, the Court is presented with defendants who did none of those things.  Indeed, the Court finds only individuals who were held accountable precisely because Jona made the decision to accept responsibility and assist the Government.  The Government has provided examples of cooperators in other cases who were more closely situated to Jona, such as Todd Howe and David Villanueva.  5K1.1 Motion at 6-9.  Yet, by the Government's own acknowledgement, the value of Jona's cooperation far outstripped those individuals'.  *Id.*  Further, unlike Howe, Jona never undermined his own credibility with post-offense conduct.  *Id.* at 7.  In the words of the Government, Jona's cooperation was unblemished (*Id.*) and exemplary (*Id.* at 1).  Todd Howe was in custody prior to sentencing for approximately five months because he violated his cooperation agreement and still received a sentence of time served.  *Id.* at 7.  David Villanueva, an NYPD officer whose prosecution can be traced back to Jona's cooperation, also was distinct from Jona in

that he was a public official. Villanueva was sentenced to four months of imprisonment. *Id.* at 9. A greater sentence for Jona in this case would produce an unwarranted disparity; indeed, those sentences reflect the appropriateness of a non-custodial sentence of time served in this case.

Finally, the Court, in imposing sentence, should take into account the need to provide restitution to the victims of the offense. The appropriate and lawful amount of restitution in this case is addressed further below, but any sentence of imprisonment not only would defeat Jona's efforts to rebuild his life, it would prevent him from satisfying any restitution order imposed as part of the sentence. To whatever extent this Court seeks to restore or repair the harm caused by the crimes that have come before it, a sentence of imprisonment for Jona would undermine that end.

## V.    Restitution

Probation has calculated the appropriate total amount of restitution as $1,206,000. *See* PSR ¶¶ 53, 143. We agree with that calculation, which is based on a loss of $6,000 by the NYPD and $1,200,000 by COBA.[10] The COBA loss amount is based on management fees charged by Platinum Partners. *See id.* ¶ 53.

This Court has twice previously indicated that it may order restitution in this case in the amount of $19,000,000 to COBA. *See* App. Ex. 48, Sentencing Transcript dated Feb. 12, 2019, in *United States v. Huberfeld*, No. 17 Cr. 467 (AKH) at 63:5 ("I order restitution in the amount of $19 million jointly and severally with Seabrook and with Rechnitz"); App. Ex. 47, Sentencing Transcript dated Feb. 8, 2019, in *United States v. Seabrook*, 16 Cr. 467 (AKH) at 56:22-57:1 ("I order restitution joint and severally with the other defendants involved in joint criminal activity

---

[10] It appears COBA already has secured a recovery in excess of this amount from one of the three participants in the offense, Murray Huberfeld. *See* App. Ex. 48, Sentencing Transcript dated Feb. 12, 2019, in *United States v. Huberfeld*, No. 16 Cr. 467 (AKH) at 6:18. If accurate, COBA could not now recover that money a second time from Jona.

that includes Mr. Huberfeld and Mr. Rechnitz, and perhaps Mr. Reichberg, I don't know, to be jointly and severally liable for $19 million."). Regardless of the outcomes with regard to other defendants, a restitution order requiring Jona to pay the total amount of COBA's losses would constitute error. Specifically, although COBA's investment was secured through the offense at hand, the loss of that investment is attributable not to any foreseeable risk but rather to the independent and unforeseeable fraudulent acts of Platinum Partners. The Government acknowledges that "Rechnitz did not appear to know that Platinum was a fraud, or even that it was a bad investment." 5K1.1 Motion at 18; PSR ¶ 52. Accordingly, COBA's lost investment does not place it within the statutory definition of a "victim" for the amount of that loss in the context of this sentencing.

The Mandatory Victims' Restitution Act of 1996, 18 U.S.C. § 3663A ("MVRA"), provides that a sentencing court shall order the defendant to "make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). A "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). Courts have grappled with the reach of restitution over time, but it remains the case that "the loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order." *Hughey v. United States*, 495 U.S. 411, 420 (1990); *see also In re Local # 46 Metallic Lathers Union*, 568 F.3d 81, 85 (2d Cir. 2009) ("the district court's statutory authority to award restitution under the MVRA is limited to awards to victims of the offense of conviction."); *United States v. Archer*, 671 F.3d 149, 170 (2d Cir. 2011)

36

(making clear that the question the district court must answer is whether the losses at issue were caused by the defendant's offense of conviction).

Restitution has been found unlawful where the defendant was convicted of one offense and then held responsible for causing a loss to another party through other conduct not part of that offense. *See Metallic Lathers Union*, 568 F.3d at 87 (rejecting restitution absent proof the loss was directly caused by the specific offense of conviction). In the context of a broader scheme or conspiracy, the Second Circuit has extended the definition of the offense for the purposes of restitution to encompass losses that were the product of an overarching fraudulent scheme. *See United States v. Paul*, 634 F.3d 668, 677 (2d Cir. 2011); *see also Archer*, 671 F.3d at 172 (the conduct producing the loss must be "an integral part of the single scheme"); *United States v. Oladimeji*, 463 F.3d 152, 159 (2d Cir. 2006). To our knowledge, however, no court has imposed restitution on a defendant where the loss was a product of the independent acts of others, separate from and not contemplated within the scheme that resulted in the offense of conviction and not foreseeable to the defendant.

We do not dispute that the purpose of the offense of conviction was to secure COBA's investment in Platinum Partners, and even though it was Murray Huberfeld and Norman Seabrook who principally stood to gain from the investment, Jona was a member of the conspiracy that sought to and did induce the investment. It is also accurate that there existed some risk of loss from investing in a hedge fund. It is error, however, to stop at this point in the analysis and impose restitution on this basis, because the investment in the hedge fund, no matter how risky, was not the proximate cause of the loss in this instance. It is evident from the Government's statements in this case as well as its prosecution of Mark Nordlicht and others that there exists substantial evidence that Platinum Partners engaged in a subsequent, separate, and independent fraud that in

fact deprived COBA of its investment.  Accordingly, the intervening and proximate cause of COBA's loss was the conduct of Platinum Partners.

Finding that COBA's funds would not have been invested in Platinum Partners absent the offense of conviction is insufficient to support restitution.  The statutory requirement for restitution is not simply a "but for" test.  *See In re Rendon Galvis*, 564 F.3d 170, 175 (2d Cir. 2009) (citing *In re Antrobus*, 519 F.3d 1123, 1126 (10th Cir. 2008)).  Restitution, to be lawful, requires proximate causation.  It is commonly accepted and a basic concept of law that an intervening event can break the chain of causation, but courts specifically have considered and confirmed that an intervening act may interrupt the chain of causation in the context of the MVRA and restitution. The Tenth Circuit, for example, reversed and remanded a restitution order because the district court failed to establish that the defendant's conduct was more than the "but for" cause of a purported victim's loss and specifically that it was the proximate cause of the loss.  *United States v. Speakman*, 594 F.3d 1165, 1171-72 (10th Cir. 2010); *see also United States v. Burns*, 843 F.3d 679, 689 (7th Cir. 2016) (finding plain error and reversing and remanding a Guidelines calculation and restitution order where the district court failed to establish proximate causation by the conduct of a defendant who fraudulently induced an investment in what ultimately was determined to be a Ponzi scheme absent a finding of the defendant's awareness of that separate fraud).  In *Speakman*, the court stated, "for purposes of determining if an individual is a 'victim' under the MVRA, an individual will be 'proximately harmed as a result of' the defendant's crime if either there are no intervening causes, or, if there are any such causes, if those causes are directly related to the defendant's offense."  594 F.3d at 1172; *see also United States v. Robertson*, 493 F.3d 1322, 1334 (11th Cir. 2007); *United States v. Cutter*, 313 F.3d 1, 7 (1st Cir. 2002); *United States v Wilfong*, 551 F.3d 1182, 1187 (10th Cir. 2008) ("the 'main inquiry for causation in restitution cases [is]

whether there was an intervening cause and, if so, whether this intervening cause was directly related to the offense conduct'" (quoting *United States v. De La Fuente*, 353 F.3d 766, 772 (9th Cir. 2003))); *United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 928 (9th Cir. 2001) ("Defendant's conduct need not be the sole cause of the loss, but any subsequent action that contributes to the loss, such as an intervening cause, must be directly related to the defendant's conduct.").

As the conduct of Platinum Partners was the intervening cause of the loss of the COBA investment, the question thus turns to whether that fraud was directly, or indeed in any way, related to Jona's conduct. It was not. Jona had no role at Platinum Partners, and unlike Murray Huberfeld, he had no inside knowledge of its operations or its struggles. The touchstone of liability for the acts of others is reasonable foreseeability. Losses caused by the acts of others that are not foreseeable are, by definition, not within the scope of the offense for which the defendant is responsible and thus not a permissible basis for punishment or a restitution order against that defendant. This is the case with regard to Jona and Platinum Partners and the loss of COBA's investment.

In this way, the course of events with the COBA investment is fundamentally different from the events of other cases such as *Paul* where the intervening event is part of the defendant's overarching course of conduct or a result of the risk assumed and contemplated by the defendant in the course of his fraud. Platinum Partners was an independent actor, engaged in a separate, unforeseeable course of conduct with which Jona had no part and of which he had no knowledge. Their conduct was a separate and intervening cause of the harm to COBA, and that conduct broke any chain of causation between the acts for which Jona stands convicted and the harm to COBA.[11]

---

[11] Indeed, although some of Platinum Partners' principals were criminally charged in the Eastern District of New York, one (SanFilippo) was acquitted by the jury, another (Levy) was acquitted in a post-trial ruling, and the third

There is no suggestion that Jona was part of any greater fraud scheme with Platinum Partners, and, unlike Murray Huberfeld, there is no basis to conclude he somehow knew of the separate, ongoing fraud at Platinum Partners. Indeed, the Government specifically notes that Jona "did not appear to know that Platinum was a fraud, or even that it was a bad investment," and even tried to steer COBA towards the more conservative of the two investment products offered. 5K1.1 Motion at 18 and 18 n. 5. Accordingly, COBA's investment loss was neither proximately caused by the offense of which Jona was convicted nor reasonably foreseeable to him.

## CONCLUSION

Accordingly, and for all of the reasons stated above, this Court should take into account all aspects of Jona Rechnitz's conduct, including both the offense and his subsequent acts of extraordinary substantial assistance, and should impose a non-custodial sentence of time served.

---

(Nordlicht) was granted a new trial, in a ruling now being appealed. *See generally* Mem. Dec. and Order dated Sep. 27, 2019, in *U.S. v. Nordlicht*, E.D.N.Y. No. 16 Cr. 640 (BMC) (ECF No. 800). While the full cause or causes of the failure of Platinum Partners presents a complicated factual question which may never be fully resolved, we do know that the Government prosecuted it as a fraud. Regardless, Jona's own lack of knowledge and involvement as established by his public testimony and the Government's observations in its 5K1.1 Motion should be sufficient to show that it was not reasonably foreseeable that his actions would cause the loss of COBA's full investment. Should the Court disagree, we submit that further discovery and fact-finding would be necessary.

New York, New York
Dated: October 21, 2019

Respectfully submitted,

COOLEY LLP

By:    /s Alan Levine

    Alan Levine
    Nicholas Flath
      55 Hudson Yards
      New York, NY 10001-2157
      (212) 479-6000

    Daniel Grooms (*pro hac vice*)
      1299 Pennsylvania Avenue NW
      Suite 700
      Washington, DC 20004
      (202) 776-2042

    *Attorneys for Defendant*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     v.

JONA RECHNITZ,

          Defendant.

16-CR-389 (AKH)

 

**APPENDIX TO SENTENCING MEMORANDUM
OF JONA RECHNITZ**

COOLEY LLP

Of Counsel:

Alan Levine
Nicholas Flath
  55 Hudson Yards
  New York, NY 10001-2157
  (212) 479-6000

Daniel Grooms (*pro hac vice*)
  1299 Pennsylvania Avenue NW
  Suite 700
  Washington, DC 20004
  (202) 776-2042

*Attorneys for Defendant*

# TABLE OF CONTENTS

**I. Letters**

| **Ex.** | **Author** |
|---|---|
| 1. | Alisa Adler |
| 2. | David Alvarez |
| 3. | Steven Burg |
| 4. | Alejandro Cadena |
| 5. | Shlomo Einhorn |
| 6. | REMOVED |
| 7. | Joshua Goldman |
| 8. | Ari Gross |
| 9. | Moise Hendeles |
| 10. | David Kahn |
| 11. | Deborah Kahn |
| 12. | Fred and Adi Kahn |
| 13. | Joshua Kahn |
| 14. | REMOVED |
| 15. | Abraham Levi |
| 16. | Haskel Lookstein |
| 17. | Brocha Chana Metzger |
| 18. | Jared Rechnitz |
| 19. | Jona Rechnitz |
| 20. | Melanie Rechnitz |
| 21. | Rachel Rechnitz |

22. Robert Rechnitz

23. Steven Rechnitz

24. Mordechai Rindenow

25. Danny Rotenberg

26. Shea and Mariam Schwebel

27. Steven Weil

## II. Articles

**Ex.      Description**

28. Shawn Cohen and Larry Celona, *Bribe Cad at Series*, N.Y. POST, Nov. 1, 2016, at 22

29. Kaja Whitehouse, *NYPD Briber Rats on Partner*, N.Y. POST, Mar. 31, 2017, at 10

30. Kaja Whitehouse, *Feds Push On With Blas-Pal Corruption Probe*, N.Y. POST, Apr. 1, 2017, at 6

31. Kaja Whitehouse, *'Cop-Bribe' Figure 'Fesses to Ponzi*, N.Y. POST, May 12, 2017, at 22

32. Kaja Whitehouse, *De Blas' Felon Friend A Mall Rat*, N.Y. POST, May 27, 2017 at 6

33. Kaja Whitehouse, *NYPD Briber Ditches NYC*, N.Y. POST, July 10, 2017, at 15

34. Kaja Whitehouse, *Blas Bribe Pal Angers LA Congregants Shul'd be a$hamed*, N.Y. POST, Oct. 4, 2017, at 21

35. Jillian Jorgensen, *Zips Lips, Gives Press the Slip*, DAILY NEWS, Oct. 28, 2017, at 5

36. William Neuman, *De Blasio Calls Donor Who Said Money Bought Him Access A "Liar"*, NEW YORK TIMES, Oct. 29, 2017 at A25

37. Melissa Klein, *Jona Bought Key to the City: Blas Donor Conquered Gotham With His Wallet*, N.Y. POST, Oct. 29, 2017, at 4

38. Graham Rayman and Jillian Jorgensen, *Blas-Bibi Meet Got Rech'd – Epic Fail By Dirty Donor Jona*, N.Y. POST, Jan. 4, 2018, at 16

39. Jillian Jorgensen and Greg B. Smith, *Bill's Email Trash*, DAILY NEWS, Dec. 1, 2018 at 2

40. Stephanie Pagones and Bruce Golding, *Banks' Statement – Scandal Cop Denies Bribes*, N.Y. POST, Jan. 1, 2019, at 8

41. Priscilla DeGregory, *Rechnitz Travel Plea*, N.Y. POST, Feb. 14, 2019, at 9

42. Emily Saul, *DeB Rat Donor's Leniency Bid*, N.Y. POST, Oct. 17, 2019, at 4

43. Stephen Rex Brown, *A Good, Dirty Rat*, DAILY NEWS, Oct. 17, 2019, at 18

## III. Transcript Excerpts

44. Excerpts from the transcript of the trial in *United States v. Seabrook and Huberfeld*, No. 16 Cr. 467 (ALC)

45. Excerpts from the transcript of the trial in *United States v. Seabrook*, No. 16 Cr. 467 (AKH)

46. Excerpts from the transcript of the trial in *United States v. Grant and Reichberg*, No. 16 Cr. 468 (GHW)

47. Excerpts from the sentencing transcript of Norman Seabrook dated Feb. 8, 2019 in *United States v. Seabrook*, No. 16 Cr. 467 (AKH)

48. Excerpts from the sentencing transcript of Murray Huberfeld dated Feb. 12, 2019 in *United States v. Huberfeld*, No. 16 Cr. 467 (AKH)

49. Excerpts from the sentencing transcript of Jeremy Reichberg dated May 13, 2019 in *United States v. Reichberg*, No. 16 Cr. 468 (GHW)

# Exhibit 1

ALISA ADLER



NEW YORK, NY

Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street,
New York, NY 10007

Dear Honorable Judge Hellerstein,

I am writing to you on behalf of Jonah Rechnitz who is sitting before you for his sentencing. I am able to write this letter from my own recent firsthand experience with the criminal justice system.

I have come to know Jonah over the last few years, mostly from amazing work he has done in the community.
However, this is a letter that is coming to you from a very personal nature. From the time my case started in 2015, there were often so many things going on at once it was hard to see the forest from the trees. I know for me I was very lost and petrified.

However, when you have to look at what has transpired, you need to be able to see past yourself and see what we are supposed to learn and change.

At the time, Jonah made himself tremendously accessible to hear me out and help me see things that I could not see. Jonah was immensely influential in making the decisions I needed to in order to move myself forward and accept responsibility.

I do not come from a lot of money and have worked very hard for many years to try to make a living. The 2009 crisis threw my family business into a tailspin. Soon after that time, the world was spiraling out of control and before I knew it my world was turned upside down.

It is Jonah who without a missing a beat, made time to talk to me, help me, guide me as well as helped me pay a portion of the legal bill so I could keep going. In addition, Jonah was responsible for guiding others in the community to help make full restitution in my case. From what I understand it is unheard of. Without Jonah's help I would not have made it.

It is very easy to get stuck in your own world and issues and ignore someone else's need for help. This is the exact opposite of what Jonah did.

He got right in there with me to help me see what I needed to see and become accountable for my actions.

I would like to share that even before I knew Jonah, I was at many social gatherings where Jonah's case and his decision were open game and discussion amongst large groups of people. In one specific instance, I was at a table with 23 people and one person openly spewed all the particulars about the case, along with his very hurtful opinion which was all wrong. I personally not even knowing who Jonah was, walked out of the room because it was so painful to hear someone else speak recklessly without abandon about someone they were supposedly friendly with. I actually went over to his wife and told her that she needs to muzzle her husband. Most of the things being said that day were not even accurate which I later learned when I became more familiar with Jonah and his case. Your honor, there has been an enormous amount of push back from everyone in his Upper West Side community and Los Angeles community. His life has been turned inside out. I cannot imagine where he would go to feel safe. It is has been horrible for him and his wife and hardest on the kids. Unfortunately, I know all too well, what it is like to have friends abandon you, and turn on you when you need them most. Yet, in the midst of it all, Jonah made time to help me.

Your honor, it is not easy for me at all to be writing to you because the pain is still so great, yet I could not imagine not helping someone who made a huge difference in my life and helped me get to the other side of responsibility and accountability.

I know Jonah is so meaningfully sorry for what happened here and his participation for what went wrong. He has acknowledged and spoken to me about his accountability time and time again. He has learned many lessons that he needed to learn. The community, his family, his wife and I need him here. We need Jonahs help to learn how to make better decisions. He is a tremendous resource of goodness and can take this information and utilize it well to help others prevent their mistakes before they even happen. I beg of you your honor, from a person who is aware of the horrible idea of being removed from your family, Jonahs children are very young and need their father with them.

Please I ask you to see how much Jonah has been willing to contribute and have mercy on him and judge him very favorably. Please do not to incarcerate him for any period of time, so he can be with his family, and continue to contribute to all that desperately need him.

Sincerely,

Alisa Adler

2

# Exhibit 2

David A. Alvarez

New York, New York

09/23/2019

Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Hellerstein:

I, David Alvarez, met Mr. Jona Rechnitz in 2006 at the Apthorp where I am still employed. He has always been a humble and caring person who always asked for my family, how I'm doing and even knew when I was going through something because he would always ask. Jona has been a great individual with me and everyone he has come in contact with, it never mattered who you are Jonah was the same with everyone - kind and helpful. I can say that when I found myself having issues with the IRS I approached Jona for advice. I showed him a letter that I got from the IRS and he then contacted his personal real estate attorney to help me find out what to do. When he got back to me, he explained that I owed the money and needed to repay it. Jona knew that I couldn't afford the payment and without me expecting it he gave me an envelope with the exact amount I owed so that I could pay it immediately. When I was ready to begin paying him back, Jona refused to accept the payment. This truly showed me what a generous, kind hearted human being he is. Needless to say, I didn't approach him with my problems for him to do anything for me, but he surprised me with his actions. I refused to keep the money and I had to insist in order for him to accept the repayment. This is only one of many acts of kindness and generosity that have led me to love him as a brother because he showed that he is selfless and truly offers his friendship without expecting anything in return.

Another big thing for me was when my mother passed away on October 2nd, 2016. Of all the people that have known me for many more years than Jona, it's incredible to believe that he is one of a handful of people that actually attended my mother's funeral in spite of this going against his personal religious beliefs. He

even offered to pay the funeral, again I refused the offer for monetary help, but these are the details that show who a person really is. Jona proved to be a true friend in moments where I needed one the most.

As if all the things that I've shared aren't enough, Jona even stepped in to assist me through a difficult time in which the landlord of my mother's apartment attempted to evict me by refusing to recognize my checks. It was clear that they were attempting to remove me from the apartment after my mother's passing, even though having been born there, I lived there for my entire life. Again, Jona came to my aid. He secured legal advice through his real estate attorneys to help me fight this injustice. At the end of the day, I can thank him yet again for having taken his time and resources to help me, a simple doorman at the Apthorp. Who would have thought that a man in his position would even think of helping another person in my position. He has a good heart and he doesn't go around boasting, but all I can say is if he's done all of these humanitarian acts of kindness for me, I could only imagine how much more he has helped the community in general.

In closing, this is what I know about Mr. Jona Rechnitz. Your Honor, thank you for your time and consideration. If you have any questions please feel free to reach out to me, David A. Alvarez at 347-█████

Sincerely

David A. Alvarez

Exhibit 3

Rabbi Steven Burg

███████████████

Bergenfield, NJ ██████

September 20, 2019

Honorable Alvin K. Hellerstein

United States District Court

Southern District of New York

500 Pearl Street

New York, NY 10007

Dear Judge Hellerstein

I have known Jona Rechnitz for the past seven years. We first met when I started working for the Simon Wiesenthal Center in New York City. I was introduced to him by people within the organization and we became fast friends.

What drew me to Jona was his unusually large heart. Whenever a situation came up regarding someone that was in need, he was the first to help. I recall vividly how one of his Rabbis from his school had fallen on hard times and was in need of a job. Jona arranged for the Rabbi to work as a security guard at one of his properties.

Jona's office became the stop for anyone that was in distress and required charity. It was as if he did not know how to say no when someone was in need. Even though Jona was a young man, I quickly became dependent on his advice and wisdom in my own work for the Simon Wiesenthal Center.

I was also close to Jona when some of the current issues came to light. I remember a conversation with Jona when I asked him what he had learned. He talked about how remorseful

he was and that he wanted to make it right. This was a private conversation and I felt that he was absolutely sincere in his remorse.

Unfortunately, the media has sought to portray him in a very negative light. Anyone who truly knows Jona understands that what they read in the newspaper is a gross distortion of who he really is.

Jona has faced tremendous communal pressure regarding his decision to testify. I was in a restaurant with him about a year ago and when I went to leave, I saw a prominent leader of the Jewish community. As I stopped to say hello, he said to me "I hope you know everything you just said was taped". I was horrified by the comment. This was a prime example of the communal ostracization Jona has been enduring as a result of his situation. Life has not been easy for Jona these past few years.

I ask you to please take the pain he has suffered these past few years and all the acts of kindness he has done and continues to do, into consideration in deciding what sentence you deem appropriate.

Sincerely,

Rabbi Steven Burg

# Exhibit 4

Date: 9/25/2019
From: Alejandro Cadena

                                 NY, NY,

Attention: Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY, 10007

Dear Judge Hellerstein,


My name is Alejandro Cadena. I was born in Ecuador and raised between Ecuador, Panama and Israel and three and a half years ago moved to NYC with my wife. My wife and I were totally secular living in Israel and for the past 5 years we have become more observant (choser betchuva) and now we both live observant lives. We first met Jona at a friend's Shabbat dinner in the Upper West side. He was extremely welcoming and friendly to us since day one. After that we used to see him during Shabbat meals at our friend's house and got to know him and his family a little bit better. They were always kind and sympathetic with everyone.

My parents in law and my wife's family live in Los Angeles. In January of this year we got a horrible call from my mother in law saying that my father in law had suffered a massive heart attack and that he was in a comma at the UCLA hospital. Since that day it was Saturday (Shabbat) we only heard the unfortunate news 5 hours later after sundown and took the first plane to LA. My sister in law was already on the plane from Israel, and my brother in law in the plane from DC. My wife being the eldest of all three she is only 29 years old, her sister 27 and her brother 25. The whole family is secular but us two. When we arrived to the hospital we spoke to the doctors and the first response from the radiologist was that my father in law Boris was not in a good situation and that he is basically brain dead which makes him dead according to medical terms. The first thing I did was to call our friends in NYC and our rabbi to consult this since they wanted to disconnect Boris from the machine. Our friends told us that Jona had moved to LA and suggested to call him. I immediately called Jona and in less than one hour that evening Jona came with Rabbi Gramma to see us and the family and to discuss what is and what is not allowed according to alacha. This was a very difficult situation since the whole family is secular but I knew how important this is to me and to my wife who is observant. My brother in law Guy he is a medical student at Georgetown University and is completely secular (anti religion to be precise). I vividly remember telling Jona how desperate I was with the situation and he just assured me that nobody would disconnect Boris. Jona spent the entire night with us until 3 in the morning, ordering food for everyone in the room, speaking to doctors, speaking to the rabbi and making calls to his friends at UCLA hospital to make sure they won't disconnect Boris. The next morning Jona was there again with us, with a smile, with food, and giving us all hope that someone is taking care of this nightmare. He was back and forth speaking with all the doctors and arguing with them why they cannot disconnect Boris no matter what. After five days of Boris being in a comma things got very ugly with the doctors and also with my brother in law. The doctors declared Boris dead and said that no matter if his heart is stil

beating according to the medical world he can no longer remain plugged in the machine and that we had 12 hours to sign a paper so that they can disconnect him otherwise they would still have to proceed with this. Also the doctors kept claiming that it is "inhumane" to keep Boris connected since his brain was dead. My brother in law started siding with the doctors due to his lack of understanding of Alacha and what is right in this type of situations. He did not want to talk to anyone about it. My wife and I were in shocked so once again called Jona to come, Jona was there every day many times two and three times each day spending 6-7 hours of his day with us and the doctors. I never met a person with such a big heart and chesed and willingness to do something for others. Jona's wife was due any day during that time and not even that hindered Jona from being with us countless hours. I told Jona the situation with my brother in law and the whole family since everyone seemed to be getting angry at my wife and I for being so strict with the Alacha part of things. Jona immediately started speaking and literally bonding with my brother in law. Jona took us outside of the hospital to drink Turkish coffee in a place nearby and we were all able to see the cool side of Jona so my brother in law immediately felt connected to him as well. Jona explained to him and the family the importance of doing things the right way and how Judaism actually protects the body and sanctity of a person above everything else. Somehow Jona was able to turn my brother in law to side with us and fight the next battle with the doctors. The next morning was the deadline to sign the papers to disconnect my father in law. Jona kept making calls and got one of the lawyers to write a letter to the radiologist saying that they must give us a few more hours so that they can move Boris to a different hospital since his heart was still beating. This was an exhausting and draining process for all of us but felt so protected and loved by our angel then Jona. The deadline was prolonged until the next morning. Jona started making tons of calls to see ways to move Boris to a different hospital. My rabbi in NYC said that no matter what we cannot disconnect Boris from the machine if his heart is still beating so we were in so much stress. That night once again Jona was there for many hours bringing us dinner to all the family members and reassuring us that he is there for us. We kept praying and asking for a miracle. That night we were praying and doing the Amidah in front of Boris and suddenly his heart rate started decreasing. The nurses came and the second we ended the prayer his heart stopped. One of the nurses had tears in her eyes and said that she has never seen such a unity in the whole family. This was around 2 am. I called Jona immediately and he came in less than 30 minutes. Now we faced a different giant problem we needed to make sure that Boris is buried as soon as possible according to alacha, but Boris's father is 91 years old and lives in MigdalHaemek in Israel so we called him to tell him the news and he said that he must be present at the funeral. The issue was that he could not fly alone and the only person who could fly with him was Reuven Boris's best friend from the army years which had become like a son to Boris's father. The issue with Reuven was that his passport was expired and he had no tourist visa so once again Jona made calls and together with my wife were able to expedite his visa and passport in less than 24 hours to come to us. Jona called his travel agent and booked them two tickets and he took care of everything. He was literally our angel throughout the whole process in the hospital, during the funeral, during the Shiva Jona came couple of times to visit us and a few days later his wife gave birth. Since then we have been very close with Jona and he is always checking on us and how we are doing. Despite of having six children at home he is a true hero who not only helped us in the most difficult critical situation in our lives but also was able to change my brothers in law's perspective on Judaism forever. My brother is law still calls himself secular but has been saying Kaddish for his dad since Boris passed away. Also the way that my brother in law Guy looks and thinks of religious people changed drastically since the moment he met Jona. He had in his mind that religious people are utterly judgmental and that they only take care of their community

members. After meeting Jona he not only realized that this was not true but also realized that he could be close and become friends with religious people. Nowadays I am glad to see that my brother in law interacts with many religious people when he goes to Shul to say kaddish without any preconceive thoughts as he did before. Going to Shul with them is a pleasure nowadays and not like before. Another moving example of the exemplar of a person Jona is when Boris's father Michael (Born in Moldova, went through Russian Army and moved to Israel with his wife and two kids) as a proper strict army person started asking me who bought my ticket I must know and he kept insisting to meet the person who bought his ticket. Jona on the other hand did not want anyone to know who bought the ticket, Jona's altruism was once again shown here. Michael as an army guy brought up in communist Russia had a really bad view of religious people since they do not do the army so he always used to criticize the religious community saying that they only care about themselves. This all changed when I introduced Jona to Michael and told him that Jona is the person he had bought his ticket in such an expedite way. He immediately saw the black kippah on Jona's head but could not resist by thanking him for everything he was doing for him and the family. I played a bit of the translator between Jona and Michael since Michael does not speak English but it was so moving to see the shock in his eyes and after everything speaking to him and seeing that he now acknowledges that there are good religious people also. This was huge to see. I was in Israel in June and went to visit Michael and he always repeats the story that a good religious man bought his ticket to be on time for his son's funeral. Once again we thank Hashem for putting us Jona in our lives and we will forever be thankful for his huge heart and love for humanity and the Jewish people. His actions and deeds are not only helping religious communities but most importantly are bridging the gap between religious and secular communities since every secular person who gets to meet Jona connects with him and that is such a Kiddush Hashem for all Klal-Israel.

I hope you find in your heart the strength to make a fair decision and to understand that Jona was, is and will be doing a terrific great job for others in this world.

Sincerely,
Alejandro Cadena
+1-917

# Exhibit 5

בס"ד

**SAMUEL A. FRYER YAVNEH HEBREW ACADEMY ♦ ישיבת יבנה**

5353 West Third Street ♦ Los Angeles, CA 90020 ♦ 323-931-5808 ♦ 323-931-5818 fax

www.yha.org

Rabbi Shlomo Einhorn
RAV AND DEAN

Eileen Wasserman
GENERAL STUDIES PRINCIPAL

Douglas Gardner
CHIEF OPERATING OFFICER

**BOARD OF GOVERNORS**
Brian Dror
Isser Elishis
Walter Feinblum
David Rubin
Steven Usdan

**EXECUTIVE BOARD**

Isser Elishis
PRESIDENT

Mira Shuchatowitz
VICE PRESIDENT

Alan Tsarovsky
VICE PRESIDENT

Isaac Orenbuch
TREASURER

Avi Helfand
SECRETARY

Akiva Greenfield
Daniel Nagel
Efrat Zisblatt

**GENERAL BOARD OF DIRECTORS**
Jonathan Barzideh
Aliza Fish
David Gershov
Jaqueline Kuppermann
Dovid Levine
David Lunzer
Sarah Pachter
Dovi Prero
Benjamin Rosenberg
Rafi Ryzman
Lou Shapiro
Jonathan Tabak
Daniel Uretsky

**PTA PRESIDENT**
Mindy Lyons

**PTA VICE PRESIDENT**
Debbie Schames

**PTA TREASURER**
Asher Hoffman

To whom it may concern,

I have known Jona Rechnitz his whole life. Ever since we were children Jona was known to have a good heart and would always think about acting on behalf of others. We went to the same day school, we went to the same high school, and we went to the same university. At each of those institutions he always displayed the utmost eagerness to get involved in helping the larger group or helping those in need. I remember at Yeshiva University when he went to bring chocolates to the individuals working hard at the campus dry cleaners. I recall Jona taking an Israeli immigrant under his wing and helping his fledgling shawarma business get off the ground. For all of our interactions – the experience has been the same – "how can I better the lives of others?"

It is now many years later since the first memory I have of Jona. I currently am the Dean of the school that we both went to. Jona has moved back to Los Angeles and sends his children to this school. The impeccable nature of his and his wife's children display a goodness that is indicative of the person he really is. His active involvement in being an incredible father is so special and so unique. Together, with his incredible wife Rachel, they have raised six fantastic children.

As for a price to pay – I think he's paid an incredible price. He was taunted in synagogue and mocked in the press. He was accosted at public events. Jona and his family have been through hell and back. I hope that my words can mitigate a decision on his behalf.

Jona is a good person who has done a tremendous amount of kindness in the world. A lot of people's lives has been made better because of him. I am Rabbi of his family's synagogue. I encounter people all the time who are in need. Jona would give the shirt off his back and beyond for anybody. Our city is frequently visited by those who can't afford rent or basic necessities. Jona is always my first call. And it is always followed by an immediate affirmative response to help.

Please allow these anecdotes to serve as the truth of who Jona really is.

Sincerely,

Rabbi Shlomo Einhorn

*Rav and Dean of Yeshivat Yavneh*









*Yeshivat Yavneh is the proud beneficiary of grants from:*

# Exhibit 7

Joshua Goldman


Los Angeles CA
323-

10-2-2019

Honorable Alvin K. Hellerstein
United States District Court
Southern District Of New York
500 Pearl Street
New York, NY 10007

Dear Judge Hellerstein:

My Name is Joshua Goldman I live in Los Angeles and I run a Transportation Company
in Los Angeles I met Jona and his family by giving them rides on their Visits to Los
Angeles when they lived in New York City and over many years our Friendship has
grown closer and closer I want to tell you your honor about what a kind, caring, and truly
compassionate person Jona is myself and my wife have three children thank g-d and
the youngest of the three was diagnosed with Autism Spectrum Disorder at the young
age of 3 years old as soon as Jona found out that my family was going through the
constant struggles of raising a special child he was there supporting me in every
possible way both financially and emotionally his caring comes from a very honest and
sincere heart and soul that he has.

 he is a very sensitive and caring person his kindness and caring knows no limits.

Other people offered us help but nobody offered such caring and compassionate help
like Jona did.

when my wife was diagnosed with a Tumor in her abdomen two and a half years ago
(February 2017) and underwent a major abdominal Surgery Jona was there again at my
side offering me anything and everything in financial and emotional support. my wife
has undergone three surgeries total since that first surgery and Jona has been there
each and every time going above and beyond the call of duty he is truly a sincere and
caring person that does tremendous kindness and compassion with joy and gladness
and makes the person receiving the kindness feel so good and comfortable which is
very noble especially for people that are undergoing and living through the hardship.

Jona is one of a kind as far as helping and caring for his fellow human being he is an
extraordinary Father to his six lovely children and Husband to his amazing wife who
cherish him and love him and need him in their lives so much I have watched in awe on
countless of occasions how much unlimited selfless love, energy and dedication he
gives to his wife and children he is a very present and active in every aspect of their
lives educationally,socially,recreationaly,emotionally and spiritually.

Jona has also gone through much suffering at the hands of certain members of the Jewish Community in Los Angeles who have ridiculed him and vindictively punished him unnecessarily and added insult and injury to him over and above the shame he has endured.

I want to share with you your honor the fact that Jona has changed dramatically over the past couple of years and lives with tremendous shame and regret and remorse because of what he has done and he honestly has changed himself as a person and is very remorseful.

I ask from the bottom of my heart to please show leniency to Jona at the sentencing his young children and his wife need him and want him in their life so very much as well as all the people that he helps with such extraordinary kindness, compassion, dedication and selflessness.

Thank you for taking the time to read my letter.

Respectfully,
Joshua Goldman

Exhibit 8



Aron (Ari) Gross

█████ ███ █████

Brooklyn NY █████

(212) █████

October 13, 2019,

The Honorable Alvin K. Hellerstein
United States District Judge,
United States District Court,
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:  United States v. Jona Rechnitz,

16 Cr. 389 (RJS)

Dear Judge Hellerstein:

I believe that a man's action should be judged by intentions. If his intentions are foul, then he is foul altogether.  Being an honorable district judge of the United States, no one can understand this better than you, or anyone in that position of authority and respect.

I am writing this compassionate letter for my dear friend, Mr. Jona Rechnitz, who will be sentenced at the next hearing.  I only intend to shed some light on his decent albeit naïve character for your consideration.  I have known Mr. Jona personally and professionally for a long time now.  Here's how I got to know him:

Since I was employed by *Eichlers Judaica*, in the Boro Park sector of Brooklyn, and Mr. Jona was the landlord and manager of the property, once a month Mr. Jona came to the store to collect the rent.  While he was there, he



Aron (Ari) Gross

Brooklyn NY █████

(212) ███████

used to shop by us, he was extremely nice and generous, he always had a smile and a nice word to say, to make us feel good, he always tip us, I personally liked to assist him with his shopping, and as my boss always told me that Mr. Jona is unique, he never pressured for the rent being paid on time, (the 1st of each month), he always had a heart and understanding our struggle in business. I was happy that Mr. Jona was becoming my good friend, as he was so friendly to each and every human being, without any discrimination,

As soon as the community got aware that Mr. Jona and myself are friends, (which I was proud and not hiding), the harassment and pressure and intimidation campaign of the so called powerful community, begun to use me and my position at Eichler's to fabricate and make up stuff against Mr. Jona. I was offered unlimited amount of money to come forward with false stories against him.

Here is an example of how I was intimidated:

Eichler's Judaica was a tenant of Mr. Jona at the time, and they were paying 30k a month for over 20 years, (was never increased due to the friendship of Mr. Solomon the owner of property with Mr. Blue the owner of Eichlers Judiaca). The day when Mr. Jona raised the rent and signed a new lease of 45k monthly, the owner still continued to pay 30k per month since they couldn't afford the 15k raise. I then got a phone call from Mr. Moshe Oretz, one of Morty Huberfield's best friends, trying to convince me, and intimidate me, that the 45k monthly lease was a phony lease, and it was made just to show the bank and for investors, but the real deal was only 30k, so Mr. Jona committed fraud.

My reply to them was, that I am aware of the fact that we are paying 30k a month, and I am aware of the legit increase, but the real lease is 45k and the reason we only pay 30k is because the owner is home very sick and



Aron (Ari) Gross
██ ██ ██
Brooklyn NY ██
(212) ██

unable to come to work, therefore business is not doing well, so we cannot afford the raise. And I can assure you that there's no fake lease or any hidden deal. They were trying so hard to create a narrative of a criminal act, of this lease situation, against Mr. Jona, so they can discredit him and his witness position. The even went that far and report that to the FBI. I then was interviewed by the FBI agent *Mr. Brad,* and it was clearly established there story is not credible.

I have seen Mr. Jona over the years being taken advantage of by some corrupt and bad people, pretending to be his friend. Mr. Jona has a very soft heart, of that I have no doubt. Amazingly, until this day he wishes the best for Mr. Jermy Reichberg. Mr. Jona has a very soft heart, of that I have no doubt.

Mr. Jona has helped me, and is helping me out a lot in my difficult times. Mr. Jona has an understanding what to be a divorced man in this community, he has been there for me in all my difficult times with my kids, mainly by his open invitation to me, to spend every single Jewish holidays with him and his family, just so I do not feel lonely. He even helped me out financially on certain occasions, when unfortunately no one looked at me twice within my community.

I had no other friends where I lived. While this soft and kind-hearted nature makes him a very good friend, it also makes him vulnerable. In his pursuit to help people, I have witnessed, on many occasions, that Mr. Jona anonymously arranged support for people with life struggle and in financial trouble. The person in need used to get strong support, without knowing the identity of this angelic donator. Or when he realized that someone struggles in business, he would get his friends and family to buy or give their business to that person, without the seller knowing that Mr. Jona referred them,



Aron (Ari) Gross

Brooklyn NY

(212)

He hates taking credit for what he's doing. The only times he would be upset at me, is when I'm thanking him for what he has done to me. If I don't want him to hang up the phone on me, then I just don't say the word "thank you Jona"

Mr. Jona has encountered many bad people who took advantage of him, and his strong talented position, and his soft heart. Please note: the same evil people, was harassing me with great hostility, when I came to court at trial to give support, and be on the side of Mr. Jona. It was the word out in the community that no one is allowed to go to court to support Mr. Jona. It went so far that when I called up *Mr. Moishe Fried*, who had throughout the years benefit a lot from Mr. Jona, and asked him to come show support for Mr. Jona, he answered me that he's too scared from the community, and his kids won't be able to get married with community members, and when I told Mr. Jona that Mr. Fried is refusing to come, he said to me "I understand him, he's right."

And when the community got the word that I, *Ari Gross*, is the one and only guy in court to support Mr. Jona, I was harassed and bullied by the entire community, even while in court I was threatened by many including Mr. *Shlomo Reichberg* in front of the FBI agent, he then got a warning from the agent, to never do this again.

One of my best friends for 20 years, Mr. Chesky Schonberger, stopped talking to me, and ignores my calls until this day, for the only crime I committed, that I came to court to show support for Mr. Jona, and so are many of my friends, but Jona keeps on telling me, "don't worry about me, don't lose friends because of me."

Aron (Ari) Gross



Brooklyn NY

(212)

Mr. Jona is a family man who loves his wife and kids very much. And so does his wife and kids love him. Likewise, he is all that his family has got. With him going true hard punishment, his family would be destroyed.

The prime reason why he was cooperating with the authorities was that he had deep regrets about what he did and that he was really willing to change. Mr. Jona has then revamped his entire lifestyle and cut all the bad people in his life.

Dear Judge, I am fully aware that your job is not easy. It is, however, a very honorable position that is only given to people of the highest order. I cannot dare to tell you how to do your job, but I can request you to consider all facets of his character and intentions before you sentence him.

Please let us know if there is any other information that Your Honors require.

Respectfully submitted

X _____
Aron Gross

cc: Alan Levine, Esq.
    Defense counsel

# Exhibit 9

*Moise E. Hendeles*
ATTORNEY AT LAW
*4601 Wilshire Boulevard*
*Suite 205*
*Los Angeles, California 90010*

*Telephone (323) 933-5763*
*Fax (323) 933-5273*

October 3, 2019

Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:     Jona Rechnitz

Dear Honorable Judge Hellerstein:

I graduated from Brooklyn Law School in 1974 and have been admitted to the State Bar of California since 1976. I have been the principal managing partner, of FLM Enterprises, a family owned Real Estate development and management firm, for the past 45 years. As one of the longest-standing members of the Los Angeles Jewish Community, my family and I are involved in philanthropy and fundraising for many charitable organizations. One of the most prominent Hebrew day schools in Los Angeles, with a student population of 500 students, carries our family name.

As a long-standing member of the Jewish Community I knew Jona's grandparents and grew up with Jona's father. I attended Jona's Bris as well as his wedding. I have four sons, ages 29 to 39. One of my sons is Jona's age, and has been a close friend of Jona for his entire life. I can honestly say I have known Jona his entire life, and I know him well. Jona is an extremely kind and caring individual.

My youngest son was single and living in New York at the same time as Jona and his wife, Rachel, lived in New York. Knowing my son was single and living alone, Jona and his wife would often invite him over for Sabbath meals and to celebrate other holidays together with their family. Jona and his wife, Rachel, looked after my son, as an older brother and sister would, and really cared for him. Every time I see Jona and Rachel, I express my gratitude to them for watching over my son. Jona always responds to my compliments saying it was "nothing."

Helping others is truly "nothing" to Jona. Helping others comes naturally to him, and is part of his nature. Jona also helped one of my other sons who started a business manufacturing and distributing men's socks. Jona helped him without any compensation. He just tried to help my son to be successful in a very difficult business.

Jona's nature is to help others when he can. He does it from the goodness of his heart and without expecting or getting anything in return. If you ask Jona for a favor, he does not hesitate if he can. His first reaction is to say yes. In this instance, Jona's mistake was his natural reaction of saying yes without really thinking about what he was doing and the consequences.

Jona expressed to me many times his regret in what he did. He is remorseful and suffered greatly as a result of his actions. Jona's parents are long-established prominent members of the Los Angeles Jewish Community. Jona, his siblings and parents are a very close-knit family. Jona's parents are proud of the reputation their family built over several generations in Los Angeles, earned by their charitable endeavors in both the United States and in Israel. They had an impeccable reputation. The embarrassment that Jona exposed his wife and family to was extremely painful to Jona. Anyone who knows Jona could see the pain that Jona experienced, and multiplied a thousand times, for what he knew his family was experiencing as a result of his actions.

I am a member of the same synagogue as Jona's parents. Two years ago, on Yom Kippur, our holiest day of the year, Jona joined his parents and siblings to pray in our synagogue, a synagogue where Jona's parents and grandparents were instrumental in building. A member of our synagogue reported to the New York Post Jona's participation in our services. The New York Post wrote a derogatory article naming our synagogue. The article caused much embarrassment to our synagogue's reputation and to its members. The member called the New York Post because he was upset that Jona was willing to testify against a fellow Jew. The New York Post and the internet caused the story to be repeated on a weekly and sometimes daily basis. The repeated newspaper articles of Jona testifying as a government witness, caused Jona and his family much embarrassment and aggravation. This was a direct result of Jona's testifying as a government witness.

I respectfully ask your consideration in granting Jona an opportunity to return to our community without the necessity of incarceration. He is already living in a community that, unfortunately, is not forgiving, especially from those who ostracize him for testifying as a government witness, and much more so against a "fellow Jew." Only by continuing to do good for others and living an honest life can he make amends to himself, his family and others he affected. Jona is a genuinely good person with a remarkably kind heart, who is doing everything in his power to rectify and make amends for his actions.

If called upon, without hesitation, I would appear in court on his behalf.

Thank you.

Respectfully yours1

Moise E. Hendeles
Attorney at Law

Exhibit 10

David Kahn

Teaneck, N.J.
October 18, 2019

Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Hellerstein;

My name is David Kahn and I am Jona's father in law. I have known Jona for almost fifteen years. Our personalities and lifestyles are quite different. I, as a CPA, from German and American parents, have lived my life, "under the radar", being relatively low key in my lifestyle. Jona, in the first ten years, was larger than life with the proclivity to do "big things". Despite the very different perspectives, I can honestly say that we have great love and respect for each other. In fact, Jona has brought a great deal of positive energy to our family dynamic. He has become the "go to" person in so many situations.

Jona's concern for others and his unique ability to actually do something for those in need, either by anticipating or by going to the essence of the issue and providing solutions, is very special. Permit me to share with you just a few small examples that illustrate this special quality.

My CPA firm has a mandatory retirement age for its partners and I was not ready to retire when I reached the designated age. Jona reached out to friends for me to meet to try to seek out job opportunities. In fact, Jona surprised me by signing me up for a first year gym membership to help provide purpose to my days. The gym has become a main core activity for me in my semi retirement state.

This past Sukkot holiday, we were in LA visiting Jona, Rachel and our grandchildren. A family was invited to dinner the first night. Their nine year old daughter had just completed chemotherapy and Jona instinctively knew that they could use an evening of diversion. Interestingly, the couple said that this was the only home they felt comfortable going to and being themselves. Additionally, a man in his sixties was in attendance at this sukkah meal, seated next to Jona. I noticed that the man was socially awkward and wondered to myself, what was he doing here? After the company left I asked Jona who this man was. Jona told me that this man was recently divorced and that Jona found out that he was going to eat his Yomtov meals alone, so Jona invited him. The next day, after synagogue services had concluded, I waited for Jona. When Jona was finally ready to go home I inquired as to why it took so long. Jona told me that he went to several congregants and asked them to have this man to their homes so that he would be surrounded by people for the rest of the holiday meals. This is just one small and recent example of Jona's sensitivity, care, and unique and special

qualities. I will not repeat the incredibly powerful stories of people whose lives were either transformed or impacted significantly by Jona's intervention. I'm sure you have received letters from many of those people.

Jona has a very big heart, he sees opportunities, issues, problems and is focused on not talking but doing something to ameliorate the situation at hand. Jona is not a bystander but a doer. He feels someone's pain and tries to alleviate their suffering.

Jona's mistakes and actions, for which he has pled, were serious errors. His insecurity, need to be a mover and shaker, impress others, were serious flaws that caused great pain to him, his family and the Jewish people. He and his family have paid an enormous price for these mistakes. Jona and I have spent a lot of time talking about his behavior and sins. I can only say that he is different now. He is much more grounded, more family focused and is more thoughtful in his decision making. Rachel and Jona's decision to leave New York and move to LA was a good and sound one for them, although it was very painful to uproot themselves and dismantle their lives. Jona is working hard on his personal life, family life, and building a business to support his family.

I have no doubt that Jona will continue to do lots of good for his family, friends and community. The pain he suffered and continues to live with will be something that will help to guide Jona as he goes forward.

I respectfully hope that Your Honor will be able to grant Jona and his wonderful young family the second chance he needs to go forward.

Sincerely,

David Kahn

# Exhibit 11

Deborah Kahn

████████████████
Teaneck, N.J. ████
September 1, 2019

Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, N.Y. 10007

Dear Judge Hellerstein:

I'm Debbie Kahn, Jona Rechnitz's mother in law. I need to share a story about one of the most pivotal and challenging times in my life. Two years ago, on the second day of Passover, my father died. Two of my married children, including Rachel and Jona, were with me at the time. My third child, with a family of 9, lives in Israel and wasn't here. The funeral was on a Thursday but my shiva period wouldn't start until the holiday ended the following week. Most people find this unusual interim period emotionally disconcerting and painful. During the funeral, Jona had an inspired idea. Unbeknownst to me, as we traveled from the funeral home to the cemetery, he called my children in Israel and convinced them to drop everything, pack up their clothes and go to the airport. They had only a few hours to agree to this outrageous idea and embark on a 12 hour flight that would bring my family together. Jona intuitively knew that family is the most important thing to me and would bring me comfort and strength. In record time, he convinced my Israeli children to come, booked and paid for their flights, arranged for a car service from the airport and ordered food for Shabbos without telling me a thing. We spent Shabbos and the last days of Passover all together as a family. My mother got to be with her children, all of her grandchildren and great grandchildren. Instead of being days of grief and despondence, they were days where we shared stories, memories and celebrated my father's legacy. Jona's role in this scenario didn't end there. He led everyone in song during the meals and engaged all of the children in games and activities all weekend. It was one of the most positive and meaningful holidays I have ever had.

I have tears streaming down my face as I write this letter. This was the greatest act of Chesed, kindness, sensitivity and generosity that anyone has ever done for me. Jona instinctively knew what would comfort me and support my family and me and didn't waste any time getting it done. Where other people think, "Wouldn't it be nice...", Jona thinks, "How can I do this?" Whether it's a shiva house, a hospital situation, someone who is out of work, the downtrodden and needy, Jona thinks out of the box and helps people overcome obstacles and alleviates their pain. Even if you don't realize that you need something, Jona senses and anticipates your need and solves your problem before it becomes a problem. He is embarrassed by thank yous and gestures of appreciation. He is uncomfortable receiving gifts for himself; he only wants to give to others. He often reverses our roles as he is so much happier doing things for me than having me do something for him.

I am truly blessed to have such a giving, caring, kind, sensitive and generous son in law. My world is a happier place with Jona in my life. I sincerely ask you to appreciate the big heart and kindness that Jona demonstrates regularly.

Respectfully,

Deborah Kahn

# Exhibit 12

Fred and Adi Kahn

Ramat Bet Shemesh, Israel

September 28, 2019

Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Hellerstein,

15 years ago our lives were greatly enhanced as we welcomed Jona into the Kahn family. We were immediately taken by Jona's zest for life, love for people, and great sense of humor. As we got closer to Jona, we began to see the depths of the kindest human being we have yet to meet.

Soon after Jona came into our lives, our family decided to make a big step and move to Israel. Rachel, Jona's beloved wife was so distraught over the idea of us being thousands of miles apart. Jona was so attuned to Rachel, soothed her pain and worry, and vowed that they will come all the time to visit. He kept his word and visited us each Sukkot holiday and many surprise visits along the way. Each and every one of our children adores and respects their Uncle Jona- not just because he knows how to have a great time and treats them so well, but they see him as a person that has strong values, knows right from wrong, and will call them out if he feels that something they did was not OK. What we find very touching about Jona is that he always gives extra special love and attention to whichever kid he feels at that particular time period is struggling or is being misunderstood. He takes that kid aside, has heart to heart talks with them and makes them feel like a million dollars. Each Sukkot our families would spend a whole week together bonding and all activities were led by our very own "Super Head Counselor", Uncle Jona. Our family was always enthralled by how much *Tzedaka* (charity) Jona would freely give out to the poor people. One time, I'm actually embarrassed to say, that I asked Jona, "Jona, don't you think it's a bit much?" To which Jona replied, "I'm not giving to be *yotzei* (fulfill an obligation), I'm giving because I want to help in a real way." Needless to say I was speechless.

About 7 years ago, our family went through a very difficult challenge. Our son, ▮▮▮, who was then 4 years old, fell onto hot coals that were left uncooled in a park. This resulted in 3rd degree burns on his hand and leg, and turned our life into a living nightmare. Yishai was in intense pain and needed us 24/7. I couldn't go to work, or even manage the house. It was a very depressing time in our life. Most people so far away were not able to comprehend what we were going through. But not Jona. I remember him calling and I cried to him about how hard it is to watch our child in such pain and that I'm just not coping. Jona cried with me and I felt so comforted. The next day, the doorbell rang, and to our disbelief and utter amazement, a delivery man is holding the biggest and coolest toy truck any of us had ever seen. Yishai's eyes were filled with glee. I saw my happy child again. And then comes the kicker. The delivery guy goes back to his car and brings back a huge box and says this is for you. I open it up and it's filled with platters of food for dinner for my family. I'm crying just thinking about that act of kindness.

Jona just got it, he knew exactly what we needed without me having to ask. That night was the turning point in our healing, the dark cloud was literally lifted by Jona's love for us.

As a social worker, I get to hear a lot of unfortunate stories. One day I got a referral for a young girl whose father abandoned the family and whose mother was mentally ill. After hearing about the girl, I asked if she had any siblings. The caller responded that the brother was learning in Yeshiva and that there's a generous man in the U.S. that is paying for his tuition. The caller said that this generous man bought him nice clothes so he can feel like a normal kid and even gave him spending money for the year so he should never feel deprived. I was so touched by the story. It was only a year later that I found out that the "generous man" in the story was my very own brother in law, Jona Rechnitz. (Just by the way, Jona continues to this day to treat this young man like a son and has literally saved his life.)

The past few years Jona's situation has been painful for many obvious reasons. But one less obvious to everyone is our personal hit that Uncle Jona has not been able to come visit us in Israel. This is beyond painful for our family. Throughout this ordeal, he has missed 2 of our son's bar mitzvahs, a huge loss for them. But Jona who has so much on his plate has tried in every way possible to make sure our families stay connected despite his legal restrictions. He flew in one son after his bar mitzvah in Israel to LA and gave him such a special one on one trip with Uncle Jona. It meant so much to our son. Last Sukkot, when we were all getting depressed that the Rechnitz's were still unable to fly to Israel, Jona decided to fly all 9 of us in to LA so that we would be able to still be together. Despite all that he's going through, he is desperate to ensure that we all be happy and that nobody should suffer from this.

Our brother in law has the biggest heart ever. His giving and kindness know no bounds. He inspires us to open our hearts and be better people. To know Jona is to love him. To be loved by him is truly heaven. We are so lucky to have such a beautiful and remarkable human being in our life.

Respectfully,

Fred and Adi Kahn

Adi Kahn

Exhibit 13

Joshua Kahn
████████████
Bergenfield, NJ ████

September 22, 2019

Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Hellerstein,

My name is Joshua Kahn and Jona Rechnitz is my brother-in-law. I have had the opportunity to get to know Jona for over 15 years. During that time I have seen Jona as a husband, father, son, son-in-law, brother-in-law, uncle, grandson, and grandson-in-law. From the very beginning, he earned the love and admiration of our entire family. My grandmother, who passed away about 3 years after Jona and my sister were married loved Jona as a grandson. The respect and sensitivity he showed to her quickly earned this affection. The same can be said for my other grandmother, to whom Jona shows great respect and care. On a personal level, I value the relationship Jona and I have. He is a sounding board whom I have turned to for guidance. When we were buying and then renovating our home, Jona helped us review the plan and guided us regarding design and appliances. His guidance and judgement were invaluable and he was always happy to lend his expertise. Additionally, as I was considering moving from my role as Associate Principal at Torah Academy of Bergen County to my current position as Head of School at Yeshiva University High School for Boys, Jona was a valued advisor.

Jona is focused on family, as has been evident to us on multiple occasions. One instance is when my grandfather passed away. Jona was focused on ensuring that our entire family would be together during this difficult time, even though it meant not being with his parents over the holiday and my brother's family joining us from Israel. Not only did Jona push the idea, but he took the initiative to make it happen, ensuring all of the arrangements would be taken care of. This commitment has also been clear to us under more mundane circumstance when two years ago he made arrangements for our family to fly to Los Angeles to spend winter break together.

Jona's sensitivity to others often stays under the radar. Two individuals come to mind who have been the beneficiaries of Jona "adopting them" to become part of his family. Jona has taken in Avi Levy, providing for his material needs. More importantly, Jona has seen to it that Avi feels like a part of the family, inviting him for holidays and other occasions. In an understated way, Jona does not discuss what he does for Avi or why, but simply includes him as if Avi was his brother. The same can be said for a friend of his, Ari, who went through a difficult divorce. Jona has included Ari in holiday, as well as family celebrations, simply because he knows that Ari does not otherwise have others who will do so. Please recognize that for each story I have shared, there are at least 10 more similar examples which illustrate the love and respect I feel for Jona, as well as the kind of person he has shown himself to be. I know that he has made mistakes for which he has accepted responsibility. However, these actions are out of character for the person I know. I hope you are able to provide him with a second chance to show the person he really is.

Sincerely,

Joshua Kahn

# Exhibit 15

09/08/2019

Abraham Levy



Woodmere, NY
347

Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Your honor, I am writing to tell you about a man who if I said has saved my life, it would be an understatement.

My name is Abraham Levy, but I go by Avi. I have had a really rough upbringing with a divorce at home and lots of instability. My father had cheated on my mother and committed a crime which led to him being disbarred as an attorney. I was left alone living with my mother but she was not able to take care of me and I was frequently out and about with friends and fell into a bad lifestyle. When I was in high school I ultimately lost touch with both of my parents. I was left to fend for myself and moved into the dormitory at Yeshiva University High School for Boys. I was often times looking for leftovers in the cafeteria as I barely had any money to buy food for myself. It was in 11th grade when I was in Golan Heights restaurant frequented by Jona at the time. The manager had seen me frequent the location always looking for something to eat. One time - Jona happened to be there and the manager introduced me to Jona saying "this boy who lives on campus comes in here but he doesn't have any money to buy food" without hesitating Jonah immediately told the manager to open up a tab for me and that I would be eating for free from now on. Little did I know it but this introduction changed my life forever.

As I got through the rest of high school I decided I wanted to go study in israel for the year, after putting together different scholarship funds I was able to attend Yeshivat Lev Hatorah. Somehow around Sukkot time I bumped into Jona and he invited me to spend the first days of Sukkot with his family in Jerusalem. They welcomed me graciously during a time which is typically reserved for family. As we spoke over the holiday - Jona asked me how I was getting by in israel and if I had any spending money. I said I really don't...I have saved up around 500$ or so but I knew it wouldn't last me too long. Again without hesitation Jona said I will deposit 500$ in your account every month so that you can have a nice year and have spending money. I was really floored - It was beyond my wildest dreams. But indeed he deposited the money in my account every month without fail.

Later that year the school was taking a trip to poland to learn more about the holocaust and visit the concentration camps. Most of the school was going and I was a little upset I wouldn't be able to attend as there was no way I could afford it. I decided to ask Jonah if he would consider sponsoring my trip as I really wanted to go. Again, he said yes I will take care of it and he paid $2,000 so that I could attend with my peers.

Next step was the summer. I was lucky enough to join my friends in Camp HASC taking care of children with special needs. As the summer was coming to an end I started to wish I can go back for another year of growth in Yeshiva. I didn't there was any way that can happen. After negotiating with the school they said I would need $6,000 as a minimum to cover the costs. There was nothing they could do. I knew jonah had been kind to me but I didn't know if I could ask him. It was just too much. I decided to call him and talk about it. After he realized this was what I really wanted to do he graciously again agreed to pay for it. So that I can go back for another year. Which looking back I am grateful for.

Now I finished learning abroad and it was time for college. Due to my financial situation I was afforded a major scholarship to Yeshiva University. It covered the tuition but not room and board. I figured I was going to need to work long hours at night to have a chance to make it through, not knowing how I would keep up in a major dual curriculum and working simultaneously.

As I got back from israel about to start college I asked Jonah if I could join his family for Shabbat. I remember it clearly. I sat around the friday night table with Jonah and his wife. We were discussing my upcoming start to college. I was telling him I wasn't sure where I would be living as I wasn't sure if I could afford the dorms, and that maybe I would look for a shared apartment to cut some costs. But even that would be at least $500 a month for rent and that without food and other supplies I would need. He said to me that night: "Avi - we are your family now, if you need something, you will have it. If things are tough and you need someone to talk to me and rachel are here for you - I will get you furniture for your apartment and put money in your account every month to cover your expenses". I was blown away never in my wildest dreams would this happen. He said I had a family now. This meant the world to me.

And so it was Jonah put money in my account every month for the next 3 years of college. He didn't just deposit money. He taught me to budget my expenses. He wanted me to learn to spend wisely. He actively cared about how I was doing. And if one month I had more expenses we would go over it and if it was indeed necessary he took care of it. He wanted me to spend smart, and took an active interest in my life. He was investing in my future.

Also during college I did have a rough time. I usually was able to go to Jonah on the weekends, but still I did get lonely and suffered mild depression. When I opened to jonah about this he immediately helped me find a therapist I was able to go to every week which he took care of and continued to do so until I felt I didn't need it anymore.

Throughout these years Jona always made me feel like part of the family. On every Jewish holiday I was with the Rechnitz's. Whether it was by his in laws, or in Israel or by his family in Los angeles. Wherever they went - I was flown out and stayed them wherever they were, whether in their homes, or at a hotel for passover programs, we were always together and I was always part of the family. Also before the Jewish Holidays Jonah's wife Rachel would take me to get clothing.

After college Jona helped me secure find my first job. I was a commercial real estate mortgage broker. When I realized it would be a difficult commute from Washington Heights to Long Island he graciously rented me a car for the summer in order to make sure I can be at work in a timely manner and stay as long as they needed me.

He told me this is where I wanted to get you - to enable you to support yourself, to bring you to a place of financial independence. I know you may not make money right away, but I am here. Keep working and I will be here to fill any gaps. Sure enough I bounced around a couple jobs looking for the right fit and not really making ends meet, but jona was always there if I needed him.

Today I am proud to be supporting myself as a Funding Specialist at The Funding Family. Earlier this year I had a rough few months not making ends meet and Jona was there again. But I now am proud to be fully supporting myself and off of financial support from Jona.

I do not know how I merited this but Jona Rechnitz was certainly sent to be my guardian angel. He is truly a special individual who cares for others and is always there to help in any way he can. I thank God every day for sending him into my life.

It hurts me a lot to see people who speak poorly of Jona. People who know he has helped me have said nasty things to me about him and I encountered a Twitter troll who was posting malicious things about Jona. I always stood up to his defense but it certainly troubled me dearly. He is really a selfless individual who thinks about how he can help others whenever an opportunity presents itself.

Your honor, please don't define Jona by mistakes that he made. I assure you that is not who he is. He is an honorable man who looks for ways to help others, even a stranger like me that he met in a restaurant.

I hope this gives you a little bit of insight into the man that Jona is.

Sincerely,
Abraham Levy

Exhibit 16

RABBI HASKEL LOOKSTEIN
125 EAST 85th STREET
NEW YORK, N.Y. 10028

THE STUDY
212-███████

September 23, 2019

Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Hellerstein,

I am writing to provide you with personal information about Jona Rechnitz prior to sentencing. I am, of course, aware of his plea status and his cooperation with prosecutors in the case. I will leave to them the responsibility for addressing that.

I know Jona personally inasmuch as he is married to the former Rachel Kahn who was raised in our community and in Ramaz. I officiated at their wedding together with Chief Rabbi Shear Yashuv Cohen, of blessed memory, fifteen years ago. They are the parents of six children, ages thirteen to seven months. All of the school-age children are enrolled in Yavneh, a Modern Orthodox Yeshiva in Los Angeles.

I have discussed with Jona quite comprehensively his unlawful behavior. I am convinced that he is genuinely contrite and ridden with guilt for the things that he did even though it is my understanding that he never profited monetarily from any of those things. It was more a matter of ego enhancing, unfortunately in the wrong way. He is and was, basically, an insecure young man. The acts in which he engaged were related to that insecurity.

A graduate of Yeshiva University where he was President of the Student Council, he went on to work for a very big man and people came to him for favors. All of this went to his head and he became a *macher*. He is now a seriously guilt-ridden person who is trying his best to lead a much more private life. What bothers him most was that, as a person who was known for his religious behavior, his serious missteps created a big *chilul HaShem* in addition to destroying his and his family's formerly sterling reputation. He is devoting himself now to behaving in a manner which will slowly rebuild that reputation and reverse the *chilul HaShem* by private acts of *kiddush HaShem*.

In fact, except for doing everything now very privately and avoiding the public scene, Jona was already doing some remarkable things, especially in the realm *of chesed*. He was always involved in giving of himself and his substance for people in need. Like our forefather, Abraham, he sat – and continues to sit – on the threshold of his tent, looking outward for needs to fulfill. He doesn't wait for those needs to come to him. He seeks them out.

I believe you are aware of his extraordinary *chesed* toward a Yeshiva University student about whom he learned and whom he has helped in so many ways that, in effect, he has saved his life. This is just one example of what he does.

When Hurricane Sandy struck New York, Jona, who was then living in New York, was extremely generous with his funds and his time to provide relief to those who suffered from that Hurricane. Together with a philanthropist, Sam Domb, he both gives and raises money for poor families on the West Side for distribution before Rosh Hashanah and Passover. This has continued even since he moved to LA.

When he learns of a need, he goes to extraordinary lengths, not just to provide funds, but to do work that will help fill that need. When friends of his have had medical issues, he has gone out of his way to find the best doctors and sometimes he even goes to the doctor with them. When there is a loss in a family, he is one of those who will provide food for the family and try everything possible to make things easier in their recovery from the loss.

A word about his wife, Rachel. She has a full-time job raising six children. Nevertheless, she was and is heavily involved in Bikur Cholim. She learned *chesed* in her home and at Ramaz and now lives it in her adulthood.

Jona told me that Rachel warned him about the nature of the people with whom he was becoming associated when he violated the law. I don't think she was aware of the violations but she sensed that the people with whom he was consorting were leading him away from an honorable life. Sadly, he didn't take his wife's advice and now everybody has paid a very high price in terms of reputation and desecrating God's name.

Quietly and unobtrusively, Jona has taken on a stronger degree of religious observance, not excessive, just stronger. I believe he is doing that in the spirit of *teshuva* and also to make sure that he stays on the straight and narrow path. He tries to avoid any kind of public behavior. His good deeds are done anonymously.

He recognizes that he has made serious mistakes and he tried his best to cooperate with the prosecutors, something of which I believe you are aware. As such, he may actually be serving as a good example for others who may be in a similar situation now and in the future.

I hope that you will consider all of this information and decide on his sentencing by tipping to the side of *chesed* and *rachamim* – kindness and mercy.

Respectfully,

Haskel Lookstein

HL:df

Exhibit 17

*Brocha Chana Metzger*

Chabad of Midtown Manhattan
509 Fifth Avenue
New York NY 10017
917-

September 23, 2019

Honorable Alvin K. Hellerstein
United States District Court
Southern District Court
500 Pearl Street
New York NY 10007

Your Honor,

Jona Rechnitz has a big heart. He cannot bear to see people suffer. While I have heard many stories of Jona's kindness, I have seen his generosity first hand.

In 2014, I tragically lost my eldest sister Rivkie Barber to Leukemia. She was 49 and lived in Australia leading a community as a beloved Rebbetzin and educator. The youngest of her six children was just nine years old. Barely two weeks after her passing, I spoke at our annual gala in Manhattan. I stood in front of a crowd of hundreds and told the audience about my sister Rivkie and what she meant to us. I got really choked up. I distinctly remember looking out at the audience and seeing Jona, his head bowed in the face of my anguish. It was clear that he could not bear to see my pain.

Later that evening, Jona approached me and asked how Rivkie's husband and children were faring and where they would be for Passover, which was just a week away. I replied that we were all in too much shock (and financially decimated) to make plans. Later that evening Jona stepped up to the plate and insisted on renting a Passover house for the family in Florida near friends. He wanted to sponsor the food as well. He also allotted spending money for each of my nieces and nephews. All told, Jona organized the entire Passover for Rivkie's orphaned family. His incredible kindness was beyond anything we had seen. My brother-in-law Rabbi Yanki Barber was dumbfounded. Jona's gift took so much pressure off the mourning family. He and the kids spent a meaningful, healing holiday in Florida, surrounded by friendly neighbors. Throughout the holiday, Jona checked in with them to ensure that all their needs were met. While our family was friendly with Jona, he barely knew my sister's family who lived in Australia. His kindness was a boon to us all at the most difficult time in our lives.

Another example of Jona's character is actually a series of good deeds. Our sister organization, Chabad Relief Project, provides food packages for the needy of New York. At our monthly food drive, volunteers gather to box food staples and distribute them around Manhattan. Few people have cars in the city center, and parking is scarce making these deliveries most challenging. When Jona heard of the difficulty in ferrying the packages to recipients, he organized a car service to facilitate the food distribution. The following month, he again sent drivers to pick up and deliver the boxes. This process repeated itself every month for many, many years. On his own dime, he ensured that shut-ins, unemployed, elderly and infirm people received their much anticipated supplies. He did this quietly and without fanfare. In fact, apart from the car service and our staff, no one knew who the benefactor was. It was Jona, time and again, helping out discreetly with a smile.

These are my personal stories. There are surely many more. It is my hope that Jona will now be given the opportunity to continue his charitable activities. People rely on his acts of goodness. His is a spirit of kindness that can continue to flourish for the benefit of so many.

Thank you for your consideration.

Brocha Chana Metzger

# Exhibit 18

Jared Rechnitz

█████████████

New York, NY ███

9/27/2019

Honorable Alvin K. Hellerstein

United States District Court

Southern District of New York

500 Pearl Street

New York, NY 10007

Dear Judge Hellerstein,

     I am writing you today, to offer a perspective, on who my brother Jona really is, as a brother, a son, a parent, a friend, and a professional.

     In my family, we are three siblings, Jacqueline, Jona, and me. I am the youngest by 8 years, and while in some cases that may mean a gap in connection between siblings, in our case it is not, and that is all because of Jona. Jona is a warm and inviting person, and brightens up a room with love and happiness. Family is and always has been his number one priority, and he always made sure my sister and I were included in every activity, every conversation, and every joke. I was never treated as a younger brother, but rather, Jona was always a sort of parent to me. I have always and continue to look up to Jona for many of his qualities. I would like to name a few of those qualities through my lens as his brother. It is because of Jona, that in my 29 years, I cannot remember a single serious fight Jona and I have ever had, as Jona always puts me first. He was always the first person to apologize, even if he was not in the wrong, as he consistently puts my needs before his. It is because of Jona, that every member of my family ends any phone call with each other with, "I love you", before hanging up. It is because of Jona that I have become a more open person with how I am feeling. I tend to hold things in and keep them to myself, however, Jona has a way of always figuring out what I need at any given moment without a word. One such instance of this really burns in my mind, although Jona probably does not even remember it, as his generous and caring personality comes so naturally to him. I had just come out of a difficult relationship, and I was having a very hard time dealing with it. Jona and Rachel were living in Los Angeles for the summer and I was alone in New York in school. Jona sensed something in my voice and within an hour of us hanging up, he sent me details to a flight he had booked for me to Los Angeles. I came home for the weekend and spent a much needed weekend with my family because of Jona. This generous behavior is not the moment of this story that I am writing about. You see, this story is not about how Jona paid for my flight to

Los Angeles. This is about my ride back to the airport when it was time to return home. The airport is just a thirty-minute ride from my parents' house, and generally I take a cab. This particular trip it was very hard to leave, and without a word Jona sensed it. He insisted on taking me to the airport himself, so we could spend some time together and talk. I can tell you confidently, that the thirty-minutes we spent together really changed my entire outlook and state of mind, and I left with a good feeling. Jona's generosity is so much more than monetary support he has given to so many worthy charities and individuals in need. Jona is one of those special people that helps you in any way, be it emotionally or mentally, but yet makes you feel good about it, and never less of yourself for needing help.

While Jona and Rachel still lived in New York, they lived only a few blocks away from me. I spent almost every Shabbat with them, and they always encouraged me to bring guests. You can tell a lot about someone by who he hosts at his Shabbat table. People often host friends, business colleagues, and family, but not Jona. More often than not, Jona's table was filled with guests who may not have been invited out, were forgotten about, or were alone. New York is a big community, and many people slip through the cracks, even with all the Shabbat programs. Some people don't feel comfortable asking for a meal or a place to go. Jona always had a way of seeking out those people and making them feel very wanted and welcome. It is not an exaggeration at all when I say that Jona and Rachel's Shabbat table hosted widows, orphans, divorcees, people new to the community, foreigners, and just people who were in need. It was a common routine that on many Friday nights, we would walk into the apartment, and Jona would whisper to Rachel that we needed another place setting, as he invited someone in synagogue who didn't have a meal. He would then proceed to make this last minute guest feel as if they were the most important person in the room, seating the guest next to him, so they could speak them the whole night.

Another characteristic I look up to Jona for, is how he is as a parent. He has a way of making each child feel included in everything, but yet special individually at the same time. It is very impressive to me how involved he is as a father in every aspect of his children's lives. It is very gratifying to see how so many of his wonderful qualities are starting to manifest themselves in my nieces and nephews. Jona's oldest son, my nephew Simcha just celebrated his Bar Mitzvah. A story came up during his bar mitzvah that I had never known, but in hearing it, made perfect sense. Jona and Rachel hosted a charity event at their home in New York when Simcha was younger, as they often did. At the event, there was a collection bowl for checks which would go to the organization. After the event, when Jona and Rachel were organizing the checks, they got to the bottom of the bowl, and found a five-dollar bill with a note stapled to it that said "from Simcha". These are the kind of qualities to which Jona is passing down to his children on a daily basis.

One of Jona's best characteristics is his involvement in the community. Jona has never been one to stand idly by when he can make a difference. The amount of drama and often involved in organizations, schools, and charities, tends to scare many people away, but not Jona. When Jona believes something is right or that he can help the community in any way, he always steps up. So many times, I would be at his home watching him on the phone at very late hours, settling other people's personal or business disputes, just to make peace between them. Many of these late night calls involved ways to improve the local schools or synagogues. I think during this trying time of the last few years, it has been especially hard for Jona to not be able to be as involved in helping the community. I know how much it has deeply hurt him, that people have

removed him from boards, asked him to step down, or have turned their back on him. Many of these individuals have been former close friends, or people that Jona has helped tremendously in many ways. As my big brother, Jona's main concern has still been for me not to worry about his situation, always putting on a strong face for me, and telling me that everything is ok. However, I know that nothing has been ok. Jona is not the person he is portrayed to be in many media outlets. It has been incredibly painful on Jona and my entire family to read and hear negative things about him. People can be extremely cruel, and have been so on many occasions. Jona moved to Los Angeles a couple of years ago, as he was essentially chased out of New York. He could not go anywhere without receiving a dirty look or a malicious comment. People pushed for synagogues to kick him out. If he dared enter a restaurant to order dinner, pictures quickly circulated of him, demeaning him as if he had no right to live. Unfortunately, this is one of the downsides of being part of a very insular community. Rumors, whether true or not travel very fast. Even once he moved to Los Angeles, the attacks did not stop. A video was circulated, in which a man approached a car that Jona was driving with Rachel, where the man starts berating Jona and even Rachel with harassing questions. Around the same time, a picture circulated in which Jona was eating dinner with Rachel at a local restaurant. These videos and pictures were not filmed secretly, but rather by people holding a camera right up to Jona's face, to shame him and Rachel for being out in any way. The past few years have been a personal hell for Jona, and he has paid the price for his actions tenfold. This price however, was not only reserved for Jona, but for anyone by association. Rachel has been shunned by many former friends, his kids have been looked down upon, and many venomous remarks have been spat at my parents. I personally still live in New York, and it has affected me terribly as well. In our dating world, people often meet through being set-up. In fact, Jona and Rachel have made several matches who are now married. However, while I was dating, there were several instances in which Jona's situation affected my relationships. Many people were very quick to approach whoever I was dating at the time, or her parents, and let them know what a horrible person my brother is, or that they should stay away from my family. I was kicked off of recreational sports teams I had played on for years, I was ignored on the street, and even professionally or at school I get the question of "are you related to Jona Rechnitz". As difficult as this has been for me, it has been worse for me to see the tremendous burden of guilt Jona feels for having brought this upon us. So much so, that I have kept many of these instances from him to this day, as I know the guilt and regret would be too difficult to carry around, as he is suffering from it too much as it is. In a few days we will be celebrating the High Holidays, which are a time for repentance and redemption. A few years back around this time, Jona wrote a letter to the entire family, in which he apologized deeply for how his actions have affected us, and let us know how much he loves us. Every word of this letter is etched in my mind, as I cannot begin to fathom the pain and suffering Jona has felt over these last few years. There has been no escape or reprieve from the situation, and the maliciousness thrown his way, and towards his family. I remember a few years back when My father, Jona, and I were sitting in our family synagogue during the High Holidays. This was not just an ordinary synagogue, but a synagogue we have prayed in for three generations, and which is attached to the school we have attended for three generations. During this time, it is customary for the synagogue to hold an appeal for charity to support it by selling certain services during the prayer. Jona wanted to buy one of these services to honor my father, especially considering everything we were all dealing with during Jona's situation, but he did not want the attention that goes along with bidding. As such, he bought this honor anonymously for my father, as well as the Rabbi of the congregation, who is a close friend of Jona's, and who provided much needed

advice to Jona during this time, on matters of Jewish law. One member of the congregation made it his business to figure out who purchased the honor, and then proceeded to leave services in the middle, subsequently going to a different synagogue to spread the word of Jona's donation to purchase the honor. This service was solely meant as both an act of gratitude towards my father, and charity towards the synagogue. Furthermore, within hours of the conclusion of the holiday, the same individual contacted the New York Post, and there was an article in the newspaper about it, demeaning Jona and his selfish spending. Jona's punishment has been very severe for his actions, as it has seeped into every aspect of his and our lives, be it professionally, emotionally, and even religiously. During this time of repentance, I can assure you that Jona regrets and has paid for his actions enough. Furthermore, while many ask me "are you related to Jona Rechnitz", expecting embarrassment, I can wholeheartedly say "yes" and I am very proud that he is my brother, as I know the person that he really is.

Your Honor, I ask that you consider all the pain and suffering that Jona and my family have already endured when determining his future. I especially ask that you consider the side of Jona that was not in the news. Jona the caring brother and best friend, Jona the involved father to his children, Jona the helping hand, Jona the generous shoulder to lean on- the real Jona.

Sincerely,

Jared Rechnitz

Exhibit 19

Jona Rechnitz

███████████

Los Angeles, CA ███

October 16, 2019

Honorable Alvin K Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Hellerstein:

I am a felon. I am a criminal. I am the ONLY person to blame for that.

I have caused tremendous pain and embarrassment to my family, my religion, and to myself.

There is no way to undo what's been done. It's permanent, and for that I am truly sorry to everyone hurt by my crimes and actions. It eats me alive each and every day. When I wake up, when I go to sleep, it is always on my mind for the past 4 years.

My actions harmed the people of New York, The people of Correction Officers Benevolent Association, my friends, my family and my community. I will forever carry this burden, as I deserve to.

I have read of your Honor asking at various sentencings, why do good people do bad things?

In my case, not assuming I'm a good person, I can answer this question. Arrogance, greed, and insecurity.

Arrogance. I felt I was above the law. At this young age in my late 20's I was busy accepting honors at dinners and board positions at prestigious institutions. It got to my head.

Greed. I wanted to gain contacts to grow my business, to make money and gain stature in the long run.

Insecurity. I wanted to gain popularity by my peers and become a big shot in my community and business circles.

Shame on me.

Finally, I couldn't wiggle my way out of this one. It changed my life as I knew it forever.

As a supposed religious man, I have been a disgrace to my religion. The only way to fix this is to make serving G-d my main focus for the rest of my life. I try to every day. I have changed as a person religiously, through prayer, my public and private behavior, and I always stop and think before I'm about to do something to see if it is something my parents, my family, and G-d would approve of.

Making the decision to come forward was the right decision. A very tough decision with tremendous repercussions, but the appropriate decision. It has come with a hefty price. I did not foresee what I was signing up for, and it has been a brutal four years, but I made the right decision. I learned that doing the right thing isn't always the easiest, but it is the only choice. There is right and wrong and nothing in between. It has changed me for the better. It has forced me to change, which I have.

I had to testify in three separate trials. Not an easy task. Outside of the regular pressures a crucial witness deals with, these circumstances were even tougher. There was a lot of press coverage, a lot of community pressure, and a lot of threats and comments made to me. The press put me on trial instead of the defendants. The press called me a snitch and paid more attention to me and my testimony then on the actual trials. They made calls to my friends, my family, and waited outside my home for me to walk outside.

Parts of the community shunned me and my family. Your honor, I can not stress the amount of pain and suffering that we received during this time. Unimaginable pain. Eventually we had to leave town. Leave our lives. Leave immediately.

Then there were the threats and private investigators after me. Threatening voice messages, windows smashed at home, windows smashed in my car several times and my parents cars on the same day at their home, people following me and sitting outside of my home in Los Angeles for periods of time. My wife and I were harassed and video taped at the mall, humiliated in our Synagogue, and embarrassed in public at a local LA high school charity event.

Your Honor, there are so many examples that I am omitting as I don't want to portray myself as the victim here. I caused a lot of pain and harm to others through my criminal activity and don't want to detract from that.

Even at various trials there were intimidation tactics. An attorney representing a defendant yelled at me in the hallway walking in to court and shoved the prosecutor when he confronted him.

The disgusting feeling I had waking up in the morning to go to trial after trial after trial. Sometimes for a week and a half straight.

One of the toughest moments was when a mistrial was declared. I remember feeling like I wanted to tap out. But I could not. I made this decision for me and my beautiful family with the hope of staying together with them at the end of this nightmare. This has been the key factor keeping me going. My family. My amazing, incredible wife and my beautiful 6 children.

The highlight of my week used to be sitting in NYPD Headquarters like a big Macher. Today, my highlight is walking to Synagogue with my children every week, and I let them know it every time we walk. When I ask them what my favorite part of the week is, they say, Daddy! You know the answer, but I still make them repeat it.

Your Honor, I can now tell you proudly I am a hands-on father and husband. I am more of a mentsch. I was not during my criminal years. For that alone, I am grateful to this situation. My wife is an amazing woman. She had a bad feeling about the people I was hanging out with and the people I wanted to impress. She was right. I should have listened to her. I do now.

I had real estate holdings which I had to give up throughout this ordeal. Many investors didn't want to be associated with me, nor do I blame them. In a few cases, some partners viewed my situation as an opportunity forcing me to give up different holdings and assets, taking management decisions and authority from me, ultimately removing me entirely. Starting to make a living again was a struggle for a period of time. Fortunately my wife and I started a new business endeavor, which looks promising. As your Honor can imagine it is hard to find a bank to work with me, so I have secured private loans and financing from family and friends. I finally have a business going that has provided stability and a way to make a living. This case has left me in a big financial hole - I have had to borrow millions of dollars to get this business going and to support my family. I am finally in a position to dedicate myself again to supporting my family. I don't see any way possible to start over a third time. I beg you to allow me to continue on this second journey of life.

This has been a difficult time. I don't feel healthy at all. I am on anti depressant medication, I wake up in the middle of the night in pain and my neck and hands are burning, and I will forever carry this guilt.

Family is everything to me. Cuddling with my children is everything to me. Being a community member and helping others is everything to me. Since this entire ordeal my wife gave birth to two beautiful baby girls. A decision that we made to not put life on hold but to continue with life in the right path and be optimistic that doing the right thing will not hinder our future.

I am a changed man. I suffered a lot. I have been severely punished. My family has suffered a lot. I beg your Honor, please allow me to continue on the path I'm on, together with my family, my wife and 6 young children. They need their Daddy, I need my family together with me, and I promise your Honor, to continue to make

my family proud, my community proud, and your Honor proud.

With humility and sincerity,

Jona

# Exhibit 20

Melanie Rechnitz

Los Angeles, CA

September 20,2019

Dear Judge Hellerstein,

My name is Melanie Rechnitz. I am Jona Rechnitz's mother.

I am writing to share with you the essence of the character of my son Jona and what I believe this experience has taught him.

Jona grew up with loving parents and two siblings, and was surrounded by four grandparents, each one teaching him about giving , sharing and kindness towards others. Everybody's love for him was boundless and he responded in kind, to the point where he even slept on his grandfather's bedroom floor or slept on a hospital chair when his grandfather was ill. Even as a child, Jona had a non-judgmental personality and always befriended the underdog. He included everyone he met in his circle of friends and never allowed anyone to be left behind. His caring disposition made him beloved by both young and old.

Although I come from a family of doctors, when my youngest sister (whose husband is a radiologist)was diagnosed with an incurable brain tumor, Jona took it upon himself to research alternate options in both the United States and abroad. His tireless efforts lead to a treatment plan that extended my sisters life.

In this spirit, Jona has always gone the extra mile to help others. He raised money for victims of hurricane Sandy, sat alongside a friend whose child was undergoing cancer treatments and mentored a young man through his education and life journey. These are just a few examples of Jona's kindness and care for others. His generosity of heart and spirit propelled Jona to be beloved, and his anonymous acts of kindness were and remain many until today.

I used to tell my husband, "Jona will be the one to make us old, but when we are old, Jona will be the one to take care of us." Jona's big heart is what drives him forward and this is also part of his imperfection.

I admit that my son Jona ,like most of us, is not perfect. He has made mistakes. I do not make excuses for his behavior and wish as a parent, I would have prepared him better with tools to face the world and its challenges and temptations. I believe that Jona has learned from his mistakes and takes responsibility for his behavior. Jona, his wife and his children had to uproot themselves from New York where they were ostracized from their community and relocate themselves to Los Angeles. Jona has struggled to rebuild himself in this new community, where he encountered social negativity, as well as in the

business world, where he often had the door closed to him.. The psychological impact of his actions as well as coming forward and cooperating with the government, has taken a toll on his mental and physical health. But Jona has taken full responsibility for his actions and has come forward trying to do the right thing.

As painful as this experience has been for our entire family, it has been a most humbling experience for Jona, providing lessons that are hard learned. As a parent, I have watched and witnessed the suffering and struggles that my son Jona has wrestled with, and I truly feel that he has evolved as a human being and has been punished enough. He has already paid a high price. I believe that Jona has the ability to use this experience as a life lesson and change the course of his actions and the direction of his future.

Moving forward, I humbly request that you give my son Jona, the opportunity to take these lessons that he has learned and use them towards building a better and more meaningful future for himself, his family and the community. I believe it will be one which will make us all proud.

Respectfully yours,

Melanie Rechnitz

Exhibit 21

Rachel Rechnitz

Los Angeles, ▮
October 15, 2019

Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Hellerstein:

This is an extremely difficult thing for me to do, to put into words and properly express my thoughts regarding Jona and the entire situation that we have been living through for the past four years or so. I am a deeply religious person who has always felt a strong connection to Gd. I don't view it as a coincidence at all that Jona's day of sentencing is taking place right after Rosh Hashanah and Yom Kippur, as Gd truly does run the world and controls our fate. Over these last four years, my prayers on Rosh Hashanah and Yom Kippur have taken on a new depth. I find my head spinning with so much to be grateful for, and still, so much to beg and request from Gd. These last four years have been incredibly challenging. I had to move from my home in New York City, leave my friends and family, and take my children out of their school and their community. I know that it was the right move and I am grateful to be able to live in LA for the primary purpose of protecting my children and sparing them from being embroiled in a potentially hurtful environment. My children are first and foremost in my life and I always want to be able to shield and protect them to the best of my ability. In LA, people haven't been dragged into this ugliness with hurtful comments, exposure to the New York Post, or having reporters outside their building. However, our lives have changed in many ways, some good and some bad. I believe that Gd gives you what you can handle and I think a lot of good has resulted from this. I can see that my husband has become a much better, humble, more open and truthful person. To me, that is incredibly important and necessary in a marriage and in our family. Jona is much more involved as a father and as a husband and has revamped his priorities. He is someone whom I trust and who makes me proud. Jona got lost in trying to be a big shot, a mover and shaker, and got sucked into wanting to be with powerful people. I honestly believe that this has been made so public in order for him to learn from his mistakes and genuinely change as a person. I am, therefore, not upset at all with Gd for bringing this upon us. However, these last few years have been very challenging. Having Jona away for weeks at a time took quite a toll on us. Testifying against people with whom he was once close and who are members of our Jewish community is difficult beyond words. There are so many people that I have to avoid or feel uncomfortable with, having them talk behind my back, not to mention the awful articles that were printed again and again.

I genuinely feel that this has all happened for a reason and I am grateful for the dramatic changes that I have seen in my husband. I know and trust that these changes

are here to stay. What has sustained me over the last few years was the knowledge that my children have been spared from being in the center of gossip, slander and hurtful actions. As I stated before, my number one priority is protecting my children. Please keep that in mind when sentencing Jona. He is innately a very good person with a very big heart, probably the biggest heart of anyone I know. He would and does do anything in his power, and even beyond his power, to help others, regardless of whether it's a family member, friend or total stranger. This is Jona. Please allow us the chance to rebuild our lives. Please have Jona come back to me and to our six children. I believe that out of hardships, you can either fall down and fail or you can learn and grow stronger. Thank Gd our marriage has grown stronger from this terrible ordeal. Jona has learned very important lessons the hard way. I pray that we can now move forward towards building new and better lives together.

Sincerely,

Rachel Rechnitz

Exhibit 22

Robert Rechnitz

Beverly Hills, CA

Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl St.
New York, NY 10007

Dear Judge Hellerstein

I am sorry to say that Jona by his acts, lost his integrity and acted hypocritically to his faith. Notwithstanding his goodness and his affinity for helping others, he crossed the line that could never be reversed for the rest of his life. Regardless of his state of maturity at the time, his decision impacted him and his entire family as it has consumed us for the past nearly four years.

When Jona decided to come forward and notify the government, he immediately called a family meeting and apologized to my wife, myself, and each sibling for his transgressions. He continues to apologize to us and express regret until this date. He carries the burden of shame for what he caused our family.

Growing up, Jona was always a great source of pride for us. My wife and I constantly enjoyed compliments from parents of friends, elderly people, the New York community on the West Side once they moved there, and business associates. Never would I have believed that Jona could be involved in the crimes that took place.
I offer no excuses for his actions which were contrary to the way that he was brought up and to the examples in our family.
I do, however, understand that with his business success at a young age, came a lot of immaturity and impulsive decisions. I too, share in the responsibility for so many of Jona's actions. It was unfair of me to allow Jona to take so many responsibilities upon himself without my guidance and involvement. In a quest to prove himself independent and become a mover and shaker in the New York community, we saw his personality take a different course. I should have seen the warning signs and intervened early on. Everything happens for a reason and no doubt G-d sent him a message that will serve him well for the rest of his life. Jona is a bit codependent and is happy to always come through for people and organizations. Sadly he had a dose of reality by watching those organizations turn their back on him because you are only as good as the last favor you did for them. This too was a very good lesson for him going forward.
Your Honor, with all the pain this experience has brought, I have seen Jona repent on every level. He suffered tremendous financial losses in real estate as a result of partners taking advantage of his position as a felon to take away his promoted equity on investments. The group that took this away from him are supposedly Jewish community leaders. I believe that is another good lesson for Jona to learn. You don't wear religion on your sleeve you wear it in your heart. How you act from one person to another reflects who you are. There is no concept of " Between man and G-d, "If there is no respect "Between man and fellow man."

Jona lost his direction but he is now solidly back on track practicing and appreciating the most important elements of being a self-respecting person.

He together with Rachel and their six children have relocated to LA. They have established a much more humble life for themselves. He is back to the basics of living and maintaining a family. He still participates together with Rachel in all their acts of kindness to others. He is still a friend that anyone can lean on. The quality time that he spends with Rachel and the children, by far exceeds the time that he spent with them when he was moving at a fast pace in New York.

The move has done them well and Jona is building a new business. He lives with the shame and the pain of what he did and what he caused to others. On the other hand he did not wait for any further action on behalf of the government but he immediately took ownership of his crimes and offered his full support and cooperation with the government. Out of concern for Halacha, he sought guidance from his friend and Rabbi, Shlomo Einhorn who sought guidance from Rabbi Herschel Shachter.
Jona is a very sensitive individual and is always concerned about doing the right thing. Your Honor, I must say that the way that he is repenting and has changed his life and learned from his mistakes, is doing the right thing. Jona has a wife and six children and they need him to be home and a constant part of their life after these last turbulent four years.

Your Honor, I plead for leniency for my dear son, so that he can continue to maintain the stable family and not lose the improvements that he has made. Six children need two parents care.

Humbly,

Robert Rechnitz

Exhibit 23

Steve Rechnitz



Los Angeles, CA

10/15/19

Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl St.
New York, NY 10007

Dear Judge Hellerstein:

Words alone cannot express the shock I had - the lingering shock that remains - learning my cousin Jona was involved in perpetrating of the crimes he committed. Any way I look at it, it just does not reconcile.

We are a considerable size of cousins in our family. Growing up as a sort of herd around our grandparents, Jona was hands down the "goody goody". We all knew he was the favorite and it was for good reason. Jona had a heart of gold and would wait on our grandparents hand and foot. Even as they aged into their nineties, it was rare for him to leave their sides during his trips back home to Los Angeles. And as they aged, and we saw less of them, Jona became closer to them. Spending nights in the hospital with both of them when their respective names were being called, he was their constant. No one can forget the excitement that filled the room when Grandma and Grandpa learned that Jona was coming to Los Angeles to visit - and for good reason. He was always the first to volunteer for any task that came up. No matter how difficult or unappealing. My brother, who owns Nursing Homes in the Los Angeles area, always says that Nursing Homes were made for older people who don't have a Jona in their lives. He is truly the last person I would have attached these crimes to, and it is the reason that the shock lingers.

Jona comes from a family of community leaders. He grew up spending much of his spare time, and under the tutelage, of our grandparents, who, with other Holocaust survivors, dedicated the remaining years of their lives to re-establishing their, once thriving, community in Poland back in Los Angeles. As a child he witnessed as brick by brick they re-built their lives, and the lives of their loved ones, by rebuilding institutions of learning, synagogues, community centers, and most importantly, the lives of the downtrodden, the depressed, the lonely, the ones that could no longer continue living with the fear, the orphans, the widowed and even the rebellious - he watched as they were all successfully rebuilt brick by brick. And the current generation has continued along that path. All one has to do is to google the name Rechnitz to read about a family that is synonymous with building. Be it giving to schools or medical centers or the hopes of our wounded warriors. Those impacted especially hard by hurricanes created by winds of the ocean or of the

heart, the Rechnitz family is at the forefront of families that continuously outstretch their arms to help build back, brick by brick.

As a member of the family, I don't write this to be haughty or to request leniency based upon past performance. I write this to attempt to give insight into Jona and his actions. Jona is not some mastermind criminal driven by greed and the need to control, as he has been so depicted in some of the press. He has always been about the little things – little instances where he thought he could help and make a difference - just like his grandparents did, but on a smaller scale. However, after all was said and done, and how grossly misguided his attempts, it really, really was always was just about helping with the little things.

*"Lights and sirens"*

*A funeral is being held and the remains must make it to the airport for its final resting place in Israel. Let's try to reach Jona as, through his connections, he can get a police escort to JFK.*

*There's a Jewish pride parade being held next Sunday but the city is not allowing for street closures past 86th st. We'll call Jona as he has an "in" with the Mayor and he can get us the required permit.*

As others may dream about getting the ball at the 3-point line with five seconds to go in the championship series, the above thoughts were Jona's dreams; they are but examples of what drove Jona, in what became his deluded attempt to help with the little things. Knowing him as we all did and always witnessing his desire to help others I place serious doubt that his crimes were driven by an attempt to strong-arm people or even to reap financial gain from the connections he yearned to develop. Far from it. That was never part of his fabric. His satisfaction always came from helping us - all of us - with the little things, which unfortunately, led to an unwise and foolish attempt to emulate what he continuously witnessed growing up. The difference being that they knew there were no shortcuts; it had to be done brick by brick.

Your Honor, looking back at what I write I seem to be creating an excuse for his actions but, pray, that is not my intent. There are no justifications. I do, however, come to offer insight into how a person who's heart and soul are good, who has always yearned to be good, who grew up surrounded by good and who has always pursued good, could end up doing bad. And it is with this insight that, as a member of our extended family, I humbly request that Your Honor consider extending mercy on his behalf.

Thank you kindly for your consideration.

Respectfully,

Steve Rechnitz

Exhibit 24

Dr. Mordechai Rindenow

███████████████

Clifton, NJ ████

October 16, 2019

Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street,
New York, NY 10007

To the honorable Judge Hellerstein,

My Name is Mordechai Rindenow.

I am both a Rabbi and psychologist and am writing to you on behalf of Mr. Jonah Rechnitz.

I was introduced to Mr. Rechnitz three years ago while working with my client who, at that time, had also been dealing with a federal indictment. I was very impressed with Jonah's willingness to assist my client in a process to fully come to terms with the realities of my client's participation in the crime that was committed. It was a reflection of his very difficult and painful journey to face the regretful behaviors in which he had engaged.

His genuine remorse for having been involved in activities that, to him, had become very shameful was quite evident. Throughout years of my association with Jonah, it became apparent that Jonah had worked to transform himself to an individual who recognized with great clarity the wrongfulness of his behaviors, both in the legal and moral realms. He has evolved through a painstaking process of stripping away all the rationalizations and denials pertaining to his actions and his motives to become an individual that has displayed true care and concern for others in need.

Mr. Rechnitz would share his time advising and guiding people experiencing difficult times in their lives. He reached out to them in a manner in which he manifested both genuine empathy and compassion. He contributed charitable monies, most times in a discreet fashion, in which no great fanfare was made of the monetary assistance he offered. There were times, where Mr. Rechnitz was able to rally the support of others for worthy charitable causes.

Jonah has returned, with sincerity, to the traditions, practices, principles and mores of his Jewish upbringing. He values and finds comfort in his relationship with G-d.

Mr. Rechnitz came to understand the importance of family. He has devoted much time in an effort to undo the hurt and pain that he brought upon his wife and family. Your honor, Jonah's children are very young and they need their father. Jonah is a person who has learned much and gained great insight into understanding himself and human nature. I speak with confidence, when I tell you that I believe, Jonah is a changed man. I have come to admire Mr. Jonah Rechnitz, as a model of the potential the human spirit possesses to facilitate transformation.

Very Sincerely,

Mordechai Rindenow

Exhibit 25

Danny Rotenberg

██████████████

Brooklyn, NY ████

September 27th 2019

Honorable Alvin K. Hellerstein

United States District Court

Southern District of New York

500 Pearl St

New York, NY 10007

Dear Judge Hellerstein:

My name is Danny Rotenberg. It has been my honor to know Jona Rechnitz from a very young age. I had pleasure of being his Rebbe and teacher over the years and watched him grow into a mature young man bringing joy and pleasure to his parents and grandparents. He was always a caring and thoughtful boy, who would make sure that all his peers would be treated with care. Jona would without a thought for he would give away his last snack or dime so that another should have. "Sharing is caring" describes best to Jona as this was one of the best characteristics he built himself on. I always treasured our time together as he gave to me sometimes more than I could give to him.

Jona worked as a counselor in my camp during his teenage years. As a counselor he got along well with the campers and other staff members because he would treat everyone with respect. During this period of time I had glimpse of the man he would become, a kind and G-D fearing person. This was the way of life that he inherited form his grandfather and father.

Before we moved to New York I had the chance to meet with Jona and discussed with him all the pro and cons regarding the change to New York.  I wanted to move to New York because I have an autistic child and wanted him to be in a Jewish environment. I reached out to Jona and he helped me by making calls and putting me in touch with the right schools for my son. After much time together I relied on his advice to take a plunge and move.

At that time I tried looking for work in the field that I had been all my working life, however after many hours of searching I was not successful in finding the right type of work. I contacted Jona and we set up a time to meet in his office. I cannot relate to you the feeling of working my entire life and now left with no options .I met with Jona and without a moment's thought Jona assured me that he himself would employ me and give me a job which really was different from anything I had done, and without a moment's thought, Jona was able to give me work so that I was able to support my family. Even though I was no longer teaching and doing a job that I was not familiar with Jona was proactive in making sure that I was treated with the up most respect and taken care of even when I was sick and unable to work for a period of time.

In conclusion Jona always tries to remain in the background when helping others; however he is usually the main drive behind every action of kindness. If you need any more information please feel free to contact me.

Yours Sincerely,

Danny Rotenberg

213████████

Exhibit 26

Shea and Mariam Schwebel

New York, NY

9/25/19

Honorable Alvin K. Hellerstein
United States District Court
500 Pearl Street
New York, NY 10007

Dear Judge Hellerstein,

My wife and I are in our late 50's and have been living on the Upper West Side of
Manhattan for the past 36 years. I am a Real Estate manager and the chairman of
the board of Yeshiva Ketana of Manhattan on West 89th st and my wife was
president of the school PTA for many years. We are both active in many charitable
organizations and local projects over the years.

We met Jona Rechnitz and his wife Rachel about 12 years ago when they moved to
our neighborhood. They immediately became active in the community. My wife
and I were so impressed as we watched this young couple with a beautiful growing
family make charity events in their home, help out with the local schools, become
active in an organization that visits the sick, as well as many other local charitable
institutions. More than that, we watched as they became a huge support for so
many people around us. After a few years they moved into our building. We saw
firsthand how lonely people including many who had moved to New York from
Jonas's hometown in Los Angeles, found a home at the Rechnitz's. A family we
know with two hard of hearing young adults were befriended and helped. Jona
made calls all over the world to help a friend of ours who has ALS find and get
into a badly needed medical trial. He became a peacemaker in a family whose two
brothers, heads of households, had been feuding for years. Rachel and Jona took in
a boy from a broken home, supported him through college, helped him get a job
and pull his life together. They also regularly hosted many guests who needed a
homemade meal for the Sabbath. Some friends and I started a fund a few years ago
to help poor people in the neighborhood pay for the holidays. Jona not only gave
generously but got other people to give as well.

1

On a personal note, when our married kids moved into our home because their baby was extremely ill, Jona and Rachel befriended them, offered a listening ear, and supported them throughout the illness and were there for them when the baby eventually passed away, which is something even their longtime friends were not emotionally able to do during that very trying time.

When my father in law passed away seven years ago, a few days before the Jewish holiday of Rosh Hashanah, Jona arranged for meals to be sent to our home for our entire family because we were all in a week of mourning and didn't have the physical or emotional wherewithal to cook or arrange the holiday meals for ourselves.

It is impossible to describe how thoughtful Jona is unless you see it for yourself. Jona and his wife Rachel are extremely generous people. They don't ask what they can do to help someone in need but they see a situation, figure out how they can help and then make it happen. Sometimes what the other person needs is money, or a job or help with some problem in the family or a listening ear. Jona intuits what is needed and he does it.

Jonas's an incredibly devoted husband, father, son, grandson, brother and friend. We have watched him in action be a  real hands on father to his kids, taking them to the park and on other outings and generally nurture them with his devotion. We've gotten to know his entire family as he hosts his parents, In laws, grandparents and grandparents in law many times in their home. They hosted their elderly grandparents for extended periods of time. When Jonas's brother was in school nearby, of course he had a home at his brother and sister in law. He manages to juggle his time with his family, friends and community all the while making everyone around him feel good in his presence.

Rachel and Jona are people that you want to be around. They are sweet, thoughtful and nurturing in a very special way that is unusual for any couple, especially such a young one.  I can't describe to you the void that was left in our lives and the lives of our children when they moved to LA.

These are just a few examples of how many people are supported in large and small ways by Jona. He knows that he made a huge mistake. Not that it excuses his actions but knowing him as I do, it was not for any benefit of his own and it came from a misguided desire to help. He knows it was wrong and I am sure would never do anything like that again.

This entire experience has been understandably life altering for Jona and Rachel , having to face the embarrassment of being judged in the most public of ways and having so many of their neighbors turn against them. Even in our own synagogue, Jona was forbidden from being called up to the Torah and was asked to step down from organizations he had helped build and support. He went from being the most sought after guest to being literally shunned and even yelled at by acquaintances. I have no doubt this is a big part of why they moved to LA.

They have a strong fan base of people who will stick with them no matter what and we have tried to be the kind of friend Jonas always been. When all the details of this episode became public my wife Mariam remarked "Jona needs a friend like Jona" because he would be the kind of person that would think about what to do to help a friend in need, figure out how to do it and get it done. It's been heart wrenching for us to watch them suffer

.
I just hope you can find it in your heart to judge him favorably.

Respectfully,

Shea & Mariam Schwebel

3

Exhibit 27

**RABBI STEVEN WEIL**
*Senior Managing Director*

Rabbi Steven Weil

████████████

Teaneck, NJ ████

September 25, 2019

Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Hellerstein:

I have known Jona Rechnitz since his adolescence. Jona as a young man spent a significant part of his after-school time volunteering in the LA community. Jona had a unique relationship with a number of Holocaust survivors who had settled in Los Angeles. Unlike the typical adolescent who was interested in sports, peers and pop culture; Jona had the ability to transcend the generation gap and connect with people of all generations. Jona was a leader amongst his peers and used his leadership abilities to motivate his class and peers at YULA (Yeshiva University of Los Angeles HS) to channel their time and talents to give back to the community, their school and to less fortunate individuals in greater Los Angeles.

After Jona returned from studying in Israel in a gap year institute (Yeshivat Mevaseret Tziyon), we spent significant time together creating programming in Los Angeles for collegiate and graduate students. Jona as a young man wanted to build and give back to his community. He was thoughtful, insightful and a real team player to work with. There was no ulterior motive other than to create a culture where young Angelinos could find fulfillment in a community near their parents and grandparents without having to settle in communities that were a five-hour place ride from their family.

Jona married Rachel Kahn, an outstanding young woman from New York. The two of them were pillars in starting a community on the Yeshiva University side of Washington Heights that exploded and became an anchor for thoughtful young Jews. My own children have been the beneficiaries of this community.



Over the span of the last decade, since I moved to New York, Jona and I have met numerous times to discuss and work on a number of issues. We have dealt with programs that attract, inspire and educate unaffiliated adolescents to having a meaningful relationship with their religion and with the State of Israel. We have discussed and worked on finding employment for a number of individuals who were in economic dire straits. We have discussed and worked on creating a community (The West Side Synagogue) in Los Angeles that will enable young Jewish couples to mature as parents, communal members and as participants in the educational institutions of the Los Angeles Jewish community. Jona has played a special role in all the above. Anytime that Jona has financially supported these projects, he has asked for anonymity. This is something that he was taught by his parents and grandparents.

Over the last few years, Jona, Rachel and have suffered emotionally in a disproportionate manner. I have seen the constant barrage of articles that cause people to gossip. People can be cruel. People say hurtful things that impact a wife and mother. The family has gone through a long period of pain, hurt and humiliation that no one should have to suffer. I am a friend of both Jona and Rachel's parents and siblings. All of the above together with Jona and Rachel have spent many sleepless, tear drenched nights.

I am not writing this letter to deny any improprieties that have happened in the past. However, I am writing this letter to paint a picture of a person that is not the individual the press and others have portrayed. Over the past 20 months I have had numerous conversations with Jona regarding his activities. Based on our talks, it is clear to me that he understands the gravity of his activities. He is a humbled man; embarrassed and distraught for the pain he has caused to others, and the impact it has had on various individuals and their families, as well as his own. Jona, Rachel and their family have suffered. They have aged (physically they have lost the youth in their complexions) over the last few years. Jona is a different person than the man I knew 3 years ago.

Dear Judge Hellerstein, please take into account the totality of who and what Jona Rechnitz has been to his family, his people, to friend and to absolute stranger when making a determination of his future.

Sincerely,

Rabbi Steven Weil

Exhibit 28

22

New York Post, Tuesday, November 1, 2016

nypost.com



# 'Bone' voyage

**SURF'S DOWN:** Hawaiian adventurer Alison Teal explores the Catacombs of Paris, home to about 6 million skeletons.

## Surfer delves Paris tombs

By CHRIS PEREZ

This Hawaiian thrill-seeker has become the first person to "surf" the Catacombs of Paris — crawling on all fours over heaping piles of skulls and bones before paddling her bright pink board through an underground maze of some 6 million skeletons.

"It was terrifying. I had to stop filming, it just became about survival," recalled Alison Teal, 30, dubbed the female "Indiana Jones" this year by Time Magazine.

"It's one of the most dangerous things, and I wouldn't encourage others to do this," she told Caters News Agency. "By the end we were just shaking."

Co-chaining her two passions — surfing and archaeology — Teal became the first person to finish the trek through the forbidden sections of the tunnels below the French capital on Oct. 13.

"I grew up listening to my father telling me stories about the catacombs on Halloween," she said. "I've always wanted to be Indiana Jones and a surfer so I combined both dreams."

While being led through the catacombs, Teal began to lose her bearings.

"The caves got narrower and narrower until we were crawling on all fours to get through," she said. "It was so suffocating, there was minimal oxygen and you couldn't see far. It suddenly got crunchy and I looked down and saw we were crawling on skeletons.

"Skulls lined the walls and it smelled horrid. As soon as someone turned a corner, you had no idea where they went."

Teal said the experience changed her.

"For me, being down there with all those lost souls, it was like stepping back in time," she said. "It was like walking through ancient history."



Caters News Agency

## Bribe cad at Series

The feds' key witness in the NYPD corruption scandal was living it up at the World Series — where a TV camera caught him rooting for the Cleveland Indians in a prime seat behind home plate at Wrigley Field Sunday night.

Crooked real-estate developer Jona Rechnitz was wearing an Indians cap and was linked arm-in-arm with a fellow Cleveland fan as they hoped in vain for victory against the Chicago Cubs.

Rechnitz pleaded guilty to bribing high-ranking cops and the former head of the correction-officers union and agreed to testify against them. His good fortune left some cops fuming.

"All the cops involved got arrested or forced to retire and this guy's sitting in a $3,000 seat. Where's the justice?" said one law-enforcement official.

Rechnitz's lawyer didn't respond to inquiries. A spokeswoman for Manhattan US Attorney Preet Bharara declined to comment.
*Shawn Cohen and Larry Celona*

## Family 'gave girl to perv'

A Pennsylvania man accused of fathering two children with a 14-year-old given to him as a "gift" by her parents was charged Monday with sexually assaulting five other girls in that family, calling them his wives.

Bucks County District Attorney Matthew Weintraub announced new child sex-abuse charges against 51-year-old Lee Kaplan, of Feasterville, calling it a "sad but critical new development."

"He played on their trust and affection for him and he groomed them to see him as a religious and cult-like figure," Weintraub said.

The victims were among 11 girls found living in Kaplan's home when he was arrested in June. *AP*

## NYPD-Muslim deal nixed

A federal judge rejected a settlement in two lawsuits that accused the NYPD of unlawfully spying on Muslims lawyers tweak the terms to give an appointed watchdog greater oversight, according to court papers.

Manhattan federal Judge Charles Haight called for changes to be made in the settlement

reached in January, in which the city agreed to appoint a civilian representative to monitor a committee that oversees intelligence investigations. The suits accused the NYPD of "religious profiling" of Muslims post-9/11.

Haight said the NYPD had a "systemic inclination" to flout court orders. *Lia Eustachewich*

## 'Kooks' plead not guilty

The three so-called "Kooks of Hazard" stopped at the New Jersey entrance to the Holland Tunnel in June as they allegedly tried to drive into the city with a cache of weapons were arraigned Monday.

John Cramsey, 50, and Dean Smith, 53, of Zionsville, Pa., and Kimberly Arendt, 29, of Lehighton, Pa., pleaded not guilty.

Their truck was stopped because it had a cracked windshield, and the weapons were discovered in a search, police said.

Cramsey, whose daughter died of a heroin OD, posted online shortly before the arrest that he was heading to New York to "rescue" a 16-year-old girl whose friend had overdosed. *Post Wires*

## Peanut-allergy 'Rx'

A wearable skin patch may help children who are allergic to peanuts by delivering small doses of peanut protein, a new study shows.

Nearly half of those treated with the patch were able to consume at least 10 times more peanut protein than they were able to consume prior to treatment, according to the yearlong study by the National Institutes of Health. *AP*

# Exhibit 29

10

nypost.com

New York Post, Friday, March 31, 2017

# Mohels: 'Bris' diss a grand waste of time

By MAX JAEGER, REUVEN FENTON and LIA EUSTACHEWICH

The city's $2,000 fine to stop unsafe circumcisions is a mere cost-of-doing-business slap that will do nothing to deter the lucrative but potentially disease-spreading ritual, mohels and community members railed Thursday to The Post.

Mohels can rake in up to $1,500 per bris — the Jewish circumcision ritual — and often perform as many as 10 a week — turning the monetary penalty into chump change, experts said.

"A $2,000 fine is like nothing," fumed Dr. Jeffrey Mazlin, an OB-GYN and part-time mohel. "Some of these Orthodox mohelim are doing 10 in a week — they're full-time mohels — so $2,000 is a slap on the wrist. They could be making loads of money.

"Orthodox mohelim are rabbis, and then they say, 'Donate to the synagogue,' and they get a kickback," Mazlin added.

Mohel Lucy Eisenstein Waldman also scoffed that the fine wasn't enough.

"It's not a lot at all, given the damage that occurs," she said. "It's safer for these babies if this practice is ended."

An Orthodox-community advocate called the punishment threatened by Mayor de Blasio a "joke" considering the potential consequences.

"It's a ridiculously low penalty to pay for a child living a life of



**DeB'S PROPOSED MOHEL FINE**

$2,000 is a slap on the wrist!

hell with herpes," the advocate said. "Given what mohels make today, $2,000 would not be a deterrent for any mohel to continue in his practice."

The city claims its hands are tied when it comes to publicly outing two mohels believed to be responsible for six cases of neonatal herpes as a result of metzitzah b'peh — a circumcision ritual in which mohels suck the blood from the incision on the baby's penis.

Instead, in a March 17 letter, the city Health Department ordered the offending mohels to stop performing the high-risk ritual or face the $2,000 fine.

Parents are now also being urged to ask their mohels if they're infected with herpes.

But Mazlin and others think the city is doing the public harm by keeping the mohels' names secret.

"These people still feel that it is important to do [metzitzah

b'peh] and parents should know about these people so they have a choice to use them or not," he said.

Cantor Jeffrey Sherman said he doesn't believe the city's new circumcision policy is actually enforceable.

"Many ultra-religious individuals are very wary of civil authorities and they won't really follow what civil authorities are dictating," said Sherman, a mohel for 40 years who has performed close to 22,000 circumcisions.

Mohel wannabes undergo a year of training before they're deemed qualified to perform circumcisions — and don't need to be officially certified, like medical doctors, to start working.

"Theoretically, someone can hang out a shingle and say, 'OK. I'm a mohel.' Anyone who decides to be a mohel can be a mohel," said Sherman.

But he said that first and foremost, a prospective mohel must be religiously observant and uphold Jewish law to the fullest.

Sherman said there are other methods to performing metzitzah b'peh, including using a tube or sterile gauze, that don't involve direct oral contact with the baby.

"They don't have to stop doing brises, they just have to modify what they're doing," Sherman said. "It's not a medical procedure. It's a profoundly significant and beautiful Jewish lifecycle event."

leustachewich@nypost.com

## 'Bull'y for escapee

He has mooved on just fine!

The bull that escaped from a Queens slaughterhouse last year and was whisked to an upstate animal sanctuary by TV's Jon Stewart is loving his freedom — and his sexy-beast new girlfriend.

Frank the bull busted out of a butchery on April 1, 2016, prompting a chase and a rodeo-style roundup. Once corralled, Stewart and his wife brought Frank (right) to Farm Sanctuary in Watkins Glen.

A year later he has a heifer gal pal named Chandini and they're "best friends," says caretaker Susie Coston.

Frank was castrated before arriving and had to be quarantined for a month, but once allowed to mingle with fellow cud-chewers, he made a beeline for Chandini.

Rival steer tried to stop him at first, but now they're all one big happy family, Coston said.

"He wanted to meet Chandini and they kept blocking him," she said. "He had a few spats with one of the guys who has horns. Now they're friends." *Max Jaeger*

## 'Lost at sea' miracle tale

A young Filipino fisherman returned home Thursday after getting lost at sea in a storm and drifting for nearly two months, during which he said he survived starved to death, before being rescued by a passing ship near Papua New Guinea.

Rolando Omongos, 21, told reporters at Manila's airport that he survived on rainwater, raw fish and prayers during his ordeal.

"I did not lose hope," Omongos said. *AP*

# Bathroom law flushed

The North Carolina state Senate on Thursday approved a bill to retool a law banning transgender people from using restrooms in accordance with their gender identities, a measure that had triggered boycotts by companies and sports leagues.

However, the measure was criticized by civil-rights advocates, and it was not immediately clear if businesses and the leagues would reverse their boycotts.

Late Wednesday, leaders of the Republican-dominated state Senate

and House of Representatives said that they had reached a compromise with Democratic Gov. Roy Cooper to scrap the law, the only one of its kind in the nation.

However, new provisions in the legislation would still ban local municipalities, public schools and others from regulating bathroom access.

The deal also blocks North Carolina cities for four years from enacting their own regulations for job and restroom protections to "vulnerable" groups. *Reuters*

# NYPD briber rats on partner

Jona Rechnitz, the government's key cooperator in an NYPD-corruption probe, told the feds that his former business partner, Jeremy Reichberg, was with him every step of the way as he bribed city officials — including attempts at greasing Mayor de Blasio's palm, newly unsealed court documents show.

Rechnitz told the feds that an unnamed "friend" introduced him to many of the city officials he bribed, including prison-guard

union chief Norman Seabrook, according to a transcript of Rechnitz's June 2016 plea.

Sources say the unnamed "friend," a prominent Borough Park resident who was charged last year with working with Rechnitz to pay Police Officers James Grant and Michael Harrington in exchange for perks, including a private NYPD escort that closed down a lane of the Lincoln Tunnel.

In his plea before Manhattan

federal Judge Richard Sullivan, Rechnitz said his partner hooked him up with many of the officials he bribed — and that together, they "agreed . . . to make contributions and to arrange for contributions by others to political campaigns."

Reichberg's lawyer Susan Necheles responded, "Mr. Rechnitz threw around his own money in the hope that politicians and police officers would become his friends." *Kaja Whitehouse*

Exhibit 30

**NEW YORK POST**

nypost.com

New York Post, Saturday, April 1, 2017

6

**Gossip**
Page Six .......................... 12

**News Columns**
Weird But True .............. 14

**Post Opinion p. 15**
Joseph Simonson ........... 15
Heather Robinson .......... 17
Betsy McCaughey ........... 17

**Business p. 19-20**

**Features & Lifestyle**
Out & About ............... 21-23
Su Doku .......................... 24
Crossword ...................... 24
Scrabble Grams .............. 24
Bridge ............................ 24
Horoscope ...................... 31

**Classifieds p. 25**

**Sports p. 25-45**
George Willis .................. 25
Racing ............................ 26
Jarad Wilk ...................... 30
Steve Serby .................... 37
Howie Kussoy ................. 37
Mike Vaccaro ................. 45

**Weather p. 33**

**Television p. 46-47**
Robert Rorke ................. 46

**POST contact numbers**

**Editorial**
Main Office ............... (212) 930-8000
News Tips .................. (212) 930-8500
Sports Desk .............. (212) 930-8700

**Advertising**
Classified .................. (212) 930-8100

**Circulation and Home Delivery**
Customer Service ....... (800) 552-7678

**Mail subscription & back issues:**
All orders, changes of address and inquiries, contact New York Post, P.O. Box 1407, Bellmawr, NJ, 08099 or phone 1-888-209-4157. Foreign and domestic mail subscription rates available upon request to the Publishers Information Center, Inc.

Postmaster: Send address changes to The New York Post, 1211 Ave. of the Americas, N.Y. NY 10036-8790.

Vol. 216, No. 137. Copyright © 2017, NYP Holdings Inc. (USPS 383060). Published daily by NYP Holdings Inc., 1211 Ave. of the Americas, New York, NY 10036-8790.

Periodicals postage paid at New York, NY, and additional offices. The Post uses recycled paper.

**Lottery Hotline**

Are you a winner?
1-900-226-7898
99 cents per minute. Results from all states
for past year. Includes hot & cold numbers.

**NEW YORK**
■Midday Nos. Fri.: 721;
Lucky Sum: 10 / Midday
Win-4 Fri.: 8911; Lucky
Sum: 19
■Evening Nos. Fri.: 336;
Lucky Sum: 12 / Evening
Win-4 Fri.: 6469; Lucky
Sum: 25
■Pick-10 Fri.: 2, 3, 7, 11, 16,
24, 36, 27, 29, 38, 39, 50, 51,
56, 61, 65, 69, 74, 75, 78
■Mega Millions Fri.: 17, 24,
27, 32, 58; Mega Ball: 10;
Megaplier: x3
■Take-5 Fri.: 1, 4, 7, 20, 24

**NEW JERSEY**
Pick-3 Fri.: 416; Fireball: 5
Pick-4 Fri.: 8268; Fireball: 5
Cash-5 Xtra Fri.: 16, 18, 21,
36, 39; Xtra: x4

**CONNECTICUT**
Play-3 Fri.: 114; Play-4 Fri.: 7198
Cash-5 Fri.: 1, 12, 15, 17, 29
Lotto Fri.: 7, 12, 15, 22, 41, 44

# Budget deal in peril over teen law



Gov. Cuomo and state lawmakers failed to reach agreement on key details of their $153 billion spending plan just hours before Saturday's deadline to have a new budget in place.

A dispute over a criminal-justice issue — whether to treat 16- and 17-year-olds accused of felony crimes as juveniles instead of adults — was a main impediment.

Democrats and Republicans could not agree on whether the teens should be treated as adults for certain serious crimes and if separate youth courts should be created to handle their cases. Sources said GOP lawmakers were trying to remove the issue from budget talks but Democrats refused to back down.

Legislative leaders are also still haggling over whether to raise the cap on the number of charter schools allowed in New York City and provide charters more financial assistance, as well as how much money to disburse to all public schools.

Government-watchdog groups slammed the secrecy.

"Albany is now guaranteed to give New Yorkers the worst of both worlds, with a late and rushed budget," said Brandon Muir of Reclaim New York.

Cuomo (left) said earlier in the week that the budget could be delayed because the state couldn't project how much revenue it would receive from the federal government under President Trump. *Kirstan Conley*

# Lessons in irony for 'behavior pro' teach

### By JULIA MARSH

Teach your children well — or lose your job.

That was the lesson learned by a Bronx science teacher who wrote a book about managing behavioral issues yet publicly humiliated a student for the minor misdeed of fiddling with her necklace in class, according to a Department of Education charge.

George Ohakamnu taught grades K through 6 at PS 76, The Bennington School, in the Allerton section of the East Bronx until he was fired last month.

In March 2015 — the same year he self-published a book called "Improving On-Task Behaviors in the Classrooms" — Ohakamnu allegedly paraded a student up to the front of the class when he caught her fixing her locket during a lesson.

He told her to say, "I'm not perfect, and I'm not a princess . . . my mom and dad might think I'm per-

> **I'm not perfect, and I'm not a princess . . . my mom and dad might think I'm perfect, but I'm not.**
> — What now-dismissed Bennington School teacher George Ohakamnu allegedly made a student recite in front of class

**NYC**
**Department of Education**
Carmen Fariña, Chancellor

fect, but I'm not," the unnamed student recalled to investigators.

The pupil returned to her desk and cried, according to a report. She said the incident "made her feel embarrassed and sad."

Ohakamnu, 55, insists he called the student to the front of the classroom only to answer a question correctly. A DOE arbitrator later decided that while there was contradictory evidence about what exactly was said during the incident, Ohakamnu nevertheless embarrassed and belittled her in front of her peers.

The 23-year veteran instructor, who has a doctorate in teacher leadership, was also found guilty of screaming at a colleague in May 2015, telling a student to throw a book at his classmate's head in September 2015 and grabbing another pupil by her hood in June 2016.

Ohakamnu "embarrasses and belittles students and fellow colleagues," a DOE official said during his departmental trial.

"He has no explanation for his actions. He should be terminated," the official urged.

Arbitrator Dean Burrell agreed, noting that while most of his infractions warranted retraining, a suspension or a fine, one incident was inexcusable.

When the student reported Ohakamnu for telling his classmate to hit him with a book, Ohakamnu went after the pupil even when he signed a statement promising not to retaliate.

"There is no excuse for respondent's conduct," Burrell wrote in a March 20 ruling dismissing Ohakamnu.

Still, the $106,000-a-year teacher is now suing over his ouster, claiming the punishment was "outrageous."

He declined to comment through his attorney.

# Feds push on with Blas-pal corruption probe

Manhattan federal prosecutors continue to investigate a public official with ties to real-estate-investor-turned-government-snitch Jona Rechnitz, unsealed court documents show.

In unsealing documents tied to Rechnitz's guilty plea last June, certain materials were redacted because they "relate to an ongoing investigation," according to a letter from Acting Manhattan US Attorney Joon Kim.

The ongoing probe involves an unnamed elected official, according to the papers — who sources say is Westchester County Executive Rob Astorino.

Astorino was subpoenaed

last year over his office's dealings with Rechnitz and businessman Jeremy Reichberg.

As The Post reported at the time, Rechnitz donated $25,000 to Astorino's re-election campaign in 2013. A few days earlier, his pal Reichberg — who had no known previous ties to Westchester County — had

been named a volunteer county police chaplain.

"Mr. Astorino and the County fully cooperated when asked for documents last June," Jerry McKinstry, Astorino's spokesman, said. "Nothing has been requested since then, nor have we been contacted for any information about the

New York City probe."

Astorino previously said he's done nothing wrong and that Rechnitz's donations have been given to charity.

Rechnitz pleaded guilty in June to bribing a wave of public officials and for seeking to bribe two elected officials, including Mayor de Blasio. *Kaja Whitehouse*

# Exhibit 31

22

New York Post, Friday, May 12, 2017    nypost.com

# ROSS✦SIMONS

celebrating our 65th anniversary of fabulous jewelry



## $49
### Plus Free Shipping

**Sterling Silver Byzantine Bracelet from Italy**
7" length. ¼" wide. Lobster clasp. Shown actual size.
Also available in 14kt gold. Item #872977 $395

Ross-Simons Item #686854
To receive this special offer, use offer code: EMPIRE272
1.800.556.7376 or visit www.ross-simons.com/EMPIRE

# 'Cop-bribe' figure 'fesses to Ponzi

By KAJA WHITEHOUSE

A Harlem restaurateur with ties to the NYPD corruption probe dodged a trial — and an expected showdown with his former partner-turned-rat — by pleading guilty on Thursday.

Hamlet Peralta, former owner of the Hudson River Cafe, admitted in Manhattan federal court to duping unsuspecting investors into giving him millions of dollars to run a fake wholesale liquor business.

Peralta used some of the money to renovate his restaurant, which was a popular hangout with NYPD brass, some of whom later came under FBI scrutiny in the bribery probe.

By copping to the plea, Peralta avoided a trial in



**HAMLET PERALTA**
Avoids trial showdown.

which Jona Rechnitz — the government's star witness in a case involving two NYPD cops accused of accepting bribes in exchange for official police favors — was expected to testify.

Rechnitz also was tied to the government's now-defunct probe into Mayor de Blasio's fund-raising, and he will testify in a brib-

ery case against former city prison-guard union head Norman Seabrook.

Rechnitz could have been called to testify because he acted as a recruiter for Peralta's liquor business, although he has denied knowing it was a Ponzi scheme.

Peralta's lawyer, Cesar de Castro, had been expected to seek to paint Rechnitz as a loan shark who charged Peralta exorbitant interest rates.

When Peralta started having trouble paying off Rechnitz's loans, Rechnitz engaged in a life-insurance scheme that would have paid him millions of dollars if Peralta died, sources have told The Post.

This prompted Peralta to fear Rechnitz wanted him killed, sources said.

kwhitehouse@nypost.com



## Post Weather Report

2017 forecasts and graphics provided by ◉ AccuWeather.com

**Friday**
Today: Rather cloudy. High 56 to 62.

Tonight: Cloudy with rain toward dawn. Low 47 to 53.

**Saturday**
Tomorrow: Breezy with rain, becoming heavy. High 51 to 57.

Tomorrow night: Evening downpours; cloudy. Low 46 to 51.

**Sunday**
Showers around. High 61 to 67.

Evening: A shower early. Low 47 to 53.

**Monday**
Windy. High 63 to 69.

Evening: Mainly clear. Low 49 to 55.

### Almanac

YESTERDAY'S CONDITIONS AT CENTRAL PARK THROUGH 8PM

**Temperature**
High: 62, Low: 47, Mean: 55
**Departure from Normal**
Yesterday: -7 degrees

**Precipitation**
Yesterday: 0.00". Month: 3.21". Year: 19.61". Normal year to date: 17.00"

Cooling Degree days yesterday .......... 0
Total for the month (normal) ......... 4 (11)
Total since Jan. 1 (normal) ......... 38 (20)
Last year to date ......... 19
Heat Index (at noon yest.) ......... 60
UV index (for Fri.) ......... 3 (Moderate)
Humidity (at noon) ......... 42%

**AIR QUALITY**
Pollen: High. Predominant pollen: Oak, Birch, Ash, Sycamore, Maple
AQI rating: (for Fri.) ......... Good

### Sun and Moon

Sunrise today ......... 5:41 a.m.
Sunset tonight ......... 8:03 p.m.
Moonrise today ......... 9:39 p.m.
Moonset today ......... 7:05 a.m.

Last   New   First   Full

May 18   May 25   June 1   June 9

Forecast data is current as of 6 p.m. yesterday. Temperatures are today's highs and tonight's lows.

Weather (W): s-sunny, pc-partly cloudy, c-cloudy, sh-showers, r-rain, t-thunderstorms, sf-snow flurries, sn-snow, i-ice

Friday, May 12, 2017

| New York Tides | TODAY | | TOMORROW | |
|---|---|---|---|---|
| High Tide for | 1st | 2nd | 1st | 2nd |
| Coney Island | 9:34a | 9:47p | 10:14a | 10:23p |
| Fire Island | 9:28a | 9:50p | 10:05a | 10:28p |
| Hempstead | 12:49a | 1:20p | 1:13a | 1:44p |
| Huntington | 12:50a | 1:19p | 1:23a | 1:54p |
| Jones Inlet | 9:18a | 9:31p | 9:58a | 10:07p |
| Montauk Point | 10:54a | 11:09p | 11:41a | 11:54p |
| Port Washington | 12:53a | 1:27p | 1:10a | 1:41p |
| Sandy Hook | 9:38a | 9:51p | 10:18a | 10:27p |

| Regional cities | TODAY | TOMORROW |
|---|---|---|
| Albany | 65/47/c | 56/45/r |
| Danbury | 60/43/c | 51/43/r |
| Glens Falls | 66/46/c | 59/45/r |
| Gr Barrington | 62/44/c | 54/42/r |
| Kingston | 64/46/c | 54/45/r |
| Liberty | 59/43/c | 48/42/r |
| Monticello | 59/43/c | 49/42/r |
| Newburgh | 63/46/c | 52/43/r |
| Poughkeepsie | 64/46/c | 53/45/r |
| Saratoga Springs | 64/46/c | 57/45/r |
| Stroudsburg | 61/45/c | 51/44/r |
| Torrington | 60/45/c | 53/43/r |
| Syracuse | 64/47/c | 55/43/r |

| World cities | TODAY | TOMORROW |
|---|---|---|
| Athens | 80/68/pc | 89/72/s |
| Baghdad | 104/78/s | 99/68/pc |
| Beijing | 87/53/s | 84/53/s |
| Berlin | 71/54/t | 68/53/t |
| Cairo | 90/66/s | 95/69/s |
| Dublin | 60/47/sh | 61/43/r |
| Geneva | 64/49/t | 67/51/t |
| Hong Kong | 87/79/c | 86/77/sh |
| Jerusalem | 78/57/s | 84/68/s |
| Kabul | 85/56/c | 84/56/pc |
| London | 64/51/pc | 65/52/pc |
| Madrid | 65/51/r | 70/50/pc |
| Mexico City | 84/57/pc | 76/56/pc |
| Montreal | 64/43/c | 63/45/r |
| Moscow | 48/30/pc | 51/33/pc |
| Paris | 68/53/t | 66/50/pc |
| Rio de Janeiro | 79/65/pc | 83/69/s |
| Rome | 75/56/pc | 73/54/pc |
| Sydney | 68/57/pc | 72/58/pc |
| Tokyo | 78/64/r | 68/62/r |

Showers
T-storms
Rain
Flurries
Snow
Ice

Fronts
Cold
Warm
Stationary

Shown are noon positions of weather systems and precipitation. Temperature bands are highs for the day. Forecast high/low temperatures are given for selected cities.

-10s   -0s   0s   10s   20s   30s   40s   50s   60s   70s   80s   90s   100s   110s

**Peekskill** 61/47
CONN.
**Stamford** 60/48  **Bridgeport** 60/49
**White Plains** 61/47
N.Y.
**Sussex** 63/46
**Paterson** 62/48
**Newark** 60/50
**La G** 61/49
**Garden City** 60/49
**Huntington** 60/48
**Riverhead** 58/45
**Montauk** 57/47
**Southampton** 60/46
**JFK** 59/48  **Deer Park** 59/48
**Long Beach** 58/50
**Sandy Hook** 57/50
**Asbury Park** 57/49
**Manasquan** 57/49
**Toms River** 58/48
**Long Beach** 56/50
**Atlantic City** 59/49
**Ocean City** 57/51

Exhibit 32

6

nypost.com

New York Post, Saturday, May 27, 2017

# Hillary 'wines' to Wellesley grads:

Hillary Clinton revealed Friday that her coping mechanisms for dealing with the stunning result of the presidential election included glasses of chardonnay.

Long walks in the woods, spending time with her family and organizing her closet helped ease the pain, the former secretary of state said in a commencement address (right) at her alma mater, Wellesley College, in Massachusetts.

"I won't lie, chardonnay helped a little, too," she added.

Most of her speech, however, was devoted to bashing President Trump.

Clinton said her Wellesley class of 1969 was furious after the election of Richard Nixon, "a man whose presidency would eventually end in disgrace, with his impeachment for obstruction of justice after firing the person running the investigation into him at the Department of Justice," according to NPR.

Nixon, however, resigned before he could be impeached.

Her barbs were a clear nod to Trump's recent dismissal of FBI Director James Comey, who was leading an investigation into Russia's involvement in the election.

In a warning to students about the spread of fake news, Clinton also recalled Trump's obsession with his inaugural-crowd size.

"Some are even denying things we see with our own eyes. Like the size of crowds," she said.

She also criticized Trump's budget proposal, calling it an "attack of unimaginable cruelty."

"Let's call it what it is, it's a con. They don't even try to hide it," she said of the administration. *Tamar Lapin*



# You win some, you booze some



**JONA RECHNITZ**
Defaults on Brooklyn mall.

# De Blas' felon friend a mall rat

A Mayor de Blasio donor and the government's key witness in several city corruption probes defaulted on a Brooklyn shopping mall he bought two years ago — thanks to his newfound status as a convicted felon, sources told The Post.

Real-estate-investor-turned-government snitch Jona Rechnitz was sued in Brooklyn state court over his failure to pay a $15 million loan on Solomon Plaza in Borough Park, which he proudly purchased in 2015 for $25 million.

Rechnitz had been trying to refinance the debt ahead of a looming May 1 deadline, but the bank was wary of giving him a new loan now that he's a convicted felon, sources told The Post.

That allowed a rival investor to swoop in with a stronger application and "steal" the loan, according to sources.

"The property is not distressed," said a person familiar with the humiliating foreclosure action. "The property ended up in this situation because of Jona Rechnitz's problems."

Rechnitz's lawyer declined to comment.

Last year, Rechnitz — the owner of JSR Capital real-estate management company — copped to one count of conspiracy to commit honest services wire fraud, which carries a maximum 20 years in prison. He's told Manhattan federal prosecutors he bribed New York City cops, tried to bribe Mayor de Blasio's office into helping him with building permits and acted as the middleman for a hedge-fund pal seeking to bribe a union official. *Kaja Whitehouse*

# Mayor's school-custodian cleanup failing: report

Mayor de Blasio promised to clean up school custodial services last year — but the mess is as bad as ever, according to a new report.

De Blasio handed control of custodial services to a not-for-profit organization, promising big savings and improved transparency.

But a Families for Excellent Schools study concluded that the setup is marred by the same problems as before — high costs, murky visibility and erratic management.

The charter-school backers said transitioning to New York City School Support Services has cost at least $105 million — more than 2.5 times de Blasio's original $40 million price tag.

Custodial salaries were already ballooning before the move, with the average worker making $140,000 a year — up 28 percent from Mayor Michael Bloomberg's last year, according to FES.

Hizzoner also promised a decrease in supplies and contractual services costs with the new format.

But FES found that spending in those two areas was already $31.7 million over this year's modified budget allocation.

The DOE blasted the report as inaccurate.

"This is completely misleading and has too many inaccuracies to qualify as a report," said spokeswoman Toya Holness. *Selim Algar*

# Exhibit 33

# NYPD briber ditches NYC

The feds' key witness in the NYPD bribery probe has hightailed it out of New York — a month after it surfaced that he allegedly lured some deep-pocketed pals into a Ponzi scheme.

Jona Rechnitz — a donor to Mayor de Blasio who will eventually take the stand for the government in the police bribery scandal — has packed his bags and headed back to his native California, sources told The Post.

Rechnitz's move comes after accusations that he recruited wealthy friends — including a diamond dealer and several Wall Streeters — into a reputed Ponzi scheme run by former city teacher Jason Nissen.

Nissen, the CEO of National Event Co. in Manhattan, was busted in May for allegedly running a $70 million Ponzi scheme involving "Hamilton," Super Bowl and Adele tickets.

When Nissen was busted, Rechnitz had already been named as a recruiter for a Ponzi scheme involving Harlem restaurateur Hamlet Peralta.

*Kaja Whitehouse*

# Sick selfie from 'killer'

A Maryland man choked his stepfather to death and tweeted a selfie lying next to the corpse, according to Washington TV news reports.

Cops found the body of a 65-year-old man in a garage in Bowie at around 8 a.m. Saturday, WJLA reported.

They began searching for the victim's stepson, and arrested him after a car and foot chase, a Prince George's County police spokesman told WTOP.

Cops learned that the stepson had tweeted out multiple pictures of the body, including one of himself lying next to it, WTOP reported. One of the photos was captioned, "THIS WHAT YALL WANTED," WDCW reported.

The photos have since been removed. Neither the son nor the father were identified by officials.

*Amanda Woods, with Wires*

# NY mom killed on I-95

A New York woman who left her vehicle to tend to her child in the back seat on Interstate 95 was fatally struck by another car.

Emma Torres, 31, exited the vehicle Saturday night in Bridgeport, Conn., before being sideswiped by an oncoming vehicle, Connecticut State Police said.

She died at Bridgeport Hospital. No one else was hurt. *AP*



Suki gets above it all

British model Suki Waterhouse is a sheer delight as she stages a makeshift photo shoot atop a sidewalk bench in the East Village Sunday.

TheImageDirect.com

# 'THIS IDIOT' JUDGE
## Cop-gun 'swipe' fury

By DANIEL PRENDERGAST, SHAWN COHEN and LARRY CELONA

A deranged man allegedly stormed into a Brooklyn police station house and attempted to steal a cop's firearm over the weekend — and was then let back on the street by a judge without bail.

Kurdel Emmanuel (top inset) lunged at the officer inside the 83rd Precinct Station house Saturday and violently clutched her firearm belt while attempting to yank out her service weapon, according to court papers.

At his arraignment Sunday, Emmanuel was hit with a slew of charges, including assault on a police officer, attempted criminal possession of a weapon and attempted robbery.

Prosecutors asked Brooklyn Criminal Court Judge Loren Baily-Schiffman (bottom inset) to hold him in lieu of $250,000 bail.

Instead, she ordered Emmanuel released on his own recognizance.

Ed Mullins, head of the Sergeant's Benevolent Association, said the suspect is "mentally ill," and sent out a safety alert describing him and urging cops to "remain cautious."

Mullins claimed Emmanuel would have "killed police officers" if he'd gotten hold of the gun.



Emmanuel was at his home in East Flatbush Sunday night, according to his stepmother, who told The Post she "absolutely" has tried to help him.

"He has mental-health issues," the woman said. "The problem you have is you have someone who is not well, and you can still get conflicting stories."

Law enforcement slammed the judge for the release — which took place on the eve of a wake for Officer Miosotis Familia, who was killed by an apparently mentally disturbed man last Wednesday.

"Prosecutors are taking this case seriously but the judge clearly didn't," one source said.

Dennis Quirk, president of the New York State Court Officers Association, declared, "This idiot should be removed from the bench."

When called for comment Sunday, Baily-Schiffman hung up on a reporter.

*Additional reporting by Emily Saul and Joe Marino*

# Airport out to ease your high anxiety

An Ohio airport is planning a workshop to help people face their fears of airports and flying.

John Glenn Columbus International Airport, named for the former Ohio senator and first American to orbit the Earth, is hosting the seminar Aug. 26. It's free, but space is limited.

The Facing Takeoff workshop will include sessions on managing anxiety and allow participants to practice going through airport security and boarding an airplane. *AP*

Exhibit 34

# US boots 15 Cuba diplos

The Trump administration on Tuesday ordered the expulsion of 15 Cuban diplomats from their embassy in Washington, DC, after a series of mysterious attacks sickened US officials in Havana.

"The decision was made due to Cuba's failure to take appropriate steps to protect our diplomats," the State Department said in a statement.

The move comes days after the United States removed about 60 percent of its embassy staff in Havana, leaving behind only 27 personnel to handle emergencies.

The expelled Cubans must be out of the US within seven days.

Despite the expulsions, the State Department said the US will continue to "maintain diplomatic relations with Cuba and will continue to cooperate with Cuba as we pursue the investigation into these attacks."

Cuba's foreign minister called Washington's response "irresponsible" and "hasty."

The Associated Press reported on Monday that sonic attacks targeted primarily US intelligence personnel in Cuba, causing brain injury and hearing loss. Twenty-one embassy officials have been injured, authorities said.   *Mark Moore*

## 'Fake news' trumps prez

Despite President Trump's repeated accusations that the media push "fake news," Americans trust the media more and him less nearly nine months into his presidency, a new poll shows.

The Reuters/Ipsos tracking poll released Tuesday found that the percentage who said they had a "great deal" or "some" confidence in the press rose to 48 percent in September from 39 percent last November.

The number of Americans who had a "great deal" or "some" confidence in the new president's executive branch, meanwhile, fell from 52 percent in January to 48 percent.

*Bob Fredericks, with Reuters*

# Blas bribe pal angers LA congregants

By KAJA WHITEHOUSE

Ostentatious displays of wealth and Hollywood connections are failing to help a crooked supporter of Mayor de Blasio rebuild his tattered reputation in his hometown of Los Angeles, sources told The Post.

Last week, disgraced real-estate developer Jona Rechnitz (right) infuriated members of an LA synagogue by donating more than $30,000 so he and his dad could take part in Yom Kippur services on Saturday.

Rechnitz was allowed to lift up the Torah and his father read aloud from the holy Jewish scroll, sources said. The $30,000-plus included an honor Rechnitz bought for the rabbi, according to sources.

One congregant was so outraged by Rechnitz's pricey piety that he slammed down his prayer book, stormed out of the Yeshivat Yavneh temple and worshipped elsewhere, sources told The Post.

"There's no shame, nothing. No regrets, no calming down. To just come in and spend $30,000 on honors is a sense of arrogance and entitlement," a synagogue source told The Post.

"I think that he's ruined so many peoples' lives and he's sitting here just trying to pretend that nothing is wrong."

A congregant also described how Rechnitz previously showed off by bringing real-estate-agent brothers Josh and Matt Altman — stars of the Bravo cable network's "Million Dollar Listing" series — to the synagogue after he returned to LA this past summer.

The Altmans, who sell multi-million-dollar homes in West Los Angeles, didn't return a request for comment.

Rechnitz, who founded New York City firm JSR Realty, gained notoriety last year by agreeing to serve as a key witness in several public-corruption probes.

Rechnitz scored that gig by admitting he bribed two NYPD cops and acted as the middleman for a hedge-fund manager seeking to bribe a union official.

He also admitted to paying off a de Blasio fund-raiser, identified by sources as Ross Offinger, in exchange for official favors, but the feds opted against charging the mayor or anyone around him following a lengthy probe.

Rechnitz's reputation took a further hit when details emerged about his dealings with alleged Ponzi schemer Jason Nissen, a former city teacher who was busted in May in a $70 million scam involving tickets to "Hamilton" and the Super Bowl.

According to civil court documents, Rechnitz pocketed as much as $8 million for touting the allegedly fraudulent ticket business to his wealthy pals — some of whom told The Post Rechnitz never told them he was getting rich off their money.

Rechnitz is scheduled to return to New York City for the Oct. 23 trial of Norman Seabrook, the former head of the city Correction Officers' Benevolent Association, who's accused of taking bribes to steer union funds to a troubled hedge fund.

Rechnitz is poised to tell a Manhattan federal jury about his role in the alleged scheme, which involved delivering $65,000 in cash to Seabrook in exchange for a promise to invest in the Platinum Partners hedge fund run by Murray Huberfeld.

Rechnitz declined to comment through his lawyer.



# SHUL'D BE A$HAMED

# Queens man charged in mortgage scam

A "heartless crook" who allegedly left a woman and her son homeless by pocketing nearly $100,000 of their money as part of a long-running mortgage scam was slapped with charges Tuesday.

Ravin Lakhram offered to help his victim modify her mortgage payments after she discovered her son had taken out a second mortgage on their two-family-home, a prosecutor said in court. Yet the former Universal Mortgage employee never filed the appropriate paperwork.

Instead, prosecutors said, he allegedly lied to the woman — saying he'd knocked more than $1,000 off her monthly payments.

Then, from 2010 to 2015, he allegedly pocketed the $1,567 monthly installments she gave him, instead of depositing the payments in the bank.

The bank later foreclosed on the victim's two-family house, and she's now sleeping on a friend's couch, prosecutor Joseph diBenedetto told Brooklyn Supreme Court Justice Danny Chun.

"When the victim in this case hired the defendant to help save her house she had no idea he was allegedly a heartless crook who was pocketing her hard-earned cash, even though he knew his scam would eventually cost her dearly," Acting Brooklyn District Attorney Eric Gonzalez said in a statement.

Lakhram, 45, pleaded "not guilty" Tuesday to grand larceny charges.

If convicted, he faces up to 15 years behind bars.

The Queens man was held on $250,000 bond. He's due back in court on Dec. 6.   *Emily Saul*

Exhibit 35

## GREASING THE WHEELS

# Zips lips, gives press the slip

**BY JILLIAN JORGENSEN**
NEWS CITY HALL BUREAU CHIEF

MAYOR DE BLASIO sidestepped questions – literally – a day after explosive testimony from a donor who said his cash translated into access and favors from Hizzoner.

Meanwhile, his opponents ripped him as corrupt and called for pay-to-play investigations to be reopened Friday.

"Is that what we want in a mayor?" Republican Nicole Malliotakis asked in a phone interview with The News.

"Someone who is looking for the little loophole or the way to skirt ethics laws to get away with something that's inappropriate? To get away with violating the law? New Yorkers deserve better."

The testimony from Jona Rechnitz, a federal cooperating witness, came during the trial of former correction union boss Norman Seabrook – one of several law enforcement figures he says he showered with cash in exchange for favors.

Rechnitz is at the center of an investigation into police corruption, but he testified Thursday that he'd also spread the love to the mayor – explicitly telling his top fund-raiser Ross Offinger that he'd bring in thousands but would expect to get his calls answered and his favors done in return.

At an event Friday in Sunset Park, Brooklyn, de Blasio refused to answer questions about his relationship with Rechnitz, Rechnitz's testimony or whether he was corrupt, and ignored reporters – including one who asked "What's your price?" – as he walked away.

At a second stop touring an affordable housing apartment project in Borough Park, the press got penned into a single room while de Blasio walked around. He spoke briefly about the project before ignoring more shouted questions from reporters who trailed him to his car and watched him drive off in silence.

He later attended a Halloween party at Gracie mansion as Daily Planet reporter Clark Kent – with a Superman logo underneath his shirt.

The mayor's relationship with Rechnitz and another donor involved in the scandal, Jeremy Reichberg, was probed by both the U.S. attorney's office and District Attorney Cy Vance Jr. Neither brought charges but issued scathing statements saying the mayor had violated the spirit of campaign-finance laws.

Malliotakis (below) said that investigation needs to be reopened in light of Thursday's explicit testimony, but also because of donations the mayor's lawyers made to Vance, who has been under pressure for taking contributions from defense attorneys.

Independent candidate and former detective Bo Dietl (below) went further – dangling a pair of handcuffs as he stood outside the U.S. attorney's office.

"I'm a former detective. You know what, I know one thing. You see these handcuffs?... These handcuffs should be put on our mayor," Dietl fumed. "I think I heard enough yesterday."

De Blasio spokesman Eric Phillips had mocked Rechnitz's credibility on Thursday, saying several agencies had investigated his claims and chosen not to charge anyone. He doubled down on Friday.

"If Jona Rechnitz says he bought the mayor, he is a liar. If he says he had unfettered access, he is a liar. The only thing Jona Rechnitz can say honestly is that he is a failed fixer of grand delusion just trying to save his own skin," Phillips said.

But Dietl argued the witness was trustworthy enough to the prosecution.

"This is a federal witness that is most credible to our U.S. attorney as a federal witness that he's telling the truth," Dietl said. "And I think the truth was spoken yesterday and it will continue at the trial."

Both candidates sought to use the blow to de Blasio as fodder for their own campaigns to take his job Nov. 7.

"This is an opportunity for the people of New York to get decent representatives in City Hall," Malliotakis said. "Nov. 7 is an election, and people who are unhappy with pay-to-play and corruption ... have to come out to vote."



# SLIME

## ● Donor called every few days

On Friday, the mayor dodged questions about his relationship with Rechnitz at a press conference on the unveiling of a "friendship arch" in Sunset Park.

His press secretary, Eric Phillips, again called Rechnitz "a liar" and said the mayor gave his personal cell phone number to "lots" of donors and nondonors.

De Blasio's campaign spokesman Dan Levitan brushed off questions about Rechnitz's testimony, insiting it was all old news and not

worth discussing.

"All of these matters have been thoroughly investigated by multiple agencies. Each of those cases has been closed with no charges brought whatsoever," Levitan said.

"Our team acted appropriately at all times. This trial is not about the mayor at all, and the testimony is from someone who has pled guilty to crimes in order to avoid additional charges and jail time."

In March, the Manhattan U.S.

attorney closed his investigation without bringing charges, but noted that the probe had made clear the mayor had, in fact, intervened on behalf of donors.

Manhattan District Attorney Cy Vance Jr. also closed his investigation into the state Senate fundraising effort, but made a point of stating that the fund-raising effort appeared "contrary to the intent and spirit of the law" limiting the influence of money in politics.

**With Jillian Jorgensen**

Exhibit 36

# De Blasio Calls Donor Who Said Money Bought Him Access a 'Liar'

**By WILLIAM NEUMAN**

Mayor Bill de Blasio on Saturday dismissed the court testimony of a campaign contributor who said he bought access to City Hall with his donations, calling the man a liar. But the mayor said he could not recall crucial details of their association, such as whether he had asked the man to intervene on his behalf with a powerful labor leader, and he refused to provide a full accounting of their meetings and telephone contacts.

The testimony of the donor, Jona Rechnitz, comes at an awkward time for Mr. de Blasio, less than two weeks before the Nov. 7 election, in which he will ask voters to give him a second term. Mr. de Blasio, a Democrat, has a commanding lead in polls.

Mr. Rechnitz began testifying last week in Federal District Court in Manhattan in a government case against Norman Seabrook, the former head of the correction officers' union, who is charged with investing millions of dollars of retirement funds through a hedge fund in exchange for promised kickbacks. But much of his testimony over two days last week involved his relationship with Mr. de Blasio.

Mr. Rechnitz said that he and Mr. de Blasio were friends and that during the latter stages of the 2013 election, when he was running for mayor, they spoke by phone about once a week.

Mr. Rechnitz has pleaded guilty to conspiracy to commit honest services wire fraud and is cooperating with federal prosecutors. He



Mayor Bill de Blasio, above at an event this month, dismissed Saturday the court testimony of a 2013 campaign donor, Jona Rechnitz, but he did not provide a full accounting of their interactions.

SAM HODGSON FOR THE NEW YORK TIMES

also cooperated in a series of investigations into Mr. de Blasio's fund-raising practices. Those investigations concluded this year when federal and state prosecutors decided not to bring charges.

Mr. Rechnitz donated directly to Mr. de Blasio's campaign and bundled more than $40,000 from other contributors. After Mr. de Blasio became mayor, Mr. Rechnitz donated $50,000 to a nonprofit group the mayor had formed to advance his agenda and made a donation of $102,300 — he said it was done at Mr. de Blasio's personal request — to help elect Democrats to the State Senate.

In return, Mr. Rechnitz said in court, he got access to the mayor and could ask for favors, including being named to an inaugural committee and helping a friend resolve a water billing issue.

"You have heard a lot of tales the last few days," Mr. de Blasio said on Saturday at a news conference on a Brooklyn sidewalk after making a campaign appearance at a synagogue. "Jona Rechnitz has had his turn. Now it's my turn to tell you the truth. Jona Rechnitz is a liar and a felon. It's as simple as that."

A day earlier, Mr. de Blasio refused to speak to reporters at two public events, walking away as they shouted questions about his dealings with Mr. Rechnitz. On Saturday — when the press corps that regularly covers the mayor and is most knowledgeable about pay-to-play accusations would be unlikely to attend — his office sent a notice at 10:16 a.m., announcing that he would hold a news conference at 11:45 a.m.

On Saturday, Mr. de Blasio said he met Mr. Rechnitz after winning the Democratic primary in 2013, when Mr. Rechnitz began donating to his campaign.

But Mr. de Blasio was vague about many details and claimed not to remember important interactions.

"I remember a handful of times being in person with him and I remember a handful of times on the phone," he said. "I really can't give you an exact number, but nothing like once a week."

Mr. de Blasio called Mr. Rechnitz "a horrible human being."

"This is not someone that I ever knew well or was close to," Mr. de Blasio said. "He is exaggerating in many, many ways."

Mr. Rechnitz testified on Friday that Mr. de Blasio had asked him at one point to appeal to Mr. Seabrook to tamp down his criticism of the correction commissioner, who at the time was Joseph Ponte.

"I have no memory of that at all," Mr. de Blasio said.

Prosecutors in the trial showed an email, sent to the mayor's personal email address, in which Mr. Rechnitz reported to the mayor that Mr. Seabrook was "under control."

"I don't remember that email," Mr. de Blasio said on Saturday.

Mr. Rechnitz also testified that he had a close relationship with Ross Offinger, a fund-raiser for Mr. de Blasio's campaign. He said that Mr. Offinger arranged for Mr. de Blasio to visit Mr. Rechnitz at his office, and that during the visit Mr. de Blasio gave Mr. Rechnitz his personal email address and cellphone number.

"I don't remember the details but I can remember the broad

*The mayor addresses awkward allegations two weeks before Election Day.*

strokes," Mr. de Blasio said on Saturday. "At some point, I think it was Ross, said, 'Here's someone who says they want to help us,' and then it proceeded from there. But I don't remember the details."

Mr. de Blasio said he did not give special treatment to donors, adding that voters did not care about accusations that he traded favors for campaign contributions.

"The fact that a convicted felon is now trying to besmirch me, no one's going to fall for that," he said.

Asked to provide a full accounting of his contacts with Mr. Rechnitz, Mr. de Blasio refused.

"You always want everything and I'm not going to give it to you," he said.

Exhibit 37

# NEW YORK POST

**LATE CITY FINAL**

SUNDAY, OCTOBER 29, 2017 / Rain 71 / Weather: Page 96 · · **SUNDAY** nypost.com $1.50

## BLASIO PAY-FOR-PLAY SCANDAL

# JONA THE WHALE

## Rogue donor had city, mayor on a string



Real estate developer-turned-federal witness Jona Rechnitz's wealthy LA pedigree, incessant name-dropping and six-figure splurges on City Hall and the NYPD bought him a wild life of privilege and access, according to court testimony, sources and his own wife's boastful social-media posts.

**PAGES 4-5**

## Inside Hollywood's hottest Halloween bash

**SEE PAGE 3**

4

New York Post, Sunday, October 29, 2017    nypost.com

# JONA BOUGHT

By MELISSA KLEIN, MELKORKA LICEA & SARA DORN

JONA Rechnitz lived like he owned New York — and arguably, he did.

Whether he was high-fiving athletes from courtside seats at the Garden, jetting to Vegas in a private plane with NYPD brass and a hooker named Candi, or getting the Port Authority to close a lane of the Lincoln Tunnel so his billionaire pal could speed through traffic, Rechnitz was a self-made, cash-powered macher.

Want VIP access to the New York City Marathon, or the Times Square New Year's Eve ball drop? Call Jona.

Want an NYPD courtesy card that gets you out of tickets? Jona could pull one out of his wallet.

In social-media posts and gossip-page clips from the past five years, the millionaire Manhattan real-estate developer and his wife, Rachel, rubbed elbows with A-listers in every corner of Gotham — Manny Pacquiao with Jona at a Knicks game, or Rachel sitting beside Jennifer Lawrence and Anna Wintour at the hottest fashion shows.

Selfies on Rachel's Facebook page show her grinning at fashion and charity events alongside Jessica Chastain, Martha Stewart, Rachel Zoe and Chris Rock.

Sometimes, Rechnitz would be chauffeured around town in a police vehicle by Philip Banks III, then a top chief in the NYPD.

"Jonah & Aryeh courtside with the Knicks!!!" the wife boasted in a 2011 Facebook photo of her husband and his business partner, Ari Schwebel, sitting on the floor of Madison Square Garden.

"They were even pictured in the Post!" she gushed.

The next time Rechnitz would be in The Post would be on Page 1 — as the campaign donor who ensnared the highest echelon of city government and law enforcement in a pay-for-play scandal.

"HOW I BOUGHT DE BLASIO," Friday's headline read.

Because while he may have had New York at his feet, he also had Mayor de Blasio on speed dial.

FOR two days last week, Rechnitz, a 34-year-old New York transplant from a wealthy California real-estate family, had the city transfixed.

In testimony at the federal bribery trial of former city correction union boss Norman Seabrook, Rechnitz told how he bought the key to the city for some $160,000 in donations to de Blasio and the state Democratic Senate Campaign Committee, plus tens of thousands of dollars more in gifts to NYPD brass.

Rechnitz is testifying as a government witness under a cooperation deal forged when he pleaded guilty last year to conspiracy to commit honest services wire fraud.

His direct testimony is expected to conclude Monday morning, after which Seabrook's defense gets a crack at him.

"I was the 'yes' man," he told jurors Thursday of his generosity to de Blasio's top fund-raising aide, Ross Offinger. "I always gave money, as long as I was seeing him produce results."

Hizzoner and he were weekly phone pals, Rechnitz claimed.

"I e-mailed him on his personal e-mail. We would chat. I'd go to events of his. He invited me to events and put me in very good-seated areas," he testified.

"He took my calls. I mean, we were friends."

Friends with ever-growing benefits, he hoped.

"I was focused on making money, getting my name out there, becoming a big player in town," he explained.

RECHNITZ had moved to New York City as a young man to set himself apart from his Los Angeles family.

His father, Robert, is a real-estate developer and philanthropist with deep political ties in the US and Israel. The elder Rechnitz was national finance co-chair for Lindsey Graham's 2016 presidential campaign.

He also "enjoyed close relationships with the highest echelons of the Israeli government," he said in an article on the Web site of the Friedlander Group, a Manhattan p.r. firm that lists him as a client. He boasted he was a "personal acquaintance and supporter" of Israeli Prime Minister Benjamin Netanyahu.

The dad ioctaned large for Jona.

"People would seek his advice often. We were involved in the community. I saw my family name in a lot of places of importance," the son recalled in court testimony last week.

Rechnitz graduated from Ye-

shiva University in Manhattan and began his career in the city.

On the Upper West Side, where Rechnitz lived before returning recently to California, he was known as a friendly neighbor and concerned dad.

Rechnitz married fellow Californian Rachel Kahn in 2005. The youngest of their five children was born late last year.

"He seemed to care a lot about his kids. They are a very hyperactive bunch, and he was very patient and gentle with them," said a friend of the family's baby sitter.

When the sitter had a fire in her apartment, he gave her $1,000, the friend said.

"He gifted it to her. It wasn't a loan," she said.

AFTER working for Marcus & Millichap, a commercial real-estate brokerage, and Broad Properties, in 2006 he started as an assistant at Africa Israel, a real-estate firm owned by Israeli diamond merchant Lev Leviev. Leviev and Rechnitz's father had done deals together on the West Coast, a source had told The Post.

The firm had bought a 50 percent stake in the Apthorp apartments on the Upper West Side, and Rechnitz got a $20 million



PERKS GALORE: Real-estate developer Jona Rechnitz, a donor to Mayor de Blasio, hand-slaps Knick center Tyson Chandler at a game in the Garden, while his wife, Rachel, rubs shoulders with Vogue editor Anna Wintour (inset).

## Blas donor conquered

## Union paper dumps Bill

The Chief-Leader, the city's influential weekly newspaper for civil-service union members, berated Mayor de Blasio for his ethical lapses and endorsed one of his election challengers.

"Someone who ran for office championing progressive ideals has behaved more like a clubhouse politician more inclined to take care of big contributors than serve the voters," the paper said in an editorial.

The paper backed de Blasio in 2013, but the Thursday editorial officially endorsed Reform Party candidate Sal Albanese.

The mayor's campaign said it was unconcerned.

"Teachers, sanitation workers and unions representing hundreds of thousands of working New Yorkers are backing his re-election campaign," said spokesman Dan Levitan.    **Mary Kay Linge**

marketing budget to lure buyers.

Sources said he wasted money by hiring a 747 jet, filling it with models and flying to Europe to shoot an ad for the Apthorp.

"You knew right away that there was something off about him," said a person who worked with him on the project. "Everything

# KEY TO THE CITY

## Gotham with his wallet

### Give and take

**What Jona Rechnitz allegedly gave to Mayor de Blasio and other figures — and what he allegedly received in return:**

#### MAYOR de BLASIO

**RECHNITZ GAVE:**
- About $50,000 to de Blasio's Campaign for One New York
- $9,900 to de Blasio's 2013 mayoral campaign
- Bundled $41,000 in contributions and allegedly gave more through illegal straw donors
- $102,300 to de Blasio's 2014 effort to help Democrats recapture the state Senate

**RECHNITZ GOT:**
- De Blasio's private cellphone number and e-mail address
- Seat on de Blasio's inauguration committee
- Direct line to de Blasio fund-raiser Ross Offinger
- Help for a friend in lowering a Borough Park building's water bill from $650,000 to $125,000
- City info on real estate a friend was selling on Ocean Parkway
- Help settling a fine over a tenant's illegal Airbnb sublet in his Madison Avenue building

#### WESTCHESTER COUNTY EXECUTIVE ROB ASTORINO

**RECHNITZ GAVE:**
- $15,000 to Astorino's 2013 campaign
- About $8,000 toward a Rolex watch bought by Astorino

**RECHNITZ GOT:**
- Position as a police chaplain, with a parking placard, even though he is not a clergyman

#### CORRECTION-UNION BOSS NORMAN SEABROOK



UNION BOSS BRIBE

**RECHNITZ GAVE:**
- All-expenses-paid 2013 trip to Dominican Republic
- $60,000 delivered in a Ferragamo bag on behalf of hedge funder Murray Huberfeld

**RECHNITZ GOT:**
- Union's $20 million investment in Huberfeld's ailing Platinum Partners hedge fund

#### NYPD OFFICERS AND BRASS

**RECHNITZ GAVE:**
- $59,000 all-expenses-paid 2013 trip to Las Vegas for Deputy Inspector James Grant and Detective Michael Milici
- $1,000 in Christmas gifts, delivered to Grant's Staten Island home
- $12,000 in repairs to Grant's home
- All-expenses-paid 2013 trip to college football game in Miami — allegedly including prostitutes — for two then-deputy chiefs and two officers
- Meals and gifts to former NYPD Chief of Department Philip Banks, including a championship ring that belonged to Muhammad Ali

**RECHNITZ GOT:**
- Rides in Banks' police car
- Closure of one lane in the Lincoln Tunnel so his former boss, a diamond dealer, could avoid traffic
- Help from Grant in expediting gun-permit applications
- Police escorts, access to events such as the Times Square New Year's Eve celebration and NYC Marathon, and police courtesy cards to help Rechnitz and his friends evade traffic tickets

---

was puffery ... He was trying to make himself like the president."

RECHNITZ left Africa Israel in 2009 and, at age 27, started his own investment firm, JSR Capital. It was to concentrate on development and distressed real assets and be headquartered in Trump Tower.

Before The Post revealed his ties to the police corruption scandal in April 2016, Rechnitz garnered a handful of mentions in the press, mostly for real-estate deals.

But his biggest splash came in 2014, when he won $25,000 on a $500 Super Bowl bet, and TMZ pictured him holding the cash.

Rechnitz said he was giving his winnings to charity, just as he had in 2012, when he scored $50,000 on the game.

On Thursday, he testified that nearly everything he did he did for money, power and access — including his charitable works.

"Marketing," he explained.

RECHNITZ says he began plying police bigs with gifts around 2012. He allegedly teamed with Brooklyn pal Jeremy Reichberg.

The pair donned elf hats to deliver a video-game system and jewelry to the Staten Island home of James Grant, former commanding officer at the 19th Precinct on the Upper East Side, according to court papers.

Grant allegedly did favors for the men including giving them police escorts and helping them get gun permits.

Grant, with Reichberg and since-fired Detective Michael Milici, was on a 2014 private plane trip to Vegas paid for by Rechnitz. A prostitute allegedly procured for the men told The Post she performed oral sex on the cops.

Rechnitz claimed in testimony last week that he fell asleep on the flight and woke to see that the cops "not fully clothed."

He also testified that he took

two deputy chiefs and two officers on a trip to Miami in 2013 and paid for hookers.

Grant and three other officers have been charged in the scandal, along with Reichberg.

THE testimony comes little more than a week before de Blasio is up for re-election. And while probers declined to pursue a case against de Blasio but chastised him, Rechnitz's accounts continue to haunt him.

"Jona Rechnitz is a liar and a felon. It's as simple as that," de Blasio told reporters Saturday.

"He's a convicted criminal."

He called Rechnitz's testimony about weekly calls "false."

"There was in intensive investigation, the authorities passed on taking any further actions in those investigations," de Blasio said.

"Rehashing stories doesn't make them true."

*Additional reporting by Kaja Whitehouse and Laura Italiano*

Exhibit 38

10

nypost.com

New York Post, Thursday, January 4, 2018



# Epic fail by dirty donor Jona
# Blas-Bibi meet got Rech'ed

**NO SHOW:** Jona Rechnitz (above) failed to deliver on a meeting he claimed to have brokered between Mayor de Blasio and Israeli PM Benjamin Netanyahu.

By YOAV GONEN
*City Hall Bureau Chief*

Mayor de Blasio was duped by disgraced donor Jona Rechnitz into a 2014 meeting with Israeli Prime Minister Benjamin Netanyahu that never came off, The Post has learned.

While it was known that Rechnitz had made the offer to broker the meeting in September 2014, e-mails obtained by The Post newly reveal that the mayor actually attempted to take him up on it.

The hastily arranged Sept. 30 tête-à-tête at the Palace Hotel in Midtown — which collapsed because Rechnitz couldn't deliver — was initially orchestrated by de Blasio fund-raiser Ross Offinger.

He responded to Rechnitz's offer by saying that senior City Hall aide Avi Fink would be the point of contact.

Fink noted the meeting would have to be added to the mayor's public schedule — which it was, at 5:45 p.m. — but without a time and location listed.

Eight minutes after the mayor's schedule was updated, Fink told Rechnitz that "our [police] detail says they are hooking up with you."

Fink then added that "we are gonna wanna move quickly from the lobby up to the destination plus on account of reporters snoopin around."

It's only then that the e-mail trail suggests something went awry.

At 6:31 p.m. Fink wrote Rechnitz to ask, "Any word?"

Rechnitz responds a minute later, "No clue they confirmed 615."

It wasn't until 7:17 p.m. that City Hall updated the mayor's schedule again, to say the meeting had been "postponed to later in the week."

The exchanges came well before Rechnitz was outed as a power-broker wannabe who attempted to use his money to buy influence from City Hall and the NYPD.

He pleaded guilty last March to making contributions in ex-change for advantageous treatment from government officials, but City Hall said he never got favors in return.

Asked what happened in those last moments the night of the near-meeting with Netanyahu, mayoral spokesman Eric Phillips said it turned out Rechnitz offered something he couldn't deliver on.

"The meeting never happened and, like many other things involving this individual, the possibility of it appears to have been a figment of his imagination," Phillips said.

Despite their political differences, Hizzoner and Netanyahu did meet two days later at the Palace, and again last year in Israel.



**DOUG JONES**
Trims GOP edge to 51-49.

# Ala. Dem sworn in as sen.

Doug Jones, the first Alabama Democrat to be elected to the Senate in 25 years, was sworn in on Wednesday by Vice President Mike Pence.

Jones, 63, was voted in during a special election last month in the deeply red state, defeating former state judge Roy Moore, whose campaign was dogged by allegations that he groped teenage girls decades ago when he was in his 30s.

Jones, who will narrow the Republican Party's majority in the chamber to 51-49, was one of two Democrats sworn in on Wednesday.

Former Minnesota Lt. Gov. Tina Smith, named to replace ex-Sen. Al Franken, who resigned over accusations of sexual misconduct, also took the oath of office as a senator.

Jones defeated Moore, 70, in a Dec. 12 special election to fill the seat vacated by Jeff Sessions when he became President Trump's attorney general.

*Mark Moore, Wires*

# Palestinians: 'Blackmail!'

Palestinians on Wednesday condemned as blackmail President Trump's threat to withhold aid payments to the Palestinian Authority.

Trump tweeted Tuesday that the US gives Palestinians "HUNDRED OF MILLIONS OF DOLLARS a year . . . with the Palestinians no longer willing to talk peace [with Israel], why should we make any of these massive future payments to them?"

Hanan Ashrawi, of the Palestine Liberation Organization, said, "We will not be blackmailed." *Yaron Steinbuch*

# Johnson new council speaker

The City Council chose Corey Johnson as its new speaker on a 48-1 vote Wednesday, ushering in a possibly more contentious era in city government.

The speaker position is the strongest check on Mayor de Blasio's power.

Johnson (right), 35, who represents Chelsea, praised the city government's accomplishments over the past term, but said it has much to overcome in coming years.

"The problems and challenges we continue to face are of historic proportions," he said. "The [housing] affordability crisis gripping our city threatens the very existence of our neighborhoods."

Overflowing homeless shelters, mom-and-pop stores unable to compete with chain stores and a failing transit system were among several other concerns the Democrat ticked off.

Councilwoman Inez Barron (D-Brooklyn) cast the lone dissenting vote.

She voted for herself, explaining: "It's time for a black speaker. White men, white women and a Latina have been speaker, but we have never had a black speaker in this a city where blacks, Latinos and Asians are the majority."

*Michael Gartland*

Exhibit 39

DAILY NEWS NYDailyNews.com

99 YEARS PROUD

**DAILY NEWS**

**EDITOR-IN-CHIEF**
**Robert York**
ryork@Nydailynews.com

**CITY EDITOR**
**Ginger Adams Otis**
gotis@Nydailynews.com

**NATIONAL EDITORS**
**Ginnie Teo**
gteo@Nydailynews.com

**Dan Good**
dgood@Nydailynews.com

**SPORTS EDITOR**
**Eric Barrow**
ebarrow@Nydailynews.com

**EDITORIAL EDITOR**
**Josh Greenman**
jgreenman@Nydailynews.com

**PHOTO EDITOR**
**Kevin MacDonald**
kmacdonaldd@Nydailynews.com

**PRINT EDITOR**
**Edward Glazarev**
eglazarev@Nydailynews.com

**HOME DELIVERY**
Call 800-692-6397 (NEWS)
or mail to DAILY NEWS L.P.,
Circulation Fulfillment,
125 Theodore Conrad Drive,
Jersey City, NJ, 07385.

**GOT A STORY? CALL
212-210-NEWS ...
GOT A PHOTO? E-MAIL
DESK@DAILYNEWSPIX.COM**

| Daily News | (212) 210-2100 |
| News Tips | (212) 210-NEWS |
| Classified Ads | (212) 210-2111 |
| Advertising | (212) 210-2004 |
| Newsstand Circulation | (212) 681-3300 |
| Education (NIE) | (212) 210-2924 |
| Home Delivery | (800) 692-NEWS |

Saturday, December 1, 2018 Vol. 100 — No. 159

© 2018 Daily News L.P. All rights reserved. The Daily News (USPS 144-380) is published daily by the Daily News L.P., 4 New York Plaza, New York, NY 10004. Periodicals postage paid at New York, NY, and additional mailing offices. Daily News camera logo: reg. U.S. Pat. & TM Off.
POSTMASTER: Send address changes to Daily News, Circulation Fulfillment, 125 Theodore Conrad Drive, Jersey City, NJ, 07385.
All materials submitted to Daily News are subject to same terms applied to submission of content to NYDailyNews.com. These Terms can be found at NYDailyNews.com/terms under "User Content".

**NEW YORK LOTTERY:**
Evening: 689 Win 4: 0708
Midday: 847 Win 4: 6553
Pick 10: 6-13-14-16-23-30-31-
32-36-38-43-44-50-51-53-62-63-
69-71-79
Mega Millions: 25-28-40-43-63
Mega Ball: 19 Megaplier: 3
Take 5: 7-12-20-35-39

**NEW JERSEY LOTTERY:**
Evening Pick 3: 318 Pick 4: 0512
Midday Pick 3: 877 Pick 4: 5632
Cash 5 Xtra: 3-8-22-31-34 x3
**LOTTERY HOTLINE:**
**1-800-448-4000**
39¢ per minute. Results from NY, NJ, CT, PA, FL

# No way bribe susps knew top cops: city

BY STEPHEN REX BROWN
AND BILL SANDERSON
NEW YORK DAILY NEWS

Two men accused of bribing NYPD brass and bragging of their law-enforcement links weren't connected enough to know the current and past police commissioners, the city says in a court filing.

NYPD Commissioner James O'Neill and his predecessor, Bill Bratton, have never met Jeremy Reichberg, who is on trial in Manhattan Federal Court for bribing cops with meals, sports tickets and posh vacations, the city's filing says.

Neither claims to know Jona Rechnitz, who pleaded guilty of bribery charges and is cooperating with prosecutors. O'Neill and Bratton also say they have no testimony relevant to charges against former NYPD Deputy Inspector James Grant, who is being tried with Reichberg.

Reichberg's claims he had influence with O'Neill were "were purely fictional," the city's filing says.

Bratton's decision to promote Grant from captain to deputy inspector was based on "recommendations from other members of his executive staff and not based upon his individual assessment of Grant," the papers say.

Grant lawyer John Meringolo said Friday he believed testimony from O'Neill and Bratton would be relevant, but wouldn't elaborate.

Reichberg and Grant's trial began Nov. 6.

# Bill's email trash

## Says his dirty donor's plea unimportant

BY JILLIAN JORGENSEN
AND GREG B. SMITH
NEW YORK DAILY NEWS

Mayor de Blasio says he has no clue how an email he received from a corrupt donor begging him to save the career of an NYPD boss disappeared — but insisted it wasn't something anybody needed to see, anyway.

"I get lots of emails, and anything consequential, anything that has to do with government business, we try to move it to the government side, preserve the ones that need to be preserved. But there was nothing here that was consequential, that's the bottom line," de Blasio said Friday on WNYC's "Brian Lehrer Show."

But the email, sent from donor-turned-felon Jona Rechnitz to de Blasio's personal email account, was consequential enough to be introduced as evidence at the federal trial of an accused crooked cop.

In the note, Rechnitz — who had funneled hundreds of thousands of dollars to de Blasio and his political pet projects — begged de Blasio to meet with him immediately in an effort to save the career of then-Chief of Department Philip Banks, whom Rechnitz had also lavished with favors and gifts in an effort to win perks from police.

That email was not among the ones turned over by de Blasio in response to a Freedom of Information Law request for his communications with Rechnitz. City Hall has said they failed to turn it over because they didn't "have" the email — implying it was deleted.

"I really don't know the specifics of it," de Blasio bristled when Lehrer asked if he or someone else had deleted it. "I just told you, anything we had, we turned over."

City officials are required to retain emails for the length of their service or for eight years, depending on their roles, and then offer them to the municipal archives. But the mayor's office has insisted those rules do not apply to them — pointing to a two-sentence policy that allows them to delete almost any email, as long as it is not another type of record protected by law.

While he couldn't say where the email went, de Blasio seemed sure about one thing: He didn't think it was important.

"I don't know why people keep coming back to it, because it's been covered and covered and covered that's all I've got to say."

But the note seeking a meeting about Banks — which Rechnitz testified under oath that he got, almost immediately, in the form of a rendezvous at the South Street Seaport — was a new revelation from Wednesday's court testimony, as Lehrer noted.

"I just don't think it's a revelation, I think it's been covered many, many times over," de Blasio fumed.

De Blasio also dismissed Rechnitz as "someone who is a very troubled person who has committed crimes and has lied,

incessantly."

But when asked whether Rechnitz was telling the truth about meeting with de Blasio to talk about Banks, City Hall declined to comment.

Rechnitz sent his email to de Blasio's personal Blackberry pressing the mayor to refuse to accept Banks' resignation at 3:49 p.m. on Nov. 3, 2014.

That's just 12 days after he wrote a check for $102,300 to support de Blasio's effort to flip the state Senate to Democratic control. He has testified he wrote that check after discussing the amount with the mayor, who let him know $102,000 was the maximum he could give.

Why this email wasn't included in those made public is troubling given that other emails between Rechnitz and the mayor's Blackberry made right around that same time were released.

For instance, at 10:10 p.m. that Oct. 20, Rechnitz emailed de Blasio's private account to ask if he was aware of concerns about a play at Lincoln Center about the death of Leon Klinghoffer. Within 10 minutes de Blasio responded from that account, "Would be happy to discuss. Let's connect tmrw."



Mayor Bill de Blasio (left) is pictured with dirty donor Jona Rechnitz in an undated photo.

COURT DOCUMENT

DAILY NEWS
MOURNING JOE
I BOUGHT THE MAYOR FOR $193G

Exhibit 40

# Banks' statement



Scandal cop
denies bribes

**FALLEN:** Former NYPD Chief of Department Philip Banks (above, and inset with Jeremy Reichberg and Jona Rechnitz) denies taking payoffs.

By STEPHANIE PAGONES
and BRUCE GOLDING

A former top city police official whom the feds have identified as an unindicted co-conspirator in the NYPD bribery scandal spoke out for the first time Monday, denying that he took payoffs from two ex-fundraisers for Mayor de Blasio.

"When friends ask me about this case and say, 'Did the police commit a crime?' I say to them that I can only answer for one person — Myself. And the answer is NO," ex-Chief of Department Philip Banks wrote on the NYPD Confidential Web site.

The guest column marked the first public statements from Banks since former NYPD Deputy Inspector James Grant and Jeremy Reichberg went on trial in November in a corruption scam.

Banks' name has been repeatedly mentioned during the trial — which is currently in jury deliberations — but he was never called to the witness stand after his lawyer said he would plead the Fifth.

In a column titled "Phil Banks Speaks for Himself," he refers to himself in the third person in response to being called "Dumb and dumber" by NYPD Confidential writer Leonard Levitt.

The insult stemmed from Banks' decision to pose in uniform for a photo with Reichberg and fellow de Blasio donor-turned-cooperating-witness Jona Rechnitz during a 2013 trip to Jerusalem's Western Wall.

"I believe the following in addition could have been introduced," Banks wrote, "That Banks received a briefing from the NYPD's intelligence division prior to going, that he conferred with the NYPD detective sta-

tioned in Israel upon arrival, that he met with the head of the Israeli Army, a ranking member of their Air Force, and had a two-hour meeting with the former head of the Masoud as well as speaking, with Palestinian and Jewish settlers in the West Bank," he added, misspelling Israel's Mossad intelligence agency.

"This was in addition to granting an interview for a local newspaper. Not the typical actions for someone receiving a bribe. Was it dumb to appear in uniform or was it the action of someone who was not hiding anything."

In a similar vein, Banks said Rechnitz's decision to hire a photographer and bring his son to a $25,000 suite at MetLife Stadium for a 2014 Patriots vs. Jets game belied Rechnitz's claim that Banks tried to pay off cops by inviting them.

Rechnitz, who spent nine days

on the witness stand, testified that Banks turned down his invitation because it wasn't exclusive to his "inner circle" — but still sent his father and brother.

Banks wrote that Rechnitz failed in his first attempt to become a government snitch and suggested he had to "fine-tune his story" before cutting a deal with the feds.

He also claimed that Rechnitz had cleared him of wrongdoing by testifying that "Banks was very careful not to bend the rules within the NYPD as favors to us."

"Those were his words, not mine," Banks wrote.

An NYPD source confirmed Banks' claims about being briefed before his Israel trip and meeting with an NYPD detective there.

Rechnitz's lawyer, Alan Levine, declined to comment.

*Additional reporting by Tina Moore*

## Cuo frees 29 cons

Gov. Cuomo granted clemency to 29 convicts Monday — including four serving time for murder.

Twenty-two of the inmates won pardons, including several immigrants convicted of drug crimes who were facing possible deportation. Seven others had their sentences commuted, four for murder and three for armed robbery.

The convicted murderers all served between 20 and 33 years.

Alphonso Riley-James and Roy Bolus, both 49, were part of a group involved in a drug deal in Albany that went bad and left two men dead. But neither inmate was accused of causing the deaths, Cuomo said, and both have served 30 years of potential life sentences.

The governor said both showed remorse and had exemplary records in prison.

Two other convicted killers were victims of crime themselves.

Dennis Woodbine, 42, served almost 22 years of a 25-to-life sentence following an incident in Brooklyn in 1998, when he was 19.

While chasing a group of young men who had stolen his jewelry, Woodbine fired a gun and killed an innocent bystander.

The governor also commuted the sentence of Michael Crawford, 38, who served 20 years of a 22-to-life sentence after being convicted at age 17 of shooting an individual who stole concert tickets from him in Buffalo in 1999. *Carl Campanile*

## Venice floats tourist tax

A measure in Italy's 2019 budget law will allow the local government in Venice to charge day-trippers for access to the city's historic center as a way to help defray the considerable costs of maintaining the centuries-old tourist destination built on water.

Venice Mayor Luigi Brugnaro said late Sunday on Twitter that the new visitors' tax would "allow us to manage the city better and to keep it clean."

He said it would vary from 2.50 euros to 10 euros per person. A euro is worth roughly $1.15. *AP*

# Homeless duo charged in subway cop 'attack'

Two vagrants have been indicted for trying to attack a cop in a Lower East Side subway station, prosecutors said Monday.

Eliseo Alvarez, 36, and Juan Nuñez, 27, didn't appear for the brief hearing in Manhattan Criminal Court. They were arrested last week for a caught-

on-camera confrontation with Officer Syed Ali on the F platform of the East Broadway station.

Ali had asked a group of five drunken homeless men to leave the station on Dec. 23 after a woman complained that they were harassing her.

In response, Alvarez swung at the cop while clutching a "pointed object in his closed fist," according to the Manhattan District Attorney's Office. Nuñez lunged at the officer but was so intoxicated he stumbled onto the tracks.

The men face misdemeanor

charges of obstructing governmental administration and riot.

Alvarez faces additional raps for felony attempted assault and misdemeanor criminal possession of a weapon and menacing.

They are due back in court Jan. 16. *Rebecca Rosenberg*

## Hunt for pickup killer

Authorities are asking Houston-area residents to review video surveillance for any images of a pickup truck whose driver they say fired into a car carrying a family, killing a 7-year-old girl.

Investigators say the driver , described as a man in his 40s, fired into the car, fatally striking Jazmine Barnes. *AP*

# Exhibit 41

9

New York Post, Thursday, February 14, 2019 · nypost.com

## Rechnitz travel plea

A Mayor de Blasio donor who is out on $500,000 bail pending his sentencing for bribing cops wants a judge to allow him to travel to Hong Kong for a jewelry show later this month, according to new court documents.

Jona Rechnitz — a government cooperator who testified at two corruption trials — is asking Manhattan federal judge Alvin Hellerstein to allow him to travel for nine days starting Feb. 25 "to attend an international jewelry show" for business, lawyer Alan Levine wrote in a letter to Hellerstein.

During testimony, Rechnitz said he currently works in real estate and jewelry.

Prosecutors agreed to the request as long as Rechnitz's wife turns over her passport.

Last month, ex-NYPD Deputy Inspector James Grant was acquitted of charges he took bribes while Rechnitz pal Jeremy Reichberg was convicted of bribing high-ranking cops for favors.

*Priscilla DeGregory*

## Horse feud win for city

Whoa, Billy!

Mayor de Blasio won a legal battle Wednesday to corral hansom cabs inside Central Park over the objection of a horse owner who sued to keep equines on nearby streets where potential ride halls can see them.

A rule dictating the move is set to take effect Friday.

"The city asserts that the purpose of this proposed change is to 'reduce the amount of time that horses spend alongside vehicular traffic,'" Manhattan Supreme Court Justice Arthur Engoron said in his ruling.

*Julia Marsh*

## Bx. teen stab-slay

Three knife-wielding thugs stabbed a 17-year-old to death on a Bronx street Wednesday night, cops said.

The crew jumped the teenager after an argument at East 193rd Street and Decatur Avenue in Fordham at 7:20 p.m., according to police.

The victim collapsed nearby and was soon pronounced dead.

*Ben Feuerherd*

# On the fence about AOC mural



A giant mural of Rep. Alexandria Ocasio-Cortez's face was painted on a Lower East Side fence, although not everyone in the neighborhood thought the freshman lawmaker was worthy of the rap star treatment.

"I'm surprised it went up so quickly," said passer-by Matthew Marblo, 27, who, though he's an AOC supporter, said, "She just got elected. She hasn't exactly done much yet and she is already up a mural?"

Terry Rogers, 74, who lives nearby, also likes the self-described Democratic socialist — but nevertheless called the mural "crap."

"I like her, but I don't know if I like the picture. It's a cliché. She's more interesting and subtle than that," he said.

The artist behind the work, Lexi Bella, told The Post that AOC deserves a tribute because she "inspires change."

The painting, which depicts AOC's head à la Brooklyn's Notorious B.I.G. mural, went up last month at Second Avenue and Houston Street.

The congresswoman's spokesman, Corbin Trent, called the work "really heartening and inspiring."

Unfortunately, it left some a little confused. One woman who stopped to snap a selfie in front of the art said she thought it was pop singer Gloria Estefan.

*Georgett Roberts and Natalie O'Neill*

# DON'S 'OPTION' PLAY

## Says he has ways of getting wall $$

**By BOB FREDERICKS**

President Trump said Wednesday that he's got options "most people don't really understand" to fund his border wall, as he vowed to avert another government shutdown even though Congress didn't allocate the $5.7 billion he has demanded.

"We have a lot of funds with other things and with the wall they want to be stingy, but we have options that most people don't really understand," Trump said during a meeting with President Ivan Duque of Colombia.

He again refused to say whether he would support the compromise spending bill on border security hammered out by congressional negotiators.

"We haven't gotten it yet. We'll be getting it. We'll be looking for land mines," Trump said.

But he reiterated he didn't want

### Prez poll vaults with indies

President Trump's job-approval rating jumped by 7 points, to 44 percent, after the end of the government shutdown, according to a survey released Wednesday.

A Gallup Poll taken between Feb. 1 and 10 — less than a week after Trump signed legislation reopening the government — found that a strong shift by independent voters accounted for the president's surge.

Thirty-eight percent of independents viewed his job performance positively, compared with 31 percent the previous month.

*Mark Moore*

another government shutdown in the wake of the recent record-breaking 35-day closure that left roughly 800,000 workers without paychecks.

"I don't want to see a shutdown — a shutdown would be a terrible thing," Trump said.

Congressional aides reported Wednesday that the bill had hit some snags, though they doubted they would prove fatal.

The hang-ups include whether to include a simple extension of the Violence Against Women Act as Senate Republicans want or move a new, longer-term bill separately, as House Speaker Nancy Pelosi is pushing.

Democrats also are pressing for employees of federal contractors to receive back pay for wages lost during the last shutdown.

The continued haggling means Thursday is the earliest the House can vote on the spending bill. The deadline to avoid another shutdown is Friday night at midnight.

Rep. Mark Meadows (R-NC), a key conservative ally of the president, said he believed Trump will sign the measure assuming there were no big surprises.

But he warned "it would be political suicide" if Trump agreed to the deal and then failed to take additional action to secure more funding for the wall.

The bill includes nearly $1.4 billion for border fencing, about a quarter of the $5.7 billion the president had demanded.

Trump and his aides have signaled repeatedly that he is preparing to use executive action to help fund the wall by shifting federal dollars without congressional sign-offs.

*With AP*

# Exhibit 42

New York Post, Thursday, October 17, 2019    nypost.com

# DeB rat donor's leniency bid

He's the Big Apple's best rat.

Federal prosecutors are begging a judge to have mercy on a disgraced former donor to Mayor de Blasio — calling Jona Rechnitz "one of the single most important and prolific" white-collar snitches in recent Manhattan history.

The former Manhattan real-estate developer spilled his guts at a series of recent city corruption trials.

Rechnitz admitted that he conspired to bestow lavish donations in exchange for access to City Hall.

His testimony led to the convictions of former correction-union chief Nor-man Seabrook and Brook-lyn businessman Jeremy Reichberg, a former pal on whom Rechnitz turned in a bid to save his own skin.

Rechnitz, who pleaded guilty to conspiracy to commit honest-services wire fraud, faces a maximum of 20 years in prison at his Nov. 1 sentencing.    *Emily Saul*

# Exhibit 43

**DAILY NEWS** NYDailyNews.com

# A good, dirty rat

## Feds praise Blaz donor in cop bribe as sentence looms

BY STEPHEN REX BROWN
NEW YORK DAILY NEWS

He bribed cops. He bought access to Mayor de Blasio. And he was one of the best cooperators Manhattan federal prosecutors have ever seen.

Jona Rechnitz, the notorious police buff and de Blasio donor, received a glowing letter Wednesday from prosecutors ahead of his sentencing for honest services fraud.

"Rechnitz has been, without exaggeration, one of the single most important and prolific white collar cooperating witnesses in the recent history of the Southern District of New York," Assistant U.S. Attorney Martin Bell wrote in a 51-page document.

The wannabe real estate big shot was the key witness in the cases against his fellow cop-briber, Jeremy Reichberg, former jails union boss Norman Seabrook and hedge fund founder Murray Huberfeld. Rechnitz also played a role in a corruption investigation of the NYPD's License Division. He cooperated with a federal probe of de Blasio's fund-raising practices, which resulted in no charges.

"Rechnitz's cooperation ex-



Jeremy Reichberg (left) went to jail after fellow Mayor de Blasio donor Jona Rechnitz (r.) spilled the beans.

posed the sordid underbelly of multiple New York City institutions, exposed serious crimes, and held powerful people who fell short of their obligations to the broader public to account," Bell wrote, noting that Rechnitz met with his office 80 times beginning in 2016.

Prosecutors did not recommend a specific sentence. But they wrote that Rechnitz had been a less problematic and more productive cooperator than crooked Albany lobbyist Todd Howe, who played a critical role in two corruption cases that rocked Gov. Cuomo's office. Howe was sentenced to five years of probation in April.

Bell wrote that the judge who sentences Rechnitz should not discredit his cooperation because no charges were brought in the de Blasio fund-raising probe, which eyed the mayor's top fund-raiser, Ross Offinger.

"Rechnitz's information with respect to his and Reichberg's involvement with Ross Offinger and Bill de Blasio's campaign was also useful. That information constituted some, but not all, of the conduct at issue in a broader inquiry as to circumstances in which Mayor de Blasio and others solicited donations from individuals who sought official favors from the City, after which the Mayor or individuals working for him made or directed inquiries to relevant city agencies on behalf of those donors," the letter read.

"The decision not to charge should not be interpreted as a determination that Rechnitz was not forthcoming."

## High-speed net now installed in all city schools

Dial-up days are done at city schools.

All of the city's approximately 1,300 public school buildings now have high-speed internet to keep up with advanced programs, like an initiative to expand computer science classes, officials said Wednesday.

"I'm thrilled to see we're making significant strides towards providing all of our students with the 21st century, high-tech classrooms they deserve," said Schools Chancellor Richard Carranza.

Officials said school internet speed in 2015 was just 10 megabits per second, which allowed only five computers on the same network to simultaneously stream videos. Speeds are now 100 megabits per second across city schools, allowing 50 video streams.

The city has already invested $650 million in wireless improvements since 2014 and plans to spend another $750 million over the next five years.

But Carranza said it's worth the price. **Michael Elsen-Rooney**

COURT DOCUMENT

# Exhibit 44

HAUJSEA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                          16 Cr. 467 ALC

NORMAN SEABROOK AND MURRAY HUBERFELD,

          Defendants.

------------------------------x

                                 October 30, 2017
                                 8:54 a.m.

Before:

                    HON. ANDREW L. CARTER, JR.,

                                 District Judge
                                  and a jury

                         APPEARANCES

JOON H. KIM,
     United States Attorney for the
     Southern District of New York
KAN MIN NAWADAY,
MARTIN S. BELL,
RUSSELL CAPONE,
     Assistant United States Attorneys

HAUJSEA1

                          APPEARANCES (Continued)


BRACEWELL, LLP,
        Attorneys for defendant Seabrook
BY:  PAUL LEWIS SHECHTMAN, Esq.
        MARGARET EMMA LYNAUGH, Esq.
                    Of counsel


MAZUREK LIPTON, LLP
        Attorneys for defendant Huberfeld
BY:  HENRY EDWARD MAZUREK, Esq.
        EVAN LOREN LIPTON, Esq.
                    Of counsel


Also Present:
        BARD HUBBARD, Special Agent FBI
        YOLANDA BUSTILLO, Paralegal USAO
        AUGUSTA GRANQUIST, Paralegal




            (In open court; jury not present)

            THE COURT:  Are counsel all here?

            MR. BELL:  Mr. Shechtman is here.

            THE COURT:  Counsel, the first thing -- everyone can

have a seat -- the first thing is U.S. Attorney's Office

contacted my Chambers this morning to see if my law clerk could

let the witness who is on the stand up through a different

door.  I wanted to check with counsel to make sure there is no

objection?

1           (In open court)

2           THE COURT:  Okay.  Let's do this.  Let's take a quick

3    bathroom break of 8 minutes.  Don't discuss the case with

4    anyone else.  Don't discuss it amongst yourselves and we'll see

5    you in 8 minutes.  Thank you.

6           (Jury excused)

7           THE COURT:  So the parties know, I got a note from my

8    Deputy indicating some of the jurors wanted a bathroom break.

9    That is why we took the break.  I'll see you in 8 minutes.

10          (Recess)

11          THE COURT:  Are the jurors ready?

12          THE CLERK:  Yes.

13          MR. BELL:  I am happy to do this here.

14          Your Honor, there have been a number of points, and

15   today is the first day where in response to witness testimony,

16   particularly with this witness, there has been audible response

17   not only from the gallery, but the back table.  This is a jury

18   proceeding.  Obviously, we want to minimize that so we ask for

19   the judge to issue the admonishment accordingly.

20          THE COURT:  Yes.  For all the people in this

21   courtroom, do not have any outburst, do not make any audible

22   gasps, sighs or comments.  We don't need any heckling or

23   anything like that from the people in the audience.  If you

24   continue to do that, you will be removed from the courtroom,

25   right?  Let's not do that.  Let's bring the witness in and

1   let's bring the jury in.

2            (Jury present)

3            THE COURT:  Please be seated.  We are just waiting for

4   the witness to come out.

5            (Pause)

6            (The witness returned to the courtroom)

7            THE COURT:  Go ahead, counsel.

8   BY MR. MAZUREK:

9   Q.  Mr. Rechnitz, we were talking about the trip that you took

10  to Las Vegas to view the 2013 Super Bowl, correct?

11  A.  Yes.

12  Q.  On that trip, sir, in Las Vegas, did you have sex with the

13  young lady that was hired to accompany you and your friends?

14  A.  No.

15  Q.  On May 12th, 2016, and I know you don't remember the

16  specific date, but you were interviewed on this topic by the

17  same prosecutors who are sitting in front of you and an FBI

18  agent.  Do you remember those kinds of meetings?

19  A.  I don't remember that date.  I had, as you said, many

20  meetings with them.

21  Q.  But you remember being interviewed on the topic of what you

22  did with this young lady on the trip to Las Vegas when you were

23  going to view the Super Bowl?

24  A.  No.  I remember them asking me about the details from that

25  entire trip.

HAVJSEA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

         v.                          16 Cr. 467 ALC

NORMAN SEABROOK AND MURRAY HUBERFELD,

         Defendants.

------------------------------x

                                 October 31, 2017
                                 8:57 a.m.

Before:

              HON. ANDREW L. CARTER, JR.,

                              District Judge
                              and a jury

                         APPEARANCES

JOON H. KIM,
    United States Attorney for the
    Southern District of New York
KAN MIN NAWADAY,
MARTIN S. BELL,
RUSSELL CAPONE,
    Assistant United States Attorneys

HAVJSEA1

APPEARANCES (Continued)

BRACEWELL, LLP,
        Attorneys for defendant Seabrook
BY:  PAUL LEWIS SHECHTMAN, Esq.
        MARGARET EMMA LYNAUGH, Esq.
                Of counsel


MAZUREK LIPTON, LLP
        Attorneys for defendant Huberfeld
BY:  HENRY EDWARD MAZUREK, Esq.
        EVAN LOREN LIPTON, Esq.
                Of counsel


Also Present:
        BARD HUBBARD, Special Agent FBI
        YOLANDA BUSTILLO, Paralegal USAO
        AUGUSTA GRANQUIST, Paralegal




            (In open court; jury not present)

            THE COURT:  Okay, let's get counsel in.  (Pause)

            I think counsel and the parties are all here.  Let me

just check in with counsel while we are waiting for the jury,

we are a little early, 8:57.  Is there anything else we need to

address this morning?

            MR. BELL:  Yes, yes, there is, your Honor.

            I think with Mr. Shechtman's consent, at least we

would like to do so in the robing room.

HAVJSEA3                        Rechnitz - cross

1          If counsel wish to submit something in writing, I can
2     have defense counsel submit something by 6:00 o'clock tonight
3     and the government respond by 9:00 or 10:00.  Does that work
4     for everyone?
5          MR. SHECHTMAN:  I don't intend to submit anything.  I
6     made my argument.
7          THE COURT:  We can speed up the government's response
8     if you want to put anything in writing, you can put it in by
9     6:00 o'clock tonight.
10          MR. BELL:  That is fine, your Honor.  Thank you.
11          THE COURT:  Is there anything else we need to discuss?
12          MR. MAZUREK:  On the exhibits I moved in, 09, 10, 11,
13     do you want further briefing on that?
14          THE COURT:  Those are the exhibits that you want to
15     have in?  I suppose you can get briefing on that.
16          It does seem to me, based on what you were saying,
17     that 608 was implicated.  I wasn't sure we were really dealing
18     with a 608 issue until you gave me your rationale for why this
19     was relevant.  If you want to give me that, that is fine.  You
20     can give me something by 6:00 o'clock tonight if you want to
21     give me something in writing on those exhibits.
22          MR. MAZUREK:  Okay.
23          THE COURT:  The government can respond to that by
24     9:00, all right?  Is there anything else we need to discuss?
25          MR. BELL:  Only that your Honor admonished I think

1    both the gallery and counsel tables about reactions, audible

2    reactions.  We're still having them.  I am facing this way, but

3    it seems to be awfully close, which is to say, counsel table

4    behind me.  I know that this is eventful testimony and we are

5    human here, but I'd ask -- particularly counsel should

6    appreciate the importance of this -- to not react audibly.

7            THE COURT:  I don't believe counsel were reacting

8    audibly.

9            MR. SHECHTMAN:  I may be guilty of that on one or two

10   occasions there.  There are things like, "I recommend that.  I

11   recommend.  I didn't make representations," that I had trouble

12   with.  I may have said something -- not words, but I may have

13   said something audible.  I will try to do better.

14           THE COURT:  Yes.  Let's have counsel and the parties

15   again not have any sort of verbal response to what the witness

16   is saying or the questions posed by counsel or anything that is

17   happening here.

18           Again for the people in the audience, it is a public

19   trial.  You are free to be here, but if you're going to make

20   noise and be disruptive, we will have you removed from the

21   courtroom.  You can go to the overflow room which I believe may

22   be in Room 850 across the street, and there you may observe the

23   trial as well, and then that is up to you whether you wish to

24   treat this as a horror move and have outbursts over there, but

25   I can't have that happening in the courtroom.

HB1JSEA1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                          16 Cr. 467 ALC

5   NORMAN SEABROOK AND MURRAY HUBERFELD,

6               Defendants.

7   ------------------------------x

8

9

10                                    November 1, 2017
                                      8:57 a.m.
11

12

13  Before:

14               HON. ANDREW L. CARTER, JR.,

15                                        District Judge
                                          and a jury
16

17

18                            APPEARANCES

19  JOON H. KIM,
         United States Attorney for the
20       Southern District of New York
    KAN MIN NAWADAY,
21  MARTIN S. BELL,
    RUSSELL CAPONE,
22       Assistant United States Attorneys

23

24

25

HB1JSEA1

1

2                          APPEARANCES (Continued)

3

4   BRACEWELL, LLP,
            Attorneys for defendant Seabrook
5   BY:  PAUL LEWIS SHECHTMAN, Esq.
            MARGARET EMMA LYNAUGH, Esq.
6                   Of counsel

7

8   MAZUREK LIPTON, LLP
            Attorneys for defendant Huberfeld
9   BY:  HENRY EDWARD MAZUREK, Esq.
            EVAN LOREN LIPTON, Esq.
10                  Of counsel

11

12  Also Present:
            BARD HUBBARD, Special Agent FBI
13          YOLANDA BUSTILLO, Paralegal USAO
            AUGUSTA GRANQUIST, Paralegal

14

15

16

17              (Trial resumes; jury not present)

18              THE COURT:  Are counsel all here?

19              MR. LIPTON:  Judge, Mr. Huberfeld is still making his

20  way through security.  He will be here any moment.

21              MR. SHECHTMAN:  I can do one housekeeping matter and

22  Mr. Mazurek can waive his presence.  It truly is housekeeping.

23              THE COURT:  Okay.

24              MR. SHECHTMAN:  We began --

25              THE COURT:  Use the mike, counsel.

1        (In robing room)

2        THE COURT:  I just wanted to take a break.  I don't

3    know if counsel was looking, the jurors are really struggling

4    over there.  I wanted to give them a break and stretch their

5    feet and get some coffee.  There's only so much coffee they can

6    drink, but let's keep this moving.

7        How much longer do you have of this witness?

8        MR. MAZUREK:  Maybe an hour.

9        THE COURT:  I don't know if counsel observed this as

10   well, but the jurors are really starting to fade.  So let's

11   just keep this moving and try to maybe kind of cut down on

12   going over the stuff that you have gone over before.  I don't

13   know if it's necessary to ask this witness what his testimony

14   is.  He's given his testimony, we know what it is.  I don't

15   know if it's necessary to keep going over having the witness do

16   math on the stand.  This is getting kind of cumulative.  Let's

17   keep this moving.

18       Anything else from counsel?

19       MR. BELL:  No, your Honor.

20       THE COURT:  Okay.

21       (Recess taken)

22       (In open court)

23       THE COURT:  For the people in the audience, no audible

24   outbursts at any time.

25       Okay, let's bring the jury in.

1    at what is highlighted there and you can answer the question.

2              MR. BELL:  While we are doing that, we ask again that

3    your Honor admonish the gallery.

4              THE COURT:  Okay.  Again, folks in the gallery, please

5    do not make any sort of audible noises at all.

6              THE WITNESS:  That is what this says, yes.

7    BY MR. SHECHTMAN:

8    Q.  So you lost $502,700 at the MGM Resorts hotels that year?

9    A.  According to this letter, I did, yes.

10   Q.  And then in 2015 you won $417,800?

11   A.  Okay.

12   Q.  Do you want to look at anything or you're okay with it?

13   A.  I am saying okay, sure.

14   Q.  In 2016, you lost $201,092?

15   A.  Okay.

16   Q.  So if you told somebody that you only placed one bet a

17   year, right, that wasn't true?

18   A.  No, that was not true.

19   Q.  You also bet illegally on sports?

20   A.  I did.

21   Q.  You're not being prosecuted for that?

22   A.  That's correct.

23   Q.  That is part of your deal?

24   A.  Yes.

25   Q.  Now I should stop.

HB2JSEA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                          16 Cr. 467 ALC

NORMAN SEABROOK AND MURRAY HUBERFELD,

        Defendants.

------------------------------x

                              November 2, 2017
                              9:10 a.m.

Before:

                  HON. ANDREW L. CARTER, JR.,

                              District Judge
                               and a jury

                        APPEARANCES

JOON H. KIM,
    United States Attorney for the
    Southern District of New York
KAN MIN NAWADAY,
MARTIN S. BELL,
RUSSELL CAPONE,
    Assistant United States Attorneys

HB2JSEA1

2                       APPEARANCES (Continued)


4   BRACEWELL, LLP,
         Attorneys for defendant Seabrook
5   BY:  PAUL LEWIS SHECHTMAN, Esq.
         MARGARET EMMA LYNAUGH, Esq.
6                   Of counsel


8   MAZUREK LIPTON, LLP
         Attorneys for defendant Huberfeld
9   BY:  HENRY EDWARD MAZUREK, Esq.
         EVAN LOREN LIPTON, Esq.
10                  Of counsel


12  Also Present:
         BARD HUBBARD, Special Agent FBI
13       YOLANDA BUSTILLO, Paralegal USAO
         AUGUSTA GRANQUIST, Paralegal




17               (Trial resumes; jury not present)

18               THE COURT:  Good morning.  I have a couple questions.

19  I think I am ready to rule on the applications.  First I want

20  to make sure I understand the lay of the land in terms of Mr.

21  Mazurek's request regarding the recording, Request No. 3, I

22  should admit extrinsic evidence to show Mr. Rechnitz told

23  family members on two occasions he could lie and blame his

24  wrongdoing on others and that the government would believe him.

25  I am looking at the transcript.  It seems to me this was

 1              (In open court)

 2              THE COURT:  Please be seated.  We still may be waiting

 3   on some jurors.

 4              (Pause)

 5              THE COURT:  Are the jurors here?

 6              THE CLERK:  Yes, Judge.

 7              THE COURT:  Let's get all the parties in.  Again let

 8   me just admonish everyone in the audience, no audible gasps or

 9   any other audible sounds or grunts or groans or boos or hisses

10   or anything like that, okay?  If you do that, you will be

11   removed from the courtroom and you can go to the overflow room

12   and watch it from there.  Bring the witness in and bring the

13   jury in.

14              (Jury present)

15              THE COURT:  Please be seated.  Let's continue with the

16   case on trial.  Welcome back.

17    JONA RECHNITZ,  (Continued)

18      having been previously affirmed, testified as follows:

19   CROSS-EXAMINATION

20   BY MR. SHECHTMAN:

21   Q.  Mr. Rechnitz, I am going to try to keep this very short

22   this morning, maybe 15 minutes.

23              You testified that Mr. Nissen paid some of your credit

24   card bills, correct?

25   A.  Correct.

1    Q.  If any of these questions are giving you trouble, you will

2    let me know?

3            Purim is a Jewish Holiday?

4    A.  Yes, it is.

5    Q.  It is a Jewish Holiday in which, like Halloween, people

6    dress up?

7    A.  Yes.

8    Q.  You went to Purim one year dressed in blackface?

9    A.  In what?

10   Q.  You went to Purim one year dressed in blackface?

11   A.  What is blackface?

12   Q.  What is blackface?

13   A.  Yes.

14   Q.  Blackface is when you paint your face black so that you

15   look like an African-American.

16   A.  Yes, that was a costume.

17   Q.  That was done in the last three, four years?

18   A.  I don't remember which year.  I think it was 2013.

19   Q.  It was in 2013 that you went dressed in blackface?

20   A.  Again I wore black face paint.  I am not sure of black

21   faces.

22           MR. BELL:  Objection.  Your Honor, I ask you admonish

23   the gallery again.

24           THE COURT:  Yes.  In the gallery, please be quiet.  Go

25   ahead, counsel.

1          THE COURT:  You can be seated.  Do you want to get the

2     witness.  We'll wait for the jury to get back.  Again I'll

3     admonish every one in the audience no gasps or audible sounds

4     of any sort, all right?  You can all have a seat.

5          Are the jurors ready?

6          THE CLERK:  Yes.

7          THE COURT:  Okay, let's bring the witness out.

8          (Jona Solomon Rechnitz returned to the courtroom)

9          THE COURT:  Let's bring the jury in.

10         (Jury present)

11         THE COURT:  Please be seated.  Let's continue.

12    BY MR. BELL:

13    Q.  Now, Mr. Rechnitz, you're aware that after Mr. Peralta was

14    arrested, his business was put into bankruptcy, yes?

15    A.  Yes.

16    Q.  And you are also aware of certain information about Mr.

17    Peralta's business that won't be available to you until after

18    the bankruptcy proceedings are completed, are you?

19    A.  That's correct.

20    Q.  Are those bankruptcy proceedings still ongoing?

21    A.  Yes.

22    Q.  What impact does that pending bankruptcy proceeding have on

23    your ability to accurately fill out your taxes?

24    A.  It has a strong impact.

25    Q.  Why?

Exhibit 45

I87TSEA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

         v.                      16 CR 467 (AKH)

NORMAN SEABROOK,

         Defendant.

------------------------------x

                           New York, N.Y.
                           August 7, 2018
                           10:10 a.m.

Before:

             HON. ALVIN K. HELLERSTEIN,

                         District Judge

                  APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
MARTIN BELL
RUSSELL CAPONE
LARA POMERANTZ
     Assistant United States Attorneys

BRACEWELL, LLP,
     Attorneys for Defendant
BY: PAUL SHECHTMAN
     MARGARET LYNAUGH

1   A.  Rotem Rosen.

2   Q.  What were your responsibilities initially?

3   A.  Anything from doing personal errands for Rotem, grabbing

4   coffee for him, to helping create models and spreadsheets and

5   partake in business meetings with him.

6   Q.  How long were you with Africa Israel?

7   A.  I was there until I started my own firm in December 2010.

8   Q.  Did you advance within the organization at that time?

9   A.  Yes.

10  Q.  To save time, Mr. Rechnitz, I'm not going to ask you about

11  every job that you had in between, but what was your last job

12  with Africa Israel?

13  A.  I was the director of acquisitions and dispositions.

14  Q.  And what work did that involve?

15  A.  That involved looking for new real estate opportunities to

16  purchase as well as selling assets of the company that were

17  marked for sale.

18  Q.  Now during the time that you were with Africa Israel USA,

19  what kinds of career ambitions did you have in the longer term?

20  A.  I wanted to one day become my own boss and have my own

21  company and own many trophy buildings throughout New York.

22  Q.  What kinds of connections did you make while you were at

23  Africa Israel USA?

24  A.  I made very substantial relationships with some of the

25  biggest real estate developers in the country.

I89TSEA1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                          16 CR 467 (AKH)

5   NORMAN SEABROOK,

6               Defendant.

7   ------------------------------x

8                                          New York, N.Y.
                                           August 9, 2018
9                                          10:05 a.m.

10
    Before:
11
                    HON. ALVIN K. HELLERSTEIN,
12
                                           District Judge
13

14                      APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    MARTIN BELL
17  RUSSELL CAPONE
    LARA POMERANTZ
18       Assistant United States Attorneys

19  BRACEWELL, LLP,
         Attorneys for Defendant
20  BY:  PAUL SHECHTMAN
         MARGARET LYNAUGH
21

22

23

24

25

1    Q.  Was that concern on your part true?

2    A.  I was concerned that Michael Weinberger would stop

3    investing with Jason.

4    Q.  Were you similarly concerned about other individuals?

5    A.  Just Michael Weinberger.

6    Q.  Now, you were asked roughly several hours' worth of

7    questions about lies that you had told people in business and

8    in your personal life and in your circle of friends.

9          It's safe to say, Mr. Rechnitz, that you lied to a lot

10   of people in a lot of facets of your life prior to the spring

11   of 2016.

12         Is that a fair characterization?

13   A.  Yes.  Absolutely.

14   Q.  I'm not sure how to put this, Mr. Rechnitz.  But why was it

15   that you lied so much?

16   A.  I was lying because I was receiving benefit for my lies.  I

17   was advancing myself image-wise.  I was profiting financially.

18   This is something that of course disgusts me looking back on it

19   now, but it's the way I was running my life at the time, and I

20   did it for my personal benefit.

21   Q.  Now, when you met with law enforcement with your new

22   lawyers when it was time to come clean, did you continue to

23   lie?

24   A.  Once it was time to come clean, I did not lie.

25   Q.  Have you lied in sworn testimony since then?

1   A.  No, I have not.

2   Q.  Have you lied yesterday or today?

3   A.  No, I have not.

4   Q.  When you met with the government to tell the government

5   about what had happened with Mr. Seabrook, did you also tell

6   them about other things?

7   A.  Yes.

8   Q.  What sorts of things did you tell the government about at

9   that first meeting?

10          MR. SHECHTMAN:  Judge, asked and answered.

11          MR. BELL:  It has not been, your Honor.

12          THE COURT:  Overruled.

13          Please do not debate among yourselves.

14          MR. BELL:  Understood, your Honor.  Thank you.

15          THE WITNESS:  When I initially met with the government

16   without a deal in place and I had decided it's time to come

17   clean on everything, I told the government about basically

18   everything the jury heard for the last two days -- every crime

19   I could think of involving cops, city hall, politicians, Norman

20   Seabrook -- everything that I'm not proud of that I've done,

21   the mockery of the chaplaincy.  All these types of things came

22   out, and I told it to the government once I decided to move

23   forward and get my life in order.

24          MR. BELL:  One moment, please.

25          (Counsel conferred)

Exhibit 46

IBKKGRA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               16 CR 468 (GHW)

JAMES GRANT and JEREMY
REICHBERG,

                Defendants.

------------------------------x

                                             November 20, 2018
                                             10:30 a.m.

Before:

                HON. GREGORY H. WOODS,

                                             District Judge

                        APPEARANCES

GEOFFREY S. BERMAN
        United States Attorney for the
        Southern District of New York
BY:   JESSICA R. LONERGAN
      KIMBERLY J. RAVENER
      MARTIN BELL
      Assistant United States Attorneys

HAFETZ & NECHELES, LLP
        Attorneys for Defendant Reichberg
BY:   SUSAN R. NECHELES

MERINGOLO & ASSOCIATES
        Attorneys for Defendant Grant
BY:   JOHN MERINGOLO
      ANJELICA CAPPELLINO

1   A.  He had developed mostly mixed use properties, retail,

2   residential above, and some affordable housing as well.

3   Q.  As far as you knew, was he successful?

4   A.  Yes.

5   Q.  What indications did you have of that?

6   A.  People would come over to the house for him to settle

7   disputes or for advice.  He was very charitable.  I'd see our

8   family name on a lot of different schools and different -- he'd

9   get involved in -- there were family fights in Los Angeles with

10  certain families.  He'd get involved and help settle disputes,

11  things like that.

12  Q.  As a child, Mr. Rechnitz, what kind of schools did you

13  attend?

14  A.  Yeshiva day schools, private schools.

15  Q.  How far did you ultimately get in school, sir?

16  A.  I graduated college with a Bachelor's of Science in

17  business management.

18  Q.  What kind of student were you?

19  A.  Average.  Slightly above average.

20  Q.  After you graduated from college, did you take on any

21  additional educational pursuits?

22  A.  Yes.  I attended NYU's school of continuing professional

23  studies to obtain a Master's in real estate.

24  Q.  Did you complete that program?

25  A.  No, I did not.

1           THE COURT:  Yes, you may.  Can I permit the witness to

2    step down?

3           MR. BELL:  No, it involves that.

4           THE COURT:  Thank you.  Please come up.

5           MR. BELL:  Thank you, your Honor.

6           (At sidebar)

7           THE COURT:  Thank you.  Go ahead, counsel.

8           MR. BELL:  Thank you, your Honor, for indulging us

9    here.

10          When Mr. Rechnitz stepped out for the earlier break he

11   got something of a collective stare down from folks there, as

12   you can imagine, along with some I think somewhat closer

13   contact; no actual physical contact, but certainly people

14   getting up in his face to a degree that would make the ordinary

15   person uncomfortable.

16          I think Mr. Rechnitz, having been prepared by great

17   prosecutors, is immune to this stuff, but he's only human.  And

18   I ask the Court to adopt a protocol in which Mr. Rechnitz,

19   certainly at the end of the day, but potentially during these

20   breaks as well, be permitted to leave -- first meet up with the

21   FBI and head out so as to avoid incidents among others.  We

22   have done it in other cases in the past where there's been a

23   particular sensitivity, and I just don't want anything to

24   happen.

25          MS. NECHELES:  Your Honor, I would request --

1              MR. MERINGOLO:  We object to that.

2              MS. NECHELES:  I don't necessarily object, but I was

3      present --

4              MR. MERINGOLO:  Me, too.

5              MS. NECHELES:  -- and yes, people might have looked at

6      him, but no one got close to him.  He was there surrounded by

7      FBI agents and a lawyer.

8              The only thing I would object to is the breaks are

9      very short, so if we're letting him go and then we can --

10     there's already a line in the woman's bathroom, so I can't

11     really -- we can't really have this kind.

12             Now he could go maybe back into a different room,

13     that's been done during the break, or something like that.  I

14     don't care about that.

15             MR. BELL:  We'd welcome that.  I know there's a sort

16     of maze of rooms back there, or at least I have heard tell of

17     it.  If there is one available for that purpose where he, and

18     to the extent appropriate during direct, the FBI and his

19     handlers can occupy that space, then I think that would more

20     than address our concern, and we greatly appreciate it.

21             MR. MERINGOLO:  We wouldn't object to coddling him and

22     making him go in the back.

23             THE COURT:  Thank you.  I heard from my deputy about

24     what happened when Mr. Rechnitz left during the prior break.  I

25     did not observe it myself.  The gallery is full of people.

1   What was reported to me was that no one physically touched him,

2   but that people stared him down, and that at least one person

3   came physically close to him.

4            In any event, I think that a reasonable concern has

5   been expressed that would require that I put in place some kind

6   of special protocol to ensure that the witness is not

7   intimidated.  This was the subject of some conversation that we

8   had previously with respect to the placards as a hypothetical.

9   Now, unfortunately, it appears to have evolved into a partial

10  reality.

11           As a result, what I would like to do is to offer one

12  of the rooms in the back to witness here.  I allowed prostitute

13  one to do so as well because I think she needed that.  I would

14  be happy to do the same for this witness during the testimony.

15  I need to make arrangements with Mr. Daniels to implement it.

16           For purposes of now, I would propose to take a short

17  break now, allow Mr. Rechnitz to leave.  I imagine the people

18  in the gallery will stay for the remaining conversations about

19  the rest of the day.

20           MR. MERINGOLO:  Judge, I would like, if possible, to

21  talk off the record regarding Mr. Grant and his wife situation,

22  and I would ask for him to be excused also at this time.

23           THE COURT:  That's fine.

24           MR. BELL:  We have no objection to an off-the-record

25  conversation about that.  That's fine.

IBQTGRA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               16 CR 468 (GHW)

JAMES GRANT and JEREMY
REICHBERG,

                Defendants.

------------------------------x

                                             November 26, 2018
                                             9:05 a.m.

Before:

                    HON. GREGORY H. WOODS,

                                             District Judge

                         APPEARANCES

GEOFFREY S. BERMAN
      United States Attorney for the
      Southern District of New York
BY:   JESSICA R. LONERGAN
      KIMBERLY J. RAVENER
      MARTIN BELL
      Assistant United States Attorneys

HAFETZ & NECHELES, LLP
      Attorneys for Defendant Reichberg
BY:   SUSAN NECHELES

MERINGOLO & ASSOCIATES
      Attorneys for Defendant Grant
BY:   JOHN MERINGOLO
      ANJELICA CAPPELLINO

1   Q.  And the picture on the right, do you see some of those same

2   individuals at the same party?

3   A.  Yes.

4            MR. BELL:  Let's take that down.

5   Q.  Now did you come to meet with Mr. Offinger at Mr. Mateo's

6   behest?

7   A.  Yes.

8   Q.  And were you able to develop a relationship with

9   Mr. Offinger?

10  A.  Yes, I was.

11  Q.  After that meeting, did you go on to raise money for Mr. de

12  Blasio?

13  A.  Yes.

14  Q.  Did you do so alone or with people?

15  A.  With Jeremy.

16  Q.  And what did you and Mr. Reichberg do for Mr. de Blasio's

17  campaign over the remainder of the campaign?

18  A.  In addition to donating the maximum allowed, my wife and I,

19  we collected and bundled for him -- I think it was $100,000.

20           MR. BELL:  And actually, your Honor, this might be a

21  logical place to take that break, unless you want to extend.

22           THE COURT:  That's fine.  So ladies and gentlemen,

23  we'll take our lunch recess now.  Please during this break, as

24  always, please don't discuss the case amongst yourselves, don't

25  communicate with anyone else, and don't do any research about

1  possibility of you, Mr. Reichberg, or Mr. Mateo getting results

2  of the sort that you described?

3  A.  When we had asked him about committees we wanted to be put

4  on and other things, he was for that, but we never spoke about

5  actual results through his office.

6  Q.  So after the election -- first off, how did the election

7  work out for Mr. de Blasio?

8  A.  He won.

9  Q.  Were you and Mr. Reichberg excited about that?

10  A.  Yes, very much so.

11  Q.  Why?

12  A.  Because we were very substantial donors to that point, we

13  had an in with his chief fundraiser, and we had our own

14  relationship with Bill de Blasio at that point.

15  Q.  Did you and Mr. Reichberg get appointed to any of the

16  committees or things of that sort that you had discussed with

17  Mr. de Blasio?

18  A.  Yes.

19  Q.  Tell us about that.

20  A.  He had an inaugural committee, I believe it was, that we

21  were appointed to.  I recall having a meeting in the Kramer

22  Levin offices, which is where the meeting was held, where Bill

23  de Blasio addressed the crowd of all members of that committee.

24  Q.  Once Mr. de Blasio became the mayor, did you have

25  continuing conversations with Mr. Offinger about the

1  arrangement that you had described discussing in that first
2  meeting?
3  A.  Yes.
4  Q.  Did Mr. Offinger ask you, on Mr. de Blasio's behalf, for
5  other financial contributions?
6  A.  Yes, he did.
7  Q.  For what?
8  A.  He asked for financial assistance with a project called the
9  Campaign for One New York.
10 Q.  What did you understand that to be, sir?
11 A.  Some sort of program to keep kids off the street.  For
12 afterschool programs where they would have to rent space in
13 other schools and buildings for afterschool programming.
14 Q.  Did Mr. Offinger get in touch regarding financial
15 contributions to any other causes?
16 A.  Yes.
17 Q.  What other causes?
18 A.  He had asked me to donate to keep senate in democratic
19 control.
20 Q.  Did you, in fact, donate to the Campaign for One New York?
21 A.  Yes, I did.
22 Q.  Did you, in fact, donate to the senate democrats?
23 A.  Yes, I did.
24 Q.  How much did you donate to each of those, do you recall?
25 A.  I gave $50,000 to the Campaign for One New York and

1    $102,000 for the democratic control of the senate.

2    Q.  Now, did you have direct contact with Mr. de Blasio about

3    either of those?

4    A.  Yes, I did.

5    Q.  What was the extent of the contact that you had with

6    Mr. de Blasio?

7    A.  I had been complaining to Ross that I was not seeing proper

8    communication results when Jeremy and I were reaching out, and

9    if the mayor really wanted the money for the democratic race,

10   he should pick up the phone, and call me, and ask me himself.

11   Ross arranged that, and he told me the mayor would be calling

12   me in a few minutes, and the mayor called me in my office, and

13   I spoke to him, and he had said that it was very important work

14   and very personal to him.

15        I asked him what the maximum amount of money I was

16   allowed to give, and it came out on the call, I think it was

17   102,000.  I had originally planned on giving less, but once the

18   mayor asked, I wanted to have the effect that I'm his guy, and

19   I said, okay, I'm giving you 102,000.

20   Q.  Now, you mentioned that prior to that call, you had

21   complained to Mr. Offinger about not getting certain things

22   done.  Did you discuss those things with Mayor de Blasio --

23   A.  No.

24   Q.  -- during that call?

25   A.  No.

1  Q.  Did you ever discuss those things with Mayor de Blasio?

2  A.  No, I did not.

3  Q.  Outside of that occasion when Mr. de Blasio personally

4  asked you to donate to the senate democrats, did Mr. de Blasio

5  personally ask you for money after being elected?

6  A.  No, he did not.

7  Q.  Now, with respect to things that you and Mr. Reichberg

8  wanted done, did you continue to discuss those things with

9  Mr. Offinger after the mayor was elected?

10 A.  Yes, we did.

11 Q.  Well, what sorts of things did you discuss with

12 Mr. Offinger?

13 A.  A lot of different private matters.  I can list a few.

14 Q.  Sure.

15 A.  My wife's cousin had a school in the East Side of New York,

16 she ran a preschool, and she received a letter before the

17 school year was expiring that she would have to vacate that

18 space.  I spoke to Jeremy about it.  He took care of the

19 details, he spoke to Ross, and I put Jeremy in touch with my

20 wife's cousin, and he fixed that issue, and she was able to

21 stay there for the remainder of the school year.

22         There was another example where I had a friend who

23 owned a building on Ocean Parkway, and it was previously

24 identified by a police precinct as a potential location for a

25 precinct, and there's some sort of law in the city that if you

1    Are those familiar to you?

2    A.  Yes.

3    Q.  And what are those amounts, and who are those people?

4    A.  The first person is somebody Jeremy collected money from

5    for $2,000.  The next eight people, I was responsible for

6    bringing in, which all gave the maximum of 4,950.  And the last

7    person, I believe, is Jeremy's wife's cousin, who gave the

8    maximum amount of 4950.

9    Q.  Were any of the people listed on that people who worked in

10   your building or in your office?

11   A.  Yes.

12   Q.  Who?

13   A.  Paul Raps shared an office with me.  Yuron Turgeman worked

14   throughout my office in the government building, and Natalia

15   Weiss' husband, Moshe, had an office in the building as well.

16        MR. BELL:  Thank you.  You can take that down.

17   Q.  Now, at the same time that you were getting involved with

18   the Thompson and de Blasio campaigns, were you getting involved

19   with politicians outside of the city?

20   A.  Yes.

21   Q.  Who?

22   A.  Rob Astorino from Westchester County.

23   Q.  How did you come to get involved with Mr. Astorino?

24   A.  Fernando lived in Westchester County and introduced me and

25   Jeremy to him.

1    Q.  Did you come to meet with Mr. Astorino as well?

2    A.  Yes.

3    Q.  Who was present when you met Mr. Astorino?

4    A.  Fernando, Jeremy, and me.

5    Q.  What sort of exchange did you have with Mr. Astorino?

6    A.  We met him, Fernando introduced us as powerful people who

7    contributed a lot to campaigns, and we expressed our desire to

8    help him.  I think initially I gave somewhere like $15,000,

9    which is a big amount for a county executive, and we explained

10   to him our desire to become police chaplains in Westchester

11   County, which is something Jeremy and I discussed before the

12   meeting.

13   Q.  Why were you and Jeremy interested in becoming police

14   chaplains in Westchester County?

15   A.  Because then you get a parking placard, and an ID, and a

16   badge, and it's good for breaking the rules in the city for

17   parking and other privileges, like getting pulled over.

18   Q.  Now, at the time, Mr. Rechnitz, did you have any clerical

19   or other qualifications to be a chaplain?

20   A.  No.

21   Q.  To the best of your knowledge, did Mr. Reichberg?

22   A.  No.

23   Q.  For the time, did you live in Westchester County?

24   A.  No, I did not.

25   Q.  Did you have anything to do with Westchester County?

```
 1                 (Government's Exhibit 612 received in evidence)

 2                 MR. BELL:  Thank you, your Honor.

 3                 Can we publish 612 to the jury, please.

 4    BY MR. BELL:

 5    Q.  So what's happening here, Mr. Rechnitz?

 6    A.  This is the swearing-in ceremony Jeremy and I went to

 7    become chaplains, and that's the swearing in for me.

 8    Q.  Did you swear to uphold the Constitution of the State of

 9    New York and certain things within Westchester County?

10                 MR. MERINGOLO:  Objection.

11                 THE COURT:  Thank you.

12                 You can answer the question.

13                 THE WITNESS:  Whatever he repeated, I said I did.

14    Q.  Did you actually do anything to live up to that oath

15    subsequently?

16    A.  No, I did not.

17    Q.  To the best of your knowledge, did Mr. Reichberg?

18    A.  No, he did not.

19                 MR. BELL:  We can take that down.

20    Q.  Now, in addition to fundraising for Mr. Astorino, did you

21    do anything else for him?

22    A.  Yes.

23    Q.  What else did you do?

24    A.  I purchased a Rolex watch for him.

25    Q.  Where did you purchase the watch from?
```

1    A.  I believe it was Daniela Diamonds.

2    Q.  What is Daniela Diamonds?

3    A.  It's a watch and jewelry store on 47th Street.

4    Q.  After you purchased the watch from Daniela Diamonds, did

5    you do anything else with respect to the watch?

6    A.  Yes.

7    Q.  What else did you do?

8    A.  I called Ariel from Motion In Time, who we spoke about

9    before, to come set it on his wrist and adjust it for him in my

10   office.

11   Q.  Did that, in fact, happen?

12   A.  Yes.

13   Q.  When you say "his wrist," who are you talking about?

14   A.  Rob Astorino's.

15   Q.  Was there an earlier point where you were questioned by the

16   government about where you got the watch from?

17   A.  Yes.

18   Q.  And were you confused at any point in answering that

19   question?

20   A.  Yes.

21   Q.  Why?

22   A.  I had thought that I had purchased the watch from Motion In

23   Time because I remember Ariel from Motion In Time coming to

24   adjust the watch, but I later remembered that he only came to

25   adjust it, and I purchased it from Daniela.

IBQTGRA7

1   end tomorrow.  It should end tomorrow morning.

2              THE COURT:  Good.

3              MR. BELL:  But I expect that it will probably be a

4   couple of hours or so.

5              There is one more matter that I want to put on the

6   record.

7              THE COURT:  That's fine.

8              MR. BELL:  Thank you, your Honor.

9              I went back at Mr. Daniels' invitation to speak to the

10  witness who had been troubled by something.  It actually

11  confirmed something that I noticed while examining him.

12  There's at least one individual, who Mr. Rechnitz knows and who

13  I would be happy to name, to the extent that it helps, in the

14  gallery who has been particularly aggressive in, well,

15  interacting with the witness as he testifies, which on its own

16  seems wholly appropriate.

17             THE COURT:  I'm sorry, inappropriate?

18             MR. BELL:  Wholly inappropriate, yes.  It was an

19  important syllable.

20             Mouthing the word "liar" in response to question after

21  question, responding audibly with sort of like grunts and

22  noises in response to those things.

23             I would ask that -- and this has happened before when

24  Mr. Rechnitz has testified in prior proceedings involving I

25  think members in the community with lot of people who care

IBQTGRA7

 1    about him.  This is an open courtroom.  We cherish that.  It's

 2    something very crucial under our system of justice and under

 3    the Constitution.  At the same time, intimidation of that or

 4    any sort is wholly inappropriate.

 5         At a minimum, I would ask that the Court admonish the

 6    jury not to react audibly, not to -- sorry, the gallery,

 7    rather, not the jury, the jury has been great -- members of the

 8    gallery not to send any sort of a message to the witness,

 9    either through mouthing things, either to reacting in audible

10    ways to portions of his testimony.  I have heard what appears

11    to be heckling, and that shouldn't be so.  And this is, I

12    think, the most sensitive part of the trial when it comes to

13    those issues.

14         I have a particular appreciation of precisely what it

15    has taken for Mr. Rechnitz to come to the point where he can

16    cooperate.  As he testified to, he needed rabbinical permission

17    in order to come and testify, and the blowback that he's gotten

18    from the community is real and has taken a number of forms.

19         To compound those issues, along with the general

20    stress of being a cooperating witness facing quite a lot of

21    potential prison time, with that sort of wholly inappropriate

22    interaction is just something that shouldn't stand, and we ask

23    that your Honor admonish the gallery.  And also to the extent

24    that your Honor can from that particular point, keep watch.

25         I will note that the individual has apparently been

1    seated behind the Reichberg family for much of the proceedings

2    today and much of the proceedings on Tuesday where he, I think,

3    could relatively easily be seen.  But it has to stop, your

4    Honor.

5              THE COURT:  Thank you.

6              MS. NECHELES:  Your Honor, I haven't heard anything.

7    I have the cautioned everybody to be careful because I have

8    noticed in the 3500 material that Mr. Rechnitz complained every

9    week that someone had said something about him, someone looked

10   at him the wrong way.  This is a man who has been very liberal

11   in complaining about other people; somebody posted something

12   online, he got a phone call, somebody said something to

13   somebody else at a wedding.  This is a man who yesterday --

14   last week sent things directly accusing a person here of well,

15   look, I found online that he's part of a group that -- so I

16   have not heard anybody.  I have told everybody be really

17   careful because this guy is dangerous.  He will get you in

18   trouble.  He accuses everybody of wrongdoing all the time.  I

19   think that people understand that.

20             And I will say something else.  This is not

21   Mr. Rechnitz's community.  So to the extent that the government

22   stands up there and says he's worried because he may have

23   people in this community who disapprove of him, I don't believe

24   he cares about this community.  It's not his community.  And

25   it's a community that is often disdained by other Jews, that

IBQTGRA7

1   Jews like Mr. Rechnitz often think poorly of this community.

2          So it's not just because he's a Jew he supports this

3   community, it's actually a community that has lots of hatred

4   from other Jews.  So I don't know what he thinks he's seeing.

5   I know it is stressful to have to testify like this.  It is a

6   difficult thing, I'm not taking that away, but I certainly have

7   not heard anything.  And I'm sure your Honor will admonish the

8   gallery that they should not say anything, not make any faces.

9   I ask that Mr. Bell do the same, that he not make faces, and

10  that we all will move forward in that way.

11         THE COURT:  Fine.  Let me take a few of those comments

12  in turn.

13         First, I have not heard what I will describe as a

14  commotion during the course of the witness's testimony.  I did

15  not perceive what Mr. Rechnitz perceived, but nor am I looking

16  at the gallery constantly.  I will look more.  And I'm going to

17  ask Mr. Daniels and the security officers to police the conduct

18  of the members of the gallery more carefully.

19         Inappropriate displays here in the courtroom are not

20  acceptable.  Simply put, this is a place of decorum.  It's not

21  an opportunity to intimidate witnesses, it is not a place to

22  disrespect the proceedings as a whole.  Counsel for each of the

23  defendants can advise members of the gallery whether they

24  believe that such conduct is appreciated and viewed positively

25  by the jury, who also have the opportunity to observe the

gallery.  It may be that such an appropriate and rude conduct
will be viewed poorly by all who perceive it.  So I fully
expect that going forward there will be no improper conduct.
If there is, I will not hesitate to ask for a person who
engages in it to be removed from the courtroom.

So I hope that this is not a concern in the future.
As I said, I did not observe this particular conduct and I do
not know to what extent Mr. Rechnitz is particularly sensitive
to these issues, but as a general matter, the prospect of
intimidation of a witness by a member of the gallery is
extremely troubling to the Court, as I expect it would be for
any member of our public.

So thank you for raising that issue, counsel.  I'm not
going to ask you to identify the person to me, but please do
identify the person to Mr. Daniels, and I will ask that
Mr. Daniels keep a closer eye for certain misconduct by that
person going forward, and will also bring it to the attention
of court security officers who are generally present here in
the court during the court day.

So I look forward to seeing you tomorrow.

Counsel for the United States, thank you for what you
have anticipated for the testimony tomorrow.  Anything else
that we should discuss before we take our recess, counsel for
the United States?

MR. BELL:  No, your Honor, only to note with respect

IBRKGRA1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4             v.                           16 CR 468 (GHW)

5   JAMES GRANT and JEREMY
    REICHBERG,
6
                 Defendants.
7
    ------------------------------x
8
                                          November 27, 2018
9                                         9:08 a.m.

10

11  Before:

12                 HON. GREGORY H. WOODS,

13                                        District Judge

14

15
                        APPEARANCES
16
    GEOFFREY S. BERMAN
17       United States Attorney for the
         Southern District of New York
18  BY:  JESSICA R. LONERGAN
         KIMBERLY J. RAVENER
19       MARTIN BELL
         Assistant United States Attorneys
20
    HAFETZ & NECHELES, LLP
21       Attorneys for Defendant Reichberg
    BY:  SUSAN R. NECHELES
22
    MERINGOLO & ASSOCIATES
23       Attorneys for Defendant Grant
    BY:  JOHN MERINGOLO
24       ANJELICA CAPPELLINO

25  ALSO PRESENT:  JEFFREY G. PITTELL, CJA Counsel (Curcio Only)

IBRKGRA1

1                    (Trial resumed; in open court; jury not present)

2                    THE COURT:  Counsel, thank you very much for being

3      here timely this morning.

4                    Before we begin, is there any issue that any party

5      would like to bring to my attention?

6                    MR. MERINGOLO:  There's a big issue.

7                    MR. BELL:  I think so, Judge, yes.

8                    MR. MERINGOLO:  Judge, I'd like to begin.  I'm sitting

9      outside in the hallway with five people -- four or five people.

10     Mr. Bell barges out, and threatens me, and tries to walk

11     towards me in a very confrontational way, so I pushed him away.

12     I did not pop him in his mouth, but I pushed him away from me.

13     Let's get the videotape.  There's four witnesses, five

14     witnesses here, let's get their statements.  It was unnecessary

15     coming out trying to threaten me.

16                    THE COURT:  Can I ask you, Mr. Meringolo, would you

17     mind just providing me with a brief description of what it is

18     that you saw happen?  I heard the overview, but if you can

19     provide me some more specifics.

20                    MR. MERINGOLO:  That's it, Judge.  I don't know what

21     caused Mr. Bell to run out of your courtroom to go and threaten

22     me in the hallway while I was talking to three people.  I have

23     no idea what caused him to do that.

24                    THE COURT:  Thank you.

25                    And when you say threatened?

IBRKGRA1

1          MR. MERINGOLO:  Threatened.  Threatened.  Threatened,

2     Judge.

3          THE COURT:  Your recollection of the statement was

4     what?

5          MR. MERINGOLO:  It was a threatening statement.

6     That's what I recall.  And there are five witnesses, also.  Or

7     four witnesses.

8          THE COURT:  Thank you.

9          Counsel for the United States?

10         MR. BELL:  I guess that's me, Judge.  I'm happy to

11    speak about this and what precipitated it.

12         As you're aware, we brought Mr. Rechnitz to a space

13    behind the courtroom largely for his protection, because he's

14    been the subject of some harassment.  I can't quite say I

15    anticipated where the harassment would come from this morning.

16    We asked Mr. Daniels whether we could bring Mr. Rechnitz back

17    to the room here in advance of this morning's proceedings.

18    Mr. Daniels told us that was the case, and so we had two FBI

19    agents bring Mr. Rechnitz up from where he had been stationed

20    downstairs.

21         I wasn't present for this.  What I did learn, as

22    Mr. Rechnitz and the FBI agents were making their way through

23    the room, was that Mr. Meringolo --

24         I'm sorry?

25         MR. MERINGOLO:  Keep going.

1              MR. BELL:  Judge?

2              THE COURT:  You can proceed.

3              MR. BELL:  Thank you.

4              -- was that Mr. Meringolo apparently walked up to

5    Mr. Rechnitz and said something along the lines of:  You're a

6    disgrace, which is attorney misconduct that I've never heard

7    of, points for creativity.  This was something heard not only

8    by Mr. Rechnitz, but by the FBI agent and by Mr. Rechnitz's

9    counsel, Allen Levine, an officer of the court.

10             I was blown away by this.  I walked back from where I

11   heard this, the space in which Mr. Rechnitz had been secreted

12   through the courtroom, to find Mr. Meringolo and find out what

13   business he had speaking to Mr. Rechnitz in any way, much less

14   an intimidating one.  I came out to Mr. Meringolo and told him,

15   essentially, if you wake up and do something like that again,

16   you'd better apologize.  That's incredibly improper.

17   Mr. Meringolo --

18             MR. MERINGOLO:  Judge --

19             MR. BELL:  Excuse me.

20             THE COURT:  Mr. Bell, Mr. Bell --

21             MR. MERINGOLO:  Where are the cameras?  The cameras

22   are here.  Where are the FBI agents?

23             THE COURT:  I'm sorry.  Mr. Meringolo --

24             MR. MERINGOLO:  Let's put everybody on the stand.

25             THE COURT:  I'm sorry.  Mr. Meringolo, give us one

IBRKGRA1

1     moment, and let Mr. Bell explain, and then I'll give you the

2     opportunity to speak further.  Thank you.

3          Please go ahead, Mr. Bell.

4          MR. BELL:  Thank you, Judge.

5          Mr. Meringolo, who had been surrounded by four, or

6     five or so people, then burst through from that group, after I

7     said that, approached me -- I was still a good ten feet away

8     from him, pointing at him as I spoke -- and shoved me in the

9     chest.  There was no contact on my part.  He came up to me, he

10    shoved me in the chest.  I know well where this happened is

11    covered by videotape because I have seen videotaped

12    confrontations in this space before.  In the past, they have

13    been from unhinged family members after a distressing

14    proceeding.

15         So, again, this is something new, but I think the

16    videotape will make it relatively clear what happened.

17         Mr. Meringolo talks about threatening statements.  He,

18    at that point, as he shoved me, uttered actual threatening

19    statements about how I'm lucky he doesn't drop me and things to

20    that effect.

21         Then, after Mr. Meringolo appeared in this courtroom,

22    where we were waiting for your Honor to appear, he said

23    essentially the same thing again.  I suspect your Honor may

24    have heard this because your Honor was waiting to emerge for

25    the beginning of this morning's proceedings.

IBRKGRA1

1          As distressed as I am from Mr. Meringolo having come

2     up to me and shoved me in the chest, I am vastly more disturbed

3     by what he appears to have thought was appropriate contact with

4     Mr. Rechnitz, who we have discussed at length, both at sidebar

5     and in open court, being vulnerable to harassment, and the

6     Court has taken measures to prevent against that.  That's what

7     I've got for you, Judge.

8          THE COURT:  Thank you.

9          Mr. Meringolo.

10          MR. BELL:  I will note, Judge, that once -- I think

11     our heads are still collectively spinning here, and we are not

12     entirely sure what to make of this.  Ms. Lonergan and I have

13     been here for eight years, Ms. Ravener for a number of years as

14     well, we've never seen anything like this.  It's our intention

15     to either move for sanctions or move to hold Mr. Meringolo in

16     contempt for both parts of what happened this morning.

17          I've never seen anything like this.

18          THE COURT:  Thank you.

19          Any comments, Mr. Meringolo?

20          MR. MERINGOLO:  I want to know when this happened with

21     Mr. Rechnitz, where are these agents.  Pull the videotape from

22     here.  Did it happen this morning?  Did it happen last night?

23     If it happened last night, and the agents knew, why didn't they

24     inform the Court via email?  It never happened.  I've been with

25     my father every day that I leave that he's here.  It didn't

IBRKGRA1

happen with Rechnitz.  It did not happen.  He came out and
threatened me.  You're not allowed to come out running the
Court, run in the hallway, and move towards me, and threaten
me, and threaten my life.  You're not allowed to do that.  You
can't do that.

          MR. BELL:  For the record --

          MR. MERINGOLO:  And we have witnesses, too.

          MR. BELL:  For the record, Judge, I didn't threaten
anybody.

          THE COURT:  Thank you.

          Just to be clear, Mr. Meringolo, Mr. Bell has stated
that you approached Mr. Rechnitz and said, in essence, you are
a disgrace.  Do you --

          MR. MERINGOLO:  That never happened.  That never
happened.

          Judge, Judge, Mr. Rechnitz has a long history of doing
exactly this.  For example -- and I need to put this on the
record on cross-examination -- he did this in California,
called Mr. Bell, said that he was threatened by an individual.
Thank God in that case, there was a videotape.  He called his
handler -- I don't know who the FBI was -- said he was
threatened from Joel Eichner -- Joel Bress.  Joel Bress.  There
was a big investigation, a grand jury, unfounded.  This is what
he does.  He's saying that he's seen -- Mr. Bell and him are
saying to your Honor that they're seeing rabbis or people with

IBRKGRA1

1    hats in the back mock him.  We have a videotape.  Let's get

2    that.  It doesn't happen, Judge.

3           If they wanted to do this to unhinge me, Mr. Bell

4    should have waited to go before your Honor instead of running

5    out of the courtroom, pointing in my face, threatening my life

6    in front of people.  You can't do that to people, Judge.  They

7    want sanctions on me.  I want sanctions on them.  When did they

8    find this out?  Why didn't they go to the Judge last night?

9    Why didn't you call me?  Where did this happen?

10          THE COURT:  Thank you.

11          MR. BELL:  It may be that Mr. Meringolo didn't listen

12   to my account.  I want to be clear as to when this happened.

13   This happened this morning, as Mr. Rechnitz was being brought

14   from the elevator area to that room in the back.

15          MR. MERINGOLO:  Well, then, we have a videotape, and

16   it never, ever, ever, ever happened.

17          MR. BELL:  And to be clear, Judge, Mr. Meringolo is

18   out of his depths, I think, when speaking about the prior

19   incident with Mr. Bress.

20          THE COURT:  That's fine.  I don't think we need to get

21   into that.

22          MR. BELL:  I don't think we need to dive into that,

23   but as to this incident, which is the one that matters, this is

24   something that the FBI agents heard, that Allen Levine saw,

25   that Jona Rechnitz saw.  I do not believe that there is, at

IBRKGRA1

1    least last I checked, audio on the surveillance footage out

2    there, but I do believe that based on where I hear this

3    happened, that it's very possible that Mr. Meringolo's having

4    spoken to Mr. Rechnitz might have been picked up on camera.  It

5    seems a decidedly bad move on his part, but whatever.  I'm

6    noting this on the record now.

7            MR. MERINGOLO:  Judge, I'm not starting this trial

8    until we see that videotape with Mr. Rechnitz because this

9    didn't happen.  It did not happen.  I'm not starting this

10   trial.  I will not defend my client with Mr. Bell, and

11   Mr. Levine, and all these people making these allegations

12   against me.  They're saying I committed crimes, and I want the

13   videotape.  I want your Honor to see the videotape because this

14   is what's been going on in this case since day one.  It's

15   Mr. Bell manipulating testimony, manipulating this.

16           Look at the tape, because I was with my father, I was

17   in here with your clerk, and I was by the window over there.

18   Where is the guy?  Where is the tape?  I went to the bathroom

19   once.  Where is this tape?  If it was on this floor this

20   morning, show me, because it didn't happen.  It didn't happen.

21   I will not start this trial with criminal allegations against

22   me when they're saying this.  And then, your Honor, if it

23   didn't happen, I want you, your Honor -- I would request you --

24   to order a criminal investigation based on this because it did

25   not happen.  It did not happen.

IBRKGRA1

|    |    |
|----|----|
| 1  | THE COURT:  Thank you. |
| 2  | Counsel? |
| 3  | MS. NECHELES:  Your Honor, I think we need the day.  I |
| 4  | would like to be able to talk with the U.S. Attorney's Office |
| 5  | about it.  I think it is very difficult to put a lawyer in the |
| 6  | position where what I heard is we're not going to bring charges |
| 7  | now, but it's putting Mr. Grant in a very unfair position, and |
| 8  | I'd like to see if we can have discussions -- maybe we can view |
| 9  | the tapes, and we can have discussions with the office and |
| 10 | maybe see what way to proceed. |
| 11 | THE COURT:  Thank you. |
| 12 | Counsel for Mr. Grant, what would you like to add? |
| 13 | MR. MERINGOLO:  Judge, at this point, I'm irate and |
| 14 | wouldn't be effective right now. |
| 15 | THE COURT:  Thank you. |
| 16 | MR. MERINGOLO:  But we need to see these tapes.  We |
| 17 | really need to see the tapes. |
| 18 | THE COURT:  Understood. |
| 19 | So, counsel, with apologies, I'm going to excuse the |
| 20 | jury for the day.  I don't believe that -- while I understand |
| 21 | the government may not be pleased about this, but I don't think |
| 22 | that the defense can proceed here.  This is -- |
| 23 | MR. BELL:  Judge. |
| 24 | THE COURT:  Please go ahead. |
| 25 | MR. BELL:  Respectfully, Judge, this is a problem of |

IBSTGRA1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,                New York, N.Y.

 4                 v.                           16 CR 468 (GHW)

 5    JAMES GRANT and JEREMY
      REICHBERG,
 6
                     Defendants.
 7
      ------------------------------x
 8
                                               November 28, 2018
 9                                             9:02 a.m.

10    Before:

11
                          HON. GREGORY H. WOODS,
12
                                               District Judge
13

14                            APPEARANCES

15    GEOFFREY S. BERMAN
           United States Attorney for the
16         Southern District of New York
      BY:  JESSICA R. LONERGAN
17         KIMBERLY J. RAVENER
           MARTIN BELL
18         Assistant United States Attorneys

19    HAFETZ & NECHELES, LLP
           Attorneys for Defendant Reichberg
20    BY:  SUSAN NECHELES

21    MERINGOLO & ASSOCIATES
           Attorneys for Defendant Grant
22    BY:  JOHN MERINGOLO
           ANJELICA CAPPELLINO
23

24

25
```

1  Q.  After the watch surfaced, did a period of time pass in

2  which you did not make the insurance company aware of that

3  fact?

4  A.  Yes.

5  Q.  Have you since made the insurance company aware of that

6  fact?

7  A.  Yes, I have.

8  Q.  And what, if anything, have you done with respect to the

9  payout that you had received of $15,000?

10 A.  I returned it to Chubb Insurance.

11 Q.  When did that happen?

12 A.  Recently; in the last few weeks.

13         MR. BELL:  Now, your Honor, I'd ask the Court to

14 admonish the jury to disregard all reactions.

15         THE COURT:  Thank you.

16         Ladies and gentlemen in the gallery, please, decorum

17 is appropriate here.

18         MR. BELL:  Thank you, your Honor.

19         THE COURT:  You can proceed.

20 BY MR. BELL:

21 Q.  In addition to destroying your computer and attempting to

22 delete certain emails, did you speak to people involved in the

23 circumstances that you were trying to cover up at the time that

24 you were approached with IAB?

25 A.  Yes.

1                    (Jury not present)

2                    THE COURT:  Thank you.  You can be seated.

3                    Mr. Rechnitz, you can step down.

4                    Before we start with cross-examination, I just want to

5         remind everyone who's in the gallery of the courtroom that this

6         is a solemn, important court proceeding.  This is not an act of

7         theater.  For the most part, you've been seated here in silence

8         with decorum and showing respect to the Court in the process.

9         That is appropriate.  However, there was a burst of laughter in

10        response to one of Mr. Rechnitz's questions -- responses

11        earlier.  That is inappropriate.  I'm very happy for the public

12        to be here, but I hope that everyone present will remember that

13        this is an important proceeding for each of the defendants

14        present and for the United States, and that this is a

15        proceeding that must be treated with decorum and respect, and

16        to the extent that any member of the public is unable to treat

17        it in that way, I will have you removed.

18                    This is not, again, an act of theater, so I will not

19        tolerate outbursts, laughter, commentary toward the witness or

20        during their testimony.  To the extent that there's commentary

21        that you'd like to make, you should feel free to exit the

22        courtroom and be sure not to make it in front of the jury.

23                    To the extent it's not already clear that this is a

24        situation that requires respect and decorum in its own right

25        because of the importance of the proceedings for the parties

1    here, please keep in mind, as well, that I and the jury am

2    perceiving some of the things that you do, and you should

3    consider to what extent your conduct is benefiting any person

4    who you may or may not support here.  The simplest and easiest

5    approach is for you not to behave in a way that is indecorous

6    or disrespectful to the Court or to this proceeding.

7         I hope I do not need to remind you of this.

8    Generally, this has not been an issue, but I want to remind you

9    of that, similarly, as the jury is entering and exiting the

10   courtroom, you are to stand, and you are to remain in silence

11   as they're doing that.  It's not an opportunity to chat.  If

12   you want to chat with your neighbor, please do so outside the

13   courtroom.

14        So it's time to begin with cross-examination.  I

15   wanted to just remind the gallery of those issues before we

16   began.

17        I also want to bring up briefly the defense exhibits

18   issue.  We have a letter brief from the United States.  I

19   received responsive briefing from each defendant on 11/18.  The

20   submissions by Defendant Reichberg were submitted to me

21   ex parte, which I believe was appropriate, and the request was

22   that I hold those ex parte submissions without revealing them

23   to the United States, for fear that they would reveal the

24   defendant's cross-examination strategy to the United States

25   prematurely.

IC5BGRAF

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                New York, N.Y.

4                v.                          16 CR 468 (GHW)

5   JAMES GRANT and JEREMY
    REICHBERG,
6
                 Defendants.
7
    ------------------------------x
8
                                             December 5, 2018
9                                            9:04 a.m.

10  Before:

11
                      HON. GREGORY H. WOODS,
12
                                             District Judge
13

14                         APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    BY:  JESSICA R. LONERGAN
17       KIMBERLY J. RAVENER
         MARTIN BELL
18       Assistant United States Attorneys

19  HAFETZ & NECHELES, LLP
         Attorneys for Defendant Reichberg
20  BY:  SUSAN NECHELES

21  MERINGOLO & ASSOCIATES
         Attorneys for Defendant Grant
22  BY:  JOHN MERINGOLO
         ANJELICA CAPPELLINO
23

24

25

IC5TGRA1                          Rechnitz - Cross

1   in the crowd.  I don't know if it's something that I should

2   bring up or not.  If someone could look out --

3          THE COURT:  I will mention it to the prosecutors.

4          THE WITNESS:  Thank you, your Honor.

5          (At sidebar)

6          THE COURT:  Just so you know, as I was coming over

7   here to the sidebar the witness said to me something along the

8   lines of the following, that there is somebody in the crowd who

9   was distracting him.  I said that I would bring it to the

10  attention of the prosecutors.  He asked if somebody could watch

11  out for it, something along those lines.  I haven't been

12  watching, so I don't know who he's referring to, but I would

13  like to find out who it is and stop whatever the conduct is, if

14  it's indeed happening.

15         So counsel, what's your suggestion about how to

16  approach that issue at the outset?

17         MS. NECHELES:  Your Honor, right now they are trying

18  to fix this up there, so maybe we should take a five-minute

19  break, say just say as long as they're fixing this we'll take a

20  five-minute break.

21         (In open court)

22         THE COURT:  Ladies and gentlemen of the jury, while

23  we're fixing that technical issue --

24         JUROR:  It's done.

25         THE COURT:  It's done, thank you.

IC5TGRA1                        Rechnitz - Cross

```
 1          (At sidebar)

 2          MS. NECHELES:  Your Honor, maybe take a break anyway,

 3   because this might -- otherwise I don't know how to deal with

 4   this.  We could deal with it later.

 5          MR. BELL:  No.

 6          THE COURT:  I would like to find out who it is.

 7          MS. NECHELES:  Then ask them to take a five-minute

 8   break anyway.

 9          THE COURT:  Fine.

10          (In open court)

11          THE COURT:  Ladies and gentlemen of the jury, I am

12   going to ask to take a quick break to make sure everything is

13   working properly so we don't have to work through it.  We'll be

14   back momentarily.  Please don't discuss the case during the

15   break, don't communicate about it with anyone else, and don't

16   do any research about the case.  See you momentarily.

17          (Jury not present)

18          MR. BELL:  May we approach, again, your Honor?

19          THE COURT:  You may.

20          MR. BELL:  Thank you.

21          (At sidebar)

22          THE COURT:  Thank you.  Go ahead, counsel.

23          MR. BELL:  Judge, rather than have Mr. Rechnitz do

24   this on the record, I think it might be appropriate for him to

25   tell his counsel and counsel to tell some combination of the
```

IC5TGRA1                         Rechnitz - Cross

1   FBI and the CSOs.

2              MS. NECHELES:  Your Honor, I would object to that.  He

3   wants to make -- just do it right now and let's move on.  I

4   don't want to make this into a half hour thing.  Have him make

5   the statement right now who he says it was, if you want to have

6   him come over here and do it, but I don't believe that this

7   should be a private thing at this point.  He's making

8   allegations in the middle of the trial, we're in the middle of

9   the trial, we're trying to move on.  Let him make the

10  allegation right here.  He's testifying.  Let him make the

11  allegation right here.

12             MR. BELL:  It does not have to be on the record, and

13  the only purpose that that would have would be to make it known

14  to the person who is bothering him.

15             THE COURT:  If there is a person here bothering him, I

16  will make it known to him, so I'm happy to take it up in open

17  court.

18             (In open court)

19             THE COURT:  So there's an objection that relates to

20  the use of good acts, whether or not this is evidence of good

21  character or something else, and we'll take that up

22  momentarily.

23             But as I was stepping down, Mr. Rechnitz, you

24  mentioned that someone in gallery was distracting you.  Who

25  were you referring to?

1            THE WITNESS:  This information should be made

2     publicly?

3            THE COURT:  You may.  If there is someone here who is

4     distracting you and you would like to identify the person, I

5     would welcome it so that we could take appropriate action.

6            THE WITNESS:  Yeah, it's the same person who came last

7     week.  Mr. Schoenberger keeps looking at me -- him -- shaking

8     his head every time I answer a question and smirking at me, and

9     I don't appreciate it.  It's very distracting.  He's shaking

10    his head frantically and laughing every time I give an answer.

11           THE COURT:  Thank you, that's fine.  Thank you for

12    bringing that to my attention, Mr. Rechnitz.

13           I will just advise the members of the gallery, as I

14    have previously, that this is a public proceeding, it is one in

15    which I expect that all people present will act with a full

16    measure of decorum and respect for the process.  To the extent

17    that people present here are unable to behave in that way I

18    will have to ask you to leave.  So to the extent that you are

19    incapable of controlling your reactions and behaving in a

20    decorous and respectful way during the course of the

21    proceedings, I will ask any member of the gallery to leave.

22           MS. NECHELES:  Your Honor, could I just comment on

23    this a little bit?

24           THE COURT:  Please.

25           MS. NECHELES:  This is a person who is from -- who

 1    lives in Los Angeles just like Mr. Rechnitz.  I believe he

 2    doesn't want him here.  And --

 3              THE WITNESS:  He doesn't live in Los Angeles.

 4              MS. NECHELES:  -- he has not been here for the last

 5    week or so --

 6              THE COURT:  That's fine, I don't need to talk about

 7    this in great depth, all I want to do is ensure that the people

 8    in the gallery are acting respectfully and appropriately

 9    throughout the proceedings.  I made my point.  The person

10    identified is aware of the concern, and I'm sure that he will

11    act in a responsible way.

12              AUDIENCE MEMBER:  Of course, your Honor, I will.

13              THE COURT:  Good.  Let's take up the other issue.

14              Counsel, is this something that we should take up at

15    sidebar?  Do you have a concern about taking up the issue of

16    the pending objection?

17              MS. NECHELES:  I don't have a concern about that, your

18    Honor.  I articulated it before, that I want this in the

19    background or for showing the relationship that Mr. Reichberg

20    had with the police.  And it's an important part of the

21    relationship.  We briefed this, your Honor, and I am not going

22    into details.  I will be asking about a specific event that I

23    think he knows about.  I don't get the answers immediately.  I

24    am not going into -- it's not coming in for other good acts,

25    it's coming in to show what was going on at the time in the

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4            v.                            16 CR 468 (GHW)

 5   JAMES GRANT and JEREMY
     REICHBERG,
 6
                   Defendants.
 7
     ------------------------------x
 8
                                           December 6, 2018
 9                                         9:40 a.m.

10   Before:

11
                      HON. GREGORY H. WOODS,
12
                                           District Judge
13

14                        APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  JESSICA R. LONERGAN
17        KIMBERLY J. RAVENER
          MARTIN BELL
18        Assistant United States Attorneys

19   HAFETZ & NECHELES, LLP
          Attorneys for Defendant Reichberg
20   BY:  SUSAN NECHELES

21   MERINGOLO & ASSOCIATES
          Attorneys for Defendant Grant
22   BY:  JOHN MERINGOLO
          ANJELICA CAPPELLINO
23

24

25
```

1  of the patrol guide specifically in the car.  We want to say

2  yeah, we violate it all the time when we help people.  It's

3  very common also.

4          THE COURT:  Thank you.  So counsel, I think the real

5  question is what's going to happen with Mr. Rechnitz given the

6  apparent and breakdown with respect to the stipulations.

7          I'm happy to schedule Lieutenant Grasso whatever time

8  it is that the parties think is necessary in order to allow him

9  to complete his testimony.  And I'm frankly indifferent if he

10  goes now or later.  I am not going to determine now that

11  Mr. Rechnitz need not stay an extra night in New York because

12  of this stipulation issue, but to the extent that there's

13  additional grounds for potential cross-examination, I don't

14  think it's reasonable for me to curtail it.

15          So with that, what's the parties' preference with

16  respect to Lieutenant Grasso, is it to bring him in first or

17  bring him in at the end?

18          MR. BELL:  Judge, it's our witness, we would like to

19  bring him in after Mr. Rechnitz.

20          THE COURT:  Fine.  Let's bring in Mr. Rechnitz and the

21  jury.

22          Mr. Rechnitz mouthed, "Someone cursed at me."  I

23  didn't observe it.  I'm sorry, Mr. Rechnitz.  But I will again

24  ask the gallery to maintain decorum.

25          (Continued on next page)

Exhibit 47

J283SEAS                         Sentence

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                              16 CR 467 (AKH)

5   NORMAN SEABROOK,

6              Defendant.

7   ------------------------------x

                                       New York, N.Y.
8                                      February 8, 2019
9                                      12:00 p.m.

10
    Before:
11
                      HON. ALVIN K. HELLERSTEIN,
12
                                       District Judge
13

14                          APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    MARTIN BELL
17  RUSSELL CAPONE
    LARA POMERANTZ
18       Assistant United States Attorneys

19  BRACEWELL
         Attorneys for Defendant
20  PAUL SHECHTMAN
    MAGGIE LYNAUGH
21

22  ALSO PRESENT:
    Paralegals Andrew Hamilton, Yolanda Bustillo, Christine Lee,
23  U.S. Attorney's Office

24  Paralegal Maria Jose Alanis, Bracewell

25

J283SEAS                    Sentence

 1    conditions that I also order.  They are set out at pages 25 and

 2    26 of the presentence investigative report and I need not

 3    repeat them.

 4              During the supervised release, he'll be supervised by

 5    the district of his residence.  Mr. Seabrook's required during

 6    the period of restitution to provide the probation officer with

 7    access to any requested financial information, and Mr. Seabrook

 8    must not incur new credit charges or open additional lines of

 9    credit without the approval of the probation officer, unless

10    he's in compliance with an installment payment schedule that we

11    will get to in a few minutes.  There is a mandatory special

12    assessment of $200, which I order.

13              And now we come to restitution.  Mr. Shechtman, you've

14    argued there should be no restitution.

15              MR. SHECHTMAN:  That's correct, your Honor.

16              THE COURT:  Would you please embellish the argument.

17              MR. SHECHTMAN:  Your Honor, I think the touchstone of

18    restitution argument is foreseeability.  And I respect that we

19    have a hedge fund prospectus that says you could lose

20    everything.  But, so does every other prospectus that this fund

21    invested in.  So does every other prospectus for every hedge

22    fund or every real estate fund in the City of New York.

23              THE COURT:  It depends on the fund.

24              MR. SHECHTMAN:  Pardon?

25              THE COURT:  It depends on the fund.  It depends on the

1    investment.  It depends on a lot of circumstances.

2            MR. SHECHTMAN:  I understand.  But the investment

3    advisor, and I think the government somehow suggested that he

4    was in Mr. Seabrook's pocket.  I don't think there is any truth

5    to that whatsoever.  Investment advisor said a reputable

6    investment, five-star fund, a supremely able accounting fund.

7    This was a good as you could get, if you believe the investment

8    advisor.

9            Now, he turned out to be wrong, but it wasn't wrong

10   because he was on the take or he had been handpicked for this.

11   He was wrong.

12           The lawyers had concerns, but what we know for certain

13   is that their concerns were answered.  The lawyer who raised

14   the concerns in two letters -- they're identical letters.

15   Seems very important to the government that there are two, but

16   they're identical.  Those concerns were satisfied.  And the

17   proof is in the pudding.  The same lawyer who wrote the letter

18   wrote the resolution that said both the lawyer and the advisor

19   believed that this investment is prudent.

20           Now, it turned out not to be.  But, that's not on

21   Mr. Seabrook.  It is on Mr. Seabrook, if you believe the jury,

22   that the money went in this direction.  But Mr. Seabrook

23   thought he was investing in a five-star fund.  And if you

24   believe the jury's verdict, I suppose, he thought what was good

25   for him was good for COBA.

```
 1              But, to say that he reasonably thought that it was
 2    foreseeable to him that this was going to go bad, I don't think
 3    that's true.  I should say the following as a practical
 4    matter --
 5              THE COURT:  It is not a subjective foreseeability.  It
 6    is an objective foreseeability.
 7              MR. SHECHTMAN:  But --
 8              THE COURT:  Would a reasonable person think that the
 9    loss if he invested in a hedge fund of this type was
10    foreseeable.
11              MR. SHECHTMAN:  I understand.  But, it is, like always
12    in the law, it is a reasonable man in this position.  This
13    position is someone who does not have a financial background,
14    who relied on the financial advisor, and who relied on a lawyer
15    who, after, diligence, told him we sign off on this.
16              THE COURT:  Had he not been bribed, that would be a
17    good argument.
18              MR. SHECHTMAN:  But bribe or not.  Bribed simply means
19    that the money went in this direction.  Bribe doesn't mean that
20    the loss was foreseeable.
21              THE COURT:  What does a bribe do?  It robs the person
22    of his autonomy.  It says here is money.  Do what I want you to
23    do.  Maybe you'll find it prudent, maybe you won't find it
24    prudent.  That's irrelevant.  It is an exchange money for an
25    act.
```

1          I'm sorry to interrupt you, Mr. Shechtman.

2          MR. SHECHTMAN:  No, no, I understand your Honor's

3    point.  But there is a difference between saying "I'll take

4    money because what I'm doing with it I've been told is prudent

5    to," and "I'll take the money and who cares where it goes."

6          You remember, your Honor, the two people who were

7    involved with this were Jona Rechnitz, who owned two of the

8    best buildings in lower Manhattan, who owned a yacht.  Right,

9    who said they owned this fund.  And Murray Huberfeld, who

10   couldn't have been wealthier, as Jona explained.

11         So if you said to Mr. Seabrook in 2013, 2014, what is

12   the chance that this fund goes bad and my members lose $19

13   million, the answer would have been none.

14         THE COURT:  But his eyes were blinded.

15         MR. SHECHTMAN:  Eyes are blinded or eyes wide open,

16   the answer would have been none.  So, that's the foreseeability

17   question.

18         I should say the practical reality is this:  If you

19   choose 17 million, if you choose 21 million, right, Norman

20   Seabrook has very little left.  You can take 10 percent of the

21   salary.  I'm not sure where the salary is coming from.  But,

22   we're not going to make COBA whole.  The one person who could

23   do that said I'll put in a third, and I hope I get sufficient

24   credit for it.  But Norman Seabrook --

25         THE COURT:  That's not binding on me.

```
 1              MR. SHECHTMAN:  I respect that.  But Norman Seabrook's
 2    not going to make this whole.  And so all I say to your Honor
 3    is, the practical reality here is he can't pay.  And I still --
 4              THE COURT:  I'm required to take that into
 5    consideration under Section 36 --
 6              MR. SHECHTMAN:  I still think the reality is that in
 7    his heart of heart, blinded or not, he thought this was a good
 8    investment.  And he thought it was a good investment because he
 9    believed the same person that the jury believed, who told him
10    this is gold.  And so in went the money.  And you know, it
11    would be a very different trial if it turned out to be gold.
12    Right.  It still, if the jury found it, he'd still be convicted
13    of bribery.  But he believed that this was a good investment,
14    and that means it's not foreseeable.
15              THE COURT:  Thank you, Mr. Shechtman.
16              MR. BELL:  May I, your Honor?
17              THE COURT:  Yes.
18              It's five to 2, folks.  I'm sorry to take your lunch
19    hour away.
20              MR. BELL:  I'll try not to make that very much worse,
21    Judge.  But there are two things that I want to comment on
22    here.  I'll start with the smaller point, which is close to
23    where Mr. Shechtman left off.  When it comes to the practical
24    realities, of course, one of the issues would be Mandatory
25    Victim Restitution Act, which is it is in fact mandatory to
```

```
 1   award sort of just restitution, regardless of what the
 2   likelihood of this being paid out is.
 3           With respect to the broader issue, which is
 4   foreseeability.  I'd say the following.  what is it
 5   Mr. Seabrook knew.  Here are some things Mr. Seabrook knew that
 6   bear upon this question.  Mr. Seabrook knew --
 7           THE COURT:  Am I right it is a test of objective
 8   foreseeability?
 9           MR. BELL:  You are, your Honor.  What I want to do in
10   line with that is lay out some objective indications of what
11   circumstances Mr. Seabrook was aware of.
12           THE COURT:  Can I make a suggestion to you?
13           MR. BELL:  Yes, your Honor.
14           THE COURT:  If you have some more remarks, let me make
15   the order and then you'll add.
16           MR. BELL:  Happy to do that, your Honor.
17           THE COURT:  Okay.  The Mandatory Victims Restitution
18   Act.
19           MR. SHECHTMAN:  Judge, can I say one word and it is on
20   a minor point, but worth saying.  That number gets to 21.
21   Right.  If that's where --
22           THE COURT:  19.
23           MR. SHECHTMAN:  Okay.  Because 21 includes --
24           THE COURT:  19.  They got back a million.
25           MR. SHECHTMAN:  Say it again?
```

1          THE COURT:  He invested 20, and one million came back.

2     It's $19 million that was lost.

3          MR. SHECHTMAN:  You have law firms that are seeking

4     riches.  And so I'm hoping that 19 is the answer.

5          THE COURT:  I don't understand.

6          MR. BELL:  I'll note, your Honor, as a factual matter

7     we ask for a number north of 19 because the union had to pay

8     substantial amount of legal fees.

9          THE COURT:  I'm not granting the expenses.

10         MR. BELL:  Understood.  I am just making your Honor

11    aware.

12         THE COURT:  I'm going to say it's $19 million that was

13    the loss.

14         MR. SHECHTMAN:  Thank you, your Honor.

15         MR. BELL:  I understand, your Honor.

16         THE COURT:  So, the Mandatory Victims Restitution Act,

17    18 U.S.C. Sections 3663(a) and 3664, requires District Courts

18    to order the defendants to make restitutions to their victims.

19    It's clear that the victim in this case is COBA.  It's COBA's

20    money that was invested, and COBA's money that was lost.  The

21    harm about which we're talking has to have a sufficiently close

22    connection to the conduct, and it must be limited to the victim

23    of the conduct.

24         So we know that apart from issues of prudence and

25    imprudence, the investment by COBA was made because of the

1   bribe to Seabrook.  Indeed, the COBA lawyers wrote in the

2   letter of February 14, 2014, that was never given to the board,

3   hedge funds are an unusual investment for retirement funds.

4   The annuity fund must invest planned assets in a manner that

5   minimizes the risk of large losses.  The structure of this

6   hedge fund, being a Cayman Islands hedge fund, which didn't

7   allow you to sue anybody, other than the fund itself, and in

8   case of a bankruptcy you couldn't see the fund either, you

9   wouldn't get anything.  The structure of this hedge fund makes

10  it difficult to recover in the event of fraud or other

11  misconduct.  Because the hedge fund is the only entity we can

12  go after as the other parties, specifically the related hedge

13  funds, the investment manager, and the limited and general

14  partners are all protected by corporate shield theories.

15          The offering plan is blunt that the investor should be

16  prepared and accepts the risk of losing its entire investment.

17  And to be permitted to invest, the annuity fund must represent

18  it can withstand the loss of the entire investment and does not

19  need its investment to be liquid.  As both of these factors are

20  inconsistent with the needs of the annuity fund, as the

21  attorney wrote, it should not make it representation.  However,

22  in order to invest, the representation had to be made, and it

23  wasn't made.  The fund documents themselves go into this.

24          On page 27, the investment must be made knowing that a

25  result could be entire loss of the value of the investment.  In

1    the event that a portfolio company is unable to generate

2    sufficient cash flow, or raise additional equity capital to

3    meet its projected cash needs, the value of the fund's

4    investments could be significantly reduced or lost entirely.

5         The nature of these hedge funds is aggressively to use

6    margin.  Margin is the borrowing of money on the basis of the

7    assets of the fund.  And because this particular fund is

8    lending on the basis of illiquid assets, assets that can't

9    readily be marketed or sold, but depend on a period of

10   maturation and a fruition to become valid, if there is a

11   reversal in the market, the loans would not be paid, and the

12   aspect of margin would create exacerbation of the problem.

13        And furthermore, as a Cayman Islands fund, any

14   bankruptcy would be administered by a receivership in the

15   Cayman Islands, not in a United States court.  So the prospect

16   of getting money back is dim.

17        In the circumstances, it seems to me that those

18   criminally responsible for the investment had reasonable

19   foreseeability to understand the risk of loss.  And by

20   restitution, must make good on the consequence of that risk.  I

21   so find.

22        And therefore, I order restitution joint and severally

23   with other defendants involved in the joint criminal activity

24   that includes Mr. Huberfeld and Mr. Rechnitz, and perhaps

25   Mr. Reichberg, I don't know, to be jointly and severally liable

J283SEAS                        Sentence

1   for $19 million.

2            Should there be a return to COBA by reason of the

3   receivership in the Cayman Islands, that would be a credit

4   against the loss.

5            Now, I understand that Mr. Seabrook has risen from

6   poverty, has no background in family investments.  And his

7   income, although reasonable, is not likely one that will ever

8   produce much savings.  So, I wonder, Mr. Shechtman, if you'll

9   help me come to an order that recognizes his ability to pay

10  under Section 3664.

11           I would like to recommend for your consideration that

12  $10,000 be paid within 60 days, and the balance over the time

13  of the supervised release at the rate of 10 percent of net

14  income.

15           MR. SHECHTMAN:  Judge, I think the latter is exactly

16  right.  I don't know that there is 10,000 available.

17           THE COURT:  How much would be available?  I think that

18  I need a good faith deposit.  Why don't you talk to your

19  client.

20           (Pause)

21           MR. SHECHTMAN:  Judge, we're going to wind up having

22  to borrow, to be honest.  But if you put 5,000, we'll try to

23  raise it.  I want you to know --

24           THE COURT:  How about 2,500.

25           MR. SHECHTMAN:  That would be great, your Honor.

1          THE COURT:  Within 60 days.

2          MR. SHECHTMAN:  Within 60 days.

3          THE COURT:  I don't need to impose more of a bad

4     situation on Mrs. Seabrook.

5          MR. SHECHTMAN:  That's greatly appreciated.

6          THE COURT:  That's where it will go, because other

7     people have wealth.

8          MR. SHECHTMAN:  That's for sure, and I thank the

9     Court.

10          THE COURT:  All right.  So $2,500 in 60 days.

11          MR. SHECHTMAN:  I thank the Court.

12          THE COURT:  Deposited with the clerk for the benefit

13     of COBA.  Joint and severally with other defendants who are

14     criminally responsible for COBA as a victim.

15          MR. BELL:  May I be heard very briefly, your Honor?

16          THE COURT:  Yes, Mr. Bell.

17          MR. BELL:  Just recognizing your Honor's remarks and

18     your Honor's judgment, two very quick things regarding the

19     precise contours of your Honor's proposed restitution order.

20     First, my understanding is that the form that your Honor would

21     take would be the form you most recently said.  That is to say

22     joint and severally with other criminal defendants whose

23     restitution orders are still to be determined.

24          THE COURT:  That's correct.

25          MR. BELL:  Since obviously they are not here, and

1    those still need to be resolved, and to the degree appropriate,

2    argued.  The second of those -- the only other point I think we

3    have to raise --

4            THE COURT:  There will be a major discussion with

5    Huberfeld.

6            MR. BELL:  And we've anticipated it, your Honor.

7            The second issue I think would be this.  It is, I

8    understand that your Honor has imposed a three-year period of

9    supervised release in part to be able to supervise and assure

10   the payment restitution over that period.  The restitution

11   order, the schedule that your Honor imposes, need not terminate

12   with the end of supervised release.

13           THE COURT:  It won't.  It will result in a judgment.

14           MR. BELL:  And that is essentially what I wanted to

15   clarify.  The judgment would live on past supervised release.

16           THE COURT:  That's the normal practice.

17           MR. BELL:  That's my understanding as well.  Thank

18   you, your Honor.

19           THE COURT:  I'm not imposing a fine.  There's already

20   a serious restitution obligation.  I'm not imposing community

21   service.  I think Mr. Seabrook's life that he said he wants to

22   resume after custody would normally involve him in various

23   community service, and I don't need to add artificial elements

24   to this.

25           When would Mr. Seabrook be surrendering?

J283SEAS                          Sentence

1          MR. SHECHTMAN:  Judge, may I speak briefly to that.

2     Judge, you will not be surprised, but I would ask you to

3     consider bail pending appeal.

4          THE COURT:  Sorry?

5          MR. SHECHTMAN:  I'd ask you to consider bail pending

6     appeal.  There is one issue.

7          THE COURT:  That's hard.

8          MR. SHECHTMAN:  Hard but --

9          THE COURT:  What's the section?

10          MR. SHECHTMAN:  I don't have it in front of me.  It

11     would be I should say the government has compared Mr. Seabrook

12     to politicians.

13          THE COURT:  3143.

14          MR. SHECHTMAN:  To politicians, all of whom at the

15     moment are out on bail pending appeal.  So I hope they will

16     continue the comparison today.

17          THE COURT:  What do you think, Mr. Bell?

18          MR. BELL:  Your Honor, part of the reason those

19     politicians are on bail pending appeal is because there has

20     been in almost all of those cases a legitimate issue created by

21     the McDonnell case law.

22          THE COURT:  That is likely an issue here.  That these

23     are gifts that were not exchanged, which is the same issue as

24     McDonnell.

25          MR. BELL:  We would welcome, if only because the

1   *McDonnell* issues don't apply here because this is private

2   honest services fraud.  We'd welcome the opportunity to brief

3   bail pending appeal.  We would ask your Honor to set a date

4   certain for surrender, which obviously Mr. Seabrook and

5   Mr. Shechtman can have appropriate input into.  We're not going

6   to object to virtually any date your Honor suggests, but I

7   think if your Honor is going to seriously entertain --

8             THE COURT:  Appeal will take a year and a half.

9             MR. SHECHTMAN:  At least a year.

10            MR. BELL:  That is my understanding of how these

11   things --

12            THE COURT:  What's the point of giving a surrender

13   date that's two years hence?

14            MR. BELL:  I'm sorry.  To be clear.  We would ask for

15   the opportunity to brief the issue of whether Mr. Seabrook

16   should in fact get bail pending appeal.  I actually don't

17   think, a part of that calculus, as your Honor is aware, is

18   whether there are significantly complicated issues that make an

19   appeal likely to be meritorious.

20            We respect the issues that Mr. Shechtman raised during

21   the trial and prior to the trial.  But we don't think that it

22   necessarily fits the framework, and we would welcome the

23   opportunity to brief that over the next couple of weeks.  And

24   that the reason why we proposed putting the sentencing date

25   in -- or the surrender date in place, if Mr. Shechtman does not

1   prevail on his application after briefing, it makes sense to

2   have something there.  It can be further out to accommodate the

3   briefing.  But we genuinely would appreciate the opportunity to

4   brief the bail pending appeal issue.

5          THE COURT:  I don't think we need it.  So 3143(b)

6   provides the judicial officer shall order that a person who has

7   been found guilty of an offense and sentenced to a term of

8   imprisonment, and who has filed an appeal or a petition for a

9   writ of certiorari be detained, unless the judicial officer

10  finds (A) by clear and convincing evidence that the person is

11  not likely to flee, or pose a danger to the safety of any other

12  person or the community, the police.  And, that the appeal is

13  not for the purpose of delay and raises a substantial question

14  of law or fact likely to result in reversal, or an order for a

15  new trial, or a sentence that does not include a term of

16  imprisonment or a reduced sentence.

17         So, I have no problem finding by clear and convincing

18  evidence that Mr. Seabrook is not likely to flee and he is not

19  likely to pose a danger to the safety of any other person or

20  community if released.  I have no problem in finding that the

21  appeal is not for the purpose of delay.

22         I do have a concern whether the appeal raises a

23  substantial question of law or fact likely to result in

24  reversal or an order for a new trial.

25         MR. SHECHTMAN:  Can I be heard?

1          THE COURT:  Yes.

2          MR. SHECHTMAN:  Judge, I will give you one.  This case

3    for your Honor started with the government's request that they

4    be able to introduce evidence and argument about the $19

5    million loss.  You may recall, you rejected their arguments.

6    And what you said was, you had your own reason.  And you did.

7    And that evidence came in, and argument.  We made a request --

8          THE COURT:  I missed your argument.  I said initially

9    that it should not come in, but then because of the

10   circumstances of the trial --

11         MR. SHECHTMAN:  My sense is what happened is the

12   following, your Honor.  The government briefed the issue and

13   they raised two grounds.  One was materiality, I can't remember

14   the other one.  We opposed it.  And you said when we met for

15   argument that you thought that we were right in opposing it,

16   but there was a third reason to let it in, which was to

17   complete the narrative.  And on that basis, you allowed in the

18   proof of the $19 million.

19         THE COURT:  It was a further basis, Mr. Shechtman.  It

20   had to do with your arguments about the prudence of the

21   investment.

22         MR. SHECHTMAN:  I understand.  But --

23         THE COURT:  And if you are talking about a prudent

24   investment, then you have to understand that there is a high

25   risk of loss, and in fact there was a loss.

1          But anyway, you want to cite that as an error?

2          MR. SHECHTMAN:  I guess I would say the following.  In

3    the Platinum case in the Eastern District, Judge Cogan is

4    keeping that evidence out for the defendants who knew about the

5    loss.

6          THE COURT:  Judge Cogan will do what he's doing.

7          MR. SHECHTMAN:  I agree.  But I just say the

8    following.  If two good district judges come to different

9    conclusions, that suggests an issue is substantial.

10          It will be an issue on this appeal.  It is not a

11    trivial issue.  You will remember that we went to sidebar and

12    jurors were concerned when they heard about the 19 million.  It

13    is a difference between the first trial and the second trial,

14    because it didn't come in in the first trial.  So, it will be

15    an issue on appeal.  It is far from a trivial one.  Substantial

16    doesn't mean that it will win.

17          THE COURT:  What else have you got?

18          MR. SHECHTMAN:  That's the principal argument, your

19    Honor.

20          THE COURT:  Are you going to argue the exchange

21    factor?

22          MR. SHECHTMAN:  That will be argued as well, but I

23    think the principal argument will be the $19 million coming in.

24          THE COURT:  What would be a reasonable term of bail?

25          MR. SHECHTMAN:  Look, we would ask you to continue it,

 1  since what you found, and what is obvious is, there is no risk

 2  of flight here.

 3          THE COURT:  What were the terms and conditions of bail

 4  up to now?

 5          MR. SHECHTMAN:  I think it is a cosigned PRB.  If you

 6  want additional bail, if you want the house to be put up as

 7  collateral, we'll do it.

 8          THE COURT:  Yes.

 9          MR. SHECHTMAN:  Okay.

10          MR. BELL:  Judge.

11          THE COURT:  Mr. Bell, I'm going to so order it.

12          MR. SHECHTMAN:  Thank you, your Honor.

13          THE COURT:  How do we implement this?

14          MR. SHECHTMAN:  I'll talk to Mr. Bell.  I think what

15  we need do, if you can give us a week, what we'll do is get a

16  new bond, and we'll file proof of value.  And we'll --

17          THE COURT:  You need the signature of Mrs. Seabrook

18  also.

19          MR. SHECHTMAN:  It will happen.  If for some reason it

20  doesn't, we'll come back before the Court and suffer the

21  consequences.  But we'll get it done.

22          MR. BELL:  If it is going to take some period of time

23  for these conditions to be met, we would welcome the

24  opportunity to in that same period of time brief the issue.

25          THE COURT:  I will let you do that.

J283SEAS                        Sentence

1              MR. BELL:  Thank you, your Honor.

2              THE COURT:  So, how do you want to proceed?  How much

3     time do you want?

4              MR. SHECHTMAN:  I'll get this done on Tuesday.

5              MR. BELL:  Today is Friday, Judge.  We'll get you

6     something by Wednesday morning.

7              THE COURT:  And Mr. Shechtman, you want to comment on

8     that?

9              MR. SHECHTMAN:  We'll have a response to it, but this

10    issue has been briefed.  And other than Judge Cogan's decision,

11    I don't know that there is a change.

12             THE COURT:  I'm not interested in the merits or lack

13    of merits of the argument you're making.  Mr. Bell's going to

14    make a different point I think.  What is that point?

15             MR. BELL:  No, your Honor.  I think it sounds like we

16    have the opportunity to brief this, and we welcome the

17    opportunity.  Thank you.

18             THE COURT:  I tell you what.  Mr. Bell issues his

19    decision, we'll have a conference call.  And if you need time,

20    I think you need a response, we'll order it then.

21             MR. SHECHTMAN:  Okay.  Fine, Judge.  Just be aware,

22    he's going to brief the merits, and I look forward to that.

23             THE COURT:  He is going to do what?

24             MR. SHECHTMAN:  He is going to brief the merits, and I

25    look forward to the conference call.

J283SEAS                    Sentence

 1           MR. BELL:  Judge, insofar as --

 2           THE COURT:  Let's not get into this argument.

 3           MR. BELL:  Understood, Judge.  I only say just so your

 4   Honor has an appreciation of what it is we argue in the brief.

 5           THE COURT:  I appreciate it is 2:20.

 6           MR. BELL:  Understood.  I'll let it go then, your

 7   Honor.  We welcome the opportunity to brief it.  Thank you.

 8           THE COURT:  Thank you.  First of all, before everybody

 9   runs out just -- I want to thank everybody for coming here and

10   paying close attention to what has happened.  You made a

11   contribution just by being here.  So thank you.

12           MR. BELL:  Judge --

13           MR. SHECHTMAN:  One last word.  We're not going to do

14   anything on the bond until your Honor has definitively ruled.

15           THE COURT:  Of course.

16           MR. SHECHTMAN:  We thank the Court.

17           MR. BELL:  Two things before we leave.  One, the

18   government moves for the dismissal of any open counts against

19   Mr. Seabrook.  We superseded so there's --

20           MR. SHECHTMAN:  I think your Honor already dismissed

21   that.  I don't think there is anything open.

22           THE COURT:  Motion granted.

23           MR. BELL:  Thank you.  And secondly --

24           THE COURT:  I haven't instructed on appellate rights.

25           MR. BELL:  That was the second issue, Judge.

J283SEAS                        Sentence

 1            THE COURT:  Wow.  Thank you, Mr. Bell.

 2            MR. BELL:  Yup.

 3            THE COURT:  So, I need to tell you this, Mr. Seabrook.

 4       You have a right of appeal.  Under the Constitution, you have a

 5       right of appeal.  You're entitled to representation during

 6       every stage of the appeal.  If you can't afford a lawyer, the

 7       government will provide a lawyer free of charge.  But you have

 8       those appellate rights.  I want to make sure you understand

 9       them.

10            Do you understand?

11            THE DEFENDANT:  Yes, sir, I do.

12            THE COURT:  Thank you.  Underlying counts are

13       dismissed.  What else, Mr. Bell?

14            MR. BELL:  I think that's all we have, your Honor.

15       Thank you.

16            THE COURT:  Thank you, everyone.

17            MR. SHECHTMAN:  Thank you, Judge.

18            (Adjourned)

19

20

21

22

23

24

25

Exhibit 48

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4              v.                        17 CR 467 (AKH)

 5   MURRAY HUBERFELD,
                                          Sentence
 6                  Defendant.

 7   ------------------------------x

 8                                        New York, N.Y.
                                          February 12, 2019
 9                                        2:30 p.m.

10   Before:

11          HON. ALVIN K. HELLERSTEIN

12                                        District Judge

13

14

15          APPEARANCES

16
     GEOFFREY S. BERMAN
17        United States Attorney for the
          Southern District of New York
18   MARTIN BELL
     RUSSELL CAPONE
19   LARA E. POMERANTZ
          Assistant U.S. Attorneys
20

21   HENRY E. MAZUREK
     EVAN L. LIPTON
22   ALAN S. FUTERFAS
     ILLANA HARAMATI
23   RICHARD BREUCHNER
          Attorneys for Defendant
24

25
```

1    feels you have missed something, he will speak up later.

2          MR. FUTERFAS:  Very good, your Honor.  The government

3    and defense in our various submissions both strongly support

4    the plea agreement that was reached for many reasons.  There

5    was a prior trial.  That trial ended in a hung jury.  Prior to

6    the second trial, before your Honor, there were significant

7    negotiations between the parties.  The government, which has

8    been on this case and investigating this case for years, for

9    years, reached the agreement that is before your Honor.

10          Many factors go into that agreement, including

11   government trial strategy, how the government views the case as

12   against different individuals.  I think we have to trust

13   institutionally the government, when they reach an agreement,

14   to have weighed many, many factors in coming to that agreement.

15   Some of those things I think the government has set out in

16   their sentencing memo.

17          Other things have weighed in more recently, such as

18   Mr. Huberfeld's agreement with COBA to pay $7 million at a time

19   when we all, the defense and the government, agree on this as

20   well, that the issues of restitution and the issues of loss are

21   complicated issues.  There are probably 200 pages of briefing

22   on these issues.

23          The government in their sentencing memo said

24   $7 million, the amount that Mr. Huberfeld has committed to, is

25   an appropriate amount of restitution.  Beyond that, they spent

1  significant time in their memo describing that this is a very

2  unusual step taken by someone in Mr. Huberfeld's position

3  before what could be a protracted, complex litigation, which

4  both the defense and the government recognized could go either

5  way, could result in appeals, all kinds of things.  Mr.

6  Huberfeld said no, I don't want to do that.

7       I must tell you, your Honor, those negotiations with

8  COBA when the defense team that you see here -- Mr. Mazurek,

9  myself, Mr. Lipton -- when we reached out to COBA, my

10 impression is they were not expecting anything near the numbers

11 that we put on the table from day one.  Mr. Huberfeld empowered

12 us to make a very substantial offer, very substantial offer,

13 millions of dollars, right out of the box.  No horse trading,

14 no back and forth and back and forth, here is a very large

15 number.  There are some negotiations after that.  The final

16 number was reached in short order.

17      It's a very significant step, one that in my

18 experience is unprecedented, I believe in the government's it

19 is.  The government talks about that in their sentencing memo

20 as a factor that talks about remorse, that talks about

21 basically Mr. Huberfeld owning the situation.  Even if legally

22 he is not responsible, he feels morally he might be or is, and

23 he owned that to a very significant degree.

24      He paid $4 million to COBA a month ago or so.  He has

25 3 million more to pay.  There have been very significant

1   payments.  Those payments may be accelerated depending on what

2   he earns.  COBA will have an opportunity to look at his tax

3   returns and see what he earns.  He owes COBA either a certain

4   number or 20 percent of his income.  That is a very significant

5   step that Mr. Huberfeld empowered, wanted us to do, wanted us

6   to accomplish.  It is something that the government has noted

7   in their papers.

8          Another distinction, your Honor, and your Honor

9   mentioned it, it is rare in human experience, certainly it has

10  been rare in my experience, where someone doesn't just walk the

11  walk, they talk the talk.  When we started researching Mr.

12  Huberfeld's charitable works over 10 years or 15 years or 20

13  years, it's rather extraordinary.  Your Honor has all the

14  information in the excellent papers put together by Mr. Mazurek

15  and Mr. Lipton.

16         If your Honor wanted to see it, you have a 700-page

17  listing of all the checks over 25 years.  Some of them are as

18  small as $1500 to families and to individuals who he heard

19  about or someone in the community heard about who were

20  suffering -- they were out of a job, they had a hard time, they

21  had medical expenses -- to much more significant contributions.

22         I know your Honor has seen a video presentation put

23  together for your Honor to review.  Some of the individuals in

24  that video presentation discuss or talk about the influence

25  that he has had.  One of the families in that video, for

1  instance, said that there was a tragedy in the family and Mr.

2  Huberfeld went to pay a shivah call, saw the circumstances in

3  which this hard-working father was living with a number of

4  children and he was working two or three jobs to make ends

5  meet.  He said the community has to help this person and

6  assembled the forces of the community to get together to buy

7  the person a home, buy family a home.

8          These are not acts that are committed or that are

9  thought of because one day I might be before the Honorable

10  Judge Hellerstein.  These are works of good that Mr. Huberfeld

11  did 10 years ago, 15 years ago, 20 years, 5 years ago.

12          Your Honor has been on the bench for some time and

13  before that your Honor was a noted litigator.  How many people

14  really do we know collectively who, way before anyone is going

15  to see what they do, way before any judge might pass on the

16  type of conduct they have engaged in, year after year and day

17  after day commit significant acts of charity to people in their

18  community, large and small?

19          THE COURT:  The highest form of charity according to

20  what we believe is charity given anonymously to help someone

21  else get on his feet and earn independently.  The letters have

22  illustrated quite substantially how Mr. Huberfeld acted in that

23  way and how he has benefited other people in that way.

24          MR. FUTERFAS:  Your Honor, we are talking about the

25  3553(a) factors here.

1               THE COURT:  I will so recommend.

2               Followed by supervised release of 3 years subject to

3       conditions stated in the pre-sentence investigative report.

4       They are set out on page 28 under mandatory conditions.  There

5       is no need for drug testing; I suspend that.  The other

6       mandatory conditions have to be complied with.  There are 13

7       standard conditions, and they have to be complied with.  They

8       are on page 29 of the PSR.

9               The special conditions: Mr. Huberfeld must provide the

10      probation officer with access to any requested financial

11      information.  I will deal with this after we fix restitution.

12      Then we'll come back to it.

13              There is a special assessment of $100, which will be

14      due upon filing of the judgment.

15              I get to restitution.  The argument of the defendant

16      is that there has already been a voluntary entry into

17      restitution in that Mr. Huberfeld has already paid $4 million

18      and he is obligated to pay $3 million more on a timed basis.

19      The defendants argue that restitution is not obligatory.  The

20      government argues that it is not clear whether it is an

21      obligation or not and that the $7 million should be fixed as

22      the restitution obligation of Mr. Huberfeld.

23              Restitution is governed by an act of Congress, the

24      Mandatory Victim Restitution Act, 18 U.S.C. sections 3663(a)

25      and 3664.  The act requires district courts to order defendants

1    to make restitution to the victims.  The act provides that when

2    sentencing a defendant convicted of an offense described in

3    subsection (c), the court shall order in addition to, or in the

4    case of misdemeanor in addition to and in lieu of, any other

5    penalty authorized by law that the defendant make restitution

6    to the victim of the offense.  That is section 3663(a)

7    subparagraph (1).

8         There is an issue whether or not COBA is a victim.  I

9    am not authorized to award restitution to people who are not

10   victims of the offense of conviction.  The term "victim" means

11   a person directly and proximately harmed as a result of a

12   commission of an offense for which restitution may be ordered,

13   including in the case of an offense that involved a known

14   scheme or conspiracy, repetitive criminal activity, any person

15   directly harmed by the defendant's criminal conduct in the

16   course of the scheme, conspiracy, or pattern.

17        The harm alleged in order to be a victim must have a

18   sufficiently close connection to the conduct of the crime.

19   That's held by Robers v. United States, 572 U.S. 639 at page

20   645, decided by the United States Supreme Court in 2014; the

21   Second Circuit in United States v. Rivernider, 828 F.3d 91 at

22   page 115; also United States v. Thompson, 392 F.3d 273, 277 (2d

23   Cir. 2015).

24        The seminal case is United States v. Archer, 671 F.3d

25   149 at page 170.  Archer involved a stock fraud.  The defendant

1    was, without disclosing, using proceeds to liquidate a

2    substantial part of his own holdings.  The court held that that

3    was an element of a securities fraud and ordered restitution to

4    the banks in which the defendant fraudulently created accounts

5    after he pled guilty to committing securities fraud.

6            Here there was the same kind of relationship with

7    COBA.  As alleged in the indictment, the purpose of papering

8    over the Platinum accounts was to avoid disclosure of a bribe

9    that was given by Huberfeld to Rechnitz to Seabrook for the

10   return of a risky investment.  Huberfeld concealed from

11   Platinum by this method that the payments were being used to

12   reimburse Rechnitz for advancing the bribe.

13           As the Court observed in Archer, the defendant in that

14   case, the bribe to Seabrook, in order to induce his investment,

15   was a mechanism devised for profit from this crime.  That is,

16   Huberfeld benefited not from causing the $60,000 to be

17   reimbursed to Rechnitz's company but from the COBA investment,

18   thereby gaining a huge amount of money to staunch redemptions

19   in a long-term investment that could not easily be withdrawn.

20           The investment was risky.  Risk was written all over.

21   Huberfeld knew that an investment from a pension fund risked

22   the entire loss of the money invested, thereby damaging in

23   substantial ways the corrections officers who would benefit

24   from the retirement fund and the ability of the retirement fund

25   to stay in business because $5 million of expense money was

 1    also invested.  Huberfeld knew that there was substantial risk.

 2    It was written all over the investment.  When a risk is imposed

 3    upon a victim, the consequences of that risk become the subject

 4    of restitution.

 5        I order restitution in the amount of $19 million

 6    jointly and severally with Seabrook and with Rechnitz.  Under

 7    the section 3664 I am required I am required to take into

 8    consideration a defendant's ability to pay and other factors of

 9    that nature.  Mr. Huberfeld has a net worth of approximately

10    over $100 million and he has cash in the bank of over

11    $10 million.  It's just that he pay $7 million within 60 days

12    less any money he has already paid to COBA, the total amount of

13    $7 million less the credit.

14        During his 3 years of supervised release he will

15    continue to pay at the rate of $250,000 per quarter.  In the

16    end there will be an entry of judgment for anything remaining.

17    Of course, if money is collected from Rechnitz and/or money

18    returned to COBA because of any dividend in the bankruptcy in

19    the Cayman Islands, that would be a credit.

20        Since three defendants are jointly and severally

21    liable, there can be the possibility of parity in some fashion

22    among the defendants.  But I am required under the statute to

23    fix the terms of restitution for the entire loss.  There is a

24    close connection between COBA as a victim and the conduct for

25    which Mr. Huberfeld pled guilty, so I do what I do.

1          Returning back to the special conditions and the

2     restitution, Mr. Huberfeld may not incur new credit charges or

3     open additional lines of credit without the approval of the

4     probation officer or make substantial gifts of assets unless he

5     is in compliance with the installment payment schedule.  The

6     restitution will be paid to the clerk of the court for the

7     benefit of COBA.

8          There will be no fine because the restitution is

9     substantial.  It would be unjust to have a fine on top of that.

10    The payments will be without interest.

11         The next question is the issue of the surrender date.

12    Mr. Seabrook asked for a continuation of bail pending his

13    appeal.  Although Mr. Bell wants to brief the issue, I have

14    decided that issue.  I am going to grant Mr. Seabrook the bail

15    and I'll make the appropriate findings.

16         MR. BELL:  We have fashioned that brief that we were

17    going to file tomorrow morning, your Honor.

18         THE COURT:  I've thought about it, Mr. Bell.  Sorry

19    about the extra work, but I think it is just.  He has

20    appealable issues.  While I'm not going to certify that is

21    likely to win on those issues, which is one of the

22    requirements, I think they are fair issues for appeal.  I will

23    follow that with Mr. Huberfeld again.  If there is a request

24    for a continuation of bail during any appeal, I will grant it.

25         MR. MAZUREK:  There is, your Honor.

1          MR. FUTERFAS:  Yes, your Honor.  Thank you.

2          MR. MAZUREK:  Thank you.

3          THE COURT:  What I need to do with Mr. Seabrook and

4   what I need to do with Mr. Huberfeld is to provide for a speedy

5   perfection of the appeal.  I'll ask Mr. Bell to work that out.

6   That's one of the conditions of bail.

7          MR. BELL:  May I have one moment, your Honor?

8          THE COURT:  Yes.  I don't mean by that asking for any

9   extraordinary time.  But the time that is set out in the

10  Federal Rules of Appellate Procedure and the statute must be

11  complied with without extensions.

12         MR. BELL:  Understood, your Honor.  That between that

13  and any motion that Mr. Huberfeld may make for expedited

14  consideration, I think that is all we really have the power to

15  do.  But it is understood, yes.

16         MR. MAZUREK:  Thank you, your Honor.

17         THE COURT:  I advise you, Mr. Huberfeld, that you have

18  right of appeal.  If you can't afford a lawyer, the lawyer will

19  be provided for you without charge by the government.

20         Mr. Futerfas and Mr. Mazurek, if Mr. Huberfeld wants

21  to appeal, I instruct you to file an appeal on a timely basis.

22         Are there underlying counts, Mr. Bell?

23         MR. BELL:  Yes, your Honor, and we would ask for the

24  dismissal of all underlying counts at this time.

25         THE COURT:  Without objection, so ordered.

```
1              MR. BELL:  Two other things, your Honor.  As with Mr.

2    Seabrook, your Honor ordered restitution joint and several

3    with --

4              THE COURT:  Rechnitz.

5              MR. BELL:  -- with the other co-conspirators,

6    including Mr. Rechnitz.  Mr. Rechnitz, of course, hasn't had a

7    restitution order imposed yet.

8              THE COURT:  I haven't sentenced him yet, but I will be

9    sentencing him.

10             MR. BELL:  Understood.  Presumably that is with any

11   restitution order that may be ultimately imposed on Mr.

12   Rechnitz.

13             THE COURT:  And possibly also Mr. Reichberg.

14             MR. BELL:  If he is ever here.  Your Honor, I was

15   going to request that the restitution addressee rather than

16   being the clerk of the court actually be the union proper at an

17   address that we will provide your Honor with.

18             THE COURT:  The reason for the clerk of court is

19   because it is a trail that we can easily follow on ECF.

20             MR. BELL:  Understood.

21             THE COURT:  But if you feel strongly about it, I'll

22   change my mind.

23             MR. BELL:  Your Honor, I will note that there are

24   attorneys here on behalf of the union.  It probably makes sense

25   for me to spotlight the crime victims.
```

1          THE COURT:  I do this in all the restitution cases.
2     They go to the clerk.
3          MR. BELL:  That's fine.  That's it, your Honor.  Thank
4     you.
5          MR. FUTERFAS:  Your Honor, if I may, we have one small
6     issue that I can raise with your Honor?
7          THE COURT:  Yes.
8          MR. FUTERFAS:  Your Honor's findings on restitution,
9     can that be held in abeyance pending the appeal?  For example,
10    we object to the 19 million as opposed to 60,000.  It's a legal
11    issue that will be briefed.
12         THE COURT:  He has paid 4.  I want him to pay
13    7 million within 60 days.
14         MR. FUTERFAS:  Your Honor, the financial statements
15    make clear that the cash accounts that are in the financial
16    statements belong solely to his wife.
17         THE COURT:  He controls the money.
18         MR. FUTERFAS:  That is not the case.  I assure your
19    Honor that is not the case.  That presents an issue, an actual
20    factual issue.  If at the end of the day the Court of Appeals
21    decides that restitution on this count of conviction can only
22    be 60,000, that obviates those issues as well.
23         I'm just concerned that your Honor has imposed an
24    order that for Mr. Huberfeld may absolutely be impossible to
25    comply with.  He does not control accounts that belong to his

 1   wife and have for many, many years.  She will defend those

 2   interests with her own counsel very vigorously.  I'm hoping we

 3   can avoid that, depending obviously on what the Court --

 4            THE COURT:  What does Mr. Huberfeld have in his own

 5   name?

 6            MR. FUTERFAS:  May I have a moment, your Honor, to

 7   confirm the information?

 8            THE COURT:  Yes.

 9            MR. FUTERFAS:  Approximately 400,000 in cash in joint

10   accounts.

11            THE COURT:  The rest is Mrs. Huberfeld's?

12            MR. FUTERFAS:  Yes, your Honor.

13            THE COURT:  Does the government wish to advise me?

14   Who owns the West End Avenue property?

15            MR. FUTERFAS:  I'm sorry, your Honor?

16            THE COURT:  Who is the registered owner of West End

17   Avenue property?

18            MR. FUTERFAS:  Mrs. Huberfeld.

19            THE COURT:  Who supplied the money to buy it?

20            MR. FUTERFAS:  It was purchased 10 years ago or so,

21   your Honor.

22            THE COURT:  Who supplied the money?

23            MR. FUTERFAS:  The purchase date was 2010, so it was

24   purchased 8 years ago.

25            THE COURT:  Who supplied the money Mr.?

1          MR. FUTERFAS:  I would guess various trusts or

2   entities associated with Mr. Huberfeld.

3          THE COURT:  We could have a hearing on this.  What is

4   the government's advice?  What I want, Mr. Futerfas, is an

5   acceleration of the money Mr. Huberfeld has already promised.

6   That's the bottom line of it.

7          MR. FUTERFAS:  I understand.  Our restitution position

8   in our papers is restitution is limited to $60,000.  That is

9   the count of conviction.  That is the same position probation

10  has taken.  When Mr. Huberfeld made his commitment by agreement

11  with COBA, that was external to what we understood would be a

12  restitution obligation under the law.  That is an issue that we

13  may appeal.  The Court of Appeals may come out however they do.

14          The discussion with COBA about the 4 million and how

15  it could be paid, especially the next 3 million, was assuming

16  that Mr. Huberfeld would be out making money and would

17  therefore be generating very significant amounts, 750,000 a

18  year to be paid out or 20 percent of his gross income.

19          THE COURT:  If I suspend the restitution until you

20  clarify the issue in the Court of Appeals, will Mr. Huberfeld

21  comply with the voluntary agreement he has made?

22          MR. FUTERFAS:  Yes, he will.

23          THE COURT:  So let's do that.  On condition that Mr.

24  Huberfeld fulfills the obligations on his part to be performed

25  in the agreement he made with COBA, the obligation to make

1   restitution is suspended until after the appeal.  There will be

2   a hearing before me and I'll fix it then.

3            MR. FUTERFAS:  Thank you, your Honor.

4            THE COURT:  Can I do that, Mr. Bell?

5            MR. BELL:  We believe so, your Honor, yes.

6            THE COURT:  So done.

7            I think I have done it all.  I thank you all for

8   coming.

9            MR. MAZUREK:  Your Honor, one last thing.  Just so the

10  record is clear, with respect to the bail pending appeal for

11  Mr. Huberfeld, the conditions will remain the same as currently

12  ordered?

13           THE COURT:  Yes.

14           MR. MAZUREK:  Thank you.

15           THE COURT:  Mr. Huberfeld, I took note of what you

16  said.  It's been a very hard day.  As I said before, people

17  wonder why good people do bad things.  My wish is that you

18  dedicate your life to continue to do good things so that the

19  good things define you and not the lapses.

20           Thank you all for coming.

21           (Adjourned)

22

23           I hereby certify that the foregoing is a true and

24  accurate transcript, to the best of my skill and ability, from

25  my stenographic notes.

Official Court Reporter
U.S. District Court

Exhibit 49

J5DTREIS

 1  The defendant's objection again seems to focus on words that I
 2  don't think are present in the PSR, namely a suggestion that
 3  the sole reason for Mr. Grant's promotion was that
 4  recommendation or that Mr. Grant was not otherwise qualified
 5  for the position.  I don't see that in the words that are
 6  included in the PSR, so the objection is overruled as to that
 7  component of the sentence.

 8         The second clause of that sentences reads, "And
 9  effected the promotion and transfer of other officers which
10  Reichberg and Rechnitz were involved, along with Harrington."
11  I recognize that the choice of the word "effected" here has a
12  connotation that this was the sole cause as opposed to a cause.
13  I'm going to modify that clause to read, "and induce the
14  promotion and transfer of other officers in which Reichberg and
15  Rechnitz were involved, along with Harrington . . ."  I think
16  that the evidence supports the conclusion that the
17  recommendation influenced the transfers.

18         Mr. Reichberg also objects to statements in paragraph
19  47 of the PSR.  In particular, he objects to the penultimate
20  sentence of paragraph 47.  That sentence reads that "McAllister
21  assisted Rechnitz in using police action to address the problem
22  of protesters in front of Rechnitz's bosses in the diamond
23  business in Manhattan."

24         I believe that this objection is not well founded, at
25  least as it's focused on the words presented in the PSR, and

J5DTREIS

1    I'm going to overrule it.  There's adequate testimony from

2    Mr. Rechnitz, in which I find credible on this point, to

3    support the conclusion that Rechnitz solicited the assistance

4    of McAllister to "address" the problem of protestors.

5           The defense objection I think again may be focused on

6    an interpretation of the statements in the PSR.  I don't read

7    that statement to mean that the police action was ultimately

8    effective or that as a result it never happened again.  Just

9    looking at the Merriam-Webster, the word "address" means, in

10   pertinent part, to deal with.  It does not mean to permanently

11   end, and I don't understand it to have this connotation in this

12   context.  I think that the evidence supports the use of the

13   words contained in the PSR, so I overruled that objection.

14          I will sustain in part the defendant's second

15   objection to paragraph 2.  They object to statement that it was

16   "most likely" McAllister who arranged for the Lincoln Tunnel

17   escort.  The jury may have concluded that McAllister arranged

18   for the escort.  If they did, I believe it would be a

19   reasonable inference to draw from the evidence.  That said,

20   confronted with the objection, I'm not concluding that it was

21   "most likely" that it was arranged by McAllister.  I believe

22   the evidence supports the conclusion that it may have been

23   McAllister, an offer based on his contacts with other

24   conspirators in that time period.  As a result, that sentence

25   will be revised to read as follows, "Reichberg also used his

1      connections -- possibly with McAllister -- to facilitate a

2      joint Port Authority/NYPD escort of Rechnitz's boss through the

3      Lincoln Tunnel, complete with a partial line closure."

4            Mr. Reichberg also objects to several categories of

5      so-called "additional relevant conduct."  He objects to a

6      number of elements of paragraph 34, in particular the third

7      full sentence, the assertion in the fourth sentence that

8      Mr. Reichberg helped to facilitate the final $5 million payment

9      described there, and the entire fifth sentence of that

10     paragraph.  Mr. Reichberg also objects to paragraphs 34B and D

11     of the PSR.

12           My ruling with respect to defendant's objections to

13     paragraphs 34A, B and C is not necessary.  I'm not going

14     consider the facts that are the subject of those objections in

15     sentencing.

16           So the Court adopts the factual recitations in the

17     presentence report as modified in accordance with the findings

18     that I just described.

19           The presentence report will be made a part of the

20     record in this matter and will be placed under seal.  If an

21     appeal is taken, counsel on appeal may have access to the

22     sealed report without further application to the Court.

23           Now although district courts are no longer required to

24     following the sentencing guidelines, we are still required to

25     consider the applicable guidelines in imposing sentence.  And

1    to do so, it's necessary that we accurately calculate the

2    sentencing guidelines range.  In this case, the defendant was

3    found guilty following a jury trial of Counts One, Two, Three

4    and Seven of the indictment in this case.

5         Count One charged him with conspiracy to commit honest

6    services wire fraud in violation of 18 USC 1349.  Count Two

7    charged him with honest services wire fraud in violation of 18

8    USC Section 1343.  Count Three charged him with conspiracy to

9    pay bribes in violation of 18 USC Section 371.  Count Seven

10   charged him with obstruction of justice in violation of 18 USC

11   Sections 1512(c)(1) and 1512(i) and 2.

12        I calculate the sentencing guidelines in a manner

13   substantially consistent with the calculations set forth in the

14   PSR with two substantial modifications, which I will describe

15   below.  The applicable sentencing guidelines manual is the

16   November 1st, 2018 sentencing guidelines manual.  Counts One,

17   Two and Three are grouped for guidelines calculation purposes

18   pursuant to Section 3D1.2D.  Count Seven is grouped with those

19   counts pursuant to Application Note 8, Section 3C1.1.  The

20   guideline for a violation of 18 USC Section 371 is 2X1.1.  That

21   section points to Section 2C1.1 to determine the base offense

22   level.  Because the defendant was not a public official,

23   pursuant to Section 2C1.1A2, the base offense level is 12.

24   Because the offense involved more than one bribe, the offense

25   level is increased by two levels pursuant to Section 2C1.1B1.

1          Now because the value of the payment, the benefit

2    received or to be received in return for the payment, the value

3    of anything obtained or to be obtained by a public officials or

4    others acting with a public official or the loss to the

5    government from the offense, whichever is greatest, exceeded

6    $6,500, the offense level was increased by the number of levels

7    from the table and Section 2B1.1 corresponding to that amount.

8          Now the defendant contends that the Court should use

9    an evaluation between $6,500 and $15,000 for purposes of

10   calculating the guidelines range.  See the Defendant's

11   Sentencing Submission at 31.  To arrive at that conclusion, the

12   defendant excludes entirely any payments made by his

13   co-conspirator, Mr. Rechnitz.

14         I don't believe that position to be sustainable.  I

15   have little trouble concluding on the basis of the evidence

16   presented at trial that payments made to officers and value

17   provided to officers by Mr. Rechnitz were within the scope of

18   his and Mr. Reichberg's joint criminal activity and were in

19   furtherance of that activity and were reasonably foreseeable in

20   connection with the activity.  Indeed, as the evidence

21   established at trial, Mr. Reichberg was viewed as the idea and

22   implementation man while Mr. Rechnitz was the money man in the

23   duo.  It would not be logical to exclude from consideration

24   payments and other value provided by Mr. Rechnitz given the

25   nature the parties' interaction in the criminal conduct.

1          The defense contends that the Court should consider

2     the cost of the window replacement of Inspector Grant's home

3     with a value of $5,000 in addition to the cost of meals

4     provided to police officers.

5          I begin this calculation thus with the $5,388 paid for

6     windows for Mr. Grant, which are not contested.  In addition,

7     this installation required approximately $8,000 worth of work,

8     if I recall correctly.  I add to that a pro rata portion of the

9     cost of the trip to Las Vegas arranged by Mr. Reichberg and

10    Mr. Rechnitz for, among others, police officers and Ms. Greco.

11    I agree with the defense that allocating the entire cost of the

12    trip to this bribe is not reasonable.  That was the price for

13    the entire trip, some of which I believe was the sum cost for

14    Mr. Rechnitz.  At the same time, I don't believe that simply

15    using the cost of round trip first class tickets for the flight

16    is adequate to capture the value of a seat on a private jet.  I

17    cannot calculate precisely what the cost of this trip should be

18    and how it should be treated as to the amount of the bribe with

19    great precision based on the information presented to me.

20         In order, therefore, to make a reasonable estimate,

21    I'm going to divide the cost of the trip per capita and will

22    allocate the amount paid on account of the two officers as the

23    amount of the value provided to them.  This arguably

24    undervalues that, given it does not the count the portion of

25    the expenses that was used to pay the travel and stay of the

1    escort, given that her presence and her availability was part

2    of the compensation for officers, but I believe that it's a

3    reasonable approach to ascertaining what the portion of this

4    cost should be attributed to the payments made on behalf of the

5    officers.  So two-fifths of the cost of the hotel and flight

6    for that trip come to $25,972.50.

7            The conspirators bought at least one Legends Yankees

8    ticket for Mr. Harrington with a low-end value of $300.

9    Mr. Rechnitz paid an amount in excess of $5,000 for

10   Mr. Harrington's family trip to Chicago.  Mr. Rechnitz also

11   organized over $60,000 in work for Blue Guardian, a company --

12   I should say approximately $60,000 in work for Blue Guardian, a

13   company affiliated with Mr. Harrington.  I'm not including that

14   amount in this calculation because it was not clear to me that

15   there was any net benefit to Mr. Harrington from that work.

16           Mr. Rechnitz also paid for a hotel room for Mr. Grant

17   in Rome at a cost of $2,066.  Mr. Rechnitz paid Mr. Banks a

18   $25,000 payment that was disguised as a return on investment

19   that did not reflect an actual return on investment.

20   Mr. Rechnitz also purchased a watch upgrade for Mr. Grant for

21   $800, and Mr. Reichberg and Mr. Rechnitz provided gifts to

22   several officers during their infamous Christmas elves trip.  I

23   don't have the precise value of the gifts provided, but they

24   included video game systems, American Girl dolls and diamond

25   earrings.  So I will establish a reasonable benchmark estimate

1    for that group of gifts, which is perhaps conservative, of

2    $1,000.  In addition, the conspirators provided Mr. Banks with

3    approximately $29,600 of value in tickets to sports events and

4    others in the conspiracy, also paid for a $3,000 watch for

5    Mr. Colon and obtained a hotel room valued at $2,000 for him to

6    use for an event.  These payments on their own sum to over

7    $120,000.

8         In addition, the conspirators paid for the travel of

9    Andrew Capul and his son to and from the PCS game by private

10    jet.  He also paid for their admission to the game as well as

11    other services.  The pro rata share of the related travel cost

12    attributable to Mr. Capul and his son alone, who I understand

13    to have been two of the seven travelers on the flight out,

14    would increase this amount by nearly $11,000.  Again, this is

15    not a precise calculation of the value of that trip, but it's a

16    reasonable estimate based on the information that's provided to

17    me.

18         Now in addition, the conspirators paid for restaurant

19    meals for officers and paid for Banks to travel to Israel and

20    the Dominican Republic.  I think it is likely that the value of

21    those additional payments would sum up in addition to the other

22    payments that I described with some more specificity to a

23    number in excess of $150,000, which is the category used in the

24    PSR, but I have not been pointed to specific evidence that

25    would allow me to benchmark their value.

1      As a result, for purposes of the guidelines

2  calculation, I conclude that what has been established as the

3  value of improper payments for things obtained or to be

4  obtained was between 95,000 and $150,000.  As a result, the

5  offense level would be increased by eight levels pursuant to

6  Section 2B1.1B1e.  Because the offense involved a public

7  official a high level decision making or sensitive position, a

8  four-level enhancement is warranted pursuant to Section

9  2C1.1b3.  Because the defendant willfully obstructed or impeded

10  or attempted to obstruct or impede the administration of

11  justice with respect to the investigation, prosecution, or

12  sentencing of the instant offense of conviction, the

13  obstructive conduct related to the defendant's offense of

14  conviction and any relevant conduct or closely related offense,

15  a two-offense level enhancement is warranted pursuant to

16  Section 3C1.1.

17      As a result of this guidelines offense calculation, I

18  sum to an offense level of 26.  The defendant has no criminal

19  history points, and as a result, is in criminal history

20  category one.

21      Now I considered whether there's an appropriate basis

22  for departure from the guidelines range system within the

23  guidelines system.  While I recognize that I have the authority

24  to depart, I do not find any grounds warranting a departure

25  under the guidelines.

1          MR. BELL:  Judge, may we be heard briefly?

2          THE COURT:  Yes.

3          MR. BELL:  I think we have been trying to keep score

4     along with your Honor, but I think that just sort of measured

5     against the PSR calculation, accepting your Honor's changes to

6     the calculation as laid out in the PSR, we believe that the

7     adjusted offense level would in fact be 28, not 26.

8          THE COURT:  Sorry, give me one moment.  Let me

9     calculate the range again.

10          Mr. Bell, you're correct.  Thank you very much.  My

11     math was incorrect.  Thank you very much for pointing that out.

12     The offense level would be 28.

13          MR. BELL:  The only other thing, your Honor, that we

14     point out for the record, I think a number of times your Honor

15     made reference to paragraph 47 with respect to certain of the

16     defense's objections.  I think, again, this is more in the vein

17     of the clerical than anything, it was in fact paragraph 27.

18          THE COURT:  Sorry, to the extent I did refer to 47

19     rather than 27, that's correct, it's 27.

20          MR. BELL:  I think, too, finally, your Honor, and we

21     appreciate very much your thoroughness and thoughtfulness and

22     going back to these various arguments that implicate fairly

23     dense record evidence, it may be helpful, again for purposes of

24     the record, to get I guess what amounts to a ruling from your

25     Honor on to what degree your Honor factors in the other schools