

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

January 21, 2026

**BY ECF**

The Honorable Katherine Polk Failla
United States District Judge
United States Courthouse
40 Foley Square
New York, NY 10007

      Re:    *United States v. Jona Rechnitz*, 16 Cr. 389 (KPF)

Dear Judge Failla:

      The Government respectfully submits this letter in advance of defendant Jona Rechnitz's resentencing scheduled for February 24, 2026, at 3:00 p.m. In light of the facts described below, and assuming that Rechnitz continues to comply with the terms of his cooperation agreement and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines, that the Court sentence Rechnitz in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

**I. The Underlying Criminal Conduct**

      Rechnitz began cooperating with the Government in May 2016. On June 8, 2016, Rechnitz pleaded guilty, pursuant to a cooperation agreement, to an information, which charged him with conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349. (Dkt. 10). Rechnitz participated in a conspiracy with two principal objects, both of which involved bribery and honest services wire fraud: (i) a scheme to bribe high-ranking officials in the New York City Police Department ("NYPD"), and (ii) a scheme to bribe Norman Seabrook, then the president of the New York City Correction Officers Benevolent Association ("COBA"), to induce Seabrook to invest millions of dollars of COBA's money with a hedge fund, Platinum Partners ("Platinum"), founded and co-owned by Murray Huberfeld. (PSR ¶ 11).[1]

      In 2008, Rechnitz was a real estate businessman from Los Angeles who had moved to New York to begin his career. Around this time, he met Jeremy Reichberg, a self-styled community

---

[1] "PSR" and "Presentence Report" refer to the Presentence Investigation Report prepared by the United States Probation Office ("Probation Office") in connection with Rechnitz's sentencing, and which was last revised on March 23, 2020; "Tr." refers to the transcript of Seabrook's retrial, 16 Cr. 467; "Reichberg Tr." refers to the transcript of Jeremy Reichberg's and James Grant's trial, 16 Cr. 468 (GHW); "GX" refers to a Government exhibit at Seabrook's retrial; and "Dkt." refers to an entry on the Court's docket for this case.

organizer and self-appointed liaison between the Orthodox Jewish community in Borough Park, Brooklyn, and local law enforcement. (PSR ¶¶ 13, 14). Reichberg was a so-called "expediter" who dealt principally in assisting people in his community in their dealings with various local government entities, including the police. (PSR ¶ 13). Reichberg already had years-long relationships with various NYPD officials. (PSR ¶ 13). Within weeks of their meeting, Rechnitz joined Reichberg in providing occasional meals and donations to the NYPD's affiliated football team at the behest of several officers. (Reichberg Tr. 2637-39). Rechnitz and Reichberg asked those officers for favors, such as arranging for a police escort through the Lincoln Tunnel for the boss of the company where Rechnitz then worked. (Reichberg Tr. 2641-43 (describing the partial lane closure of the tunnel to expedite travel); PSR ¶ 24).

From this beginning developed the first of a number of ultimately corrosive and criminal relationships between Rechnitz and others in positions of power, including, among others, police officers, a union leader, and a hedge fund founder.

### A. The NYPD Bribery Scheme

Between 2013 and early 2015, Rechnitz and Reichberg escalated their criminal activity significantly. Several developments fueled this intensification. First, several of the police officers whom Rechnitz and Reichberg had built relationships with ascended to positions of power. Michael Harrington, whom Reichberg had known for years, became the Executive Officer to the Chief of Department. Through this relationship, Rechnitz and Reichberg came to lavish things of value upon Harrington's new boss, then-Chief of Department Philip Banks, who was the highest ranking uniformed officer in the NYPD, in order to cultivate a relationship with Banks. (PSR ¶¶ 17-19). James Grant, a former NYPD captain in Brooklyn, rose through the ranks such that he was eligible for a promotion to Commanding Officer of the Upper East Side's 19th Precinct in Manhattan, a promotion that Reichberg and Rechnitz helped secure through their lobbying of Banks and Harrington. (PSR ¶¶ 18, 20). The Presentence Report lists an array of other police relationships that Reichberg and Rechnitz cultivated during this period of time (*see, e.g.*, PSR ¶¶ 23-28), but the positioning of Banks, Harrington, and Grant in 2013 through 2014 led to significant opportunities to lavish things of value on high-level officials and receive favors for Reichberg and Rechnitz, their friends and associates, and their business clients.

Reichberg and Rechnitz provided NYPD officials with the following things of value, among others:

- Reichberg and Rechnitz provided officials with free or nearly free trips to numerous vacation destinations, including Punta Cana, Las Vegas, and Los Angeles, and to sporting events—sometimes on private jets, and usually at luxury hotels. (PSR ¶¶ 12, 17, 22, 24, 27).

