| | |
|---|---|
| **From:** | Jayson Winer |
| **To:** | Pomerantz, Lara (USANYS) |
| **Subject:** | [EXTERNAL] Additional Civil Filings Relevant to Sentencing |
| **Date:** | Monday, February 23, 2026 9:10:50 PM |
| **Attachments:** | Complaint FILED – Winer.pages |
| | David_Rovinsky_LLC v. Peter Marco v. Jona Rechnitz - Complaint.pdf |

Complaint v Mayweather Rechnitz (1

2022-12-22 Ethereum Max Second A

20M Vic Novall Statement_of_Decisi

Florida compaint Leonard Sulaymanc

kuwait-vs-al-sabah.pdf

B332788_OPF.pdf

Pierre Ladow v. Jona Rechnitz - Com

Israel Sam Gorodistian v. Jadelle Jew

[DE 1] 2026 01 14 EFILED Complair

Oved Anter, Et Al. V. Jona S. Rechni

Dear Ms. Pomerantz,

Thank you for your continued professionalism and for filing my prior correspondence.

Attached are ten additional civil lawsuits involving Mr. Rechnitz from the past five years. Due to the volume of attachments, these materials may need to be transmitted in multiple emails.

I am submitting these because they demonstrate a clear and consistent pattern of conduct that is directly relevant to sentencing.

These are not isolated disputes. The filings reflect a sustained course of behavior in which Mr. Rechnitz enters business dealings without any genuine intent to act in good faith, followed by coercion, intimidation, threats, and the leveraging of perceived government protection to pressure or silence counterparties. The pattern is deliberate, repeated, and ongoing.

The attached matters represent only a portion of those affected. Many individuals have refrained from coming forward due to fear of retaliation or reputational harm. The absence of additional public filings should not be interpreted as an absence of harm.

Taken together, this record reflects an individual who continues to use intimidation and perceived influence as tools. In my view, this presents an ongoing danger to the public and to any party who unknowingly engages with him under the assumption of honest intent.

For these reasons, I respectfully encourage you to recommend the strongest sentence possible in order to protect the public and remove this danger from our society.

Thank you for your time and service.

Respectfully,
Jayson Winer

IN THE CIRCUIT COURT FOR THE
ELEVENTH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.
JAYSON WINER (aka "Mr. Black")
and ,THE EYES LLC,

     Plaintiffs,

vs.

FRIST APEX VENTURES, LLC,
a Florida limited liability company,       JURY TRIAL DEMANDED
JONA RECHNITZ, YITZI FRID,
and AYAL FRIST,

     Defendants.

_____/

     This is an action by Plaintiffs Jayson Winer and The Eyes LLC against fraudster Jona Rechnitz and his co-conspirators. Rechnitz, a serial informant for the Justice Department, appears to believe that he can defraud victims with impunity, relying on his relationship with the Government to protect him from liability. Rechnitz preys on vulnerable and unsuspecting victims, including PlaintiffMr. Winer, to fraudulently peddle and sell celebrity access and influence.

INTRODUCTION

From the beginning, Defendants Jona Rechnitz, Ayal Frist, Yitzi Frid, and Frist Apex Ventures, LLC acted in concert to exploit Winer'Plaintiff's trust and financial resources under the guise of providing high-profile marketing services for Plaintiff's' art collection, "The Eyes Are Always Watching." Defendant's' actions reflect a coordinated and premeditated conspiracy to defraud Plaintiffs.

The scheme involved identifying Plaintiff's' vulnerabilities, creating a credible but false narrative, securing significant payments and assets, and then failing to deliver on their promises while evading accountability.

Defendants identified Plaintiff's Plaintiffs' reliance on social media to market his art collection and exploited his desperation after the alleged shadow ban of his X (formerly Twitter) account.

By presenting themselves as connected to influential figures like Floyd Mayweather and Elon Musk, Defendants created a veneer of credibility to lure Plaintiff Winer into their scheme.

Defendants fabricated agreements involving Floyd Mayweather and Elon Musk. These agreements were designed to extract large sums of money and high-value assets (e.g., watches) while providing no real service.

Defendants worked in tandem to create a façade of credibility.

Among other things, Rechnitz and Ayal made false assurances that they could get Mayweather to use his close ties with Musk and influence him, and Frid manipulated access to Plaintiff's X account, falsely claiming it was banned to increase Plaintiff's dependency.

Each Defendant played a distinct role in reinforcing the false narrative, creating a seamless appearance of a legitimate operation, and each was paid for their role in the conspiracy.

After receiving payments and assets, Defendants failed to deliver any of the promised services, including arranging contact with Elon Musk.

Rechnitz and others ceased communication with PlaintiffWiner, and Defendants collectively attempted to evade accountability.

Rechnitz's history of fraudulent activities and exploitation of his Justice Department

informant status fits within this pattern of deception. By leveraging his reputation, he likely emboldened the other Defendants to participate in this conspiracy.

THE PARTIES

Plaintiff, JAYSON WINER, is an individual residing at 1525 Bay Road, Miami, Florida 33139in Miami, Florida.

Plaintiff, THE EYES LLC, is a sole member limited liability company created under Delaware law with its principal place of business in Miami, Florida. Winer is the sole member of The Eyes LLC, which suffered damages as a result of Defendants' misconduct.

Defendant, FRIST APEX VENTURES, LLC (hereinafter "Apex") is a Florida Limited Liability Company, with its principal place of business located at 7300 W Camino Real, Suite 201, Boca Raton, Florida 33433.

Defendant, JONA RECHNITZ (hereinafter "Rechnitz") is an individual residing at 9363 Monte Mar Drive,in Los Angeles, California 90035.

Defendant, YITZI FRID (hereinafter "Frid") is an individual residing at 22385 Dorado Drive,in Boca Raton, Florida 33433.

Defendant, AYAL FRIST (hereinafter "Ayal") is an individual residing at Martinique Boulevard,in Boca Raton, Florida 33433. Frist is a member of Apex.

JURISDICTIONAL ALLEGATIONS AND VENUE

This Ccourt has subject matter jurisdiction of over this action because this is an action for damages, which, in the aggregate, exceed $50,000.00 exclusive of interest, costs and attorneys' fees.

This Court has personal jurisdiction over FRIST APEX VENTURES, LLC as because Apex is a Florida company that resides in and maintains a principal place of business in Boca Raton, Florida. Moreover, Apex operates, conducts, engaged in or carries on business in the State of Florida. Further, Apex has sufficient minimum contacts with the State of Florida so as to render the exercise of jurisdiction by the Florida courts permissible under traditional notions of fair play and substantial justice.

This Court has personal jurisdiction over defendants Frid and Ayal as they both reside in and are citizens of Boca Raton, Florida. Moreover, Frid and Ayal committed tortious acts alleged herein within the State of Florida. Further both Frid and Ayal have sufficient minimum contacts with the State of Florida so as to render the exercise of jurisdiction by the Florida courts permissible under traditional notions of fair play and substantial justice.

This Court has personal jurisdiction over defendant Rechnitz pursuant to Fla. Stat. § 48.193(1)(a)(1) and (7). This Court also has personal jurisdiction over defendant Rechnitz pursuant to Fla. Stat. § 48.193(1)(a)(2), as Rechnitz committed a tortious acts within the State of Florida, including by knowingly and intentionally directing fraudulent statements to Plaintiffs in Florida.. Rechnitz also participated in and/or directed a conspiracy with Florida residents to commit such tortious acts against Plaintiffs who is a Florida Residentin Florida. At all relevant times, Rechnitz knew that he was directing his misrepresentations to Winer to Florida, where he knew Winer resides. Moreover, Rechnitz distributed proceeds from the conspiracy to persons and/or entities in Florida. Rechnitz's actions caused Plaintiffs to suffer damages in Florida. , which took place in the State of Florida. Further, Rechnitz direction of and/or participation in the aforesaid conspiracyThe foregoing also establisheses sufficient minimum contacts to satisfy due process.

Finally, as Courts have repeatedly held, this Court has personal jurisdiction over all defendants herein through Florida's long-arm statute, since Plaintiff alleges a conspiracy among the Defendants to commit tortious acts toward Plaintiff, and that multiple members of that conspiracy committed tortious acts in Florida in furtherance of the aforesaid conspiracy.

Venue is proper in this Court pursuant to Fla. Stat. § 47.011 because the causes of action alleged herein accrued in Miami-Dade County.

MATERIAL ALLEGATIONS

Plaintiff Jayson Winer is a businessman and entrepreneur. His creativity and talent have allowed him to achieve great success despite his dyslexia and life-long battles with

depression and substance abuse. Winer is a digital artist renowned for his enigmatic global street art, operating in the digital art realm under the artistic pseudonym "Mr. Black." https://x.com/mrblack4384?lang=en

The Eyes Collection

In or around November 2023, Plaintiff Winer was inspired to create and develop a digital art collection titled "The Eyes Are Always Watching," which consists of 21,000 unique ordinal pieces inscribed on Bitcoin ("The Eyes Collection").

Many of the pieces in The Eyes Collection depict public figures, including politicians, celebrities, and athletes.

The Eyes Collection conveys its deep political, social, and religious themes and commentary via skeletal portraits that evoke today's visceral polarization and accompanying doomsday psyche. The Eyes Collection connects those feelings to their roots and shades in moral and religious dogma and juxtaposes the inherent human desire to control one's destiny (including by exercising political control) with the fatalist desire to surrender to the will of a religious figure or idol via faith.

In addition, The Eyes Collection examines faith in a digital age. The art raises timely and important questions. For example, many believe that it has become impossible to determine fact from fiction online, so, who should you believe? Who is telling the truth? What is truth? The viewer's preferred politicians, celebrities, arm-chair reporters, or news organizations? Forced to rely at least to some degree on faith, do we fall unwittingly into the trap of worshiping false saviors?

Though skeletal, the portraits' facial expressions are rich and often either sinister, joyful, or both, depending on the viewer's political, social, and religious convictions. This evokes the irony of faith—can you believe what you see when what you see is distorted by your strongly held beliefs?

The arts' clean lines, "pop" feel, and (what some may see as extreme messages) force some viewers to question whether the pieces are intended to promote or mock the underlying political message. Again, can you trust what you see? Do you believe that this image is promoting Donald Trump or criticizing him for supporting Israel? Is Bernie Sander's shock warranted by his stated fears of an emerging oligarchy in America or is he shocked because the viewer has just exposed him as the enemy? The answer likely depends on your beliefs.

The themes and features of The Eyes Collection—polarization, morality, faith, distrust, perspective, idolatry, doomsday extremes—have reached peak levels on a global scale because of social media, which has allowed people to spread opinion, fact, and misinformation (depending on your perspective) with a speed and scope never before seen or even contemplated in history.

Therein lies the importance of social media to The Eyes Collection—it harnesses social media and exists in a digital form to properly reflect the effects of social media and the digitalization of our "reality."

In other words, the marketing and medium—social media and digital—are as much a part of the art as the images themselves.

Indeed, placement of The Eyes Collection on Bitcoin is itself intended to reflect the purchaser's faith in a new monetary system that has no physical personification, existing only in images on a screen, dependent on a system built by a person or persons no one can see or even identify, and deriving its value in proportion to the number of people who have enough faith to use and accept it.

The marketing and placement of The Eyes Collection on X (formerly Twitter) is as much a part of the art as its images. X is not just a social media platform. It is a global phenomenon, the world's town square, a place to raise questions about whether there is a difference between information and misinformation, and the deities in whom we place our faith as a society. Depending on one's political persuasion, X's owner, Elon Musk,

either is a deity who has single-handedly saved the concept of free speech or a demon who has utilized his staggering wealth to blur fact and fiction, imposing his will on the world.

How society views X and Musk—as encapsulated by The Eyes Collection—is a matter of faith and perspective and begs the viewer to question whether it is possible to see beyond the horizon of their own narrow worldview. Ironically, while social media has made new ideas readily available to everyone, The Eyes Collections posits that its effect has been to weld us to our pre-existing prejudices and beliefs rather than open our "Eyes" to new perspectives. In sum, the Eyes Collection reminds us that everyone can find "evidence" to support their perspective or theory on social media, no matter how outrageous.

Plaintiffs Employes Frid

Recognizing the scope and complexity of the project, Plaintiff Winer reached out to Yitzi Frid, to explore his interest in helping Plaintiffs market The Eyes Collection via X. Since December 2021, Plaintiff Winer had employed Frid to help him with other business ventures and trusted him with his new project, which Plaintiff Winer was working on in secret.

Frid agreed to assist Plaintiffs with the digital aspects of the project and, in or around January 2024, started working with Plaintiff Winer to create an artist profile on X under the artistic pseudonym "Mr. Black" or @mrblack4384 (the "X Account").

Frid assumed responsibility for creating the X Account and retained full access as the primary account holder, granting Plaintiff Winer access through a secondary login. Plaintiffs maintained full control over the substantive and creative aspects of the X Account, including posting all content or directing its publication, and quickly built a following on the X Account, utilizing the platform to promote The Eyes Collection.

The Auction

Plaintiffs ultimately planned to sell The Eyes Collection via an online auction (the "Auction").

Each of the 21,000 pieces in The Eyes Collection was digital and was preserved uniquely and in perpetuity by association with a specific "satoshi," the smallest unit of Bitcoin. The X Account provided information about the Auction and a link to a protocol on the Eyes4384.com website (the "Protocol"). The Protocol would inscribe each art piece on a satoshi. Frid setup his Bitcoin wallet to control the Protocol, which is Plaintiff'Plaintiffs's property. Frid wrongfully refuses to return the Protocol to Plaintiff.

The Auction would start the evening of September 16, 2024 and last seven days. Each of the 21,000 pieces would start at .7 Bitcoin, the equivalent of approximately $100,000 per piece or $2.1 billion for the entire collection. The price of each unsold piece would decrease by .1 Bitcoin each day until the price reached 0 Bitcoin at the end of the Auction.

The Auction was scheduled to start on September 16, 2024. The Auction commenced as scheduled on September 16, 2024, and proceeded over the designated seven-day period. The Auction progressed ultimately reaching the floor price and is now available for free..

Initial Efforts to Market Thethe Eyes Collection

In late April or early May 2024, Plaintiffs launched a marketing campaign to coincide with President Donald Trump's criminal trial at the New York County Courthouse, employing trucks adorned with images from The Eyes Collection and QR codes that directed viewers to the X Account of "Mr. Black."

Shortly after this marketing campaign, however, Plaintiff Winer received what appeared to be a message from X stating that he could not market the Auction on X. In addition, Plaintiff Winer believed that his accountthe X Account was "shadow banned," which refers to a situation where a user's content or activity on a social media platform is deliberately restricted or made less visible by the platform, often without the user being explicitly informed.

The irony was that X was suppressing The Eyes Collection, which is in part a commentary on the impacts that free-flowing communication via social media on a global scale have had on society.

Unable to advertise his artwork through X, the circumstances became increasingly more urgent because the September 16, 2024 Auction was fast approaching.

Frid pitched to Winer the opportunity to enter into a potential agreement with professional boxer Ryan Garcia, to promote the artwork and auction. Defendant Ayal represented Garcia, who ultimately signed an agreement with Frid to promote the art and auction.

As part of that agreement, and relying on Frid's representations, Plaintiff Winer wired $175,000 of his personal funds to Frid on August 28, 2024, and wired $100,000 of his personal funds to Ayal on September 6, 2024, to be held by Ayal in escrow, with the understanding that the funds would only be released upon Garcia fulfilling his obligations under the agreement.

Before placing the $100,000 in Ayal's escrow, Plaintiff Winer realized that Garcia was not performing his obligations under the agreement and expressed these concerns to Frid and Ayal, who pitched an alternative plan.

Defendants Promote and Sell Floyd Mayweather's Access to Elon Musk

Frid texted Plaintiff Winer on September 2, 2024 saying that he "Spoke to Ayal. He [c]an get Elon [Musk] and Floyd [Mayweather] on a FaceTime call for around 5mm [i.e. $5 million]." According to Frid and Ayal, Mayweather could communicate with Elon Musk about resolving Plaintiff's' advertising/shadow ban issues on X and, at the same time, promote The Eyes Collection and the Auction to Musk.

This felt like fate to Plaintiff Winer given The Eyes Collection's themes and incorporation of X, and both Frid and Ayal knew that it would seem that way to PlaintiffWiner.

Frid and Ayal arranged a call between PlaintiffWiner, Rechnitz, and someone Rechnitz, Frid, and Ayal claimed was Mayweather on September 16 or 17, 2024. Frid and Ayal also were on the call. Rechnitz, Mayweather's agent, confirmed that Mayweather had become close to Musk, including because Mayweather helped train Musk for his "Cage Match" against Mark Zuckerberg, and that Mayweather and Musk had remained close ever since. Rechnitz confirmed that, for $5 million, Mayweather could arrange a FaceTime call between Plaintiff Winer and Musk.

Plaintiff Winer responded that he did not have $5 million, did not need a meeting with Musk, and that a text message from Mayweather informing Musk about Plaintiff's shadow ban and advertising issues on X would suffice to meet his twin aims of accessing X's marketing platform and promoting the collection to Musk personally, so long as the message included certain photos from The Eyes Collection.

Plaintiff's response angered Defendants, who then collectively locked him out of his Twitter accountthe X Account in an effort to create the false impression that he no longer had access to the Aauction.

Plaintiff proposed that Mayweather send the text message and photos for $1 million. Rechnitz and Ayal agreed.

THE SEPTEMBER 16 AGREEMENT

Relying on Defendants' representations, Plaintiff Winer entered into a September 16, 2024 agreement (the "September 16 Agreement") with Defendant Apex, "representing Floyd Mayweather/Mayweather Promotions." Exhibit A.

Pursuant to the September 16 Agreement, Apex "agreed to arrange for Floyd Mayweather to send [a] specific text message to Elon Musk" along with seven images from The Eyes Collection. The text of the message and the seven images were included as part of the September 16 Agreement, which also requires the application of Florida law and could "be amended only by a written instrument executed by both parties."

Pursuant to the September 16 Agreement, the text messages had to be sent within two hours of executing the agreement. Time was of the essence because the Auction was about to go online at 7:40 pm that night.

The text message from Floyd was supposed to read:

In exchange for sending the text message (including all seven photos of the art), Plaintiff Winer agreed to pay Apex a total of $1 million, with $100,000 to be paid upon

execution of the September 16 Agreement via transfer from the escrowed funds held by Ayal and the remaining $900,000 to be paid upon the maturity of a specific life insurance policy identified in the September 16 Agreement (the "Insurance Policy") and payment to Plaintiff Winer of those funds.

The afternoon of September 16, 2024, Rechnitz sent Plaintiff Winer a message saying, "He read it he's checking," intending to mean that Musk had read the text message from Mayweather and was checking into the situation.

At approximately 1:07 am on September 17, 2024, Rechnitz sent Plaintiff Winer a screenshot purporting to show that Mayweather sent the text message and some of the photos to Musk, who purportedly responded: "Ok. Is his account suspended?" Mayweather purportedly replied, "Bc of these messages," referring to some photos of The Eyes Collection he attached to the message thread.

However, the X Account remained shadow banned and there was no apparent follow up from Musk.

It is clear, in hindsight, that Defendants fraudulently induced Plaintiff to enter into the September 16 Agreement knowing that they could not or would not have Mayweather send the text message to Musk or communicate with him in any meaningful way. Defendants knew that Apex would not perform its obligations under the September 16 Agreement, which they used solely as a means of stealing money from Plaintiff.

Rechnitz lied when he reassured Plaintiff that Mayweather had sent the text message and when he reassured Plaintiff that Musk had read the text message and had expressed interest.

In the alternative, even if Mayweather had sent the message, Apex breached the September 16 Agreement by failing to send the requisite number of pictures with the message.

Defendants' Continue Their Predatory Fraud

On the evening of September 17, 2024, Rechnitz contacted Plaintiff Winer via FaceTime with someone Rechnitz claimed was Mayweather.

Rechnitz pretended to be excited for PlaintiffWiner, telling him that Musk wanted to talk to him. Rechnitz told Plaintiff Winer that, for $4 million, Mayweather could arrange a call with Musk about The Eyes Collection.

Plaintiff Winer responded that Apex had not fulfilled the terms of the September 16 Agreement because Mayweather only sent 5, instead of 7, pictures of art from The Eyes Collection, as expressly required by the September 16 Agreement.

Rechnitz claimed that Plaintiff Winer had agreed via text messages that Mayweather only needed to send 3 pictures from The Eyes Collection. However, that was incorrect.

Plaintiff Winer merely agreed that Mayweather needed to send 3 of the pictures immediately, so as not to overwhelm Musk, but that Mayweather needed to send the remaining pictures shortly thereafter.

Rechnitz became enraged and began intimidating Plaintiff Winer and his business partner in the life insurance business if they did not pay him the funds from the Insurance Policy immediately, even though those funds would not be due under the express terms of the September 16 Agreement until maturity and receipt by Plaintiff Winer of the funds, neither of which had (or has) occurred.

Nonetheless, Plaintiff Winer attempted to make peace with Rechnitz and Ayal, and even tried to meet them in Boca Raton on September 18, 2024.

Rechnitz and Ayal refused to see Plaintiff Winer and did not respond to his text messages.

On or about September 20, 2024, Plaintiff Winer sent Rechnitz 45 bottles of a new tequila brand he had started called Casa Malka. https://casamalka.com/. Plaintiff Winer did so in an effort to make peace with Rechnitz.

Around this time, and in order to make Plaintiff Winer more vulnerable and desperate, Rechnitz directed and paid Yitz in Florida to block Winer'sPlaintiff's access to the X Account to make it appear like X had completely suspended the Account. Rechnitz subsequently admitted that he was the one who blocked the X Account.

THE SEPTEMBER 22 AGREEMENT

On or about September 22, 2024, with only 1 day left in the Auction, Plaintiff Winer sent Rechnitz a message desperately pleading for help because he was out of options and out of cash.

Rechnitz responded: "[D]o you have any expensive watches or anything. I have an idea for you to get short-term cash."

In response, Plaintiff Winer sent Rechnitz a message saying that he did not need cash, only a chance to speak with Musk about The Eyes Collection. Plaintiff Winer also sent Rechnitz a picture of his Audemars Piguet watch.

Rechnitz then asked Plaintiff Winer if he owned any other watches, to which Plaintiff Winer replied that he had a Patek Philippe.

Together, the watches are worth at least $160,000.

Rechnitz responded, "Floyd is a huge watch guy. Let me work, give me 15 minutes" and "My idea will work and will be cheaper than $4 million."

Rechnitz's idea was to pitch Mayweather on accepting the watches as payment for sending an additionala text message from Plaintiff Winer to Musk and arranging a FaceTime call between Plaintiff Winer and Musk.

Rechnitz claimed that he needed a third watch for his idea. To make himself appear like he wanted to help Plaintiff Winer and make the deal appear legitimate, Rechnitz claimed that he would supply the third watch. He also encouraged Plaintiff Winer to make the deal by trying to obtain an interest in the sale of The Eyes Collection.