- On a few occasions, Reichberg and Rechnitz arranged for prostitutes to be available to the travelers, both in the United States and abroad. (PSR ¶¶ 12, 15, 17, 22).

- Banks received a luxury tour through Israel. (PSR ¶ 17).

Case 1:16-cr-00389-KPF   Document 255   Filed 01/21/26   Page 3 of 14

Page 3

- Banks and Harrington received thousands of dollars in meals at high-end kosher steakhouses in Manhattan. (PSR ¶¶ 17, 19).

- Rechnitz and Reichberg rented out a suite at the Meadowlands (now known as MetLife Stadium) for officials and their families at a New England Patriots–New York Jets game. (PSR ¶ 17; Reichberg Tr. 2893-94).

- Reichberg steered $70,000 worth of business to a private security business run by Harrington's relatives and close friend, and Rechnitz paid for hotel accommodations for a trip to Chicago Harrington took with family members and friends. (PSR ¶ 19).

- Harrington and Banks received expensive hockey and basketball tickets. (PSR ¶ 19).

- Rechnitz provided Banks with what amounted to a $20,000 gift disguised as a successful "investment" on his behalf. (PSR ¶ 18).

- Grant received numerous home improvements, including new railings and windows, along with luxury lodging during a vacation in Rome. (PSR ¶ 22).

- Reichberg and Rechnitz visited three Staten Island-based officers on Christmas day, bearing video game systems and high-end collectible dolls for their children. (PSR ¶ 20).

In total, Rechnitz and Reichberg gave approximately $225,000 worth of bribes in the form of in-kind benefits or payments to officials. In return, the officials provided Reichberg and Rechnitz with police-related favors, including (i) a parking placard, (ii) Grant's promotion and that of other officers known to Reichberg, (iii) the dispatch of a police boat to a private event Reichberg hosted, (iv) the dispatch of a police helicopter to a private event Reichberg hosted, (v) assistance in applying for gun permits they likely were not eligible for,[2] (vi) personal rides in police vehicles (for example, to the airport, with lights and sirens blaring), (vii) favorable treatment to individuals who had been ticketed or arrested in order to benefit Reichberg's business, and (viii) police action in addressing private disputes. (*See, e.g.*, PSR ¶¶ 18, 20-22, 56). In early 2015, some weeks after Banks resigned from his position as Chief of Department, Reichberg and Rechnitz were recorded on a judicially authorized wiretap, lamenting that they did not get even more for their investment in Banks and Harrington.

---

[2] As part of their effort to obtain gun permits, Reichberg and Rechnitz arranged for Rechnitz to be placed on the payroll of an associate's diamond business. Rechnitz did not actually work for the associate but used his purported employment with a risky business (*i.e.*, the diamond business) as a partial justification in applying for the firearm license. That application was fraudulent. Rechnitz also used the diamond company's health insurance plan to obtain health insurance for a period of approximately two years instead of setting up a health insurance plan through his own business. (Reichberg Tr. 2842-43).

### B. The COBA Bribery Scheme

Rechnitz had done business with Huberfeld, and the two were friends. In late 2013, Huberfeld asked Rechnitz to help Platinum attract institutional investors. (PSR ¶ 35). Rechnitz responded that he would approach Seabrook about investing COBA's money with Platinum. (Tr. 634; PSR ¶ 35). Seabrook, who had been introduced to Rechnitz earlier in 2013, wielded enormous power over the finances of COBA, the largest municipal jail union in the United States. (PSR ¶¶ 33-34).

In December 2013, Rechnitz took Seabrook and others on a trip to the Dominican Republic. (Tr. 632-33). During the trip, Rechnitz told Seabrook that Seabrook could personally make money if he invested with Platinum on COBA's behalf. Seabrook, who told Rechnitz that he controlled COBA's Annuity Fund, agreed to invest that fund's money with Platinum, remarking, "It's time Norman Seabrook got paid." (Tr. 634-37). Rechnitz and Huberfeld then arranged to pay Seabrook based on a percentage of Platinum's profits from the COBA investment; Huberfeld estimated that Seabrook's share would exceed $100,000 annually. (Tr. 641-42; PSR ¶ 36).

Before COBA invested in Platinum, its attorneys conducted due diligence and wrote letters—including a letter addressed to COBA's Board of Trustees—that expressed concerns about investing in a higher-risk vehicle like Platinum. (PSR ¶¶ 37-38). Seabrook concealed these letters, and the attorneys' concerns, from COBA's board in order to secure the board's approval for the investment. (PSR ¶¶ 37-38). At the behest of Seabrook, COBA invested a total of $20 million with Platinum. First, in March 2014, Seabrook caused COBA's Annuity Fund to invest an initial $10 million with Platinum. (PSR ¶ 39). Rechnitz continued to speak with Huberfeld and Seabrook after that about the possibility of additional COBA investments with Platinum. (Tr. 656, 677). On May 1, 2014, Rechnitz reassured Huberfeld, based on a conversation Rechnitz had had with Seabrook, that Seabrook might cause COBA to invest $20 million more. (Tr. 677). Ultimately, Seabrook arranged for COBA to make two additional investments with Platinum totaling $10 million: a $5 million investment in June 2014 of funds COBA had set aside for a potential emergency; and a $5 million Annuity Fund investment in August 2014. (PSR ¶ 39). Rechnitz later testified that he had firsthand knowledge of COBA investments with Platinum totaling $15 million (*i.e.*, Rechnitz was not aware of $5 million of the total $20 million that was invested in Platinum by COBA). (Tr. 681, 736).