Shortly after, Rechnitz sent a message to Plaintiff Winer claiming that he was about to speak with Mayweather (who Rechnitz claimed was bowling at that time) and could get the deal done for WinerPlaintiff's two watches and $20,000 cash.

Rechnitz also asked Plaintiff Winer to keep the deal "private," except for Ayal and Yitz, Rechnitz's co-conspirators. .

 Just after midnight on September 23, 2024, Rechnitz sent a message to Plaintiff Winer claiming that he had gotten the deal done and that he was going to send Mayweather's security to pick up the watches and $20,000 from Winer in Miami, Florida.

Furthermore, Rechnitz sent multiple text messages to PlaintiffWiner, including one stating, "Let's get this done for real now because you can make crazy money. I know how this game works."

Plaintiff Winer agreed, and Rechnitz informed him that he had spoken with Floyd Mayweather and "got it done." This was all a lie. Rechnitz had not spoken with Floyd about a deal, Rechnitz never intended to offer one of his watches to solidify the supposed deal, and he was never going to have Mayweather arrange a video call between WinerPlaintiff and Musk. Rechnitz was just trying to squeeze as much as he could out of WinerPlaintiff, whom Rechnitz knew was vulnerable and desperate to promote The Eyes Collection and its message on a global scale.

Promptly thereafter, Rechnitz directed Plaintiff Winer to prepare the $20,000 in cash and the watches for pickup in Miami by Mayweather's security guard within a few hours.

On September 22, 2024, at approximately 1:30 a.m., someone purporting to be part of Mayweather's security team arrived at Plaintiff's Winer's home and collected the $20,000 in cash and the two watches from PlaintiffWiner.

At approximately 2:30 am on September 22, 2024, Rechnitz sent Plaintiff Winer messages claiming that he and Mayweather had an initial video call with Musk and that Musk was interested, would review everything, and would get back to them on his vision for The Eyes Collection. This all was a lie.

Later that day, Rechnitz claimed that Musk had advised Plaintiff Winer to take the Auction offline and reschedule it after obtaining other celebrity endorsements, which, of course, Rechnitz promised he could provide. This was a lie. Rechnitz merely was setting up the opportunity to defraud Plaintiffs in the future by getting him them to pay for other celebrity endorsements that Rechnitz claimed he had access to.

Rechnitz further claimed that Musk said that The Eyes Collection was "powerful" and that "every MAGA will buy it."

Rechnitz also claimed that Musk "said he may want to buy entire collection."

Rechnitz told Plaintiff Winer that he was heading to Miami that night so that Plaintiff Winer could have the call with Musk the following morning. This too was lie.

Ultimately, Plaintiff Plaintiffs could not stop the Auction from going forward. After Plaintiff Winer informed Rechnitz that he could not take the Auction offline, Rechnitz refused to arrange the call between Plaintiff Winer and Musk, even though there was still time to promote The Eyes Collection before it automatically would become free. Over the following months, Plaintiff Winer sought to address with Rechnitz the wrongful conduct and conspiracy directed against him. In response, Rechnitz reacted with hostility, issuing threats against PlaintiffWiner and his's family. Indeed, Rechnitz acted on several of his threats by intimidating and harassing Plaintiff's Winer's brother-in-law and orchestrating the blockage of Plaintiff's Winer's ex-wife's business Instagram account. In hindsight, it is clear that Defendants took advantage of Plaintiffs. All Defendants shared in the proceeds of the frauds on Plaintiffs. All conditions precedent to the filing of the action have been satisfied or waived.

COUNT I
(FRAUD / FRAUDULENT INDUCEMENT: SEPTEMBER 16 CONTRACT
(against all Defendants))

Plaintiffs repeats, reiterates, and realleges each and every allegation contained in those paragraphs of this demand marked "1" through "1054" inclusive, with the same force and effect as if fully set forth at length herein. Defendants Frid, Ayal, Apex, and Rechnitz made false representations of material fact to induce Plaintiff to enter into the September 16 Agreement. Among other things, Defendants Frid (a) , specifically, among other things: a.) represented to PlaintiffWiner that they could get Floyd Mayweather to contact Elon Musk on Plaintiffs' behalf; (b) that Floyd Mayweather had both the ability and intention to contact Elon Musk on Plaintiffs' behalf to contact Elon Musk on Plaintiff's behalf;, and (cb.) that Mayweather's relationship with Musk was such that Musk would actually read the communications and understand that Mayweather had sent them in earnest. All these representations were false. Plaintiffs relied on Defendants' misrepresentations, including when Winer agreed to pay Apex the $1 million, which Defendants agreed to divide among themselves as payment for

their respective roles in the fraud and theft. As Defendants all were aware, Plaintiffs further relied on their misrepresentations by not pursuing other marketing relationships, causing The Eyes Collection to become available for free and causing Plaintiffs to suffer damages in the hundreds of millions of dollars or more.

Defendants further lied to Winer when they provided Winer with supposed proof that Mayweather had sent the messages to Musk, and when they claimed that Musk was interested in the art and was looking into Plaintiffs' advertising issues on X. These false statements were both an effort to conceal and perpetuate their fraud, and part of a broader scheme to steal more from Winer.

Specifically, Defendants knew that telling Winer that Mayweather had successfully sent the message, and telling Winer about Musk's purported interest in The Eyes Collection, would induce Winer to want follow-up communications with Musk. However, neither Mayweather nor Defendants ever communicated with Musk, and Defendants never even asked Mayweather to do so.

Through this lie, Defendants tried to entice Plaintiffs to give them $4 million to have Mayweather send a message to Musk and to arrange a video call between Winer and Musk. Realizing that Plaintiffs did not have the $4 million available, Defendants decided instead to get as much out of Plaintiffs as they possibly could. But their goal was not merely to defraud and steal from Plaintiffs, but to destroy The Eyes Collection and harm Winer.

To that end, Rechnitz fabricated a story about getting Mayweather to agree that he would setup the video call between Winer and Musk in exchange for Winer's watches and Winer's remaining $20,000 in cash.

Rechnitz further lied when he told Winer that he was on his way to Miami to see Winer and arrange the video call with Musk.

Defendants further (a) represented to Winer that they could get Floyd Mayweather to contact Elon Musk on Plaintiffs' behalf; (b) that Floyd Mayweather had both the ability and intention to contact Elon Musk on Winer's behalf; (c) that Floyd Mayweather could arrange the video call between Winer and Musk; and (d) that Mayweather's relationship with Musk was such that Musk would actually read the communications and understand that Mayweather had sent them in earnest. All these representations were false.

Defendants made these misrepresentations with the intent to defraud Plaintiffs and induce Winer to pay them with the $20,000 and his watches, which Defendants divided among themselves as payment for their respective roles in the fraud and theft. As Defendants all were aware, Plaintiffs further relied on their misrepresentations by not pursuing other marketing relationships, causing The Eyes Collection to become available for free and causing Plaintiffs to suffer damages in the hundreds of millions of dollars or more.

Defendants coordinated their misconduct and actions to present a unified front and mislead Plaintiffs. Each Defendant agreed to participate in the fraudulent scheme and took overt acts in furtherance thereof.

assured Plaintiff that upon payment of the $1 million, Floyd Mayweather would send seven messages to Elon Musk within two hours of the Agreement's execution, c.) participated in communications, including messages in the Group Chat, falsely reinforcing the legitimacy of the deal and the promised performance, and d.) advised Plaintiff that he was shadow banned from his twitter account and/or that he had been banned from the account when he knew that he had removed plaintiff's access to the account.

pay them the initial $1 million under the September 16 Agreement.

Defendants herein collectively, coordinated their actions to present a unified front and mislead Plaintiff into believing the Agreement was legitimate, represented that Floyd Mayweather would send seven messages to Elon Musk upon payment, despite knowing this would not occur, and structured the September 16 Agreement with the intent to misappropriate Plaintiff's funds under false pretenses.

Defendant Frid, specifically, among other things: a.) represented to Plaintiff that Floyd Mayweather had both the ability and intention to contact Elon Musk on Plaintiff's behalf, b.) assured Plaintiff that upon payment of the $1 million, Floyd Mayweather

would send seven messages to Elon Musk within two hours of the Agreement's execution, c.) participated in communications, including messages in the Group Chat, falsely reinforcing the legitimacy of the deal and the promised performance, and d.) advised Plaintiff that he was shadow banned from his twitter account and/or that he had been banned from the account when he knew that he had removed plaintiff's access to the account.

Defendant Frid knew that these representations were false at the time they were made.

Defendant Frid was aware that Floyd Mayweather did not intend to send the messages and that the Agreement would not be performed.

In good faith reliance on the above representations, Plaintiff agreed to enter into the Agreement, paid Defendants the initial $1 million, and performed all obligations required of him under the terms of the Agreement.

Defendant Frid never intended for the September 16, 2024 Agreement to be performed. Rather, his recommendation that Plaintiff enter into the deal was part of a deliberate scheme to deprive Plaintiff of his money under false pretenses.

Defendant Frid fraudulently induced Plaintiff to enter into the Agreement as part of Defendants' ultimate scheme to deceive Plaintiff and wrongfully appropriate his funds.

Plaintiff justifiably relied on Defendant Frid's false representations and took significant and detrimental action in reliance thereon.

As a direct and proximate result of Defendants' fraudulent acts Frid's fraudulent conduct, Plaintiffs has suffered substantial damages, which continue to accrue.

Defendant Ayal, specifically, among other things: a.) Assured Plaintiff that Floyd Mayweather could and would contact Elon Musk as part of the deal, and b.) Executed the Agreement on behalf of Apex while knowing or intending that Floyd Mayweather would not fulfill the contractual obligations.

Defendant Ayal knew that the representations he made were false at the time they were made and intended to mislead Plaintiff.

In good faith reliance on these representations, Plaintiff agreed to enter into the Agreement, paid the initial $1 million, and performed all obligations required of him.

Defendant Ayal never intended for the Agreement to be performed and acted as part of the broader scheme to defraud Plaintiff.

Defendant Ayal fraudulently induced Plaintiff to enter into the Agreement, contributing to the Defendants' coordinated scheme to misappropriate Plaintiff's funds.

Plaintiff justifiably relied on Defendant Ayal's false representations and took significant and detrimental action in reliance thereon.

As a direct and proximate result of Defendant Ayal's fraudulent conduct, Plaintiff has suffered substantial damages, which continue to accrue.

Defendant Apex, specifically, among other things: a.) Held itself out as the entity responsible for arranging the deal with Floyd Mayweather, claiming to officially represent him and/or Mayweather Promotions, b.) Assured Plaintiff that the Agreement was legitimate and that Floyd Mayweather would perform as agreed, c.) Assured Plaintiff that Floyd Mayweather would send the agreed-upon messages to Elon Musk upon payment, and d.) Provided false assurances to Plaintiff regarding the validity and execution of the Agreement.

Defendant Apex knew these representations were false at the time they were made and intended to deceive Plaintiff.

In good faith reliance on these representations, Plaintiff agreed to enter into the Agreement, paid the initial $1 million, and performed all obligations required of him.

Defendant Apex never intended for the Agreement to be performed and acted as part of the Defendants' broader scheme to defraud Plaintiff.

Defendant Apex fraudulently induced Plaintiff to enter into the Agreement to further Defendants' coordinated plan to misappropriate Plaintiff's funds.

Plaintiff justifiably relied on Defendant Apex's false representations and took significant and detrimental action in reliance thereon.

As a direct and proximate result of Defendant Apex's fraudulent conduct, Plaintiff has suffered substantial damages, which continue to accrue.

Defendant Rechnitz, specifically, among other things: a.) orchestrated the purported deal with Floyd Mayweather, knowing it was fraudulent, b.) assured Plaintiff that Floyd Mayweather was a close friend of Elon Musk and could and would directly contact him, c.) assured Plaintiff that payment of $1 million would result in the agreed-upon messages being sent to Elon Musk, and d.) participated in communications with Plaintiff, reinforcing the legitimacy of the Agreement.

Defendant Rechnitz knew that these representations were false and made with the intent to mislead Plaintiff.

In good faith reliance on these representations, Plaintiff agreed to enter into the Agreement, paid the initial $1 million, and performed all obligations required of him.

Defendant Rechnitz never intended for the Agreement to be performed and actively perpetuated the fraudulent scheme to misappropriate Plaintiff's funds.

Defendant Rechnitz fraudulently induced Plaintiff to enter into the Agreement to further Defendants' collective scheme.

Plaintiff justifiably relied on Defendant Rechnitz's false representations and took significant and detrimental action in reliance thereon.

As a direct and proximate result of Defendant Rechnitz's fraudulent conduct, Plaintiff has suffered substantial damages, which continue to accrue.

WHEREFORE, Plaintiffs demands judgment against Defendants for damages, attorneys' fees and costs, pre and post judgment interest, punitive damages, and such other and further relief as the Court deems just and proper.

COUNT II
(CONSPIRACY TO COMMIT FRAUD: SEPTEMBER 16 CONTRACT)
(against all Defendants)

Plaintiffs repeat, reiterate, and reallege each and every allegation contained in those paragraphs of this demand marked "1" through "105" inclusive, with the same force and effect as if fully set forth at length herein.

Defendants Frid, Ayal, Apex, and Rechnitz made false representations of material fact to induce Plaintiff to enter into the September 16 Agreement.

Among other things, Defendants (a) represented to Winer that they could get Floyd Mayweather to contact Elon Musk on Plaintiffs' behalf; (b) that Floyd Mayweather had both the ability and intention to contact Elon Musk on Plaintiffs' behalf; and (c) that Mayweather's relationship with Musk was such that Musk would actually read the communications and understand that Mayweather had sent them in earnest. All these representations were false.

Plaintiffs relied on Defendants' misrepresentations, including when Winer agreed to pay Apex the $1 million, which Defendants agreed to divide among themselves as payment for their respective roles in the fraud and theft. As Defendants all were aware, Plaintiffs further relied on their misrepresentations by not pursuing other marketing relationships, causing The Eyes Collection to become available for free and causing Plaintiffs to suffer damages in the hundreds of millions of dollars or more.

Defendants further lied to Winer when they provided Winer with supposed proof that Mayweather had sent the messages to Musk, and when they claimed that Musk was interested in the art and was looking into Plaintiffs' advertising issues on X. These false statements were both an effort to conceal and perpetuate their fraud, and part of a broader scheme to steal more from Winer.

Specifically, Defendants knew that telling Winer that Mayweather had successfully sent the message, and telling Winer about Musk's purported interest in The Eyes Collection, would induce Winer to want follow-up communications with Musk. However, neither Mayweather nor Defendants ever communicated with Musk, and Defendants never even asked Mayweather to do so.

Through this lie, Defendants tried to entice Plaintiffs to give them $4 million to have Mayweather send a message to Musk and to arrange a video call between Winer and Musk. Realizing that Plaintiffs did not have the $4 million available, Defendants decided instead to get as much out of Plaintiffs as they possibly could. But their goal was not

merely to defraud and steal from Plaintiffs, but to destroy The Eyes Collection and harm Winer.

To that end, Rechnitz fabricated a story about getting Mayweather to agree that he would setup the video call between Winer and Musk in exchange for Winer's watches and Winer's remaining $20,000 in cash.

Rechnitz further lied when he told Winer that he was on his way to Miami to see Winer and arrange the video call with Musk.

Defendants further (a) represented to Winer that they could get Floyd Mayweather to contact Elon Musk on Plaintiffs' behalf; (b) that Floyd Mayweather had both the ability and intention to contact Elon Musk on Winer's behalf; (c) that Floyd Mayweather could arrange the video call between Winer and Musk; and (d) that Mayweather's relationship with Musk was such that Musk would actually read the communications and understand that Mayweather had sent them in earnest. All these representations were false.

Defendants made these misrepresentations with the intent to defraud Plaintiffs and induce Winer to pay them with the $20,000 and his watches, which Defendants divided among themselves as payment for their respective roles in the fraud and theft. As Defendants all were aware, Plaintiffs further relied on their misrepresentations by not pursuing other marketing relationships, causing The Eyes Collection to become available for free and causing Plaintiffs to suffer damages in the hundreds of millions of dollars or more.

Defendants coordinated their misconduct and actions to present a unified front and mislead Plaintiffs. Each Defendant agreed to participate in the fraudulent scheme and took overt acts in furtherance thereof.

As a direct and proximate result of Defendants' fraudulent acts, Plaintiffs has suffered substantial damages, which continue to which continue to accrue.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, attorneys' fees and costs, pre and post judgment interest, punitive damages, and such other and further relief as the Court deems just and proper.Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of this demand marked "1" through "136" inclusive, with the same force and effect as if fully set forth at length herein.

At all relevant times herein, Defendants Frid, Ayal, Apex and Rechnitz engaged in a conspiracy to commit fraud against Plaintiff.

Defendants conspired together to induce Plaintiff into entering the September 16 Agreement with the common objective of misappropriating Plaintiff's funds.

Defendants acted in concert and coordinated their actions, as evidenced by their communications in the Group Chat and their individual and collective misrepresentations to Plaintiff.

Defendants agreed, either explicitly or implicitly, to work together to defraud Plaintiff through a series of misrepresentations and fraudulent acts.

Defendants' conspiracy aimed to commit an unlawful act—fraud—by intentionally making false representations of material fact to Plaintiff.

These false representations included, but were not limited to: Misrepresenting Floyd Mayweather's ability and intention to contact Elon Musk on Plaintiff's behalf; Falsely assuring Plaintiff that payment of $1 million would secure the promised performance under the September 16, 2024 Agreement; and Orchestrating and perpetuating the illusion of a legitimate agreement while knowing that the promises made would not be fulfilled.

Defendants further acted unlawfully by concealing their true intentions and presenting themselves as coordinated representatives of Floyd Mayweather and/or Mayweather Promotions to lend credibility to their scheme.

In furtherance of the conspiracy, each Defendant committed overt acts.

Defendant Frid: (a) Locked Plaintiff out of his X account, disrupting Plaintiff's ability to advertise his artwork and increasing his reliance on alternative promotional methods, (b) Represented that Floyd Mayweather would fulfill the obligations under the Agreement, (c) Acted as a liaison between Plaintiff and the other Defendants, facilitating the fraudulent scheme.

Defendant Ayal: (a) Executed the September 16 Agreement on behalf of Defendant Apex while knowing the promises made therein would not be performed, and (b) Provided assurances to Plaintiff about the legitimacy of the Agreement and the involvement of Floyd Mayweather.

Defendant Apex: (a) Represented itself as the entity responsible for arranging the deal with Floyd Mayweather, falsely claiming to officially represent him and/or Mayweather Promotions, and (b) Failed to fulfill its contractual obligations under the September 16 Agreement.

Defendant Rechnitz: (a) Orchestrated the fraudulent deals and made repeated misrepresentations to Plaintiff about the progress of the Agreement, (b) Repeatedly assured Plaintiff that Floyd Mayweather would perform the terms of the Agreement and that Elon Musk was a close friend of Floyd Mayweather who could be contacted directly and (c) Coordinated communications with Plaintiff to perpetuate the false narrative regarding the Agreement.

Moreover, Defendants collectively: (a) Coordinated their actions to mislead Plaintiff into believing the September 16 Agreement was legitimate and (b) Structured the Agreement to extract $1 million from Plaintiff under false pretenses.

As a direct and proximate result of Defendants Fraudulent Conspiracy, Plaintiff has suffered substantial damages, which continue to accrue.

      WHEREFORE, Plaintiff demands judgment against Defendants for damages, attorneys' fees and costs, pre and post judgment interest, and such other and further relief as the Court deems just and proper.

COUNT III

(FRAUD: SEPTEMBER 22 AGREEMENT)

Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of this demand marked "1" through "151" inclusive, with the same force and effect as if fully set forth at length herein.

Defendants Frid, Ayal, Apex, and Rechnitz made false representations of material fact to induce Plaintiff into taking additional actions and making further payments after the execution of the September 16, 2024 Agreement, culminating in the September 22, 2024 Agreement.

Collectively, Defendants: Coordinated their actions to mislead Plaintiff into believing that additional payments and actions were necessary to fulfill the Agreement; Represented that Elon Musk was interested in speaking with Plaintiff, despite knowing this was false; and, structured their demands to extract additional funds and assets from Plaintiff under false pretenses.

Plaintiff has suffered substantial damages as a result of Defendants' collective fraudulent conduct, which continues to cause harm.

Specifically, Defendant Frid, among other things: Represented to Plaintiff that Elon Musk had expressed interest in speaking with Plaintiff about his artwork; informed Plaintiff that Elon Musk's alleged interest was contingent upon Plaintiff paying an additional $4 million; and continued to communicate with Plaintiff in the Group Chat and individually to reinforce the legitimacy of these demands.

Defendant Frid knew that these representations were false at the time they were made and intended to deceive Plaintiff into making further payments.

In good faith reliance on the above representations, Plaintiff attempted to comply with the additional demands but ultimately refused to pay the $4 million.

Defendant Frid never intended for Elon Musk to contact Plaintiff and acted as part of a deliberate scheme to extract further funds from Plaintiff under false pretenses.

Defendant Frid fraudulently induced Plaintiff to consider taking additional steps and actions, perpetuating Defendants' coordinated scheme to misappropriate Plaintiff's funds.

Plaintiff justifiably relied on Defendant Frid's false representations and suffered further harm as a result.

As a direct and proximate result of Defendant Frid's fraudulent conduct, Plaintiff has suffered substantial damages, which continue to accrue.

Specifically, Defendant Ayal, among other things: Participated in discussions and

communications with Plaintiff, reinforcing the false claim that Elon Musk had expressed interest in Plaintiff's artwork, and supported the false narrative that additional payments were necessary to secure Elon Musk's engagement.

Defendant Ayal knew that these representations were false at the time they were made and intended to mislead Plaintiff.

In good faith reliance on these representations, Plaintiff considered making additional payments and continued to engage with Defendants in an effort to fulfill the terms of the Agreement.

Defendant Ayal never intended for Elon Musk to contact Plaintiff and acted as part of the scheme to defraud Plaintiff.

Defendant Ayal fraudulently induced Plaintiff to continue his engagement with Defendants, perpetuating their coordinated effort to misappropriate Plaintiff's funds.

Plaintiff justifiably relied on Defendant Ayal's false representations and suffered further harm as a result.

As a direct and proximate result of Defendant Ayal's fraudulent conduct, Plaintiff has suffered substantial damages, which continue to accrue.

Specifically, Defendant Apex, among other things: Continued to hold itself out as a legitimate entity representing Floyd Mayweather and/or Mayweather Promotions, reinforcing the legitimacy of the demands made to Plaintiff, and supported the claim that additional payments were necessary to fulfill the objectives of the Agreement.

Defendant Apex knew that these representations were false at the time they were made and intended to deceive Plaintiff.