In late 2014, when it was time to deliver Seabrook's first kickback payment, Huberfeld told Rechnitz that Seabrook would get only $60,000, rather than the six-figure payment Huberfeld originally estimated, because Platinum had underperformed. (PSR ¶ 40). Rechnitz agreed to front the cash payment to Seabrook, and Huberfeld agreed that Platinum would reimburse him. (PSR ¶ 40). Rechnitz delivered the payment on December 11, 2014, handing Seabrook, who was sitting in a sport utility vehicle bearing COBA's name, a newly purchased Ferragamo handbag containing $60,000 in cash. (PSR ¶ 41). Rechnitz submitted his reimbursement request to Platinum that same day. To conceal the nature of the transaction, Rechnitz submitted a phony invoice purporting to bill Platinum $60,000 for courtside tickets to New York Knicks games. (PSR ¶¶ 40-41). Platinum reimbursed Rechnitz three days later. (PSR ¶ 41).

Platinum ultimately collapsed and lost $19 million of the $20 million COBA had invested. (PSR ¶ 43). The Government has no information suggesting that Rechnitz received any monetary benefits for facilitating the meetings between Seabrook and Huberfeld, or that Rechnitz knew of Platinum's financial instability. (PSR ¶ 43).

### C. Political Bribery

Rechnitz and Reichberg were introduced to then-mayoral candidate Bill de Blasio's chief fundraiser, Ross Offinger, and promised to back de Blasio financially, through their own individual donations and through substantial fundraising as "bundlers," provided that "anytime we would call with any issues, . . . we would have access, we would have good response, and we expected results." (Tr. 603). Rechnitz and his wife gave de Blasio the maximum amount permitted under the law, and Rechnitz also gave through straw donors, an illegal practice under local election law. (Tr. 604). In addition to accounting for over $100,000 in donations to de Blasio's campaign, Rechnitz gave over $150,000 to political causes de Blasio championed, including the Senate Democrats and the Campaign for One New York, after the election. (Tr. 604, 794; PSR ¶ 29). In return, Reichberg and Rechnitz called upon Offinger. (PSR ¶ 29).

At trial, Rechnitz testified about instances in which he asked Offinger for favorable treatment from the City. Some of these efforts led to Rechnitz getting meetings that the general public would not have expected but still did not achieve the desired ends; others were more successful. (*See* Tr. 605-09 (cataloguing various requests and their outcomes, including securing a delayed deadline for Rechnitz's wife's cousin to close her preschool as ordered by a City department and rectifying a water bill issue at a property affiliated with Reichberg)). Rechnitz also paid for Offinger's stay at a hotel in the Dominican Republic. (Tr. 604).

Rechnitz and Reichberg reached a similar understanding with Robert Astorino, the Westchester County Executive, the chief executive of the most populous county in the state north of New York City. Astorino, who was running for re-election in 2014, accepted some $15,000 in donations from Rechnitz and Reichberg, around which time Astorino helped arrange for the two to be named Westchester County Police Chaplains—a title that came with no clerical responsibilities for Reichberg and Rechnitz, who were not rabbis, but which entitled them to parking placard privileges.[3] (PSR ¶ 30; Tr. 613-14). Rechnitz also paid for all but $1,800 of a nearly $8,000 Rolex Submariner watch for Astorino later the same year. (PSR ¶ 30; Tr. 612-13). Astorino subsequently surrendered that watch to federal authorities. *See In re One Rolex Submariner Watch*, No. 19 Misc. 283 (DLC), Dkt. No. 2.

---

[3] One of the NYPD officers whom Reichberg and Rechnitz bestowed benefits on early in the conspiracy, Steven McAllister, eventually retired from the NYPD in order to take a position as Police Commissioner of the Village of Floral Park, a small municipality just outside of Queens. (Tr. 617). Once there, McAllister appointed Rechnitz and Reichberg to chaplaincy positions in that jurisdiction. (Tr. 617-18). These positions also came with parking placards. (Tr. 617).