In good faith reliance on these representations, Plaintiff considered making additional payments and continued to engage with Defendants.

Defendant Apex never intended for the obligations under the Agreement to be fulfilled and acted as part of the broader scheme to defraud Plaintiff.

Defendant Apex fraudulently induced Plaintiff to continue his engagement with Defendants, contributing to their coordinated scheme to misappropriate Plaintiff's funds.

Plaintiff justifiably relied on Defendant Apex's false representations and suffered further harm as a result.

As a direct and proximate result of Defendant Apex's fraudulent conduct, Plaintiff has suffered substantial damages, which continue to accrue.

Specifically, Defendant Rechnitz, among other things: Claimed that Elon Musk was enthusiastic about Plaintiff's artwork and excited to speak with him; stated that Plaintiff's additional payment of $20,000 and the transfer of two high-value watches valued at $160,000 were necessary to secure direct contact with Elon Musk; and, assured Plaintiff that he had spoken with Floyd Mayweather and that arrangements had been finalized.

Defendant Rechnitz knew that these representations were false and made with the intent to deceive Plaintiff.

In good faith reliance on these representations, Plaintiff provided $20,000 in cash and two high-value watches to Defendants.

Defendant Rechnitz never intended for Plaintiff to have contact with Elon Musk and acted as part of the scheme to defraud Plaintiff.

Defendant Rechnitz fraudulently induced Plaintiff to take these actions as part of Defendants' coordinated scheme to misappropriate Plaintiff's funds and assets.

Plaintiff justifiably relied on Defendant Rechnitz's false representations and suffered further harm as a result.

As a direct and proximate result of Defendant Rechnitz's fraudulent conduct, Plaintiff has suffered substantial damages, which continue to accrue.

    WHEREFORE, Plaintiff demands judgment against Defendants for damages, attorneys' fees and costs, pre and post judgment interest, and such other and further relief as the Court deems just and proper.

COUNT IV
(FRAUDULENT CONSPIRACY: SEPTEMBER 22 AGREEMENT)

Plaintiff repeats, reiterates, and realleges each and every allegation contained in

those paragraphs of this demand marked "1" through "183" inclusive, with the same force and effect as if fully set forth at length herein.

Defendants Frid, Ayal, Apex and Rechnitz engaged in a conspiracy to commit fraud against Plaintiff specifically related to the events and demands following the September 16, 2024 Agreement, culminating in the September 22, 2024 Agreement.

Defendants conspired together to induce Plaintiff into making additional payments and transferring valuable assets after the September 16 Agreement, with the common objective of misappropriating Plaintiff's funds and property.

Defendants acted in concert and coordinated their actions through the Group Chat and other communications to mislead Plaintiff and perpetuate their scheme.

Defendants acted in concert and coordinated their actions through the Group Chat and other communications to mislead Plaintiff and perpetuate their scheme.

Defendants' conspiracy aimed to commit the unlawful act of fraud by intentionally making false representations to Plaintiff to secure additional payments and valuable assets. These false representations included, but were not limited to: Misrepresenting that Elon Musk was enthusiastic about Plaintiff's artwork and eager to speak with him; claiming that additional payments, including $20,000 in cash and two high-value watches, were necessary to facilitate direct contact with Elon Musk; and, falsely asserting that arrangements had been finalized with Floyd Mayweather to fulfill these promises.

Defendants further acted unlawfully by concealing their true intentions and continuing to present themselves as legitimate representatives capable of fulfilling their promises.

At all relevant times herein, in furtherance of the conspiracy, Defendants committed overt acts.

Specifically, Defendant Frid communicated with Plaintiff to reinforce the false narrative that Elon Musk was interested in speaking with him, and Participated in discussions through the Group Chat to maintain the appearance of legitimacy and encourage Plaintiff to comply with the new demands.

Defendant Ayal, supported and reinforced the claims that additional payments and assets were necessary to facilitate contact with Elon Musk and Participated in the ongoing misrepresentation of Floyd Mayweather's role in fulfilling the promises made to Plaintiff.

Defendant Apex, continued to hold itself out as the legitimate entity coordinating arrangements with Floyd Mayweather and Elon Musk and Played an active role in structuring and supporting the September 22 Agreement, knowing its terms were fraudulent.

Defendant Rechnitz, sent messages to Plaintiff falsely claiming that Elon Musk was excited about Plaintiff's artwork and eager to engage with him, Persuaded Plaintiff to part with $20,000 in cash and two high-value watches valued at over $150,000, falsely promising that this would secure direct contact with Elon Musk and Assured Plaintiff that he had spoken with Floyd Mayweather and that the arrangements had been finalized, despite knowing these statements were false.

Defendants collectively coordinated their actions to mislead Plaintiff into believing that the September 22 Agreement was legitimate and necessary to fulfill the objectives of the September 16 Agreement and Used false representations to extract additional funds and assets from Plaintiff under the guise of facilitating contact with Elon Musk.

    WHEREFORE, Plaintiff demands judgment against Defendants for damages, attorneys' fees and costs, pre and post judgment interest, and such other and further relief as the Court deems just and proper.

COUNT V
(CONVERSION)
(against All Defendants)


Plaintiff Winer repeats, reiterates, repeat, reiterate, and reallege each and every allegation contained in those paragraphs of this demand marked "1" through "105" inclusive, with the same force and effect as if fully set forth at length herein.and realleges each and every allegation contained in those paragraphs of this demand marked "1" through "197" inclusive, with the same force and effect as if fully set forth at

length herein.
THE WATCHES
Plaintiff Winer is the rightful owner of two high-value watches: an Audemars Piguet and a
Patek Philippe, collectively referred to as the ""two watches.""
On and before September 22, 2024, Plaintiff Winer had possession of the two watches and
maintained the right to possess and control them.
On or about September 22, 2024, Defendants Frid, Ayal, Apex, and Rechnitz unlawfully
obtained Plaintiff's Winer's two watches under false pretenses.
Specifically, Defendant Rechnitz persuaded Plaintiff to part with the two watches,
falsely promising that they were necessary to facilitate direct contact with Elon Musk.
Defendants, collectively, falsely represented that the watches were required to fulfill
the obligations of the September 16, 2024 Agreement and to ensure Plaintiff's meeting
with Elon Musk.
Defendants' act of taking possession of the two watches was wrongful and inconsistent
with Plaintiff's ownership and right to possess the watches. Defendants had no lawful
claim to the watches and no intent to return them to Plaintiff.
Defendant Rechnitz, acting on behalf of all Defendants, took possession of Plaintiff's
two watches, knowing that no legitimate agreement or arrangement with Mayweather or Elon
Musk was ever intended., and that Plaintiff would not receive the promised meeting or
contact with Elon Musk.
Defendants' conduct in retaining Plaintiff's two watches, despite the fraudulent nature
of the Agreement and their failure to perform any promised actions, constitutes
conversion under Florida law.
Defendants' wrongful retention of the two watches was inconsistent with Plaintiff's
Winer's property rights and deprived Plaintiff of the use, control, and enjoyment of his
property.
As a direct and proximate result of Defendants' wrongful acts, Plaintiff has suffered
damages, including but not limited to the value of the two watches, which were valued at
more than $160,000, and the loss of use and enjoyment of his property. These damages
continue to accrue.
        WHEREFORE, Plaintiff demands judgment against Defendants for damages, attorneys'
fees and costs, pre and post judgment interest, punitive damages, and such other and
further relief as the Court deems just and proper..
THE BITCOIN WALLET AND PROTOCOL

Plaintiff is the rightful owner of the Protocol used to inscribe each artwork onto a
Satoshi, as well as the Bitcoin wallet established to manage the Protocol.
Defendant Frid, acting as Plaintiff's employee, set up Plaintiff's Bitcoin wallet to
manage the Protocol.
Since that time, Defendant Frid has locked Plaintiff out of his Bitcoin Wallet and
ability to access and manage the protocol.
Defendant Frid's act of taking possession of the Bitcoin Wallet and Protocol was wrongful
and inconsistent with Plaintiff's ownership and right to possess the same. Defendant Frid
has no lawful claim to the Bitcoin Wallet or Protocol and no intent to return them to
Plaintiff.
Defendants Frid's conduct in retaining Plaintiff's Bitcoin Wallet and Protocol
constitutes conversion under Florida law.
Defendant Frid's wrongful retention of the Bitcoin Wallet and Protocol is inconsistent
with Plaintiff's property rights and deprived Plaintiff of the use, control, and
enjoyment of his property.
As a direct and proximate result of Defendant Frid's wrongful acts, Plaintiff has
suffered damages, including but not limited to the value of the Bitcoin Wallet and
Protocol, and the loss of use and enjoyment of his property. These damages continue to
accrue.
        WHEREFORE, Plaintiff demands judgment against Defendant Frid for damages,
attorneys' fees and costs, pre and post judgment interest, and such other and further

relief as the Court deems just and proper.


COUNT IV
AIDING AND ABETTING CONVERSION
(against All Defendants)


COUNT VI
(AIDING AND ABETTING CONVERSION)
PlaintiffWiner repeats, reiterates, and realleges each and every allegation contained in those paragraphs of this demand marked "1" through "215105" and "134" through "142" inclusive, with the same force and effect as if fully set forth at length herein.
Defendants Frid, Ayal, Apex, and Rechnitz aided and abetted the conversion of Plaintiff's two high-value watches, an Audemars Piguet and a Patek Philippe, through their wrongful acts, knowledge, and substantial assistance in the conversion.
Defendant Rechnitz took possession of Plaintiff's Winer's watches under false pretenses, falsely claiming that they were necessary to facilitate Plaintiff's contact with Elon Musk, thereby converting Plaintiff's property.
The wrongful conversion of Plaintiff's Winer's watches was performed by Defendant Rechnitz, with the involvement and participation of the other Defendants.
Defendants collectively herein knew or should have known that their actions contributed to the wrongful conversion of Plaintiff's Winer's watches.
Defendant Frid was generally aware of the role his misrepresentations played in furthering the wrongful taking of Plaintiff's two watches and was aware that the watches were wrongfully obtained through the fraudulent misstatements made to Plaintiff.
Defendant Ayal through his role in the execution of the September 16 Agreement, was aware that his actions were part of the broader scheme to deceive Plaintiff into giving up his watches, and knowingly participated in facilitating the false narrative to Plaintiff.
Defendant Apex through its representations and role in the execution of the September 16 Agreement, was also generally aware that its actions aided in the conversion of Plaintiff's watches by encouraging Plaintiff to transfer the watches under false pretenses.
Defendant Rechnitz orchestrated the false promises regarding the watches and claimed to have arranged the deal with Floyd Mayweather, was fully aware that the watches were being wrongfully taken from Plaintiff and had no intention of fulfilling any promises related to Elon Musk.
Defendants knowingly and substantially assisted in the conversion.
Defendant Frid facilitated the false representation to Plaintiff that the watches were required for fulfilling the Agreement with Floyd Mayweather and Elon Musk, and supported the fraudulent narrative presented to Plaintiff.
Defendant Ayal assisted in structuring the September 16 Agreement, which included the fraudulent representation regarding the transfer of Plaintiff's watches, and failed to correct the false representations made by Defendants.
Defendant Apex played an active role in presenting itself as a legitimate entity facilitating the Agreement, despite knowing the fraudulent nature of the deal.
Defendant Rechnitz, orchestrated the demands for Plaintiff's watches, knowing that no valid arrangement with Elon Musk existed, and falsely claiming that the watches were needed for contact with Musk, while ensuring Plaintiff transferred the property.Winer suffered damages as a result of the conversion and Defendants' actions.
        WHEREFORE, Plaintiff Winer demands judgment against Defendants for damages, attorneys' fees and costs, pre and post judgment interest, punitive damages, and such other and further relief as the Court deems just and proper.


COUNT VII
(CIVIL THEFT)
(against all Defendants)

Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of this demand marked "1" through "229" inclusive, with the same force and effect as if fully set forth at length hereinWiner repeats, reiterates, repeat, reiterate, and reallege each and every allegation contained in those paragraphs of this demand marked "1" through "105" inclusive, with the same force and effect as if fully set forth at length herein.

Winer is the rightful owner of two high-value watches: an Audemars Piguet and a Patek Philippe, collectively referred to as the "two watches."

On and before September 22, 2024, Winer had possession of the two watches and maintained the right to possess and control them.

On or about September 22, 2024, Defendants Frid, Ayal, Apex, and Rechnitz unlawfully obtained Winer's two watches under false pretenses.

Specifically, Defendant Rechnitz persuaded Winer to part with the two watches, falsely promising that they were necessary to facilitate direct contact with Elon Musk.

Defendants' act of taking possession of the two watches was wrongful and inconsistent with Winer's ownership and right to possess the watches. Defendants had no lawful claim to the watches and no intent to return them to Winer.

Defendant Rechnitz, acting on behalf of all Defendants, took possession of Winer's two watches, knowing that no legitimate agreement or arrangement with Mayweather or Elon Musk was ever intended.

Defendants' wrongful retention of the two watches was inconsistent with Winer's property rights and deprived Winer of the use, control, and enjoyment of his property.

Defendants knowingly and intentionally acted to convert the watches.

As a direct and proximate result of Defendants' wrongful acts, Plaintiff has suffered damages, including but not limited to the value of the two watches, which were valued at more than $160,000, and the loss of use and enjoyment of his property. These damages continue to accrue.

WHEREFORE, Plaintiff demands judgment against Defendants for damages, attorneys' fees and costs, pre and post judgment interest, punitive damages, and such other and further relief as the Court deems just and proper.

Defendants Frid, Ayal, Apex, and Rechnitz committed civil theft by knowingly obtaining and using Plaintiff's two high-value watches, an Audemars Piguet and a Patek Philippe, through fraudulent and unlawful means.

Defendant Rechnitz, on behalf of all Defendants, knowingly obtained Plaintiff's two watches under false pretenses, falsely representing that the watches were required to facilitate Plaintiff's contact with Elon Musk. Defendants collectively encouraged Plaintiff to transfer the watches, promising performance under the Agreement which was never fulfilled.

Defendants knowingly took possession of the watches with the intent to retain them for their own use or the use of others, acting contrary to Plaintiff's rights to the property.

Defendants acted with felonious intent by knowingly depriving Plaintiff of his right to benefit from the watches.

Defendants' conduct—fraudulently inducing Plaintiff to transfer his property under false pretenses—was done with the intent to permanently or temporarily deprive Plaintiff of his right to possess and use the watches.

Defendants, at all relevant times, knew that they had no lawful claim to Plaintiff's property and that their actions were designed to permanently or temporarily deprive Plaintiff of the watches for their own benefit or the benefit of others.

Defendants' actions were intended to deprive Plaintiff of his right to benefit from his two watches and to appropriate the watches for their own use or the use of unauthorized persons.

Defendants' false promises and fraudulent misrepresentations regarding the necessity of the watches were intended to convince Plaintiff to relinquish possession of his property without ever intending to fulfill the terms of the September 16 Agreement.

Defendant Rechnitz, in particular, falsely assured Plaintiff that the watches were essential for facilitating contact with Elon Musk, while intending to retain the watches for his own use or for the use of others, without any intention of fulfilling the promises made to Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants for damages, attorneys' fees and costs, pre and post judgment interest, and such other and further relief as the Court deems just and proper.


COUNT V
AIDING AND ABETTING CIVIL THEFT
(against all Defendants)


COUNT VIII
(AIDING AND ABETTING CIVIL THEFT)
Plaintiff Winer repeats, reiterates, and realleges each and every allegation contained in those paragraphs of this demand marked "1" through "105" and "150" through "159" inclusive, with the same force and effect as if fully set forth at length herein.
Defendants Frid, Ayal, Apex, and Rechnitz aided and abetted the conversion of Plaintiff's two high-value watches, an Audemars Piguet and a Patek Philippe, through their wrongful acts, knowledge, and substantial assistance in the conversion.
Defendant Rechnitz took possession of Winer's watches under false pretenses, falsely claiming that they were necessary to facilitate Plaintiff's contact with Elon Musk, thereby converting Plaintiff's property.
The wrongful conversion of Winer's watches was performed by Defendant Rechnitz, with the involvement and participation of the other Defendants.
Defendants collectively herein knew or should have known that their actions contributed to the wrongful conversion of Winer's watches.
Defendants knowingly and substantially assisted in the conversion.
Winer suffered damages as a result of the conversion and Defendants' actions. repeats, reiterates, and realleges each and every allegation contained in those paragraphs of this demand marked "1" through "243" inclusive, with the same force and effect as if fully set forth at length herein.
Defendants Frid, Ayal, Apex, and Rechnitz aided and abetted the civil theft of Plaintiff's two high-value watches: an Audemars Piguet and a Patek Philippe, through their wrongful acts, knowledge, and substantial assistance in the theft.
As alleged in Count VII, Defendant Rechnitz (acting on behalf of all Defendants) knowingly obtained Plaintiff's two watches under false pretenses, falsely claiming that the watches were required to facilitate Plaintiff's contact with Elon Musk, thereby committing civil theft.
Defendants collectively played an integral role in inducing Plaintiff to part with the watches under fraudulent and unlawful circumstances.
At all relevant times herein, the wrongful act of civil theft was performed by Defendant Rechnitz, with the involvement and participation of the other Defendants, who knowingly and substantially assisted in the wrongful taking of Plaintiff's property.
Each Defendant, including Defendant Frid, Defendant Ayal, and Defendant Apex, was generally aware that their actions contributed to the wrongful taking of Plaintiff's two watches.
Each Defendant, at all relevant times, knew or should have known that their collective actions were part of a broader scheme to deceive Plaintiff, induce him to part with his property, and wrongfully take Plaintiff's property under false pretenses.
Defendant Frid, through his role in facilitating the misrepresentation regarding the watches, knew that his actions were directly contributing to the wrongful taking of Plaintiff's property.
Defendant Ayal, by executing the September 16 Agreement and participating in the scheme, was aware that his actions were assisting in the civil theft of Plaintiff's watches.
Defendant Apex, by continuing to present itself as a legitimate party facilitating the

agreement, knew that its involvement was contributing to the theft of Plaintiff's property.
Defendant Rechnitz, who orchestrated the fraudulent demands for the watches and falsely claimed they were needed to facilitate contact with Elon Musk, was fully aware that his actions were intended to wrongfully take Plaintiff's property for his own benefit.
Defendant Frid knowingly and substantially assisted in the civil theft of Plaintiff's two watches by Facilitating the fraudulent representation that the watches were necessary for fulfilling the Agreement with Floyd Mayweather and Elon Musk, supporting the false narrative presented to Plaintiff.
Defendant Ayal knowingly and substantially assisted in the civil theft of Plaintiff's two watches by Assisting in structuring the September 16 Agreement, which included the fraudulent misrepresentation that the watches were needed for the supposed contact with Elon Musk.
Defendant Apex knowingly and substantially assisted in the civil theft of Plaintiff's two watches by Playing an active role in presenting itself as a legitimate intermediary, despite knowing the fraudulent nature of the deal and the wrongful taking of Plaintiff's property.
Defendant Rechnitz knowingly and substantially assisted in the civil theft of Plaintiff's two watches by Orchestrating the false demands for Plaintiff's watches, knowing that no legitimate arrangement existed, and falsely claiming that the watches were needed to facilitate the promised contact with Elon Musk, while ensuring Plaintiff transferred the property.
Collectively, Defendant's actions were substantial and integral to the civil theft of Plaintiff's two watches, as their fraudulent acts and misrepresentations directly contributed to Plaintiff's wrongful loss of his property.
        WHEREFORE, Plaintiff demands judgment against Defendants for damages, attorneys' fees and costs, pre and post judgment interest, punitive damages, and such other and further relief as the Court deems just and proper.


COUNT VIIIX

(BREACH OF SEPTEMBER 16 CONTRACT
(against Apex)
IN THE ALTERNATIVE

)
PlaintiffWiner repeats, reiterates, and realleges each and every allegation contained in those paragraphs of this demand marked "1" through "255105" inclusive, with the same force and effect as if fully set forth at length herein.
Winer pleads this count in the alternative.
Plaintiff and defendants, Apex and AyalWiner and Apex, entered into the September 16 2016 Agreement, which is valid and enforceable.
Upon information and belief, Defendant's Apex and Ayal were operating on behalf of all defendants herein.
Plaintiff fully performed his duties under the September 16 Agreement.
Defendants, Apex and Ayal materially breachedApex breached the September 16 Agreement, including the specific provisions set forth above.
Defendants, Apex and Ayal'sApex's breaches of the September 16 Agreement have cause plaintiff Winer to suffer damages, which continue to accrue.
        WHEREFORE, Plaintiff Winer demands judgment against Defendants for damages, attorneys' fees and costs, pre and post judgment interest, and such other and further relief as the Court deems just and proper.

COUNT VII
BREACH OF SEPTEMBER 22 CONTRACT

(against Rechnitz)
IN THE ALTERNATIVE

Winer repeats, reiterates, and realleges each and every allegation contained in those paragraphs of this demand marked "1" through "105" inclusive, with the same force and effect as if fully set forth at length herein.

Winer pleads this count in the alternative.

Winer and Rechnitz entered into the September 22 Agreement, which is valid and enforceable.

Rechnitz breached the September 22 Agreement, including the specific provisions set forth above.

Rechnitz's breaches of the September 22 Agreement have cause Winer to suffer damages, which continue to accrue.

WHEREFORE, Winer demands judgment against Defendants for damages, attorneys' fees and costs, pre and post judgment interest, and such other and further relief as the Court deems just and proper.

COUNT X
(FRAUD IN THE INDUCEMENT)

Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of this demand marked "1" through "261" inclusive, with the same force and effect as if fully set forth at length herein.

Defendants, knowingly and intentionally, made fraudulent representations to Plaintiff leading up to the September 16, 2024 Agreement with the intent to fraudulently induce Plaintiff to enter into the Agreement.

These fraudulent representations as iterated above, included, but were not limited to, misrepresenting Floyd Mayweather's ability and intention to contact Elon Musk on Plaintiff's behalf, falsely claims that Plaintiff's payment of $1 million would result in seven messages being sent to Elon Musk, and assuring that Plaintiff's $100,000 payment would lead to the fulfillment of the Agreement, despite Defendants' knowledge that they had no intention of performing.

Plaintiff reasonably relied on these false representations and omissions in entering into the September 16 Agreement.

Plaintiff believed Defendants' claims regarding Floyd Mayweather's involvement and their promises of contact with Elon Musk, which induced Plaintiff to part with significant sums of money and property.

Plaintiff would not have entered into the September 16 Agreement if he had known about the fraudulent scheme defendants were implementing to deprive plaintiff of his money and watches.

Defendants knowingly and intentionally made fraudulent representations and omissions to execute their fraudulent scheme.

Plaintiff suffered damage as a result of Defendants' fraudulent representations and omissions as to the September 16 Agreement.