### D. Other Conduct

During the time of the charged conduct, Rechnitz engaged in real estate transactions through his business, JSR Capital. (PSR ¶ 14). JSR Capital engaged in hard-money lending during the same period of time.[4] (Tr. 737). Rechnitz's hard-money lending business involved making short term loans available to business partners at higher-than-normal interest rates, and recruiting investors—mostly friends and family members—to invest in making those loans with the promise of swift, substantial returns. (Tr. 737). Between 2013 and 2015, Rechnitz recruited investors into two relevant loan arrangements of this type—the alcohol resale business of a Harlem-based restauranteur named Hamlet Peralta, and National Event Company, the sports and concert ticket resale business of Jason Nissen, with whom Rechnitz shared Knicks season tickets. (Tr. 737-40). Rechnitz invested, and got associates of his to invest, in both businesses. (Tr. 737-40). Rechnitz induced his associates to invest through a number of representations, some of which were false. (Tr. 740-41). Among other things, Rechnitz omitted that he was receiving commissions for recruiting them, and he exaggerated his own personal stake in the ventures. (Tr. 740-41).

The effect of these representations was magnified when it turned out that both Peralta and Nissen's businesses were kept afloat by Ponzi scheme tactics. (Tr. 742-43). Rechnitz did not appear to be aware of those frauds—on the contrary, Rechnitz lost money in at least one scheme, and wiretapped conversations between Rechnitz and Reichberg chronicle their frantic attempts to recoup the Peralta investments and do not show that they were aware of the overall fraud. (Tr. 743-44). Nissen's fraud was not discovered until 2017, when Nissen self-reported and surrendered to authorities, and his account did not incriminate Rechnitz. But people whom Rechnitz had lured into investing through misrepresentations and omissions about his own activity lost money, including one particularly egregious instance in which one of Rechnitz's friends lost over $2 million. (Tr. 832, 853-60).[5] Both Peralta and Nissen were prosecuted for fraud in this district, *see United States v. Peralta*, 16 Cr. 354 (KBF); *United States v. Nissen*, 17 Cr. 477 (PAE), and Rechnitz's cooperation touched these cases in ways discussed below.

Finally, when Rechnitz was approached by law enforcement on three occasions in 2015, he was untruthful in responding to questions about his relationships with police officers, Seabrook, and Huberfeld. (Tr. 557-58). Wiretapped conversations reveal efforts on the part of Rechnitz and Reichberg to discuss how to respond to the investigation, and efforts to coach business contacts

---

[4] Rechnitz explained that he understood hard-money lending to be "when you make a loan to somebody at above normal banking interest rates." (Tr. 737).

[5] Rechnitz's inducement, through fraud, of these investments is not an offense to which he pled guilty as part of his agreement with the Government, although he did disclose the conduct in his early meetings with the Government. (*See generally* GX 1601). Rechnitz's agreement immunized him from prosecution for conduct related to the Peralta scheme; the Nissen business was not known to be a Ponzi scheme to either Rechnitz or the Government until 2017, when Nissen self-reported.

and family members on how to avoid deepening Rechnitz's problems if contacted. Rechnitz also destroyed a laptop and a phone in an effort to destroy evidence that incriminated him. (Tr. 736).[6]

## II. Rechnitz's Cooperation

### A. Initial Cooperation

Rechnitz was not candid when approached by law enforcement on three occasions in 2015. In May 2016, Rechnitz made the decision to cooperate with the Government. Rechnitz ultimately met with the Government over 80 times. Over the course of numerous proffer sessions, Rechnitz spoke openly about his involvement in criminal conduct and expressed remorse for his actions.

### B. Rechnitz's Trial Testimony

Rechnitz served as a key witness at the trial of Seabrook and Huberfeld before the Honorable Andrew L. Carter, Jr., the retrial of Seabrook before the Honorable Alvin K. Hellerstein, and the trial of Reichberg and Grant before the Honorable Gregory H. Woods. Rechnitz testified over the course of a combined 18 days and endured substantial cross-examination over the course of 13 of those days. Rechnitz's testimony—which involved direct testimony about explicit discussions of the *quid pro quo* agreement he had with Seabrook and Huberfeld, as well as incriminating conversations he had with Reichberg and other NYPD officers—was important.

### C. Relevant Co-Conspirator Sentences and the Sentencing Guidelines

The Probation Office has calculated Rechnitz's Guidelines range as 87 to 108 months' imprisonment. (PSR ¶ 143). On November 1, 2023, various amendments to the Guidelines took effect, including Amendment 821, which created a new, retroactive two-level reduction in offense level for certain defendants with zero criminal history points. *See* U.S.S.G. § 1B1.10(d), (e), 4A1.1, 4C1.1 (Nov. 1, 2023 ed.). Section 4C1.1 of the United States Sentencing Guidelines applies and, accordingly, the applicable Guidelines range is now 70 to 87 months' imprisonment.[7]

The defendant's co-conspirators have been sentenced.