Defendants, knowingly and intentionally, made fraudulent representations to Plaintiff leading up to the September 22, 2024, Agreement with the intent to fraudulently induce Plaintiff to enter into that agreement.

These fraudulent representations included, but were not limited to Promising that $20,000 in cash and the two high-value watches, valued at $150,000, were required to facilitate the agreement's performance.

Plaintiff reasonably relied on these false representations and omissions in entering into the September 22 Agreement.

Plaintiff believed Defendants' claims regarding Floyd Mayweather's involvement and their promises of contact and a call with Elon Musk, which induced Plaintiff to part with significant sums of money and property.

Plaintiff would not have entered into the September 22 Agreement if he had known about the fraudulent scheme defendants were implementing to deprive plaintiff of his money and watches.

Defendants knowingly and intentionally made fraudulent representations and omissions to execute their fraudulent scheme.

Plaintiff suffered damage as a result of Defendants' fraudulent representations and omissions as to the September 22 Agreement.

Punitive damages are warranted because Defendants 'conduct was egregious, intentional, and malicious, and will be sought consistent with Florida Law.

WHEREFORE, Plaintiff demands judgment against Defendants for damages, attorneys' fees and costs, pre and post judgment interest, and such other and further relief as the Court deems just and proper.

COUNT XI
(UNJUST ENRICHMENT)

Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of this demand marked "1" through "270" inclusive, with the same force and effect as if fully set forth at length herein.

Defendants Frid, Ayal, Apex, and Rechnitz have been unjustly enriched at Plaintiff's expense through their wrongful actions and fraudulent scheme to deprive Plaintiff of his property.

Plaintiff conferred a significant benefit on Defendants by transferring two high-value watches—an Audemars Piguet and a Patek Philippe—valued at $150,000 and $20,000 in cash to Defendants, believing the watches were required to facilitate a legitimate agreement with Floyd Mayweather and Elon Musk.

These benefits were conferred in good faith, based on Defendants' fraudulent misrepresentations regarding the legitimacy of their agreement and the performance that Plaintiff was promised.

Defendants voluntarily accepted and retained the two watches, despite failing to fulfill any legitimate promise made regarding Elon Musk, and the $20,000 in cash, despite having no intention of performing under the September 22 Agreement or providing any legitimate benefit in return.

Defendants retained these benefits without providing Plaintiff any value in return, and with no intention to fulfill their promises or perform the agreed-upon actions.

It would be inequitable for Defendants to retain the two watches and the $20,000 without compensating Plaintiff for their value, as Defendants' actions were fraudulent and they have not provided any equivalent value or service in exchange.

Defendants' retention of these benefits was unjust, as their fraudulent conduct prevented Plaintiff from receiving the promised contact with Elon Musk and deprived him of the use and enjoyment of his property.

Defendants' actions constitute unjust enrichment because they accepted and retained Plaintiff's property without fulfilling their obligations or providing any return to Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants for damages, attorneys' fees and costs, pre and post judgment interest, and such other and further relief as the Court deems just and proper.

REQUESTED RELIEF

WHEREFORE, the plaintiff demands judgment against the defendants for compensatory and punitive damages, together with the interest, cost, and disbursements pursuant to the first, second, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth and eleventh causes of action herein.


Dated: January 3029, 2025                          Respectfully Submitted

                                    _/s/ Conor D. Cassidy_____Lara T. Gatz
                 Lara T. Gatz
                 Email: Lgatz@reedsmith.com

Daniel A. Sox
Email: Dsox@reedsmith.com
Conor D. Cassidy
Email: ccassidy@reedsmith.com
REED SMITH LLP
200 S. Biscayne Blvd., Floor 26
Miami, FL 33131
Telephone: (786) 747-0200

1  Baruch C. Cohen, Esq. (SBN 159455)
   **LAW OFFICE OF BARUCH C. COHEN**
2        A Professional Law Corporation
   4929 Wilshire Boulevard, Suite 940
3  Los Angeles, California 90010
   (323) 937-4501     Fax (888) 316-6107
4  e-mail: baruchcohen@baruchcohenesq.com

5  Attorney for Third Party Plaintiffs PETER VOUTSAS aka PETER MARCO aka
   PETER MARCO EXTRAORDINARY JEWELS OF BEVERLY HILLS, dba
6  PETER MARCO LLC

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                  **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10
   DAVID ROVINSKY LLC, a                  USDC # 2:20-cv-02580
11 Delaware limited liability company,
                                          **CROSS-COMPLAINT FOR:**
12       Plaintiff,
                                          1.    **INTENTIONAL**
13 PETER VOUTSAS aka PETER                      **MISREPRESENTATION &**
   MARCO aka PETER VOUTSAS, aka                 **FRAUD;**
14 PETER MARCO                            2.    **CIVIL THEFT (PENAL**
   EXTRAORDINARY JEWELS OF                      **CODE, § 496);**
15 BEVERLY HILLS, dba PETER              3.    **EMBEZZLEMENT;**
   MARCO LLC,                            4.    **CIVIL CONSPIRACY TO**
16                                             **COMMIT THEFT, FRAUD,**
         Defendants/Third Party Plaintiffs,    **AND FRAUD BY**
17                                             **CONCEALMENT;**
   vs.                                   5.    **CONVERSION;**
18                                       6.    **BREACH OF CONTRACT;**
   JONA S. RECHNITZ, an individual;      7.    **BREACH OF THE IMPLIED**
19 RACHEL RECHNITZ, an individual;            **COVENANT OF GOOD**
   LEVIN PRADO aka LEVON                       **FAITH AND FAIR DEALING;**
20 PRADO, an individual,                 8.    **ACCOUNT STATED; &**
                                         9.    **UNETHICAL BUSINESS**
21       Third Party Defendants.               **PRACTICES IN VIOLATION**
                                               **OF CALIFORNIA BUSINESS**
22                                             **& PROFESSIONS CODE §**
                                               **17200**
23
                                          **DEMAND FOR A JURY TRIAL**
24
         Third Party Plaintiffs PETER VOUTSAS aka PETER MARCO aka PETER
25
   MARCO EXTRAORDINARY JEWELS OF BEVERLY HILLS, dba PETER
26
   MARCO LLC. ("Marco") hereby allege the following against Third Party
27
   Defendants JONA S. RECHNITZ, RACHEL RECHNITZ, LEVIN PRADO aka
28

LEVON PRADO, (collectively "Third Party Defendants") as follows:

## THE PARTIES, JURISDICTION, AND VENUE

1.     Third Party Plaintiff PETER VOUTSAS aka PETER MARCO ("Marco") is an individual residing in Los Angeles County, State of California.

2.     Third Party Plaintiff PETER MARCO LLC is a limited liability company qualified to do business in California qualified to do business in California. Marco is the managing member of PM-LLC.

3.     Third Party Plaintiff PETER MARCO EXTRAORDINARY JEWELS OF BEVERLY HILLS is a dba of Marco and PETER MARCO LLC.

4.     All Third Party Plaintiffs are collectively herein referred to as ("Marco").

5.     Third Party Defendant JONA S. RECHNITZ ("Jona")  is an individual residing in Los Angeles County, State of California. Jona is also Rachel's husband.

6.     Third Party Defendant RACHEL RECHNITZ ("Rachel")  is an individual residing in Los Angeles County, State of California. Rachel is the managing member of Jadelle LLC and the Chief Executive Officer for Jadelle Inc. Rachel is also Jona's wife.

7.     Jona and Rachel Rechnitz operate a jewelry business through two similarly named entities, Jadelle Inc. and Jadelle Jewelry and Diamonds, LLC, herein the Jadelle Entities, whose marque client is the Kardashian family. Both Jona and Rachel Rechnitz advertise political and powerful celebrity connections to create a false sense of credibility about themselves and their business, posting photos on their social media of Kylie Jenner and Kim Kardashian.

8.     The alleged frauds committed by Jona were committed with Rachel's knowledge and direction, making her personally liable. Without Rachel setting up the entities to commit the frauds, Jona lying to steal Marco's Consigned Jewelry, none of the below referenced offenses could have

4/14-3:01pm

occurred.

9.     On information and belief, on 4-6-2020, an involuntary chapter 7 bankruptcy proceeding was filed against Jadelle Jewelry and Diamonds, LLC, a Delaware limited liability company, Jadelle Jewelry, LLC, and Jadelle Inc., a California corporation, USBC # 2:20-bk-13530-BR. The petitioning creditors are: First International Diamond, Inc., with Trade Debt/Damages of $1,976,225.00, Peter Marco, LLC, with Trade Debt/Damages of $7,676,744.00 (The correct amount is $6,950,444.40) and Victor Franco Noval with Trade Debt/Damages of $5,800,000.00, with total petitioners' claims of $15,452,969.00.[1] See, "**Corrupt de Blasio donor Jona Rechnitz's alleged victims trying to force him into bankruptcy**" (https://nypost.com/2020/04/07/de-blasio-donor-jona-rechnitzs-alleged-victims-trying-to-bankrupt-him/), and "**Creditors File Petition to Put Jadelle Jewelry in Bankruptcy**" (https://www.jckonline.com/editorial-article/jadelle-jewelry-bankruptcy/).

10.    Presently, Third Party Plaintiffs are currently stayed from pursuing the Jadelle entities in this Court by virtue of the automatic stay of bankruptcy (11 U.S. Code § 362). Marco will be filing claims against the Jadelle entities debtors in the United States Bankruptcy Court.

11.    Non-party JADELLE JEWELRY AND DIAMONDS, LLC ("Jadelle LLC," collectively with Jadelle Inc., the "Jadelle Entities") (now in an involuntary bankruptcy) is a Delaware limited liability company qualified to do business in California. Rachel is the managing member of Jadelle LLC.

12.    Non-party JADELLE JEWELRY, LLC,  ("Jadelle LLC," collectively with

---

[1]A true and correct copy of the involuntary chapter 7 bankruptcy proceeding *In re Jadelle Jewelry and Diamonds, LLC, a Delaware limited liability company, Jadelle Jewelry, LLC, and Jadelle Inc., a California corporation*, USBC # 2:20-bk-13530-BR is attached as Exhibit "1" and is incorporated herein by this reference.

1   Jadelle Inc., the "Jadelle Entities") (now in an involuntary bankruptcy) is a
2   California limited liability company qualified to do business in California.
3   Rachel is the managing member of Jadelle LLC.

4   13.   Non-party JADELLE INC. ("Jadelle Inc.") (now in an involuntary
5   bankruptcy) is a California corporation whose principle office is in Beverly
6   Hills and whose CEO, CFO, and Secretary is Rachel.

7   14.   Third Party Defendant LEVIN PRADO AKA LEVON PRADO ("Prado") is
8   the agent for service of process, controller, and check signer for the Jadelle
9   Entities.

10   15.   The alleged frauds committed by Jona were committed with Rachel's
11   knowledge and direction, along with the assistance of Prado, making them
12   personally liable. Without Rachel setting upon the entities to commit the
13   frauds, Jona's lying to steal Marco's Consigned Jewelry, and Prado signing
14   the check, none of the below referenced offenses could have occurred.

15   16.   Upon information and belief, Third Party Plaintiffs believe, that at all times
16   relevant hereto Third Party Defendants, including but not limited to (the
17   Jadelle entities) Jona, Rachel, and Prado, formed a civil conspiracy and
18   engaged in acts in operation and furtherance of that conspiracy.

19   17.   Third Party Plaintiffs are informed and believe, and so allege, that, at all
20   times mentioned, each of the Third Party Defendants was the agent, servant,
21   joint venturer, co-conspirator, and/or employee of some or all of the
22   remaining Third Party Defendants, and in doing the things hereinafter
23   alleged, was acting within the course and scope of that relationship and with
24   the full permission and consent of such Third Party Defendants. Third Party
25   Plaintiffs are informed and believe, and so allege, that each Third Party
26   Defendant ratified, approved, and adopted as its own some or all of the acts
27   of each of the other Third Party Defendants. Third Party Plaintiffs are

28

informed and believe, and thereon allege, that each of the Third Party Defendants materially aided in some or all of the violations of the other Third Party Defendants.

18. Third Party Plaintiffs are informed and believe, and so allege, that the Third Party Defendants are the alter egos of each other and there exists, and at all relevant times herein there existed, a unity of interest and ownership and control among the Third Party Defendants, such that any individuality and separateness among them has ceased to exist, and they are alter egos of each other, and thus one or more Third Party Defendants' business is nothing more than a shell, instrumentality, or conduit through which the remaining Third Party Defendants carry on certain of their business.

19. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs.

20. Venue in this district is appropriate pursuant to 28 U.S.C. § 1391(b) because Third Party Defendants reside in this district and a substantial part of the events giving rise to this action occurred here.

21. On 3-18-2020 2020, David Rovinsky Inc., filed a complaint against Marco, Case # 2:20-cv-02580 for negligence, conversion, fraud, negligent misrepresentation, civil theft (Cal. Penal Code § 496), and aiding and abetting conversion and civil theft seeking damages of $1,130,000.00.

22. Pursuant to FRCP 13(g), Third Party Plaintiffs cross-claims against Third Party Defendants, as they are responsible for the Rovinsky claim.

23. Pursuant to FRCP 19, Third Party Defendants constitute "Required Party' as they are subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

   a.    (A) in that person's absence, the court cannot accord complete relief

4/14-3:01pm

-5-

1        among existing parties; or

2    b.    (B) that person claims an interest relating to the subject of the action

3          and is so situated that disposing of the action in the person's absence

4          may:

5          i.    (i) as a practical matter impair or impede the person's ability to

6                protect the interest; or

7          ii.   (ii) leave an existing party subject to a substantial risk of

8                incurring double, multiple, or otherwise inconsistent obligations

9                because of the interest.

10   24.  Pursuant to FRCP 20, Third Party Defendants may be joined in this action in

11       one action as defendants if:

12   a.    (A) any right to relief is asserted against them jointly, severally, or in

13          the alternative with respect to or arising out of the same transaction,

14          occurrence, or series of transactions or occurrences; and

15   b.    (B) any question of law or fact common to all defendants will arise in

16          the action.

## GENERAL ALLEGATIONS
## JONA RECHNITZ

19   25.  On information and belief, Jona is infamously known for his involvement

20       with a federal probe into corruption in the NYPD and the de Blasio mayoral

21       campaign. He reportedly funneled money into the 2013 de Blasio campaign

22       and bribed police commanders. He admitted to directing campaign donations

23       to Mayor de Blasio in exchange for access to City Hall and showering NYPD

24       leaders with prostitutes and other bribes to cultivate them as allies. He

25       pleaded guilty to charges of to providing financial and personal benefits and

26       political contributions to public officials including law enforcement officials

27       in exchange for official action in March of 2017. Asked about Jona's

28

testimony, the mayor called Jona *"a liar and a felon*."

26.   On 6-6-2016, in the criminal matter entitled: *United States of America vs. Jona Rechnitz*, 1:16-cr-00389-AKH, before the United States District Court Southern District of New York, a sealed information was filed against Jona for wire fraud, who then entered a guilty plea. On 3-15-2017, the information against Jona was unsealed, and Jona was released on bond pursuant to release conditions imposed by Judge Alvin K. Hellerstein. On 12-6-2019, Jona was sentenced to 10 months of custody, and was granted release pending appeal.

27.   Interestingly, among the Mandatory Conditions of Jona's release was that he not commit another federal, state or local crime.[2]

28.   Indeed, in Jona's 10-16-2019 letter to Judge Hellerstein seeking a reduced sentence, Jona wrote the Court (he shared this letter with Marco):

> Dear Judge Hellerstein: **I am a felon. I am a criminal**. I am the ONLY person to blame for that. **I have caused tremendous pain and embarrassment to my family, my religion, and to myself**. There is no way to undo what's been done. It's permanent, and for that I am truly sorry to everyone hurt by my crimes and actions. It eats me alive each and every day. When I wake up, when I go to sleep, it is always on my mind for the past 4 years. **My actions harmed the people of New York, The people of Correction Officers Benevolent Association, my friends, my family and my community**. I will forever carry this burden, as I deserve to. I have read of your Honor asking at various sentencings, why do good people do bad things? In my case, not assuming I'm a good person, I can answer this question. **Arrogance, greed, and insecurity. Arrogance. I felt I was above the law**. At this young age in my late 20's I was busy accepting honors at dinners and board positions at prestigious institutions. **It got to my head. Greed. I wanted to gain contacts to grow my business, to make money and gain stature in the long run. Insecurity. I wanted to gain popularity by my peers and become a big shot in my community and business circles**. [Emphasis added].

---

> **Shame on me**. Finally, I couldn't wiggle my way out of this one. It changed my life as I knew it forever. **As a supposed religious man, I have been a disgrace to my religion. The only way to fix this is to**

---

[2]A true and correct copy of Jona's 3-3-2020 *Judgement In a Criminal Case* in *United States of America vs. Jona Rechnitz*, 1:16-cr-00389-AKH is attached hereto as Exhibit "2" and is incorporated herein by this reference.

1         ***make serving G-d my main focus for the rest of my life. I try to every***

2         ***day. I have changed as a person religiously, through prayer, my***
        ***public and private behavior, and I always stop and think before I'm***

3         ***about to do something to see if it is something my parents, my family,***
        ***and G-d would approve of.*** [Emphasis added].

4    ---

5         *Your Honor, there are so many examples that I am omitting **as I don't***
        ***want to portray myself as the victim here**. I caused a lot of pain and*

6         ***harm to others through my criminal activity and don't want to***
        ***detract from that**. JONA RECHNITZ*. [Emphasis added]. [3]

7

8 29.    On 12-19-19, as reported in the New York Times, **'Liar,' and Star Witness**

9          **in City Graft Cases, Gets 10-Month Sentence**"

10          (https://www.nytimes.com/2019/12/19/nyregion/jona-rechnitz-corruption-sen

11          tencing.html) Jona was sentenced to five months in prison and five months of

12          house arrest, followed by three years on parole, apologized to Judge Alvin K.

13          Hellerstein for his criminal and immoral behavior, and asked the judge for

14          leniency.

15         "***I've been a real fraud to God, a fraud to my wife and family, a fraud***
        ***as an American, a fraud as a businessman***, *and a fraud to the people*

16         *of New York, namely, the hard-working COBA members, and I'm truly*
        *sorry for that*. ***My actions have hurt many people, and I'm very sorry***

17         ***for that. I continue to pay for my mistakes on a daily basis***.
        [Emphasis added].

18    ---

19         "*While living in New York City, **I wrongly felt pressure to become a***

20         ***bigshot***. *I was working for one of the largest real restate companies in*
        *2007, and it got to my head. I was in my late 20's, and big people in*

21         *the real estate industry were dealing with me.* ***My ego was big, and I***
        ***so badly wanted to impress these people in order to advance my***

22         ***career and profile***. *This is where things started to spiral out of*
        *control. This is where I went so off the rails for a number of years.* ***I***

23         ***assure your Honor that these past years and the experience I've gone***
        ***through has changed me. I will never act that way again***." [Emphasis

24         added].

25    ---

26    _____

27       [3]A true and correct copy of Jona's 10-16-2019 letter to Judge Hellerstein seeking
   a reduced sentence is attached hereto as Exhibit "3" and is incorporated herein by this

28    reference.

1   *"I've been a big hypocrite to my religion. I failed to conduct myself*
    *properly between myself and my fellow man and between myself and*
2   *my relationship with God. I have strayed. I did all of these horrible*
    *things without worrying about God or the consequences that come*
3   *with this sort of behavior.* I cannot express to your Honor how
    ashamed I am for desecrating my religion. *I have and will continue to*
4   *repent to God every single day. I have and continued to make*
    *amends. Part of my efforts to make right included cooperating as a*
5   *first step. I have a lot more work to do."* [Emphasis added].

6   ---

7   *"This is one of several jobs that I have in the coming months* **as I**
    **continue to sort out my life in a lawful path. In fact, I will spend the**
8   **rest of my life trying to make amends for my criminal behavior.** *I will*
    *try to make a better name for my family, for my religion, and for*
9   *myself.* **I am on the path to recovery, your Honor. I am a better**
    **family man; I am a better friend; I am a more religious person. I am**
10  **working again to make an honest living.** *"* [Emphasis added].

11  *"THE COURT: What is the new business? Jadelle?*

12  *"Jadelle, yes. I really paid a hefty price for cooperating with the*
    *government for my crimes. Most recently, the New York Post put up an*
13  *article that was mentioned this morning -- your Honor may not be*
    *aware – accusing me of hobnobbing and flirting with the rich and*
14  *famous at a time when I claim I am a pariah to society. In fact, Jadelle*
    *Jewelery hosted a jewelery show to promote the brand and new*
15  *jewelry collection. The event was to make sales and increase business.*
    *One attendee was a Kim Kardashian, a client of Jadelle."*

16

17  ---

18  *"Within my community, within the media, and through*
    *self-introspection. In New York City, I am persona non grata. I am to*
19  *blame.* **I burnt a lot of bridges and relationships and had to relocate**
    **to California. I am so truly sorry for my behavior. I am a changed**
20  **man**...*"

    **"I don't see any way to start over a third time. I'm on my second**
21  **chance**...*"

22  ---

23  *"THE COURT: ... And yet in the life that's been depicted in this court,*
    **he cheapens people. He works on their insecurities and their quest**
24  **for material possessions and just does the opposite. He diminishes**
    **people**....*"*[4]

25

26  ─────────────

27  [4]A true and correct copy of the relevant portions of the transcript of Jona's 12-
    19-2019 Sentencing Hearing is attached hereto as Exhibit "4" and is incorporated
28  herein by this reference.

1    30.    On information and belief, Jona made numerous false statements to the

2           federal sentencing judge because by 12-19-2019, Jona's frauds (below) were

3           well under way. One of the primary reasons for documenting Jona's criminal

4           activities with specificity and by the attachments to this Complaint is to

5           properly expose his fraud and to preempt the "spin" that he and his family

6           will inevitably spin to the community of his innocence and that he is unfairly

7           being pursued. Jona's house of fraudulent cards needs to be exposed. "*The*

8           *only thing necessary for the triumph of evil is for good men to do nothing*."

9           (Edmund Burke, in a letter addressed to Thomas Mercer). Abuse thrives in a

10          culture of silence.

11                       **MARCO & RECHNITZ (JADELLE)**

12   31.    From the period  8-26-2018 - 12-23-2019, Marco & Jona enjoyed a

13          successful and trusting relationship with each other whereby they engaged in

14          approximately 32 transactions totaling approximately **$39,369,620** in value,

15          whereby they bought merchandise from each other and/or returned

16          merchandise to each other. Jona introduced Marco to famous celebrities,

17          including NBA stars Shaquille "Shaq" O'Neal, Scottie Pippen, Sam Cassell,

18          boxing champ Floyd Mayweather, pop stars Kim Kardishian & Kris Jenner,

19          and artist Alec Monopoly, to name a few, who Marco parlayed Jona's

20          introductions into clients and/or to advance his social media presence by

21          being connected to them.