- On February 8, 2019, Judge Hellerstein sentenced Seabrook to a term of 58 months' imprisonment, to be followed by three years' supervised release, and imposed a $200 mandatory special assessment and $19 million in restitution to COBA.[8] (16 Cr. 467, Dkt. 298).

---

[6] Rechnitz later provided the Government with substantial electronic evidence that incriminated him and others, including a different cellphone, and hundreds of pictures of him, Reichberg, and their police and political contacts.

[7] Amendment 821 did not take effect until after Rechnitz's Presentence Report was prepared.

[8] In an order entered on February 24, 2023, Judge Hellerstein granted Seabrook's motion for a reduction of his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A), reducing Seabrook's sentence from 58 months' imprisonment to time served, amounting to approximately 21 months'

- On June 22, 2021, the Honorable Lewis J. Liman sentenced Huberfeld to seven months' imprisonment, to be followed by one year of supervised release, and imposed a $100 mandatory special assessment, $60,000 in restitution to Platinum, and $4,000 in forfeiture.[9] (16 Cr. 467, Dkt. 402).

- On June 13, 2018, Judge Woods sentenced Harrington to a term of two years of probation and imposed a $100 mandatory special assessment and a $5,000 fine. (16 Cr. 468 (GHW), Dkt. 304).

- On May 13, 2019, Judge Woods sentenced Reichberg to 48 months' imprisonment, to be followed by two years' supervised release, and imposed a $400 mandatory special assessment and a $50,000 fine. (16 Cr. 468 (GHW), Dkt. 601).

With respect to the COBA bribery scheme, Seabrook was the most culpable, including because he abused a position of trust, and failed to take responsibility. Huberfeld was less culpable than Seabrook, but more culpable than Rechnitz. Rechnitz, while a key player in the criminal conduct as the middleman between Seabrook and Huberfeld, is the least culpable of the three defendants.

With respect to the NYPD bribery scheme, Rechnitz and Reichberg were arguably more culpable than many of the particular police officers that they recruited and called upon to perform official acts, because Reichberg led, and Rechnitz funded, a scheme to bribe a network of officers. While those officers, unlike Rechnitz and Reichberg, betrayed their duty to the public, none of their individual conduct was as pervasive as the conduct of Rechnitz and Reichberg. Rechnitz was less culpable than Reichberg, whose bribery activities extended at times beyond Rechnitz's involvement and knowledge. Rechnitz's chief contribution was to leverage his personal wealth to provide cash for the scheme.

---

imprisonment. (16 Cr. 467, Dkt. 459). On December 4, 2025, the Second Circuit reversed Judge Hellerstein's judgment with instructions that the case "be reassigned to a new district judge and that the sentence previously imposed on Seabrook be reinstated." *United States v. Seabrook*, No. 23-6279, 2025 WL 3484616, at *3 (2d Cir. Dec. 4, 2025).

[9] On February 12, 2019, Judge Hellerstein sentenced Huberfeld to a term of 30 months' imprisonment to be followed by three years' supervised release, and imposed a $100 mandatory special assessment and $19 million in restitution to COBA. (Dkt. 296). The Second Circuit held that Judge Hellerstein had erred by imposing a restitution order against Huberfeld as if he had been convicted of the bribery scheme. *United States v. Seabrook*, 968 F.3d 224, 236 (2d Cir. 2020). The Second Circuit also concluded that Judge Hellerstein had procedurally erred by applying the Guideline for commercial bribery (30 to 37 months' imprisonment), rather than for fraud (6 to 12 months' imprisonment). *See id.* at 232-35. As a result, the Second Circuit vacated Huberfeld's sentence, reversed the restitution order entered against Huberfeld, and remanded for resentencing. *See id.* at 227. On December 1, 2020, Huberfeld's case was reassigned to Judge Liman.

### III. Assessment of Rechnitz's Cooperation

Under Section 5K1.1 of the Guidelines, the appropriate reduction in a defendant's sentence for his cooperation is determined based on, among other things, "the significance and usefulness of the defendant's assistance," the "truthfulness, completeness, and reliability" of his information, the "nature and extent" of his cooperation, and the "timeliness of the defendant's assistance." As measured by those factors, Rechnitz's cooperation was timely, significant, and reliable. He met with the Government over 80 times and was consistently thorough and helpful. Although he initially lied to law enforcement, once he decided to cooperate, he was forthcoming about his own misconduct and about the misconduct of others.

Rechnitz testified at three trials over the course of a combined 18 days and proved a credible witness who withstood extensive cross-examination. And, as much as his criminal conduct contributed to the corruption by Seabrook and within the NYPD, his cooperation greatly assisted the Government in combatting that same corruption. His substantial assistance thus merits significant credit.