22   32.    From the period 10-29-2019 - 1-7-2020 (notwithstanding his then legal

23          troubles in NY), Jona assured Marco that he was back from NY refocused on

24          his business, and acquired **$6,950,444.40** of additional jewelry from Marco

25          on consignment for the purpose of reselling them to his clients (including

26          Plaintiff's Ring and Necklace).

27   33.    At the time, Marco had no reason to believe that the $6,950,444.40

28

Case 1:16-cr-00380-KBF  Document 260-1  Filed 03/06/26  Page 36 of 113

consignments with Rechnitz would be in jeopardy, primarily because of his successful and trusting relationship with Jona, the 32 prior transactions with him totaling approximately **$39,369,620** in value. Accordingly, Marco LLC consigned the following pieces of Consigned Jewelry to Rechnitz.

| # | Date | Vendor | Item | Cost |
|---|------|--------|------|------|
| 1 | 10-29-2019 | Luna | Yellow & White Choker Necklace / Bracelet - 69.13 ct 10stone 34.9ct 412,500 yellow /wt choker/bracelet | $150,000.00 |
| 2 | 11-11-2019 | Marco LLC | Three Butterfly Rings for Kris Jenner & the Kardashians | $22,000.00 |
| 3 | 11-19-2019 | David Rovinsky | NECKLACE - 18KYG Diamond necklace, 134.71 Fancy Yellow, internally flawless, VS2´, 49 stones. | $1,300,000.00 |
| 4 | 11-26-2019 | Marco LLC | Two Watches for Jona's client Justin Bieber | $89,000.00 |
| 5 | 11-27-2019 | David Rovinsky | RING - 43.10 Carat Fancy Yellow diamond+ 6.82 carats. | $1,650,000.00 |
| 8 | | Marco LLC | Two Diamond fashion rings for Jona's client Kim Kardashian | $5,000.00 |
| 7 | 12-2-2019 | Norman Silverman (Lazar) | BRACELET - Multi-shape 14 stone diamond bracelet, 45.47 carats, white gold. | $500,000.00 |
| 8 | 12-5-2019 | Marco LLC | Watch for Jona's father Robert & <br><br> Mixed gold & diamond pieces, for Jona's client Alec Andon Monopoly | $145,000.00 $44,200.00 $189,200.00 |
| 9 | 12-9-2019 | Marco LLC | Cufflinks for Jona's client Chaz | $7,000.00 |
| 10 | 12-12-2019 | Norman Silverman | BY215 - BRACELET - Platinum/18kwg 36.69 carats, 132 stones, 44 radiant 25.52cttw., 66 baguettes 7.57 cttw | $140,000.00 |

| 11 | 12-16-2019 | Norman Silverman | NS10052 - EARRINGS - 18kwg 2stones, 9.02 Round Brilliant, J/Sl2G, GIA# 2165989714, 9.02 Round Brilliant, J/Sl2, GIA# 2205611416 | $335,000.00 |
|---|---|---|---|---|
| 12 | 12-16-2019 | Lazar | LAZ52342 - RING- 20.54 carat Oval diamond ring, H/VVS2, GIA# 6204485119 | $793, 049.40 |
| 13 | 12-16-2019 | First International | EID MT 13.62 D/VVS1, # 11776564 | $1,333, 695.00 |
| 14 | 12-23-2019 | Marco LLC | Watch for Jona's client Kim Kardashian, and Two Diamond fashion rings for Jona's client Kim Kardashian | $141,500.00 |
| 15 | 1-7-2020 | Eli, Inc. | RING - 15.03 Fancy Yellow internally flawless radiant diamond mounted on a WG ring with a diamond halo. | $215,000.00 |
| 16 | | Marco LLC | Saloman (charge back credit card) | $80,000.00 |
| | | | **TOTAL** | **$6,950,444.40** |

34.　　Prior to 10-29-2019, and thereafter, Rechnitz repeatedly represented to Marco that he had interested buyers for the pieces of Consigned Jewelry, and that consummation of his sales were imminent.

35.　　As stated above, on 11-19-2019 and on 11-27-2019, Marco LLC consigned Rovinsky's Ring & Necklace to Rechnitz based on his representations that he had buyers for them.

| **Date** | **Vendor** | **Item** | **Cost** |
|---|---|---|---|
| 11-19-2019 | Marco LLC to Rechnitz | NECKLACE - 18KYG Diamond necklace, 134.71 Fancy Yellow, internally flawless, VS2 , 49 stones. | $1,300,000.00 |
| 11-27-2019 | Marco LLC to Rechnitz | RING - 43.10 Carat Fancy Yellow diamond+ 6.82 carats. | $1,650,000.00 |
| | | **TOTAL** | **$2,950,000.00** |

Case 1:15-cr-00389-KBF Document 260-1 Filed 03/06/26 Page 38 of 113

36.    The way consignments work, is that if Rechnitz's sale to his clients did not go though, then Rechnitz would return the pieces of Consigned Jewelry back to Marco, who would in turn, return the Consigned Jewelry back to Marco's vendors.

37.    Prior to 10-29-2019, and thereafter, Jona repeatedly indicated to Marco that he had buyers and sold the pieces of Consigned Jewelry (including Rovinsky's Ring & Necklace), and was awaiting receipt of payment from his clients. These representations by Jona to Marco were false when made, and Jona knew the representations were false when made. Jona made these representation with the intention of causing Marco to rely on them. Marco indeed relied on Jona's representations to Marco's detriment.

38.    Yet, no sooner than within weeks of being sentenced in the Southern District of New York, Jona, a convicted felon, was apparently so "distraught" and repentant about his criminal past, that instead of reselling Marco' Consigned Jewelry (including Rovinsky's Ring & Necklace) and repaying Marco, Jona swindled Marco in a large scale fraud by absconding with the pieces of Consigned Jewelry, and either pawned them off, or used them as collateral for loans to various questionable sources, and has not repaid Marco the $6,950,444.40. In reality, Jona liquidated Marco' Consigned Jewelry (including Rovinsky's Ring & Necklace). Marco subsequently discovered from colleagues that Jona liquidated all pieces of Marco LLC's Consigned Jewelry (including Rovinsky's Ring & Necklace).

39.    On information and belief, at this same time, Jona defrauded other diamond dealers and insurance companies in Southern California, including but not limited to: Sotheby's, Leon Landver, Ben Adhoot, and Yehuda Gamzo, Oved Anter, Moti Klein, and Julius Klein. The amount of losses to these various parties is alleged to be over $15,000,000.00.

40.     But even after Marco discovered Rechnitz's recent frauds from colleagues in the jewelry industry, Rechnitz continued to 'play' Marco and deceive him with further false and misleading stories:

On 1-21-20, at 10:22:38AM, Rechnitz texted Marco of a 'major issue' a 'legal situation' a 'huge crisis' and a 'disaster' that forced him to not consummate his deals with Marco:

> The stone of Oved's is coming back tomorrow with all of the other stones. Client isn't taking anythinf. **I have a major issue now they didn't know about my legal situation and freaked out** they also want to reverse previous transactions of mine. He can't be associated with me. A man of his status. **I'm dealing with a huge crisis now and my Dad is at bank trying to sort out issue for me in regards to all this. I stopped the wire because they may be sending the necklace and ring back. I need a few hours to deal with them with my lawyer. This is a disaster. I am trying to fix this** but won't know for a few hours. I also have Moty Klein in town at the same time while this is all going on which is extra stress as he can't hear any of this. Give me a few hours please and I hope to have better news. [Emphasis Added].

41.     On 1-21-20, at 10:23:29AM, Rechnitz texted Marco a vague admission of guilt and liability:

**I understand if you never want to deal with me again or see my fave ever again I am so sorry**. [Emphasis Added].

42.     On 1-21-20, 10:24:09AM, Rechnitz texted Marco that he is trying to fix his 'major issue' a 'legal situation' a 'huge crisis' and 'disaster:' :

**You need to let me try and resolve this now**. [Emphasis Added]

43.     On 1-21-20, at 10:33:53AM,  Rechnitz texted Marco his shame and depression that his recent frauds are causing Marco:

**You don't even need to type back anything to me I'm depressed. Upset. This all happened Yesterday evening**. I'm dealing with it. Standby [Emphasis Added].

44.     In addition, and to make matters worse, on 1-5-2020, Jona issued Marco a worthless check that he had no intention of honoring, # 8630 for $2,950,000.00 post-dated to 1-5-2020 (for the two Rovinsky pieces he had on consignment from Marco).

| Check # | Date | To | $ |
|---------|------|-----|---|
| 8630 | 1-5-2020 | Peter Marco | $2,950,000.00 |

45.   Even had Marco tried to deposit Rechnitz's $2,950,000.00 post-dated check, he could not because Rechnitz had instructed him to rip it up earlier based on his promises to Marco that he would wire the funds to Marco.

46.   In addition, and as an aside, on 1-17-2020 Jona issued two worthless checks to another one of his defrauded creditors First International totaling $2,122,760.00 that he had no intention of honoring: (1) Check # 2200 for $922,760.00; and (2) Check # 2201 for $1,200,000.00.  Both checks were NSF at the time of tender, in violation of the California Civil Code § 1719 and the California Penal Code §476a.

47.   In addition, and to make matters worse, on 1-14-2020 Jona issued another defraused creditor Franco Noval a worthless check that he had no intention of honoring, check # 8817 for $2,500,000.00, and then on 1-16-2020 check # 8820 for $1,300,000.00, and then on 1-22-2020 check # 8823 for $4,500,000.00  also in violation of the California Civil Code § 1719 and the California Penal Code §476a.

| Check # | Date | To | $ |
|---------|------|-----|---|
| 8630 | 1-5-2020 | Peter Marco | $2,950,000.00 |
| 8817 | 1-14-2020 | Franco Noval | $2,500,000.00 |
| 8820 | 1-16-2020 | Franco Noval | $1,300,000.00 |
| 2200 | 1-17-2020 | First International | $922,760.00 |
| 2201 | 1-17-2020 | First International | $1,200,000.00 |
| 8823 | 1-22-2020 | Franco Noval | $4,500,000.00 |
| Total NSF Checks issued by Jona | | | **$13,372,760.00** |

48.   Based upon information and belief, Third Party Defendant Prado, acting in concert with Jona, and to further his scheme, signed Marco's post-dated

1   check and had his girlfriend or another representative at Wells Fargo Bank

2   issue a stop payment on the check, that Marco was going to deposit.

3   49.   During this entire time, Jona repeatedly lied to Marco that the deals with his

4         clients were consummated. Jona lulled, and attempted to fabricate one excuse

5         after another to delay paying Marco, and hid the truth from them through

6         stonewalling and lies. Repeated demands have been made to Jona to return

7         Marco's Consigned Jewelry (including Rovinsky's Ring & Necklace).

8         Instead, Jona, took numerous steps to lull Marco into a false sense of security

9         to buy more time, and to keep this matter secret via phone calls and

10        WhatsApp texts.

11  50.   On 1-22-2020 at 5:12:52, once Jona's most recent frauds in stealing and

12        liquidating Marco' Consigned Jewelry (including Rovinsky's Ring &

13        Necklace) and of other victims, hit the streets, Jona texted Marco begging

14        him to stay quiet and not report him, lulling him to buy time:

15        "***I'm at my cousin lawyer and cousin*** *still getting everything sorted out* ***so no noise and no issue*** *I'll see you later still.*" [Emphasis added].

16
    51.   On 1-27-20 at 3:47:58, Jona repeated his request that Marco not report him
17
          for his fraud:
18
          "*Please confirm the following: They will wait until end of day tomorrow* ***and keep it quiet****. Need to know ASAP*"
19

20  and then at 4:03:11:

21        "*Need to know NOW.*".

22  52.   On 1-29-20 at 7:55:07, Jona repeated his request that Marco not report him

23        for his fraud:

24        "*All I can say is I'm handling things and* ***don't discuss anything with anyone. No updates to people who call you*** *unless it's oved or lazar.*"

25        [Emphasis added].

26  53.   On 1-30-2020 at 11:35am, Jona introduced Oved Anter of First International

27        Diamonds to an attorney at Williams & Cohen about the Rechnitz cousin's

28

4/14-3:01pm                                        -16-

1    proposed bailout:

2    *"Oved meet Reuven. Reuven oved is a vendor I owe and used his
     goods for loans.* **He has been the single biggest force in helping keep**
3    **people calm**. *He needs to hear from you in order to continue please.
     Thank you.*" [Emphasis added].

4

5    54.    On 2-4-2020, 12:30:22, Jona repeated his request that Marco not report him

6            to news outlets for his fraud:

7            *"Pls confirm you didn't hear back* **or communicate to the paper**."
            [Emphasis added].

8    55.    On 2-4-2020 at 3:36:55, Jona texted Marco of his fear of being reported to

9            the authorities for his fraud:

10           *"Is david dealing through you because* **I heard he wants to report me**
            *so* **confirm that he is holding off** *and you'll wait to hear from my*
11           *lawyers*"

12   and then at 4:49:01 texted Marco:

13           "**Make sure you ignore the reporter**. *Moty is too.* **She can't print**
            **without a comment**." [Emphasis added].

14

15   56.    That night, on 2-4-2020 at 9:40pm, Jona falsely enlisted attorneys to pretend

16           a bailout was coming from family members to buy himself more time.

17           Attorneys from Williams & Cohen wrote Marco about the purported bailout:

18           *"We write with an update on Jona Rechnitz.* **A family member of Mr.**
            **Rechnitz has informed our law firm that the family member is**
            **seeking to refinance certain real property in order to satisfy Mr.**
19           **Rechnitz's outstanding liabilities**. *We currently have no visibility into*
            *the family member's interest in the property, the value of the property,*
20           *or what, if any, equity, the family member has in it. If you are*
            *represented by counsel, please let us know and provide your counsel's*
21           *contact information. Our client's desire is to resolve this matter*
            *amicably.*"

22   57.    Meanwhile, on 2-10-2020, as reported in the NY Post: ***"Ex-de Blasio crony***

23           ***used Kardashian ties for fraud scheme, lawsuit claims***,"

24           (https://nypost.com/2020/02/09/ex-de-blasio-crony-used-kardashian-ties-for-

25           fraud-scheme-lawsuit-claims/), and as reported in the 3-6-2020 article in

26           JCK: ***"The Troubling Case of Jona Rechnitz***"

27           (https://www.jckonline.com/editorial-article/the-troubling-case-jona-rechnitz

28

1  /), and as reported in the 3-10-2020 NY Daily News article "***Corrupt Mayor***
2  ***de Blasio donor Jona Rechnitz faces new FBI probe in L.A.: court papers***"
3  (https://www.nydailynews.com/new-york/ny-rechnitz-los-angeles-probe-202
4  00310-nrzbb6263nga3hkcyob2lw46wq-story.html), one of Jona's recently
5  defrauded victims filed a lawsuit entitled: *Victor Franco Norval vs Jona S.*
6  *Rechnitz, Rachel Rechnitz, Jadelle Inc., a California Corporation; Jadelle*
7  *Jewelry and Diamonds, LLC, a Delaware Limited Liability Company; Levin*
8  *Prado Aka Levon Prado, an Xiomara Cortez*, LASC # 20SMCV00216, for
9  (1) Fraud (2) Civil Theft (Penal Code, § 496), (3) Breach of Contract, (4)
10 Conspiracy to Commit Theft, Fraud, and Fraud by Concealment, (5)
11 Appointment of Receiver seeking damages of $7,000,000.00.

12 58. Interestingly, on 2-22-2020, Jona's father Robert Rechnitz reiterated the
13 proposed bailout by Jona's cousin to Marco and represented that Marco
14 would be paid "*first in line*" by Jona's cousin.

15 59. And then on 2-20-2020, as reported in the NY Post "***De Blasio donor Jona***
16 ***Rechnitz accused of $1M scam in California***,"
17 (https://nypost.com/2020/02/28/de-blasio-donor-jona-rechnitz-accused-of-1m
18 -scam-in-california/) another one of Jona's defrauded victims filed a lawsuit
19 entitled: *Israel Sam Gorodistian vs. Jadelle Jewelry and Diamonds, LLC, a*
20 *Delaware Limited Liability Company; Jadelle Inc., a California*
21 *Corporation; Jona Rechnitz, Rachel Rechnitz, Robert Rechnitz*, LASC #
22 20STCV07425, for 1. Conversion; 2. Civil Theft (Pen. Code § 496); 3. Fraud
23 – False Promise; 4. Negligent Misrepresentation; 5. Civil Conspiracy to
24 Defraud; 6. Breach of Oral Contract (2 Counts); 7. Breach of Implied-in-fact
25 Contract (2 Counts); 8. Money Lent; 9. Account Stated; and 10. Breach of
26 Written Guaranty seeking damages of $1,659,333.33.

27 60. Jona is no stranger to fraud. Unbeknownst to Marco, on 6-3-2019, Jona was

28

sued in the United States Bankruptcy Court Southern District of New York (Manhattan), Adv. Case No, # 19-01236-jlg by Kenneth P. Silverman, Esq., the Chapter 7 Trustee of the Jointly Administered Estates of National Events Holdings, LLC, Chapter 7 Case No.: 17-11556 (JLG) on 35 counts of receiving fraudulent conveyances through an elaborate Ponzi scheme, pursuant to New York Debtor and Creditor Law §276, and (b) pursuant to 11 U.S.C. §§550(a) and 551, 11 U.S.C. §548(a)(1)(A), and (b), 11 U.S.C. §548(a)(1)(B), and (b),  totaling $45,000,000.00.

**JONA AND ROBERT RECHNITZ**

61. On information and belief, Jona personally ingratiated himself to Marco, as an Orthodox Jewish diamond dealer, leading Marco to believe that Jona was more trustworthy than others because of his Orthodox faith and belief in Jewish law (and common Orthodox Jewish friends in and out of the Diamond industry), which requires honesty and maximum integrity. These types of internal community relationships such as the Orthodox Jewish diamond community create a vulnerability for affinity fraud to be perpetuated. Jona targeted Marco exploiting his standing in, and knowledge of, the customs and practices of this community to further his fraudulent scheme. This type of illegal activity is commonly referred to as "affinity fraud," and refers to scams that prey upon members of identifiable groups, such as religious or ethnic communities, the elderly, or professional groups. The perpetrators of affinity fraud scams, like Jona, frequently are, or pretend to be, members of the group, and they exploit the trust and friendship that exist in groups of people who have something in common. The conventional thinking is that the religious man doing business with you is unlikely to ruthlessly rip you off.

62. On information and belief, Jona and his father Robert Rechnitz's ("Robert")

4/14-3:01pm

-19-

*modus operandi* is as follows: Robert would meet Marco in Jona's office and at his office, endearing Marco with old school charm warmth & friendship to place him at ease, while Jona would rip him off in broad daylight and steal from him. Then, once Jona's fraud was discovered by his victims (including Marco), Robert was there officially trying to clean up Jona's messes, further lulling the defrauded creditors (including Marco), with promises of bailouts, putting his friendships with Jona's victims on the line so-to-speak, in the unspoken understanding that an action against Jona would be tantamount to an action against Robert. The two acted in tandem like a tag-team to further defraud Marco and other victims.

63.     On the one hand, it is laudable for a loving parent to come to the aid of their child in distress, no matter what. On the other hand, in this case, Marco believes that Robert's involvement was too interwoven with Jona's criminal actions to be innocent or laudable. For example, throughout their relationship, Jona constantly brought his father Robert into the conversations and transactions portraying him to Marco as the moral authority and the one overseeing and coaching Jona's affairs, who's presence conferred legitimacy on Jona's wild bragging and transactions, who appeared at the epicenter whenever Jona's frauds were discovered by his victims (including Marco).

64.     On 8-8-19, at 15:24:03, Jona texted Anter about Jona's father Robert:

***My Dad is a nice guy doesn't talk when ppl owe him ?? lee. Yossi. But keeps getting mad I talk to you too much***.  [Emphasis added]

65.     On 10-28-19 at 8:43:40, Jona texted Marco citing his father as a bailout source for him:

*"Issue! My account has a charge back from that client! Money was withdrawn from my account not enough funds for your wire this morning Bc sent after cutoff Friday. Will resolve next few hours and **get money from my Dad today**. Bear with me until later in the day. I'm sorry. Unforseen."* [Emphasis added].

66.     On 11-5-19 at 9:22:25, Jona texted Marco seeking a bailout for his father:

-20-

4/14-3:01pm

*"You know me by now if I would ever need anything from a friend YOU this is a level 10. I committed to something by tonight **that is not reversible for my Dad** and said it is done. Please tell me you got me and let me breathe here. Thx"*

and at 11-5-19 at 10:12:57:

*"I am sorry to pressure you and now I'm just letting you know for me this is super urgent And **you are the only person I am comfortable to discuss this with. Obviously it goes without saying I will go all the way for you and I do not need to even say that here but I feel like saying it to remind you I'm always in your corner** either way I hope we have good news today because I'm out of options thank you,"* [Emphasis added].

and at 11-5-19 at 11:44:55 endeared himself to Marco as his 'brother:'

*"**Brother** pls help me here"* and finally, at 11-5-19 at 1:58:26: *"**My Dad** is good with 70."* [Emphasis added].

67.    On 1-21-20 at 10:22:38, after Jona's recent frauds to Marco was revealed (by other sources in the community), Jona cited his father as the one trying to solve Jona's frauds, Jona texted Marco:

*"The stone of Oved's is coming back tomorrow with all of the other stones. Client isn't taking anythinf. I have a major issue now they didn't know about my legal situation and freaked out they also want to reverse previous transactions of mine. He can't be associated with me. A man of his status. **I'm dealing with a huge crisis now and my Dad is at bank trying to sort out issue for me in regards to all this**. I stopped the wire because they may be sending the necklace and ring back. I need a few hours to deal with them with my lawyer. This is a disaster. I am trying to fix this but won't know for a few hours. I also have Moty Klein in town at the same time while this is all going on which is extra stress as he can't hear any of this. Give me a few hours please and I hope to have better news."* [Emphasis added].

68.    On 1-26-20 at 12:18:08 PM, Jona texted Marco a report of his father's attempts to rectify his most recent frauds to his vendors:

*"And lazar tried to control things a little too much from my cousins money. **My Dad very involved** joe. Just wait...Promise you"* and at 1-26-20 at 12:18:15: *"*now."* [Emphasis added].

69.    For now, Robert is not a named party, but Marco reserves the right to name him as a third party defendant once facts become known as to the full extent of his involvement with Jona's most recent frauds. Parenthetically, Robert was recently placed into an involuntary bankruptcy/receivership by his

creditor ITOR 116 SF LLC in Israel, Case # 27255-09-18 for debts in excess of $2,600,000.00 shekel ($9,500,000.00 dollars) ("***Receiving order against businessman Robert Rechnitz, who is close to Netanyahu***" http://www.calcalist.co.il//articles/0,7340,L-3803076,00.html) but the Israeli bankruptcy does not stay Marco's claims against him in this country.