#### 1. Significance and Usefulness of the Defendant's Assistance (5K1.1(a)(1))

Rechnitz's cooperation was both significant and useful, and it contributed substantially to the vindication of the public's interest in several public corruption and fraud prosecutions.

The Government would not have been able to prosecute *United States v. Seabrook and Huberfeld*, 16 Cr. 467, without facts Rechnitz provided the Government and his eventual testimony at two separate trials. The Government likewise would not have been able to prosecute *United States v. Reichberg, Grant, and Harrington*, 16 Cr. 468 (GHW), which concerned police bribery at executive decision-making levels, without Rechnitz's proffers and testimony at the November 2018 trial. Rechnitz also contributed to the prosecution of *United States v. Villanueva et al.*, 16 Cr. 342 (SHS), involving corruption in the NYPD's gun licensing division. Rechnitz also provided information that aided in the resolution of other cases, including that of two corrupt businessmen with whom Rechnitz and others connected to him had collectively invested millions of dollars. In addition, Rechnitz was prepared to testify at a fourth trial (the trial of Peralta), but ultimately was not needed.

##### a. The COBA Bribery Scheme

Rechnitz's cooperation was essential to the convictions of Seabrook and Huberfeld. The case could not have been charged without Rechnitz's information and testimony. Although the Government was actively investigating the circumstances under which COBA had invested millions of dollars with Platinum, most of the actual contours of the bribery scheme were unknown to the Government before Rechnitz provided them. The personal involvement of Huberfeld, the terms of the understanding between the co-conspirators, and virtually every detail of the events of December 11, 2014—the day Seabrook received a $60,000 bribe payment—were all brought to the Government's attention by Rechnitz in his initial round of proffer sessions. None of these details were memorialized in emails the Government obtained separately via search warrant, and wiretap monitoring on Reichberg's and Rechnitz's phones did not begin until January 2015—after the payoff to Seabrook. The few calls relevant to the COBA bribery scheme after that point, which

the Government played at both Seabrook trials, were sufficiently oblique as to be of limited probative value on their own. Insider information was vital to prosecution of these crimes. Rechnitz provided it, and made the prosecution possible. In particular, Rechnitz's testimony was necessary to establishing basic background and key events of the bribery scheme, including his explicit discussions of the *quid pro quo* agreement with both Seabrook and Huberfeld, Seabrook's agreement to invest COBA's money with Platinum, while remarking that it was time he "got paid," (Tr. 634-37), and the delivery of cash in a Ferragamo bag to Seabrook. Moreover, Rechnitz's information led to the identification of corroborating evidence—surveillance footage, license plate reader information, and the discovery of the Ferragamo bag at Seabrook's house.

Rechnitz testified at both the trial and retrial of Seabrook. In all, across the two Seabrook trials, Rechnitz testified for nine days. Rechnitz's testimony was invaluable to the Government's ultimate ability to secure a conviction at trial against Seabrook. And Rechnitz's testimony at the first trial helped the Government secure a guilty plea from Huberfeld before the retrial.

Rechnitz's assistance helped hold responsible a powerful union leader and a hedge fund founder who both engaged in a bribery scheme involving betrayal and dishonesty.

### b. NYPD Bribery Scheme

Rechnitz's cooperation was similarly important to the prosecution of the NYPD bribery scheme. The bribery conduct at issue occurred over the course of more than seven years. Rechnitz provided information that enabled the Government to find corroboration for individual incidents, made the Government aware of new incidents, and provided credible evidence of the *pro* between the things of value he and Reichberg gave to officers and the acts those officers performed in return. In particular, Rechnitz provided a first-hand account of conversations he had with Reichberg that evinced the criminal understanding between the two that formed the backbone of the conspiracy.

Prior to trial, on March 1, 2018, Harrington pled guilty before Judge Woods to misapplication of resources in connection with a program receiving federal funds, in violation of Title 18, United States Code, Section 666(a)(1)(A), a felony offense. (16 Cr. 468 (GHW), Dkt. 137-38 & Mar. 1, 2018 Minute Entry). Rechnitz served as a critical witness at the trial of Grant and Reichberg, conducted before Judge Woods in November 2018 through January 2019. The defense hinged not on whether the transactions had taken place, but on whether the defendants shared the requisite criminal understanding with each other and their other alleged co-conspirators. As a result, a critical component of the Government's presentation of evidence was Rechnitz's testimony. Rechnitz testified over the course of nine days, and endured substantial cross-examination over the course of seven days.