70. On 3-9-2020, Marco' litigation counsel Baruch C. Cohen ("Cohen") extended a professional courtesy to Robert to inform him that Cohen had been retained by Marco to sue Jona, inquiring (actually, hoping) that Rechnitz's cousin's bailout was imminent, to avoid the litigation. Further, as Robert personally guaranteed the debts to Oved Anter and First International of up to $12,000,000.00, that Cohen would reluctantly have to sue Robert as well. Cohen told Robert that he personally preferred ***not*** to have to sue Robert, as both pray at the same synagogue in Hancock Park and have known each other for years. Cohen acknowledged that Robert attempted to help Cohen in the past and was gracious in Cohen's time of need, as Cohen was to Robert's. Cohen acknowledged that Jona introduced Cohen to Marco. Cohen made it clear that he took no joy in prosecuting these cases on behalf of Marco and Anter against Jona and Robert, as Cohen agonized over it for over a month ever since Marco was being pursued by Rovinsky because of Jona's actions. But, Cohen explained, that Jona placed his clients in a terrible predicament exposing them to millions of dollars of damages from Rovinsky and others, and the scope of Jona's perfidy and betrayal was so breathtaking, overwhelming and devastating, that Marco and Anter absolutely insisted that Cohen protect their interests. While Cohen did not expect Robert to be pleased with this decision, as Marco's attorney, Cohen owed Marco a 100% duty and must represent his client's interests.

71. Further, in the matter of *Oved Anter & First International Diamonds*

1   ("Anter") vs Rechnitz et al, on 6-25-2019 Robert personally guaranteed up to

2   $12,000,000.00 of Jona's debt to Anter. Robert's 6-25-2019 Personal

3   Guaranty to Anter stated that Robert stood behind Jona and all his dealing. It

4   reads as follows:

5   *Dear Oved / First International Diamonds Inc., I very much enjoyed
     speaking to you by phone. Jona has shared some of your conversations*

6   *with me. Thank you for being a confidant for Jona. He mentioned to
     me about how your Father had a special bond and relationship with*

7   *you. I was also privileged to have a close relationship with my Father,
     as did Jona. I'm sure you will find much success in your dealings*

8   *together. I completely understand your desire to know that Jona's
     family is aware of his dealings with you and stands behind him.* **I am**

9   **pleased to confirm that I stand behind Jona and all his dealing with
     you*. *You have indicated that you have extended memos up to the**

10  **amount of $12,000,000.00. If for some reason you need to callback
     your credit line, all merchandise will be returned to you, and any**

11  **cash deficiencies will be repaid by me.** *. May your confidence in Jona
     and your extension of credit be profitable for both of you.*  BOBBY

12  RECHNITZ / CC: JONA RECHNITZ [Emphasis added]

13  72.  Jona personally handed Robert's 6-25-2019 Personal Guaranty letter to Anter

14  several days after Robert orally promised to personally guaranty Jona's debts

15  to Anter, while all three met at Pat's Kosher Restaurant on Pico Boulevard.

16  73.  On 6-25-19 at 16:22:18, Jona Whatsapp texted Oved - confirming Robert's

17  Personal Guaranty:

18  *"It's good to know* **I'm worth 12mm to my Dad** *not 10mm lol."*

19  [Emphasis added].

20  74.  On 7-3-19 at 21:58:14 Jona Whatsapp texted Oved again, confirming the

21  UCC Financing Statement and the Personal Guaranties to Anter:

22  *"OK also I filled out the application so Monday let's go through it I
     am away until Monday I will come see you Monday I will take care of*

23  *that and I will get the application filled out with you. No worries.* **In
     meantime you have UCC.** <u>**My Dad guarantee in writing. My**</u>

24  <u>**guarantee. My wife. Everything and the legal document that's owns
     me. I want you to feel protected and will make it happen**</u>*."* [Emphasis

25  added].

26  75.  On 3-9-2020 Cohen notified Robert that he would have to sue Robert on the

27  personal guarantee to Anter as well.

28

76.  3-10-2020 was the Jewish holiday of Purim, and Robert approached Cohen in synagogue that night acknowledging the professional courtesy extended to him, and asked to speak to Cohen under the guise and pretext of wanting to talk about "nothing legal, just as friends." Cohen reiterated the above, and Robert repeatedly denied personally guaranteeing the debts to Anter.

77.  Robert's denial that he personally guaranteeing the debts to Anter was indeed curious, as Cohen had a copy of Robert's 6-25-2019 Personal Guaranty in his file. So, what was Cohen to make of Robert's denials? Was he involved with Jona's frauds, or was he not?

78.  If indeed, Robert did not sign the Personal Guaranty to Anter - as he insisted to Cohen orally - and giving Robert the benefit of the doubt - then that would mean that Jona forged his own father's name to Robert's 6-25-2019 Personal Guaranty to Anter, and shamelessly exploited Anter's trust and his father's name, using a doctored document to continue to commit crimes while out on bail.

79.  On 3-10-2020 at approximately 10:00pm that night, Jona resumed and resorted to his criminal behavior and called Marco, livid that Cohen is "going after his family and his father" threatening him and Anter that unless he receives a letter from Marco and Anter that they will be firing Cohen as their attorney, that Jona will engage in an all out war, "destroy" "rip apart" and "mess and fuck Cohen good" with the State Bar (claiming to have texts that Cohen was his lawyer creating a conflict of interest), and report Anter to the IRS for criminal tax evasion. Jona repeated his bogus pledge that his cousin is still working on bailing him out to make Marco whole within one week, but that it was conditional on them firing Cohen. Jona brazenly assured Marco that his role as one of the single most important and prolific white collar cooperating witnesses in the recent history of the Southern District of

New York, with his working closely with the FBI as an informant, along with the fact that he only received 10 months custody time with 5 months house arrest, that since the FBI needs him as an informant so badly in the New York case that they would never do anything to him no matter what he did, making him immune from any further prosecution (mistakenly believing that this provides him some kind of ill-conceived immunity from committing criminal acts of fraud and extortion in California [ie., Penal Code 518]). Tragically, Jona learned nothing from his life of crime and resorted to his old tricks of extortion and blackmail, and if anything, has become emboldened by it.

80. In said conversation, Jona immediately conferenced-in his father Robert into the late night conversation (who was curiously readily available), under the guise and pretext of wanting to talk about "nothing legal, just as friends."

81. Obviously, whatever good will Cohen was prepared to extend to Robert disintegrated by Jona's extortion call and Robert's convenient joinder late that night.

///
///
///
///
///
///
///
///
///
///
///
///

82.  After Jona finished threatening Marco, Cohen and Anter, Jona texted Marco at 10:55pm a veiled confirmation of the conversation:



83.  As to Jona's threats to report Cohen to the State Bar, Jona merely introduced Cohen to Peter Marco and nothing more. Jona was never Cohen's client, and Cohen was never Jona's lawyer, as evidenced by Jona's texts to Cohen.





-27-

4/14-3:01pm

84. Obviously, by this lawsuit, Cohen is not resigning and will remain counsel of record for both of his clients, and he and Marco will not be scared away or intimidated by Jona's criminal threats of extortion.

85. As reported in the 2-12-2020 NY Post article "***DeBlasio Donor Jona Rechnitz Used Kardashian Ties to Further His Schemes***" (http://thejewishvoice.com/2020/02/deblasio-donor-jona-rechnitz-used-kardashian-ties-to-further-his-schemes/) Jona Rechnitz's dark dealings is eerily similar of the character Howard Ratner, played by actor Adam Sandler, in the 2019 film "Uncut Gems," of a charismatic debt-ridden gambling addict, a wheeling, dealing, greedy Jewish diamond dealer, scheming, ripping people off, swearing and making bold plays to try and advance his own life, clearly headed toward self-destruction.

## FIRST CAUSE OF ACTION
## INTENTIONAL MISREPRESENTATION & FRAUD

*(On behalf of Third Party Plaintiffs as to Jona Rechnitz, Rachel Rechnitz, Levin Prado)*

86. Third Party Plaintiffs hereby incorporate by reference as though fully set forth in full herein, all preceding Paragraphs of this Complaint.

87. The foregoing representations made by Jona, and the Third Party Defendants were false when they were made, and Third Party Defendants knew the representations to be false. Jona and the Third Party Defendants did not intend to comply with the promises and representations when they were made.

88. The foregoing representations were made by Jona and the Third Party Defendants with the intent to deceive Marco and with knowledge that Marco would rely on them.

89. Third Party Plaintiffs detrimentally and reasonably relied on the foregoing

4/14-3:01pm

1    representations.

2    90.    Third Party Plaintiffs have been damaged by Third Party Defendants' false,

3           intentional, and fraudulent representations and concealing of material

4           information, as alleged above, in an amount to be proven at trial, but at least

5           $6,950,444.40, which represents the consigned jewelry Jona lied to steal as

6           well as tendered worthless instruments for.

7    91.    Third Party Plaintiffs further request the imposition of a constructive trust

8           against all Third Party Defendants who are in possession of the Consigned

9           Jewelry set forth in the Consignment Memos and for an order and judgment

10          that they hold the consigned jewelry and/or all proceeds therefrom as

11          constructive trustees for the benefit of Marco.

12   92.    In doing the things herein alleged, Jona and the Third Party Defendants acted

13          willfully, maliciously, and with the intent to cause injury and harm to Marco.

14          All Third Party Defendants are therefore guilty of malice and/or fraud in

15          conscious disregard of Marco' rights, thereby warranting an assessment of

16          punitive and exemplary damages in an amount appropriate to punish Third

17          Party Defendants, and each of them, and deter them and others from

18          engaging in similar misconduct.

19                              **SECOND CAUSE OF ACTION**

20                          **CIVIL THEFT (Cal. Penal Code § 496)**

21          (*On behalf of Third Party Plaintiff as to Jona Rechnitz, Rachel Rechnitz*)

22   93.    Third Party Plaintiffs hereby incorporate by reference as though fully set

23          forth in full herein, all preceding Paragraphs of this Complaint.

24   94.    As a result of Jona and Third Party Defendants' conduct as alleged herein,

25          they have violated California Penal Code, §496 that provides: "[e]very

26          person who buys or receives any property that has been stolen or that has

27          been obtained in any manner constituting theft or extortion, knowing the

28

property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a county jail for not more than one year, or imprisonment pursuant to subdivision (h) of Section 1170. However, if the value of the property does not exceed nine hundred fifty dollars ($950), the offense shall be a misdemeanor, punishable only by imprisonment in a county jail not exceeding one year, if such person has no prior convictions for an offense specified in clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667 or for an offense requiring registration pursuant to subdivision (c) of Section 290.

95. Jona and Third Party Defendants have obtained and received property from Marco, the $6,950,444.40 of Consigned Jewelry, in a manner constituting "theft," as that term is defined in California Penal Code, § 484(a) that provides: "[e]very person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft."

96. Third Party Defendants' conduct constitutes theft, as that term is defined in California Penal Code § 484(a).

97. As a direct and proximate result of Third Party Defendants' civil theft, Marco has been damaged in an amount to be proven at trial, but at least

1    $6,950,444.40.

2    98.    Pursuant to California Penal Code, § 496(c), Marco is also entitled to recover

3           treble damages from Third Party Defendants.

4    99.    Pursuant to California Penal Code, § 496(c), Marco is also entitled to recover

5           attorneys' fees from Third Party Defendants.

6    100.   Marco further requests the imposition of a constructive trust against all Third

7           Party Defendants who are in possession of the consigned jewelry set forth in

8           the Consignment Memos and for an order and judgment that they hold the

9           consigned jewelry and/or all proceeds therefrom as constructive trustees for

10          the benefit of Marco.

11   101.   In doing the things herein alleged, Third Party Defendants acted willfully,

12          maliciously, and with the intent to cause injury and harm to Marco. Third

13          Party Defendants are therefore guilty of malice and/or fraud in conscious

14          disregard of Marco's rights, thereby warranting an assessment of punitive

15          and exemplary damages in an amount appropriate to punish Third Party

16          Defendants, and each of them, and deter them and others from engaging in

17          similar misconduct.

18                          **THIRD CAUSE OF ACTION**

19                              **EMBEZZLEMENT**

20                  (*On behalf of Third Party Plaintiffs as to Jona Rechnitz*)

21   102.   Third Party Plaintiffs hereby incorporate by reference as though fully set

22          forth in full herein, all preceding Paragraphs of this Complaint.

23   103.   Based on the foregoing, Jona, without Marco' knowledge or consent, instead

24          of reselling Marco's Consigned Jewelry (including Rovinsky's Ring &

25          Necklace) and repaying Marco, Jona swindled Marco in a large scale fraud

26          by absconding with Marco's Consigned Jewelry (including Rovinsky's Ring

27          & Necklace), and either pawned them off, or used them as collateral for loans

28

1    to various questionable sources, and has not repaid Marco the $6,950,444.40.

2    In reality, Jona liquidated Marco' Consigned Jewelry Marco's Consigned

3    Jewelry (including Rovinsky's Ring & Necklace) , and refused to tell Marco

4    how he liquidated the Consigned Jewelry or how he spent the proceeds.

5    Marco asked Jona to disclose the location of the Consigned Jewelry and to

6    provide a tracing and accounting of the proceeds, and Jona refused to do so.

7  104.  In engaging in the conduct described above, Jona acted despicably, willfully,

8    wantonly, oppressively, fraudulently, or in conscious disregard of Marco's

9    rights, within the meaning of Civil Code § 3924(c), so as to entitle Marco to

10    punitive damages in an amount sufficient to punish or make an example of

11    Jona.

12 105.  As a result of Jona's actions, Marco have been damaged in an amount

13    according to proof, plus interest, costs, and attorneys' fees as permitted by

14    law.

15            **FOURTH CAUSE OF ACTION**

16  **CIVIL CONSPIRACY TO COMMIT THEFT, FRAUD, AND FRAUD BY**

17              **CONCEALMENT**

18  (*On behalf of Third Party Plaintiffs as to Jona Rechnitz, Rachel Rechnitz, Levin*

19              *Prado*)

20 106.  Third Party Plaintiffs hereby incorporate by reference as though fully set

21    forth in full herein, all preceding Paragraphs of this Complaint.

22 107.  Jona, Rachel and Prado conspired to make illegal agreements to defraud

23    Marco of the consigned jewelry and to commit civil theft.

24 108.  Jona, with his wife Rachel, have set up companies to solicit consigned

25    jewelry based upon the false premise they have clients to sell them to.

26    Meanwhile they took Marco's Consigned Jewelry (including Rovinsky's

27    Ring & Necklace), swindled Marco in a large scale fraud by absconding with

28

4/14-3:01pm

-32-

the pieces of jewelry, and either pawned them off, or used them as collateral for loans to various questionable sources, and has not repaid Marco the **$6,950,444.40**. In reality, Jona liquidated Marco's consigned jewelry, and refused to tell Marco how he liquidated the consigned jewelry or how he spent the proceeds. Marco asked Jona to disclose the location of the consigned jewelry and to provide a tracing and accounting of the proceeds, and Jona refused to do so.

109. Jona deceived Marco to consign them the $6,950,444.40 in jewelry, with false promises of consummated sales and with false promises of repayment.

110. Third Party Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto, Third Party Defendants formed a civil conspiracy and engaged in the foregoing acts in operation and furtherance of that conspiracy.

111. Third Party Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto, Third Party Defendants committed the foregoing misrepresentations, wrongs, theft, and fraud for the purpose and in furtherance of a fraudulent conspiracy and scheme to defraud Marco, as alleged herein.

112. As a result of the civil conspiracy, each and every Defendant is liable and responsible for the acts of the other Third Party Defendants in furtherance of the conspiracy and all damages resulting therefrom.

113. As a result of the civil conspiracy, Third Party Defendants are jointly and severally liable for $6,950,444.40.

114. The egregious nature of the Third Party Defendants/conspirators' collective conduct is malicious, wanton, and willful. Marco need to be awarded punitive damages plus a judgment of joint and several liability.

///

///

# FIFTH CAUSE OF ACTION
# CONVERSION

*(On behalf of Third Party Plaintiffs as to Jona Rechnitz, Rachel Rechnitz)*

115. Third Party Plaintiffs hereby incorporate by reference as though fully set forth in full herein, all preceding Paragraphs of this Complaint.

116. At all times relevant, by virtue of their Consignment Memos, Marco owned, possessed, or had a right to receive and possess their $6,950,444.40 in Consigned Jewelry.

117. Third Party Plaintiffs recently discovered that the Third Party Defendants have intentionally and substantially interfered with Marco's property by means of false and fraudulent activity, including, but not limited to, misappropriating Marco' Consigned Jewelry (including Rovinsky's Ring & Necklace) for their own personal use and other theft according to proof. The Third Party Defendants engaged in this conduct with the intention of wrongfully benefitting themselves at the expense of Marco.

118. Third Party Defendants sold, encumbered, or otherwise transferred Marco's Consigned Jewelry (including Rovinsky's Ring & Necklace) to third parties of questionable reputation, subject to Marco's Consignment Memos without the knowledge of Marco. These transferees took possession of Marco' Consigned Jewelry (including Rovinsky's Ring & Necklace). Once Marco discovers the identities of these fraudulent transferees, Marco will amend this Complaint to add them as Third Party Defendants to a claim and delivery (replevin) cause of action.

119. Third Party Plaintiffs did not consent to said activities.

120. As a direct and proximate result of the foregoing acts, Third Party Defendants intended to cause, and have in fact caused, actual harm to Marco, and are liable to Marco for damages in an amount to be proven at trial, but no

4/14-3:01pm

less than $6,950,444.40.

121. During, and as a further proximate result of, the Third Party Defendants' wrongful possession and detention of Marco's Consigned Jewelry, Marco has suffered the loss of the deterioration of their property and resulting business losses in an amount to be proven at trial.

122. Furthermore, Marco is informed and believe, and so allege, that the Third Party Defendants' aforementioned acts were taken with malice, fraud, and oppression and in conscious disregard for Marco's rights, and were done willfully and with the intent to cause injury to Marco. The Third Party Defendants were aware at all times that Marco was owed either return of the consigned goods or repayment of $6,950,444.40 and intended to surreptitiously misappropriate Marco's consigned goods and funds for their own personal use, seeking only to intentionally and maliciously deceive Marco. Accordingly, Marco is entitled to an award of exemplary and punitive damages against the Third Party Defendants.

## SIXTH CAUSE OF ACTION
## BREACH OF CONTRACT

*(On behalf of Third Party Plaintiffs as to Jona Rechnitz, Rachel Rechnitz)*

123. Third Party Plaintiffs hereby incorporate by reference as though fully set forth in full herein, all preceding Paragraphs of this Complaint.

124. Third Party Plaintiffs, (the Jadelle Parties), Jona and Rachel are parties to binding contracts, the Consignment Memos.

125. At all times, Marco performed all conditions, covenants, and promises required in accordance with the terms of the Consignment Memos,, except as they have been prevented or excused from performing by the acts and/or omissions of (the Jadelle Parties), Jona & Rachel.

126. Under the 10-29-2019 Consignment Memo to Luna, (the Jadelle Parties) and

Jona & Rachel were to either return the Yellow & White Choker Necklace / Bracelet to Third Party Plaintiffs or pay them $150,000.00.

127. Under the 12-2-2019 Consignment Memo to Norman Silverman, (the Jadelle Parties) and Jona & Rachel were to either return the BRACELET - Multi-shape 14 stone diamond bracelet, 45.47 carats, white gold to Third Party Plaintiffs or pay them $500,000.00.

128. Under the 12-12-2019 Consignment Memo to Norman Silverman, (the Jadelle Parties) and Jona & Rachel were to either return the BY215 - BRACELET - Platinum/18kwg 36.69 carats, 132 stones, 44 radiant 25.52cttw., 66 baguettes 7.57 cttw to Third Party Plaintiffs or pay them $140,000.00.

129. Under the 12-16-2019 Consignment Memo to Norman Silverman, (the Jadelle Parties) and Jona & Rachel were to either return the NS10052 - EARRINGS - 18kwg 2stones, 9.02 Round Brilliant, J/Sl2G, GIA# 2165989714, 9.02 Round Brilliant, J/Sl2, GIA# 2205611416 to Third Party Plaintiffs or pay them $335,000.00.

130. Under the 12-16-2019 Consignment Memo to Lazar, (the Jadelle Parties) and Jona & Rachel were to either return the LAZ52342 - RING- 20.54 carat Oval diamond ring, H/VVS2, GIA# 6204485119 to Third Party Plaintiffs or pay them $793, 049.40.

131. Under the 12-16-2019 Consignment Memo to First International, (the Jadelle Parties) and Jona & Rachel were to either return the EID MT 13.62 D/VVS1, # 11776564 to Third Party Plaintiffs or pay them $1,333, 695.00.

132. Under the 11-19-2019 Consignment Memo, the Jadelle Parties) and Jona & Rachel were to either return the NECKLACE - 18KYG Diamond necklace, 134.71 Fancy Yellow, internally flawless, VS2 , 49 stones to Third Party Plaintiffs or pay them $1,300,000.00.

Case 1:16-cr-00880-KBF Document 260-1 Filed 03/06/26 Page 62 of 113

133. Under the 11-27-2019 Consignment Memo to David Rovinsky, (the Jadelle Parties) and Jona & Rachel were to either return the RING - 43.10 Carat Fancy Yellow diamond+ 6.82 carats to Third Party Plaintiffs or pay them $1,650,000.00.

134. Under the 1-7-2020 Consignment Memo to Eli, Inc., (the Jadelle Parties) and Jona & Rachel were to either return the RING - 15.03 Fancy Yellow internally flawless radiant diamond mounted on a WG ring with a diamond halo to Third Party Plaintiffs or pay them $215,000.00.

135. (The Jadelle Parties) and Jona & Rachel breached the Consignment Memos by failing to return the consigned jewelry and make full repayment of the $6,950,444.40. As of the date of filing of this complaint, the full amount of Third Party Plaintiffs' debt in the amount $6,950,444.40 is past due and owing. In addition, accrued and ongoing interest, remains due, owing, and unpaid from (the Jadelle Parties) and Jona & Rachel to Third Party Plaintiffs.

136. As a direct and proximate result of the foregoing acts, Third Party Plaintiffs have been damaged in an amount to be proven at trial, together with interest at the maximum legal rate according to proof. (The Jadelle Parties) and Jona & Rachel would receive unjust enrichment if allowed to retain the benefits of Third Party Plaintiffs' performance under the Consignment Memos without abiding by (the Jadelle Parties) and Jona's & Rachel's own repayment obligations under the Consignment Memos and/or Third Party Plaintiffs detrimentally relied on the Consignment Memos and would suffer an unconscionable injury if the Consignment Memos were not enforced.