The trial concluded with a split verdict: conviction on nearly all counts for Reichberg, and acquittal for Grant.[10] Rechnitz's testimony proved essential to securing Reichberg's conviction. As noted above, Reichberg had engaged in a far-reaching scheme to bribe some of the highest-

---

[10] Reichberg was found not guilty of a single bribery count specifically limited to his interactions with Grant.

ranking members of the NYPD, along with other public officials, for at least eight years. In exchange for bribes, Reichberg demanded and often received a wide range of official actions, including the deployment of NYPD cars, boats, and helicopters to serve himself and his associates; influence over personnel transfers and promotions; favorable dispositions on arrests; police interference in ordinarily civil disputes; and more. While Grant was ultimately acquitted by the jury, the verdict did not appear to reflect any determination about Rechnitz's credibility. Rechnitz's testimony, while critical, was one piece of evidence in a complex, two-month-long trial, which required the jury to weigh numerous factors in assessing each defendant's guilt. Rechnitz fulfilled his responsibility to testify truthfully when called, irrespective of the outcome. As noted above, Judge Woods sentenced Reichberg to 48 months' imprisonment in May 2019. Harrington, who was less culpable than Reichberg and Grant, received a noncustodial sentence for his crime, but nevertheless carries a federal felony conviction for the crime that ended his career as a once highly decorated NYPD official.

Rechnitz's cooperation helped the Government hold accountable Reichberg and NYPD leaders for their participation in a brazen bribery scheme.

### c. Additional Cooperation

Rechnitz's information with respect to his and Reichberg's involvement with Offinger and de Blasio's campaign was also useful. That information constituted some of the conduct at issue in a broader inquiry as to circumstances in which de Blasio and others solicited donations from individuals who sought official favors from the City, after which de Blasio or individuals working for him made or directed inquiries to relevant city agencies on behalf of those donors. While the investigation ultimately concluded without charges, Rechnitz's information was generally corroborated by other evidence uncovered during the investigation, including the accounts of other witnesses.

Rechnitz also provided assistance that helped the Government in connection with *United States v. Peralta*, 16 Cr. 354 (KBF). Peralta solicited more than $12 million from various investors by falsely representing that the funds would be used to purchase wholesale liquor for resale, with the profits to lead to high rates of return for the investors. In truth, Peralta used no more than $700,000 to purchase alcohol, and the rest of the money was used either to repay other investors or enrich himself. Rechnitz—both a victim of the fraud and recruiter of other victims under false pretenses—provided information and emails that assisted the Government in understanding how Peralta's business worked. He was scheduled to testify at Peralta's trial as part of his cooperation, and met with the Government to prepare for that testimony. Peralta pled guilty four days before the start of trial. At the time that Peralta pleaded guilty, Rechnitz's 3500 material had been provided to Peralta. Peralta was sentenced to five years' imprisonment.

After the National Event Company's $70 million resale ticket fraud was uncovered, and owner Nissen was arrested, Rechnitz provided information concerning his understanding of how Nissen's business worked. Nissen pled guilty to the wire fraud charge contained in an information in *United States v. Nissen*, 17 Cr. 477 (PAE). After Nissen's plea, the Honorable Paul A. Engelmayer ordered the Government to undertake an investigation of whether the defendant or persons close to him received a personal financial benefit from the funds that Nissen had

fraudulently obtained, as opposed to money that had gone to business expenses and/or the repayment of other investors. As part of his cooperation, Rechnitz provided information to the Government that assisted with that aspect of the investigation. Nissen was ultimately sentenced to 27 months' imprisonment.

Finally, Rechnitz's cooperation assisted the Government with prosecutions related to the NYPD's Licensing Division, the bureau that vets and approves handgun permits in New York City. Rechnitz provided the Government with information regarding how Grant had used his contacts at the NYPD's Licensing Division—including Sergeant David Villanueva—to attempt to smooth the path for approval of his and Reichberg's gun licenses. After Grant and Reichberg were arrested for, among other things, gun permit-related misconduct, Villanueva and other Licensing Division personnel who had previously accepted bribes from corrupt expediter Alex "Shaya" Lichtenstein decided to stop accepting Lichtenstein's bribes. Lichtenstein attempted to reach out to new "partners" in the NYPD, one of whom contacted the relevant authorities immediately. This launched a broader inquiry that resulted in the arrests and convictions of Villanueva, Lichtenstein, and numerous other corrupt police officers and expediters. *See United States v. Lichtenstein*, 16 Cr. 342 (SHS) (32 month sentence after guilty plea on bribery charges relating to serial bribery of Licensing Division officers); *United States v. Villanueva*, 16 Cr. 342 (SHS) (four month sentence for cooperating police official who received bribes); *United States v. Ochetal*, 16 Cr. 342 (SHS) (time served for police officer who received bribes and testified at trial as cooperator); *United States v. Chambers*, 17 Cr. 396 (WHP) (one year and one day sentence for corrupt attorney who facilitated gun license bribes); *United States v. Dean*, 17 Cr. 398 (ER) (18 month sentence for participation in gun license approval-related bribery); *United States v. Espinel*, 17 Cr. 398 (ER) (one year and one day sentence for participation in gun license approval-related bribery); *United States v. Valastro*, 17 Cr. 398 (ER) (time served for expediter who received bribes); *United States v. Soohoo*, 16 Cr. 342 (SHS) (sentence of time served for corrupt gun license expediter).