///
///
///
///

# SEVENTH CAUSE OF ACTION
## BREACH OF THE IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING

*(On behalf of Third Party Plaintiffs as to Jona S. Rechnitz., Rachel Rechnitz, Levin Prado)*

137. Third Party Plaintiffs hereby incorporate by reference as though fully set forth in full herein, all preceding Paragraphs of this Complaint.

138. Based on the foregoing, Third Party Plaintiffs are informed and believe, and on such information and belief allege, that based on the foregoing, Third Party Defendants breached the implied covenant of good faith and fair dealing continuously throughout the business relationship with Marco.

139. Third Party Plaintiffs are informed and believe, and on such information and belief allege, that there may be other facts constituting breach of the implied covenant of good faith and fair dealing which will be presented through discovery or at the time of trial.

140. As a direct and proximate cause of the acts of Third Party Defendants, Marco suffered damages in an amount according to proof at the time of trial of at least $6,950,444.40.

141. Third Party Plaintiffs are informed and believe, and on such information and belief allege, that Third Party Defendants acted despicably, willfully, wantonly, oppressively, fraudulently, or in conscious disregard of Marco's rights. Marco seeks recovery of exemplary damages  in an amount according to proof at the time of trial.

142. As a result of Third Party Defendants' actions, Marco has been damaged in an amount according to proof, plus interest, costs, and attorneys' fees as permitted by law.

///

4/14-3:01pm

-38-

# EIGHTH CAUSE OF ACTION

## ACCOUNT STATED

*(On behalf of Plaintiff as to Jona Rechnitz, Rachel Rechnitz)*

143. Third Party Plaintiffs hereby incorporate by reference as though fully set forth in full herein, all preceding Paragraphs of this Complaint.

144. Based on the foregoing, in Los Angeles County, State of California, an account was stated in writing by and between Marco and (the Jadelle Parties), Jona, Rachel, and on such statement, a balance of $6,950,444.40 was found due to Marco from (the Jadelle Parties), Jona, Rachel, who all agreed to pay to Marco said balances in full.

145. Although demanded by Marco from (the Jadelle Parties), Jona, Rachel, they have failed to fully repay the balance of $6,950,444.40. Repeated demands were made and ignored by Third Party Defendants. As of the date of filing of this complaint, $6,950,444.40 is the current principal amount past due and owing. In addition, accrued and ongoing interest remains due, owing, and unpaid from (the Jadelle Parties), Jona, Rachel, to Marco.

146. Third Party Plaintiffs have incurred attorneys' fees in connection with this matter, in an amount to be determined at trial. Because the Consignment Memos are contracts on a book account, Marco are entitled to recover attorneys' fees from (the Jadelle Parties), Jona, Rachel, pursuant to Civil Code section 1717.5.

# NINTH CAUSE OF ACTION

## UNETHICAL BUSINESS PRACTICES IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §17200

*(On behalf of Third Party Plaintiffs as to Jona S. Rechnitz, Rachel Rechnitz, Levin Prado)*

147. Third Party Plaintiffs hereby incorporate by reference as though fully set

forth in full herein, all preceding Paragraphs of this Complaint.

148.  Based on the foregoing, Third Party Plaintiffs are informed, believe, and thereupon allege , that Third Party Defendants intentionally conspired with each other to restrain competition and deprive Marco of the benefit of their contracts.

149.  As a direct and proximate result of the aforementioned conduct of Third Party Defendants, and each of them, Marco has been damaged in a sum in excess of the jurisdiction of this Court, to be determined according to proof at the time of trial of at least $6,950,444.40.

150.  In engaging in the conduct described above, Third Party Defendants, and each of them, acted willfully and intending to deprive Marco of their property or legal rights, thereby committing acts of fraud, within the meaning of Civil Code §3924(c), so as to entitle Marco to punitive damages in an amount sufficient to punish or make an example of Third Party Defendants, and each of them.

### PRAYER FOR RELIEF

WHEREFORE, Third Party Plaintiffs seek a judgment in their favor and an order granting the following relief:

1.  That Marco be awarded compensatory damages in the amount of at least $6,950,444.40;

2.  That Marco be awarded treble damages pursuant to California Penal Code, §496(c);

3.  That Marco be awarded reasonable attorneys' fees pursuant to California Penal Code, §496©;

4.  That Marco be awarded attorneys' fees pursuant to Civil Code section 1717.5.

5.  For a constructive trust over the Consigned Jewelry and all proceeds

1   therefrom;

2   6.   That Marco be awarded punitive damages in an amount to be proven at trial;

3   7.   That Marco be awarded costs of suit; and

4   8.   That Marco be awarded such further relief as the Court deems just and

5        proper.

6

7                         **DEMAND FOR JURY TRIAL**

8        Third Party Plaintiffs hereby demand a trial by jury to the full extent

9   permitted by law.

10  DATED:      April 14, 2020         LAW OFFICE OF BARUCH C. COHEN
11                                     A Professional Law Corporation

12                                     By ____/S/ Baruch C. Cohen_____
                                          Baruch C. Cohen, Esq.
13                                        Attorney for Third Party Plaintiffs PETER
                                          VOUTSAS aka PETER MARCO aka
14                                        PETER MARCO EXTRAORDINARY
                                          JEWELS OF BEVERLY HILLS, dba
15                                        PETER MARCO LLC

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT - 1

United States Bankruptcy Court
Central District of California

## Notice of Involuntary Bankruptcy Case Filing



An involuntary bankruptcy case concerning the debtor (s) listed below was filed under Chapter 7 of the United States Bankruptcy Code, entered on 04/06/2020 at 3:52 PM and filed on 04/06/2020.

**Jadelle Jewelry And Diamonds LLC a Delaware limited liability company**
9454 Wilshire Blvd
Penthouse 01
Beverly Hills, CA 90212
Tax ID / EIN: 00-0000000
*dba* **Jadelle Inc**

The case was filed by the following petitioning creditor(s):

| **First International Diamond Inc** | **Baruch C Cohen** |
|---|---|
| | Law Office of Baruch C. Cohen APLC |
| PO Box 3765 | 4929 Wilshire Blvd Ste 940 |
| Beverly Hills, CA 90212 | Los Angeles, CA 90010 |
| | 323-937-4501 |

| **Peter Marco LLC** | **Baruch C Cohen** |
|---|---|
| 252 N Rodeo Dr | Law Office of Baruch C. Cohen APLC |
| Beverly Hills, CA 90210 | 4929 Wilshire Blvd Ste 940 |
| | Los Angeles, CA 90010 |
| | 323-937-4501 |

| **Victor Franco Noval** | **Ronald N Richards** |
|---|---|
| 1141 Summit Drive | Law Offices of Ronald Richards & Assoc |
| Beverly Hills, CA 90210 | |
| | PO Box 11480 |
| | Beverly Hills, CA 90213 |
| | 310-556-1001 |

The case was assigned case number 2:20-bk-13530-BR to Judge Barry Russell.

If you would like to view the bankruptcy petition and other documents filed by the

petitioning creditor(s) and the debtor, they are available at our *Internet* home page www.cacb.uscourts.gov or at the Clerk's Office, 255 East Temple Street,, Los Angeles, CA 90012.

You may be a creditor of the debtor. If so, you will receive an additional notice from the court setting forth important deadlines.

**Kathleen J. Campbell
Clerk, U.S. Bankruptcy
Court**

ORIGINAL

Fill in this information to identify the case:

United States Bankruptcy Court for the:

Central _____ District of California
                              (State)

Case number (if known): _____ Chapter _____

FILED

APR - 6 2020

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk

☐ Check if this is an
   amended filing

## Official Form 205
# Involuntary Petition Against a Non-Individual

12/15

Use this form to begin a bankruptcy case against a non-individual you allege to be debtor subject to an involuntary case. If you want to begin a case against an individual, use the *Involuntary Petition Against an Individual* (Official Form 105). Be as complete and accurate as possible. If more space is needed, attach any additional sheets to this form. On the top of any additional pages, write debtor's name and case number (if known).

### Part 1:  Identify the Chapter of the Bankruptcy Code Under Which Petition Is Filed

| 1. Chapter of the Bankruptcy Code | Check one: |
|---|---|
| | ☒ Chapter 7 |
| | ☐ Chapter 11 |

### Part 2:  Identify the Debtor

| 2. Debtor's name | JADELLE JEWELRY AND DIAMONDS, LLC, a Delaware limited liability company |
|---|---|

| 3. Other names you know the debtor has used in the last 8 years | Jadelle, Inc. |
|---|---|
| Include any assumed names, trade names, or *doing business as* names. | |

| 4. Debtor's federal Employer Identification Number (EIN) | ☒ Unknown |
|---|---|
| | ___ - _____ |
| | EIN |

**5. Debtor's address**

| Principal place of business | | Mailing address, if different | |
|---|---|---|---|
| 9621 | Brighton Way | 9454 | Wilshire Blvd., Penthouse 01 |
| Number | Street | Number | Street |
| | | P.O. Box | |
| Beverly Hills | CA 90210 | Beverly Hills | CA 90212 |
| City | State ZIP Code | City | State ZIP Code |
| | | Location of principal assets, if different from principal place of business | |
| Los Angeles | | | |
| County | | Number | Street |
| | | City | State ZIP Code |

Official Form 205                        Involuntary Petition Against a Non-Individual                        page 1

American LegalNet, Inc.
www.FormsWorkFlow.com

| Debtor | Jadelle Jewelry and Diamonds, LLC | Case number (if known) | |
|---|---|---|---|
| | Name | | |

---

**6. Debtor's website (URL)** _____

---

**7. Type of debtor**

- ☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))
- ☐ Partnership (excluding LLP)
- ☐ Other type of debtor. Specify: _____

---

**8. Type of debtor's business**

*Check one:*

- ☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
- ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
- ☐ Railroad (as defined in 11 U.S.C. § 101(44))
- ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
- ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
- ☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))
- ☒ None of the types of business listed.
- ☐ Unknown type of business.

---

**9. To the best of your knowledge, are any bankruptcy cases pending by or against any partner or affiliate of this debtor?**

- ☒ No
- ☐ Yes. Debtor _____  Relationship _____

District _____ Date filed _____ Case number, if known _____
MM / DD / YYYY

Debtor _____  Relationship _____

District _____ Date filed _____ Case number, if known _____
MM / DD / YYYY

---

**Part 3:   Report About the Case**

**10. Venue**

*Check one:*

- ☒ Over the last 180 days before the filing of this bankruptcy, the debtor had a domicile, principal place of business, or principal assets in this district longer than in any other district.
- ☐ A bankruptcy case concerning debtor's affiliates, general partner, or partnership is pending in this district.

---

**11. Allegations**

Each petitioner is eligible to file this petition under 11 U.S.C. § 303(b).

The debtor may be the subject of an involuntary case under 11 U.S.C. § 303(a).

*At least one box must be checked:*

- ☒ The debtor is generally not paying its debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount.
- ☐ Within 120 days before the filing of this petition, a custodian, other than a trustee, receiver, or an agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

---

**12. Has there been a transfer of any claim against the debtor by or to any petitioner?**

- ☒ No
- ☐ Yes. Attach all documents that evidence the transfer and any statements required under Bankruptcy Rule 1003(a).

---

American LegalNet, Inc.
www.FormsWorkFlow.com

| Debtor | Jadelle Jewelry and Diamonds, LLC | Case number (if known) | |
|---|---|---|---|
| | Name | | |

**13. Each petitioner's claim**

| Name of petitioner | Nature of petitioner's claim | Amount of the claim above the value of any lien |
|---|---|---|
| First International Diamond, Inc. | Trade Debt/Damages | $ 1,976,225.00 |
| Peter Marco, LLC | Trade Debt/Damages | $ 7,676,744.00 |
| Victor Franco Noval | Trade Debt/Damages | $ 5,800,000.00 |
| | Total of petitioners' claims | $ 15,452,969.00 |

If more space is needed to list petitioners, attach additional sheets. Write the alleged debtor's name and the case number, if known, at the top of each sheet. Following the format of this form, set out the information required in Parts 3 and 4 of the form for each additional petitioning creditor, the petitioner's claim, the petitioner's representative, and the petitioner's attorney. Include the , along with the signature of the petitioner's attorney.

**Part 4:   Request for Relief**

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

Petitioners request that an order for relief be entered against the debtor under the chapter of 11 U.S.C. specified in this petition. If a petitioning creditor is a corporation, attach the corporate ownership statement required by Bankruptcy Rule 1010(b). If any petitioner is a foreign representative appointed in a foreign proceeding, attach a certified copy of the order of the court granting recognition.

I have examined the information in this document and have a reasonable belief that the information is true and correct.

cab 2698544v1

| Petitioners or Petitioners' Representative | Signature of petitioner or representative, including representative's title |
|---|---|
| Name and mailing address of petitioner | |

First International Diamond, Inc.
Name

P.O. BOX 3765
Number   Street

Beverly Hills          CA          90212
City          State          ZIP Code

Name and mailing address of petitioner's representative, if any

Baruch C. Cohen, Esq.
Law Office of Baruch C. Cohen, APLC
Name

4929   Wilshire Blvd., Suite 940
Number   Street

Los Angeles          CA          90010
City          State          ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   4-3-2020
MM/DD/YYYY

x

Official Form 2          Involuntary Petition Against a Non-Individual          page 3

American LegalNet, Inc.
www.FormsWorkFlow.com

Attorneys

Daniel A. Lev
Printed name

SulmeyerKupetz, A Professional Corporation
Firm name, if any

333 South Grand Avenue
Number    Street

Los Angeles _____ CA _____ 90071
City                        State              ZIP Code

Contact phone    213.626.2311    Email   dlev@sulmeyerlaw.com

Bar number    129622

State    CA

x _____
Signature of attorney

Date signed    04/06/2020
                MM / DD / YYYY

American LegalNet, Inc.
www.FormsWorkFlow.com

Case 2:16-cv-00080-KBF   Document 260-1   Filed 03/06/26   Page 74 of 113
Case 2:20-cv-02580-ODW-AS   Document 19   Filed 04/14/20   Page 49 of 88   Page ID #:147

Case 2:20-bk-13530   Doc 1   Filed 04/06/20   Entered 04/06/20 15:52:15   Desc Main
Document    Page 5 of 12

Debtor   __Jadelle Jewelry and Diamonds, LLC__                Case number (if known) _____
              Name

                                                          Signature of petitioner or representative, including representative's title
                                                          ...............................................................................

Name and mailing address of petitioner
__Peter Marco, LLC__
Name

__252__  __N. Rodeo Dr.__
Number   Street

__Beverly Hills__         __CA__      __90210__
City                      State       ZIP Code

Name and mailing address of petitioner's representative, if any
Baruch C. Cohen, Esq.
__Law Offices of Baruch C. Cohen, APLC__
Name
__4929__  __Wilshire Blvd., Suite 940__
Number   Street

__Los Angeles__           __CA__      __90010__
City                      State       ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed On  **4-3-2020**
             MM / DD / YYYY

x _____
Signature of petitioner or representative including representative's title

Name and mailing address of petitioner
__Victor Franco Noval__
Name

__1141__  __Summit Drive__
Number   Street

__Beverly Hills__         __CA__
City                      State       ZIP Code

Name and mailing address of petitioner's representative, if any
Ronald Richards, Esq.
__Law Offices of Ronald Richards & Associates, A.P.C.__
Name

__P.O. Box 11480__
Number   Street

__Beverly Hills__         __CA__      __90213__
City                      State       ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  _____
             MM / DD / YYYY

x _____

Official Form 205                    Involuntary Petition Against a Non-Individual                    page 4
                                                                                                American LegalNet, Inc.
                                                                                                www.FormsWorkFlow.com

Case 2:16-cv-00889-KBF Document 260-1 Filed 03/06/26 Page 75 of 113
Case 2:20-cv-02590-ODW-AS Document 19 Filed 04/14/20 Page 50 of 98 Page ID #:148

Case 2:20-bk-13530   Doc 1   Filed 04/06/20   Entered 04/06/20 15:52:15   Desc Main
Document   Page 6 of 12

Debtor   Jadelle Jewelry and Diamonds, LLC
         _____
         Name

Case number (if known)   _____

---

Signature of petitioner or representative, including representative's title

**Name and mailing address of petitioner**

Peter Marco, LLC
_____
Name

252      N. Rodeo Dr.
_____  _____
Number   Street

Beverly Hills          CA       90210
_____  _____   _____
City                   State    ZIP Code

**Name and mailing address of petitioner's representative, if any**

Baruch C. Cohen, Esq.
Law Offices of Baruch C. Cohen, APLC
_____
Name

4929     Wilshire Blvd., Suite 940
_____  _____
Number   Street

Los Angeles            CA       90010
_____  _____   _____
City                   State    ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed On  _____
             MM / DD / YYYY

X _____
Signature of petitioner or representative, including representative's title

**Name and mailing address of petitioner**

Victor Franco Noval
_____
Name

1141     Summit Drive
_____  _____
Number   Street

Beverly Hills          CA       90210
_____  _____   _____
City                   State    ZIP Code

**Name and mailing address of petitioner's representative, if any**

Ronald Richards, Esq.
Law Offices of Ronald Richards & Associates, A.P.C.
_____
Name

P.O. Box 11480
_____  _____
Number   Street

Beverly Hills          CA       90213
_____  _____   _____
City                   State    ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  04/06/2020
             MM / DD / YYYY

X _Ronald Richards_____

Official Form 205          Involuntary Petition Against a Non-Individual          page 4

American LegalNet, Inc.
www.FormsWorkFlow.com

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| BARUCH C. COHEN ESQ.<br>LAW OFFICE OF BARUCH C. COHEN, APLC<br>4929 Wilshire Blvd Ste 940<br>Los Angeles, CA 90010<br>(323 937-4501)<br>DANIEL A LEV, ESQ.<br>333 S GRAND AVE STE 3400<br>LOS ANGELES, CA 90071<br>(213 626-2311)<br>RONALD N RICHARDS, ESQ.<br>P.O. BOX 11480<br>BEVERLY HILLS, CA 90213  (310 556-1001)<br><br>☑ Attorney for Petitioning Creditor(s)<br>☐ Petitioning Creditor(s) appearing without attorney | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

| In re:<br><br>JADELLE JEWELRY AND DIAMONDS, LLC.,<br>a Delaware limited liability company<br>dba JADELLE INC,<br><br><br>Debtor(s). | CASE NO.: 20-13530BR<br>CHAPTER: 7<br><br>**SUMMONS AND NOTICE OF**<br>**STATUS CONFERENCE IN AN**<br>**INVOLUNTARY BANKRUPTCY CASE** |
|---|---|

To the above-named debtor(s):

Pursuant to 11 U.S.C. § 303, an involuntary petition was filed on __4/6/2020__ in this bankruptcy court praying for the entry of an order for relief against you under chapter __7__ of title 11 of the Bankruptcy Code. A copy of the involuntary petition accompanies this summons.

A status conference in the involuntary case commenced by the involuntary petition has been set for:

| Hearing Date: 6/9/2020<br>Time: _10 am_<br>Courtroom: 1668 | Place:<br>☑ 255 East Temple Street, Los Angeles, CA 90012<br>☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367<br>☐ 3420 Twelfth Street, Riverside, CA 92501<br>☐ 411 West Fourth Street, Santa Ana, CA 92701<br>☐ 1415 State Street, Santa Barbara, CA 93101 |
|---|---|

If you wish to oppose the entry of an order for relief, you must file with the clerk of this court an answer to the involuntary petition or a motion pursuant to FRBP 1011(c) within 21 days after the date of service of this summons and attached involuntary petition, plus 3 additional days if you were served by mail. At the same time, you must also serve a copy of the answer or motion on the petitioner's attorney (or on the petitioner, if the petitioner does not have an attorney) at the address stated above. If you file a motion under FRPB 1011(c), your time to answer the petition will be governed by that rule.

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2012                                    Page 1                                    **F 1010-1.SUMMONS.INVOL**

**TO THE DEBTOR:**

IF YOU FAIL TO TIMELY FILE A RESPONSE TO THIS SUMMONS, THE BANKRUPTCY COURT MAY ENTER AN
ORDER FOR RELIEF IN ACCORDANCE WITH 11 U.S.C. § 303(h).

**TO THE PETITIONING CREDITOR(S):**

IF YOU FAIL TO TIMELY SERVE THE SUMMONS AND INVOLUNTARY PETITION AND/OR TO FILE PROOF OF
SERVICE OF DOCUMENT THEREOF WITH THE COURT OR TO APPEAR AT THE STATUS CONFERENCE, THIS
INVOLUNTARY CASE MAY BE DISMISSED IN ACCORDANCE WITH LBR 1010-1.

KATHLEEN J. CAMPBELL
CLERK OF COURT

Date: 4/7/2020

By: STACEY FORTIER
Deputy Clerk

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2012                              Page 2                              F 1010-1.SUMMONS.INVOL

# EXHIBIT - 2

AO 245B (Rev. 09/19)  Judgment in a Criminal Case    (form modified within District on Sept. 30, 2019)
Sheet 1

# UNITED STATES DISTRICT COURT

## Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) |
| Jona Rechnitz | ) Case Number: 1: 16 cr. 00389-01(AKH) |
| | ) USM Number: 77751-054 |
| | ) Alan Levine/ AUSA, Martin Bell |
| | ) Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)    1

☐ pleaded nolo contendere to count(s) _____
  which was accepted by the court.

☐ was found guilty on count(s) _____
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 1349 | Conspiracy to Commit Honest Services Wire Fraud | 6/6/2016 | 1 |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

12/19/2019
Date of Imposition of Judgment

_____
Signature of Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/3/2020

Hon. Alvin K. Hellerstein, U.S. District Judge
Name and Title of Judge

March 3 2020
Date

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __2__ of __7__

DEFENDANT:   Jona Rechnitz
CASE NUMBER:   1: 16 cr. 00389-01(AKH)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a
total term of:
5 months.  Defendant is notified of his right to appeal.

☑  The court makes the following recommendations to the Bureau of Prisons:
that the defendant be confined at the Lompac or Taft facility outside of Los Angeles.

☐  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at _____  ☐ a.m.  ☐ p.m.  on _____ .

    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m. on _____ .

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

| | Judgment—Page 3 of 7 |
| --- | --- |

DEFENDANT:  Jona Rechnitz
CASE NUMBER:  1: 16 cr. 00389-01(AKH)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

3 years, of which the first 5 months shall be home confinement.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

|  | Judgment—Page | 4 | of | 7 |
|---|---|---|---|---|

DEFENDANT: Jona Rechnitz
CASE NUMBER: 1: 16 cr. 00389-01(AKH)

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____   Date _____

| | Judgment—Page | 5 | of | 7 |
|---|---|---|---|---|

DEFENDANT: Jona Rechnitz
CASE NUMBER: 1: 16 cr. 00389-01(AKH)

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall provide the probation officer with access to any requested financial information.

2. The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer unless he/she is in compliance with the installment payment schedule.