### 2. Truthfulness, Completeness, and Reliability of Information and Testimony (5K1.1(a)(2))

As noted above, Rechnitz was not candid when first approached by law enforcement. He lied in order to obfuscate his connections to Seabrook and the NYPD officers he and Reichberg had cultivated. Once Rechnitz decided to cooperate, he gave information both on previously known subjects of investigation and on subjects that were new to the Government. The information he provided was corroborated by other evidence, including the statements of others. Rechnitz was forthright about his crimes and those of others, accepted responsibility for his conduct, and did not minimize or shift blame.

Rechnitz answered questions honestly, both during meetings with the Government and during direct and cross-examination. Rechnitz also provided the Government with considerable evidence that it was able to use during its prosecutions, including documents and dozens of pictures of himself and co-conspirators and persons of interest. He turned over, and the Government made use of, videos he recorded of himself and Reichberg, including on the Christmas morning when they delivered video game systems and high-end collectible dolls to police officers' homes, and the various parking-related credentials that he had received from Banks and others. He made tens

of thousands of emails available to the Government, which tracked many of the schemes that were eventually charged, as well as the full contents of a cellphone.

### 3. "[N]ature and extent" of Assistance (5K1.1(a)(3))

Rechnitz's cooperation was extensive. He met with the Government over 80 times, usually for hours at a time, for debriefings and trial preparation. Rechnitz made himself available to the Government whenever he was requested to do so, without complaint.

Rechnitz's trial testimony exemplifies the extensive nature of his cooperation. As noted, he testified over the course of 18 days at three separate trials, including intense cross-examination by multiple lawyers over multiple days.

Rechnitz kept his composure throughout his time on the witness stand. He answered the defense attorneys' questions to the best of his recollection, conceding a point when appropriate and pushing back when not.

### 4. Any Injury Suffered, or Any Danger or Risk of Injury to the Defendant or His Family Resulting from Assistance (5K1.1(a)(4))

It is inherently risky for a criminal defendant to cooperate with the Government, particularly where his cooperation involved an extensive scheme and implicated defendants in positions of power, including law enforcement officers and a union leader. Rechnitz experienced harassment as a result of his cooperation. In the weeks before he was scheduled to testify at the first trial of Seabrook and Huberfeld, Rechnitz reported, and the FBI verified, that (1) Rechnitz was approached in a hostile manner by an associate of Huberfeld at a school event Rechnitz attended for one of his children, (2) Rechnitz's residence was shadowed by a vehicle on multiple occasions, the owner of which traced back to persons with connections to Huberfeld, and (3) both before and after his testimony, Rechnitz received several unsettling anonymous phone calls and emails.

Moreover, the trials at which Rechnitz testified were closely and widely covered by news media, magnifying the reputational impact of Rechnitz's testimony significantly. (*See, e.g.*, PSR ¶ 57 ("The defendant was ostracized by his Jewish Orthodox community in New York City and ridiculed by the New York City media, particularly the New York Post, for working with the Government.")). Rechnitz had stressful experiences in testifying. For example, at different points during Rechnitz's testimony in the Reichberg trial, Judge Woods had to admonish the gallery not to "intimidate witnesses" or engage in "outbursts, laughter, [or] commentary toward the witness or during their testimony." (Reichberg Tr. 2718-19, 2983, 2994, 4003, 4282). On several occasions early in Rechnitz's testimony, his efforts to exit the courtroom were impeded by Reichberg's supporters who stood in his way; eventually, Judge Woods permitted Rechnitz to take his breaks in a separate room within the Court's space in order to avoid a potential confrontation. (Reichberg Tr. 2581).

### 5. Timeliness of the Defendant's Assistance (5K1.1(a)(5))

In May 2016, Rechnitz made the decision to cooperate with the Government. Rechnitz then sat for three full day-long debriefing sessions with the Government to describe his crimes. Rechnitz's timely assistance was highly important to the Government and helped the Government prosecute the various cases detailed above.

## IV. Conclusion

In light of the foregoing, Rechnitz's assistance was "significan[t] and useful[]" to the Government in its investigation and prosecution of numerous public corruption and fraud defendants. *See* U.S.S.G. § 5K1.1(a)(1). The information provided by Rechnitz was also "truthful[], complete[], and reliab[le]." *See id.* § 5K1.1(a)(2). Accordingly, assuming that Rechnitz continues to comply with the terms of his cooperation, and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines, that the Court sentence Rechnitz in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: s/
Lara Pomerantz
Assistant United States Attorney
(212) 637-2343

cc: Noam Biale, Esq.