3. The defendant shall continue to cooperate with the U.S. Attorney's Office.

4. The defendant's duty to pay restitution in the amount of $19,000,000.00 is joint and several with co-conspirators Norman Seabrook (16 Cr. 467) and Murray Huberfeld (16 Cr. 467) provided, however, that defendant Rechnitz' payments shall be capped at $10,000,000.00. The defendant shall make payments of $500,000 per year, payable in equal monthly installments, due on the last day of each month.

5. The defendant shall be supervised by the district of residence.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 5 — Criminal Monetary Penalties

| | | Judgment — Page | 6 | of | 7 |

DEFENDANT: Jona Rechnitz
CASE NUMBER: 1: 16 cr. 00389-01(AKH)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $ 100.00 | $ 19,000,000.00 | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

  If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Correction Officers' Benevolent Association | $19,000,000.00 | $19,000,000.00 | |
| 77-10 21st Avenue | | | |
| East Elmhurst, NY 11370 | | | |

| TOTALS | $ | 19,000,000.00 | $ | 19,000,000.00 |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

   ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Case 2:20-cv-03250-KBF Document 260-1 Filed 03/06/26 60 Page 85 of 113 #:158
Case 1: 16-cr-00389-AKH  Document 84  Filed 03/03/20  Page 7 of 7
AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page  7  of  7

DEFENDANT:  Jona Rechnitz
CASE NUMBER:  1: 16 cr. 00389-01(AKH)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $  100.00  due immediately, balance due

    ☐  not later than  , or
    ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
    _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
    _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
    term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
    imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☑  Special instructions regarding the payment of criminal monetary penalties:
    The defendant shall pay restitution in the amount of $10,000,000.00, joint and several with the $19,000,000.00
    restitution obligation of co-conspirators Norman Seabrook (16 Cr. 467) and Murray Huberfeld (16 Cr. 467).  The
    defendant shall make payments of $500,000 per year, payable in equal monthly installments, due on the last day
    of each month.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number Defendant and Co-Defendant Names (including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

# EXHIBIT - 3

Case 1:16-cr-00389-KBF Document 26-1 Filed 03/06/36 Page 87 of 113

Jona Rechnitz
9533 Sawyer Street
Los Angeles, CA 90035
October 16, 2019

Honorable Alvin K Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Hellerstein:

I am a felon. I am a criminal. I am the ONLY person to blame for that.

I have caused tremendous pain and embarrassment to my family, my religion, and to myself.

There is no way to undo what's been done. It's permanent, and for that I am truly sorry to everyone hurt by my crimes and actions. It eats me alive each and every day. When I wake up, when I go to sleep, it is always on my mind for the past 4 years.

My actions harmed the people of New York, The people of Correction Officers Benevolent Association, my friends, my family and my community. I will forever carry this burden, as I deserve to.

I have read of your Honor asking at various sentencings, why do good people do bad things?

In my case, not assuming I'm a good person, I can answer this question. Arrogance, greed, and insecurity.

Arrogance. I felt I was above the law. At this young age in my late 20's I was busy accepting honors at dinners and board positions at prestigious institutions. It got to my head.

Greed. I wanted to gain contacts to grow my business, to make money and gain stature in the long run.

Insecurity. I wanted to gain popularity by my peers and become a big shot in my community and business circles.

Shame on me.

Finally, I couldn't wiggle my way out of this one. It changed my life as I knew it forever.

As a supposed religious man, I have been a disgrace to my religion. The only way to fix this is to make serving G-d my main focus for the rest of my life. I try to every day. I have changed as a person religiously, through prayer, my public and private behavior, and I always stop and think before I'm about to do something to see if it is something my parents, my family, and G-d would approve of.

Making the decision to come forward was the right decision. A very tough decision with tremendous repercussions, but the appropriate decision. It has come with a hefty price. I did not foresee what I was signing up for, and it has been a brutal four years, but I made the right decision. I learned that doing the right thing isn't always the easiest, but it is the only choice. There is right and wrong and nothing in between. It has changed me for the better. It has forced me to change, which I have.

I had to testify in three separate trials. Not an easy task. Outside of the regular pressures a crucial witness deals with, these circumstances were even tougher. There was a lot of press coverage, a lot of community pressure, and a lot of threats and comments made to me. The press put me on trial instead of the defendants. The press called me a snitch and paid more attention to me and my testimony then on the actual trials. They made calls to my friends, my family, and waited outside my home for me to walk outside.

Parts of the community shunned me and my family. Your honor, I can not stress the amount of pain and suffering that we received during this time. Unimaginable pain. Eventually we had to leave town. Leave our lives. Leave immediately.

Then there were the threats and private investigators after me. Threatening voice messages, windows smashed at home, windows smashed in my car several times and my parents cars on the same day at their home, people following me and sitting outside of my home in Los Angeles for periods of time. My wife and I were harassed and video taped at the mall, humiliated in our Synagogue, and embarrassed in public at a local LA high school charity event.

Your Honor, there are so many examples that I am omitting as I don't want to portray myself as the victim here. I caused a lot of pain and harm to others through my criminal activity and don't want to detract from that.

Even at various trials there were intimidation tactics. An attorney representing a defendant yelled at me in the hallway walking in to court and shoved the prosecutor when he confronted him.

The disgusting feeling I had waking up in the morning to go to trial after trial after trial. Sometimes for a week and a half straight.

One of the toughest moments was when a mistrial was declared. I remember feeling like I wanted to tap out. But I could not. I made this decision for me and my beautiful family with the hope of staying together with them at the end of this nightmare. This has been the key factor keeping me going. My family. My amazing, incredible wife and my beautiful 6 children.

The highlight of my week used to be sitting in NYPD Headquarters like a big Macher. Today, my highlight is walking to Synagogue with my children every week, and I let them know it every time we walk. When I ask them what my favorite part of the week is, they say, Daddy! You know the answer, but I still make them repeat it.

Your Honor, I can now tell you proudly I am a hands-on father and husband. I am more of a mentsch. I was not during my criminal years. For that alone, I am grateful to this situation. My wife is an amazing woman. She had a bad feeling about the people I was hanging out with and the people I wanted to impress. She was right. I should have listened to her. I do now.

I had real estate holdings which I had to give up throughout this ordeal. Many investors didn't want to be associated with me, nor do I blame them. In a few cases, some partners viewed my situation as an opportunity forcing me to give up different holdings and assets, taking management decisions and authority from me, ultimately removing me entirely. Starting to make a living again was a struggle for a period of time. Fortunately my wife and I started a new business endeavor, which looks promising. As your Honor can imagine it is hard to find a bank to work with me, so I have secured private loans and financing from family and friends. I finally have a business going that has provided stability and a way to make a living. This case has left me in a big financial hole - I have had to borrow millions of dollars to get this business going and to support my family. I am finally in a position to dedicate myself again to supporting my family. I don't see any way possible to start over a third time. I beg you to allow me to continue on this second journey of life.

This has been a difficult time. I don't feel healthy at all. I am on anti depressant medication, I wake up in the middle of the night in pain and my neck and hands are burning, and I will forever carry this guilt.

Family is everything to me. Cuddling with my children is everything to me. Being a community member and helping others is everything to me. Since this entire ordeal my wife gave birth to two beautiful baby girls. A decision that we made to not put life on hold but to continue with life in the right path and be optimistic that doing the right thing will not hinder our future.

I am a changed man. I suffered a lot. I have been severely punished. My family has suffered a lot. I beg your Honor, please allow me to continue on the path I'm on, together with my family, my wife and 6 young children. They need their Daddy, I need my family together with me, and I promise your Honor, to continue to make

my family proud, my community proud, and your Honor proud.

With humility and sincerity,

Jona

Case 1:16-cr-00380-KPF Document 260-1 Filed 03/06/26 Page 91 of 113

# EXHIBIT - 4

JCJYRECS                                                                    1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                                16 CR 389 (AKH)

5   JONA RECHNITZ,

6               Defendant.
                                              Sentence
7   ------------------------------------------------x

8                                             New York, N.Y.
                                              December 20, 2019
9                                             10:15 a.m.

10  Before:

11
                    HON. ALVIN K. HELLERSTEIN,
12
                                              District Judge
13
                         APPEARANCES
14
    GEOFFREY S. BERMAN
15       United States Attorney for the
         Southern District of New York
16  BY:  MARTIN S. BELL
         JESSICA LONERGAN
17       KIMBERLY RAVENER
         LAURA POMERANTZ
18       Assistant United States Attorneys

19  COOLEY LLP
         Attorneys for Defendant
20  BY:  ALAN LEVINE

21
    Also Present:
22  Andrew Hamilton, Government Paralegal Specialist
    Marc Klausner, NYPD

23    Joseph Downs, FBI

24

25

1   and, Judge, appearing before judges of this court, including

2   yourself, we either gain or lose credibility.  My hope is that

3   I personally have kept faith with not just a certain caliber of

4   advocacy but also with the truth and with the way things really

5   are.

6           To the extent that I have amassed that credibility

7   over a period of time, I am laying it entirely on not only the

8   quality of Mr. Rechnitz's cooperation but the value of what

9   that means to the mechanism of justice working with respect to

10  future cooperators.

11          THE COURT:  I have your point, Mr. Bell.

12          MR. BELL:  Thank you, Judge.

13          THE COURT:  Mr. Levine.

14          MR. LEVINE:  Your Honor, I think it might be helpful

15  if the Court hears from Mr. Rechnitz first.

16          THE COURT:  Sure.

17          Mr. Rechnitz.

18          THE DEFENDANT:  Your Honor, I stand before your Honor

19  and this court with respect for the law, tremendous remorse for

20  my actions and behavior, and with great humility.

21          Growing up, my parents raised me in a very loving

22  environment --

23          THE COURT:  Don't worry about the microphone,

24   Mr. Rechnitz.  Speak to me.  I'll hear you.

25          THE DEFENDANT:  Growing up, my parents raised me in a

1   very loving environment.

2          THE COURT:  That's okay, Mr. Levine.  I can hear him.

3          Go ahead.

4          THE DEFENDANT:  Growing up, my parents raised me in a

5   very loving environment with an emphasis on religion and doing

6   the right thing.  Here I am.  I did not start off this way, and

7   I was raised differently.

8          I have let down my family, my parents, my in-laws, my

9   wife, my children, friends, and my community in a big way.  I

10  made very poor choices, and many people have suffered because

11  of them.  I didn't always appreciate the fact that I had the

12  blessing to have six beautiful children in my home and a

13  beautiful wife.

14         When you get into trouble, you realize the blessings

15  of life and what's important.  I took my blessings for granted.

16  I've been a real fraud to God, a fraud to my wife and family, a

17  fraud as an American, a fraud as a businessman, and a fraud to

18  the people of New York, namely, the hard-working COBA members,

19  and I'm truly sorry for that.  My actions have hurt many

20  people, and I'm very sorry for that.  I continue to pay for my

21  mistakes on a daily basis.

22         While testifying before your Honor during the Norman

23   Seabrook trial, a tape was played for the jury.  It had

24   recorded a conversation where I was going to attend an  Mincha

25   prayer service as a Shiva.  Your Honor asked me to explain what

JCJYRECS                                                                    66

1   Shiva and Mincha were for the jury.  In fact, your Honor

2   explained it much better than I did afterwards.

3          At that moment is when it really hit me what a

4   hypocrite I've been.  It was that exact moment.  Here I am

5   going to pray to God and visiting a mourner to comfort them,

6   and then I turn around and commit these crimes and sins.  It is

7   not the way I was raised and not the way I was educated.

8          While living in New York City, I wrongly felt pressure

9   to become a bigshot.  I was working for one of the largest real

10  estate companies in 2007, and it got to my head.

11         I was in my late 20's, and big people in the real

12  estate industry were dealing with me.  My ego was big, and I so

13  badly wanted to impress these people in order to advance my

14  career and profile.  This is where things started to spiral out

15  of control.  This is where I went so off the rails for a number

16  of years.

17         I assure your Honor that these past years and the

18  experience I've gone through has changed me.  I will never act

19  that way again.  My family and I have been through too much.

20         I have been forced to self-reflect, and I have

21  identified many of my flaws in order to grow from my mistakes.

22  I apologize for my criminal and immoral behavior for trying to

23    bribe my way through these years of my life.

24              I left the moral way of going about business and my

25    religious beliefs.  I bestowed gifts upon police officers in

JCJYRECS

1  exchange for favors in return.  I raised and contributed large

2  sums of money for the mayor of New York City and his projects

3  in the hope of obtaining benefit in return.

4         I introduced Norman Seabrook and Murray Huberfeld to

5  each other for the purposes of COBA to invest funds into

6  Murrey's fund, Platinum Partners, so that they could both

7  mutually financially benefit from one another and to elevate my

8  status with them.

9         I knowingly delivered a $60,000 kickback payment to

10 Norman Seabrook from Murray Huberfeld.  This corrupt bargain is

11 something that continues to haunt me.  I have struggled with

12 how it is I let my life go astray this way and how I took leave

13 of my adherence of the law and spirituality.

14        I've been a big hypocrite to my religion.  I failed to

15 conduct myself properly between myself and my fellow man and

16 between myself and my relationship with God.  I have strayed.

17        I did all of these horrible things without worrying

18 about God or the consequences that come with this sort of

19 behavior.  I cannot express to your Honor how ashamed I am for

20 desecrating my religion.

21        I have and will continue to repent to God every single

22 day.  I have and continued to make amends.  Part of my efforts

23    to make right included cooperating as a first step.  I have a

24    lot more work to do.

25              I did the best I could for the government and told the

1  truth about myself, and I realize that I will have to make

2  financially right those that I hurt.

3         Please allow me just a few more minutes to discuss the

4  cooperation.  I hired Mr. Levine in 2016, May 2016.  When I

5  realized that there was an investigation heating up, I knew I

6  had not told the truth to the New York City police officers and

7  Internal Affairs Bureau a few months earlier.

8         Right away, based on my initial conversations with

9  Mr. Levine and Ms. Laura Birger, I authorized them to meet with

10  the assistant U.S. attorneys and begin the process of making a

11  proffer, agreeing to plead guilty and signing a cooperation

12  agreement.

13         I understood from those initial meetings with both my

14  lawyers and the government, if I was going to cooperate with

15  the government, I needed to be 100 percent truthful.

16         I have been completely forthcoming in all my meetings

17  and on the witness stand throughout three separate trials.

18  There is not any question that I was asked that I did not

19  answer truthfully, and there are many events and conduct that I

20  told the government that they did not know.

21         Included in my early proffer sessions with the

22  government -- this was in the spring of 2016.  I gave the

23    government information about two different hard-lending

24    businesses that I was involved in.

25              One turned into a criminal case in which Peralta was

1   charged with a Ponzi scheme, and the second one also turned

2   into a criminal case charging Nissen with the same scheme.

3          At the time, I was unaware these were both Ponzi

4   schemes and, as a result, personally lost money for myself and

5   others.  Since then, I am more cautious and conservative in my

6   business dealings.

7          My financial dealings with both were a mess with lots

8   of transactions, paying and receiving, some on my own behalf

9   and some on behalf of third parties, including cash

10  transactions.

11         I was simply unable to sort all those transactions

12  out, and I have yet to file a 2015 tax return.  I told my

13  lawyers and the government about that at the time  immediately.

14         After speaking with my accountant during 2016, I

15  realized I cannot file my 2015 tax returns accurately because  I

16  did not have a handle on all the transactions, and I can't

17  provide my accountant with complete information.

18         The situation got more complex in 2017 for 2016

19  because criminal charges were filed.  I was scheduled to

20  testify in one of the trials, and there was no way to sort out

21  the transactions.

22         As I testified in all three trials, I have yet to file

23    the returns for these years up through 2018.  I was sued in the

24    Peralta bankruptcy and settled paying over $350,000 to  the

25    state.

1    I have been sued in the Nissen bankruptcy, but that

2  has not moved forward yet, and I do not know what my exposure

3  will be at that bankruptcy.  I understand my obligation to

4  resolve that bankruptcy and have filed tax returns for those

5  years.  And I also understand the additional problems I have

6  created in my inability to file those returns, including the

7  financial consequences they will cause.

8    This is one of several jobs that I have in the coming

9  months as I continue to sort out my life in a lawful path.

10  In fact, I will spend the rest of my life trying to make amends

11  for my criminal behavior.

12    I will try to make a better name for my family, for my

13  religion, and for myself.  I am on the path to recovery,

14  your Honor.  I am a better family man; I am a better friend; I

15  am a more religious person.  I am working again to make an

16  honest living.

17    Please allow me to continuing on this course

18  undisrupted in order to provide for my large family.  I really

19  want to do good, please.  I failed myself in a number of ways.

20  I am humbly asking your Honor to stop the bleeding, to continue

21  in this new business I've started in order to provide for my

22  family and to enable me to take care of my financial

23   responsibilities.

24              THE COURT:  What is the new business?  Jadelle?

25              THE DEFENDANT:  Jadelle, yes.  I really paid a hefty

1   price for cooperating with the government for my crimes.  Most

2   recently, the New York Post put up an article that was

3   mentioned this morning -- your Honor may not be aware --

4   accusing me of hobnobbing and flirting with the rich and  famous

5   at a time when I claim I am a pariah to society.

6           In fact, Jadelle Jewelery hosted a jewelery show to

7   promote the brand and new jewelry collection.  The event was to

8   make sales and increase business.  One attendee was a Kim

9   Kardashian, a client of Jadelle.

10          If one were to read the article, I am portrayed as a

11  hobnobber with no concern in the world, no remorse  whatsoever,

12  and like a party animal.  I urge your Honor to watch the video

13  that was attached to the article online, and your Honor will

14  see a very different picture.

15          Your Honor will see me dressed in a suit and a tie

16  trying to sell jewelry, no partying, no hobnobbing, just a  man

17  trying to make an honest living.

18          I am not here to complain about my suffering in the

19  past few years, but I can promise your Honor I have been

20  punished in so many ways I can't begin to describe.

21          Within my community, within the media, and through

22  self-introspection.  In New York City, I am persona non grata.

23    I am to blame.  I burnt a lot of bridges and relationships and

24    had to relocate to California.

25              I am so truly sorry for my behavior.  I am a changed

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JCJYRECS

1  man.  I have had years to make this change.  It did not happen

2  overnight, your Honor.  I have had four years, close to four

3  years, since this ordeal started.

4        I beg your Honor, please allow me to remain with my

5  family, my beautiful wife and children, and allow me to

6  continue working so that I can continue to provide for them  and

7  make good on my financial obligations.

8        I don't see any way to start over a third time.  I'm

9  on my second chance.  Please allow me to continue on this path.

10 Thank you.

11        THE COURT:  Mr. Levine.

12        MR. LEVINE:  Your Honor, I was just going to ask.  The

13 hour is late.  If the Court would want to take a recess, I

14 would certainly appreciate that.

15        THE COURT:  It's very tempting.

16        MR. LEVINE:  If the Court wishes to proceed, I'd like

17 to proceed.

18        THE COURT:  Keep going, Mr. Levine.

19        MR. LEVINE:  So, your Honor, we're finally here for

20 the day of Mr. Rechnitz's sentence.  How did he get here.  And

21 I think an important question on the mind of the Court is has

22 he shown remorse.

23              Your Honor, we've submitted a lot of letters, and what

24      comes out from those letters is the personality of an

25      individual wanting and needing to help people.

1      THE COURT: I've read the letters. They depict a

2  person who enlarges others by charity, by friendship to others

3  and makes other people feel better.

4      And yet in the life that's been depicted in this

5  court, he cheapens people. He works on their insecurities and

6  their quest for material possessions and just does the

7  opposite. He diminishes people.

8      How can you square both?

9      MR. LEVINE: Your Honor, that's what I was going to

10  say. So this personality that has done so much good for so

11  many people before these events, during these events, and since

12  these events -- it collided with his desire to be independent,

13  to establish himself in Manhattan, and not to take the

14  comfortable road going back to Los Angeles.

15      It also collided with his desire for immediate success

16  by staying in Manhattan in his late 20's. It introduced him to

17  a world of Jeremy Reichberg. And he realized in that world

18  that with his money, he could do good for police officials and

19  others, to have them at his beck and call for his community and

20  for himself.

21      What he perceived, incorrectly, would be a win/win,

22  and it turned into a bad/bad. He never should have offered

1    **CERTIFICATE OF SERVICE**

2          I declare that I am a citizen of the United States and I am a resident and employed in Los Angeles, California; that my business address is 4929 Wilshire Boulevard, Suite 940, Los Angeles CA 90010; that I am over the age of 18 and not a party to the above-entitled action.

4          I am employed by a member of the United States District Court for the Central District of California, and at whose direction I caused service of the foregoing document entitled **CROSS-COMPLAINT FOR: INTENTIONAL MISREPRESENTATION & FRAUD; CIVIL THEFT (PENAL CODE, § 496); EMBEZZLEMENT; CIVIL CONSPIRACY TO COMMIT THEFT, FRAUD, AND FRAUD BY CONCEALMENT; CONVERSION; BREACH OF CONTRACT; BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; ACCOUNT STATED; & UNETHICAL BUSINESS PRACTICES IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200** on all interested parties in this action by the method indicated below at the address stated below:

| | |
|---|---|
| Anthony R Bisconti, Esq.<br>Bienert Katzman PC<br>601 West 5th Street Suite 720<br>Los Angeles, CA 90071<br>Email: tbisconti@bienertkatzman.com<br>*Attorney for Plaintiff David Rovinsky LLC* | Steven Jay Katzman, Esq.<br>Bienert Katzman PC<br>601 West 5th Street Suite 720<br>Los Angeles, CA 90071<br>Email: skatzman@bienertkatzman.com<br>*Attorney for Plaintiff David Rovinsky LLC* |
| Jason A. Levine, Esq.<br>Hangley Aronchick Segal<br>Pudlin & Schiller<br>One Logan Square, 27th Floor<br>Philadelphia, PA 19103<br>Email: jlevine@hangley.com<br>*Attorney for Plaintiff David Rovinsky LLC* | Andrew E. Erdlen, Esq.<br>Hangley Aronchick Segal<br>Pudlin & Schiller<br>One Logan Square, 27th Floor<br>Philadelphia, PA 19103<br>Email: aerdlen@hangley.com<br>*Attorney for Plaintiff David Rovinsky LLC* |
| Marc S. Williams, Esq.<br>Cohen Williams, LLP<br>724 South Spring Street, 9th Floor<br>Los Angeles, CA 90014<br>Email: mwilliams@cohen-williams.com<br>*Attorney for Jona & Rachel Rechnitz* | |

**[X]     BY ELECTRONIC TRANSMISSION**: by electronically filing the foregoing with the Clerk of the District Court using its CM/ECF System pursuant to the Electronic Case Filing provision of the United States District Court General Order and the E-Government Act of 2002, which electronically notifies all parties in this case. A pdf version of this document was also transmitted to counsel via electronic mail at the email address indicated above.

          I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 14, 2020 at Los Angeles, California.

By: _/s/ Baruch C. Cohen_
      Baruch C. Cohen