1  FARYAN ANDREW AFIFI (SBN 167344)
   AFIFI LAW GROUP
2  1801 Century Park E, Suite 1100
   Los Angeles, CA 90067
3  Tel: (310) 407-3000
   Fax: (310) 407-3004
4  Email: faryan@afifilaw.com

5  Attorneys for Plaintiff,
   YOGI SECURITIES HOLDINGS, LLC
6

7

8  **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

   **COUNTY OF LOS ANGELES**
9

10

| YOGI SECURITIES HOLDINGS, LLC, a Nevada Limited Liability Company, | CASE NO. |
|---|---|
| Plaintiff, | *Unlimited Jurisdiction* *Assigned for all Purposes to:* |
| v. | **COMPLAINT FOR:** |
| FLOYD MAYWEATHER JR., an individual, AL HAYMON, an individual, MAYWEATHER PROMOTIONS, LLC, a Nevada Limited Liability Company, JONA RECHNITZ, an individual, ROBERT RECHNITZ, an individual, JSR HOLDINGS, LLC, a Limited Liability Company, ALAN "AVI" GOLOMBECK, an individual, ABRAHAM ZEV GOLOMBECK, an individual, AGOL HOLDINGS, LLC, a Limited Liability Company, AYAL FRIST, an individual, STATELAND BROWN, LLC, a Florida limited liability company, and DOES 1-100, | 1. BREACH OF CONTRACT-Count 1; 2. BREACH OF CONTRACT – Count 2; 3. BREACH OF FIDUCIARY DUTY; 4. BREACH OF GUARANTY; 5. CONVERSION; 6. NEGLIGENT MISREPRESENTATION; 7. FRAUD AND CONCEALMENT; |
| Defendants. | |

Plaintiff YOGI SECURITIES HOLDINGS, LLC, a Limited Liability Company,

("Plaintiff") alleges as follows:

<u>FACTS COMMON TO ALL CAUSES OF ACTION</u>

-1-
**COMPLAINT**

1.    Plaintiff, YOGI SECURITIES HOLDINGS, LLC ("YOGI") is a Limited Liability Company, duly formed and conducting business under the laws of the State of Nevada. At all times relevant herein, Joseph Englanoff ("ENGLANOFF") was the authorized agent and Trustee of the manager of YOGI, and authorized to act on its behalf.

2.    Plaintiff is informed and believes, thereon alleging that Defendant, **FLOYD MAYWEATHER, JR.** is an individual, (hereinafter "MAYWEATHER"), over the age of eighteen, and a resident of the City of Las Vegas, State of Nevada.

3.    Plaintiff is informed and believes, thereon alleging that defendant MAYWEATHER PROMOTIONS, LLC (hereinafter "MP") is a Nevada Limited Liability Company, duly formed and conducting business under the laws of the State of Nevada, with its principal place of business in the City of Las Vegas, Nevada.  Plaintiff is further informed and believes that defendants MAYWEATHER and HAYMON are members of MP, with MAYWEATHER an officer and manager of MP, with authority to act on its behalf and to bind it to contracts at all times relevant herein.

4.    Plaintiff is informed and believes, thereon alleging that defendant **AL HAYMON** (hereinafter "HAYMON"), is an individual, over the age of eighteen

5.    Plaintiff is informed and believes that defendant MAYWEATHER at all times relevant herein was the appointed agent and authorized representative of HAYMON with authority to act on his behalf with respect to the promotions and investments described herein, including events that MAYWEATHER was a participant in as a manager, promoter or fighter.

6.    Plaintiff is informed and believes, thereon alleging that defendant ALAN "AVI" GOLOMBECK (hereinafter "AVI"), is an individual, over the age of eighteen and a resident of New York, New York.

7.    Plaintiff is informed and believes, thereon alleging that defendant **ABRAHAM ZEV GOLOMBECK** (hereinafter "ZEV"), is an individual, over the age of eighteen and a resident of the City and State of New York, and father of AVI.

8.    Plaintiff is informed and believes, thereon alleging that defendant **AGOL HOLDINGS, LLC** (hereinafter "AGOL"), is a New York limited liability company with its

-2-

**COMPLAINT**

principal place of business in New York, New York. Plaintiff is informed and believes that AVI is the principal member and manager of AGOL, and at all times relevant herein, the managing member of AGOL.

9. Plaintiff is informed and believes, thereon alleging that defendant **GOLOMBECK HOLDINGS II, LLC (hereinafter "GH")**, is a New York limited liability company, with its principal place of business in New York, New York. Plaintiff is further informed and believes that AVI and ZEV are the members and managers of GH, and or officers with authority to act on its behalf and duly authorized representatives of GH at all times relevant herein.

10. Plaintiff is informed and believes, thereon alleging that defendant **AYAL FRIST (hereinafter "FRIST")**, is an individual, over the age of eighteen and a resident of the City of Miami, and State of Florida.

11. Plaintiff is informed and believes that defendant STATELAND BROWN, LLC ("STATELAND") is a limited liability company, duly formed and operating under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. Plaintiff is further informed and believes that at all times relevant herein, FRIST is the President and Manager of STATELAND, with authority to act on its behalf and bind it to agreements.

12. Plaintiff is informed and believes, thereon alleging that defendant JONA RECHNITZ (hereinafter "JONA"), is an individual, over the age of eighteen and a resident of the City and County of Los Angeles, residing at 9533 Sawyer Street, Los Angeles, CA 90035.

13. Plaintiff is informed and believes, thereon alleging that defendant ROBERT RECHNITZ (hereinafter "ROBERT"), is an individual, over the age of eighteen and a resident of the City and County of Los Angeles, residing at 454 S. McCadden Place, Los Angeles, CA 90020.

14. Plaintiff is informed and believes, thereon alleging that defendant JSR CAPITAL, LLC (hereinafter "JSR"), is a California Limited Liability Company, duly formed and operating under the laws of the State of California, with its principal place of business in Los Angeles, California. Plaintiff is further informed and believes that JONA is the managing member of JSR.

15. Plaintiff is ignorant of the true names and capacities of defendants sued herein as

1   DOES 1 through 100 inclusive, and therefore sue such defendants by such fictitious names.

2   Plaintiff is informed and believes, alleging thereon, that each of said DOE defendant is in some

3   manner responsible for the damages, breaches, and tortious acts alleged and claimed herein, are

4   agents, employers, employees, assigns, assignees, contractors, superiors or otherwise related to

5   other defendants or other individuals who may be liable to Plaintiff, and when the true names,

6   identities and capacities of said defendants are ascertained, Plaintiff will amend this complaint to

7   alleges the same.

8       16.    Plaintiff alleges on information and belief that each of the defendants herein, at

9   all relevant times herein were and still are the agents, employees, or representatives of each of

10  the other defendants, and at all times mentioned in this complaint, were acting within the scope

11  of such agency, employment or representative capacity.   Plaintiff alleges further on information

12  and belief that there exists, and at all times herein mentioned there existed, a unity of interest

13  and ownership between Defendants, such that any individuality and separateness between said

14  corporate or company Defendants have ceased, that adherence to the fiction of the separate

15  existence of the Defendants would permit an abuse of the company privilege, would sanction

16  fraud and promote injustice, and would unfairly limit Plaintiff' recovery solely to the assets of

17  the business entities, and that the individual defendants are the alter egos of the companies

18  named herein, that the corporate structure was not properly maintained, and/or there existed a

19  unity of financial interest between the corporation/companies and the individuals, thereby

20  warranting the piercing of the company veil which unfairly and unjustly shrouds the company

21  defendants.

22      **The History and Relationship of the Parties**

23      17.    MAYWEATHER is a fifteen-time professional world champion boxer who won

24  championships in 5 different weight classes between 1996 and 2015, and retired undefeated as a

25  professional fighter.  Over the years he has accumulated a number of accolades and worldwide

26  notoriety, including Fighter of the Decade and the greatest pound for pound boxer.  He has also

27  become one of the top 50 highest paid athletes of all time on the Forbes Magazine and Sports

28  Illustrated ratings.  During his career, MAYWEATHER was managed by HAYMON, to whom

-4-

**COMPLAINT**

1  he regularly referred in public and private circles as his family and his father.  In or about 2007

2  MAYWEATHER and HAYMON established MP a boxing promotion firm.  MP has been

3  actively engaged, under the supervision of MAYWEATHER and HAYMON, with promoting

4  many forms of live entertainment and pay per view events, including live music, theater, sports,

5  and specifically several pay per view boxing matches in which MAYWEATHER participated

6  himself, and other boxers represented by MP, MAYWEATHER and HAYMON participated.

7         18.    Plaintiff is informed and believes, thereon alleging that HAYMON is a long-time

8  sports and entertainment agent and promoter, and has been acting as MAYWEATHER's agent

9  and promotor for decades.  Plaintiff is informed and believes that HAYMON controls the

10 money and proceeds from the promoted events he is involved with, whether as a manager, agent

11 or promoter, including specifically events where MAYWEATHER was a fighter.  After 2007,

12 HAYMON was also a part owner and manager of MP, one of several business ventures jointly

13 entered into between MAYWEATHER and HAYMON.   At all times after 2007,

14 MAYWEATHER who worked as a promoter through MP, was acting as HAYMON's agent,

15 with HAYMON's knowledge and blessing to utilize HAYMON's cache, reputation and know-

16 how in the sports and entertainment management and promotion industry.   Accordingly,

17 HAYMON, who prefers to remain behind the scenes of various events, was using

18 MAYWEATHER and MP, with his full knowledge, consent and authorization, to act as his

19 agent, representatives, and to act on HAYMON's behalf in securing financing, investments,

20 promotional events, pay per view and events and related functions in the sports and

21 entertainment industry.

22         19.    Plaintiff is further informed and believes that upon agreement with

23 MAYWEATHER, HAYMON would control the proceeds and monies received from all events

24 promoted by MAYWEATHER and MP, including events were MAYWEATHER was a

25 participant.

26         20.    JONA RECHNITZ is a convicted felon, who in 2016 pled guilty to conspiracy to

27 commit fraud, admitting that he bribed New York City police, public officials and union leaders

28 on behalf of a hedge fund, and turned states evidence to obtain a lighter sentence which was 10

**COMPLAINT**

months incarceration. Indeed, the very US District Judge that sentenced JONA, later considered additional evidence of JONA driving a Bugatti and paying exorbitant amounts in rent, and defrauding others in California, and stated that JONA had "conned" him, ordering JONA to pay restitution of $12 Million expeditiously.

21. JSR is JONA's investment entity, and has built connections and arrangements with various jewelry and diamond importers including a company named Africa-Israel, through which JONA and JSR obtain access to discounted jewelry and diamonds, which JONA and JSR have used as leverage to negotiate other deals with various parties, including with MAYWEATHER and HAYMON. In addition, Plaintiff is further informed and believes that JONA and JSR have reached agreements with MAYWEATHER, HAYMON and MP to promote tickets for events where MAYWEATHER, HAYMON and MP would otherwise have legal conflicts and unable to serve as promoters.

22. ROBERT is JONA's father, and a businessman with political connections which he has touted and utilized in the past to secure multiple investments from unwary investors. When JONA was convicted in 2016, ROBERT funded a bond with the court to release his son from prison, which bond remains. After JONA's conviction, ROBERT made every effort to help his son resume business relationships in California, including backing him and regularly supporting him with investments, and guaranteeing JONA's business activities in order to assuage any concerns of persons who may have misgivings dealing with JONA.

23. In addition, ROBERT has made multiple donations to religious entities, particularly in his orthodox Jewish community and synagogue, and with the tightly knit and small Los Angeles orthodox Jewish community. In addition, ROBERT has funded and chaired numerous political events, has capitalized on his relationship with former Israeli Prime Minister, Benjamin Netanyahu, and lives a very high profile and wealthy lifestyle.

24. By contrast, ROBERT has been a defendant in multiple legal actions, including ones for fraud, and has had several million dollars of judgments entered against him. Most recently, in the past few years, on multiple occasions, ROBERT was ordered to appear and testify to his assets in judgment debtor examination proceedings in order to satisfy the judgment against

**COMPLAINT**

him and in those examinations, ROBERT has claimed under oath that he has no money to pay any portion of the judgments, no income, and lives on the charity of his nephew, and the entire time hiding his assets abroad in Israel, including a very exclusive and expensive condominium in Jerusalem, and while living in a mansion in Hancock Park.

25.    Defendant, AVI and ZEV (collectively the "GOLOMBECKS") are also members of the Orthodox Jewish Community, in New York.  The GOLOMBECKS have been well-known investors and businessmen in the Community, and actively involved and engaged in the religious traditions, attending services at synagogues, donors at various holidays, and have regularly invested their family holdings through AGOL and GH in various entrepreneurial and business ventures.  In fact, ZEV has had the GOLOMBECK family holdings invest through GH and publish the successes of their investments in a spice company named "McCormick," which resulted in significant returns on their investments, a fact proudly shared publicly in the Community.

26.    At all times, AVI had the authority and blessing to represent ZEV in negotiations on his father's behalf and on behalf of the family holdings, and to act on behalf of his father since ZEV and AVI knew that utilizing his father's history of investment and successes in GH, would encourage others to work with and invest with AVI.  In fact, AVI had stated specifically to Plaintiff that he had his father's authority to speak on his behalf and to invest their family holdings into various investments, specifically on behalf of AGOL and GH in the investments described herein regarding events being promoted by MP, MAYWEATYER and HAYMON, and solicited by JONA and ROBERT.

27.    After JONA pled guilty to Fraud Felonies in New York in or about 2016, JONA and ROBERT asked their friend from the Community, ENGLANOFF, to write letters of support on behalf of JONA to reduce the sentence he would obtain from the court, and ENGLANOFF, then believing JONA and ROBERT to be sincere, and that JONA had actually reformed his ways and needed a second chance, duly accommodated the request.  In fact, ENGLANOFF agreed to rent JONA a home that he owned which was walking distance to the synagogue that he and the JONA attended, a proximity crucial for members who have to walk

-7-

**COMPLAINT**

to synagogue on Saturdays as ordained by their religious observance. ENGLANOFF agreed to rent the home during JONA's trial in New York, again in the hopes that maintaining his connections with the synagogue would help JONA reform and achieve in the next phase of his life, particularly since ROBERT specifically requested the same.

28.    Accordingly, ENGLANOFF agreed to rent his home to JONA as of May, 2017. However, in addition to the events described herein, while ROBERT was extremely grateful to ENGLANOFF, JONA has subsequently become delinquent in payment of rent.

29.    Plaintiff ENGLANOFF and MAYWEATHER have been friends for over three years, often socializing with each other both in Los Angeles at ENLANOFF's home and in Las Vegas at MAYWEATHER's home. In or about 2021, MAYWEATHER became interested in purchasing one of ENGLANOFF's high end luxury properties in Bel Air (the "Bel Air Home"), which negotiations were ongoing through them personally and in drafting purchase and sale documents through their respective attorneys. During the entire time of the events described herein, ENGLANOFF and MAYWEATHER were also in the process of negotiating the purchase and sale of the Bel Air Home at values significantly greater than all of YOGI's investments alleged herein.

**The Jewish Orthodox Community and The Parties' Prior Exchanges**

30.    Plaintiff ENGLANOFF, JONA, and ROBERT, are all members of a very tightly knit, observant, and close orthodox Jewish community, with shared traditions, dietary restrictions, work and holiday schedules, religious observances, synagogue attendance and a code of lifestyle for their community (the "Community"). The members of the Community also extend geographical boundaries throughout the United States where members share the same religious doctrines, and observe in the same manners, such that the members of the Community in Los Angeles, are also well acquainted with members of the Orthodox Jewish communities in NY as well where AVI and ZEV are residents and in Florida, where FRIST resides.

31.    As a result of being members of the same Community, the members have a higher level of trust with each other, and family members of the Community, than is normal in regular society, and more so than they have with others that are not members of the Community.

**COMPLAINT**

**Plaintiff Initial Terms and Investment in the Mayweather-Paul Fight.**

32.     MAYWEATHER and JONA advised Plaintiff ENGLANOFF, while MAYWEATHER was negotiating the purchase of the Bel Air Home in or about May, 2021, that they may have an opportunity for ENGLANOFF to invest and purchase tickets to the upcoming MAYWEATHER and Logan Paul boxing match set for June 6, 2021, being promoted by MAYWEATHER, HAYMON and MP.  During the discussions, MAYWEATHER advised Plaintiff ENGLANOFF that MAYWEATHER and HAYMON through MP were managing and promoting the fight, including access to tickets for the fight, and that they had allocated a number of such tickets for JONA and JSR to allow investors to purchase at face value, and then to share the proceeds of the public sale of those tickets.  MAYWEATHER specifically stated that he considered ENGLANOFF to be a part of his and HAYMON's family, and would treat Plaintiff; investment as he would with his own family investing, and that JONA was authorized on their behalf to negotiate with ENGLANOFF for any investment by ENGLANOFF, or his entity, YOGI, into the purchase of tickets for the event.

33.     Thereafter, Plaintiff through ENGLANOFF had discussions with JONA as to the actual profit split, and other terms.  The terms agreed to were that Plaintiff would invest money in exchange for which Plaintiff would acquire tickets at face value, which tickets Plaintiff would own.  Plaintiff's initial investment was to be $1.2 Million, which was then increased to $1.4 Million.  At the specific request and under the direction of MAYWEATHER, the money would be wired or sent directly to MAYWEATHER and MP, and MAYWEATHER provided MP's bank account and wiring information for that specific investment.  After the tickets were purchased and sold, Plaintiff's entire investment would be repaid first, and then the profits from the sales would be split 75% to JONA to share with MP, MAYWEATHER, HAYMON and JSR, and 25% to Plaintiff.  The entire investment and profit portion would be repaid by June 13, 2021.

34.     Further, on May 5, 2021, ENGLANOFF and JONA called AVI and in that call, AVI stated that he knew how the investments were arranged, that he, AVI was on top of everything, and that AVI was watching every ticket sale, which he concluded was a very safe

investment such that he was not only investing himself from his own money at AGOL, but also his family money as his father's agent on behalf of GH. AVI also stated to ENGLANOFF that he had witnessed the ticket sales, and in most cases they were selling for 8-10 times face value. These terms were also confirmed in text messages with ENGLANOFF on May 5, 2021 whereby JONA and MAYWEATHER confirmed the amounts and wiring, and in an email on May 6, 2021 between ENGLANOFF and JONA. Relying on these representations, Plaintiff agreed to these terms, and effectuated that agreement by wiring $1.2 Million initially.

35.     Then on May 12, 2021, in an email with JONA, and ENGLANOFF, which Plaintiff is informed and believes JONA sent copies to ROBERT, the amount was agreed to increase to $1.4 Million with ROBERT also investing. That same day, ENGLANOFF in the presence of JONA, spoke with ROBERT on the telephone, who specifically stated he was investing in the tickets as well, and that ENGLANOFF would have the same shares as ROBERT did, because he believed in the investment.

36.     As a result of the promises and statements made by each defendant and the agreements reached, Plaintiff agreed to these terms and to invest by paying $1.2 Million via wire from YOGI initially on or about May 5, 20921 and another payment of $200,000 sent to MP on those terms in or about May 12, 2021, per the wiring and account details provided by MAYWEATHER for a total of $1.4 Million invested. Plaintiff signified its acceptance of the terms agreed upon by wiring the money to MP's account.

37.     Plaintiff fully performed their obligations by timely paying the full amount of the agreed investment of $1.4 Million.

38.     However, on June 13, 2021, no money was paid by any defendants, and in spite of Plaintiff' demands and queries, no money was made available to be paid. Consequently, defendants were in breach of the agreement.

**Defendants Cover-Ups, Further Concealment and Delays and Revisions to the Profit Split**

39.     From about June 15 to June 24, defendants provided a variety of excuses, including the fact that HAYMON was withholding money and not releasing it, and that there

-10-

**COMPLAINT**

1   were delays but the money would be forthcoming.

2       40.    Then on or about June 24, 2021, in an in person meeting between ENGLANOFF

3   and JONA, JONA changes his version of events, and claimed that he had taken all the proceeds

4   of the Mayweather Paul fight, and invested them into the next fight being promoted by

5   MAYWEATHER, HAYMON and MP, namely the Pacquiao- Ugas fight scheduled for August

6   21, 2021.  JONA acknowledged that he did so without Plaintiff' knowledge, consent or

7   permission, but explained that he needed the proceeds to purchase a large allocation demanded

8   by HAYMON, without which he would lose such rights.  JONA also stated that with

9   ENGLANOFF and YOGI's investment in the Pacquiao fight, all of JONA's problems would

10  be resolved, that JONA would make over $20 Million, and as a result, JONA agreed to modify

11  the profit split with Plaintiff by agreeing that Plaintiff would receive the full value of their

12  investment and the profit from the Mayweather Paul fight, which he estimated to about $5

13  Million in total, and that JONA, JSR, MAYWEATHER, MP and HAYMON would also honor

14  Plaintiff' profit from the Pacquiao fight, and no longer have the 75/25 split in favor of JONA.

15      **The July 2021 Arrangements and FRIST**

16      41.    In or about June 6, 2021 Plaintiff learned that FRIST individually, and as the agent

17  for STATELAND had also invested in the ticket sales, and were involved with overseeing the

18  sale proceeds of tickets.  Consequently, on or about July 1, 2021, ENGLANOFF had several

19  telephone calls with JONA, AVI and FRIST.  During those calls, ENGLANOFF specifically

20  asked AVI and FRIST to let him know what Plaintiff' share was from the Mayweather-Paul fight,

21  and AVI and FRIST agreed that they would calculate the numbers from all ticket sales and all

22  investments by AVI, ZEV, AGOL, GH, FRIST and STATELAND, and that FRIST would

23  provide them to Plaintiff.  Indeed, ENGLANOFF met JONA on June 6, 2021 at JONA''s hotel

24  room in Florida before the fight, at which point ENGLANOFF witnesses several armed guards

25  with JONA and a table of stacks and bounds of cash in hundred dollar bills, filing multiple duffle

26  bags, with JONA bragging about the large amount of money he was handling in connection with

27  MAYWEATHER, HAYMON and MP.

28      42.    On or about July 1, 2021, in an email from FRIST to Plaintiff copied to JONA,

**COMPLAINT**

FRIST stated to ENGLANOFF that the money had been collected, and that FRIST was handling the investor payouts, requesting a W-9 form from Plaintiff and confirming the amount being paid to Plaintiff to be $4.886 Million.  Relying on these promises, Plaintiff did not object to FRIST acting as a fiduciary to handle their money, and Plaintiff duly provided the W-9 form as well as the wiring details requested by FRIST.

43.     On or about July 2, 2021, FRIST stated in an email to ENGLANOFF, copying JONA, that the initial investment would be repaid by MP, and that FRIST would be paying the profit to Plaintiff, and further that the ticket brokers had sent the money to his account, from which FRIST would settle out Plaintiff and other investors.

44.     On July 5, 2021, JONA emailed FRIST, and copied ENGLANOFF, in which he stated that the ticket broker wired the money to him, and not to FRIST, and that JONA would be (i) sending YOGI a wire for $3.48 Million, and (ii) sending $1.4 Million to MP who would then issue a check to Plaintiff to repay YOGI's initial investment of $1.4 Million.  JONA also stated that all wires will be sent before the wire cutoff.  FRIST and STATELAND never contradicted this statement, nor indicated that they either did not have the money, or would not act accordingly, effectively acknowledging the arrangement written by JONA.

45.     Notwithstanding the promises and statements, Plaintiff received no monies on July 6 or July 7.  Instead, a series of false statements and excuses began.

46.     On July 7, 2021, JONA sent text messages to Plaintiff stating he was in Hawaii and was wiring the money to Plaintiff which did not happen because of the different cut-off times.

47.     The same day, in a telephone call with ENGLANOFF, JONA stated that his account had been locked due to fraud, and he could not send wires out.

48.     On July 12, 2021, JONA sent a text message to ENGLANOFF stating that he would pay Plaintiff by next Monday because he claimed he had not received the money.

49.     On July 22, 2021, JONA sent a text message to ENGLANOFF stating that he will sell his stock to make a partial good faith payment to Plaintiff at least $2.86 Million toward the balance owed.

**COMPLAINT**

50.    On July 23, 2021, JONA delivered a check for $100,000 only, handing it to ENGLANOFF and stating he was doing it as a religious act and gesture before Shabbat.

51.    Each of the statements made by the defendants was false at the time they made them, and they intended that Plaintiff would rely on them in foregoing any legal action that would interfere with their ongoing business relationships, jewelry and diamond purchase and sales, and activities in the upcoming fights, including the Pacquiao fight set for August 21, 2021, and events thereafter.

52.    Plaintiff intended to pursue their legal claims at that time and stated the same to defendants, which actions would interfere with and prevent defendants from promoting or engaging in any further activity on future ticket sales for upcoming events.

**Revised Agreements, Fiduciary Duties, Guarantees and the Pacquiao Fight**

53.    In or about August, 2021, ENGLANOFF had several conversations with JONA, AVI, and FRIST, in their individual capacities and representing ZEV, AGOL, GH, and ROBERT to address the unpaid amounts and next steps. The parties reached an agreement, which JONA memorialized in an email dated August 11, 2021 circulated by JONA among ENGLANOFF, AVI, and FRIST. The agreement reached as of August 11, 2021 provided that Plaintiff would receive $4.88 Million (Less the $100,000 already repaid) from the first fight, Mayweather-Paul, of which $1.4 Million represented repayment of Plaintiff' principal investment, and because defendants had rolled over that investment into the Pacquiao fight, Plaintiff would also receive the same return on their total investment as AVI, AGOL, ZEV, GH and FRIST would receive(i.e. no longer a 75/25 split as was initially the case), the investments and returns of all parties would be paid to AGOL, of which the first money paid out will be to Plaintiff before any monies are repaid to JONA, ROBERT, AVI, ZEV, AGOL, GH, FRIST or any other investors, which amount will include monies made from the Pacquiao fight as well, that Plaintiff will be paid their money back by no later than September 6, 2021

54.    Each of these defendants also agreed to personally guarantee this contractual agreement, and to confirm its in writing. In response to JONA's August 11, 2021 email reciting the terms of the agreement and the personal guarantees, AVI and FRIST both confirmed their

-13-

**COMPLAINT**

agreement in writing, AVI wrote back, in his continuing capacity representing the other investors which included AGOL, GH and ZEV, that after Plaintiff receive their returns, and AVI, GH, and ZEV as well as FRIST receive their returns, then profits from the Pacquiao will be split between the parties proportionally, and that since September 6 was labor day, followed by the Jewish New year of Rosh Hashana, the repayment date would be September 9, 2021.

55.     After the Pacquiao fight took place, defendants failed to fulfill their promises or agreements on September 9, 2021 as promised.  In conversations between ENGLNOFF, JONA, AVI and FRIST after the Pacquiao fight, they confirmed that the profits from the fight were only 20%, which was less than expected.

56.     Thereafter, on September 14, 2021, AVI emailed ENGLANOFF copying JONA and FRIST, stating that the funds were coming in, and that ENGLANOFF should expect $4.786 Million multiplied by 1.2 (for the 20% return) totaling $5,743,200.00.

57.     The next day, JONA in an in-person meeting with Plaintiff stated that the money was coming from HAYMON via check because Al does not deal in wires, and the checks need 7-10 days to clear, and JONA showed ENGLANOFF a handwritten check for just short of $11 Million.

58.     Again, none of the money was paid when due or promised.  Consequently, ENGLANOFF had a telephone call with ROBERT on October 3, 2021 where ENGLANOFF was suspicious that the defendants had invested Plaintiff' money in another investment, and concerned that their actions were illegal, to which ROBERT replied and assured ENGLANOFF that nothing improper or illegal was happening, that ROBERT would personally audit the books and records, will speak directly with HAYMON and he personally guaranteed the repayment to Plaintiff of the $5.8 Million.

59.     The next day, JONA and JSR wired $100,000 to YOGI's account which JONA proclaimed to be an act of good faith.

60.     On October 6, 2021, ENGLANOFF met with JONA and ROBERT at ENGLANOFF's home in Los Angeles, and at that meeting JONA confirmed Plaintiff' entitlement to approximately $5.8 Million from after the Pacquiao fight but that he had

-14-

**COMPLAINT**

reinvested the money, without any disclosure, consent, author8ization or approval from Plaintiff, into the next fight being promoted by MAYWEATHER, HAYMON and MP, the Wilder fight in October, and that JONA would add in considerably more after the Wilder fight, swearing with his hand on his chest and pointing to a copy of the old testament in ENGLANOFF's home, that those returns would make ENGLANOFF very happy.  ROBERT confirmed, stating that all funds will be in the account from the Wilder fight by October 25, 2021, he stated he saw the books himself, had personally discussed with HAYMON the fact that the proceeds would repay Plaintiff first, and that HAYMON had agreed to this, and further that ROBERT guarantees this repayment to Plaintiff of $5.8 Million by no later than October 25, 2021, adding that the he saw the books, verified the money, it is real and the math adds up.

61.    ROBERT confirmed in a text message sent to ENGLANOFF on October 7, 2021 that there were a total of $26.4 million invested in tickets for the Wilder fight, and that he agrees to make sure Plaintiff receive their first money out from HAYMON's payments.

62.    On October 16, 2021, ENGLANOFF had a meeting at his home with AVI and FRIST to discuss the tickets, where both AVI and FRIST claimed they did not know that the money had been reinvested in the Wilder fight, and claimed that FRIST had initially invested $2 Million in the Floyd-Paul fight and AVI had initially invested $800,000 in that fight, but that both were very concerned about being paid back, and both acknowledged that Plaintiff would be paid the first $4.8 Million plus Plaintiff's return from the Pacquiao fight.  ROBERT walked into the meeting unannounced, insisted that the meeting stop, and told ENGLANOFF that he should trust ROBERT, and ROBERT confirmed in front of AVI and FRIST that he was personally guaranteeing the full payment of $5.8 Million to be repaid as promised by October 25, 2021, if JONA and JSR do not pay on time.

63.    That day, ROBERT stated to ENGLANOFF that he had a letter from HAYMON in which HAYMON acknowledged that YOGI's unpaid amounts of at least $5.88 Million would be paid first, and ROBERT confirmed his personal guarantee in an email he sent to ENGLANOFF, copying JONA on October 22, 2021, confirming that Plaintiff would be paid first, to which JONA responds that he needs to calculate from the Wilder fight how much

-15-

**COMPLAINT**

1  Plaintiff is to receive, to which ROBERT agreed. ROBERT also sent a text message to

2  ENGLANOFF stating that he was overseeing the wire and it will be sent on October 26, 2021.

3      64.    On October 25, 2021, ENGLANOFF had an in-person meeting with ROBERT

4  and JONA, during which meeting they called AVI who confirmed that the returns from the

5  Wilder fight were between 90-95%, and then called FRIST who confirmed that the returns from

6  that fight were 95%, but after the calls, JONA claimed they were wrong, the returns were only

7  70%.

8      65.    No money was paid to Plaintiff on any of the promised occasions, and Plaintiff

9  have received nothing to date, other than $200,000 described above.

10     66.    Plaintiff is informed and believes that each of the statements made by each of the

11 defendants were false, intended that Plaintiff rely on their truth to their detriment in initially

12 paying $1.4 Million, and thereafter in foregoing any legal action that may disrupt defendants'

13 fraudulent schemes in further events and fights. In fact, Plaintiff did rely on their truth in paying

14 $1.4 Million and agreeing to wait and forego any legal action from June 2021 through December

15 2021, the entire time allowing these defendants to continue using the monies for purchasing of

16 tickets at events and reaping the profits.

17     67.    By December 2021, Plaintiff had determined that it would not be repaid as

18 promised, and ENGLANOFF contacted AVI by telephone on December 8, 2021. During that

19 call, AVI stated that neither his family and entities, nor FRIST had received any monies from

20 any of these fights, and that he believed JONA, JSR and ROBERT had used the proceeds in

21 another ticket investment with MAYWEATHER, HAYMON and MP for the Davis-Cruz fight

22 on December 5, 2021. In that call AVI acknowledged ROBERT stating he was personally

23 guaranteeing repayment of $5.8 Million to Plaintiff as the first money to be paid out, and also

24 acknowledged that he was responsible for improperly handling the money from the Mayweather-

25 Paul fight in June, but claimed it got out of control, and that JONA took control, and expressed

26 regret to ENGLANOFF for not telling him about the events that transpired between June and

27 then.

28              FIRST CAUSE OF ACTION FOR

**COMPLAINT**

BREACH OF CONTRACT- Count 1

(Against MAYWEATHER, HAYMON, MP, JONA, ROBERT, AVI, ZEV, AGOL, GH, and DOES 1-100)

68.     Plaintiff hereby incorporates paragraphs 1 through 67 of this complaint, as though again stated in full.

69.     In or about May 12, 2021, the parties reached an agreement for Plaintiff to invest $1.4 Million in ticket purchases for the Mayweather-Paul fight, amounts being paid by each of AVI, ZEV, AGOL, GH, ROBERT  in addition to Plaintiff, that AVI, AGOL and GH would oversee the handling of the proceeds, and that MAYWEATHER, HAYMON and MP would handle the management and promotions to insure Plaintiff investment would be secured by his tickets, with proceeds distributed to Plaintiff at an agreed return and profit split, and repaid by no later than June 13, 2021.

70.     At all times relevant herein, Plaintiff performed each of their duties and obligations under the agreement, paying $1.2 Million plus an additional $200,000 by May 12, 2021.

71.     Defendants breached their obligations and representations under the agreement, by failing to ensure Plaintiff' money was secured with tickets purchased at face value, failing to ensure the profits from Plaintiff's ticket sales were maintained separately for Plaintiff, and failing to insure that Plaintiff's initial investment of $1.4 Million plus the agreed return would be repaid to Plaintiff by June 13, 2021.

72.     Defendants MAYWEATHER, HAYMON and MP further breached their obligations by failing to ensure Plaintiff' monies wired to them with the express understanding that it would be segregated, and that tickets purchased with Plaintiff; money would be owned by Plaintiff alone, under their direct supervision and oversight, which they failed to honor in the manner they would have protected Plaintiff' investment as one of their family members.

73.     As a proximate result of the breach, Plaintiff have suffered damages and economic harm in an amount to be proven at trial, and continues to suffer harm so long as the terms of the Agreement is not being honored, in that its business, profitability, and the ability to order

-17-

**COMPLAINT**

1    the goods and services are all hindered or completely undermined, all in amounts to be proven

2    at trial, but at least $4.88 Million.

3        74.    In addition, Plaintiff is seeking the imposition of a constructive trust on the

4    proceeds, benefits, profits and monies received by defendants from Plaintiff' investment, and

5    any gains they benefitted from, since such gains equitably belong to Plaintiff and not these

6    defendants.

7                        SECOND CAUSE OF ACTION FOR

8                        BREACH OF CONTRACT- Count 2

9    (Against JONA, ROBERT, AVI, ZEV, AGOL, GH, FRIST, STATELAND, and DOES 50-

10                                    100)

11        75.    Plaintiff hereby incorporates paragraphs 1 through 74 of this complaint, as though

12    again stated in full.

13        76.    In or about August 11, 2021, defendants reached an agreement whereby they

14    confirmed Plaintiff' entitlement to $4.88 Million from the first fight, that Plaintiff would receive

15    an equal return on all fights and investments after the Pacquiao fight proceeds are received by

16    no later than September 6-9, with AVI, ZEV, AGOL and GH overseeing the money and

17    distribution of proceeds, all as more fully alleged above.

18        77.    At all times relevant herein, Plaintiff performed their duties under the revised

19    agreement by refraining from pursuing legal action and remedies which could prevent the

20    defendants from participating in further events.

21        78.    Defendants breached their obligations and representations under the agreement,

22    by failing to insure Plaintiff' money was secured with tickets purchased at face value, failing to

23    insure the profits from Plaintiff's ticket sales were maintained separately for Plaintiff, and failing

24    to insure that Plaintiff's initial investment of $1.4 Million plus the agreed return which Plaintiff

25    later learned totaled at least $5.856 Million would be repaid to Plaintiff by September 9, 2021.

26        79.    As a proximate result of the breach, Plaintiff have suffered damages and economic

27    harm in an amount to be proven at trial, and continues to suffer harm so long as the terms of

28    the Agreement is not being honored, in that its business, profitability, and the ability to order

                                    -18-

                            **COMPLAINT**

the goods and services are all hindered or completely undermined, all in amounts to be proven at trial, but at least $5.856 Million.

80.    In addition, Plaintiff is seeking the imposition of a constructive trust on the proceeds, benefits, profits and monies received by defendants from Plaintiff' investment, and any gains they benefitted from, since such gains equitably belong to Plaintiff and not these defendants.

<u>THIRD CAUSE OF ACTION FOR</u>

<u>BREACH OF FIDUCIARY DUTY</u>

(Against All  Defendants)

81.    Plaintiff hereby incorporates paragraphs 1 through 80 of this complaint, as though again stated in full.

82.    As of May 2021, a fiduciary relationship existed between Plaintiff on the one hand and defendants MAYWEATHER, HAYMON, MP, JONA, ROBERT, AVI, ZEV, GH, AGOL on the other, who agreed to supervise, account for, watch and marshal the handling of Plaintiff's money, investment, the purchase of tickets and the return of proceeds and profits from the sale of tickets from the Mayweather-Paul fight.

83.    As of July 5, 2021, defendant FRIST also became a fiduciary of Plaintiff, by agreeing to handle the proceeds of monies from the sale of tickets, and overseeing which accounts were used to repay portions of Plaintiff' money and repayment, including FRIST specifically agreeing to personally return monies to Plaintiff.

84.    At all times relevant herein, defendants, and each of them had a duty to use reasonable care in overseeing and supervising the purchase and sale of the tickets, as well as the flow of the proceeds from such sales for repayment to Plaintiff.

85.    Defendants also had a duty of undivided loyalty by virtue of the personal trust and familial and religious relationship that existed between them.

86.    Defendants failed to use reasonable care in performing their duties and tasks in overseeing Plaintiff' investments and proceeds from ticket sales, and failed to act as a reasonable person in their position would have acted.

-19-

**COMPLAINT**

87.    Defendants also knowingly acted against Plaintiff' interests, and in the private and pecuniary interests of themselves, and their own investments, without Plaintiff' knowledge or consent.

88.    As a proximate result of such failure, Plaintiff were substantially harmed in amounts to be proven at trial, but no less than $5.856 Million as to MAYWEATHER, HAYMON and MP, and approximately $15 Million as to the remaining defendants.

89.    The acts, statements and omissions of defendants were intentional, volitional, oppressive, wanton and reckless and malicious, with the intent to harm Plaintiff, and consequently warrant the award of punitive and exemplary damages in amounts to be proven at trial.

<u>FOURTH CAUSE OF ACTION FOR</u>

<u>BREACH OF GUARANTY</u>

(Against ROBERT and DOES 50-100)

90.    Plaintiff hereby incorporates paragraphs 1 through 89 of this complaint, as though again stated in full.

91.    As more fully alleged herein, Defendant ROBERT personally guaranteed the repayment of $5.8 Million to Plaintiff by no later than October 25, 2021.  The guarantee was initially made orally, witnessed by defendants AVI, FRIST and JONA, and then confirmed in writing by ROBERT.

92.    At the time the guarantee was made, ROBERT obtained a benefit in Plaintiff not proceeding with any action or legal remedy against JONA and JSR, because ROBERT wanted to ensure the use of Plaintiff' monies to generate further revenues for JONA and JSR to pay to ROBERT.

93.    In addition, ROBERT who had secured a bond for JONA's legal problems with his own assets, wanted to ensure that JONA would control additional monies to help secure the repayment and satisfaction of said bond, benefitting ROBERT, whose home had been mortgaged for the bond.

94.    Defendant ROBERT breached his guarantee by failing to pay $5.8 Million after

-20-

**COMPLAINT**

October 25, 2021, when JONA breached and failed to honor his obligation to make such payment.

95.    As a proximate result of said breach, Plaintiff have been substantially harmed in the amount of at least $5.856 Million.

FIFTH CAUSE OF ACTION FOR

CONVERSION

(Against all Defendants)

96.    Plaintiff hereby incorporates paragraphs 1 through 89 of this complaint, as though again stated in full.

97.    Defendants had a limited right to possess Plaintiff's funds totaling $1.4 Million in May, 2021 pursuant to the express terms of their agreement, and specifically for purchasing tickets to the Mayweather-Paul Fight at face value, to be kept for Plaintiff' sole use and direction.

98.    The money and proceeds from the sale of those tickets was the exclusive property of Plaintiff, who alone had the right to possess and use it.  Plaintiff is informed and believes that such proceeds totaled $4.88 Million which were in the hands and control of defendants only to be paid back by June 13, 2021.

99.    Defendants refused to return the monies, took possession of the proceeds, despite demands on them and their agents by Plaintiff for their return.

100.    Plaintiff is informed and believes that defendants used Plaintiff' monies to invest in other events, for purchase of additional tickets, and otherwise took possession and control of the proceeds, none of which was with Plaintiff' consent or knowledge at the time.

101.    Plaintiff is informed and believes that as of August 2021, the proceeds had increased to $5.856 Million, which Plaintiff demanded the return of said amount. Notwithstanding, defendants refused to return said amounts, and again kept them for their own purposes without Plaintiff' consent.

102.    Plaintiff were harmed as a result of the conversion by defendants in amounts to be proven at trial but no less than $5.856 Million as to MAYWEATHER, HAYMON and MP, and approximately $15 Million as to the remaining defendants.

-21-

**COMPLAINT**

103.    Defendants' conversion was a substantial factor in Plaintiff' harm and damages which as more fully alleged herein were proximately caused thereby.

104.    The acts, statements and omissions of defendants were intentional, volitional, oppressive, wanton and reckless and malicious, with the intent to harm Plaintiff, and consequently warrant the award of punitive and exemplary damages in amounts to be proven at trial.

<u>SIXTH CAUSE OF ACTION FOR</u>

<u>NEGLIGENT MISREPRESENTATION</u>

(Against all Defendants)

105.    Plaintiff hereby incorporates paragraphs 1 through 89 of this complaint, as though again stated in full.

106.    Defendants made numerous representations of fact to Plaintiff between May and December 2021 as more fully alleged herein.

107.    The statements were false and untrue when made.

108.    While Defendants may have honestly believed that some of the representations were true when made, Defendants had no reasonable grounds for believing them to be true when they were made.

109.    Defendants at all times intended that Plaintiff rely on the statements made by Defendants.

110.    Plaintiff reasonably relied on the truth of these statements in making the investment of $1.2 Million and an additional $200,000 in May, 2021, and in delaying any action to seek redress, including legal action to obtain the proceeds.

111.    Plaintiff' reasonable reliance on these statements was a substantial factor in Plaintiff first investing $1.4 Million, and thereafter in failing to collect $5.8 Million from proceeds of events between July and December 2021.

112.    As a proximate result of these acts and statements of defendants, Plaintiff has suffered harm and damages of no less than $5.856 Million as to MAYWEATHER, HAYMON and MP, and approximately $15 Million as to the remaining defendants.

-22-

**COMPLAINT**

SEVENTH CAUSE OF ACTION FOR

FRAUD/CONCEALMENT

(Against all Defendants)

113.   Plaintiff hereby incorporates paragraphs 1 through 89 of this complaint, as though again stated in full.

114.   At all times herein, a personal, religious, and business relationship existed between Plaintiff and each defendant, including via the agreements reached, the performance by Plaintiff, the fiduciary and other relationships which emanated from them as more fully alleged above.

115.   Plaintiff alleges on information and belief that defendants made false statements to Plaintiff verbally and in writing as more fully alleged herein.

116.   Plaintiff is further informed and believes, alleging thereon that defendants intentionally failed to disclose the facts and information known to them about the transaction, about the handling of the monies and tickets which information was only known to defendants, not Plaintiff, and Plaintiff could not have discovered the same separately, including specifically that AVI, ZEV, GH and AGOL as well as FRIST were not handling or in control of the money, that they had chosen to reinvest part of the money or keep the money for themselves, that FRIST did not actually have the proceeds when he claimed he did and would repay them, and that monies had not been sent by the ticket broker to these defendants.

117.   Defendants' statements and conduct, including their material misrepresentations, and their concealing the truth prevented Plaintiff from discovering the facts sooner and taking actions to legally protect themselves, because each defendant believed that their economic interests would be served by being able to participate in further events, ticket sales and the purchase and sale of discounted jewelry and diamonds, including reaping their own benefits before Plaintiff.

118.   Plaintiff is further informed and believes that defendants intended to deceive Plaintiff by concealing the facts and the truth, and by making the false statements alleged herein, and intended that Plaintiff rely on their truth to their detriment, in paying $1.4 Million and in failing to take legal action to recover their monies between July and December 2021.

-23-

**COMPLAINT**

119.    Plaintiff reasonably relied on the truth of the statements and not knowing the true concealed facts, in paying money to Defendants totaling $1.4 Million, and in holding off any legal actions to protect their financial interests, including asserting claims as a secured party to any tickets purchased with their monies.  In fact, Plaintiff believed the statements made by defendants, and unaware of the truth concealed by them, relied on their truth in acting as they have alleged to have acted.

120.    Plaintiff is informed and believes, thereon alleging that Defendants had no intention of satisfying the terms of the Agreements they entered into, honoring the promises they made or performing the obligations they represented, and had no reason to believe any of their representations, all of which were false, and intentionally false in order to convince Plaintiff to pay money and refrain from taking actions.  Plaintiff is further informed and believes that the statements made by each defendant were false, knowingly false at the time they were made, and without any reason to believe their truth.

121.     As a proximate result of these fraudulent acts and statements and concealment, Plaintiff has suffered damages in an amount to be proven at trial, but in no event less than the jurisdictional minimum of this court but no less than $15 Million as to all defendants.

122.    Further, Defendants' concealment of these material facts was a substantial factor in causing Plaintiff's damages and harm as more fully alleged herein.

123.    The acts, statements and omissions of defendants were intentional, volitional, oppressive, wanton and reckless and malicious, with the intent to harm Plaintiff, and consequently warrant the award of punitive and exemplary damages in amounts to be proven at trial.

WHEREFORE, Plaintiff prays for damages and other relief against defendants, and each of them as follows;

As to All Causes of Action:

1.    For damages in an amount to be proven at trial, but in no event less than the jurisdictional minimum of this court and at least $15 Million;.

2.    For costs of suit incurred herein;

-24-

**COMPLAINT**

3.      For Imposition of a constructive trust on any proceeds, monies or other benefits received by defendants from any monies due to Plaintiff.

4.      For such other and further relief as the court deems proper.

5.      For interest at the legal rate of 10% on any amounts owed and unpaid pursuant to Civil Code § 3289 from the date of breach, or pursuant to Civil Code §3287(a).

As to the Third, Fifth and Seventh Causes of Action:

1.      For punitive and exemplary damages in an amount to be determined by the court;

Dated:      February 1, 2022                 AFIFI LAW GROUP

                                             *Faryan Andrew Afifi*

                                    By:_____
                                             FARYAN ANDREW AFIFI
                                             Attorneys for Plaintiff ENGLANOFF and
                                             YOGI SECURITIES

-25-
**COMPLAINT**

1    John T. Jasnoch (CA 281605)
    jjasnoch@scott-scott.com
2    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
    600 W. Broadway, Suite 3300
3    San Diego, CA 92101
    Tel.: 619-233-4565
4    Fax: 619-236-0508

5    *Lead Counsel for Plaintiffs and the Proposed Class*

6

7

8            **UNITED STATES DISTRICT COURT**

9            **CENTRAL DISTRICT OF CALIFORNIA**

10            **WESTERN DIVISION**

| | |
|---|---|
| 11   IN RE ETHEREUMMAX INVESTOR LITIGATION | Lead Case No. 2:22-cv-00163-MWF-(SKx) |
| 12   | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| 13   This Document Relates To: | |
| 14   ALL ACTIONS | |
| 15   | <u>DEMAND FOR JURY TRIAL</u> |

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

NATURE OF THE CASE ......................................................................................... 1

PARTIES ................................................................................................................. 2

    Plaintiffs ............................................................................................................ 2

    Defendants ......................................................................................................... 4

JURISDICTION AND VENUE ............................................................................... 6

FACTUAL ALLEGATIONS ................................................................................... 7

    EthereumMax Background ................................................................................. 7

    The Pump – Shilling EthereumMax ................................................................ 18

    The Dump – EMAX Token Price Plummets .................................................... 56

    Regulators Raise Concerns that EthereumMax Is a "Pump and Dump" Scam .................................................................................................................. 61

CLASS ALLEGATIONS ........................................................................................ 62

FIRST CAUSE OF ACTION ................................................................................. 65

SECOND CAUSE OF ACTION ............................................................................ 75

THIRD CAUSE OF ACTION ................................................................................ 89

FOURTH CAUSE OF ACTION ............................................................................ 99

FIFTH CAUSE OF ACTION ............................................................................... 103

SIXTH CAUSE OF ACTION ............................................................................... 116

SEVENTH CAUSE OF ACTION ......................................................................... 124

EIGHTH CAUSE OF ACTION ............................................................................ 131

NINTH CAUSE OF ACTION .............................................................................. 133

TENTH CAUSE OF ACTION .............................................................................. 135

ELEVENTH CAUSE OF ACTION ...................................................................... 146

TWELFTH CAUSE OF ACTION ........................................................................ 148

THIRTEENTH CAUSE OF ACTION .................................................................. 157

JURY DEMAND .................................................................................................. 159

Plaintiffs Ryan Huegerich, Jonathan Semerjian, Nabil Nahlah, Till Freeman, Marko Ciklic, Tunisia Brignol, Milan Puda, Neil Shah, Michael Buckley, and Christopher DeLuca ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint ("Complaint") against Defendant EMAX Holdings, LLC ("EMAX Holdings" or the "Company"), Giovanni Perone, Mike Speer, Justin Maher, and Jona Rechnitz (the "Executive Defendants"), Kimberly Kardashian, Floyd Mayweather, Jr., Paul Pierce, Russell Davis, and Antonio Brown (the "Promoter Defendants" and, together with the Executive Defendants, the "Defendants"). The following allegations are based upon personal knowledge as to Plaintiffs' own facts, upon investigation by Plaintiffs' counsel, and upon information and belief where facts are solely in possession of Defendants.

## NATURE OF THE CASE

1.      Plaintiffs bring this action on behalf of all investors who purchased EthereumMax tokens ("EMAX Tokens") between May 14, 2021 and June 27, 2021, (the "Relevant Period") and were damaged thereby.

2.      This case arises from a scheme among various individuals in the cryptocurrency sector to misleadingly promote and sell the digital asset associated with EthereumMax (the EMAX Tokens) to unsuspecting investors. The Company's executives, collaborating with several celebrity promotors, (a) made false or misleading statements to investors about EthereumMax through social media advertisements and other promotional activities, and (b) disguised their control over EthereumMax and a significant percent of the EMAX Tokens that were available for public trading during the Relevant Period (the "Float").

3.      In furtherance of this scheme, Defendants touted the prospects of the Company and the ability of investors to make significant returns due to the favorable "tokenomics" of the EMAX Tokens. In truth, Defendants marketed the EMAX Tokens to investors so that they could sell their portions of the Float for a profit.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

4.     Defendants' strategy was a success.  The misleading promotions and celebrity endorsements were able to artificially increase the interest in and price of the EMAX Tokens during the Relevant Period, causing investors to purchase these losing investments at inflated prices.  In addition, the Executive Defendants disguised their control of EthereumMax to avoid scrutiny and facilitate this scheme.  The Executive Defendants then conspired with the Promoter Defendants to improperly use inside information to sell their EMAX Tokens to investors for a profit.

5.     Plaintiffs bring this class action on behalf of themselves and an objectively identifiable class consisting of all investors that purchased EthereumMax's EMAX Tokens between May 14, 2021 and June 27, 2021.

## PARTIES

### Plaintiffs

6.     Plaintiff Ryan Huegerich ("Huegerich") is a resident and citizen of New York, living in Brooklyn, New York.  After viewing numerous celebrity endorsements of EMAX, Plaintiff Huegerich purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

7.     Plaintiff Jonathan Semerjian ("Semerjian") is a resident and citizen of California, living in Valencia, California.  After viewing numerous celebrity endorsements of EMAX, Plaintiff Semerjian purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

8.     Plaintiff Nabil Nahlah ("Nahlah") is a resident and citizen of Florida, living in Miami Beach, Florida.  After viewing numerous celebrity endorsements of EMAX, Plaintiff Nahlah purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

9.     Plaintiff Till Freeman ("Freeman") is a resident and citizen of Florida, living in Hallandale, Florida.  After viewing numerous celebrity endorsements of

1  EMAX, Plaintiff Freeman purchased EMAX Tokens, paid fees, and suffered
2  investment losses as a result of Defendants' conduct.

3        10.    Plaintiff Marko Ciklic ("Ciklic") is a resident and citizen of New York,
4  living in Brooklyn, New York.  After viewing numerous celebrity endorsements of
5  EMAX, Plaintiff Ciklic purchased EMAX Tokens, paid fees, and suffered investment
6  losses as a result of Defendants' conduct.

7        11.    Plaintiff Tunisia Brignol ("Brignol") is a resident and citizen of Florida,
8  living in Miami, Florida.  After viewing numerous celebrity endorsements of EMAX,
9  Plaintiff Brignol purchased EMAX Tokens, paid fees, and suffered investment losses
10  as a result of Defendants' conduct.

11        12.    Plaintiff Milan Puda ("Puda") is a resident and citizen of Florida, living
12  in Miami, Florida.  After viewing numerous celebrity endorsements of EMAX,
13  Plaintiff Puda purchased EMAX Tokens, paid fees, and suffered investment losses as
14  a result of Defendants' conduct.

15        13.    Plaintiff Neil Shah ("Shah") is a resident and citizen of California, living
16  in San Jose, California.  After viewing numerous celebrity endorsements of EMAX,
17  Plaintiff Shah purchased EMAX Tokens, paid fees, and suffered investment losses as
18  a result of Defendants' conduct.

19        14.    Plaintiff Michael Buckley ("Buckley") is a resident and citizen of
20  California, living in Sherman Oaks, California.  After viewing numerous celebrity
21  endorsements of EMAX, Plaintiff Buckley purchased EMAX Tokens, paid fees, and
22  suffered investment losses as a result of Defendants' conduct.

23        15.    Plaintiff Christopher DeLuca ("DeLuca") is a resident and citizen of
24  New Jersey, living in Cranford, New Jersey.  After viewing numerous celebrity
25  endorsements of EMAX, Plaintiff DeLuca purchased EMAX Tokens, paid fees, and
26  suffered investment losses as a result of Defendants' conduct.

27
28

*Defendants*

16. Defendant Justin Maher ("Maher") is a resident and citizen of Connecticut, living in Milford, Connecticut. Maher is the co-founder/creator of EthereumMax and exercised control over EthereumMax and directed and/or authorized, directly or indirectly, the sale and/or solicitations of EMAX Tokens to the public.

17. Defendant Giovanni Perone ("Perone") is a resident and citizen of Florida, living in Miami, Florida. Perone is the co-founder/creator of EthereumMax and served as the sole director of EMAX Holdings, LLC. Perone exercised control over EthereumMax and directed and/or authorized, directly or indirectly, the sale and/or solicitations of EMAX Tokens to the public.

18. Defendant Mike Speer ("Speer") is a resident and citizen of Texas, living in Georgetown, Texas. Speer is the co-founder/creator of EthereumMax and exercised control over EthereumMax and directed and/or authorized, directly or indirectly, the sale and/or solicitations of EMAX Tokens to the public.

19. Defendant Jona Rechnitz ("Rechnitz") is a resident and citizen of California, living in Los Angeles, California. Rechnitz served as a consultant, recruiter, and spokesman for EthereumMax, and he exercised control over EthereumMax and directed and/or authorized, directly or indirectly, the sale and/or solicitations of EMAX Tokens to the public.

20. Defendant Kimberly Kardashian ("Kardashian") is a resident and citizen of California, living in Hidden Hills, California. Kardashian acted as a promotor for EthereumMax and the EMAX Tokens.

21. Defendant Floyd Mayweather, Jr. ("Mayweather, Jr.") is a resident and citizen of Nevada, living in Las Vegas, Nevada. Mayweather, Jr. acted as a promotor for EthereumMax and the EMAX Tokens.

22.     Defendant Paul Pierce ("Pierce") is a resident and citizen of California, living in Inglewood, California.  Pierce acted as a promotor for EthereumMax and the EMAX Tokens.

23.     Defendant Russell Davis ("Davis") is a resident and citizen of Connecticut, living in Woodmont, Connecticut.  Davis acted as a consultant, developer, promoter, and spokesman for EthereumMax, and he exercised control over EthereumMax and directed and/or authorized, directly or indirectly, the sale and/or solicitations of EMAX Tokens to the public.

24.     Defendant Antonio Brown ("Brown") is a resident and citizen of Florida, living in Miami, Florida.  Brown acted as a promotor for EthereumMax and the EMAX Tokens.

25.     Defendant EMAX Holdings, LLC is a Florida limited liability company with its principal place of business located at 851 Northeast 1st Avenue, Miami, Florida 33132.  EMAX Holdings is the corporate entity created by Perone after the launch of the EMAX Tokens to hold the EthereumMax intellectual property, and it was incorporated on June 6, 2021.  On December 22, 2021, the Company filed trademark applications for various software for "financial exchange of virtual currency, utility tokens and digital tokens."  EMAX Holdings was dissolved on September 23, 2022.

26.     Defendants John Does 1-7 are persons who participated in the wrongdoing alleged herein but whose identities are currently unknown to Plaintiffs. Plaintiffs will identify the John Doe Defendants through discovery.[1]

---

[1]     While the identities of John Does 1-7 cannot yet be confirmed, there are clues. For example, as a now-deleted telegram post from the EMAX official account admitted: "Kim Kardashian is a family member of someone on the team."  In addition, one of Kardashian's EthereumMax promotions is made in conjunction with a nightclub, LIV, and Groot Hospitality, both of which are partially owned by David Grutman.  Since at least 2017, Grutman has been friends with Scott Disick, who also happens to be the father of Kardashian's niece and nephews.

5

## JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because: (1) there are 100 or more (named or unnamed) class members; (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest or costs; and (3) there is minimal diversity because at least one Plaintiff and Defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

28. This Court may exercise jurisdiction over Defendants because they have continuous and systematic contacts with this District, do substantial business in this State and within this District, and engage in unlawful practices in this District as described in this Complaint, so as to subject themselves to personal jurisdiction in this District, thus rendering the exercise of jurisdiction by this Court proper and necessary.

29. Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) because certain Defendants live and/or conduct business in this District, therefore, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

30. For example, one of the Company's marketing executives, Steve Gentile's September 13, 2021 post congratulating the winners of EthereumMax's "exclusive in-person LA influencer event with CRE8LUCK" is still pinned (Pinned Message # 93) as a top post on the Ethereum Max official Telegram account.[2] *See also* Pinned Messages 86-87. Similarly, Gentile's September 17, 2021 post bragging that the "influencer event with CRE8LUCK in Los Angeles at the Petersen Automotive Museum was a success. Lots of exciting EMAX content coming soon" is also still pinned on the official EthereumMax Telegram account (Pinned Message # 99) for investors to see in particular. In addition, the EthereumMax Telegram page

---

[2] EthereumMax (@EthereumMax), TELEGRAM, https://t.me/EthereumMax (last visited Dec. 21, 2022).

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

promotes as part of its "Business of the Week" and "Vender of the Week" promotions, businesses like aerial photography business Diablo Drone Services located "in the California bay area" and cannabis delivery service CVALT located in Alameda, Tulare, Fresno, and Kern Counties, which have started "accepting payments" in EMAX Tokens.

## FACTUAL ALLEGATIONS

### EthereumMax Background

31.     EthereumMax is a cryptocurrency-related project founded by Justin Maher, Steve Gentile, Giovanni Perone, and at least seven other undisclosed individuals.[3]  Maher and others funded the development and creation of the EMAX Token.

32.     The EMAX Tokens are blockchain-based digital assets known as "ERC-20 tokens" that are created using the Ethereum blockchain.  After an ERC-20 token is created, it can be traded, spent, or otherwise transacted with.

33.     EMAX Tokens were not sold on popular centralized exchanges like Coinbase or Gemini, which generally require that the tokens be compliant with local laws and regulations.  Instead, the EMAX Tokens traded exclusively on decentralized exchanges, like Uniswap, that allow anyone to list and sell their tokens.

34.     Uniswap and other decentralized exchanges are known as "automated market makers" which use liquidity pools and smart contracts to allow investors to exchange one asset for another without a direct counterparty.  Users called liquidity providers add an equal value of two tokens into a smart contract pool to create a market.  When executing a trade on a decentralized exchange, an investor does not have a counterparty and is instead executing the trade against the liquidity in the liquidity pool.  In order to execute trades on a decentralized exchange, users must pay

---

[3]     *See* DeFi Angels, *Defi Angels Illumination Series: EMAX Cofounder, Justin Maher dishes the real story behind EMAX*, YOUTUBETELEGRAM (Sept. 28, 2021), https://www.youtube.com/watch?v=EkBOlCK3cuU.

1  "gas fees" in order to process the transaction on the Ethereum blockchain.  The gas
2  fee can be significant, as it takes into account the amount of computing power needed
3  to process the transaction, as well as the amount of traffic on the network.

4      35.    The EMAX Tokens were primarily traded against Ether, the native
5  currency of the Ethereum blockchain network.[4]

6      36.    At inception, Maher was ranked seventh out of the ten original founders
7  in terms of ownership interest in EthereumMax, with a 5.9% stake in the project.

8      37.    The developer held the number one rank with 23% ownership interest.

9      38.    After an initial failed attempt to launch the EMAX Tokens, Maher
10  tapped into a network of 20 traders of collectibles he knew prior to creating
11  EthereumMax to assist in the operation and promotion of the EthereumMax project.
12  These individuals previously served as the moderators for the social media accounts
13  for the cryptocurrency, Shiba Inu coin.  Between them, this group had upward of
14  400,000 followers across their various social media accounts.

15      39.    Maher tasked this group to work as the moderators for the various
16  EthereumMax social media accounts, including those on Facebook, Instagram,
17  Twitter, Telegram, Reddit, and Discord.  In particular, the group was meant to "shill"
18  the EMAX Tokens to their followers, enticing potential investors with claims that the
19  EMAX Tokens were up "8000%" (after the EMAX Token price had been artificially
20  inflated) and would continue to rise.  Maher himself served as the administrator/
21  moderator of the EthereumMax Facebook page.

22

23

---

[4]    EthereumMax has no connection to the second largest cryptocurrency, Ethereum.  This name association appears to be an effort by the Company and the Executive Defendants to mislead investors into believing that the EMAX Tokens were a part of the Ethereum network (when they are not).  It would be akin to marketing a restaurant as "McDonald'sMax" when it had no affiliation with McDonald's other than the name similarity and the fact that both companies sell food products.  In fact, the founder of Ethereum, Vitalik Buterin, called for Kardashian to be "cancelled" for her shilling of EMAX Tokens. *See* Grand Amphi Théatre, *Vitalik Buterin: Things that matter outside of defi*, YOUTUBE (July 21, 2021), https://www.youtube.com/watch?v=oLsb7clrXMQ&t=793s.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

40.     According to Defendant Davis, he created the "roadmap" for EthereumMax following the failed launch.  Davis also admitted that about half of the EthereumMax founders were "literally in there to pump and dump.  They said the wallets were locked, they were not.  It was all just like handshake deals, . . . but you need to respect that."[5]   Davis further described this undisclosed half of the EthereumMax development team as "scumbags, absolute scumbags."  Davis did, however, reveal that the name of one of the individuals he was referring to "rhymes with Gio Perone."[6]

41.     Upon information and belief, one of the other individuals that Davis was referring to was Defendant Jona Rechnitz.

42.     Rechnitz is a convicted felon whose brazen criminality played an instrumental role in effectuating two aspects of the EthereumMax scam.  First, Rechnitz secured the Promoter Defendants' agreements to shill EthereumMax without disclosing their connection to him or the payments they each received for the solicitations.  Second, Rechnitz, along with co-conspirators Mayweather, Pierce, Maher, and Davis, personally traded EMAX Tokens based on insider knowledge of the timing of the celebrity promotions.  Rechnitz has close personal and business connections to Promotor Defendants Pierce, Mayweather, Kardashian, Brown, and was the key player in securing their assistance in this scheme.

43.     In 2016, Defendant Rechnitz pled guilty to honest services fraud in connection with a wire fraud conspiracy and bribery scheme involving the New York City mayor's office and the New York Police Department's Correction Officer's Benevolent Association.[7]   Following his guilty plea, Rechnitz began to cooperate

---

[5]     Emax Holder, *RussPodcastsCompilation*, YOUTUBE (Nov. 11, 2022), https://www.youtube.com/watch?v=gwrmpNHHVfw.

[6]     *Id.*

[7]     *See generally USA v. Rechnitz*, 1:16-cr-00389 (S.D.N.Y.).

with authorities in connection with their ongoing investigation and later testified at
trial of his co-conspirators.

44.     At the trial of his co-conspirator Norman Seabrook, government
prosecutors elicited testimony from Defendant Rechnitz describing instances in
which he had lied to law enforcement officials, failed to report certain income,
fostered illegal relationships with members of the New York City Police Department,
bribed New York police officers in exchange for various illegal privileges, bribed
New York politicians in order to secure access and the promise of future benefits
from said politicians and their staffs, violated election laws by fundraising by way of
"straw donors," procured a police chaplaincy despite not having religious credentials,
and solely for purposes of obtaining the prestige and privileges associated with that
title, and lied about owning certain properties in order to impress others.[8]

45.     Similarly defense attorneys elicited testimony from Rechnitz at trial
detailing instances in which Rechnitz reported a $59,000 watch lost, received
proceeds from his insurance to cover the loss, found the watch, and did not notify his
insurance company, fraudulently obtained an insurance policy for his family,
submitted false documents in a firearm application, pretended to hold no interest in a
real estate property (when in fact he did hold an interest) to deceive the property's
tenant in a purchase negotiation, gave Christmas presents and jewelry to the family
of a police officer in exchange for a private police escort to the airport and a dedicated
private lane in a crowded tunnel, and had even invoked the fact that his grandparents
were Holocaust survivors to mislead FBI investigators in their investigation of his
illegal relationships with police officers.[9]

46.     The Court observed that Jona Rechnitz is "somebody who looked out
for himself above all costs, that Jona Rechnitz was always in it for Jona.  That Jona

---

[8]     *See,* Order Denying Motion for a New Trial, *USA v. Seabrook*, No. 16-cr-467
(S.D.N.Y.) ECF No. 325.
[9]     *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

Rechnitz[, in] other words, was a creature of incentive."[10]  In its sentencing memorandum, the government noted that "Rechnitz was in a position to cooperate regarding a broad range of subject matters in part because, for several years beginning when he was 26 years old in 2008, Rechnitz rode a wave of unbridled ambition and a seemingly limitless sense of entitlement through a series of misdeeds.  Rechnitz had been a brazen criminal, and the seriousness of his crimes of conviction cannot, and should not, be minimized."[11]

47.    In summarizing Rechnitz's involvement in the scheme, Judge Hellerstein of the Southern District of New York wrote that "The record evidence establishes that Rechnitz was the arranger and prime mover of the bribery conspiracy and sought to extract as much money as possible" from the victim.[12]  With respect to Rechnitz's financial discrepancies, Judge Hellerstein wrote that "Rechnitz claimed that a Bugatti sports car belonged to Floyd Mayweather and that the diamonds were stolen from him, failing to explain how he could put up in collateral a Bugatti that he claims not to own, or non-existing diamonds that he says were stolen from him." Judge Hellerstein concluded that Rechnitz "continues to refuse to disclose his finances fully, and he continues to engage in substantial transactions requiring large amounts of assets which are inconsistent with the poverty he asserts.  The financial information he provided to the probation officer and to this court is totally unreliable."[13]

48.    Rechnitz was ultimately sentenced to five months incarceration, three years supervised release, and was ordered to pay $12 million in restitution.[14] Rechnitz is currently out on bond pending his appeal of the restitution.

---

[10]    *Id.*

[11]    *See USA v. Rechnitz*, No. 1:16-cr-00389 (S.D.N.Y.) (ECF No. 70).

[12]    *See* Opinion and Order Granting Motion for Restitution, *USA v. Rechnitz*, No. 1:16-cr-00389 (S.D.N.Y.) (ECF No. 156).

[13]    *Id.*

[14]    *Id.*

49.     Following his conviction, Defendant Rechnitz's father Robert Rechnitz, a businessman with political connections, funded a bond with the court to release his son from prison and made significant efforts to help his son resume business relationships in California.

50.     Prior to that, Rechnitz first went to Florida in order to explore becoming involved with digital assets and cryptocurrencies.  Upon information and belief, while there, Rechnitz first met with Defendant Perone.

51.     After making that connection, Rechnitz and his wife moved to California and started a jewelry business through two similarly named entities, Jadelle Inc. and Jadelle Jewelry and Diamonds, LLC, whose purported marquee client was the Kardashian family.

52.     Through their jewelry business, Defendant Rechnitz and his wife promoted and advertised political and powerful celebrity connections to create a false sense of credibility about themselves and their business, posting photos on their social media of Defendant Kardashian and other members of her family wearing their jewelry.  For example, Defendant Kardashian wrote on instagram that "New jeweler alert ⚠ Follow @jadellebh for the 💧"[15] and has made numerous posts promoting Jadelle.[16]  Jadelle posted on its Facebook a picture of Defendant Kardashian wearing Jadelle jewelry stating "The gorgeous @kimkardashian glowing in her custom @jadellebh necklaces."  Defendant Kardashian's sisters Kourtney Kardashian[17] and Kylie Jenner[18] have posted advertisements for Jadelle.  Defendant Kardashian's

---

[15]     Pinterest, https://www.pinterest.com/pin/600597300287966070/.

[16]     Kellie Chudzinski, *Kim Kardashian flaunts her curves and toned abs in crop top and skintight skirt as she stops by Ulta to see her new KKW Beauty displays*, DAILY MAIL (Oct. 23, 2019 9:46 AM) https://www.dailymail.co.uk/tvshowbiz/article-7603407/Kim-Kardashian-reveals-curves-toned-abs-tight-two-piece-outfit-Ulta-visit.html.

[17]     Alina Torres, *Kourtney Kardashian explota contra sus hermanas*, ENPAREJA (Dec. 17, 2019 5:32 PM), https://www.enpareja.com/break/Kourtney-Kardashian-explota-contra-sus-hermanas-20191217-0041.html.

[18]     Pinterest, https://www.pinterest.com/pin/430586414376243338/.

mother, Kris Jenner, has also made social media posts promoting "@jadellebh" bracelets.



53.     In August 2021, MJS Diamond alleged in a complaint for fraud and civil theft that Defendant Rechnitz portrayed himself as a successful jeweler and salesman to several celebrities and athletes like Kim Kardashian and Floyd Mayweather.[19] Likewise, Oved Anter & First International Diamond alleged in June 2020 that Defendant Rechnitz used ties to the Kardashian family to create a false sense of credibility about themselves and their business, posting photos on their social media of Defendant Kardashian and her sister Kylie Jenner.[20]  In connection with his guilty

---

[19]     *See MJS., Inc., v. XL Specialty Company and Jona Rechnitz;* Case No. 20STDV08082 (Cal. Sup. Ct. Los Angeles Cty.).

[20]     *See Oved Anter & First International Diamond Inc. v. Jona Rechnitz,* Case No. 20STCV23877 (Cal. Sup. Ct. Los Angeles Cty.).

plea sentencing, Rechnitz proudly told his sentencing judge about partying with Defendant Kardashian, claiming that it showed he was a hardworking jeweler.[21]

54. Bankruptcy proceedings in this District for these Jadelle Jewelry entities demonstrate numerous examples of Defendant Rechnitz's misrepresentation and bad faith. *See In re Jadelle Jewelry & Diamonds, LLC*, No. 2:20-bk-13530-BR (Bankr. C.D. Cal. June 23, 2020), ECF No. 83 at 9 (noting, among other things, that "the assets may have been dissipated by the Rechnitzs and that there may be millions of dollars in missing jewelry, which the Court considers to be in dire need of investigation by the chapter 7 trustee").

55. Defendant Rechnitz is also a close personal friend, business partner, and member of the "inner circle" of Defendant Mayweather. Rechnitz is a member of "The Money Team" and is listed as a collaborator in Defendant Mayweather's GOAT (greatest of all time) documentary series.[22] Rechnitz has control over ticket sales and resulting proceeds for Defendant Mayweather's recent exhibit boxing matches. Rechnitz has been photographed sitting next to Defendant Mayweather courtside at Los Angeles Lakers games.[23] The NBA connection is particularly notable as Rechnitz previously used pricey NBA tickets to create fraudulent invoices to launder his bribe money.[24] Rechnitz recently partied "the night away" at Art Basel in 2022

---

[21] Emily Saul, *DeBlasio donor-turned-informant Jona Rechnitz sentenced to 10 months*, NEW YORK POST (Dec. 19, 2019), https://nypost.com/2019/12/19/de-blasio-donor-turned-informant-jona-rechnitz-sentenced-to-10-months/.

[22] *Floyd Mayweather Making 'Last Dance' Style Docuseries . . . 'The GOAT'*, TMZ (Oct. 6, 2022, 10:00 AM), https://www.tmz.com/2022/10/06/floyd-mayweather-signs-deal-docuseries-show-last-dance-the-goat-boxing-tbe/.

[23] *Floyd Mayweather Makes Good on Promise . . . Sends Kids to Clips Game*, TMZ (Oct. 31, 2022, 9:04 AM), https://www.tmz.com/2022/10/31/floyd-mayweather-gifts-young-fans-tickets-clippers-game-lakers/.

[24] *Hedge Fund Founder Pleads Guilty To Fraud In Connection With Bribery Of Former Correction Officers Union Leader*, U.S. Dep't Of Just., U.S. Att'y Off., S.D.N.Y. (May 25, 2018), https://www.justice.gov/usao-sdny/pr/hedge-fund-founder-pleads-guilty-fraud-connection-bribery-former-correction-officers.

14

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

with Defendants Mayweather and Kardashian.[25]   TMZ recently reported that Defendant Mayweather gifted Defendant Rechnitz a custom jacket.

56.     Until recently, Defendant Rechnitz was also close personal friends with Defendant Antonio Brown.  After a falling out, Defendant Brown has "aired the dirty laundry" between the two on Instagram, publishing text messages regarding a $415,000 payment for fake high end Richard Millie watches.



---

[25]     Jeroslyn JoVonn, *Floyd Mayweather drops over $4M on Art Basel Pieces by Warhol, Rober Indiana, and Alexander Calder*, BLACK ENTERPRISE (Dec. 2, 2022), https://www.blackenterprise.com/floyd-mayweather-drops-over-4m-on-art-basel-pieces-by-warhol-robert-indiana-and-alexander-calder/.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

57.   In another text message authored by Rechnitz, he bragged about his associations with Promoter Defendants Mayweather, Kardashian, and Brown and cavalierly refers to how he "bribed the mayor of NYC":

Floyd fucks with me

Kim fucks with me

Ab fucks with me

Floyd and Kim going strong 10 + years

Shit happened.

I bribed the mayor of NYC and cops and got jammed up in 2016

Simple Answer



SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

58. On May 14, 2021, the Executive Defendants launched the EMAX Tokens with a transaction volume of $16.11 million and a price of $0.00000005875, according to data from CoinMarketCap.[26]

59. Liquidity pools were created on Uniswap to allow users to purchase EMAX Tokens with Ether. Wallets associated with Defendants continually provided EMAX Tokens to the pool as retail investors provided Ether to purchase EMAX Tokens.

60. At the time of launch, and throughout the Relevant Period, the EMAX Tokens were not sold pursuant to a "whitepaper." Whitepapers in cryptocurrency are documents released by the founders of the project that gives investors technical information about its concept, and a roadmap for how it plans to grow and succeed.

61. Subsequently, however, the Company did release a whitepaper in October 2021 entitled: "EthereumMax – Disrupt History," which explained the business model for EthereumMax and described its activities during the Relevant Period.

62. According to the Company, "[w]e launched EMAX with a vision to bridge the gap between the emergence of community-driven tokens and the well-known foundational coins of crypto, creating a unique token that provides lifestyle perks with financial rewards and incentives to its holders with a pathway for practical long-term use in everyday life."[27] The founders' "approach to bridging this gap was to simplify the complex and instill confidence through a trusted circle that can provide guidance and instill trust."[28]

---

[26] *Historical Data for EthereumMax*, CoinMarketCap, https://coinmarketcap.com/currencies/ethereummax/historical-data/ (last visited Dec. 19, 2022).

[27] *See* Whitepaper, *EthereumMax – Disrupt History*, EthereumMax, 5 (Oct. 2021), https://ethereummax.org/wp-content/uploads/EthereumMax-White paper-v1-Final.pdf.

[28] *Id.* at 7.

63.     In plain terms, EthereumMax's entire business model relies on using constant marketing and promotional activities, often from "trusted" celebrities, to dupe potential investors into trusting the financial opportunities available with EMAX Tokens.  The whitepaper was reviewed by ICOLAW P.C., a law firm located in Los Angeles, California.

64.     The Company later even bragged in its whitepaper that its "expertise in marketing strategy and managing relationships" was a "key area" for EthereumMax's successful promotional efforts in the preceding six months (*i.e.*, the Relevant Period):

> Each week we track and analyze our marketing efforts, continuing to make strategic modifications to optimize engagement for week-over-week improvements and impact.  If we can do all of this in less than 6 months, imagine what the future holds?  The best is yet to come.[29]

65.     This so-called expertise in "marketing strategy and managing relationships" came primarily from three individuals: Defendants Perone, Maher, and Rechnitz.  Upon information and belief, Rechnitz was either (1) one of the undisclosed founders of EthereumMax, or (2) brought in by Perone and/or Maher prior to the launch of the EMAX Token to help the Execute Defendants recruit the Promotor Defendants.

66.     Rechnitz provided the Executive Defendants with access to several high-profile celebrities that were willing to tout EMAX Tokens in exchange for under-the-table payments and the ability to frontrun EMAX Tokens investors.  For example, as Davis subsequently disclosed, Davis and the Executive Defendants were able to recruit Mayweather as an EMAX Token promoter due to them having "two degrees of separation" from Mayweather (*i.e.*, via Rechnitz).

**The Pump – Shilling EthereumMax**

67.     On May 14, 2021, the day of the EMAX Token launch, Defendant Maher posted a promotion and solicitation for EMAX Tokens on the

---

[29]     *Id*. at 48.

"InRussWeTrust" Facebook page (which was owned and operated by Defendant Russell Davis).  Specifically, the following post showed a screenshot of the financial metrics for the EMAX Tokens and displayed a "466,590.48%" increase in the EMAX Tokens price over a 24-hour period:



68.     The next day, after the price of EMAX Tokens sharply decreased, Maher made the following post on Facebook to ease concerns from EMAX Token investors and encourage further purchasing and/or holding of the tokens:

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

I've been getting a lot of questions about this being a rug pull or a dump and dump. It's easy to be pessimistic when you see a 50-75% drop in a day much less a half hour. After further look though the massive sell off came from one single account, that bought 35 ETH worth of coins and sold off his entire position after a sharp bump. This cause a cascade of panic selling wiping out all the gains from the day. You can view his account, he does this regularly to new alt coins at our stage of the game.

The good news, neither of the two largest accounts sold a single penny. These are held by the coin developers and their marketing team. After speaking with the development team they've assured us that aside from marketing expenses they will not sell off any of their position for at least six months.

If you've invested in new coins before (Shiba, Kishu, etc.), you'll have been through this ride already. The lessons we've learned from those coins, is that in turbulent times, it's actually best to do nothing. That's naturally hard to do when you see a dramatic movement, so have a plan in place for what your goal is and stick to it. Don't feel bad about taking small profits to the sideline as the coin appreciates. This will help you let the rest ride without letting your emotions get in the way.

There's going to be a lot of bumps along the way. Stay strong, and hold tight. #EthereumMax

69. On May 16, 2021, the EthereumMax Instagram account posted the following promotion titled the "EthereumMax Pre-launch Kickoff" (the "Pre-launch Kickoff post"), which touted, among other things, how (1) the EMAX Tokens grew "500,000+% in the first 24 hours"; (2) the Executive Defendants had "locked in partnership with global digital marketing agency" and "lined up a knockout influencer" for a "nationwide campaign"; and (3) "We are 3 days in with ~$100M market cap and the train is just getting rolling":[30]

---

[30] EthereumMax (@ethereummax), INSTAGRAM (May 16, 2021), https://www.instagram.com/p/CO87bQ0srEF/.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19   70.   On May 17, 2021, Maher issued the following statement regarding the

20   Prelaunch Kickoff Post from the EMAX team:

21
22
23
24
25
26
27
28

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163



**Justin Maher**
🐦 · 17 May 2021 · 🌐                                    · · ·

Hey guys,
I know everyone probably saw the brief release last night from the Emax team. While they can't let out all their information I can tell you after talking with their marketing team last night that there are exciting moves going on behind the scenes between celebrity endorsement and partnerships with major corporations.

Anyone telling you this is a scam or pump and dump has no idea the bigger picture on where this coin is going to be taken.

As always with crypto or any security, invest responsibly, risk what you can afford to lose. There are many whales in there right now making waves in the day to day trades. So try not to time this market right now, try to take emotion out of the decisions. You may buy in right before a brief dip or correction. Those are to be expected when you have such a meteoric rise in such a short period of time. Long term this is a hold all the way.

#EthereumMax

 84                                          64 comments

71.     On May 18, 2021, Defendant Davis posted to his followers that it was "Not too late for Emax and Bezoge!  Just the start!"

72.     As the subsequently released whitepaper acknowledged, the Executive Defendants actively recruited and retained the Promoter Defendants to serve as the promotors for the launch of the EMAX Tokens in May 2021.

73.     The Promotor Defendants are sophisticated public figures with familiarity and experience with endorsement contracts.

74.     Upon information and belief, the Promoter Defendants received EMAX Tokens and/or other forms of consideration as part or all of their compensation for promoting EthereumMax.

75.     For example, a combined search of the Ethereum Blockchain Explorer ("Etherscan") and the non-fungible token marketplace OpenSea shows that a wallet owned/controlled by Pierce received and sold millions of dollars' worth of EMAX Tokens while Pierce simultaneously promoted EMAX Tokens to investors.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

76.     As a starting point, on May 28, 2021, Pierce posted a screenshot of his trading account with 15,858,700,526,204.817 EMAX Tokens valued at "\$2,520,087.34," which had increased "83.34% (\$1,145,469.23)" on the one-day chart.[31]  The caption to the image posted by Pierce contained the following string of emojis:



77.     Notably, while Pierce covered up his wallet's actual address, he left the unique image displayed as the wallet's profile picture unredacted.  This image is a direct match to an image associated with wallet address 0x70f5a6ebc69087996ce5eb94b799e15994beae10 on the OpenSea exchange.  An examination on Etherscan of some of the other digital assets within Wallet 0x70f5A6 shows additional connections to Pierce, further confirming that Wallet 0x70f5A6 [32].  For example, Wallet 0x70f5A6 trades in Ethernity tokens.  Pierce has direct connections to Ethernity via his participation in a celebrity charity poker tournament

---

[31]     Paul Pierce (@paulpierce34), TWITTER (May 28, 2021, 8:07 AM), https://twitter.com/paulpierce34/status/1398294745806299139?s=20&t=V-OgyFf-y6rqaCh_CgzpGg.

[32]     https://etherscan.io/address/0x70f5a6ebc69087996ce5eb94b799e15994beae10.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1 sponsored and/or promoted by Ethernity[33]  Pierce even played at the same table

2 with Ethernity's CEO, Nick Rose, on September 26, 2021.

3      78.    An examination of Pierce's wallet's trading activity in conjunction with

4 Pierce's social media activity shows that Pierce made millions of dollars trading (and

5 selling) EMAX Tokens while simultaneously promoting the tokens to investors as

6 sound long-term investments.

7      79.    Initially, on May 24, 2021, after making a small transfer of

8 approximately $13,350 (seemingly as a test to confirm that the transfer between

9 wallets could be done successfully), Pierce's wallet received an "airdrop" of

10 approximately 15 trillion now-defunct EMAX Tokens from the beta version of the

11 EthereumMax deployer wallet.[34]

12      80.    On May 25, 2021, Pierce received an approximate equivalent of 15.4

13 trillion new EMAX Tokens via the EthereumMax deployer wallet, valued at around

14 $1,350,000 in cash at the time.  That same day, Pierce also additionally purchased

15 around 110 billion EMAX Tokens for about $10,000.[35]

16      81.    On May 26, 2021, Pierce received approximately 247 billion additional

17 EMAX Tokens from a second EthereumMax deployer wallet "airdrop."[36]

18

19

20

21

---

22 [33]    blockchainnews, *Paul Pierce, Phil Ivey, Mr. Beast and Joe Lubin Tonight In*

23 *Virtue Poker's Awaited Celebrity Charity Poker Tournament*, THE CRYPTO BASIC (Sept. 26, 2021), https://thecryptobasic.com/2021/09/26/paul-pierce-phil-ivey-mr-

24 beast-and-joe-lubin-tonight-in-virtue-pokers-awaited-celebrity-charity-poker-tournament/.

25 [34]    A "deployer wallet" refers to the original wallet or central interaction point

26 for a token's liquidity.

[35]    https://etherscan.io/token/0x15874d65e649880c2614e7a480cb7c9a55787ff

27 6?a=0x70f5a6ebc69087996ce5eb94b799e15994beae10.

[36]    https://etherscan.io/address/0x7e3c20044ac242acc6340d73ab56f7a7b3054

28 11d#tokentxns.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

82.     That same day, Pierce promoted EthereumMax in a widely discussed post on the social media platform Twitter during an online dispute between Pierce and the television broadcasting network ESPN.[37]  Prior to the May 26 post, Pierce had worked for ESPN as a popular sports analyst and commentator until he was fired for an unrelated video he had previously posted to his social media account.  After his firing, Pierce publicly slammed ESPN while conversely praising EthereumMax's ability to make money for him at the same time:



83.     The trading volume for the EMAX Token exploded as a result of Pierce's post and the Company's announcement that it was partnering with Defendant Mayweather, Jr. (discussed further below).  On May 26, 2021, the volume reached $44.43 million – **almost five times higher than the previous day**.[38]  Then, on May

---

[37]     *See, e.g.*, Jenna Lemoncelli, *Paul Pierce's ESPN revenge after firing over stripper video*, N.Y. POST (May 26, 2021), https://nypost.com/2021/05/26/paul-pierce-slams-espn-with-cryptocurrency-claim/.

[38]     *EMAX – EthereumMax 3 Historical Price Data*, NOMICS, https://nomics.com/assets/emax3-ethereummax-3/history/3 (last visited Dec. 20, 2022).

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1    27, the volume more than doubled, reaching \$107.7 million.[39]  That same day, Pierce
2    purchased an additional 120 billion EMAX Tokens.[40]

3        84.    Then on May 28, 2021, as noted above, Pierce again promoted EMAX
4    Tokens' price growth to his followers on Twitter, boasting about the one-day increase
5    in the EMAX Token price of over 83%.[41]

6        85.    On May 29, 2021, the very next day, Pierce enacted 118 sells, totaling
7    approximately 8.4 trillion EMAX Tokens that were valued at around \$5,500,000 at
8    the time.  Pierce then capitalized further on his successful pump of the EMAX Tokens
9    trading volume.  Pierce made 12 buys totaling 1.214 trillion EMAX Tokens, then
10   immediately turned around and sold those 1.214 trillion EMAX Tokens plus an
11   additional 680 billion EMAX Tokens (*i.e.*, 1.89 trillion EMAX Tokens in total).[42]

12       86.    From May 30, 2021 to June 2, 2021, Pierce amassed another 2.5 Trillion
13   EMAX Tokens through numerous buys and sells.[43]

---

[39]    *Id.*

[40]    https://etherscan.io/token/0x15874d65e649880c2614e7a480cb7c9a55787ff
6?a=0x70f5a6ebc69087996ce5eb94b799e15994beae10.

[41]    *See* n.31, *supra*.

[42]    https://etherscan.io/token/0x15874d65e649880c2614e7a480cb7c9a55787ff
6?a=0x70f5a6ebc69087996ce5eb94b799e15994beae10.

[43]    https://etherscan.io/token/0x15874d65e649880c2614e7a480cb7c9a55787ff
6?a=0x70f5a6ebc69087996ce5eb94b799e15994beae10.

87. On May 30, 2021, Pierce posted the following tweet[44], promoting Ethereum Max:



88. Three days after falsely telling investors he was in it "for the long haul" with EthereumMax, Pierce sold approximately 9.7 trillion EMAX Tokens worth approximately $1,300,000.[45]

89. On June 6, 202 (i.e. the day of the Mayweather-Logan fight), around 97.4 billion EMAX Tokens were transferred to Pierce's wallet. That same day, Pierce promoted EthereumMax to investors, falsely stating that he was going to "double down" on Ethereum Max.[46] Two days later, Pierce sold over 98% of those 97.4 billion EMAX Tokens.

90. On July 13, 2021 (*i.e.*, the day that Kardashian promoted EMAX Tokens to her 250 million followers on Instagram), Pierce traded EMAX Tokens, selling off approximately 1.17 trillion EMAX Tokens.[47] Similarly, around that same time frame, Pierce received over 462 billion EMAX Tokens from wallet address

---

[44] Paul Pierce (@paulpierce34), TWITTER (May 30, 2021, 7:41 AM), https://twitter.com/paulpierce34/status/1399013195151417345?s=20&t=qpvEL-yI0O2jszrSIxCfcA.

[45] https://etherscan.io/token/0x15874d65e649880c2614e7a480cb7c9a55787ff6?a=0x70f5a6ebc69087996ce5eb94b799e15994beae10.

[46] Paul Pierce (@paulpierce34), TWITTER (June 5, 2021, 10:40 PM), https://twitter.com/paulpierce34/status/1401413650691280899?s=20&t=SrB147wN07nQ8YSjpC6-PA.

[47] https://etherscan.io/token/0x15874d65e649880c2614e7a480cb7c9a55787ff6?a=0x70f5a6ebc69087996ce5eb94b799e15994beae10.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

0x2671663ff57fdb0ee8a8613286802ae4d1c72428, which, upon information and belief, is controlled and/or operated by the Executive Defendants.[48]

91.　Pierce had access to material, non-public information about the timing of various celebrity promotions of the EMAX Tokens (including his own), and improperly used that information to perfectly time his trades of EMAX Tokens to maximize his ill-gotten profits.

92.　These complicated transactions demonstrate a pattern by which Pierce and other promotors, including the Promoter Defendants, are given tokens as a payment for promotions, they go out and post about the tokens on social media, then turn around and sell the tokens for profit as retail investors buy in. The entire purpose of this paid promotion is for pumping and dumping the tokens based on the value created by the Promoter Defendants' direct action. Furthermore, the complexity of these financial transactions and movements between wallet address demonstrates that the Promoter Defendants understand how to both time and execute their selling strategy.

93.　Pierce was not alone with his insider trading. His friend and business associate Rechnitz was another prime culprit for this portion of the scheme. Upon information and belief, Rechnitz engaged in various forms of frontrunning his transactions with EMAX Tokens based on material, non-public information in his possession. Given Rechnitz's intimate connection to Mayweather and his being authorized by Mayweather to conduct business on Mayweather's behalf, Mayweather had actual knowledge Rechnitz's insider trading scheme. Upon information and belief, Mayweather received a cut of the money that Rechnitz generated from improperly frontrunning the celebrity promotions of EMAX Tokens.

94.　Confidential Witness #1 (CW1) is a former social acquaintance of Defendants Rechnitz and Mayweather, having first met Rechnitz in 2017 and

---

[48]　https://etherscan.io/tx/0x0c4825fcb332f9d791980b9b95903f94331c011
3a516c9b95c91e0cf18dffa0d.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

Mayweather in 2019.  CW1 lived near Rechnitz and frequently socialized with him and those in the Rechnitz orbit.  Over the years, CW1 also had conducted or explored business dealings with Defendants Kardashian and Mayweather.

95.     Beginning in May 2021, Defendant Rechnitz proposed that CW1 "get in on" the EthereumMax scam.  Defendant Rechnitz told CW1 at least ten times that he had a connection to a "garbage crypto" that would pay Defendant Mayweather to advertise on his boxing shorts during the June 6 exhibition match.  In addition to Mayweather, Rechnitz told CW1 that he and the Company were going to have Defendants Pierce and Kardashian to solicit EthereumMax sales.

96.     Defendant Rechnitz confirmed to CW1 that EthereumMax was a scam and that his celebrity promoter cohorts were aware that they were shilling the dubious EMAX Tokens for his (and their collective) benefit.  CW1 inquired as to why the celebrity promotors would engage with these solicitations, Rechnitz revealed that the Executive Defendants give the Promotor Defendants millions of tokens.  Rechnitz further disclosed that he knew exactly when these promotions would occur and used this knowledge to front run the posts and sell tokens into the market in the aftermath.  According to CW1, Defendant Rechnitz was constantly in touch with the Promotor Defendants, including Defendant Kardashian, who Rechnitz would speak with at least every few days.

97.     On one occasion taking place on or around the same time as Pierce's promotions, Rechnitz again tried to convince CW1 to get in on the scheme to front run investors.  Because CW1 was not crypto-savvy, Rechnitz once pulled out his phone and demonstrated how he made trades on his trading app immediately following a celebrity promotion.  As Rechnitz was demonstrating his illicit trading strategy, CW1 observed Rechnitz jump out of his seat, point his fingers in the air and proclaim that it was "so easy."  CW1 then saw Rechnitz dancing in a circle and

chanting "pump and dump . . . pump and dump" in an apparent victory dance for a successfully capitalizing on his inside information regarding Pierce's promotions.

98. According to transactions from the Ethereum blockchain, starting on May 19, 2021, the wallet address 0x1439caa755c82c300b9fc2cd86c9a9b2565606fd (which was identified by Defendant Maher as being owned by Rechnitz) (the "Rechnitz Wallet") began receiving trillions of EMAX tokens for free and then transferring them to various pass-through wallets. On May 26, 2021, Rechnitz received 25 billion tokens from the Deployer wallet. The Rechnitz Wallet also made several purchases of EMAX to accumulate tokens in order to better front run the celebrity endorsements.

99. After the Pierce promotions began on May 26, the Rechnitz Wallet undertook a series of transactions swapping EMAX tokens into the much more liquid token Eth (Ethereum). On May 27, 2021, for example, in a series of five transactions, the Rechnitz wallet swapped over 1.4 trillion EMAX tokens into over 81 Eth. Rechnitz then swapped this eth into tether, a stablecoin pegged to the United States Dollar. On May 28, 2021 the Rechnitz Wallets transferred billions of EMAX tokens to a "dgroot.eth" wallet address, likely in exchange for the promotional efforts of Groot Hospitality and/or Dave Grutman. Also on May 28th, the Rechnitz Wallet makes several swaps of EMAX tokens into hundreds of thousands of dollars' worth of eth and tether. The various wallets that received token transfers directly from the Rechnitz wallet display the similar behavior of swapping EMAX tokens into eth and tether in conjunction with the celebrity endorsements.

100. These EMAX Token transactions in the Rechnitz Wallet line up within the same timeframe that Rechnitz engaged in a live "pump and dump" after the price of EMAX Tokens increased due to Pierce's promotions in order to convince CW1 to join in the conspiracy to engaging in unlawful insider trading.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

101. According to CW1, besides Mayweather, Rechnitz is also a close personal friend of Defendant Pierce. Defendant Rechnitz would even bring Pierce to CW1's house to sign basketballs and shoot hoops with members of CW1's family.

102. Defendant Pierce, in turn, is also close friends with Defendant Mayweather. Pierce attended the EthereumMax-connected June 6 Mayweather bout and sat with Mayweather in the locker room prior to the fight.[49] Pierce also attended the pre-fight media scrum leading up to the fight.[50]

103. According to CW1, Rechnitz was also in the locker room with Mayweather and Pierce before the EthereumMax-promoted June 6 exhibition. Notably, Defendant Russell Davis also bragged of meeting with Mayweather prior to the match.

104. Pierce and Mayweather are also tied to Rechnitz through celebrity Jeweler Peter Marco. Marco is a jeweler connected to Pierce and who counted Mayweather as his biggest client.[51] Marco alleged in a lawsuit that Rechnitz scammed him through jewelry company Jadelle, after he was impressed with Rechnitz's celebrity connections like Defendant Kardashian. Rechnitz even introduced Marco to Defendant Mayweather. *Id.*

105. Defendant Rechnitz is currently under investigation by federal authorities in this District. In connection with his New York case, the Government

---

[49] Viral Star Videos, *Floyd Mayweather a& Paul Pierce in the Locker Room Before the Fight*, YOUTUBE (June 7, 2021), https://www.youtube.com/shorts/qHK6B8E8x-0.

[50] Sipa USA, *Former NBA player Paul Pierce attends media availability ahead of the June 6th exhibition boxing match between Floyd Mayweather and Logan Paul on June 03, 2021 at Villa Casa Casuarina at the former Versace Mansion in Miami Beach, Florida*, (June 3, 2021), https://www.alamy.com/former-nba-player-paul-pierce-attends-media-availability-ahead-of-the-june-6th-exhibition-boxing-match-between-floyd-mayweather-and-logan-paul-on-june-03-2021-at-villa-casa-casuarina-at-the-former-versace-mansion-in-miami-beach-florida-photo-by-jlsipa-usa-image430892482.html.

[51] Sha Be Allah, *Floyd Mayweather is 'Smart and on Top of His Brand' Says His Jeweler Peter Marco*, THE SOURCE (Sept. 18, 2018), https://thesource.com/2018/09/18/floyd-mayweather-is-smart-and-on-top-of-his-brand-says-his-jeweler-peter-marco/.

submitted *ex parte* and sealed correspondence concerning an ongoing investigation by the Federal Bureau of Investigation in Los Angeles and the U.S. Attorney's Office for the Central District of California for conduct unrelated to Rechnitz's prosecution or cooperation in the Southern District of New York.[52]

106. Upon information and belief, all of the Promoter Defendants received similar payments funneled by Defendant Rechnitz, including disbursements of tokens from the EthereumMax deployer wallet and/or marketing wallet or for other consideration, and cashed out shortly after engaging in their respective promotional activities in a similar manner to Pierce. At the same time, Rechnitz, Mayweather, and Perone separately entered into a conspiracy to engage in insider trading of EMAX Tokens that was correlated with the dates and times of the celebrity promotional activities alleged herein.

107. This is also why Defendants Rechnitz and Maher were a vital part of the Executive Defendants' plan for marketing the EMAX Tokens. Rechnitz has direct, longstanding personal and business relationships with Promoter Defendants Mayweather, Kardashian, and Pierce.

108. Maher has direct, familial ties to Promotor Defendant Davis. For example, Maher has a personal relationship with Russ Davis, who is his brother-in-law and business associate. According to Maher, he brought the EthereumMax project to Davis specifically to leverage Davis' cryptocurrency-investing followers on social media.

109. On or around May 16, 2021, Maher removed $10,000 from the EMAX Token liquidity pool to pay cryptocurrency influencer and promotor Russ Davis and professional football player Antonio Brown to promote EthereumMax.

---

[52] *USA v. Rechnitz*, 1:16-cr-00389 (S.D.N.Y.) (ECF No. 151).

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

110. Davis reposted the following promotion from the EthereumMax official Twitter account to his own personal "InRussWeTrustCrypto" account:[53]



111. Notably, according to Maher, the development team had "messed up" both the initial launch and the liquidity pool, leaving Maher and other insiders with a huge percentage of the available Float. Moreover, the liquidity pool was underfunded. Thus, small amounts of trading volume had a disproportionately large impact on the EMAX Tokens' price.

112. That same day, Speer promoted the EMAX Tokens in a video he posted to his personal YouTube channel, wherein Speer advised retail investors "[h]ow to buy EthereumMax."[54] Notably, Speer told retail investors about "a coin that just launched about 48 hours ago and it is taking off." Speer added that the EMAX Tokens price has "tons of room to go" and that the EthereumMax leadership team and insiders consisted of "lots of same hype and people behind it as Shiba." Speer further compared EMAX Tokens' potential to the massive surge in price that occurred with the Shiba Inu coin, claiming that the EMAX Token price was "only going up long term."[55]

---

[53] EthereumMax (@ethereum max). TWITTER (May 16. 2021, 10:41 AM), https://twitter.com/ethereum_max/status/1393984963616419842.

[54] Mike Speer, *How to buy EthereumMax*, YOUTUBE (May 16, 2021), https://www.youtube.com/watch?v=bi6ZeRzC-QQ.

[55] *Id.*

113.   Throughout the video, Speer attempted to disclaim inside knowledge of the EMAX Token by stating he was not a "crypto expert" in an effort to mislead retail investors into believing that Speer simply stumbled onto the EMAX Token accidentally instead of him being an EthereumMax founder and/or insider.   For example, Speer states that the EthereumMax website is "vague" and that "they" did not yet have a whitepaper in a misleading attempt to distance himself from the EthereumMax leadership team.

114.   In the caption to Speer's video, he explains the following 18 steps that retail investors need to take to purchase the EMAX Tokens:[56]

Step 1: Purchase your ETH on whatever exchange you use.

Step 2: Transfer to Coinbase Wallet.

Step 3: Go to https://app.uniswap.org/#/swap

Step 4: Click add token to transfer to from ETH.  **Paste in this address: 0x15874d65e649880c2614e7a480cb7c9A55787FF6.**

Step 5: Think long and hard, can you risk this money and still pay your bills?  It's a serious question.  It's ok if the answer is no.  Please do not proceed.

Step 6: **Can you leave this money in eMax for a couple of months? If yes, proceed below.  If the answer is no, the reason why you shouldn't buy is because you will be part of the reason for a price drop if you sell.  This coin is only a couple of days old as of May 16th.  Holders help the price stabilize. Paper hands drive price down**

Step 7: Click connect to wallet and click Coinbase

Step 8: Select ETH to eMax – Select the amount you want to transfer

---

[56]   *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

Step 9: Click the gear in the top right, change slippage to 10%, close gear

Step 10: Make sure you have extra ETH outside of the amount you are using to purchase for the fees.

Step 11: Press swap + confirm / accept etc.

Step 12: There won't be any dollar value in your CB Wallet because it's new

Step 13: Go to the App Store and download Zerion

Step 14: Go to your CB Wallet click receive and get your ETH address

Step 15: Go back to Zerion and click import wallet

Step 16: Paste your ETH address

Step 17: Wait a few minutes and it will populate the dollar amount.

Step 18: Enjoy and HODL

115.   As the above instructions indicate, Speer's instructions to retail investors state that EMAX Token holders should be prepared to "leave this money in eMax for a couple of months," suggesting that the EMAX Tokens were a long-term investment because "[h]olders help the price stabilize.  Paper hands[57] drive price down."

116.   The promotion from Davis and Speer kick-started the interest in and buying of EMAX Tokens.  In fact, Maher used the large spikes in price chart (actually caused by the low liquidity pool funding) to promote EMAX Tokens' potential for significant returns to investors (*see supra* 67-69).

117.   Shortly after his promotion, Davis began selling off his EMAX Tokens, causing the price of the tokens to plummet until Maher was able to reach a deal with Davis to lock up some of the massive EMAX Token holdings.

---

[57]   Having "paper hands" is a term used in cryptocurrency trading that refers to someone that sells at the first sign of a price drop.

118.     Upon information and belief, the following wallet addresses are owned/controlled by Davis and were used to conceal his transactions (*i.e.*, timing of sales) with EMAX Tokens:

- 0xe3FA73f404EA11C9Ce3DCA4B474cD99D6283134C
- 0xd0AEE2df438Ccea32194dACFf330083B04277D71
- 0x74dEc05E5b894b0EfEc69Cdf6316971802A2F9a1
- 0x663f4bf1816d771415fffa86aabc1ee273b92055
- 0xfEd37836fE065496c608E32073D0E759F96989b3
- 0xfb34b53aa6a5840ae740b9818db34b854818de85
- 0x9b1fbe51576d00d1f3a484d9c3c5c52a09866f78
- 0xacd3f3835a3dd7865560953eb745d5f8dba6ce33
- 0x037a7c7c8bAAbBd64aC735F505deF3423528dbA5
- 0x5e47AAE49eAA9D176E3c09b6bc0844BdfBBa27e0
- 0x027A16926de9f38523a71d19d6998923085Dc093
- 0xeB3E690C8ee0299B18Fa40B9B21F54c690b00a7b
- 0x05e45ebBFD62b5E448e0073ABFB4a956FE13f4d1
- 0xE7494f0D06142c70eF1382bb4F5629bA3B377FCd
- 0x35278BF7f391285818F9092c860D698010802f7D
- 0xbcac50256345775e4bbff526b247b3d68a0f10ca
- 0xe277f115a3758e802e40869545646f8142be00ca
- 0x0eb5101719662a00bf4c22e03374a7ffd11f4092
- 0x45f433ae7553900d7ae7af8a1b0d35c3eb7ece46
- 0xce3e48caeb5d0e9124b2b1dcab8b47818fcedc7
- 0x47bA7f557a361A12BB1b28DA1Fb3323dc7C942f4
- 0xd7292AA5924D4f536B9E996cB7FC4bE21b6c3357
- 0xDF6300635c490408C393c1DAdBE7Ba8e88cdBb8B
- 0xBa299a1FE0Da7B443Bf444FDCd0C2a5F2506D2B1

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

- 0x77Dc423692480979DFdC904278D3d0ec0474782d
- 0xfF773b585638D599C64d8ac02e73D12bd9807C30
- 0x97758D2C5533663042D72d5389Ef4Bb5c89EAe60
- 0xe3254c36fEedF4211D405718702a0389f5871c85
- 0x1C58CE90Fa5A610649Ab172000F41b909A9Efc83
- 0x761493a52595F7016493b4a7515180d504CdF28f
- 0x1711bc52bf7e0494325799717fe640F1924617B7
- 0x53061173fbf4CD5886b01d1c68DA266A9B479E1b
- 0x4e28ab721c1C3180A82B6a758C081f9Cc4CDd702
- 0x233834E733EFf003598e8B6eD1082C984a1E8D53
- 0x967f1dC29158486eBE771942e094C41B0AD7F57d
- 0x1C473aFE50E060AD872Fb1a209C6b2F257Bdbd5B
- 0x4a302Af80dc286714fE22db4855B5024317449eB
- 0x7fFA930D3F4774a0ba1d1fBB5b26000BBb90cA70
- 0x2930662Fa96cA799C9913264B83E227C7f828105
- 0xbe3167f8687d0f6b81a053f938ae335333eeb549
- 0x1e7a2e2bbea1362d49c06951f3265d9d6bc90386
- 0x64fba1c5e31d8f7ee0194f67ed9c5fed1a17b241
- 0xe477aE0b50f2985592BDc1e5aC91f59c93111955
- 0xacD3f3835A3dd7865560953eb745d5F8dbA6CE33
- 0x74dEc05E5b894b0EfEc69Cdf6316971802A2F9a1
- 0x69c97ceb87f0b121d92a3aa57bf7845d2dda4e3e

119. On May 19, 2021, the Executive Defendants posted a message to investors on the EthereumMax Instagram account, with a caption that stated: "Accepted at top global exchanges ✅ Roadmap and White Paper coming ✅ Hired marketing agency ✅ Influencer campaign initiated ✅ Real-world applications . . . 👀 #disrupthistory $eMax #TellYourGrandma." The message itself stated:

To the eMax community,

As we quickly approach our first full week of being live, we as a team could not be prouder to see the rapid growth and expansion of not only the token itself, but the strong community that eMax has built. We've just weathered one of the biggest crypto drops in history, better than any other token. Consumers are now looking beyond products and services. They want benefits, and $eMax holders have seen the impact of a 2% benefit. We've broken down barriers, soared past goals, and have achieved more than expected from any other new crypto currency out there.[58]

120. On May 21, 2021, Speer uploaded another video to his YouTube channel promoting EthereumMax generally and specifically providing investors with instructions on how to purchase EMAX Tokens.[59] Again, Speer did not reveal to investors that he was a part of the EthereumMax leadership team.

121. Two days later, on May 23, 2021, Speer uploaded an audio recording from Perone to Speer's YouTube channel,[60] wherein Perone states that EthereumMax's use of "high level" brand ambassadors and promotors "legitimized" the project. Perone also touted the "technological upgrades" that were on the way for the EthereumMax project. Perone repeatedly proclaimed that he will be meeting retail investors "on the moon" when the price of EMAX Tokens rises after the marketing campaign created by the Executive Defendants and executed by the Promotor Defendants was successful.

122. According to Maher, the Executive Defendants were "wildly connected" and understood the impact that celebrity promotion and marketing could have on the price and trading volume of the EMAX Tokens. Upon information and belief, the Executive Defendants leveraged their respective contacts to recruit additional celebrities to promote the EMAX Tokens in exchange for a portion of the Float.

---

[58] EthereumMax (@ethereummax), INSTAGRAM (May 19, 2021), https://www.instagram.com/p/CPE3yvtsQNo/.

[59] Mike Speer, *Buying Ethereum Max? Gas Fees? Buying The Dip? WTF*, YOUTUBE (May 21, 2021), https://www.youtube.com/watch?v=3CZv0FFn7S8.

[60] Mike Speer, *EthereumMax – MAYWEATHER v. PAUL – "Culture Coin" Announcement*, YOUTUBE (May 23, 2021), https://www.youtube.com/watch?v=HMbWVXUWB5I.

123. For example, early on Defendants Maher, Perone, and Davis worked with Rechnitz to recruit world champion boxer, Floyd Mayweather, Jr. as EthereumMax's "marquee" promotor for a fee of $1,000,000 as his "first down payment" and then $1,500,000 as a second payment. Notably, "everything that was sent to Mayweather was in Ethereum and cashed out immediately."[61] According to Maher, Mayweather's representatives refused payment in EMAX Tokens and instead received payment in Ethereum, which has significantly more price stability. In order to raise the Ethereum needed for Mayweather's payment, Maher and Davis sought out large holders of Ethereum and offered them a "sweetheart" deal relative to the amount of Ethereum needed for celebrity promotion payments. For example, in exchange for providing $500,000 worth of Ethereum, they would give the Ethereum provider $2,000,000 of EMAX Tokens. As Maher observed, however, most often, the Ethereum provider would then immediately sell the $2,000,000 in EMAX Tokens on the open market. This tremendous downward selling pressure caused the price of the EMAX Tokens to drop. Defendant Davis later clarified during his InRussWeTrust podcast on April 30, 2022, that Mayweather was not paid in Ethereum or cash, but rather he was actually paid in EMAX Tokens for promoting EthereumMax. Davis in particular stated that Mayweather "should have sold [his EMAX Token promotional fee] and that's exactly what he did." Davis claimed to have warned Perone and others that paying celebrity promoters in the EMAX Token would cause downward selling pressure.[62]

124. On May 26, 2021, at the same time Pierce was promoting EMAX Tokens as paying him more than ESPN, EthereumMax issued a press release

---

[61] NeverHedge – Crypto, NFTs, Sports Betting, Stocks, *Emax Talk with Justin Ep. 02: Hard Fork Rundown: Mayweather Fight Updates: Hodler (sic) Questions Answered*, YOUTUBE (May 26, 2021), https://www.youtube.com/watch?app=desktop&v=bPT0Tnmt63A&feature=youtu.be&fbclid=IwAR2w8sHjsGnrXL6G9N8Nc0hWAyjn2w3mmSOOTnoWZCnYyERZrSM_k9Q9En8.

[62] Emax Holder, *RussPodcastsCompilation*, YOUTUBE (Nov. 11, 2022), https://www.youtube.com/watch?v=gwrmpNHHVfw.

1  announcing that it was "now the exclusive CryptoCurrency accepted for online ticket
2  purchasing for the highly anticipated Floyd Mayweather vs. Logan Paul Pay-Per-
3  View event, June 6, 2021 in Miami Gardens, Florida."[63]  The press release directed
4  investors seeking "more information" to visit the Company's social media accounts
5  and the "Fight Website" with the following hyperlink: https://mayweatherpaultickets.
6  com/.

7      125.   The Fight Website featured Mayweather and offered various incentives
8  for those purchasing online tickets with EMAX Tokens, including: "Orders over
9  $5000 will receive authentic, signed Floyd Mayweather boxing gloves"; "2 front row
10 ringside tickets available exclusively for EthereumMax purchase"; "All
11 EthereumMax purchases receive 10% discount at checkout"; and "Tickets purchased
12 with EthereumMax automatically entered into a lottery drawing to attend the official
13 Mayweather after-party at a private table at LIV."[64]

14     126.   On May 28, 2021, EthereumMax released a press release out of Los
15 Angeles entitled: "EthereumMax ($eMax) Disrupts Miami Ahead of Mayweather vs.
16 Paul Fight as the First Crypto Currency of Major Nightclubs LIV and Story" (the
17 "5/28/21 Press Release").  The 5/28/21 Press Release stated: "The upcoming boxing
18 match is the single largest sporting event in history to accept cryptocurrency as
19 payment, making it a huge move for the practical use of $eMax."  The 5/28/21 Press
20 Release touted the EMAX Token as the "fastest-growing Altcoin on the market,"
21 bragging that the EMAX Token price "is up over 21,000% with over 32,000 holders
22 since its launch on May 14, 2021."  The 5/28/21 Press Release further claimed that
23 the EMAX Token "has been gaining massive moment [sic] and popularity," and
24 quoting Defendant Pierce's tweet verbatim as an example of this popularity.  Finally,

25

26 _____
   [63]    Press Release, PR NEWSWIRE, *Huge Milestone for Practical Use of $eMax*
27 (May 26, 2021), https://www.prnewswire.com/news-releases/huge-milestone-for-
   practical-use-of-emax-301300421.html.
28 [64]    Fight Website, https://mayweatherpaultickets.com/.

the 5/28/21 Press Release announced that the partnership with Groot Hospitality would "bring eMAX and Cryptocurrency to Miami Nightlife & Entertainment. This is the first of many opportunities where we see EthereumMax as a reliable payment method for real-life usage."[65]

127. On or about May 29, 2021, Defendant Antonio Brown promoted EthereumMax in the following now-deleted "story" post on his personal Instagram account:



128. On May 30, 2021, Defendant Kimberly Kardashian and nightclub promotor and hotelier David Grutman promoted EthereumMax on their respective social media accounts. For example, Kardashian's promotion of the EMAX Tokens to her hundreds of millions of followers also did double duty of promoting the nightclub "Club LIV" which is partly owned by Grutman (also a longtime friend and associate of Kardashian):

---

[65] Press Release, PR NEWSWIRE, *EthereumMax ($eMax) Disrupts Miami Ahead of Mayweather vs. Paul Fight as the First Crypto Currency of Major Nightclubs LIV and Story* (May 28, 2021), https://www.prnewswire.com/news-releases/ethereummax-emax-disrupts-miami-ahead-of-mayweather-vs-paul-fight-as-the-first-crypto-currency-of-major-nightclubs-liv-and-story-301301958.html.



129.   Following the aforementioned promotions from Brown and Kardashian, and the announcement of the partnership with Mayweather, the trading volume for EMAX Tokens spiked.  In particular, the volume went from $25 million on May 27, 2021 to $80.9 million on May 28 after the Mayweather announcement.   Then it jumped to $112.5 million following Brown's post.   Kardashian's promotion generated another $75.5 million in EMAX Token trading volume on May 30, 2021 before dropping precipitously.[66]

130.   On June 1, 2021, Mather left the EthereumMax project with about $4.1 million worth of EMAX Tokens, of which he subsequently sold off approximately 98%.  No later than July 22, 2021, Maher was confronted about his selling activities with EMAX Tokens.   In particular, in the comments section of one of Davis's Facebook posts, an investor posted a wallet address speculated to belong to Maher, which showed suspicious selling activity.  Maher bragged about his ability to conceal

[66]    *See* n.26, *supra*.

his financial movements and mocked the investor who tried to identify Maher's wallet address: "haha yeah unfortunately that's not one of my secret wallets. Good try though sleuth. *I cleaned all the money I shifted through exchanges first*. *You'd never be able to track it to what wallets I sent it to*. Good try though."[67]

131. On June 3, 2021, the Executive Defendants posted the following statement on the EthereumMax Instagram account,[68] which, upon information and belief, was released in response to Defendant Maher's selling activities:

> eMax Community,
>
> We are fully aware of the drastic price fluctuation that took place with eMax on June 3rd, 2021 and wanted to address this matter with the community head-on. First and foremost, we are here for the long haul, we are committed to our community, committed to our growth plans, and that is not changing. This is not a short-term project and there is no single moment, dip, or increase that will derail EthereumMax from fulfilling our vision and strategic efforts to create a powerful movement and fill a void for a new/improved category that is long overdue within the cryptocurrency space.
>
> Last night we released our multi-phase roadmap with excitement and passion, sharing our future plans to expand our community and significantly enhance the benefits of the eMax token. Today, we had a very upfront and honest conversation with David Grutman, and unfortunately, due to time constraints and the technical complexity behind being able to seamlessly process crypto payments, the venues have determined they do not have the immediate ability to accept $eMax as a payment option this weekend. Therefore, we collectively decided that it made sense for Groot Hospitality, EthereumMax, and the eMax community, to not force the roll-out process of accepting eMax for payment and run the risk of a bigger dilemma this week in Miami, potentially making for an unpleasant user experience for eMax holders. We want to stress that this decision did not result in EthereumMax ending a business relationship with David Grutman or the Groot Hospitality team, but rather we're aligned about being smart about future partnerships. We're looking forward to continuing this conversation and confident a collaboration is in our near future. It's true that in nightlife grand openings are everything, and with that truth, we have one change to make a good first impression and that's what we'll do.

---

[67]    *See* JusticeForCrypto, *InRussWeTrust Fully Exposed within the Crypto Space*, YOUTUBE, at 7:17-24 (July 25, 2021), https://www.youtube.com/watch?v=iyDeOfZnOaY.

[68]    EthereumMax (@ethereummax), INSTAGRAM (June 3, 2021), https://www.instagram.com/p/CPrUCO5szYi/?igshid=YzdkMWQ2MWU.

As some people have noticed, of late, there are a handful of larger wallets that have been selling and taking a profit. When that news from David Grutman was released, several of these large wallets, who were early investors and not part of the development team, began to sell in panic. As with almost anything, people started to copy their actions and the price of eMax continued to drop (about 60%). Since the time of this release, eMax has recovered amazingly well and has continued to regain value.

To be fully transparent with our community, we've almost been living in our own world these past few weeks and going at Mach 5 speed. In just twenty days, eMax has taken over our lives and has been such a huge part of so many others. As a community, we could not have dreamed of this speed of growth. The truth is – eMax is still very young and very small, but with these young beginnings, we have only scratched the surface of our true potential. Even though we've been the fastest growing cryptocurrency, with over 75,000 holders in less than 3 weeks, people speak about eMax as if the token has been around for months or even years, and that in and of itself is exciting.

Right now, EthereumMax is ecstatic to be heading to Miami this weekend to take part in the largest sporting event to ever accept cryptocurrency as payment and they're exclusively accepting $eMax (the flow of that payment process is already finalized and active). In just 3 weeks we've accomplished milestones that no other crypto has every done, to this scale or at this speed – and we will continue to set the bar higher for ourselves.

This is Chapter 1. Chapter 1 of a story, written in real-time, that has us on a path to shatter records and bring cryptocurrency into walks of life we have yet seen or even imagined.

75,000 holders know eMax today. On Sunday, June 6th, millions and millions of people from across the world find out who eMax is. Then, the next chapter begins and the story only continues to grow.

This journey has just begun and our future has never been brighter.

132.    The price of EMAX Tokens dropped sharply on the news that EMAX Tokens would not be available for payment at Club LIV as promised. In response, the Executive Defendants sent Maher and Davis out to do some damage control. Maher posted the following message to the InRussWeTrust Facebook group: "Trust me I know it's tough to watch your account plummet in a matter of minutes. Here's my wallet. I was down to $400k at one point today. I didn't sell a penny. In fact I dumped $25k at the bottom. You can't let one bad news piece trash your long term goals." Maher counseled investors: "Put your emotions aside. So what, they don't

have Emax being used to LIV Bottle service.  Who gives a fuck. Name a single crypto that you can pay your bar tab with?  The Emax team is trying to make radical moves. If you can't stomach that then don't play the game.  #EthereumMax."  Similarly, Defendant Davis also attempted to ease investor concerns and solicit new purchases on June 3, 2021.  He posted the following message on the "InRussWeTrust" Facebook group: "Well I'm sure everyone sees Emax plummeting.  The reason behind it is because the credit card processor did not know how to program to accept a cryptocurrency on a credit card machine for Liv nightclub after party.  This has nothing to do with the coin.  I think it is a rock bottom right now which is why I'm posting.  If anybody wants emax for 90% off. Now is the time!!  This is a Solid BUYING OPPORTUNITY in my mind!!"

133.  On June 4, 2021, former world champion boxer, Mayweather, Jr., attended the "Bitcoin 2021" conference in Miami.  While there, instead of discussing the cryptocurrency that was the focus of the conference (*i.e.*, Bitcoin), Mayweather promoted EthereumMax.  In particular, Mayweather and his entourage wore t-shirts with EthereumMax emblazoned across the chest.  The following are images of Mayweather being interviewed by Fox Business at the Bitcoin 2021 event, which described it as the "largest cryptocurrencies event ever to be held on the planet":[69]

---

[69]  *Floyd Mayweather raves about crypto: 'It's the new wave,'* Fox Business (June 4, 2021), https://video.foxbusiness.com/v/6257455680001#sp=show-clips.

45





134. The same day, Defendant Maher posted this interview on the EthereumMax Facebook page and Instagram social media accounts.[70]  Maher also posted this interview on the InRussWeTrust Facebook group.  In the introduction to the video, the reporter observed that the attendees at the Bitcoin 2021 event "were attracted here because of a lot of prime-time stars and that does include Floyd Mayweather."  During the interview itself, Mayweather, with the EthereumMax name and logo prominently displayed on the front of his shirt, stated that cryptocurrency investing is "the new wave."  Mayweather then described how he first made his money through boxing and then with real estate.  After recounting his previous success at making money, Mayweather reemphasized that investing in cryptocurrency was the next big thing.

135.    Mayweather later proclaimed during a panel discussion at the Bitcoin 2021 event: "I believe there's gonna be another cryptocurrency just as large as Bitcoin some day."[71]

136.    Later in the day, the EthereumMax Instagram account posted a video promoting a shopping event at a jewelry story in Miami.  The caption stated in relevant part: "#Ethereummax will be accepted for the premier event 50 Karats by @floydmayweather."[72]

137.    The combination of Mayweather's statements on investing and promotion of EthereumMax falsely gave investors the impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion dollar investment strategy.

138.    Two days later, on June 6, 2021, Mayweather similarly promoted EthereumMax during his highly viewed exhibition boxing match with internet celebrity-turned-boxer, Logan Paul.[73]  For example, during the highly-publicized weigh-in before the fight, Mayweather again wore a shirt with EthereumMax and its logo on the front:

---

[70]    EthereumMax, *Cryptocurrency week is here in Miami and Floyd Mayweather shared his thoughts on crypto with FOXBusiness*, FACEBOOK (June 4, 2021), https://www.facebook.com/EthereumMax/videos/173981531399668/; EthereumMax (@ethereummax), INSTAGRAM (June 4, 2021), https://www.instagram.com/p/CPt34eUA7d9/?igshid=YzdkMWQ2MWU; *see also* Ethereum Max (@ethereummax), INSTAGRAM (June 4, 2021), https://www.instagram.com/p/CPtfEZ8MeFV/?igshid=YzdkMWQ2MWU.

[71]    Jeff Benson, *Floyd Mayweather, Sponsored by Ethereum Token, Gets Booed at Bitcoin Conference*, DECRYPT (June 4, 2021), https://decrypt.co/72807/floyd-mayweather-sponsored-ethereum-token-gets-booed-bitcoin-conference.

[72]    EthereumMax (@ethereummax), INSTAGRAM (June 4, 2021), https://www.instagram.com/p/CPsiR_PAZXr/?igshid=YzdkMWQ2MWU.

[73]    Brendan Rearick, *EthereumMax (EMAX) Price Predictions: Can Floyd Mayweather Help EMAX Win the Fight?*  MSN (June 7, 2021), https://www.msn.com/en-us/money/markets/ethereummax-emax-price-predictions-can-floyd-mayweather-help-emax-win-the-fight/ar-AAKNxNi.



139. During the fight itself, Mayweather's trunks adorned the EthereumMax brand on the front waist of his boxing trunks:



SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

140.   Mayweather also promoted EthereumMax in connection with the "Official Afterparty" for his fight held at Club LIV.  The following is a promotion from Club LIV, which tags the EthereumMax Instagram page and features the EthereumMax logo and website:



141.   That same day, Defendant Davis posted the following picture in the InRussWeTrust group on Facebook of himself and Mayweather together in Las Vegas earlier in the day, announcing a "long term deal" between Emax, Mayweather, and Davis' InRussWeTrust cryptocurrency consulting business:[74]

---

[74]   John Hyatt, *The Untold Story Behind Emax, The Cryptocurrency Kim Kardashian Got Busted For Hyping*, FORBES (Nov. 11, 2022), https://www.forbes.com/sites/johnhyatt/2022/11/11/the-untold-story-behind-emax-the-cryptocurrency-kim-kardashian-got-busted-for-hyping/?sh=18c82ea940d7.





142. Between June 4, 2021 and June 6, 2021, the trading volume for EMAX Tokens spiked from $15.7 million to $24.5 million.[75]

143. On June 8, 2021, Executive Defendant Perone, along with Steve Gentile and Josh James (the lead developer at EthereumMax), uploaded a video of themselves on Executive Defendant Speer's YouTube channel entitled: "Addressing the $eMax Community – EthereumMax."[76]   Gentile and Perone identified themselves as the

---

[75] *See* n.38, *supra*.

[76] Mike Speer, *Addressing the $eMax Community – EthereumMax*, YOUTUBE (June 7, 2021), https://www.youtube.com/watch?v=CkR8QJrNubI.

1  "creators" of EthereumMax, and explained that Mr. James had recently joined
2  EthereumMax as its new lead developer.

3  144.  Perone described his prior experience in "the hedge fund space" and had
4  "significant experience structuring nuanced securitizations and financing
5  arrangements," and he touted EthereumMax as something "special" with "real
6  sustainability." Perone also stated that they were able to forge a "landmark agreement
7  with the Mayweather team" and reassured investors regarding the "volatility" in the
8  EMAX Token price.  Gentile further stated that EthereumMax's work with
9  "launching ambassadorships and working with influencers" was not solely in
10 preparation for the Mayweather fight, but rather "the launch point" with "great
11 prospects moving forward."

12 145.  Gentile also noted that his background involved specialties revolving
13 around marketing and brand development and he exclaimed that EthereumMax was
14 a "super exciting project" and that he was "excited for the updates" that would be
15 "rolling out in the near future."  Gentile claimed that it was "going to be beneficial
16 not only to the token, but more importantly the community."

17 146.  During a pseudo question and answer portion of the video, Gentile
18 brought up investors' questions about a "rug pull" of the EMAX Token and asked
19 Perone to "nip it in the bud."  Perone stressed that the EthereumMax team was in for
20 the long term, stating, among other things, that the Executive Defendants were
21 "looking to lock the wallets" to show investors that they "were here to stay."

22
23
24
25
26
27
28

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

147.   On June 14, 2021, Kardashian posted the following solicitation for EthereumMax on her Instagram account, which has over 250 million followers:



148.   As noted in a scathing op-ed piece called "Celebrity Crypto Shilling Is a Moral Disaster," Kardashian's "post was an immediate sensation, and a touch controversial."  The EMAX Token was "only a month old, few had heard of it, and it wasn't even obvious how the 'token' was supposed to work.  More than that, Kardashian was urging her 251 million Instagram followers to get involved in a highly volatile, speculative market that's little different than gambling in the world's most fraudulent casino."[77]

---

[77]   Ben McKenzie & Jacob Silverman, *Celebrity Crypto Shilling Is a Moral Disaster*, SLATE (Oct. 7, 2021), https://slate.com/technology/2021/10/ben-mckenzie-crypto-celebrities-kardashian-brady-lohan.html.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

149.    Kardashian's promotion had tremendous reach.  The financial services company, Morning Consult, analyzed "the impact of celebrities on crypto investor decisions," and, in particular, the impact of Kardashian's EthereumMax post.  The survey found that up to 21% of all American adults and nearly half of all cryptocurrency owners had seen this ad for a risky financial instrument.  Furthermore, Kardashian's "conversion was also impressive: ***A striking 19% of respondents who said they heard about the post invested in EthereumMax as a result***."[78]

150.    The chair of the Financial Conduct Authority ("FCA") in the United Kingdom, Charles Randell, in a September 6, 2021 speech given to the Cambridge International Symposium on Economic Crime, remarked that Kardashian's EthereumMax post was "the financial promotion with the single biggest audience reach in history."[79]

151.    Notably, Kardashian's post did include a promotional disclosure in the post itself.  However, this disclosure is tucked in the far bottom right of the post and is just three characters long: "#AD."  The promotion was false and misleading in that Kardashian was purportedly just "sharing what my friends just told me about the Ethereum Max Token!"  Moreover, by stating that "Ethereum Max Burned 400 trillion tokens – Literally 50% of their Admin Wallet" the promotion created a false impression that the EMAX Tokens were scarce.  Because two quadrillion tokens had been originally created, the burning of 400 trillion tokens did not meaningfully impact the availability of EMAX Tokens.

152.    According to the SEC Order, "EthereumMax, through an intermediary, paid Kardashian $250,000 for this promotion." Upon information and belief, this

---

[78]    Charlotte Principato, *Kim Kardashian, Cryptocurrency and Celebrity Clout*, MORNING CONSULT (Sept. 21, 2021), https://morningconsult.com/2021/09/21/kim-kardashian-crypto-celebrity/ (Emphasis added).

[79]    Charles Randell, Chair, Fin. Conduct Auth., *The risks of token regulation*, Speech at Cambridge International Symposium on Economic Crime (Sept. 6, 2021) https://www.fca.org.uk/news/speeches/risks-token-regulation.

1    intermediary was Defendant Rechnitz.  Kardashian and Rechnitz have a long history

2    together.

3    153.   Upon information and belief, Kardashian received a similar payment

4    from Rechnitz and Perone for her May 30, 2021 promotion.

5    154.   Kardashian also has experience and familiarity with making misleading

6    claims in similar promotional endorsements on her Instagram and Twitter accounts.

7    For example, in 2015, the United States Food and Drug Administration ordered

8    Kardashian to remove a promotional post she had made with a strikingly similar

9    beginning to the EthereumMax Post at issue in this action[80]:



17   155.   Pierce, Brown, and Davis did not include any promotional disclosures

18   when they promoted EthereumMax throughout May and June of 2021.

19   156.   It does not appear that Mayweather has disclosed any payments either

20   for his promotion of EthereumMax on June 4 and 6, 2021.  Mayweather does have

21   experience with being fined previously over improper cryptocurrency promotion,[81]

22   and, as a result, he knew that his conduct alleged herein was improper.

---

[80]   Mark Sweney, *Kim Kardashian forced to delete selfie endorsing morning sickness drug*, THE GUARDIAN (Aug. 12, 2015), https://www.theguardian.com/media/2015/aug/12/kim-kardashian-selfie-morning-sickness-drug-instagram.

[81]   Press Release, U.S. SEC. & EXCH. COMM'N, *Two Celebrities Charged with Unlawfully Touting Coin Offerings* (Nov. 29, 2018), https://www.sec.gov/news/press-release/2018-268.

157.   In November 2018, Mayweather and another celebrity promotor settled charges with the United States Securities and Exchange Commission ("SEC") for failing to disclose payments they received for promoting fraudulent cryptocurrency investments.   One of the posts at issue there was one that Mayweather made on Twitter, stating: "You can call me Floyd Crypto Mayweather from now on" and a promotion with the message to his Twitter followers that a company's fraudulent initial coin offering "starts in a few hours.  Get yours before they sell out, I got mine." As part of the settlement, Mayweather agreed to pay "$300,000 in disgorgement, a $300,000 penalty, and $14,775 in prejudgment interest."   In addition, Mayweather agreed not to promote any securities – digital or otherwise – for three years.[82]   The settlement was dated November 29, 2018, meaning that this agreement was blatantly violated in connection with Mayweather's EthereumMax promotion.  Mayweather, therefore, had an understanding that his own conduct, as well as the conduct of the Executive Defendants, was improper and fraudulent.

158.   Maher has experience with financial regulations from his position as a financial advisor at Northwestern Mutual Investment Services, LLC from 2011 to October 13, 2021.  Maher knew that his conduct alleged herein was improper. Notably, Maher was "permitted to resign" from his financial advisor position in 2021 "while under internal review for allegations that [Maher] was involved in a cryptocurrency shilling scam."[83]

159.   Similarly, when discussing the Promoter Defendants' EMAX Token promotions, Davis acknowledged that "when you are a celebrity and you don't know the law and say . . . invest in this . . . that's financial advice.  You can't say that."[84]

---

[82]    *Id.*

[83]    *Investment Adviser Public Disclosure: Justin Thomas Maher*, U.S. SEC. & EXCH.   COMM'N,   https://adviserinfo.sec.gov/individual/summary/5504995   (last visited Dec. 19, 2022).

[84]    NeverHedge – Crypto, NFTs, Sports Betting, Stocks, *Emax Talk with Justin Ep. 02: Hard Fork Rundown: Mayweather Fight Updates: Hodler (sic) Questions*

1

**The Dump – EMAX Token Price Plummets**

2  160.  Following the EMAX Tokens' launch and Defendants' promotional

3  activities in May 2021, the trading volume and price of EthereumMax surged.  By

4  May 30, EMAX already had a transaction volume of over $100 million, up 632% in

5  just two weeks.  The day before, it reached its maximum price of $0.000000863,

6  which represents a rise of 1,370% more than its initial price of $0.00000005875.[85]

7  161.  However, this meteoric rise did not last long, and EthereumMax began

8  to deflate immediately after Kardashian's post.  On July 15, 2021, the price of the

9  EMAX Token hit its all-time low: $0.000000017 per unit, a 98% drop from which it

10  has not been able to recover.  Investors were left holding worthless tokens, with the

11  cost in transaction fees and gas fees to swap back into Ether far exceeding what

12  investors would actually receive in Ether.  On August 1, 2021, its transaction volume

13  plummeted to $157,423, which is less than a hundredth of its initial capital.  On April

14  1, 2022, transaction volume was less than $13,000.[86]

15  162.  The Promoter Defendants' improper promotional activities generated

16  the trading volume needed for all the Defendants to offload their EMAX Tokens onto

17  unsuspecting investors.  While Plaintiffs and Class members were buying the

18  inappropriately-promoted EMAX Tokens, Defendants were able to, and did, sell their

19  EMAX Tokens during the Relevant Period for substantial profits.  According to

20  Perone, the Executive Defendants did not "lock" their EMAX Token wallet addresses

21  until after the Relevant Period.

22  163.  The EMAX Token price still has not recovered and trading volume

23  remains down significantly.  As bluntly noted in actor Benjamin McKenzie's op-ed:

24

25  *Answered*, YOUTUBE (May 26, 2021),
https://www.youtube.com/watch?app=desktop&v=bPT0Tnmt63A&feature=

26  youtu.be&fbclid=IwAR2w8sHjsGnrXL6G9N8Nc0hWAyjn2w3mmSOOTnoWZC
nYyERZrSM_k9Q9En8.

27  [85]  *See* n.38, *supra*.

28  [86]  *Id.*

1  "If you bought EthereumMax after Kardashian pushed it and didn't sell fast enough,

2  all you were left with was a practically worthless digital asset."[87]

3      164.   In the wake of the dramatic decline in the EMAX Token price, the cabal

4  became fractured with some of the Defendants even pointing fingers at one another.

5  For example, the relationship between Davis and Brown on one side and Mayweather

6  and Rechnitz on the other was soured after an incident between Rechnitz and Brown.

7  Upon information and belief, Brown was displeased with Rechnitz after the two of

8  them arranged a deal to flip four expensive watches for a quick profit, but Rechnitz

9  ended up providing counterfeits instead of the real watches (*see supra* 56).  In an

10  effort to gain leverage over Brown and prevent him from exposing Rechnitz's fraud,

11  Rechnitz filmed Brown exposing himself to another guest while they were all

12  partying at a hotel pool in Dubai during a trip for Mayweather's exhibition boxing

13  match against Don Moore.[88]

14      165.   Upon information and belief, Rechnitz threatened to release the footage

15  unless Brown agreed not to reveal Rechnitz's misconduct.  Ultimately, both Brown

16  and Rechnitz exposed each other.  Rechnitz released the video, which shows "Brown

17  jumping up and down and breaking the water plane with his naked rear end close to

18  the face of a woman in the Armani Hotel Dubai swimming pool."[89]

---

[87]    *See* n.77, *supra.*

[88]    Rhett Butler, *Antonio Brown Fractures Relationship with Floyd Mayweather, Alleging He Was Involved in Leaking the Dubai Pool Incident*, THE SHADOW LEAGUE (Oct. 9, 2022), https://theshadowleague.com/antonio-brown-fractures-relationship-with-floyd-mayweather-alleging-he-was-involved-in-leaking-the-dubai-pool-incident/.

[89]    *Id.*

166. On October 1, 2022, Defendant Brown made the following statement on his Twitter account about Defendants Rechnitz and Mayweather:[90]



AB ✔
@AB84

Jona Rechnitz biggest scam just like the

mayweather Fights

9:54 AM · Oct 1, 2022

14 Retweets   27 Quote Tweets   366 Likes

167. In a now-deleted post from October 9, 2022 on his official Twitter account, Brown further declared: "Defamation of Character Jona Rechnitz recorded sold falsified this video in something disgusting per source Floyd Mayweather business partner."

168. On October 10, 2022, the SEC issued an Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Making Findings, and Imposing a Cease-and-Desist Order ("the SEC Order") against Defendant Kardashian in relation to her June 13, 2021 promotion of EMAX Tokens. The SEC Order contained several factual findings that, while not binding outside of SEC's proceeding against Kardashian, still formed the basis of the SEC Order and the related settlement and tracked closely to the misconduct alleged herein.

169. The SEC Order stated the following:

- Kardashian did not disclose that she had been paid by EthereumMax or the amount of compensation she received from EthereumMax for making [the June 13, 2021] post.

- Kardashian's crypto asset security promotion occurred after the Commission warned in its July 25, 2017, DAO Report of Investigation that digital tokens or coins offered and sold may be securities, and those who offer and sell securities in the United States must comply with the federal securities laws. The promotion also occurred nearly four years after the Commission's Division of Enforcement and Office of Compliance Inspections and Examinations issued a statement

---

[90] AB (Antonio Brown) (@AB84), Twitter (Oct. 1, 2022, 6:54 AM), https://twitter.com/AB84/status/1576208814227193857.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

reminding market participants that a]ny celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion. A failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws.

- Kardashian violated Section 17(b) of the Securities Act by touting the EMAX token sale on her social media account without disclosing that she received compensation from the issuer for doing so, and the amount of the consideration.[91]

170. Pursuant to the SEC Order and related settlement, Kardashian was ordered to pay disgorgement of $250,000, prejudgment interest of $10,415.35, and a civil money penalty in the amount of $1,000,000 to the SEC. The SEC Order also barred Kardashian from receiving any payments or compensation for promoting any digital assets for three years. Kardashian was also ordered to cease and desist from committing or causing any violations and any future violations of Section 17(b) of the Securities Act.

171. On November 15, 2022, Maher made several statements in response to the October 3, 2022 announcement from SEC Chairman Gensler regarding the SEC's investigation into Kardashian's promotional activities with the EMAX Tokens. In particular, Maher stated: "I mean I wish Gio had been paying me like he did with everyone else. Then I'd at least have made these millions they claimed I did."[92] Maher then gave "one freebie" to investigators, saying that "Blockchain doesn't lie right? Have fun going down the rabbit hole with this one… #JonaRechnitz." Maher attached the following screenshot of a text conversation between the "eMax team marketing," which included Steve Gentile, and Defendants Perone and Speer, which confirmed that Rechnitz negotiated and facilitating the payments to Mayweather for promoting EMAX Tokens.

---

[91] SEC Order, ¶¶10-12.
[92] Justin Maher (@TrustInJustin83), Twitter (Nov. 22, 2022), https://twitter.com/TrustInJustin83/status/1592501917804302337/photo/1.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



172.   The following chart from *The Financial Times*[93] shows the rise and fall of the EMAX Tokens' price in conjunction with the Promoter Defendants' promotional activities:



**Regulators Raise Concerns that EthereumMax Is a "Pump and Dump" Scam**

173.   Following the precipitous drop of the EMAX Token price in the wake of Kardashian's EthereumMax post, the United Kingdom's FCA chair issued a statement noting that Kardashian's promotion of the EMAX Token could be "fraudulent."  Specifically, Charles Randell, director of the FCA, gave a speech about the need for a "permanent and consistent solution to the problem of online fraud from paid-for advertising."[94]

174.   Cryptocurrency "scams" were one of the topics that Randell specifically addressed, and during that portion of the speech, Randell specifically took issue with Kardashian's EthereumMax post.  Randell noted that "social media influencers [like

---

[93]   Joshua Oliver & Madison Darbyshire, *Kim Kardashian, Floyd Mayweather and a crypto token's wild ride*, THE FIN. TIMES (Jan. 14, 2022), https://www.ft.com/content/a6dd4d6f-6a86-48cc-992c-f8a32c64fdd7.

[94]   *See* n.79, *supra*.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

the Promoter Defendants] are routinely paid by scammers to help them pump and dump new tokens on the back of pure speculation."[95]

175. Randell further observed that the hype around speculative digital assets like the EMAX Token "generates a powerful fear of missing out from some consumers who may have little understanding of their risks. There is no shortage of stories of people who have lost savings by being lured into the crypto bubble with delusions of quick riches, sometimes after listening to their favourite influencers, ready to betray their fans' trust for a fee."[96]

176. This is precisely what occurred with the Executive Defendants' stated marketing strategy to use celebrities like the Promoter Defendants to "instill trust" from investors in EthereumMax in exchange for fees and/or EMAX Tokens – that the Promotor Defendants could sell for profits.

## **CLASS ALLEGATIONS**

177. Plaintiffs bring this action, individually, and on behalf of a nationwide class, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All persons who, during the Class Period, purchased EthereumMax's EMAX Tokens and were subsequently damaged thereby.

178. The Class Period is defined as the period between May 14, 2021 and June 27, 2021.[97]

179. Excluded from the Class are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers and directors; (c) Plaintiffs' counsel and Defendants' counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family. Plaintiffs reserve the right to modify, change, or

---

[95] *Id*.

[96] *Id.*

[97] Plaintiffs reserve the right to expand or amend the Class Period based on discovery produced in this matter.

expand the various class definitions set forth above based on discovery and further investigation.

180. **Numerosity**: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identity of individual members of the Class is unknown currently, such information being in the sole possession of EthereumMax and/or third parties and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that the Class consists of at least hundreds of people. The number of Class members can be determined based on EthereumMax's and other third parties' records.

181. **Commonality**: Common questions of law and fact exist as to all members of each Class. These questions predominate over questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a. whether Defendants improperly and misleadingly marketed EMAX Tokens;

b. whether Defendants' conduct violates the state consumer protection statutes asserted herein;

c. whether Promoter Defendants aided and abetted violations of the state consumer protection statutes asserted herein;

d. whether Executive Defendants conspired to artificially inflate the price of the EMAX Tokens and then sell their EMAX Tokens to unsuspecting investors;

e. whether Defendants have been unjustly and wrongfully enriched as a result of their conduct;

f. whether the proceeds that the Defendants obtained as a result of the sale of EMAX Tokens rightfully belongs to Plaintiffs and Class members;

g. whether Defendants should be required to return money they received as a result of the sale of EMAX Tokens to Plaintiffs and Class members;

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1      h.    whether Executive Defendants breached the implied covenant of good
2 faith and fair dealing; and

3      i.    whether Plaintiffs and Class members have suffered damages, and, if so,
4 the nature and extent of those damages.

5      182.   **Typicality**: Plaintiffs have the same interest in this matter as all Class
6 members, and Plaintiffs' claims arise out of the same set of facts and conduct as the
7 claims of all Class members. Plaintiffs' and Class members' claims all arise out of
8 EthereumMax's uniform misrepresentations, omissions, and unlawful, unfair, and
9 deceptive acts and practices related to the sale of EMAX Tokens.

10      183.   **Adequacy**: Plaintiffs have no interests that conflicts with the interests
11 of the Class and are committed to pursuing this action vigorously. Plaintiffs have
12 retained counsel competent and experienced in complex consumer class action
13 litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect
14 the interests of the Class.

15      184.   **Superiority**: A class action is superior to all other available means of
16 fair and efficient adjudication of the claims of Plaintiffs and members of the Class.
17 The injury suffered by each individual Class member is relatively small compared to
18 the burden and expense of individual prosecution of the complex and extensive
19 litigation necessitated by EthereumMax's conduct. It would be virtually impossible
20 for individual Class members to effectively redress the wrongs done to them. Even
21 if Class members could afford individualized litigation, the court system could not.
22 Individualized litigation would increase delay and expense to all parties and to the
23 court system because of the complex legal and factual issues of this case.
24 Individualized rulings and judgments could result in inconsistent relief for similarly
25 situated individuals. By contrast, the class action device presents far fewer
26 management difficulties, and provides the benefits of single adjudication, economy
27 of scale, and comprehensive supervision by a single court.

28

185.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §17200**
**(Based on Unlawful Acts and Practices)**
**(Against all Defendants)**

186.    Plaintiffs restate and reallege all preceding allegations in paragraphs 1 to 185 above as if fully set forth herein, and further allege the following:

187.    Plaintiffs Semerjian, Buckley, and Shah are residents of the State of California.

188.    Plaintiffs Semerjian, Buckley, and Shah paid for or purchased EMAX Tokens in California and thus the deceptive transactions alleged herein occurred in California.

189.    At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, which prohibits, *inter alia*, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

190.    ""[A]n act can be alleged to violate any or all three of the three prongs of the UCL — unlawful, unfair, or fraudulent.'" *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1149 (N.D. Cal. 2010) (quoting *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007)).

191.    The "unlawful" prong of the UCL prohibits "anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  By proscribing "any unlawful" business practice, the UCL permits injured consumers to "borrow" violations of other laws and treat them as unlawful competition that is

1    independently actionable. In other words, an "unlawful" business practice under the

2    UCL is a practice that violates any other law.

3          192.  Any violation of the California false advertising laws (*e.g.*, Cal. Bus. &

4    Prof. Code §17500) necessarily violates the "unlawful" prong of the UCL. Likewise,

5    any violations of other state consumer protection laws, such as New York G.B.L.

6    §349(a); NJSA §§56:81-156; and Fla. Stat. Ann Ch. 501, §211(1) also constitutes a

7    violation of the unlawful prong of the UCL.

8          193.  To meet the heightened pleading standard of Federal Rule of Civil

9    Procedure ("Rule") 9(b) for claims that sound in fraud, plaintiffs must plead "'the

10   who, what, when, where, and how'" of the alleged fraud. *Vess v. Ciba-Geigy Corp.*

11   *USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

12         194.  In order to have standing for a UCL claim, a plaintiff must meet the

13   injury-in-fact requirement. This requirement is met where a plaintiff can "show that,

14   by relying on a misrepresentation on a product label, they 'paid more for a product

15   than they otherwise would have paid, or bought it when they otherwise would not

16   have done so.'" *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015). A

17   plaintiff's claims under this California statute are governed by the "reasonable

18   consumer" test. *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995) ("'[T]he

19   false or misleading advertising and unfair business practices claim must be evaluated

20   from the vantage of a reasonable consumer.'"). Under the reasonable consumer

21   standard, a plaintiff must "show that 'members of the public are likely to be

22   deceived.'" *Id*. (quoting *Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254, 1267 (1992)).

23         195.  Plaintiff Semerjian is lifelong fan of professional sports, particularly

24   basketball and boxing. Semerjian regularly watched Defendant Pierce when the latter

25   played basketball professionally and then as a commentator on ESPN. Semerjian

26   saw the promotions by Pierce on May 26, 2021, May 28, 2021, and May 30, 2021,

27   respectively. These promotions regarding the growth potential and price increases

28

for EMAX Tokens induced Semerjian to make his first and second purchases of EMAX Tokens on May 31, 2021 and June 1, 2021. Semerjian has also been aware of Defendant Mayweather from his many years of being a world champion boxer. Semerjian regularly sees posts from and about Mayweather on various social media platforms via the trending or discovery features of the platform. Semerjian specifically saw Mayweather's promotions of EthereumMax during the Bitcoin Miami conference (which were also promoted on social media accounts for EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release. Mayweather's statements and promotions of EthereumMax gave Semerjian the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy. Each of these promotions induced Semerjian to make another purchase of EMAX Tokens on June 4, 2021. Semerjian is also aware of Defendant Kardashian's reputation as a celebrity influencer, and in particular, her renowned business savvy. Semerjian also saw Defendant Kardashian's June 14, 2021 promotion of the EMAX Tokens. Semerjian believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX Tokens to correspondingly increase in value. Kardashian's promotion induced Semerjian to continue to hold on to his investment in EMAX Tokens when he otherwise would not have done so.

196. Semerjian also followed the EthereumMax Instagram page during the Relevant Period and saw the promotions from the Executive Defendants that were posted on that platform. Semerjian specifically saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling. Semerjian reasonably believed that the price drop on EMAX Tokens only came from "a handful

of larger wallets" of "early investors" who were "not part of the development team." Similarly, Semerjian believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout. The misleading statements and omissions within the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Pierce, Mayweather, and Kardashian, induced Semerjian to make his June 4, 2021 purchase of EMAX Tokens. Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused Semerjian to retain his EMAX Token investment when he otherwise would not have done so.

197. Plaintiff Buckley is a lifelong fan of professional sports, particularly basketball and boxing. Buckley regularly watched Defendant Pierce when the latter played professionally and then as a commentator on ESPN. Buckley saw the promotions by Pierce on May 26, 2021, and May 28, 2021, respectively. These promotions regarding the growth potential and price increases for EMAX Tokens induced Buckley to make his first two purchases of EMAX Tokens on May 28, 2021. In addition to Pierce, Buckley is aware of Defendant Brown's football career and off-field conduct, and he specifically saw Brown's May 29, 2021 promotion wherein Brown indicated that he wanted his next football contract to be paid in EMAX Tokens. Buckley also saw Pierce's May 30, 2021 promotion of EthereumMax. Buckley has also been aware of Defendant Mayweather from his many years of being a world champion boxer. Buckley regularly sees posts from and about Mayweather on various social media platforms via the trending or discovery features of the platform. Buckley specifically saw Mayweather's promotions of EthereumMax during the Bitcoin Miami conference (which were also promoted on

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

the social media accounts for EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release. Mayweather's statements and promotions of EthereumMax gave Buckley the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy. Buckley also saw Defendant Kardashian's June 14, 2021 promotion of the EMAX Tokens. Buckley believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX Tokens to correspondingly increase in value. Each of these promotions induced Buckley to make his third and final purchase of EMAX Tokens on June 18, 2021. These promotions also induced Buckley to continue to hold on to his investment in EMAX Tokens when he otherwise would not have done so.

198. Buckley also followed the EthereumMax Instagram page during the Relevant Period and saw the promotions from the Executive Defendants that were posted on that platform. Buckley specifically saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling. Buckley reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors" who were "not part of the development team." Similarly, Buckley believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout. The misleading statements and omissions within the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Pierce, Mayweather, and Kardashian, induced Buckley to make his June 18, 2021 purchase of EMAX Tokens. Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the

ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused Buckley to retain his EMAX Token investment when he otherwise would not have done so.

199. Buckley also saw the statements and promotions from Defendants Maher and Davis that were posted and/or reposted on various social media platforms. Buckley specifically saw the May 14, 2021 promotion from Maher touting the approximately 500,000% increase in the EMAX Token Price. Buckley reasonably believed that this price increase was the result of genuine investor interest. Buckley also saw Maher's May 15, 2021 statement dismissing concerns about price volatility because the Executive Defendants "assured" Maher that "aside from marketing expenses they will not sell off any of their position[s] for at least six months." Buckley believed the statement that EthereumMax insiders would not be selling their portion of the Float and driving the price of EMAX Tokens down. Similarly, Buckley saw and believed Maher's solicitations in his May 17, 2021 social media post dismissing claims that EthereumMax was a "scam or pump and dump" and touting EMAX Tokens were a "[l]ong term" investment that investors like Plaintiffs and the class should "hold all the way." Buckley also saw and relied on Davis' May 18, 2021 solicitation that it was "not too late" to purchase EMAX Tokens given their growth potential. These misleading statements and omissions by Davis and Maher induced Buckley to make his May 28, 2021 purchase of EMAX Tokens.

200. Plaintiff Shah is lifelong fan of professional sports, particularly basketball and boxing. Shah regularly watched Defendant Pierce when the latter played basketball professionally and then as a commentator on ESPN. Shah follows Pierce on Twitter and saw the promotions by Pierce on May 26, 2021, May 28, 2021, and May 30, 2021, respectively. These promotions regarding the growth potential and price increases for EMAX Tokens induced Shah to make his first and second

purchases of EMAX Tokens on May 29, 2021 and June 1, 2021. Shah has also been aware of Defendant Mayweather from his many years of being a world champion boxer. Shah follows Mayweather on social media. Shah specifically saw Mayweather's promotions of EthereumMax during the Bitcoin Miami conference (which were also promoted on the social media accounts for EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release. Mayweather's statements and promotions of EthereumMax gave Shah the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy. Each of these promotions induced Shah to make another purchase of EMAX Tokens on June 3, 2021 and June 11, 2021. Shah is also aware of Defendant Kardashian's reputation as a celebrity influencer, and in particular, her renowned business savvy. Shah also saw Defendant Kardashian's May 30, 2021 and June 14, 2021 promotion of the EMAX Tokens. Shah believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX Tokens to correspondingly increase in value. Kardashian's promotion induced Shah to continue to hold on to his investment in EMAX Tokens when he otherwise would not have done so.

201. Shah also followed the EthereumMax Instagram page and other social media platforms like Telegram, Reddit, and Twitter during the Relevant Period and saw the promotions from the Executive Defendants that were posted. Shah specifically saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling. Shah reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors" who were "not part of the development team." Similarly, Shah believed the statements

that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout. The misleading statements and omissions within the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Pierce, Mayweather, and Kardashian, induced Shah to make his June 3, 2021 and June 11, 2021 purchases of EMAX Tokens. Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused Shah to retain his EMAX Token investment when he otherwise would not have done so.

202. Defendants engaged in deceptive acts and practices under California law by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree, including but not limited to, in the following ways:

(a) knowingly and intentionally concealing the Executive Defendants' specific roles and ownership interests in EthereumMax;

(b) failing to disclose that the huge increase in price of the EMAX Tokens during the first days following launch were caused by manipulation by the Executive Defendants instead of being due to an organic increase in interest from investors;

(c) failing to disclose that EMAX Tokens were not being accepted as a payment and would not be at any point in the foreseeable future; and

(d) knowingly and intentionally using and/or failing to disclose the use of the Promotor Defendants to "instill trust" in uninformed investors to promote the financial benefits of a highly speculative and risky investment in EMAX Tokens, in an effort to manipulate and artificially inflate the price and trading volume of the

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

EMAX Tokens and allow Defendants to sell their EMAX Tokens at those inflated prices.

203. The Executive Defendants did not disclose that the EMAX Token developer held the number one rank with 23% ownership interest. Nor did they disclose until much later that the Executive Defendants had purposefully chosen not to lock the wallets of the EthereumMax insiders. Semerjian, Buckley, and Shah would have found it material to their decisions to purchase EMAX Tokens to know whether or not insiders had significant percentages of the available Float of EMAX Tokens with the ability to freely sell those EMAX Tokens and create massive downward pressure. Likewise, had Semerjian, Buckley, and Shah been made aware of that information at the times of their respective purchases, as well as the later-revealed admission from Steve Gentile that the Executive Defendants had chosen not to "lock the wallets" (which gives the ten original founding members, including Defendant Maher who held 5%, the ability to sell off their portions of EMAX Tokens without restriction), it would have altered their decision to both purchase the EMAX Tokens for the price they paid as well and hold on to those EMAX Tokens when they otherwise would not have done so.

204. The facts that the Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian misrepresented and concealed were material to the decisions of Plaintiffs Semerjian, Buckley, and Shah and the members of the class about whether to pay for or purchase EMAX Tokens (at all or for the price they paid), in that they would not have proceeded with their transactions but for the deceptive, fraudulent, and false acts and practices.

205. The Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian intended for Plaintiffs Semerjian, Buckley, and Shah and the members of the class to pay for EMAX Tokens in reliance upon their deceptive and fraudulent acts and practices.

206. Had the Promoter Defendants disclosed the omitted information, Semerjian, Buckley, and Shah would have been aware of it because (a) they saw the actual promotions by Promoter Defendants Pierce, Mayweather, and Kardashian and would have concurrently seen any disclosure on the promotions themselves had it been included, and (b) they follow, directly or indirectly, the social media accounts of, and news reports on, Promoter Defendants Pierce, Mayweather, and Kardashian.

207. As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages. The Executive Defendants' activities with the Promoter Defendants caused Plaintiffs and the Class members to purchase and/or hold the EMAX Tokens when they otherwise would not have done so.

208. The statements from Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian are actionable and not puffery. "'The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions.'" *Orlick v. Rawlings Sporting Goods Co.*, No. CV 12-6787-GHK (RZX), 2013 WL 12139142, at *5 (C.D. Cal. Feb. 20, 2013). Under California law, there is no requirement that for a statement to be actionable it must also be false — the UCL also prohibits "'advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). Significantly, even if certain statements would be non-actionable on their own, where there are multiple statements at issue, courts must consider "as a whole." *Id.* at 939 n.3; *Lima v. Gateway, Inc.*, 710 F. Supp. 2d 1000, 1007-08 (C.D. Cal. 2010) (denying motion to dismiss where some specific representations could be considered puffery, but all of defendants' statements "taken as a whole" might be actionable); *In re NJOY, Inc. Consumer Class Action Litig.*, No. CV 14-00428 MMM (JEMx), 2015 WL 12732461, at *10 (C.D. Cal. May 27, 2015)

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

(‘“Even assuming . . . that some of the statements would themselves be non-actionable, they “cannot be considered in isolation because they contribute to the [potentially] deceptive context” of the packaging and marketing “as a whole.”’”) (alteration in original).

209.   As alleged further above, the Executive Defendants' May 16, 2021 Pre-launch Kickoff post stated, among other things, that (1) EMAX Tokens were up "500,000+% in the first 24 hours"; (2) the Executive Defendants had "locked in partnership with global digital marketing agency" and "lined up a knockout influencer" for a "nationwide campaign"; and (3) "We are 3 days in with ~$100M market cap and the train is just getting rolling."  These statements from Executive Defendants are specific, detailed factual assertions the Executive Defendants were using to encourage purchases and increase the price of the EMAX Tokens.  At the same time, the Executive Defendants Maher and Speer, with Promoter Defendant Davis, each failed to disclose that these metrics were the result of the failed launch that allowed insiders, including but not limited to Maher, to disproportionately increase the price of the EMAX Tokens with their early trades.

210.   Taken together, the misleading statements and omissions of the Executive Defendants and Promoter Defendants Davis, Pierce, Mayweather, and Kardashian contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of EMAX Tokens.

211.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by EthereumMax, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under Cal. Bus. & Prof. Code §17200.

## SECOND CAUSE OF ACTION

**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §17200**
**(Based on Unfair Acts and Practices)**
**(Against All Defendants)**

212. Plaintiffs restate and reallege all preceding allegations in paragraphs 1 - 185 above as if fully set forth herein, and further allege the following:

213. Plaintiffs Semerjian, Buckley, and Shah are residents of the State of California.

214. Plaintiffs Semerjian, Buckley, and Shah paid for or purchased EMAX Tokens in California and thus the deceptive transactions alleged herein occurred in California.

215. At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, which prohibits, *inter alia*, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

216. "'[A]n act can be alleged to violate any or all three of the three prongs of the UCL — unlawful, unfair, or fraudulent.'" *Stearns*, 763 F. Supp. 2d at 1149 (quoting *Berryman*, 152 Cal. App. 4th at 1554).

217. The Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian engaged in business acts and practices deemed "unfair" under the UCL, because of the conduct, statements, and omissions described above. Unfair acts under the UCL have been interpreted using different tests, including: (1) whether the public policy which is a predicate to a consumer unfair competition action under the unfair prong of the UCL is tethered to specific constitutional, statutory, or regulatory provisions; (2) whether the gravity of the harm to the consumer caused by the challenged business practice outweighs the utility of the defendant's conduct; and (3) whether the consumer injury is substantial, not outweighed by any countervailing benefits to consumers or competition, and is an injury that consumers themselves could not reasonably have avoided.

218. The Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian have engaged in, and continue to engage in, conduct

that violates the legislatively declared policies of: (1) California Civil Code §§1572,1573, 1709, 1710, 1711 against committing fraud and deceit; (2) California Civil Code §1770 against committing acts and practices intended to deceive consumers regarding the representation of goods in certain particulars; and (3) the Federal Tort Claims Act ("FTCA"), 15 U.S.C. §45(a)(1), against unfair or deceptive practices. The Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian gain an unfair advantage over their competitors, whose practices relating to other similar products must comply with these laws.

219. Defendants' affirmative acts in soliciting sales of EMAX Tokens are unfair within the meaning of the UCL, because they constituted immoral, unethical, oppressive, and unscrupulous activity, caused substantial injury to consumers, and provided no benefit to consumers or competition.

220. The gravity of the harm to consumers caused by actions of Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian far outweighs the utility of their conduct. According to a "Data Spotlight" from the Federal Trade Commission from June 3, 2022 (the "FTC Data Spotlight"), entitled: "Reports show scammers cashing in on crypto craze," "[s]ince the start of 2021, more than 46,000 people have reported losing over $1 billion in crypto to scams – that's about one out of every four dollars reported lost, more than any other payment method. The median individual reported loss? A whopping $2,600."[98]

221. The FTC Data Spotlight further stated that "[r]eports point to social media and crypto as a combustible combination for fraud. Nearly half the people who reported losing crypto to a scam since 2021 said it started with an ad, post, or

---

[98] Emma Fletcher, *Data Spotlight: Reports show scammers cashing in on crypto craze*, FED. TRADE COMM'N (June 3, 2022), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

message on a social media platform."[99]  Furthermore, "[d]uring this period, nearly four out of every ten dollars reported lost to a fraud originating on social media was lost in crypto, far more than any other payment method."[100]  Of the reported crypto fraud losses that began on social media, most are investment scams.[101]  Indeed, since 2021, $575 million of all crypto fraud losses reported to the FTC were about bogus investment opportunities, far more than any other fraud type.  Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian engaged in the exact kind of bogus crypto "investment opportunity" scam that the FTC Data Spotlight reported on as causing hundreds of millions (and rising) of dollars of damage to investors.

222.  The conduct of the Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian – including, but not limited to, failing to disclose that (1) insiders held a significant portion of the Float at the time of the EMAX Token launch; and (2) the promotions by Promoter Defendants Pierce, Mayweather, and Kardashian were the result of them being paid to promote the EMAX Tokens instead of an organic interest/support of EthereumMax – was and is substantially injurious to consumers.  Such conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have continued with the transaction but for the deceptive, fraudulent, false, and unfair acts and practices alleged herein.  Consumers have thus overpaid for EMAX Tokens.  Such injury is not outweighed by any countervailing benefits to consumers or competition.  Indeed, no benefit to consumers or competition results from the alleged conduct of

---

[99]  *Id*. ("From January 1, 2021 through March 31, 2022, 49% of fraud reports to the FTC indicating cryptocurrency as the payment method specified that the scam started on social media, compared to 37% in 2020, 18% in 2019, and 11% in 2018.").

[100]  *Id*. ("From January 1, 2021 through March 31, 2022, $1.1 billion was reported to the FTC as lost to fraud originating on social media.").

[101]  *Id*. ("From January 1, 2021 through March 31, 2022, people reported to the FTC that $417 million in cryptocurrency was lost to fraud originating on social media.  $273 million of these losses were to fraud categorized as investment related, followed by romance scams ($69 million), and business imposters ($35 million).").

the Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian.  Since consumers reasonably rely on the representations, and could not have known about the omitted disclosures, and the injury results from ordinary use of their product, consumers could not have reasonably avoided such injury.

223.  The Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian willfully and knowingly engaged in the deceptive and unfair acts and practices described above and knew or should have known that those acts and practices were unlawful and thus in violation of Cal. Bus. & Prof. Code §17200, *et seq.*

224.  These facts that the Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian omitted and concealed were material to the decisions of Plaintiffs Semerjian, Buckley, and Shah and the members of the class about whether to pay for EMAX Tokens, in that they would not have proceeded with the transaction but for the deceptive and unfair acts and practices.

225.  Defendants' conduct harmed competition.  While the Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian cut corners and minimized costs, their competitors spent the time and money necessary to promote financial products and/or digital assets that complied with the applicable state and federal laws.  Further, the injuries suffered by Plaintiffs are not outweighed by any countervailing benefits to consumers or competition.  And because the Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian are solely responsible for their respective promotional activities and related disclosures (or lack thereof), there is no way Plaintiffs Semerjian or Shah, or the members of the class could have known about the payments that Promoter Defendants Pierce, Mayweather, and Kardashian received for pretending that they were interested in EthereumMax.  There were reasonably available alternatives to

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1 further EthereumMax's legitimate business interests, such as including disclaimers,
2 other than the conduct alleged herein.

3     226.  In order to have standing for a UCL claim, a plaintiff must meet the
4 injury-in-fact requirement.  This requirement is met where a plaintiff can "show that,
5 by relying on a misrepresentation on a product label, they 'paid more for a product
6 than they otherwise would have paid, or bought it when they otherwise would not
7 have done so.'"  *Reid*, 780 F.3d at 958.  A plaintiff's claims under this California
8 statute are governed by the "reasonable consumer" test.  *Freeman*, 68 F.3d at 289
9 ("'[T]he false or misleading advertising and unfair business practices claim must be
10 evaluated from the vantage of a reasonable consumer.'").  Under the reasonable
11 consumer standard, a plaintiff must "show that 'members of the public are likely to
12 be deceived.'"  *Id*. (quoting *Bank of the West*, 2 Cal. 4th at 1267).

13     227.  To meet the heightened pleading standard of Rule 9(b) for claims that
14 sound in fraud, plaintiffs must plead "'the who, what, when, where, and how'" of the
15 alleged fraud.  *Vess*, 317 F.3d at 1106.

16     228.  Plaintiff Semerjian is lifelong fan of professional sports, particularly
17 basketball and boxing.  Semerjian regularly watched Defendant Pierce when the latter
18 played basketball professionally and then as a commentator on ESPN.  Semerjian
19 saw the promotions by Pierce on May 26, 2021, May 28, 2021, and May 30, 2021,
20 respectively.  These promotions regarding the growth potential and price increases
21 for EMAX Tokens induced Semerjian to make his first and second purchases of
22 EMAX Tokens on May 31, 2021 and June 1, 2021.  Semerjian has also been aware
23 of Defendant Mayweather from his many years of being a world champion boxer.
24 Semerjian regularly sees posts from and about Mayweather on various social media
25 platforms via the trending or discovery features of the platform.  Semerjian
26 specifically saw Mayweather's promotions of EthereumMax during the Bitcoin
27 Miami conference (which were also promoted on the social media accounts for

28

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release. Mayweather's statements and promotions of EthereumMax gave Semerjian the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy. Each of these promotions induced Semerjian to make another purchase of EMAX Tokens on June 4, 2021. Semerjian is also aware of Defendant Kardashian's reputation as celebrity influencer, and in particular, her renowned business savvy. Semerjian also saw Defendant Kardashian's June 14, 2021 promotion of the EMAX Tokens. Semerjian believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX Tokens to correspondingly increase in value. Kardashian's promotion induced Semerjian to continue to hold on to his investment in EMAX Tokens when he otherwise would not have done so.

229. Semerjian also followed the EthereumMax Instagram page during the Relevant Period and saw the promotions from the Executive Defendants that were posted on that platform. Semerjian specifically saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling. Semerjian reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors" who were "not part of the development team." Similarly, Semerjian believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout. The misleading statements and omissions within the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Pierce, Mayweather, and Kardashian, induced Semerjian to make his June 4, 2021 purchase of EMAX Tokens.

Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused Semerjian to retain his EMAX Token investment when he otherwise would not have done so.

230.   Plaintiff Buckley is a lifelong fan of professional sports, particularly basketball and boxing.  Buckley regularly watched Defendant Pierce when the latter played professionally and then as a commentator on ESPN.  Buckley saw the promotions by Pierce on May 26, 2021, and May 28, 2021, respectively.  These promotions regarding the growth potential and price increases for EMAX Tokens induced Buckley to make his first two purchases of EMAX Tokens on May 28, 2021.  In addition to Pierce, Buckley is aware of Defendant Brown's football career and off-field conduct, and he specifically saw Brown's May 29, 2021 promotion wherein Brown indicated that he wanted his next football contract to be paid in EMAX Tokens.  Buckley also saw Pierce's May 30, 2021 promotion of EthereumMax.  Buckley has also been aware of Defendant Mayweather from his many years of being a world champion boxer.  Buckley regularly sees posts from and about Mayweather on various social media platforms via the trending or discovery features of the platform.  Buckley specifically saw Mayweather's promotions of EthereumMax during the Bitcoin Miami conference (which were also promoted on the social media accounts for EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release.  Mayweather's statements and promotions of EthereumMax gave Buckley the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy.  Buckley also saw Defendant

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

Kardashian's June 14, 2021 promotion of the EMAX Tokens. Buckley believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX Tokens to correspondingly increase in value. Each of these promotions induced Buckley to make his third and final purchase of EMAX Tokens on June 18, 2021. These promotions also induced Buckley to continue to hold on to his investment in EMAX Tokens when he otherwise would not have done so.

231.  Buckley also followed the EthereumMax Instagram page during the Relevant Period and saw the promotions from the Executive Defendants that were posted on that platform. Buckley specifically saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling. Buckley reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors" who were "not part of the development team." Similarly, Buckley believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout. The misleading statements and omissions within the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Pierce, Mayweather, and Kardashian, induced Buckley to make his June 18, 2021 purchase of EMAX Tokens. Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused Buckley to retain his EMAX Token investment when he otherwise would not have done so.

232.  Buckley also saw the statements and promotions from Defendants Maher and Davis that were posted and/or reposted on various social media platforms. Buckley specifically saw the May 14, 2021 promotion from Maher touting the

approximately 500,000% increase the EMAX Token Price. Buckley reasonably believed that this price increase was the result of genuine investor interest. Buckley also saw Maher's May 15, 2021 statement dismissing concerns about price volatility because the Executive Defendants "assured" Maher that "aside from marketing expenses they will not sell off any of their position[s] for at least six months." Buckley believed the statement that EthereumMax insiders would not be selling their portion of the Float and driving the price of EMAX Tokens down. Similarly, Buckley saw and believed Maher's solicitations in his May 17, 2021 social media post dismissing claims that EthereumMax was a "scam or pump and dump" and touting EMAX Tokens was a "[l]ong term" investment that investors like Plaintiffs and the class should "hold all the way." Buckley also saw and relied on Davis' May 18, 2021 solicitation that is was "not too late" to purchase EMAX Tokens given their growth potential. These misleading statements and omissions by Davis and Maher induced Buckley to make his May 28, 2021 purchase of EMAX Tokens.

233. Plaintiff Shah is lifelong fan of professional sports, particularly basketball and boxing. Shah regularly watched Defendant Pierce when the latter played basketball professionally and then as a commentator on ESPN. Shah follows Pierce on Twitter and saw the promotions by Pierce on May 26, 2021, May 28, 2021, and May 30, 2021, respectively. These promotions regarding the growth potential and price increases for EMAX Tokens induced Shah to make his first and second purchases of EMAX Tokens on May 29, 2021 and June 1, 2021. Shah has also been aware of Defendant Mayweather from his many years of being a world champion boxer. Shah follows Mayweather on social media. Shah specifically saw Mayweather's promotions of EthereumMax during the Bitcoin Miami conference (which were also promoted on the social media accounts for EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

Mayweather's statements and promotions of EthereumMax gave Shah the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy. Each of these promotions induced Shah to make another purchase of EMAX Tokens on June 3, 2021 and June 11, 2021. Shah is also aware of Defendant Kardashian's reputation as a celebrity influencer, and in particular, her renowned business savvy. Shah also saw Defendant Kardashian's May 30, 2021 and June 14, 2021 promotion of the EMAX Tokens. Shah believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX tokens to correspondingly increase in value. Kardashian's promotion induced Shah to continue to hold on to his investment in EMAX Tokens when he otherwise would not have done so.

234. Shah also followed the EthereumMax Instagram page and other social media platforms like Telegram, Reddit, and Twitter during the Relevant Period and saw the promotions from the Executive Defendants that were posted. Shah specifically saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling. Shah reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors" who were "not part of the development team." Similarly, Shah believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout. The misleading statements and omissions within the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Pierce, Mayweather, and Kardashian, induced Shah to make his June 3, 2021 and June 11, 2021 purchases of EMAX Tokens. Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an

85

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1  accepted payment and the increase in value his investments in EMAX Tokens would
2  receive if he continued to hold, caused Shah to retain his EMAX Token investment
3  when he otherwise would not have done so.

4       235.   Defendants engaged in deceptive acts and practices under California law
5  by taking advantage of the lack of knowledge, ability, experience, or capacity of
6  Plaintiffs to a grossly unfair degree, including but not limited to, in the following
7  ways:

8       (a)    knowingly and intentionally concealing the Executive Defendants'
9  specific roles and ownership interests in EthereumMax;

10      (b)    failing to disclose that the huge increase in price of the EMAX Tokens
11 during the first days following launch were caused by manipulation by the Executive
12 Defendants instead of being due to an organic increase in interest from investors;

13      (c)    failing to disclose that EMAX Tokens were not being accepted as a
14 payment and would not be at any point in the foreseeable future; and

15      (d)    knowingly and intentionally using and/or failing to disclose the use of
16 the Promotor Defendants to "instill trust" in uninformed investors to promote the
17 financial benefits of a highly speculative and risky investment in EMAX Tokens, in
18 an effort to manipulate and artificially inflate the price and trading volume of the
19 EMAX Tokens and allow Defendants to sell their EMAX Tokens at those inflated
20 prices.

21      236.   The Executive Defendants did not disclose that the EMAX Token
22 developer held the number one rank with 23% ownership interest.  Nor did they
23 disclose until much later that the Executive Defendants had purposefully chosen not
24 to lock the wallets of the EthereumMax insiders.  Plaintiffs Semerjian, Buckley, and
25 Shah would have found it material to their decision to purchase EMAX Tokens to
26 know whether or not insiders had significant percentages of the available Float of
27 EMAX Tokens with the ability to sell freely those EMAX Tokens and create massive

28

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1  downward pressure. Likewise, had Semerjian, Buckley, and Shah been made aware
2  of that information at the times of their purchases, as well as the later-revealed
3  admission from Gentile that the Executive Defendants had chosen not to "lock the
4  wallets" (which gives the ten original founding members, including Defendant Maher
5  who held 5%, the ability to sell off their portions of EMAX Tokens without
6  restriction), it would have altered their respective decisions to both purchase the
7  EMAX Tokens for the price they paid as well and hold on to those EMAX Tokens
8  when they otherwise would not have done so.

9      237.  The facts that the Executive Defendants and Promoter Defendants
10  Pierce, Mayweather, and Kardashian misrepresented and concealed were material to
11  the decisions of Plaintiffs Semerjian, Buckley, and Shah and the members of the class
12  about whether to pay for or purchase EMAX Tokens (at all or for the price they paid),
13  in that they would not have proceeded with their transactions but for the deceptive,
14  fraudulent and false acts and practices.

15      238.  The Executive Defendants and Promoter Defendants Pierce,
16  Mayweather, and Kardashian intended for Plaintiffs Semerjian, Buckley, and Shah
17  and the members of the class to pay for EMAX Tokens in reliance upon their
18  deceptive and fraudulent acts and practices.

19      239.  Had the Promoter Defendants disclosed the omitted information,
20  Semerjian would have been aware of it because (a) he saw the actual promotions by
21  Promoter Defendants Pierce, Mayweather, and Kardashian and would have
22  concurrently seen any disclosure on the promotions themselves had it been included,
23  and (b) because he follows, directly or indirectly, the social media accounts of, and
24  news reports on, Promoter Defendants Pierce, Mayweather, and Kardashian.

25      240.  As a direct and proximate result of Defendants' unlawful, unfair, and
26  deceptive practices, Plaintiffs and Class members suffered damages. The Executive
27  Defendants' activities with the Promoter Defendants caused Plaintiffs and the Class
28

members to purchase and/or hold the EMAX Tokens when they otherwise would not have done so.

241.  The statements from Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian are actionable and not puffery.  "'The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions.'" *Orlick*, 2013 WL 12139142, at *5.  Under California law, there is no requirement that for a statement to be actionable it must also be false — the UCL also prohibits "'advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" *Williams*., 552 F.3d at 938.  Significantly, even if certain statements would be non-actionable on their own, where there are multiple statements at issue, courts must consider "as a whole." *Id*. at 939 n.3; *Lima*, 710 F. Supp. 2d at 1007–08 (denying motion to dismiss where some specific representations could be considered puffery, but all of defendants' statements "taken as a whole" might be actionable); *NJOY*, 2015 WL 12732461, at *10 ("'Even assuming . . . that some of the statements would themselves be non-actionable, they "cannot be considered in isolation because they contribute to the [potentially] deceptive context" of the packaging and marketing "as a whole."'") (alteration in original).

242.  As alleged further above, the Executive Defendants' May 16, 2021 Pre-launch Kickoff post stated, among other things, that (1) EMAX Tokens were up "500,000+% in the first 24 hours"; (2) the Executive Defendants had "locked in partnership with global digital marketing agency" and "lined up a knockout influencer" for a "nationwide campaign"; and (3) "We are 3 days in with ~$100M market cap and the train is just getting rolling."  These statements from Executive Defendants are specific, detailed factual assertions the Executive Defendants were using to encourage purchases and increase the price of the EMAX Tokens.  At the same time, the Executive Defendants Maher and Speer, with Promoter Defendant

Davis, each failed to disclose that these metrics were the result of the failed launch that allowed insiders, including but not limited to Maher, to disproportionately increase the price of the EMAX Tokens with their early trades.

243. Taken together, the misleading statements and omissions of the Executive Defendants and Promoter Defendants Davis, Pierce, Mayweather, and Kardashian contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of EMAX Tokens.

244. Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by EthereumMax, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under California Business & Professions Code §17200.

## **THIRD CAUSE OF ACTION**

**Violation of the California Unfair Competition Law
Cal. Bus. & Prof. Code §17200
(Based on Fraudulent Acts and Practices)
(Against All Defendants)**

245. Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein, and further alleges as follows.

246. Plaintiffs Semerjian, Buckley, and Shah are residents of the State of California.

247. Plaintiffs Semerjian, Buckley, and Shah paid for or purchased EMAX Tokens in California and thus the deceptive transactions alleged herein occurred in California.

248. At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, which prohibits, *inter alia*, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

249.   "'[A]n act can be alleged to violate any or all three of the three prongs of the UCL — unlawful, unfair, or fraudulent.'" *Stearns*, 763 F. Supp. 2d at 1149 (quoting *Berryman*, 152 Cal. App. 4th at 1554).

250.   Any violation of the California false advertising laws (*e.g.*, §17500) necessarily violates the "fraudulent" prong of the UCL.

251.   To meet the heightened pleading standard of Rule 9(b) for claims that sound in fraud, plaintiffs must plead "'the who, what, when, where, and how'" of the alleged fraud. *Vess*, 317 F.3d at 1106.

252.   In order to have standing under California law for a UCL claim, a plaintiff must meet the injury-in-fact requirement.  This requirement is met where a plaintiff can "show that, by relying on a misrepresentation on a product label, they 'paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so.'" *Reid*, 780 F.3d at 958.

253.   A plaintiff's claims under this California statute are governed by the "reasonable consumer" test. *Freeman*, 68 F.3d at 289 ("'[T]he false or misleading advertising and unfair business practices claim must be evaluated from the vantage of a reasonable consumer.'").  Under the reasonable consumer standard, a plaintiff must "show that 'members of the public are likely to be deceived.'" *Id.* at 289 (quoting *Bank of the West*, 2 Cal. 4th at 1267).

254.   Plaintiff Semerjian is a lifelong fan of professional sports, particularly basketball and boxing. Semerjian regularly watched Defendant Pierce when the latter played professionally and then as a commentator on ESPN.  Semerjian saw the promotions by Pierce on May 26, 2021, May 28, 2021, and May 30, 2021, respectively.  These promotions regarding the growth potential and price increases for EMAX Tokens induced Semerjian to make his first and second purchases of EMAX Tokens on May 31, 2021 and June 1, 2021.  Semerjian has also been aware of Defendant Mayweather from his many years of being a world champion boxer.

Semerjian regularly sees posts from and about Mayweather on various social media platforms via the trending or discovery features of the platform. Semerjian specifically saw Mayweather's promotions of EthereumMax during the Bitcoin Miami conference (which were also promoted on the social media accounts for EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release. Mayweather's statements and promotions of EthereumMax gave Semerjian the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy. Each of these promotions induced Semerjian to make another purchase of EMAX Tokens on June 4, 2021. Semerjian also saw Defendant Kardashian's June 14, 2021 promotion of the EMAX Tokens. Semerjian believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX Tokens to correspondingly increase in value. Kardashian's promotion induced Semerjian to continue to hold on to his investment in EMAX Tokens when he otherwise would not have done so.

255. Semerjian also followed the EthereumMax Instagram page during the Relevant Period and saw the promotions from the Executive Defendants that were posted on that platform. Semerjian specifically saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling. Semerjian reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors" who were "not part of the development team." Similarly, Semerjian believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout. The misleading statements and omissions within

the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Pierce, Mayweather, and Kardashian, induced Semerjian to make his June 4, 2021 purchase of EMAX Tokens. Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused Semerjian to retain his EMAX Token investment when he otherwise would not have done so.

256. Plaintiff Buckley is a lifelong fan of professional sports, particularly basketball and boxing. Buckley regularly watched Defendant Pierce when the latter played professionally and then as a commentator on ESPN. Buckley saw the promotions by Pierce on May 26, 2021, and May 28, 2021, respectively. These promotions regarding the growth potential and price increases for EMAX Tokens induced Buckley to make his first two purchases of EMAX Tokens on May 28, 2021. In addition to Pierce, Buckley is aware of Defendant Brown's football career and off-field conduct, and he specifically saw Brown's May 29, 2021 promotion wherein Brown indicated that he wanted his next football contract to be paid in EMAX Tokens. Buckley also saw Pierce's May 30, 2021 promotion of EthereumMax. Buckley has also been aware of Defendant Mayweather from his many years of being a world champion boxer. Buckley regularly sees posts from and about Mayweather on various social media platforms via the trending or discovery features of the platform. Buckley specifically saw Mayweather's promotions of EthereumMax during the Bitcoin Miami conference (which were also promoted on the social media accounts for EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release. Mayweather's statements and promotions of EthereumMax gave Buckley the false impression that Mayweather

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy. Buckley also saw Defendant Kardashian's June 14, 2021 promotion of the EMAX Tokens. Buckley believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX Tokens to correspondingly increase in value. Each of these promotions induced Buckley to make his third and final purchase of EMAX Tokens on June 18, 2021. These promotions also induced Buckley to continue to hold on to his investment in EMAX Tokens when he otherwise would not have done so.

257. Buckley also followed the EthereumMax Instagram page during the Relevant Period and saw the promotions from the Executive Defendants that were posted on that platform. Buckley specifically saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling. Buckley reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors" who were "not part of the development team." Similarly, Buckley believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout. The misleading statements and omissions within the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Pierce, Mayweather, and Kardashian, induced Buckley to make his June 18, 2021 purchase of EMAX Tokens. Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused Buckley to retain his EMAX Token investment when he otherwise would not have done so.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

258. Buckley also saw the statements and promotions from Defendants Maher and Davis that were posted and/or reposted on various social media platforms. Buckley specifically saw the May 14, 2021 promotion from Maher touting the approximately 500,000% increase in the EMAX Token Price. Buckley reasonably believed that this price increase was the result of genuine investor interest. Buckley also saw Maher's May 15, 2021 statement dismissing concerns about price volatility because the Executive Defendants "assured" Maher that "aside from marketing expenses they will not sell off any of their position[s] for at least six months." Buckley believed the statement that EthereumMax insiders would not be selling their portion of the Float and driving the price of EMAX Tokens down. Similarly, Buckley saw and believed Maher's solicitations in his May 17, 2021 social media post dismissing claims that EthereumMax was a "scam or pump and dump" and touting EMAX Tokens were a "[l]ong term" investment that investors like Plaintiffs and the class should "hold all the way." Buckley also saw and relied on Davis' May 18, 2021 solicitation that is was "not too late" to purchase EMAX Tokens given their growth potential. These misleading statements and omissions by Davis and Maher induced Buckley to make his May 28, 2021 purchase of EMAX Tokens.

259. Plaintiff Shah is a lifelong fan of professional sports, particularly basketball and boxing. Shah regularly watched Defendant Pierce when the latter played basketball professionally and then as a commentator on ESPN. Shah follows Pierce on Twitter and saw the promotions by Pierce on May 26, 2021, May 28, 2021, and May 30, 2021, respectively. These promotions regarding the growth potential and price increases for EMAX Tokens induced Shah to make his first and second purchases of EMAX Tokens on May 29, 2021 and June 1, 2021. Shah has also been aware of Defendant Mayweather from his many years of being a world champion boxer. Shah follows Mayweather on social media. Shah specifically saw Mayweather's promotions of EthereumMax during the Bitcoin Miami conference

(which were also promoted on the social media accounts for EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release. Mayweather's statements and promotions of EthereumMax gave Shah the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy. Each of these promotions induced Shah to make another purchase of EMAX Tokens on June 3, 2021 and June 11, 2021. Shah is also aware of Defendant Kardashian's reputation as celebrity influencer, and in particular, her renowned business savvy. Shah also saw Defendant Kardashian's May 30, 2021 and June 14, 2021 promotion of the EMAX Tokens. Shah believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX Tokens to correspondingly increase in value. Kardashian's promotion induced Shah to continue to hold on to his investment in EMAX Tokens when he otherwise would not have done so.

260. Shah also followed the EthereumMax Instagram page and other social media platforms like Telegram, Reddit, and Twitter during the Relevant Period and saw the promotions from the Executive Defendants that were posted. Shah specifically saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling. Shah reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors" who were "not part of the development team." Similarly, Shah believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout. The misleading statements and omissions within the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants

Pierce, Mayweather, and Kardashian, induced Shah to make his June 3, 2021 and June 11, 2021 purchases of EMAX Tokens. Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused Shah to retain his EMAX Token investment when he otherwise would not have done so.

261. The facts that the Executive Defendants and Promoter Defendants Davis, Pierce, Mayweather, and Kardashian misrepresented and concealed were material to the decisions of Plaintiffs Semerjian, Buckley, and Shah and the members of the class about whether to pay for or purchase EMAX Tokens (at all or for the price they paid), in that they would not have proceeded with their transactions but for the deceptive, fraudulent, and false acts and practices.

262. The Executive Defendants and Promoter Defendants Davis, Pierce, Mayweather, and Kardashian intended for Plaintiffs Semerjian, Buckley, and Shah and the members of the class to pay for EMAX Tokens in reliance upon their deceptive and fraudulent acts and practices.

263. Defendants engaged in deceptive acts and practices under California law by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree, including but not limited to, in the following ways:

(a) knowingly and intentionally concealing the Executive Defendants' specific roles and ownership interests in EthereumMax;

(b) failing to disclose that the huge increase in price of the EMAX Tokens during first days following launch were caused by manipulation by the Executive Defendants instead of being due to an organic increase in interest from investors;

(c)     leading investors to believe that the EMAX Token would be available for use as a payment at select locations when there was no such capability; and

(d)     knowingly and intentionally using and/or failing to disclose the use of the Promotor Defendants to "instill trust" in uninformed investors to promote the financial benefits of a highly speculative and risky investment in EMAX Tokens, in an effort to manipulate and artificially inflate the price and trading volume of the EMAX Tokens and allow Defendants to sell their EMAX Tokens at those inflated prices.

264.   The Executive Defendants did not disclose that the EMAX Token developer held the number one rank with 23% ownership interest.  Nor did they disclose until much later that the Executive Defendants had purposefully chosen not to lock the wallets of the EthereumMax insiders.  Semerjian, Buckley, and Shah would have found it material to their decision to purchase EMAX Tokens to know whether or not insiders had significant percentages of the available Float of EMAX Tokens with the ability to sell freely those EMAX Tokens and create massive downward pressure.  Likewise, had Semerjian, Buckley, and Shah been made aware of that information at the times of their purchases, as well as the later-revealed admission from Gentile that the Executive Defendants had chosen not to "lock the wallets" (which gives the ten original founding members, including Defendant Maher who held 5%, the ability to sell off their portions of EMAX Tokens without restriction), it would have altered their decisions to both purchase the EMAX Tokens for the price they paid as well and hold on to those EMAX Tokens when they otherwise would not have done so.

265.   Had the Promoter Defendants disclosed the omitted information, Semerjian, Buckley, and Shah would have been aware of it because (a) they saw the actual promotions by the Executive Defendants and Promoter Defendants Pierce,

Mayweather, and Kardashian and would have concurrently seen any disclosure on the promotions themselves had it been included, and (b) because they follow, directly or indirectly, the social media accounts of, and news reports on, Promoter Defendants Pierce, Mayweather, and Kardashian.

266.   As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages.  The Executive Defendants' activities with the Promoter Defendants caused Plaintiffs and the Class members to purchase and/or hold the EMAX Tokens when they otherwise would not have done so.

267.   The statements from Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian are actionable and not puffery.  "'The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions.'"  *Orlick*, 2013 WL 12139142, at \*5.  Under California law, there is no requirement that for a statement to be actionable it must also be false — the UCL also prohibits "'advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'"  *Williams*., 552 F.3d at 938.  Significantly, even if certain statements would be non-actionable on their own, where there are multiple statements at issue, courts must consider "as a whole."  *Id*. at 939 n.3; *Lima*, 710 F. Supp. 2d at 1007-08 (denying motion to dismiss where some specific representations could be considered puffery, but all of defendants' statements "taken as a whole" might be actionable); *NJOY*, 2015 WL 12732461, at \*10 ("'Even assuming . . .  that some of the statements would themselves be non-actionable, they "cannot be considered in isolation because they contribute to the [potentially] deceptive context" of the packaging and marketing "as a whole.'"") (alteration in original).

268.   As alleged further above, the Executive Defendants' May 16, 2021 Pre-launch Kickoff post stated, among other things, that (1) EMAX Tokens were up

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

"500,000+% in the first 24 hours"; (2) the Executive Defendants had "locked in partnership with global digital marketing agency" and "lined up a knockout influencer" for a "nationwide campaign"; and (3) "We are 3 days in with ~$100M market cap and the train is just getting rolling." These statements from Executive Defendants are specific, detailed factual assertions the Executive Defendants were using to encourage purchases and increase the price of the EMAX Tokens. At the same time, the Executive Defendants Maher and Speer, with Promoter Defendant Davis, each failed to disclose that these metrics were the result of the failed launch that allowed insiders, including but not limited to Maher, to disproportionately increase the price of the EMAX Tokens with their early trades.

269.  Taken together, the misleading statements and omissions of the Executive Defendants and Promoter Defendants Davis, Pierce, Mayweather, and Kardashian contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of EMAX Tokens.

270.  Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by EthereumMax, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under California Business & Professions Code §17200.

### FOURTH CAUSE OF ACTION

**Violation of the California False Advertising Law**
**Cal. Bus. & Prof. Code §17500, *et seq*.**
**(Against Defendant Kardashian)**

271.  Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

272.  Plaintiffs Semerjian, Buckley, and Shah are residents of the State of California.

273.   Plaintiffs Semerjian, Buckley, and Shah paid for or purchased EMAX Tokens in California and thus the deceptive transactions alleged herein occurred in California.

274.   The "'primary evidence'" is the "'advertising itself.'"  *Brockey v. Moore*, 107 Cal. App. 4th 86, 100 (2003).  The Ninth Circuit has recognized that the question of whether advertising materials are deceptive to a reasonable consumer "will usually be a question of fact not appropriate for decision" at the pleading stage.  *Williams*, 552 F.3d at 938.

275.   In order to have standing under California law for a False Advertising Law ("FAL") claim, a plaintiff must meet the injury-in-fact requirement.   This requirement is met where a plaintiff can "show that, by relying on a misrepresentation on a product label, they 'paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so.'"  *Reid*, 780 F.3d at 958.

276.   Plaintiffs Semerjian, Buckley, and Shah saw Defendant Kardashian's May 30, 2021 and June 14, 2021 promotions of the EMAX Tokens.  Semerjian, Buckley, and Shah believed Kardashian's promotion and statements about the ability to use EMAX Tokens as an accepted payment at Club LIV and the number of tokens being burned as indicating that the decrease in supply would cause their current investments in EMAX Tokens to correspondingly increase in value.  Kardashian's promotions induced Semerjian, Buckley, and Shah to continue to hold on to their respective investments in EMAX Tokens when they each otherwise would not have done so.

277.   At all relevant times there was in full force and effect the California False Advertising Law, Cal. Bus. & Prof. Code §17500, *et seq.*, which prohibits, *inter alia*, any public statement made "to induce the public to enter into any obligation relating" to the disposal of real or personal property "which is untrue or misleading,

and which is known, or which by the exercise of reasonable care should be known, to be untrue and misleading."

278.   Kardashian used online and social media advertising to sell the EMAX Tokens.   Kardashian disseminated (and could continue to do so in the future) advertising concerning the EMAX Token which by its very nature is deceptive, untrue, or misleading within the meaning of Cal. Bus. & Prof. Code §17500 because those advertising statements are misleading and likely to deceive, and continue to deceive, members of the Class and the general public.

279.   In making and disseminating the statements alleged herein, Kardashian knew that the statements were untrue or misleading, and acted in violation of Cal. Bus. & Prof. Code §17500.

280.   The misrepresentations and non-disclosures by Kardashian of the material facts detailed above constitute false and misleading advertising and therefore constitute a violation of Cal. Bus. & Prof. Code §17500.

281.   Through her deceptive acts and practices, Kardashian has improperly and illegally obtained money from Plaintiffs and the members of the Class.   As such, Plaintiffs request that this Court cause Defendant Kardashian to restore this money to Plaintiffs and the members of the Class, and to enjoin Defendant from continuing to violate Cal. Bus. & Prof. Code §17500, as discussed above.   Otherwise, Plaintiffs and those similarly situated will continue to be harmed by Kardashian's false and/or misleading advertising regarding EMAX Tokens.

282.   "Any violation of [Cal. Bus. & Prof. Code §17500] is a misdemeanor punishable by imprisonment in county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both that imprisonment and fine."   Cal. Bus. & Prof. Code §17500.

283.   "Punishment is partly an expression of a society's desire to inflict pain on those who break the law.   But giving wealthy offenders a mere slap on the wrist

1    makes a mockery of that objective.  And while punishment is supposed to prevent

2    undesirable conduct from happening in the first place, flat fines deter the wealthy less

3    than everyone else."[102]

4         284.   Given Kardashian's status as one of the country's most influential and

5    wealth celebrity promotors – someone who regularly makes millions of dollars from

6    similarly promoting products to her massive following on social media – the

7    maximum fine of only $2,500 for a violation of Cal. Bus. & Prof. Code §17500 will

8    do little, if anything, to deter Kardashian from making false and misleading

9    advertisements in the future.

10        285.   In addition, pursuant to Cal. Bus. & Prof. Code §17535, Plaintiffs seek

11   an Order of this Court ordering Defendants to fully disclose the true nature of their

12   misrepresentations.  Plaintiffs additionally request an Order requiring Kardashian to

13   disgorge her ill-gotten gains and/or award full restitution of all monies wrongfully

14   acquired by Kardashian by means of such acts of false advertising, plus interest and

15   attorneys' fees so as to restore any and all monies which were acquired and obtained

16   by means of such untrue and misleading advertising, misrepresentations and

17   omissions, and which ill-gotten gains are still retained by Kardashian.  Plaintiffs and

18   those similarly situated may be irreparably harmed and/or denied an effective and

19   complete remedy if such an Order is not granted.

20        286.   Kardashian's conduct is ongoing and continues to this date.  Plaintiffs

21   and the Classes are therefore entitled to the relief sought.

---

[102]    Alec Schierenbeck, *A Billionaire and a Nurse Shouldn't Pay the Same Fine for Speeding*, N.Y. TIMES (Mar. 15, 2018), https://www.nytimes.com/2018/03/15/opinion/flat-fines-wealthy-poor.html.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

## FIFTH CAUSE OF ACTION

**Violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA")
Ch. 501, §211(1), Fla. Stat. Ann.
(Against All Defendants)**

287. Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein, and further alleges as follows:

288. Plaintiffs Nahlah, Freeman, Brignol, and Puda are residents of the State of Florida.

289. Plaintiffs Nahlah, Freeman, Puda, and Brignol paid for or purchased EMAX Tokens in Florida and thus the deceptive transactions alleged herein occurred in Florida.

290. Chapter 501, Fla. Stat., FDUTPA is to be liberally construed to protect the consuming public, such as Plaintiffs in this case, from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce.

291. Plaintiffs are "consumers" within the meaning of Fla. Stat. §501.203(7).

292. By soliciting investor funds in the manner in which they did, Defendants engaged in "trade and commerce" within the meaning of Fla. Stat. §501.203(8).

293. The elements comprising a consumer claim for damages under FDUTPA are: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016) (citing *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. Dist. Ct. App. 2008)).

294. Under FDUTPA, "'deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.'" *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)). "Under Florida law, an objective test is employed in determining whether the practice was likely to deceive a consumer

acting reasonably.  That is, '[a] party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue.'" *Carriuolo*, 823 F.3d at 984 (quoting *Davis v. Powertel, Inc.*, 776 So. 2d 971, 973 (Fla. Dist. Ct. App. 2000).

295.   Here, Plaintiffs Nahlah, Freeman, Puda and Brignol nevertheless did, in fact, reasonably rely on the alleged misleading statements and omissions when making their respective decisions to purchase the EMAX Tokens.

296.   A plaintiff's claims under FDUPTA are governed by the "reasonable consumer" test.  *Piescik v. CVS Pharmacy, Inc.*, 576 F. Supp. 3d 1125, 1132 n.2 (S.D. Fla. 2021) ("This case was brought under California's consumer protection laws, which apply the same 'reasonable consumer' test for deception as applied in interpreting FDUTPA.").

297.   Plaintiff Nahlah is a lifelong fan of professional sports, particularly basketball and boxing.  Nahlah regularly watched Defendant Pierce when the latter played professionally and then as a commentator on ESPN.  Nahlah saw Defendant Pierce's May 26, 2021 and May 28, 2021, respectively.  These promotions induced Nahlah to make his first purchase of EMAX Tokens on May 28, 2021.  Nahlah also follows Defendant Mayweather's career and social media accounts.  Nahlah specifically saw Mayweather's promotion of EthereumMax during the Bitcoin Miami conference (which were also promoted on the social media accounts for EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release. Mayweather's statements and promotions of EthereumMax gave Nahlah the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy.  These promotions induced Nahlah to make six more purchases of EMAX Tokens on June

4, 2021, June 5, 2021, June 6, 2021, June 7, 2021, June 8, 2021, and June 10, 2021. Nahlah also saw Defendant Kardashian's May 30, 2021 and June 14, 2021 promotions of the EMAX Tokens.  Nahlah often visited Club LIV during the Relevant Period and was particularly enticed by Kardashian's promotion to use EMAX Tokens there.  Furthermore, Nahlah believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX Tokens to correspondingly increase in value.  Kardashian's promotions induced Nahlah to make additional purchases of EMAX Tokens as well as continuing to hold on to his investment in EMAX Tokens when he otherwise would not have done so.

298.   Nahlah also followed the EthereumMax Instagram page during the Relevant Period and saw the promotions from the Executive Defendants that were posted on that platform.  Nahlah specifically saw the May 16, 2021 post related to the "EthereumMax Pre-launch Kickoff," which promoted the growth of the EMAX Tokens and alluded to a relationship with Defendant Mayweather as a "knockout influencer."  Nahlah also saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling.  Nahlah reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors" who were "not part of the development team," as opposed to those insiders like Defendant Maher.  Similarly, Nahlah believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout.  The misleading statements and omissions within the June 3, 2022 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Pierce, Mayweather, and Kardashian, caused Nahlah to make his June 4, 2021, June 5, 2021, June 6, 2021, June 7, 2021, June 8, 2021, and June 10, 2021 purchases of EMAX Tokens.  Similarly, this post, in conjunction with Defendant Kardashian's posts

regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused Nahlah to retain his EMAX Token investment when he otherwise would not have done so.

299.   Nahlah also saw the statements and promotions from Defendants Maher and Davis that were posted and/or reposted on various social media platforms. Nahlah specifically saw the May 14, 2021 promotion from Maher touting the approximately 500,000% increase the EMAX Token Price. Nahlah reasonably believed that this price increase was the result of genuine investor interest. Nahlah also saw Maher's May 15, 2021 statement dismissing concerns about price volatility because the Executive Defendants "assured" Maher that "aside from marketing expenses they will not sell off any of their position for at least six months." Nahlah believed the statement that EthereumMax insiders would not be selling their portion of the Float and driving the price of EMAX Tokens down. Similarly, Nahlah saw and believed Maher's solicitations in his May 17, 2021 social media post dismissing claims that EthereumMax was a "scam or pump and dump" and touting EMAX Tokens was a "[l]ong term" investment that investors like Plaintiffs and the class should "hold all the way." Nahlah also saw and relied on Davis' May 18, 2021 solicitation that is was "not too late" to purchase EMAX Tokens given their growth potential. These misleading statements and omissions by Davis and Maher further induced Nahlah to make his May 28, 2021 purchase of EMAX Tokens.

300.   Plaintiff Puda followed the EthereumMax Instagram page during the Relevant Period and saw the promotions from the Executive Defendants that were posted on that platform.  Puda specifically saw the May 16, 2021 post related to the "EthereumMax Pre-launch Kickoff," which promoted the growth of the EMAX Tokens and alluded to a relationship with Defendant Mayweather as a "knockout influencer."  Each of the promotions, separately and taken together, induced Puda to

purchase EMAX Tokens on May 29, 2021. Puda also saw Defendant Kardashian's May 30, 2021 promotion of the EMAX Tokens being accepted as payments as venues like Club LIV.  Puda often visited Club LIV during the Relevant Period and was particularly enticed by Kardashian's promotion to use EMAX Tokens there.   Puda is also a lifelong fan of professional sports, particularly boxing.  Puda is aware of Defendant Mayweather from his career as a world champion boxer.  Puda also follows Defendant Mayweather's career and social media accounts.  Puda specifically saw Mayweather's promotion of EthereumMax during the Bitcoin Miami conference (which were also promoted on the social media accounts for EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens during the pay-per-view fight with Logan Paul.  Mayweather's statements and promotions of EthereumMax, including the "EthereumMax Pre-launch Kickoff" post alluding to Mayweather, gave Puda the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy.  Furthermore, Puda both saw and believed Kardashian's June 14, 2021 promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX Tokens to correspondingly increase in value.  The promotions from Defendants Mayweather and Kardashian induced Puda to continue holding on to his investment in EMAX Tokens when he otherwise would not have done so.

301.   Puda also saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling.  Puda reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors" who were "not part of the development team," as opposed to those like Defendant Maher and the other Executive Defendants.  Similarly, Puda believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues

1    at a future date, despite the issues that caused the delay of the rollout.  The misleading

2    statements and omissions within the June 3, 2021 Instagram post from the Executive

3    Defendants, in conjunction with the above-mentioned promotions from Defendants

4    Mayweather and Kardashian, induced Puda to hold onto his investment in EMAX

5    Tokens.  Similarly, this post, in conjunction with Defendant Kardashian's posts

6    regarding the ability to use EMAX Tokens as an accepted payment and the increase

7    in value his investments in EMAX Tokens would receive if he continued to hold,

8    caused Puda to retain his EMAX Token investment when he otherwise would not

9    have done so.

10        302.   Plaintiff Freeman is a lifelong fan of professional sports, particularly

11   basketball, football, and boxing.  Freeman regularly watched Defendant Pierce when

12   the latter played professionally and then as a commentator on ESPN.  Freeman saw

13   Defendant Pierce's May 26, 2021 and May 28, 2021 promotions, respectively.  Each

14   of these promotions, separately and taken together, induced Freeman to make his first

15   and second purchases of EMAX Tokens on June 2, 2021.  Freeman is also aware of

16   Defendant Brown's football career and off-field conduct, and he follows Brown's

17   social media.  Freeman specifically saw Brown's May 29, 2021 promotion wherein

18   Brown indicated that he wanted his next football contract to be paid in EMAX

19   Tokens.  This promotion also caused Freeman to make his two separate purchases of

20   EMAX Tokens on June 2, 2021.  Freeman is aware of Defendant Mayweather

21   through several means and found Mayweather's promotions particularly influential

22   on his decision to purchase EMAX Tokens.   First, Freeman regularly saw

23   Mayweather at various events around Miami (*e.g.*, charity basketball games and night

24   clubs).  Second, Freeman followed Mayweather's career throughout the years as a

25   world champion boxer.  Freeman specifically saw Mayweather's promotion of

26   EthereumMax during the Bitcoin Miami conference (which were also promoted on

27   the social media accounts for EthereumMax, Maher, and Davis), as well as the

28

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

promotions of EMAX Tokens during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release. Mayweather's statements and promotions of EthereumMax gave Freeman the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion dollar investment strategy. These promotions from Defendant Mayweather and the Executive Defendants induced Freeman to make his third purchase of EMAX Tokens on June 6, 2021. Freeman also saw Defendant Kardashian's May 30, 2021 and June 14, 2021 promotions of the EMAX Tokens. Freeman often visited Club LIV during the Relevant Period and was particularly enticed by Kardashian's promotion to use EMAX Tokens there. Furthermore, Freeman believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX Tokens to correspondingly increase in value. Kardashian's promotions induced Freeman to continue to hold on to his investment in EMAX Tokens when he otherwise would not have done so.

303. Freeman also followed the EthereumMax Instagram page during the Relevant Period and saw the promotions from the Executive Defendants that were posted on that platform. Freeman specifically saw the May 16, 2021 post related to the "EthereumMax Pre-launch Kickoff," which promoted the growth of the EMAX Tokens and alluded to a relationship with Defendant Mayweather as a "knockout influencer." Freeman also saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling. Freeman reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors" who were "not part of the development team," as opposed to those insiders like Defendant Maher. Similarly, Freeman believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout. The misleading

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

statements and omissions within the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Pierce, Mayweather, and Kardashian, caused Freeman to make his June 4, 2021 purchase of EMAX Tokens. Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold while EMAX Tokens were being "burned" by the Executive Defendants, caused Freeman to retain his EMAX Token investment when he otherwise would not have done so.

304. Plaintiff Brignol follows professional sports, in particular boxing and basketball. Brignol regularly watched Defendant Pierce when the latter played professionally and then as a commentator on ESPN. Brignol also followed Pierce's social media accounts and saw Defendant Pierce's May 26, 2021 and May 28, 2021 promotions, respectively. These promotions induced Brignol to make her first purchases of EMAX Tokens on May 29, 2021 and May 31, 2021 (made in four separate transactions). Brignol also follows Defendant Mayweather's career and social media accounts. Brignol specifically saw Mayweather's promotions of EthereumMax on the lead up and during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release. Mayweather's statements and promotions of EthereumMax gave Brignol the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy. These promotions induced Brignol to make her fifth and final purchase of EMAX Tokens on June 8, 2021. Brignol also followed Defendant Kardashian's social media accounts and saw Kardashian's May 30, 2021 and June 14, 2021 promotions of the EMAX Tokens. Brignol often visited Club LIV during the Relevant Period and was particularly enticed by Kardashian's promotion to use

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1   EMAX Tokens there.  Furthermore, Brignol believed Kardashian's promotion and

2   statements about the number of tokens being burned as indicating that the decrease

3   in supply would cause her current investments in EMAX Tokens to correspondingly

4   increase in value.  Kardashian's promotions induced Brignol to continue to hold on

5   to his investment in EMAX Tokens when she otherwise would not have done so.

6        305.  Brignol also followed the EthereumMax Instagram page during the

7   Relevant Period and saw the promotions from the Executive Defendants that were

8   posted on that platform.  Brignol specifically saw the May 16, 2021 post related to

9   the "EthereumMax Pre-launch Kickoff," which promoted the growth of the EMAX

10   Tokens and alluded to a relationship with Defendant Mayweather as a "knockout

11   influencer."  Brignol also saw the June 3, 2021 post regarding the EMAX Token price

12   volatility that came from insider selling.  Freeman reasonably believed that the price

13   drop on EMAX Tokens only came from "a handful of larger wallets" of "early

14   investors" who were "not part of the development team," as opposed to those insiders

15   like Defendant Maher.  Similarly, Brignol believed the statements that EthereumMax

16   would still be accepted as a payment at David Grutman's venues at a future date,

17   despite the issues that caused the delay of the rollout.  The misleading statements and

18   omissions within the June 3, 2021 Instagram post from the Executive Defendants, in

19   conjunction with the above-mentioned promotions from Defendants Pierce,

20   Mayweather, and Kardashian, caused Freeman to make her May 29, 2021 and May

21   31, 2021, and June 8, 2021 purchases of EMAX Tokens.  Similarly, this post, in

22   conjunction with Defendant Kardashian's posts regarding the ability to use EMAX

23   Tokens as an accepted payment and the increase in value her investments in EMAX

24   Tokens would receive if she continued to hold while EMAX Tokens were being

25   "burned" by the Executive Defendants, caused Brignol to retain her EMAX Token

26   investment when she otherwise would not have done so.

27

28

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

306.   To establish an unfair practice, the plaintiff must show that it is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'"  *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1098 (11th Cir. 2021) (quoting *PNR*, 842 So. 2d at 777); *see also CMR Constr. & Roofing, LLC v. UCMS, LLC*, No. 21-11183, 2022 WL 3012298, at *4 (11th Cir. July 29, 2022).

307.   Defendants engaged in business acts and practices deemed "deceptive" because of the conduct, statements, and omissions described above, including, but not limited to, the following:

(a)   knowingly and intentionally concealing the Executive Defendants' specific roles and ownership interests in EthereumMax;

(b)   failing to disclose that the huge increase in price of the EMAX Tokens during first days following launch were caused by manipulation by the Executive Defendants instead of being due to an organic increase in interest from investors;

(c)   leading investors to believe that the EMAX Token would be available for use as a payment at select locations when there was no such capability; and

(d)   knowingly and intentionally using and/or failing to disclose the use of the Promotor Defendants to "instill trust" in uninformed investors to promote the financial benefits of a highly speculative and risky investment in EMAX Tokens, in an effort to manipulate and artificially inflate the price and trading volume of the EMAX Tokens and allow Defendants to sell their EMAX Tokens at those inflated prices.

308.   The Executive Defendants did not disclose that the EMAX Token developer held the number one rank with 23% ownership interest.  Nor did they disclose until much later that the Executive Defendants had purposefully chosen not

to lock the wallets of the EthereumMax insiders.  Nahlah, Freeman, Puda, and Brignol each would have found it material to their decision to purchase EMAX Tokens to know whether or not insiders had significant percentages of the available Float of EMAX Tokens with the ability to sell freely those EMAX Tokens and create massive downward pressure.  Likewise, had Nahlah, Freeman, Puda, and Brignol each been made aware of that information at the times of their respective purchases, as well as the later-revealed admission from Gentile that the Executive Defendants had chosen not to "lock the wallets" (which gives the ten original founding members, including Defendant Maher who held 5%, the ability to sell off their portions of EMAX Tokens without restriction) it would have altered each of their decisions to both purchase the EMAX Tokens for the price they paid as well and hold on to those EMAX Tokens when they otherwise would not have done so.

309.   These acts and omissions constitute both deceptive and unfair trade practices because the false representations and omissions made by Defendants have a tendency or capacity to deceive consumers, such as Plaintiffs, into investing in the EMAX Tokens to their collective financial detriment.  Such conduct is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

310.   Had the Promoter Defendants disclosed the omitted information, Nahlah, Freeman, Puda, and Brignol would have been aware of it because (a) they saw the actual promotions by the Executive Defendants and Promoter Defendants Pierce, Brown, Mayweather, and Kardashian and would have concurrently seen any disclosure on the promotions themselves had it been included, and (b) because they each follow, directly or indirectly, the social media accounts of, and news reports on, Promoter Defendants Pierce, Mayweather, and Kardashian.

311.   As a direct and proximate result of Defendants' deceptive trade practices, Plaintiffs Nahlah, Freeman, Puda, and Brignol, and the members of the class, suffered damages.  The activities of the Executive Defendants and Promoter

Defendants Pierce, Brown, Mayweather, and Kardashian caused Plaintiffs Nahlah, Freeman, Puda, and Brignol, and the members of the Class to purchase and/or hold the EMAX Tokens when they otherwise would not have done so.

312. The materially false statements and omissions as described above, and the fact that this was a misleading investment, were unfair, unconscionable, and deceptive practices perpetrated on Plaintiffs which would have likely deceived a reasonable person under the circumstances.

313. Defendants were on notice at all relevant times that the false representations of material facts described above were being communicated to prospective investors (such as Plaintiffs) by their authorized agents.

314. As a result of the false representations and violations of the laws described above, Plaintiffs have been damaged by, among other things, overpaying for the EMAX Tokens that were artificially inflated by Defendants.

315. Plaintiffs have also been damaged in other and further ways subject to proof at trial. For example, an injury under FDUPTA is found when "the [defendant] made an allegedly misleading advertisement by making an offer or promise which the [defendant] did not intend to keep." *Stires v. Carnival Corp.*, No. 6:02-CV-542-ORL31JGG, 2003 WL 21356781, at *2 (M.D. Fla. Jan. 2, 2003). As alleged herein, the Executive Defendants and Promoter Defendant Kardashian promoted the ability to use the EMAX Tokens as an accepted payment method at Club LIV, which was later disclosed to not have been possible due to supposed technical complexity that apparently had not been addressed prior to promising investors that they could use EMAX Tokens to purchase goods and services at Club LIV. As noted above, Plaintiffs Nahlah, Freeman, Puda, and Brignol all patronized Club LIV in Miami and were induced to purchase EMAX Tokens because of these particular promotions.

316. The statements from Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian are actionable and not puffery. Under Florida

law, "'specific and measurable claims' are not puffery 'and may be the subject of deceptive advertising claims.'" *Wyndham Vacation Ownership v. Reed Hein & Assocs., LLC*, No. 618CV02171GAPDCI, 2019 WL 3934468, at *6 (M.D. Fla. Aug. 20, 2019) (citing *Fed. Trade Comm'n v. World Patent Mktg., Inc*., No. 17-CV-20848, 2017 WL 3508639, at *12 (S.D. Fla. Aug. 16, 2017)); *Luczak v. Nat'l Beverage Corp*., 812 F. App'x 915, 925 (11th Cir. 2020) (finding that certain statements were actionable because, while National Beverage's statements expressed optimism, they did so by citing to specific strategies and metrics the company said it was using). And while statements of opinion and puffery (*i.e*., exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely) are not actionable, a statement of opinion may be actionable if it "'fairly implies a [factual] basis.'" *Duty Free Americas, Inc. v. Estee Lauder Cos., Inc*., 797 F.3d 1248, 1277 (11th Cir. 2015) (quoting *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1311 (11th Cir. 2010) (alteration in original). As the Eleventh Court observed: "A conclusion that a statement constitutes puffery doesn't absolve the reviewing court of the duty to consider the possibility — however remote — that in context and in light of the 'total mix' of available information, a reasonable investor might nonetheless attach importance to the statement." *Carvelli v. Ocwen Fin. Corp*., 934 F.3d 1307, 1320–21 (11th Cir. 2019).

317. As alleged further above, the Executive Defendants' May 16, 2021 Pre-launch Kickoff post stated, among other things, that (1) EMAX Tokens were up "500,000+% in the first 24 hours"; (2) the Executive Defendants had "locked in partnership with global digital marketing agency" and "lined up a knockout influencer" for a "nationwide campaign"; and (3) "We are 3 days in with ~$100M market cap and the train is just getting rolling." These statements from Executive Defendants are specific and measurable, and they relate to specific strategies and metrics the Company said it was using to encourage purchases and increase the price

of the EMAX Tokens.  At the same time, the Executive Defendants Maher and Speer, with Promoter Defendant Davis, each failed to disclose that these metrics were the result of the failed launch that allowed insiders, including but not limited to Maher, to disproportionately increase the price of the EMAX Tokens with their early trades.

318.   Taken together the misleading statements and omissions of the Executive Defendants and Promoter Defendants Davis, Pierce, Brown, Mayweather, and Kardashian contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of EMAX Tokens.

319.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under Florida law.

320.   Pursuant to Fla. Stat. §§501.211(1) and 501.2105, Plaintiffs are entitled to recover from Defendants the reasonable amount of attorneys' fees Plaintiffs have had to incur in representing their interests in this matter.

## SIXTH CAUSE OF ACTION

**Violation of New York's General Business Law**
**Art. 22-A, §349, *et seq*.**
**(Against the Executive Defendants and Promoter Defendants Pierce, Brown, Mayweather, and Kardashian)**

321.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein, and further allege as follows:

322.   Plaintiffs Huegerich and Ciklic are residents of the State of New York.

323.   Plaintiffs Huegerich and Ciklic paid for or purchased EMAX Tokens in New York and thus the deceptive transactions alleged herein occurred in New York.

324.   At all relevant and material times as described herein, the Executive Defendants and Promoter Defendants Brown, Mayweather, and Kardashian were engaged in "the conduct of any business, trade or commerce" in New York within

the meaning of New York General Business Law ("GBL") §349 with respect to the act alleged herein.

325.   Section 349 proscribes "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]," N.Y. Gen. Bus. Law §349(a), and, further, provides a private right of action to "any person who has been injured by reason of any violation of th[e] section." *Id*., §349(h). Although "[j]ustifiable reliance by the plaintiff is not an element of [a §349] claim" (*Koch v. Acker, Merrall & Condit Co*., 967 N.E.2d 675, 676 (N.Y. 2012)), a plaintiff under that statute must ultimately "prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000); *see also Crawford v. Franklin Credit Mgmt. Corp*., 758 F.3d 473, 490 (2d Cir. 2014) (same).   Nevertheless, "an action under §349 is not subject to the pleading-with-particularity requirements of Rule 9(b) . . . but need only meet the bare-bones notice-pleading requirements of Rule 8(a)." *Pelman ex rel. Pelman v. McDonald's Corp*., 396 F.3d 508, 511 (2d Cir. 2005).

326.   In assessing whether an act is materially misleading, the inquiry is whether, objectively, the act is "'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Cohen v. JP Morgan Chase & Co*., 498 F.3d 111, 126 (2d Cir. 2007) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20 (1995)).

327.   At the threshold, a plaintiff must demonstrate that the §349 claim implicates "'consumer oriented'" conduct by the defendant. *Gaidon v. Guardian Life Ins. Co.*, 94 N.Y.2d 330 (1999).   Under New York law, a deceptive act or practice "'that ha[s] "a broader impact on consumers at large"'" meets this threshold test. *Shapiro v. Berkshire Life Ins. Co*., 212 F.3d 121, 126 (2d Cir. 2000) ("A 'deceptive act or practice' has been defined as a representation or omission 'likely to mislead a

1   reasonable consumer acting reasonably under the circumstances.'") (citing *Oswego*
2   *Laborers*, 85 N.Y.2d at 26).

3       328.   Plaintiff Huegerich is a lifelong fan of professional sports, particularly
4   football and boxing.  Huegerich is aware of Defendant Brown's football career and
5   off-field conduct, and he specifically saw Brown's May 29, 2021 promotion wherein
6   Brown indicated that he wanted his next football contract to be paid in EMAX
7   Tokens.  Additionally, Huegerich follows Defendant Mayweather's career and social
8   media accounts.    Huegerich specifically saw Mayweather's promotion of
9   EthereumMax during the Bitcoin Miami conference, as well as the promotions of
10  EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul,
11  including the 5/28/21 Press Release.  Each of these promotions induced Huegerich to
12  make purchase EMAX tokens on June 6, 2021.  Huegerich also follows Defendant
13  Kardashian on Instagram and saw her June 14, 2021 promotion of the EMAX Tokens.
14  Huegerich believed Kardashian's promotion and statements about the number of
15  tokens being burned as indicating that the decrease in supply would cause his current
16  investments in EMAX Tokens to correspondingly increase in value.  Kardashian's
17  promotion induced Huegerich to continue to hold on to his investment in EMAX
18  Tokens when he otherwise would not have done so.

19      329.   Huegerich also followed the EthereumMax Instagram page during the
20  Relevant Period and saw the promotions from the Executive Defendants that were
21  posted on that platform.  Huegerich specifically saw the June 3, 2021 post regarding
22  the EMAX Token price volatility that came from insider selling.   Huegerich
23  reasonably believed that the price drop on EMAX Tokens only came from "a handful
24  of larger wallets" of "early investors" who were "not part of the development team."
25  Similarly, Huegerich believed the statements that EthereumMax would still be
26  accepted as a payment at David Grutman's venues at a future date, despite the issues
27  that caused the delay of the rollout.  The misleading statements and omissions within

28

the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Brown, Mayweather, and Kardashian, induced Huegerich to make his June 6, 2021 purchase of EMAX Tokens. Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused Huegerich to retain his EMAX Token investment when he otherwise would not have done so.

330.    Plaintiff Ciklic is a lifelong fan of professional sports, particularly football and boxing.  Ciklic regularly watched Defendant Pierce when the latter played professionally and then as a commentator on ESPN.  Ciklic also followed Pierce's social media accounts and saw Defendant Pierce's May 26, 2021, and May 28, 2021 promotions, respectively.  Ciklic is aware of Defendant Brown's football career and off-field conduct, and he saw Brown's May 29, 2021 promotion wherein Brown indicated that he wanted his next football contract to be paid in EMAX Tokens.   Additionally, Ciklic follows Defendant Mayweather's career and social media accounts.  Ciklic specifically saw Mayweather's promotion of EthereumMax during the Bitcoin Miami conference, as well as the promotions of EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release. These promotions by Pierce, Brown, and Mayweather induced Ciklic to make two purchases of EMAX Tokens on May 28, 2021 and May 29, 2021 as a result. Ciklic is also aware of Defendant Kardashian from her reality television show and renowned business savvy, and Ciklic saw Kardashian's May 30, 2021 promotion of the EMAX Tokens being accepted as payment at Club LIV.  Ciklic knew about the high-end status of Club LIV during the Relevant Period and was particularly enticed by Kardashian's promotion to use EMAX Tokens there.  Ciklic also saw Kardashian's June 14, 2021 promotion of the EMAX Tokens.   Ciklic

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1   believed Kardashian's promotion and statements about the number of tokens being
2   burned as indicating that the decrease in supply would cause his current investments
3   in EMAX Tokens to correspondingly increase in value. Kardashian's These
4   promotions from Kardashian and Mayweather induced Ciklic to continue to hold on
5   to his investment in EMAX Tokens when he otherwise would not have done so.

6       331.   Ciklic also followed the EthereumMax Instagram page during the
7   Relevant Period and saw the promotions from the Executive Defendants that were
8   posted on that platform. Ciklic specifically saw the June 3, 2021 post regarding the
9   EMAX Token price volatility that came from insider selling. Ciklic reasonably
10  believed that the price drop on EMAX Tokens only came from "a handful of larger
11  wallets" of "early investors" who were "not part of the development team."
12  Similarly, Ciklic believed the statements that EthereumMax would still be accepted
13  as a payment at David Grutman's venues at a future date, despite the issues that
14  caused the delay of the rollout. The misleading statements and omissions within the
15  June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the
16  above-mentioned promotions from Defendants Brown, Mayweather, and
17  Kardashian, induced Ciklic to make his June 6, 2021 purchase of EMAX Tokens.
18  Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the
19  ability to use EMAX Tokens as an accepted payment and the increase in value his
20  investments in EMAX Tokens would receive if he continued to hold, caused Ciklic
21  to retain his EMAX Token investment when he otherwise would not have done so.

22      332.   For the reasons discussed herein, Defendants violated and continued to
23  violate Section 349(a) of the New York General Business Law by engaging in the
24  herein described unfair or deceptive acts or practices. Defendants' acts and practices,
25  including the material omissions, described herein, were likely to, and did in fact,
26  deceive and mislead members of the public, including consumers acting reasonably
27  under the circumstances, to their detriment.

28

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

333.    Defendants engaged in deceptive acts and practices under New York law by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree, including but not limited to, in the following ways:

(a)    knowingly and intentionally concealing the Executive Defendants' specific roles and ownership interests in EthereumMax;

(b)    failing to disclose that the huge increase in price of the EMAX Tokens during the first days following launch were caused by manipulation by the Executive Defendants instead of being due to an organic increase in interest from investors;

(c)    failing to disclose that EMAX Tokens were not being accepted as a payment and would not be at any point in the foreseeable future; and

(d)    knowingly and intentionally using and/or failing to disclose the use of the Promotor Defendants to "instill trust" in uninformed investors to promote the financial benefits of a highly speculative and risky investment in EMAX Tokens, in an effort to manipulate and artificially inflate the price and trading volume of the EMAX Tokens and allow Defendants to sell their EMAX Tokens at those inflated prices.

334.    The Executive Defendants did not disclose that the EMAX Token developer held the number one rank with 23% ownership interest.  Nor did they disclose until much later that the Executive Defendants had purposefully chosen not to lock the wallets of the EthereumMax insiders.  Huegerich would have found it material to his decision to purchase EMAX Tokens to know whether or not insiders had significant percentages of the available Float of EMAX Tokens with the ability to sell freely those EMAX Tokens and create massive downward pressure.  Likewise, had Huegerich and Ciklic been made aware of that information at the times of their purchases, as well as the later-revealed admission from Gentile that the Executive Defendants had chosen not to "lock the wallets" (which gives the ten original

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1  founding members, including Defendant Maher who held 5%, the ability to sell off

2  their portions of EMAX Tokens without restriction), it would have altered their

3  respective decisions to both purchase the EMAX Tokens for the price they each paid

4  as well and hold on to those EMAX Tokens when they otherwise would not have

5  done so.

6      335. The facts that the Executive Defendants and Promoter Defendants

7  Brown, Mayweather, and Kardashian misrepresented and concealed were material to

8  the decisions of Plaintiff Huegerich and Ciklic and the members of the New York

9  Class about whether to pay for or purchase EMAX Tokens (at all or for the price he

10 paid), in that he would not have proceeded with his transactions but for the deceptive,

11 fraudulent, and false acts and practices.

12     336. The Executive Defendants and Promoter Defendants Brown,

13 Mayweather, and Kardashian intended for Plaintiff Huegerich and the members of

14 the New York Class to pay for EMAX Tokens in reliance upon their deceptive and

15 fraudulent acts and practices.

16     337. Had the Promoter Defendants disclosed the omitted information,

17 Huegerich and Ciklic would have been aware of it because (a) they saw the actual

18 promotions by Promoter Defendants Brown, Mayweather, and Kardashian and would

19 have concurrently seen any disclosure on the promotions themselves had it been

20 included, and (b) because they follow, directly or indirectly, the social media

21 accounts of, and news reports on, Promoter Defendants Pierce, Brown, Mayweather,

22 and Kardashian.

23     338. As a direct and proximate result of Defendants' unlawful, unfair, and

24 deceptive practices, Plaintiffs and Class members suffered damages. The Executive

25 Defendants' activities with the Promoter Defendants caused Plaintiffs and the Class

26 members to purchase and/or hold the EMAX Tokens when they otherwise would not

27 have done so.

28

339.   The statements from Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian are actionable and not puffery.  Puffery in the Second Circuit includes "'generalized or exaggerated statements which a reasonable consumer would not interpret as a factual claim upon which he could rely.'" *Lugones v. Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 241 (S.D.N.Y. 2020) (discussing puffery in context of GBL §349 claim).  It can also include "'an exaggeration or overstatement expressed in broad, vague, and commendatory language, as distinguished from misdescriptions or false representations of specific characteristics of a product.'"  *Id*.  Significantly, even if certain statements would be non-actionable on their own, where there are multiple statements at issue, courts must consider "'as a whole.'"  *Id.* ("'The entire mosaic is viewed rather than each tile separately.'") (quoting *Belfiore v. Procter & Gamble Co*., 311 F.R.D. 29, 53 (E.D.N.Y. 2015)); *see also In re Gen. Motors LLC Ignition Switch Litig*., 257 F. Supp. 3d 372, 457 (S.D.N.Y. 2017) (holding that, when "'viewed in isolation'" some statements may constitute puffery, but "when viewed in conjunction with other allegations in the [complaint] . . . many of these statements cross the line from mere puffery to active misrepresentations").

340.   As alleged further above, the Executive Defendants' May 16, 2021 Pre-launch Kickoff post stated, among other things, that (1) EMAX Tokens were up "500,000+% in the first 24 hours"; (2) the Executive Defendants had "locked in partnership with global digital marketing agency" and "lined up a knockout influencer" for a "nationwide campaign"; and (3) "We are 3 days in with ~$100M market cap and the train is just getting rolling."  These statements from Executive Defendants are specific, detailed factual assertions the Executive Defendants were using to encourage purchases and increase the price of the EMAX Tokens.  At the same time, the Executive Defendants Maher and Speer, with Promoter Defendant Davis each knowingly failed to disclose that these metrics were the result of the failed

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

launch that allowed insiders, including but not limited to Maher, to disproportionately increase the price of the EMAX Tokens with their early trades.

341.   Taken together the misleading statements and omissions of the Executive Defendants and Promoter Defendants Pierce, Brown, Mayweather, and Kardashian contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of EMAX Tokens.

342.   Pursuant to GBL §349(h), Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under New York law.

343.   In addition, Plaintiffs are entitled to reasonable attorney's fees and exemplary damages not exceeding three times the value of the consideration given by the consumer, and any other relief this Court determined is appropriate. *See* GBL §349(h).

## SEVENTH CAUSE OF ACTION

**Violation of New Jersey Consumer Fraud Act ("NJCFA")**
**NJSA §§56:8-1 to 156**
**(Against the Executive Defendants and Promoter Defendants Mayweather and Kardashian)**

344.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein and further alleges as follows:

345.   Plaintiff DeLuca is a resident of the State of New Jersey.

346.   Plaintiff DeLuca paid for or purchased EMAX Tokens in New Jersey and thus the deceptive transactions alleged herein occurred in New Jersey.

347.   Defendants sell "merchandise," as defined by N.J. Stat. Ann. §§56:8-1(c) & (e).

348.   The NJCFA authorizes "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by

another person of any method, act, or practice declared unlawful under this act" to bring a private action. N.J. Stat. Ann. §56:8-19.

349. The NJCFA prohibits unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, as well as the knowing concealment, suppression, or omission of any material fact with the intent that others rely on the concealment, omission, or fact, in connection with the sale or advertisement of any merchandise.

350. Under New Jersey law, NJCFA claims should be construed liberally in favor of consumers. *See Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 461 (N.J. 1994); *Barry v. Arrow Pontiac, Inc.*, 494 A.2d 804, 810-11 (N.J. 1985).

351. There are three elements a plaintiff must show to state a prima facie case under the NJCFA: (1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss. *See Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007) (citing *Cox*, 647 A.2d at 462-65). There are three general types of "'[u]nlawful practices'": "'affirmative acts, knowing omissions, and regulation violations.'" *Id.* (quoting *Cox*, 647 A.2d at 462). A plaintiff asserting a claim based on an omission must demonstrate that the defendant "(1) knowingly concealed (2) a material fact (3) with the intention that plaintiff rely upon the concealment." *Judge v. Blackfin Yacht Corp.*, 815 A.2d 537, 541 (N.J. Super. Ct. App. Div. 2003); *see also* N.J. Stat. Ann. §56:8-2.

352. To establish that information withheld was "material," a plaintiff needs to show that "'a reasonable [person] would attach importance to its existence in determining his [or her] choice of action.'" *Coba v. Ford Motor Co.*, 932 F.3d 114, 125-26 (3d Cir. 2019) (quoting *Suarez v. E. Int'l Coll.*, 50 A.3d 75, 89 (N.J. Super. Ct. App. Div. 2012). An "'unconscionable commercial practice'" is "'an amorphous concept obviously designed to establish a broad business ethic.'" The standard of

1   conduct that the term "'unconscionable'" implies is lack of "'good faith, honesty in

2   fact and observance of fair dealing.'"   *Cox*, 647 A.2d at 462 (quoting *Kugler v.*

3   *Romain*, 279 A.2d 640, 652 (N.J. 1971).

4       353.   Plaintiff DeLuca is a lifelong fan of professional sports, particularly

5   boxing.   DeLuca is aware of Defendant Mayweather's career as a world champion

6   boxer.   DeLuca specifically saw Mayweather's promotion of EthereumMax and the

7   EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul,

8   including the 5/28/21 Press Release.   Mayweather's statements and promotions of

9   EthereumMax gave DeLuca the false impression that Mayweather was more than a

10   celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens,

11   and that he was making this particular cryptocurrency a part of his multimillion-dollar

12   investment strategy.   DeLuca is also familiar with Defendant Kardashian's reality

13   television show and her renowned business savvy.   DeLuca saw Kardashian's May

14   30, 2021 promotion of the EMAX Tokens being accepted as payment at Club LIV.

15   DeLuca knew about the high-end status of Club LIV during the Relevant Period and

16   was particularly enticed by Kardashian's promotion to use EMAX Tokens there.

17   These promotions by Mayweather and Kardashian induced DeLuca to purchase

18   EMAX Tokens on June 2, 2021 and June 5, 2021 as a result.

19       354.   DeLuca also followed the news and updates on EthereumMax, which he

20   accesses through various social media platforms like Telegram, Reddit, and Twitter

21   during the Relevant Period and saw the promotions from the Executive Defendants

22   that were posted.   DeLuca specifically saw the June 3, 2021 post regarding the EMAX

23   Token price volatility that came from insider selling.   DeLuca reasonably believed

24   that the price drop on EMAX Tokens only came from "a handful of larger wallets"

25   of "early investors" who were "not part of the development team."   Similarly, DeLuca

26   believed the statements that EthereumMax would still be accepted as a payment at

27   David Grutman's venues at a future date, despite the issues that caused the delay of

28

the rollout.   The misleading statements and omissions within the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Mayweather and Kardashian, induced DeLuca to make his June 2, 2021 and June 5, 2021 purchases of EMAX Tokens. Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused DeLuca to retain his EMAX Token investment when he otherwise would not have done so.

355.   Defendants engaged in deceptive acts and practices under New Jersey law by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree, including but not limited to, in the following ways:

(a)    knowingly and intentionally concealing the Executive Defendants' specific roles and ownership interests in EthereumMax;

(b)    failing to disclose that the huge increase in price of the EMAX Tokens during the first days following launch were caused by manipulation by the Executive Defendants instead of being due to an organic increase in interest from investors;

(c)    failing to disclose that EMAX Tokens were not being accepted as a payment and would not be at any point in the foreseeable future; and

(d)    knowingly and intentionally using and/or failing to disclose the use of the Promotor Defendants to "instill trust" in uninformed investors to promote the financial benefits of a highly speculative and risky investment in EMAX Tokens, in an effort to manipulate and artificially inflate the price and trading volume of the EMAX Tokens and allow Defendants to sell their EMAX Tokens at those inflated prices.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

356.   The Executive Defendants did not disclose that the EMAX Token developer held the number one rank with 23% ownership interest.   Nor did they disclose until much later that the Executive Defendants had purposefully chosen not to lock the wallets of the EthereumMax insiders.   DeLuca would have found it material to his decisions to purchase EMAX Tokens to know whether or not insiders had significant percentages of the available Float of EMAX Tokens with the ability to sell freely those EMAX Tokens and create massive downward pressure.   Likewise, had DeLuca been made aware of that information at the times of his purchases, as well as the later-revealed admission from Gentile that the Executive Defendants had chosen not to "lock the wallets" (which gives the ten original founding members, including Defendant Maher who held 5%, the ability to sell off their portions of EMAX Tokens without restriction) it would have altered DeLuca's decision to both purchase the EMAX Tokens for the price he paid as well and hold on to those EMAX Tokens when he otherwise would not have done so.

357.   The facts that the Executive Defendants and Promoter Defendants Mayweather and Kardashian misrepresented and concealed were material to the decisions of Plaintiff DeLuca and the members of the New Jersey Class about whether to pay for or purchase EMAX Tokens (at all or for the price they paid), in that they would not have proceeded with their transactions but for the deceptive, fraudulent and false acts and practices.

358.   The Executive Defendants and Promoter Defendants Mayweather and Kardashian intended for Plaintiff DeLuca and the members of the New Jersey Class to pay for EMAX Tokens in reliance upon their deceptive and fraudulent acts and practices.

359.   Had the Promoter Defendants disclosed the omitted information, DeLuca would have been aware of it because (a) he saw the actual promotions by Promoter Defendants Mayweather and Kardashian and would have concurrently seen

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1   any disclosure on the promotions themselves had it been included, and (b) he follows,

2   directly or indirectly, the social media accounts of, and news reports on, Promoter

3   Defendants Mayweather and Kardashian.

4       360.   As a direct and proximate result of Defendants' unlawful, unfair, and

5   deceptive practices, Plaintiffs and Class members suffered damages.  The Executive

6   Defendants' activities with the Promoter Defendants caused Plaintiff DeLuca and the

7   Class members to purchase (at all or at the premium price he paid) and/or hold the

8   EMAX Tokens when they otherwise would not have done so.  An ascertainable loss

9   must be "quantifiable or measurable," but a plaintiff need not demonstrate an out-of-

10  pocket loss where a diminution in the value of a product can be "'calculated within a

11  reasonable degree of certainty.'"  *Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d

12  783, 793 (N.J. 2005) (citation omitted).

13      361.   The statements from Executive Defendants and Promoter Defendants

14  Mayweather and Kardashian are actionable and not puffery.  "'The distinguishing

15  characteristics of puffery are vague, highly subjective claims as opposed to specific,

16  detailed factual assertions.'"  *Hammer v. Vital Pharm., Inc.*, Civ. No. 11-4124, 2012

17  WL 1018842, at *6-*8 (D.N.J. Mar. 26, 2012) (citation omitted).  New Jersey courts

18  have held that "[e]ven if an advertisement is literally true, it may be actionable if "the

19  overall impression [it] create[s] . . . is misleading and deceptive to an ordinary

20  reader.""  *Conner v. Perdue Farms, Inc.*, No. CIV.A. 11-888, 2013 WL 5977361, at

21  *6 (D.N.J. Nov. 7, 2013) (quoting *Union Ink Co., Inc. v. AT&T Corp.*, 801 A.2d 361,

22  379 (N.J. Super. Ct. App. Div. 2002).  Indeed, "'a claim of literal truth will not

23  constitute a defense to a charge that the overall impression created by an

24  advertisement is misleading and deceptive to an ordinary reader.'"  *Id*. (quoting

25  *Miller v. Am. Fam. Publishers*, 663 A.2d 643, 653-54 (N.J. Super. Ct. Ch. Div. 1995).

26  Thus, even a finding of literal accuracy will not bar a conclusion that a misleading or

27

28

1  deceptive statement violates the Consumer Fraud Act. *See id*. at 85. As the *Miller*

2  court explained:

> 3  "To determine whether an advertisement or solicitation makes a
> false or misleading representation, the court must consider the effect
> 4  that the advertisement, taken as a whole, would produce on one with an
> ordinary and unsuspecting mind. A court must consider the
> 5  implications of an advertisement because, if it is designed to deceive
> the reader, an advertisement 'may be completely misleading' even if
> 6  'every sentence separately considered is literally true.' Taking an
> advertisement or solicitation as a whole means considering not only
> 7  what it states literally, but also what it reasonably implies."

8  *Miller*, 663A.2d at 653(citation omitted).

9  362. As alleged further above, the Executive Defendants' May 16, 2021 Pre-

10  launch Kickoff post stated, among other things, that (1) EMAX Tokens were up

11  "500,000+% in the first 24 hours"; (2) the Executive Defendants had "locked in

12  partnership with global digital marketing agency" and "lined up a knockout

13  influencer" for a "nationwide campaign"; and (3) "We are 3 days in with ~$100M

14  market cap and the train is just getting rolling." These statements from Executive

15  Defendants are specific, detailed factual assertions the Executive Defendants were

16  using to encourage purchases and increase the price of the EMAX Tokens. At the

17  same time, the Executive Defendants Maher and Speer, with Promoter Defendant

18  Davis each failed to disclose that these metrics were the result of the failed launch

19  that allowed insiders, including but not limited to Maher, to disproportionately

20  increase the price of the EMAX Tokens with their early trades.

21  363. Taken together the misleading statements and omissions of the

22  Executive Defendants and Promoter Defendants Mayweather and Kardashian

23  contributed to the deceptive marketing tactics as a whole, which were used to solicit

24  sales of EMAX Tokens.

25  364. As a direct and proximate result of Defendants' unfair and deceptive

26  practices, Plaintiffs and Class members suffered damages. Defendants' activities

27

28

caused Plaintiffs and the Class members to purchase and/or retain the EMAX Tokens when they otherwise would not have done so.

365.   Pursuant to NJSA §§56:8-1 to 156, Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under New Jersey law.

366.   In addition, Plaintiffs are entitled to reasonable attorney's fees and an exemplary damages award of threefold the damages suffered by Plaintiffs and the Class Members. *See* N.J. Stat. Ann. §56:8-19.

## **EIGHTH CAUSE OF ACTION**

### **Common Law Conspiracy to Violate Cal. Corp. Code §25402**
### **(Against Executive Defendants Perone and Rechnitz and Promoter Defendants Mayweather and Pierce)**

367.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

368.   Beginning in May 2021, and continuously thereafter up to and including the date of the filing of the Complaint, the Executive Defendants Perone, Maher, Rechnitz, and Does 1-7 did engage in the formation and operation of a conspiracy with the Promotor Defendants to misleadingly promote the EMAX Tokens to retail investors in order to artificially inflate the price and trading volume so that Defendants could sell their respective EMAX Tokens for substantial profits.

369.   As alleged above, each Defendants Perone, Rechnitz, Mayweather, and Pierce acted in furtherance of the conspiracy by, among other things, sharing inside information with each other about the timing of various celebrity promotions of EthereumMax and the EMAX Tokens and then profiting from subsequent trades they made based on that insider knowledge. These Defendants further conspired to falsely promote the EMAX Tokens as sound investments with significant growth potential and make misleading statements about the Defendants holding their EMAX Tokens

along with the retail investors who bought, while, in truth, Defendants Rechnitz, Pierce, and Mayweather (with the aid of Perone) were selling their EMAX Tokens for substantial profits.

370. "Under California law, the existence of a conspiracy may sometimes be inferred from the nature of the acts done, the relations of the parties, the interests of the alleged conspirators, and other circumstances." *In re Sunset Bay Assocs.*, 944 F.2d 1503, 1517 (9th Cir. 1991).

371. As alleged herein, Defendants Rechnitz, Mayweather, and Pierce are close friends and business partners in multiple endeavors. Each of them had actual knowledge of each other's insider trading activities and agreed to both improperly promote EthereumMax and then time their trading of EMAX Tokens accordingly.

372. For example, Rechnitz literally chanted "pump and dump" while showing off his success at frontrunning Pierce's promotions to try to recruit CW1 into the conspiracy. This fact clearly establishes a deceitful purpose for the enterprise and "tend[s] to exclude the possibility that any alternative explanation is true." *See Shaw v. Nissan N. Am., Inc*., 220 F. Supp. 3d 1046, 1056 (C.D. Cal. 2016).

373. This frontrunning conspiracy between Rechnitz, Mayweather, and Pierce (and aided by Perone) was not any of these three individuals' primary business activity. Indeed, Rechnitz is a jeweler, Pierce is a sports personality, and Mayweather is a semi-retired professional boxer. None of them are licensed securities traders or brokers. Their conspiratorial enterprise was also distinct from Perone's and EthereumMax's business of using EMAX Tokens as a method of digital payment for goods and services.

374. Rechnitz, Pierce, and Mayweather each shared the common purpose of using the inside information Rechnitz obtained from the Executive Defendant Perone (and then shared with Pierce and Mayweather) to time their trades to coincide with the "pump" of the EMAX Token price created by the particular promotion. Rechnitz,

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

Pierce and Mayweather then would "dump" their EMAX Tokens as misled investors poured in to buy.

375.   As a proximate result of said conspiracy, as described in the foregoing paragraphs, Plaintiffs suffered, continue to suffer, and will suffer in the future, the damages alleged herein.

376.   For the conduct of Defendants Perone, Rechnitz, Pierce, and Mayweather in the alleged conspiracy, Plaintiffs seek compensatory damages against each of these Defendants, jointly and severely, in an as-yet undetermined amount; punitive damages, injunctive relief enjoining these Defendants from continuing to falsely and misleadingly promote the EMAX Tokens and then trading off of their material, non-public information; and divestiture of all money wrongfully obtained, whether directly or indirectly, as part of the alleged conspiracy

## NINTH CAUSE OF ACTION

### Aiding and Abetting
### California Common Law
### (Against the Executive Defendant Maher and the Promoter Defendants)

377.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

378.   Under California law, aiding and abetting requires not agreement, but simply assistance.  The elements of aiding and abetting liability have cited the elements of the tort as they are set forth in the RESTATEMENT (SECOND) OF TORTS §876, and have omitted any reference to an independent duty on the part of the aider and abettor.

379.   Under California law, "'[l]iability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered,

1   constitutes a breach of duty to the third person.'"  *Neilson v. Union Bank of Cal.,*
2   *N.A.*, 290 F. Supp. 2d 1101, 1118 (C.D. Cal. 2003) (citation omitted).

3         380.   "Unlike a conspirator, an aider and abettor does not 'adopt as his or her
4   own' the tort of the primary violator.  Rather, the act of aiding and abetting is distinct
5   from the primary violation; liability attaches because the aider and abettor behaves in
6   a manner that enables the primary violator to commit the underlying tort."  *Id.*

7         381.   The Promoter Defendants have previous knowledge and experience with
8   making misleading promotional statements (with Mayweather having nearly an
9   identical experience with a previous fraudulent cryptocurrency promotion), and, as
10  such, knew that the marketing strategy employed by the Executive Defendants for
11  the EMAX Tokens was unlawful, deceitful, fraudulent, and/or violated the terms of
12  the California, Florida, New York, and New Jersey state statutes described in this
13  Complaint.

14        382.   By promoting the EMAX Tokens on their social media platforms and
15  through their reported conduct, the Promotor Defendants provided assistance that was
16  a substantial factor causing the EMAX Token price to both surge and do so long
17  enough to allow all Defendants to sell their EMAX Tokens for huge profits at the
18  expense of their followers and investors.  Without the help of the Promoter
19  Defendants' activities, the Executive Defendants would have been unable to use the
20  misleading marketing strategy devised by Gentile, and Defendants would not have
21  been able to commit the violations of California state consumer protection statutes
22  alleged herein.

23        383.   As a direct and proximate result of the Promotor Defendants' unlawful,
24  unfair, and deceptive practices, Plaintiffs and Class members suffered damages.  The
25  Executive Defendants' activities with the Promoter Defendants caused Plaintiffs and
26  the Class members to purchase and/or hold the EMAX Tokens when they otherwise
27  would not have done so.

28

384.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by EthereumMax, to obtain monetary damages, restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under California law.

## **TENTH CAUSE OF ACTION**

**Violations of California Corporate Securities Law of 1968**
**Cal. Corp. Code §§25110, 25401, 25403, & 25404**
**(Sale of Unregistered Securities)**
**(Against the Company and Executive Defendants)**

385.   Plaintiffs restate and reallege all preceding allegations above in paragraphs 1 – 185 as if fully set forth herein, and further allege as follows:

386.   Plaintiffs Semerjian, Buckley, and Shah are residents of the State of California.

387.   Plaintiffs Semerjian, Buckley, and Shah paid for or purchased EMAX Tokens in California and thus the deceptive transactions alleged herein occurred in California.

388.   The EMAX Token is a "security" within the meaning of the term as defined by Cal. Corp. Code §25019.   Additionally, the SEC has concurrently determined that the EMAX Tokens "were offered and sold as investment contracts and therefore securities pursuant to Section 2(a)(1) of the Securities Act."   SEC Order, ¶4.

389.   Defendants, and each of them, by engaging in the conduct described above within California, directly or indirectly, sold and offered to sell securities.

390.   Plaintiffs Semerjian, Buckley, and Shah, and the members of the Class purchased EMAX Tokens from Defendants.

391.   Section 25110 of California's Corporate Securities Law of 1968 provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of California unless the security is exempt under Chapter 1 of the California statute.

135

392.   Section 25400 further provides that it is unlawful for any person within California to, directly or indirectly, "effect, alone or with one or more other persons, a series of transactions in any security creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others." Cal. Corp. Code §25400(b). Concurrently, under Cal. Corp. Code §25401, it is unlawful for any person to offer or sell a security within California, or to buy or offer to buy a security in this state, "by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading." Cal. Corp. Code §25401.

393.   California law also contains a provision making it illegal to knowingly provide substantial assistance to another in violation of this law. *See* Cal. Corp. Code §25504.   Any person that directly or indirectly induces a violation or provides substantial assistance in violating California's Corporate Securities Law of 1968 shall be deemed to be in violation of that provision to the "same extent" as the primary violator.  Cal. Corp. Code §25403(b)-(c).

394.   Section 25504 also extends liability to "[e]very person who directly or indirectly controls a person liable under Section 25501 or 25503, . . . every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation . . . are also liable jointly and severally with and to the same extent as such person." Cal. Corp. Code §25504.

395.   Under §2(a)(1) of the Securities Act of 1933, a "security" is defined to include an "investment contract."  15 U.S.C. §77b(a)(1).  The Supreme Court in the case *S.E.C. v. W.J. Howey Co*., 328 U.S. 293, 301 (1946), established the prevailing

test for determining whether something is an investment contract, which is defined as is "an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* Specifically, a transaction qualifies as an investment contract and, thus, a security if it is: (1) an investment; (2) in a common enterprise; (3) with a reasonable expectation of profits; and (4) to be derived from the entrepreneurial or managerial efforts of others. *See United Hou. Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975). This definition embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," and thereby "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" *Howey*, 328 U.S. at 299 (citation omitted). Accordingly, in analyzing whether something is a security, "'form should be disregarded for substance,'" and the emphasis should be "on the economic realities underlying a transaction, and not on the name appended thereto." *Forman*, 421 U.S. at 848-49.

396. The EMAX Tokens sold and offered for sale to Plaintiffs and Class members were not:

(a)     exempt from registration under the California Corporate Securities Law of 1968;

(b)     a covered security;

(c)     registered with the Office of Financial Regulations; or

(d)     sold in a transaction exempt under California or federal law.

397. The Company and Executive Defendants sold and offered to sell the unregistered EMAX Tokens to Plaintiffs Semerjian, Buckley, and Shah, and the members of the Class.

398.   Investors who bought EMAX Tokens invested money or other valuable consideration in a common enterprise.  Investors had a reasonable expectation of profit based upon the efforts of the Defendants, including, among other things, Defendants' promotional efforts and business operations.  As stated in the SEC Order:

> Based on EthereumMax's marketing materials, as well as public statements by EthereumMax affiliates, the EthereumMax website, and EthereumMax social media handles, purchasers of EMAX tokens would have had a reasonable expectation of profits from their investment in the tokens.  EthereumMax frequently touted the token's rise in price on its social media pages as it offered and sold EMAX tokens.

> Based on EthereumMax's public statements, purchasers of the EMAX tokens would have had a reasonable expectation that EthereumMax and its agents would expend significant efforts to develop the EthereumMax platform, which would increase the value of their EMAX tokens, resulting in investor profit.  EthereumMax's marketing materials highlighted that the Company and its agents would ensure a secondary trading market for EMAX tokens by creating a trading market for EMAX tokens.  EthereumMax's marketing materials also emphasized the purported expertise of the Company's management.

> EthereumMax's marketing materials, moreover, contained numerous direct statements that the EMAX tokens would rise in value as a result of the efforts of the Company and its agents, including by touting future deals and relationships that would "drive value."  EthereumMax also promised to develop certain "token enhancements," including "additional tokenomics to enhance economic value," future rewards and staking programs, national sporting and event partnerships, and a general expansion of the EMAX token ecosystem.

399.   Plaintiffs Semerjian, Buckley, and Shah and Class members invested fiat, including U.S. dollars, and digital currencies, such as Bitcoin and Ethereum, to purchase EMAX Tokens.

400.   Defendants sold EMAX Tokens to the general public on various cryptocurrency exchanges.

401.   Every purchase of EMAX Tokens by a member of the public is an investment contract.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

402.   Additionally, investors were passive participants in the EMAX Tokens launch and the profits of each Plaintiff and the Class were intertwined with those of Defendants.

403.   The Executive Defendants also were responsible for supporting the EMAX Token products and its code.  Additionally, the Executive Defendants also were responsible for supporting EMAX Tokens, pooled investors' assets, and controlled those assets.

404.   Plaintiffs Semerjian, Buckley, and Shah and Class members in the EMAX Tokens made their investment with a reasonable expectation of profits.

405.   Investors' profits in the EMAX Tokens were to be derived from the managerial efforts of others – specifically the Company, the Executive Defendants or any EthereumMax personnel responsible for developing the networks on which these tokens will operate and managing the proprietary trading codes.  EMAX Token investors relied on the managerial and entrepreneurial efforts of the Company and the Executive Defendants to manage, oversee, and/or develop the EthereumMax business and sales of EMAX Tokens.

406.   This dependency, however, on the managerial efforts of the Company and Executive Defendants was not apparent at issuance to a reasonable investor.  Considering the limited available information about how these EMAX Tokens were designed and intended to operate, if such an investor were even able to interpret the relevant law at the time, a reasonable investor lacked sufficient bases to conclude whether the EMAX Tokens were securities until the platform at issue, and its relevant "ecosystem," had been given time to develop.  In the interim, the investor lacked the facts necessary to conclude - let alone formally allege in court - that the EMAX Tokens they had acquired were securities.

407.   The SEC has also provided guidance for determining claims alleging the improper sale of unregistered securities.  On April 3, 2019, the SEC published its

"Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework") in which it "provide[d] a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."[103]

408.  The Framework described how to analyze the various facts surrounding an initial coin offering ("ICO") in making the determination of whether a given digital asset is a security.

409.  In particular, the Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues: Does the purchaser reasonably expect to rely on the efforts of an [Active Participant or "AP"]? Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?"[104]

410.  The Framework further notes that the "stronger the[ ] presence" of the following factors, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others.'"[105]

411.  The first factor the SEC looked at was whether an AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

412.  At the time of the EthereumMax launch, Defendants actively marketed the EMAX Token launch and the tokens' growth and utilization prospects, thereby necessitating the continued managerial efforts of the Company and Executive

---

[103]  *Framework for "Investment Contract" Analysis of Digital Assets*, U.S. SEC. & EXCH. COMM'N (Apr. 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

[104]  *Id.*

[105]  *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

Defendants. Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly).

413. Another factor the Framework considers is whether the AP creates or supports a market for, or the price of, the digital asset. This includes, *inter alia*, whether the AP "(1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities."[106]

414. As noted above, all of the EMAX Tokens in circulation were created at the direction of the Executive Defendants. Additionally, the Executive Defendants also created the protocols by which the EMAX Tokens are burned.

415. The framework further states that "[a]n AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents."[107]

416. Here, the Company and Executive Defendants have discussed the long-term prospects on extended frames, continually noting how the utilization of EMAX Tokens as a method of payment will grow in the future.

417. The ability to determine whether and where the digital asset will trade is another factor discussed in the Framework. For example, "purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform."[108]

---

[106] *Id.*
[107] *Id.*
[108] *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

418.   Here, the Executive Defendants, in particular Defendant Maher, admitted that the Executive Defendants had access to and did manipulate the sales of EMAX Tokens in the first days, which had a dramatic impact on the EMAX Token price and effected the EMAX Token liquidity pool.

419.   Another factor the Framework notes is whether the AP has the ability to determine who will receive additional digital assets and under what conditions.  This could be, for example, "[m]aking or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset."[109]

420.   Here, the Company and Executive Defendants are the arbiters of funding for EthereumMax.

421.   Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

422.   The Framework also remarks that purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, including, but not limited to, the instances where the AP "has the ability to realize capital appreciation from the value of the digital asset.  This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset." According to the SEC, in these instances, "purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset."[110]

423.   Here, the Executive Defendants retain a significant interest in the EthereumMax project even after selling off many EMAX Tokens at the height of the initial launch.

424.   On May 7, 2021, on CNBC's "Squawk Box" television program, chairman of the SEC Gary Gensler stated that "a lot of crypto tokens – I won't call

---

[109]    *Id.*
[110]    *Id.*

them cryptocurrencies for this moment – are indeed securities."[111]  In addition to being the Chairman of the SEC, Mr. Gensler is also a world renowned expert on cryptocurrencies and blockchain technology, having taught the "Blockchain and Money" course at the Sloan School of Management at the Massachusetts Institute of Technology ("MIT").[112]

425.  In a June 14, 2018 speech entitled "Digital Asset Transactions: When Howey Met Gary (Plastic)" that is available on the SEC's website,[113] the following observations were made on "when a digital transaction may no longer represent a security offering":

> If the network on which the token or coin is to function is sufficiently decentralized – where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract. Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede.  As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful.
>
> And so, when I look at Bitcoin today, I do not see a central third party whose efforts are a key determining factor in the enterprise.  The network on which Bitcoin functions is operational and appears to have been decentralized for some time, perhaps from inception.

426.  A key factor in determining whether a digital asset is a security or not is whether the there is a centralized entity behind the digital asset.[114]  EMAX Holdings, LLC operated as the de facto corporate entity and Defendant Perone is the sole

---

[111]    Jesse Point, SEC Chairman Gary Gensler says more investor protections are needed for bitcoin and crypto markets, CNBC (May 7, 2021), https://www.cnbc.com/2021/05/07/sec-chairman-gary-gensler-says-more-investor-protections-are-needed-for-bitcoin-and-crypto-markets.html.

[112]    Lectures and Materials from Chairman Gensler's MIT course are available to the public for free at: https://ocw.mit.edu/courses/sloan-school-of-management/15-s12-blockchain-and-money-fall-2018/video-lectures/session-1-introduction/.

[113]    William Hinman, Director, Division of Corporation Finance, Remarks at the Yahoo Finance All Markets Summit, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.

[114]    *Id*. (noting that the "decentralized structure" of Bitcoin and Ethereum placed these digital assets outside the "disclosure regime of the federal securities laws").

1  executive and director of this holding company.  Thus, there is a centralized entity

2  behind the EMAX Tokens.

3      427.  Finally, the SEC also already concluded that other virtual currencies

4  (*e.g.*, DAO tokens) that are substantially similar to EMAX Tokens are "securities and

5  therefore subject to the federal securities laws."  As stated by the SEC, "issuers of

6  distributed ledger or blockchain technology-based securities must register offers and

7  sales of such securities unless a valid exemption applies."[115]  More recently, on

8  November 7, 2022, the SEC was granted summary judgment on the issue of whether

9  or not the token at issue constituted a security, stating that "no reasonable trier of fact

10 could reject the SEC's contention that LBRY offered LBC [tokens] as a security, and

11 LBRY does not have a triable defense that it lacked fair notice [that it needed to

12 register its offerings]."  *S.E.C. v. LBRY, Inc.*, _ F. Supp. 3d __, No. 21-cv-260, 2022

13 WL 16744741, at *8 (D.N.H. Nov. 7, 2022).

14     428.  This analysis of whether the DAO and LBC tokens are securities should

15 be applied here.

16     429.  Additionally, each of the Executives Defendants (especially Defendant

17 Maher) are liable under §§25400(b)-(e), and 25401 through 25404 of the California

18 Corporate Code for: (1) effecting transactions of the EMAX Token security that

19 created the appearance of active trading in the EMAX Tokens and/or raised the price

20 of the EMAX Tokens for the purpose of inducing the purchase or sale of EMAX

21 Tokens by others; (2) inducing the purchase or sale of EMAX Tokens by

22 disseminating information to the effect that the EMAX Token's price will or is likely

23 to rise because of market operations of any one or more persons conducted for the

24 purpose of raising or depressing the price of EMAX Tokens; (3) making, for the

25 purpose of inducing the purchase or sale of EMAX Tokens by others, any statement

26

27 _____

28 [115]   Press Release, U.S. Sec & Exch. Comm'n, *SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities* (July 25, 2017), https://www.sec.gov/news/press-release/2017-131.

which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and which he knew or had reasonable ground to believe was so false or misleading; and (4) receiving consideration, directly or indirectly from any person selling or offering for sale or purchasing or offering to purchase EMAX Tokens, to induce the purchase or sale of EMAX Tokens.

430.   As noted above, Defendant Maher, in conjunction with the other Executive Defendants, manipulated the price of EMAX Tokens by effectively engaging in wash trading in the early days of the EthereumMax launch in order to artificially increase the price of the EMAX Tokens and then sell those unregistered securities to Plaintiffs and the Class.  Maher, Davis, and Speer each made misleading statements regarding the exponential increase in the price of EMAX Tokens in the early days of the launch.  Defendants purposefully did not disclose to investors that the percentage increases that they were collectively touting was the result of price manipulation as opposed to organic interest in the project.

431.   Cal. Corp. Code 25503 provides, in relevant part, that any person who violates Section 25110 "shall be liable to any person acquiring from them the security sold in violation of that section, who may sue to recover the consideration they paid for that security with interest thereon at the legal rate, and reasonable attorney's fees, less the amount of any income received therefrom."  Damages, if the plaintiff no longer owns the security, shall be equal to the difference between (a) the purchase price plus interest at the legal rate from the date of purchase, plus reasonable attorney's fees, and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

432.   Cal. Corp. Code 25500 provides, in relevant part, that "any person who willfully participates in any act or transaction in violation of Section 25400 shall be liable to any other person who purchases or sells any security at a price which was affected by such act or transaction for the damages sustained by the latter as a result of such act or transaction."  Damages are measured as "the difference between the price at which such other person purchased or sold securities and the market value which such securities would have had at the time of his purchase or sale in the absence of such act or transaction, plus interest at the legal rate."

433.   Cal. Corp. Code 25500 provides that "any person who violated Section 25401 shall be liable to the person who purchases a security from, or sells a security to, that person, who may sue for either recission or for damages (if the plaintiff no longer owns the security)."  Upon rescission, a purchaser may recover the consideration paid for the security, plus interest at the legal rate, less the amount of any income received on the security, upon tender of the security.  Damages recoverable under this section by a purchaser shall be an amount equal to the difference between (a) the price at which the security was bought plus interest at the legal rate from the date of purchase and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received on the security by the plaintiff.  "In addition to the relief described above, the court shall award reasonable attorney's fees and costs to a prevailing purchaser who succeeds in establishing a right to the relief provided by this section."

## ELEVENTH CAUSE OF ACTION

**Violation of California Corporate Securities Law of 1968**
**Cal. Corp. Code §25402**
**(Insider Trading)**
**(Against Defendants Perone, Rechnitz, Maher, Mayweather, and Pierce)**

434.  Plaintiffs restate and reallege all preceding allegations above in paragraphs 1 - 185 as if fully set forth herein, and further allege as follows:

146

435.   Plaintiffs Semerjian, Buckley, and Shah are residents of the State of California.

436.   Plaintiffs Semerjian, Buckley, and Shah paid for or purchased EMAX Tokens in California and thus the deceptive transactions alleged herein occurred in California.

437.   The EMAX Token is a "security" within the meaning of the term as defined by Cal. Corp. Code §25019.

438.   Defendants, and each of them, by engaging in the conduct described above within California, directly or indirectly, sold and offered to sell securities.

439.   Plaintiffs Semerjian, Buckley, and Shah, and the members of the Class purchased EMAX Tokens from Defendants.

440.   California Corporations Code §25402 prohibits insider trading. Specifically, it provides:

> It is unlawful for an issuer or any person who is an officer, director or controlling person of an issuer or any other person whose relationship to the issuer gives him access, directly or indirectly, to material information about the issuer not generally available to the public, to purchase or sell any security of the issuer in this state at a time when he knows material information about the issuer gained from such relationship which would significantly affect the market price of that security and which is not generally available to the public, and which he knows is not intended to be so available, unless he has reason to believe that the person selling to or buying from him is also in possession of the information.

441.   Rechnitz, Maher, Pierce, and Mayweather had relationships with the issuer (Executive Defendant Perone) that gave them direct access to material information about the timing of the marketing activities of the celebrity promoters (which were not generally available to Plaintiffs Semerjian, Buckley, or Shah, or the members of the class. Rechnitz, Maher, Pierce, and Mayweather are also considered controlling persons under Cal. Corp. Code §25402.

442.   As alleged above, Rechnitz, Maher, Pierce, and Mayweather (with assistance from Perone) used this information to purchase and sell EMAX Tokens at

a time when the value of the EMAX Tokens was artificially inflated from the Promoter Defendants' promotional activities.

443.  Given the amounts of EMAX Tokens that Defendants Rechnitz, Maher, Pierce, and Mayweather had received from Perone, their trades of the same would significantly impact the market price of the EMAX Tokens. Indeed, upon information and belief, the price decrease occurring on or around June 2, 2021 (which the Executive Defendants claimed was caused by the news that Groot Hospitality would not be able to accept EMAX Tokens as a payment as promised) was actually caused when, as Defendants Davis revealed, Mayweather immediately sold off all of the EMAX Tokens that he was given as his fee for promoting EthereumMax.

444.  None of the Plaintiffs or members of the class were in possession of the information regarding the time of the celebrity promotions of EMAX Tokens.

445.  Cal. Corp. Code 25502 states:

> Any person who violates Section 25402 shall be liable to the person who purchases a security from him or sells a security to him, for damages equal to the difference between the price at which such security was purchased or sold and the market value which such security would have had at the time of the purchase or sale if the information known to the defendant had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information, plus interest at the legal rate.

## TWELFTH CAUSE OF ACTION

**Violation of the Florida Securities and Investor Protection Act**
**Fl. Stat. Section 517.07**
**(Sale of Unregistered Securities)**
**(Against the Company and Executive Defendants)**

446.  Plaintiffs restate and reallege all preceding allegations above in paragraphs 1 – 185 as if fully set forth herein, and further allege as follows:

447.  Plaintiffs Nahlah, Freeman, Puda, and Brignol are residents of the State of Florida.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

448.   Plaintiffs Nahlah, Freeman, Puda, and Brignol paid for or purchased EMAX Tokens in Florida and thus the deceptive transactions alleged herein occurred in Florida.

449.   The EMAX Token is a "security" within the meaning of the term as defined by Section 517.021(22), Fla. Stat. Additionally, the SEC has concurrently determined that the EMAX Tokens "were offered and sold as investment contracts and therefore securities pursuant to Section 2(a)(1) of the Securities Act."  SEC Order, ¶4.

450.   Defendants, and each of them, by engaging in the conduct described above within California, directly or indirectly, sold and offered to sell securities.

451.   Plaintiffs Nahlah, Freeman, Puda, and Brignol, and the members of the Class purchased EMAX Tokens from Defendants.

452.   Section 517.07(1) of the Florida Statute provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Florida Statute §517.051, is sold in a transaction exempt under Florida Statute §517.061, is a federally covered security, or is registered pursuant to Chapter 517 of the Florida Statute.

453.   Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."  Fla. Stat. §517.211(1).

454.   Under §2(a)(1) of the Securities Act of 1933, a "security" is defined to include an "investment contract."  15 U.S.C. §77b(a)(1).  The Supreme Court in *Howey* established the prevailing test for determining whether something is an investment contract, which is defined as "an investment of money in a common enterprise with profits to come solely from the efforts of others."  *Id*. at 301.

Specifically, a transaction qualifies as an investment contract and, thus, a security if it is: (1) an investment; (2) in a common enterprise; (3) with a reasonable expectation of profits; and (4) to be derived from the entrepreneurial or managerial efforts of others. *See Forman*, 421 U.S. at 852-53. This definition embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," and thereby "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" *Howey*, 328 U.S. at 299 (citation omitted). Accordingly, in analyzing whether something is a security, "'form should be disregarded for substance,'" and the emphasis should be "on the economic realities underlying a transaction, and not on the name appended thereto." *Forman*, 421 U.S. at 848-49.

455. The EMAX Token is a security pursuant to Fla. Stat. §517.021(22)(a).

456. The EMAX Tokens sold and offered for sale to Plaintiffs and Class members were not:

      a.    exempt from registration under Fla. Stat. §517.051;

      b.    a federal covered security;

      c.    registered with the Office of Financial Regulations (OFR); or

      d.    sold in a transaction exempt under Fla. Stat. §517.061.

457. The Company and Executive Defendants sold and offered to sell the unregistered EMAX Tokens to Plaintiff Nahlah, Freeman, Puda, and Brignol, and the members of the Class.

458. Defendants are directors, officers, partners and/or agents of the Company pursuant to Fla. Stat. §517.211.

459. Investors who bought EMAX Tokens invested money or other valuable consideration in a common enterprise. Investors had a reasonable expectation of

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

profit based upon the efforts of the Defendants, including, among other things, Defendants' promotional efforts and business operations.  As stated in the SEC Order:

> Based on EthereumMax's marketing materials, as well as public statements by EthereumMax affiliates, the EthereumMax website, and EthereumMax social media handles, purchasers of EMAX tokens would have had a reasonable expectation of profits from their investment in the tokens.  EthereumMax frequently touted the token's rise in price on its social media pages as it offered and sold EMAX tokens.

> Based on EthereumMax's public statements, purchasers of the EMAX tokens would have had a reasonable expectation that EthereumMax and its agents would expend significant efforts to develop the EthereumMax platform, which would increase the value of their EMAX tokens, resulting in investor profit.  EthereumMax's marketing materials highlighted that the Company and its agents would ensure a secondary trading market for EMAX tokens by creating a trading market for EMAX tokens.  EthereumMax's marketing materials also emphasized the purported expertise of the Company's management.

> EthereumMax's marketing materials, moreover, contained numerous direct statements that the EMAX tokens would rise in value as a result of the efforts of the Company and its agents, including by touting future deals and relationships that would "drive value."  EthereumMax also promised to develop certain "token enhancements," including "additional tokenomics to enhance economic value," future rewards and staking programs, national sporting and event partnerships, and a general expansion of the EMAX token ecosystem.

460.  Plaintiffs Nahlah, Freeman, Puda, and Brignol and Class members invested fiat, including U.S. dollars, and digital currencies, such as Bitcoin and Ethereum, to purchase EMAX Tokens.

461.  Defendants sold EMAX Tokens to the general public on various cryptocurrency exchanges.

462.  Every purchase of EMAX Tokens by a member of the public is an investment contract.

463.  Additionally, investors were passive participants in the EMAX Tokens launch and the profits of each Plaintiff and the Class were intertwined with those of Defendants.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

464.   The Executive Defendants also were responsible for supporting the EMAX Token products and its code.  Additionally, the Executive Defendants also were responsible for supporting EMAX Tokens, pooled investors' assets, and controlled those assets.

465.   Plaintiffs Nahlah, Freeman, Puda, and Brignol and Class members in the EMAX Tokens made their investment with a reasonable expectation of profits.

466.   Investors' profits in the EMAX Tokens were to be derived from the managerial efforts of others – specifically the Company, the Executive Defendants or any EthereumMax personnel responsible for developing the networks on which these tokens will operate and managing the proprietary trading codes.  EMAX Token investors relied on the managerial and entrepreneurial efforts of the Company and the Executive Defendants to manage, oversee, and/or develop the EthereumMax business and sales of EMAX Tokens.

467.   This dependency, however, on the managerial efforts of the Company and Executive Defendants was not apparent at issuance to a reasonable investor.  Considering the limited available information about how these EMAX Tokens were designed and intended to operate, if such an investor were even able to interpret the relevant law at the time, a reasonable investor lacked sufficient bases to conclude whether the EMAX Tokens were securities until the platform at issue, and its relevant "ecosystem," had been given time to develop.  In the interim, the investor lacked the facts necessary to conclude – let alone formally allege in court – that the EMAX Tokens they had acquired were securities.

468.   The SEC has also provided guidance for determining claims alleging the improper sale of unregistered securities.  On April 3, 2019, the SEC published its "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework") in which it "provided a framework for analyzing whether a digital

1    asset is an investment contract and whether offers and sales of a digital asset are

2    securities transactions."[116]

3         469.   The Framework described how to analyze the various facts surrounding

4    an ICO in making the determination of whether a given digital asset is a security.

5         470.   In particular, the Framework provides that the "inquiry into whether a

6    purchaser is relying on the efforts of others focuses on two key issues: Does the

7    purchaser reasonably expect to rely on the efforts of an [Active Participant or "AP"]?

8    Are those efforts 'the undeniably significant ones, those essential managerial efforts

9    which affect the failure or success of the enterprise,' as opposed to efforts that are

10   more ministerial in nature?"[117]

11        471.   The Framework further notes that the "stronger the[ ] presence" of the

12   following factors, "the more likely it is that a purchaser of a digital asset is relying

13   on the 'efforts of others.'"[118]

14        472.   The first factor the SEC looked at was whether an AP is responsible for

15   the development, improvement (or enhancement), operation, or promotion of the

16   network, particularly if purchasers of the digital asset expect an AP to be performing

17   or overseeing tasks that are necessary for the network or digital asset to achieve or

18   retain its intended purpose or functionality.

19        473.   At the time of the EthereumMax launch, Defendants actively marketed

20   the EMAX Token launch and the tokens' growth and utilization prospects, thereby

21   necessitating the continued managerial efforts of the Company and Executive

22   Defendants.  Where the network or the digital asset is still in development and the

23   network or digital asset is not fully functional at the time of the offer or sale,

24   purchasers would reasonably expect an AP to further develop the functionality of the

25   network or digital asset (directly or indirectly).

26   ───────────────

[116]  *See* n.103, *supra*.

27   [117]  *Id.*

28   [118]  *Id.*

474.    Another factor the Framework considers is whether the AP creates or supports a market for, or the price of, the digital asset.  This includes, inter alia, whether the AP "(1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities."[119]

475.    As noted above, all of the EMAX Tokens in circulation were created at the direction of the Executive Defendants.  Additionally, the Executive Defendants also created the protocols by which the EMAX Tokens are burned.

476.    The framework further states that "[a]n AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents."[120]

477.    Here, the Company and Executive Defendants have discussed the long-term prospects on extended frames, continually noting how the utilization of EMAX Tokens as a method of payment will grow in the future.

478.    The ability to determine whether and where the digital asset will trade is another factor discussed in the Framework.  For example, "purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform."[121]

479.    Here, the Executive Defendants, in particular Defendant Maher, admitted that the Executive Defendants had access to and did manipulate the sales of EMAX Tokens in the first days, which had a dramatic impact on the EMAX Tokens price and effected the EMAX Token liquidity pool.

---

[119]    *Id.*

[120]    *Id.*

[121]    *Id.*

480.   Another factor the Framework notes is whether the AP has the ability to determine who will receive additional digital assets and under what conditions.  This could be, for example, "[m]aking or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset."[122]

481.   Here, the Company and Executive Defendants are the arbiters of funding for EthereumMax.

482.   Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

483.   The Framework also remarks that purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, including, but not limited to, the instances where the AP "has the ability to realize capital appreciation from the value of the digital asset.  This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset." According to the SEC, in these instances, "purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset."[123]

484.   Here, the Executive Defendants retain a significant interest in the Ethereum Max project even after selling off many EMAX Tokens at the height of the initial launch.

485.   On May 7, 2021, on CNBC's "Squawk Box" television program, chairman of the SEC Gary Gensler stated that "a lot of crypto tokens – I won't call them cryptocurrencies for this moment – are indeed securities."[124]  In addition to being the Chairman of the SEC, Mr. Gensler is also a world renowned expert on

---

[122]    *Id.*

[123]    *Id.*

[124]    Jesse Point, *SEC Chairman Gary Gensler says more investor protections are needed for bitcoin and crypto markets*, CNBC (May 7, 2021), https://www.cnbc.com/ 2021/05/07/sec-chairman-gary-gensler-says-more-investor-protections-are-needed-for-bitcoin-and-crypto-markets.html.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1   cryptocurrencies and blockchain technology, having taught the "Blockchain and
2   Money" course at the Sloan School of Management at the Massachusetts Institute of
3   Technology ("MIT").[125]

4       486.   In a June 14, 2018 speech entitled "Digital Asset Transactions: When
5   Howey Met Gary (Plastic)" that is available on the SEC's website,[126] the following
6   observations were made on "when a digital transaction may no longer represent a
7   security offering":

8       If the network on which the token or coin is to function is sufficiently
        decentralized – where purchasers would no longer reasonably expect a
9       person or group to carry out essential managerial or entrepreneurial
        efforts – the assets may not represent an investment contract.
10      Moreover, when the efforts of the third party are no longer a key factor
        for determining the enterprise's success, material information
11      asymmetries recede.  As a network becomes truly decentralized, the
        ability to identify an issuer or promoter to make the requisite dis-
12      closures becomes difficult, and less meaningful.

13          And so, when I look at Bitcoin today, I do not see a central third
        party whose efforts are a key determining factor in the enterprise.  The
14      network on which Bitcoin functions is operational and appears to have
        been decentralized for some time, perhaps from inception.
15

16      487.   A key factor in determining whether a digital asset is a security or not
17   is whether the there is a centralized entity behind the digital asset.[127]   EMAX
18   Holdings, LLC operated as the de facto corporate entity and Defendant Perone is the
19   sole executive and director of this holding company.   Thus, there is a centralized
20   entity behind the EMAX Tokens.

21      488.   Finally, the SEC also already concluded that another virtual currency
22   (*i.e.*, DAO tokens) that are substantially similar to EMAX Tokens are "securities and

---

23   [125]   Lectures and Materials from Chairman Gensler's MIT course are available to
24   the public for free at: https://ocw.mit.edu/courses/sloan-school-of-management/15-
     s12-blockchain-and-money-fall-2018/video-lectures/session-1-introduction/.
25   [126]   William Hinman, Director, Division of Corporation Finance, Remarks at the
26   Yahoo Finance All Markets Summit, *Digital Asset Transactions: When Howey Met
     Gary (Plastic)* (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-
27   061418.
     [127]   *Id*. (noting that the "decentralized structure" of Bitcoin and Ethereum placed
28   these digital assets outside the "disclosure regime of the federal securities laws").

therefore subject to the federal securities laws."  As stated by the SEC, "issuers of distributed ledger or blockchain technology-based securities must register offers and sales of such securities unless a valid exemption applies."[128]   More recently, on November 7, 2022, the SEC was granted summary judgment on the issue of whether or not the token at issue constituted a security, stating that "no reasonable trier of fact could reject the SEC's contention that LBRY offered LBC [tokens] as a security, and LBRY does not have a triable defense that it lacked fair notice [that it needed to register its offerings.]"  *LBRY*, 2022 WL 16744741, at *8.

489.   This analysis of whether the DAO and LBC tokens are securities should be applied here.

## THIRTEENTH CAUSE OF ACTION

**Unjust Enrichment/Restitution**
**(California Common Law, in the Alternative)**
**(Against All Defendants)**

490.   Plaintiffs restate and reallege all preceding allegations above in paragraphs 1 – 185 as if fully set forth herein, and further allege as follows:

491.   Plaintiffs and members of the Class conferred a monetary benefit on Defendants by raising the price and trading volume of the EMAX Tokens, which allowed Defendants to sell their EMAX Tokens to Plaintiffs and Class members at inappropriately and artificially inflated prices.

492.   Defendants received a financial benefit from the sale of their EMAX Tokens at inflated prices and are in possession of this monetary value that was intended to be used for the benefit of, and rightfully belongs to, Plaintiffs and members of the Class.

---

[128]   Press Release, U.S. SEC. & EXCH. COMM'N, *SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities* (July 25, 2017), https://www.sec.gov/news/press-release/2017-131.

493. Plaintiffs seek restitution in the form of the monetary value of the difference between the purchase price of the EMAX Tokens and the price those EMAX Tokens sold for.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully request that this Court:

A. Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more of the Classes defined above;

B. Appoint Plaintiffs as representatives of the Class and their counsel as Class counsel;

C. Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and the Class members are entitled;

D. Order appropriate relief under Cal. Bus. & Prof. Code §17500 for Defendant Kardashian;

E. Award post-judgment interest on such monetary relief;

F. Grant appropriate injunctive and/or declaratory relief;

G. Award reasonable attorneys' fees and costs; and

H. Grant such further relief that this Court deems appropriate.

**JURY DEMAND**

Plaintiffs, individually and on behalf of the putative Class, demand a trial by jury on all issues so triable.

DATED: December 22, 2022     **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ *John T. Jasnoch*

John T. Jasnoch (CA 281605)
jjasnoch@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
Fax: 619-236-0508

*Counsel for Plaintiffs and the Proposed Class*

1

**<u>CERTIFICATE OF SERVICE</u>**

2       I hereby certify that on December 22, 2022, I caused the foregoing to be

3 electronically filed with the Clerk of the Court using the CM/ECF system, which

4 will send notification of such filing to the email addresses denoted on the Electronic

5 Mail Notice List.

6                                 *s/ John T. Jasnoch*

7                                 John T. Jasnoch

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1                    TENTATIVE STATEMENT OF DECISION

2          PLAINTIFF HAS SUED JONA RECHNITZ, RACHEL

3   RECHNITZ, JADELLE, INC., AND JADELLE JEWELRY AND

4   DIAMONDS, LLC, ASSERTING FOUR CAUSES OF ACTION.

5   PLAINTIFF ALSO SUED LEVIN PRADO, WHO HAS BEEN

6   DEFAULTED.  TO THE EXTENT THAT THE DOE DEFENDANTS HAVE

7   NOT BEEN DISMISSED, THEY ARE DISMISSED NOW.  THE SUIT

8   IS FOR FRAUD, CIVIL THEFT PURSUANT TO PENAL CODE

9   SECTION 496, BREACH OF CONTRACT, AND CONSPIRACY.

10         BEFORE GETTING TO THE MERITS, THE COURT

11  DISCUSSES A WRINKLE.  JONA RECHNITZ AND RACHEL

12  RECHNITZ WERE UNDER INVESTIGATION FOR CRIMINAL

13  ACTIVITY.  THEY BOTH ASSERTED THEIR RIGHT AGAINST

14  SELF-INCRIMINATION, AND, AS A RESULT, THEY REFUSED TO

15  RESPOND TO DISCOVERY IN THE SENSE THAT DOING SO WOULD

16  REQUIRE THEM TO VERIFY THEIR RESPONSES, WHICH THEY

17  ASSERTED COULD INCRIMINATE THEM.

18         FURTHER, DISCOVERY WAS SENT TO THE LLC AND

19  THE CORPORATION AND OBJECTIONS WERE MADE THEREON, ALSO

20  WITHIN THE SELF-INCRIMINATION PRIVILEGE, BOTH JONA AND

21  RACHEL RECHNITZ DECLARING THAT ANY RESPONSE ON BEHALF

22  OF THE ENTITIES WOULD INCRIMINATE THEM.  NO MOTION TO

23  COMPEL WAS MADE REGARDING THE CORPORATE ENTITIES.

24         AT AN EARLIER HEARING, THE COURT HELD THAT

25  JONA AND RACHEL RECHNITZ WOULD HAVE TO DECIDE

26  EVENTUALLY WHETHER TO INSIST ON THEIR RIGHTS AGAINST

27  SELF-INCRIMINATION AND TESTIFYING, BUT IF THEY STOOD

28  ON THE PRIVILEGE, THEY WOULD NOT BE ALLOWED TO WAIVE

1    IT LATER AT TRIAL.  UNLIKE A CRIMINAL PROCEEDING,

2    WHERE THE DEFENDANT CAN WAIT TO DECIDE WHETHER TO

3    WAIVE THE PRIVILEGE UNTIL THE DEFENSE CASE AT TRIAL,

4    IN A CIVIL CASE THE PARTIES CANNOT USE THE PRIVILEGE

5    AS BOTH A SWORD AND A SHIELD --

6              (INTERRUPTION IN THE PROCEEDINGS.)

7         **THE COURT:**  MAYBE YOU WANT TO MUTE YOURSELF.

8    THANK YOU.

9              -- AS A SWORD AND A SHIELD, REFUSING TO ALLOW

10   DISCOVERY ONLY TO SUDDENLY BECOME A FONT OF

11   INFORMATION AT THE TRIAL, WHILE AT THE SAME TIME

12   TAKING DISCOVERY AGAINST THE PLAINTIFF.  JONA AND

13   RACHEL RECHNITZ ELECTED TO STAND ON THE PRIVILEGE, AND

14   THEY DID NOT TESTIFY AT TRIAL.

15             AS STATED ABOVE, PLAINTIFF ALLEGES FOUR

16   CAUSES OF ACTION, EACH AGAINST ALL DEFENDANTS:

17   ONE, FRAUD; TWO, CIVIL THEFT PURSUANT TO PENAL CODE

18   SECTION 496; THREE, BREACH OF CONTRACT; AND, FOUR,

19   CONSPIRACY TO COMMIT THEFT, FRAUD, AND FRAUD BY

20   CONCEALMENT.

21             THE FOURTH CAUSE OF ACTION FOR CONSPIRACY IS

22   DISMISSED INASMUCH AS THERE IS NO TORT OF CIVIL

23   CONSPIRACY; HOWEVER, THAT DOES NOT MEAN CONSPIRACY HAS

24   NO PLACE.  TO THE EXTENT TWO OR MORE PEOPLE CONSPIRE

25   TO COMMIT A TORT, LIABILITY EXTENDS TO BOTH.  THE KEY

26   DIFFERENCE IS THAT THERE HAS TO BE AN UNDERLYING TORT;

27   THE CONSPIRACY ITSELF IS NOT A TORT AND RESULTS IN NO

28   RELIEF.

THE FACTS, AS THE COURT FINDS THEM, ARE
ESSENTIALLY AS FOLLOWS:  PLAINTIFF LOANED MONEY TO
JADELLE, LLC -- I THINK I'VE GOT THE "LLC" CORRECTLY,
BUT JADELLE, LLC.  AS SECURITY FOR THE LOAN, PLAINTIFF
TOOK POSSESSION OF CERTAIN JEWELRY.  THE LOAN, OR AT
LEAST PART OF IT, WAS REFLECTED IN AN AGREEMENT
BETWEEN PLAINTIFF AND THE LLC.  SUMS WERE ADVANCED
FROM TIME TO TIME, AND ADDITIONAL JEWELRY WAS GIVEN AS
COLLATERAL FROM TIME TO TIME.  NONE OF THE INDIVIDUAL
DEFENDANTS WERE PURPORTEDLY BOUND TO THE AGREEMENT.
ACCORDING TO PLAINTIFF, JONA CONSISTENTLY TOLD HIM
THAT THE JEWELRY WAS WORTH MORE THAN THE OUTSTANDING
LOAN AMOUNT.

JADELLE, LLC'S ONLY LISTED OFFICER IS RACHEL
RECHNITZ, WHO IS ALSO THE ONLY LISTED DIRECTOR FOR
CORPORATE FILINGS.  THERE IS NO EVIDENCE BEFORE THE
COURT AS TO HOW JADELLE, LLC IS RUN ON A DAY-TO-DAY
BASIS, OR WHAT ROLE JONA HAS IN RUNNING THE BUSINESS,
OR WHAT SPECIFIC ROLE RACHEL HAS AS A PRACTICAL
MATTER.

THE LOAN WAS ALSO SECURED BY A BUGATTI.  AT
SOME POINT, RACHEL WANTED TO RETAKE POSSESSION OF THE
CAR.  SHE OBTAINED SUCH POSSESSION BY PAYING PLAINTIFF
APPROXIMATELY $400,000.  THE EVIDENCE BEFORE THE COURT
IS THAT THE CHECK CLEARED AND THE CAR WAS, IN FACT,
RESTORED TO RACHEL.  THERE IS ALSO EVIDENCE BEFORE THE
COURT THAT AN ADDITIONAL $215,000 WAS REPAID.  THE
BALANCE, HOWEVER, HAS NOT BEEN REPAID.

1    SOME TIME LATER, JONA CONTACTED PLAINTIFF'S

2 BROTHER. HE ASKED TO TAKE POSSESSION OF THE

3 JEWELRY -- WHICH WAS BEING HELD BY PLAINTIFF IN A

4 SECURE BOX AT WELLS FARGO BANK -- TO DISPLAY AT A

5 TRUNK SHOW, WHICH IS A SALES EVENT WHERE PEOPLE SEE

6 AND POTENTIALLY BUY JEWELRY. THE THOUGHT WAS THAT IF

7 THE JEWELRY SOLD, THE PROCEEDS COULD BE USED TO PAY

8 DOWN OR PAY OFF THE LOAN.

9    PLAINTIFF'S BROTHER, WITH PLAINTIFF'S

10 PERMISSION, WENT TO THE BANK AND RETRIEVED THE

11 JEWELRY, WHICH HE THEN TURNED OVER TO JONA. THE

12 PARTIES AGREED THAT THE JEWELRY WOULD BE STORED BY

13 JONA OVERNIGHT IN A VAULT BECAUSE JONA HAD THE

14 APPROPRIATE FACILITIES TO STORE THE JEWELRY SAFELY AND

15 WAS INSURED. BY THE TIME THE SHOW WAS OVER, THE COURT

16 UNDERSTANDS THAT IT WAS TOO LATE TO GET THE JEWELS

17 BACK INTO THE BANK THAT NIGHT.

18    THE NEXT DAY, PLAINTIFF'S BROTHER WENT TO

19 RETRIEVE THE JEWELRY BUT WAS TOLD BY JONA THAT THERE

20 WAS AN INTERESTED BUYER, SO JONA ASKED IF HE COULD

21 HOLD ON TO THE JEWELRY FOR A WHILE TO SEE IF THE BUYER

22 WOULD BUY IT, AND THE MONEY WOULD THEN BE USED TO PAY

23 DOWN THE LOAN. THIS WENT ON FOR A FEW DAYS, BUT

24 ULTIMATELY THE JEWELRY WAS NEVER RETURNED, AND THE

25 LOAN WAS NOT REPAID.

26    JONA CAUSED CHECKS TO BE SENT TO PLAINTIFF

27 SIGNED BY PRADO, BUT THEY NEVER CLEARED. AT SOME

28 POINT, PLAINTIFF AND JONA SIGNED A DOCUMENT THAT

1   CONFIRMED THAT JONA STILL HAD THE JEWELRY AND WAS

2   TENDERING A CHECK THAT HE ASKED NOT TO BE CASHED FOR A

3   FEW DAYS.  BUT ON THE DAY THAT IT WAS TO BE CASHED,

4   THERE WAS INSUFFICIENT FUNDS, AND THIS CHECK, TOO, WAS

5   DISHONORED.

6          AT THE SAME TIME THAT THIS WAS HAPPENING,

7   JONA WAS FACING SENTENCING IN A FEDERAL CRIMINAL COURT

8   IN NEW YORK.  AT ISSUE WAS THE AMOUNT OF RESTITUTION

9   JONA WOULD HAVE TO PAY.  PLAINTIFF POSITS THAT JONA

10  WAS ESSENTIALLY TRYING TO KEEP PLAINTIFF QUIET UNTIL

11  AFTER THE SENTENCING HEARING BECAUSE IF THE JUDGE

12  LEARNED THAT JONA WAS STILL DEFRAUDING PEOPLE, THE

13  SENTENCE WOULD BE HARSHER, WHICH THE COURT FINDS TO BE

14  A LOGICAL CONCLUSION.  THE BOTTOM LINE IS THAT

15  EVENTUALLY PLAINTIFF HAD ENOUGH OF JONA'S PROMISES,

16  AND, WHEN THE JEWELRY WAS NOT RETURNED AND THE LOAN

17  WAS NOT PAID, HE SUED.

18          TRIAL BEGAN ON FEBRUARY 6.  TRIAL BEGAN AND

19  ENDED IN FEBRUARY 2023.  THE PARTIES DELIVERED CLOSING

20  ARGUMENTS.  SHORTLY THEREAFTER, DEFENDANTS SOUGHT TO

21  SUBMIT A CLOSING BRIEF.  PLAINTIFF MOVED TO STRIKE

22  THAT BRIEF, AND THE COURT GRANTED THE MOTION TO

23  STRIKE.  UPON CONCLUSION OF CLOSING ARGUMENT, THE

24  TRIAL WAS OVER AND DONE.  THE COURT EXERCISED ITS

25  DISCRETION TO REJECT THE UNAUTHORIZED SUPPLEMENTAL

26  FILING.

27          TURNING FIRST TO THE THIRD CAUSE OF ACTION,

28  FOR BREACH OF CONTRACT, THE COURT FINDS IN FAVOR OF

1    PLAINTIFF AND AGAINST JADELLE, LLC ONLY.  THIS IS A
2    CONTRACT CAUSE OF ACTION.  THE ONLY PARTY LIABLE WOULD
3    BE THE CONTRACTING PARTIES AND ANY
4    SUCCESSORS-IN-INTEREST.  THE CONTRACTING PARTIES ARE
5    PLAINTIFF AND JADELLE, LLC.  THERE ARE NO OTHERS.
6         JADELLE INCORPORATED MAY BE A
7    SUCCESSOR-IN-INTEREST, BUT THE ONLY EVIDENCE THE COURT
8    HAS OF THAT IS THAT THE CORPORATION OPERATES OUT OF
9    THE SAME SPACE, AS DID THE PRIOR ENTITY, AND THERE IS
10   SOME COMMON OWNERSHIP.  BUT THAT IS NOT ENOUGH UNDER
11   THE LAW TO FIND THAT ONE IS THE SUCCESSOR-IN-INTEREST
12   OF THE OTHER, NOR DO ALLEGATIONS OF CONSPIRACY HELP.
13   CONSPIRACY IS A TORT DOCTRINE.  ONE CANNOT CONSPIRE TO
14   BREACH A CONTRACT.  THE COURT NEED NOT DETERMINE
15   WHETHER JONA OR ANYONE ELSE WOULD BE LIABLE FOR
16   INTERFERENCE AS THAT TORT WAS NOT PLED.
17        JADELLE, LLC CONTENDS THAT THERE IS
18   INADEQUATE PROOF OF THE CONTRACT OR THAT PLAINTIFF
19   PERFORMED THEREUNDER.  THE COURT DISAGREES.  FIRST,
20   PLAINTIFF TESTIFIED THAT HE MADE THE PAYMENTS AT
21   ISSUE, AND THAT TESTIMONY IS UNREBUTTED; SECOND, THE
22   CHECKS ARE IN EVIDENCE.  TRUE, THE PAYOR IS NOT THE
23   ENTITY THAT SIGNED THE CONTRACT, BUT THAT IS OF NO
24   MOMENT.  WE STILL HAVE THE TESTIMONY FROM THE
25   PLAINTIFF THAT THE CHECKS WERE WRITTEN AND THE AMOUNTS
26   WERE PAID.
27        A LENDER CAN HAVE MONEY LENT BY A RELATED
28   ENTITY.  IT NEED NOT COME FROM THE LENDER DIRECTLY,

1  AND THAT IS THE CASE HERE.  THE BOTTOM LINE IS THERE

2  IS SUFFICIENT EVIDENCE THAT THE LOAN WAS MADE, AND

3  THERE WAS SUFFICIENT EVIDENCE AS TO THE AMOUNT

4  OUTSTANDING.  THE COURT FINDS BOTH PLAINTIFF AND HIS

5  BROTHER TO BE CREDIBLE ON THIS POINT, AND THERE IS AT

6  LEAST A PREPONDERANCE OF THE EVIDENCE, IN THE COURT'S

7  VIEW, ON THIS QUESTION TO FAVOR PLAINTIFF.

8       THE AMOUNT DUE IS THE AMOUNT OF THE LOAN PLUS

9  SIMPLE INTEREST.  INTEREST ACCRUES FROM THE DATE OF

10  EACH LOAN MADE, EACH PORTION OF THE LOAN MADE.  ANY

11  PAYMENTS ARE CREDITED FIRST AGAINST INTEREST, AND TO

12  THE EXTENT THERE IS MONEY LEFT, IT IS CREDITED AGAINST

13  PRINCIPAL.  INTEREST CONTINUES AT THE RATE SET FORTH

14  IN THE CONTRACT UNTIL THE DATE OF JUDGMENT, AT WHICH

15  POINT IT WILL ACCRUE ON THE TOTAL JUDGMENT AMOUNT AT

16  THE LEGAL RATE.

17       AS TO THE FIRST CAUSE OF ACTION, FOR FRAUD,

18  THE COURT FINDS IN FAVOR OF PLAINTIFF AND AGAINST

19  JADELLE, LLC AND JONA RECHNITZ, JOINTLY AND SEVERALLY.

20  THE COURT DOES NOT FIND SUFFICIENT EVIDENCE OF FRAUD

21  IN THE INDUCEMENT; THAT IS, THE COURT CANNOT SAY THAT

22  THE EVIDENCE PREPONDERATES THAT DEFENDANTS NEVER

23  INTENDED THE LOAN TO BE REPAID AT THE TIME THE LOAN

24  WAS MADE.  BUT PLAINTIFF WAS MOST CERTAINLY DEFRAUDED

25  OUT OF THE SECURITY, WHICH HAD THE EFFECT OF MAKING

26  THE LOAN WORTHLESS.

27       THE PROMISE WAS MADE BY JONA THAT HE WAS ONLY

28  GOING TO BORROW THE COLLATERAL FOR A SHORT PERIOD OF

1  TIME IN AN ATTEMPT TO SELL IT, AFTER WHICH HE WOULD

2  EITHER PAY OFF THE LOAN OR PAY IT DOWN OR RETURN THE

3  JEWELRY.  THE COURT BELIEVES THAT JONA HAD NO INTENT

4  TO DO EITHER.  HE WAS ATTEMPTING TO REGAIN POSSESSION

5  OF THE JEWELRY SO THAT HE COULD USE THE MONEY FOR

6  OTHER PURPOSES AND ESSENTIALLY ALLOW JADELLE, LLC TO

7  WALK AWAY FROM THE LOAN.

8         JONA PURPORTED TO ACT ON JADELLE, LLC'S

9  BEHALF, AND HE CERTAINLY HAD AT LEAST OSTENSIBLE

10 AUTHORITY TO SO ACT.  THAT MAKES JADELLE, LLC LIABLE.

11 AND JONA IS, OF COURSE, LIABLE FOR THE FRAUD THAT HE

12 HIMSELF COMMITTED.

13        THE CORPORATION, JADELLE, INC., HAD NOT YET

14 BEEN CREATED, SO IT IS NOT LIABLE ABSENT BETTER

15 EVIDENCE ON SUCCESSORSHIP, NOR IS THERE ANYTHING --

16 ANY SPECIFIC EVIDENCE ABOUT ANYTHING JADELLE

17 INCORPORATED DID WITH REGARD TO THE COLLATERAL.

18 THAT LEAVES RACHEL.  PLAINTIFF, AGAIN, ARGUES THAT

19 RACHEL IS THE ALTER EGO OF JADELLE.  SHE MIGHT BE, BUT

20 THE EVIDENCE, AT LEAST AT PRESENT, IS NOT THERE.

21        TO SUPPORT A FINDING OF ALTER EGO -- WHICH

22 THE COURT FINDS IS MORE OFTEN ASSERTED THAN PROVEN --

23 PLAINTIFF NEEDS TO PROVE THAT RACHEL WAS

24 JADELLE, LLC'S OWNER AND THAT HER INTERESTS AND

25 JADELLE, LLC'S INTERESTS WERE SO UNIFIED THAT THERE IS

26 REALLY NO DIFFERENCE BETWEEN THE TWO.

27        TO AID IN THAT SHOWING, PLAINTIFF COULD GO

28 THROUGH THE TRADITIONAL TOOLS -- EVIDENCE THAT

1     JADELLE, LLC WAS UNDERCAPITALIZED, THAT CORPORATE

2     FORMALITIES WERE IGNORED, OR THAT RACHEL ESSENTIALLY

3     USED THE ENTITY AS AN EXTENSION OF HERSELF OR THAT

4     THERE WAS NO CORPORATE DISTINCTIVENESS.  IN ADDITION,

5     THERE MUST BE A SHOWING THAT, ABSENT ALTER EGO, THE

6     RESULT WOULD BE INEQUITABLE.  THE COURT BELIEVES THE

7     PLAINTIFF DID MAKE THAT LAST SHOWING.

8            THE PROBLEM IS THERE'S NO SHOWING ON THE REST

9     OF IT, AT LEAST GIVEN THE EVIDENCE THAT THE COURT HAS

10    NOW.  FOR EXAMPLE, PLAINTIFF CONTENDS THAT

11    JADELLE, LLC WAS UNDERCAPITALIZED.  PLAINTIFF'S PROOF

12    IS THAT THE CHECKS BOUNCED, BUT A BOUNCED CHECK IS NOT

13    ENOUGH TO MAKE THAT SHOWING.  IT HAS TO BE A MORE

14    CHRONIC CONDITION.  FURTHER, EVEN A BOUNCED CHECK

15    MEANS NOTHING.

16            FOR ALL THE COURT KNOWS, IN ADDITION TO THE

17    ACCOUNT UPON WHICH THE CHECK WAS ISSUED, JADELLE, LLC

18    HAD TEN OTHER ACCOUNTS THAT HAD LOTS OF MONEY.

19    JADELLE, LLC MIGHT HAVE HAD TENS OF MILLIONS OF

20    DOLLARS IN JEWELRY.  IT MIGHT HAVE HAD OTHER ASSETS.

21            THERE ARE NO FINANCIAL RECORDS AT ALL, LET

22    ALONE SUFFICIENT RECORDS TO SHOW THAT THE ENTITY IS

23    UNDERCAPITALIZED.  TRUE, THERE WAS A BANKRUPTCY, BUT,

24    ESSENTIALLY, DUE TO THE CRIMINAL PROCEEDINGS, THE

25    COURT'S READING OF THE BANKRUPTCY PROCEEDINGS IS THAT

26    THE TRUSTEE WAS ESSENTIALLY UNABLE TO LEARN ANYTHING,

27    NOR IS THERE EVIDENCE TO SHOW THAT CORPORATE

28    FORMALITIES WERE IGNORED OR THAT RACHEL USED THE

1    ENTITY AS AN EXTENSION OF HERSELF.

2          IT MIGHT BE THAT THERE IS SOME EVIDENCE OF

3    THAT FOR JONA, BUT JONA IS HELD JOINTLY AND SEVERALLY

4    ANYWAY.  THERE JUST ~~NEEDS TO BE~~ A DEARTH OF SPECIFIC

5    EVIDENCE AS TO RACHEL.  THE ONLY ACTUAL INVOLVEMENT OF

6    RACHEL ON WHICH THERE'S EVIDENCE IS THAT SHE REDEEMED

7    THE BUGATTI, BUT THAT REDEMPTION WAS AN HONEST ONE.

8    SHE SAID SHE WOULD PAY CASH FOR THE REDEMPTION, AND

9    SHE DID.  TRUE, SHE'S THE ONLY LISTED CORPORATE

10   OFFICER, BUT BEING THE ONLY OFFICER IS SIMPLY NOT

11   ENOUGH FOR ALTER EGO.

12         AS TO CONSPIRACY, THE COURT HAS NO DOUBT THAT

13   THERE'S PLENTY OF EVIDENCE TO SNARE JONA, BUT IT'S

14   HARD TO SEE WHAT RACHEL ACTUALLY DID IN FURTHERANCE OF

15   THE CONSPIRACY.  THERE'S NO EVIDENCE OF ANY DISCUSSION

16   INVOLVING HER, NO EVIDENCE OF HER PLOTTING OR

17   PLANNING, NO EVIDENCE OF ANY ACTION THAT SHE HERSELF

18   TOOK TO FURTHER THE FRAUD.  SHE MIGHT WELL BE THE

19   PERSON WHO HAD SOME POWER AS AN OFFICER OR DIRECTOR OF

20   JADELLE, LLC, BUT AN ENTITY'S MANAGER IS NOT

21   PERSONALLY RESPONSIBLE FOR THE ENTITY'S CONDUCT ABSENT

22   SOME EVIDENCE TYING THE MANAGER SPECIFICALLY TO THE

23   MISCONDUCT.

24         NOW, PLAINTIFF RIGHTLY COMPLAINS THAT IT WAS

25   STYMIED IN GETTING THIS EVIDENCE.  IT GOT NO DOCUMENTS

26   FROM ANY JADELLE ENTITY OR ANY DEFENDANT BECAUSE THE

27   RIGHT AGAINST SELF-INCRIMINATION WAS INVOKED.  THERE

28   WAS NO MOTION TO COMPEL.  AND EVEN BEYOND THAT,

1    PLAINTIFF DID NOT USE ALL OF THE TOOLS AT HAND.

2          FOR EXAMPLE, PLAINTIFF KNEW AT LEAST ONE

3    JADELLE, LLC ACCOUNT NUMBER THAT CAME FROM THE CHECKS

4    THAT PLAINTIFF RECEIVED.  THE CHECKS BOUNCED, BUT THAT

5    DOESN'T MEAN IT WASN'T AN ACCOUNT.  PLAINTIFF COULD

6    HAVE SUBPOENAED THE BANK AND OBTAINED RECORDS SHOWING

7    WHERE MONEY CAME IN AND WHEN IT WENT OUT AND TO WHOM.

8    IF MONEY WAS PAID BY A CHECK OR TRANSFER, PLAINTIFF

9    WOULD HAVE HAD ANOTHER ENTITY THAT COULD HAVE BEEN

10   SUBPOENAED.

11          IN THE WORDS OF "DEEP THROAT" OF WATERGATE

12   FAME -- APPARENTLY ONLY IN THE MOVIE, IN WHICH THE

13   WORDS WERE UTTERED BY HAL HOLBROOK, BUT THEY WERE NOT

14   IN THE BOOK -- QUOTE, "FOLLOW THE MONEY."

15          THAT MIGHT HAVE SHOWN OTHER ACCOUNTS HELD BY

16   JADELLE; IT MIGHT HAVE SHOWN INTERMINGLING; IT MIGHT

17   HAVE SHOWN ALTER EGO; IT MIGHT HAVE SHOWN ACCOUNTS FOR

18   RACHEL OR JONA, INCLUDING PAYMENTS MADE TO ONE OF THEM

19   OR BOTH OF THEM.  AND IF THEIR ACCOUNTS COULD HAVE

20   BEEN FOUND, THEY, TOO, COULD HAVE BEEN EXAMINED BY

21   SUBPOENAS ISSUED TO THE VARIOUS FINANCIAL

22   INSTITUTIONS.

23          IS THAT EXPENSIVE AND DIFFICULT?  PROBABLY.

24   BUT THAT'S THE KIND OF EVIDENCE THAT MIGHT HAVE LED TO

25   AN ALTER EGO FINDING OR, PERHAPS, A CONSPIRACY FINDING

26   IF ONE WANTED TO START TO TRACE THE MONEY OR TRACE THE

27   JEWELRY.  THE GOOD NEWS FOR PLAINTIFF IS THAT ALTER

28   EGO IS ONE OF THE FEW THEORIES THAT CAN BE RAISED

1    POST-JUDGMENT.

2         PLAINTIFF CAN, THROUGH VARIOUS JUDGMENT

3    DEBTOR LAWS, CONDUCT THE DISCOVERY THE COURT HAS JUST

4    SUGGESTED AND FOLLOW THE MONEY.  NOW, IT MIGHT SHOW

5    ALTER EGO, AND THE JUDGMENT CAN BE AMENDED AFTER THE

6    FACT TO ADD NEW JUDGMENT DEBTORS AS ALTER EGOS OF THE

7    EXISTING JUDGMENT DEBTORS; THEN AGAIN, IT MIGHT NOT.

8    THAT IS A QUESTION FOR ANOTHER DAY.

9         THAT LEAVES THE CIVIL THEFT STATUTE.

10   PENAL CODE SECTION 496(C) PROVIDES THAT ANY PERSON

11   INJURED AS A RESULT OF A DEFENDANT HAVING STOLEN

12   PROPERTY MAY BRING AN ACTION FOR DAMAGES AND CAN

13   RECOVER THREE TIMES THE AMOUNT OF ACTUAL DAMAGES, AS

14   WELL AS ATTORNEY'S FEES.  THE OPERATIVE ELEMENT IS

15   THAT THE DEFENDANT MUST HAVE RECEIVED, QUOTE,

16   "PROPERTY THAT HAS BEEN STOLEN OR THAT HAS BEEN

17   OBTAINED IN ANY MANNER CONSTITUTING THEFT," UNQUOTE.

18   THIS APPLIES TO THE ORIGINAL THIEF.

19        SO THE QUESTION BECOMES:  WHAT IS THEFT?

20   "THEFT" IS DEFINED IN PENAL CODE SECTION 484.  IT

21   APPLIES TO PEOPLE WHO, QUOTE, "STEAL, TAKE, CARRY,

22   LEAD, OR DRIVE AWAY THE PERSONAL PROPERTY" -- DRIVE

23   AWAY, LIKE A CAR -- "THE PERSONAL PROPERTY OF ANOTHER,

24   OR WHO SHALL FRAUDULENTLY APPROPRIATE PROPERTY WHICH

25   HAS BEEN ENTRUSTED TO HIM OR HER, OR WHO SHALL

26   KNOWINGLY AND DESIGNEDLY, BY FALSE OR FRAUDULENT

27   REPRESENTATION OR PRETENSE, DEFRAUD ANY OTHER PERSON

28   OF...PERSONAL PROPERTY..." UNQUOTE.

1       HERE, THE PROPERTY IN QUESTION IS THE

2   JEWELRY.  THERE IS NO DOUBT IN THE COURT'S MIND THAT

3   THE JEWELRY WAS TAKEN BY FRAUD.  THE QUESTION, THEN,

4   IS WHETHER IT IS PROPERTY THAT WAS, QUOTE, "THE

5   PERSONAL PROPERTY OF ANOTHER," UNQUOTE, OR WHETHER

6   JONA, QUOTE, "FRAUDULENTLY APPROPRIATED PROPERTY WHICH

7   HAS BEEN ENTRUSTED TO HIM," OR "DEFRAUDED ANY OTHER

8   PERSON OF," UNQUOTE, PERSONAL PROPERTY.

9       THE ISSUE THAT DEFENDANT RAISES IS THAT THE

10  JEWELRY WAS NEVER PLAINTIFF'S; IT BELONGED TO

11  JADELLE, LLC AND WAS HELD BY PLAINTIFF ONLY AS

12  SECURITY.  AS SUCH, THE COURT AGREES WITH DEFENDANT

13  THAT IT IS NOT PERSONAL PROPERTY OF ANOTHER, AS THE

14  PROPERTY BELONGED TO THE ALLEGED THIEF.  HOWEVER, IT

15  DOES SEEM TO FALL WITHIN THE FOUR CORNERS OF THE

16  PROVISION MAKING ONE LIABLE WHO, QUOTE, "FRAUDULENTLY

17  APPROPRIATES PROPERTY WHICH HAS BEEN ENTRUSTED TO HIM

18  OR HER," UNQUOTE.

19      WHILE INITIALLY THE PROPERTY WAS ENTRUSTED TO

20  PLAINTIFF AND PLAINTIFF HELD IT IN THE WELLS FARGO

21  SAFETY DEPOSIT BOX, PLAINTIFF, IN TURN, ENTRUSTED THE

22  PROPERTY TO JONA FOR THE PURPOSES OF THE TRUNK SHOW OR

23  SELLING IT TO A BUYER AND PROVIDING THE PROCEEDS TO

24  REPAY THE LOAN.  INSTEAD OF DOING THAT, THOUGH,

25  JONA, THROUGH FRAUD, TOOK THAT PROPERTY WHICH HAD BEEN

26  ENTRUSTED TO HIM.

27      UNLIKE THE FIRST CLAUSE, THE SECOND CLAUSE

28  DOES NOT REQUIRE THAT THE PLAINTIFF OWN THE PROPERTY.

1   AND THE FINAL CLAUSE APPLIES TO ONE WHO, QUOTE,

2   "KNOWINGLY AND DESIGNEDLY, BY ANY FALSE OR FRAUDULENT

3   REPRESENTATION OR PRETENSE, DEFRAUDS ANY OTHER PERSON

4   OF...PERSONAL PROPERTY," AND THE COURT BELIEVES THAT

5   THE FACTS HERE FALL WITHIN THAT DEFINITION.

6            THE REASON THAT SECTION 496(C) DOES NOT

7   BECOME JUST AN ALL-PURPOSE STATUTE IS THAT IN ADDITION

8   TO THE REQUIREMENTS THAT THE PROPERTY BE TAKEN BY

9   FORCE OR FRAUD, IT CAN ONLY BE BROUGHT BY A PERSON

10  INJURED BY THE THEFT.  PLAINTIFF WAS INJURED BY THE

11  THEFT IN THAT THE LOAN, WHICH HAD BEEN FULLY SECURED,

12  BECAME WORTHLESS.

13           IT SEEMS TO THE COURT THAT THE REQUIREMENTS

14  OF THIS STATUTE ARE MET.  THEREFORE, THE COURT FINDS

15  FOR PLAINTIFF AND AGAINST JADELLE, LLC AND JONA IN THE

16  AMOUNT OF APPROXIMATELY $5.9 MILLION, TREBLED, WHICH

17  MEANS THE STOLEN SUM, TREBLED, JOINTLY AND SEVERALLY.

18  THAT AMOUNT DOES NOT ACCRUE INTEREST UNTIL SUCH TIME

19  AS JUDGMENT IS ENTERED, AT WHICH TIME THE ENTIRE

20  JUDGMENT WILL ACCRUE INTEREST AT THE LEGAL RATE.

21           PLAINTIFF ARGUES THAT 496(C) IS ADDITIVE TO

22  OTHER AWARDS, MEANING THAT THE RECOVERY IS REALLY FOUR

23  TIMES THE ACTUAL AMOUNT STOLEN; THAT IS, THE AMOUNT

24  STOLEN, PLUS THREE TIMES THAT AMOUNT.  THE COURT DOES

25  NOT AGREE.  THE COURT BELIEVES THAT TREBLING INCLUDES

26  THE ACTUAL DAMAGE, SIMILAR TO THE ANTITRUST CONTEXT,

27  SO THE NUMBER IS 5.9 TIMES THREE.

28           IN MAKING THESE DETERMINATIONS, THE COURT

1  FOUND PLAINTIFF'S WITNESSES TO BE GENERALLY CREDIBLE.

2  THE COURT UNDERSTANDS DEFENDANTS' CONTENTION THAT

3  PLAINTIFF'S WITNESSES WERE NOT CREDIBLE BECAUSE THE

4  WHOLE TRANSACTION WAS JUST TOO INFORMAL.  MAYBE SO,

5  BUT THE COURT HAS NO EVIDENCE AS TO CUSTOM AND

6  PRACTICE IN THE JEWELRY BUSINESS.

7        IT COULD WELL BE THAT THIS SORT OF

8  INFORMALITY IS COMMONPLACE.  AT LEAST THERE'S NO

9  EVIDENCE ON THE OTHER SIDE.  IN ANY EVENT, THE COURT

10  IS PERSUADED THAT PLAINTIFF'S WITNESSES WERE TELLING

11  THE TRUTH ON THESE CRITICAL FACTS, AND THE COURT,

12  THEREFORE, GIVES THAT TESTIMONY WEIGHT.

13        THE TOTAL JUDGMENT, THEN, IS THREE TIMES THE

14  ACTUAL DAMAGES.  IN ADDITION, PLAINTIFF IS ENTITLED TO

15  PREJUDGMENT INTEREST ON THE BREACH OF CONTRACT AND

16  FRAUD CAUSES OF ACTION, BUT NOT ADDED TOGETHER.

17  PREJUDGMENT INTEREST IS AWARDED ONLY ONCE.  INTEREST

18  RUNS ON THE CONTRACT, AS THE COURT STATED, AT THE

19  AMOUNT SET FORTH IN THE CONTRACT FROM THE TIME EACH

20  ADVANCE IS MADE UNTIL THE TIME OF JUDGMENT, LESS ANY

21  AMOUNTS REPAID.

22        IT RUNS ON THE FRAUD CAUSE OF ACTION FROM THE

23  DATE OF THE TRUNK SALE WHEN THE JEWELRY WAS ENTRUSTED

24  TO JONA.  THE RATE FOR FRAUD IS 7 PERCENT COMPOUNDED

25  ANNUALLY.  YOU CAN'T ADD THEM TOGETHER.  YOU GET ONE

26  OR THE OTHER BUT NOT BOTH.

27        PLAINTIFF IS DIRECTED TO PERFORM THE INTEREST

28  CALCULATION AND PROVIDE THE SPECIFIC NUMBERS AFTER

1    GIVING DEFENDANTS FULL CREDIT FOR THE PAYMENTS

2    ACTUALLY MADE AND AFTER MEETING AND CONFERRING WITH

3    DEFENDANT TO MAKE SURE THAT THE PARTIES AT LEAST AGREE

4    ON THE MATH.  DEFENDANTS, BY AGREEING ON THE MATH,

5    WILL NOT BE CONCEDING THE MERITS IN ANY WAY.  THE

6    DEFENDANT WILL SIMPLY AGREE THAT THE PLAINTIFF CAN DO

7    MULTIPLICATION PROPERLY.

8            IN ADDITION, PURSUANT TO SECTION 496(C),

9    PLAINTIFF IS ENTITLED TO RECOVER ITS ATTORNEY'S FEES

10   FROM JONA AND JADELLE, LLC.

11           UPON SIGNING THIS PROPOSED STATEMENT OF

12   DECISION, WHICH THE COURT WILL DO ONCE IT RECEIVES THE

13   TRANSCRIPT, WHICH THE COURT IS ORDERING, DEFENDANTS

14   WILL HAVE THE TIME PRESCRIBED BY LAW TO FILE ANY

15   OBJECTIONS THERETO.  PLAINTIFFS WILL ALSO HAVE THAT

16   TIME TO FILE ANY OBJECTIONS TO THE PROPOSED STATEMENT

17   OF DECISION.

18           IF NO TIMELY OBJECTIONS ARE FILED, THE

19   PROPOSED STATEMENT OF DECISION WILL BECOME THE FINAL

20   STATEMENT OF DECISION WITHOUT FURTHER ORDER OF THE

21   COURT.  IF TIMELY OBJECTIONS ARE FILED, THE COURT WILL

22   RULE ON THEM ONCE MADE.

23           THAT CONCLUDES THE COURT'S TENTATIVE

24   STATEMENT OF DECISION.

25                       --O0O--

26           **THE COURT:**  UNLESS A PARTY HAS A CLARIFYING

27   QUESTION -- THAT IS, THERE IS SOMETHING THAT THE

28   PARTIES DO NOT UNDERSTAND -- THAT WILL CONCLUDE

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

LEONARD SULAYMANOV and JLZ   :
CONSULTING, INC. d/b/a        :
LENZO & CO,                    :
                             :
          Plaintiffs,    :   **CASE NO.: 24-cv-23229**
v.                        :
                             :
FLOYD MAYWEATHER JR.,      :
MICHAEL RAY STEVENSON     :
(a.k.a TYGA), THE MONEY      :
TEAM LLC, and JONA RECHNITZ,  :
                             :
          Defendants.    :

## AMENDED COMPLAINT

AND NOW, the above-named Plaintiffs, Leonard Sulaymanov ("Sulaymanov") and JLZ Consulting, Inc. d/b/a Lenzo Co ("JLZ") (collectively, "Plaintiffs"), by and through their undersigned counsel, initiate this complaint against the Defendants, Floyd Mayweather Jr. ("Mayweather"), Michael Ray Stevenson a.k.a TYGA ("Tyga"), The Money Team LLC ("TMT" or "The Money Team") and Jona Rechnitz ("Rechnitz") (collectively, "Defendants"), and in support thereof aver as follows:

## INTRODUCTION

1.    Defendants are a group of individuals and celebrities who, in essence, live lavish lifestyles, purchasing all sorts of extravagant and luxurious personal items for themselves, their family, friends and even bodyguards, such as watches, necklaces, and rings.

2.     These Defendants individually, jointly, severally and/or in concert with each other solicited Plaintiffs to meet with them privately and present to them such luxury items for sale upon promises that the Defendants would purchase selected items from Plaintiffs.

3.     All of the scheduling of meetings and discussion of the financial matters for this relationship were handled, processed and set up by and through Jona Rechnitz, who claimed himself to be the exclusive agent, broker and friend of Mayweather, while offering endorsements from Mayweather to induce Plaintiffs to allow them to convert jewelry for Defendants' benefit and to advance their scheme.

4.     Defendants controlled all aspects of the transactions from selecting the meeting locations, to their choice of watch brands to be displayed, the types of jewelry they wanted to see, the deposit terms for items purchased, the delivery locations of the luxury items and finally the invoicing and payment of all balances due.

5.     This action arises out of a pattern of predatory, unfair, improper, fraudulent and unscrupulous practices through which Defendants used Plaintiffs' reputation, business and its inventory to systematically steal and convert Plaintiffs' watches and jewelry to their own, without paying the full and fair price for same all to Plaintiffs' extreme financial loss.

6.     Defendants misled, deceived, defrauded and misrepresented their true intentions and relationships with each other to induce Plaintiffs to deliver

2

and display millions of dollars of inventory that Plaintiff had for sale, all outside the purview of cameras, security systems and traditional store sale methods.

7.    Defendants then misled, coerced and defrauded Plaintiffs into accepting fractional cash deposits toward the full purchase price for the luxury items the Defendants selected and purchased.

8.    Defendants have engaged in illegal, improper, fraudulent and/or racketeering and other activities which include but are not limited to:

- Targeting high-end jewelers and watch brokers who work with high-net-worth celebrities and sports athletes and offer financial terms on purchases;

- Falsely promising to provide Plaintiffs with publicity and other benefits;

- Misrepresenting to Plaintiffs the person who was in charge of funds for purchases;

- Claiming, falsely, that they did not accept or take possession of certain luxury items, while posting pictures of themselves on social media with them;

- Misrepresenting to Plaintiffs the terms and conditions of sales;

- Threatening physical violence if Plaintiffs made a claim;

- Threatening or engaging in extortion by threatening to "go to the Feds" and have Plaintiffs investigated for crimes if they attempted to assert civil remedies;

- Misrepresenting to Plaintiffs that they all paid Jona Rechnitz the total invoiced amounts due for the luxury items the individually possessed.

9.    In sum, Defendants have engaged in a scheme where they used Mayweather's reputation, celebrity status and false promises of publicity to induce Plaintiffs to depart with millions of dollars of jewelry and other luxury

items without ever intending to pay Plaintiffs for it. Defendants then threatened, intimidated, and otherwise defrauded Plaintiffs in an attempt to prevent Plaintiffs from asserting their rights with respect to the jewelry and other luxury items that have been converted.

10.     This conduct, which is ongoing, and which has continued after the filing of the instant lawsuit, has forced Plaintiffs to bring this action under various Federal and State laws to obtain temporary, preliminary and/or permanent injunctive relief, writs or replevin, disgorgement of ill-gotten luxury items, unjust enrichment and other equitable relief for Defendants' acts and practices hereinafter described in greater detail.

11.     Alternatively, in the event equitable relief is unattainable, then Plaintiffs seek compensatory and punitive damages for Defendants' breach of contract, fraud, theft and conversion.

## THE PARTIES TO THIS ACTION

12.     Plaintiff, Leonard Sulaymanov (hereafter, "Sulaymanov"), is a resident of Florida and operates a high-end watch and jewelry business at 169 E. Flagler Street, Suite 1012, Miami, Florida 33131.

13.     Plaintiff, JLZ Consulting, Inc., is a duly organized and registered corporation, doing business as "Lenzo & Co" with a business address located at 169 E. Flager St, Suite 1012, Miami, Florida 33131 (hereafter, "JLZ"). Sulaymanov is the owner and managing member of JLZ. Plaintiffs are hereinafter collectively referred to as "Plaintiffs".

14.     Defendant, Floyd Mayweather Jr. (hereinafter, "Mayweather"), is a world champion boxer, celebrity and social media influencer who owns real property located at 288 S. Coconut Lane, Miami Beach, Florida 33139. Mayweather has at all times material hereto, acted alone or in concert with other named Defendants to solicit Plaintiffs for inventory, to select luxury items from Plaintiffs and to convert said items as his own personal possessions without compensating Plaintiffs.

15.     Defendant, The Money Team LLC (hereinafter, TMT), is a corporate entity created by Mayweather, which employs Mayweather's staff of bodyguards, agents, servants, and workmen.

16.     Defendant, Michael Ray Stevenson a.k.a Tyga (hereinafter, "Tyga"), is a world-renowned musical artist commonly known as 'TYGA", with an address located at 801 S. Figueroa St, Suite 1000, Los Angeles, CA 90017, and he hired, employed, engaged, and/or contracted with Jona Rechnitz to solicit Plaintiffs and to acquire certain luxury items from Plaintiffs all as part of Defendants' fraudulent scheme.

17.     Defendant, Jona Rechnitz (hereinafter "Rechnitz"), is an individual with alleged multiple residences in New York, California and Miami who operates out of Mayweather's residential address located at 288 S. Coconut Lane, Miami Beach, Florida 33139. Rechnitz is, upon information and belief, the agent, servant, representative, workman, partner, member and/or independent contractor of Mayweather and Tyga and he acted in concert with said named

Defendants to formulate, direct, control, authorize, participate, solicit and orchestrate Defendants' watch and jewelry scheme.

## JURISDICTION AND VENUE

18.    Plaintiffs bring this civil action against Defendants, individually, jointly, severally and in the alternative for crimes under the Racketeer Influenced and Corrupt Organization Act, as codified in 18 U.S.C. §1962 *et seq*, and various State actions including civil theft, fraud, breach of contract, conversion and collection upon a book account.

19.    This Court has original jurisdiction over this matter under the U.S. Constitution and the laws of the United States pursuant to 28 U.S.C. §1331.

20.    This Court has pendent jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

21.    The amount in controversy exceeds the sum of $4,000,000.00.

22.    Venue in this District is proper under 28 U.S.C. §1391 (b)(2) in that Plaintiffs and Defendants transacted business within Miami-Dade County, Florida.  Furthermore, the unlawful acts and practices of Defendants were committed by, and/or upon the direction, and with the knowledge of Defendants within the State of Florida and more specifically the City of Miami.

23.    This Court may exercise personal jurisdiction over Defendants because (i) Defendants committed a tortious act in the state of Florida; (ii) Defendants have systematic but not isolated contact with the state of Florida; (iii) Defendants have resided in the State of Florida and/or owned real property

in the State of Florida; and/or (iv) Defendants have engaged in a business venture in the state of Florida.

24.    Plaintiffs complied with any and all the jurisdictional prerequisites and the amount in controversy exceeds all jurisdictional limits exclusive of interest and costs.

## FACTS PERTINENT TO ALL COUNTS OF THE COMPLAINT

25.    In or around June 28, 2021, Dan Roden, an individual jeweler, contacted Plaintiffs about attending a meeting with himself, Moshe Rivs and Jona Rechnitz to make an introduction so that Rechnitz could discuss the purchase of luxury watches and jewelry from Plaintiffs for some of his alleged clients.

26.    At that time, Rechnitz stated that he was soliciting high-end watches and diamond jewelry specifically on behalf of Defendants, Mayweather and TMT, and that Mayweather was interested in buying jewelry from and pursuing a future business relationship with Plaintiffs.

27.    Mayweather is well known for his extravagant purchases and claims that he is a high net worth individual, who has amassed nearly half a billion dollars in wealth. He has promotional deals with various luxury brands, including, without limitation, Hublot, Hermese and Louis Vuitton.

28.    To maintain this public perception, Mayweather will often feature himself as the purchaser of expensive jewelry and luxury items. Mayweather touts that he has a following of more than a million people and using the reach of his network to highlight certain purchases and luxury items, and famous

7

jewelers. Rechnitz also carries himself as a member and trusted advisor of Mayweather and is often seen and depicted with Mayweather and enjoying a luxury lifestyle.

29.     Rechnitz, as a known associate of Mayweather, reached out to Plaintiffs to discuss the purchase of jewelry on Mayweather's behalf. Rechnitz also suggested that Plaintiffs become one of Mayweather's preferred jewelers and told them that if they sold Mayweather the best jewelry in their inventory that Mayweather would publicize Plaintiffs' product and jewelry.

30.     Rechnitz claimed to be the exclusive agent, consultant and buyer of luxury items for Defendants Mayweather and TMT. Rechnitz also claimed that he had the ability to control the publicity that Mayweather could offer, and that he could introduce Plaintiffs to other celebrities that were associated with Mayweather.

31.     Sulaymanov met with Rechnitz that evening for dinner, at which time Sulaymanov showcased a Richard Mile 29 with factory diamonds and Richard Mille 10 Lemans Classic to Rechnitz to highlight some of Plaintiffs' more extravagant inventory. Rechnitz complimented Plaintiffs' jewelry and told Sulaymanov that Plaintiffs had the potential to be one of Mayweather's chosen jewelers. In that regard, Plaintiffs would receive publicity from Mayweather and would be introduced to other celebrities who were associated with Mayweather.

32.     After the dinner meeting Rechnitz requested Sulaymanov go back to their office and gather more high-end watch inventory and bring it to Mayweather's hotel room at the Fontainebleau in Miami Beach.

33.    Rechnitz stated Mayweather was in a "shopping mood" and so Sulaymanov should bring a variety of luxury watches to showcase his inventory to become one of Mayweather's preferred jewelers, explaining that Plaintiffs would need to be able show that they could satisfy the increased demand that would result from the publicity that Mayweather would offer.

34.    During the late hours of June 28, 2021, and into the early morning hours of June 29, 2021, Sulaymanov attended the Fontainebleau meeting with Rechnitz, Mayweather and members of TMT.

35.    Sulaymanov arrived at the hotel carrying a secure case containing Richard Mille (hereinafter "RM"), Patek Philippe (hereinafter "Patek"), Rolex, and Audemars Piguet (hereinafter "AP") watches and were taken up to Mayweather's suite.

36.    Upon entering the suite, Sulaymanov was met by Mayweather and his bodyguards.[1] The bodyguards instructed Sulaymanov to surrender his cell phone to them because they said no photos, calls or texts are allowed while in the presence of Mayweather. Mayweather did, however, inspect Plaintiffs' jewelry, compliment the quality of it, and commented on how it would complement his style and how his followers would love it.

37.    After inspecting the merchandise in the hotel suite, Defendants asked Sulaymanov to meet them at his office later that morning (June 29, 2021)

---

[1] Plaintiffs will discuss in greater detail the role of the bodyguards in Defendants' scheme later in the complaint.

so they could inspect and select even more merchandise in order for Plaintiffs to make a "grand presentation" to Mayweather that evening back at his hotel suite.

38.    Consistent with the instructions from Mayweather, on June 29, 2021, Rechnitz brought members of TMT to Plaintiffs' office, and acting on behalf of Mayweather, they selected items they believed Mayweather would purchase that evening.  Plaintiffs captured Rechnitz and TMT members selecting all the items for the "grand presentation" to Mayweather later that evening.



39.    On the evening of June 29, 2021, Sulaymanov returned to the Fontainebleau with all the merchandise that had been selected by Mayweather and TMT over the past 24 hours. Unbeknown to Mayweather and TMT, Sulaymanov carried two (2) cell phones with him this time for security and insurance purposes so he could document the inventory in his possession and any business transactions that occurred.[2] Sulaymanov was able to capture the meeting, the attendees and Plaintiffs' inventory as follows:

---

[2] At the first meeting the evening before, the bodyguards took Sulaymanov's phone to prevent any photos or video recordings of his meeting with Mayweather and Rechnitz.





40.     On that evening Rechnitz selected for Mayweather a Rolex Presidential date, in rose gold with a black dial and ruby begets for an agreed-upon purchase price of $75,000.  Mayweather and TMT also selected a series of additional watches for themselves.

41.     To confirm and secure the purchase of the watches, Rechnitz was instructed by Mayweather to pull out stacks of cash from Mayweather's satchel bags and give Plaintiffs an "initial down payment."  Specifically, Rechnitz gave Sulaymanov $90,000 in cash from Mayweather and TMT, as confirmed in the following photographs:



42.     At the time, Rechnitz, in Mayweather's presence, told Plaintiffs that Plaintiffs would be part of Mayweathers' team, that they would be his partners, preferred jewelers, and that Plaintiffs would make millions of dollars as a result of Mayweather's endorsement through various mechanisms of interstate commerce.

43.     On June 30, 2021, Rechnitz and two of Mayweather's security guards arrived at Plaintiffs' office to pick up the Rolex Presidential and the merchandise that Mayweather and TMT purchased the night before.  Once again, TMT demanded that Plaintiffs surrender all cell phones and turn off any video cameras, however, Plaintiffs documented the sales meeting and transaction as follows:



44.    At that time, Mayweather and TMT purchased and took physical possession of a Patek Philip 5980/1R watch; an RM 35–02 red NT Petey watch; an AP 37 yellow gold watch; an RM 35–02 black watch; one diamond ring and one diamond necklace. Plaintiffs provided all the boxes and warranty paperwork to Mayweather and TMT for their purchases as evidenced in the photographs above.

45.    On the evening of June 30, 2021, Sulaymanov again presented to the Fontainebleau prior to Mayweather and TMT's departure to Las Vegas, at which time Plaintiffs were paid an additional $177,000 in cash. This was a second "down payment" towards the overall purchase price of the items taken by Mayweather and TMT.

46.    Mayweather was wearing the diamond necklace and diamond ring riding in his TMT van departing from Miami and more recently, Mayweather posted a photograph wearing the necklace with his agent, Jona Rechnitz. The

aforementioned photo was taken after Rechnitz claimed that neither he nor Mayweather had possession or custody of the aforementioned jewelry.



47. Moreover, despite the repeated promises to publicize the relationship between Mayweather and Plaintiffs and to help improve Plaintiffs' brand and reputation, there was no actual reference to Plaintiffs or their jewelry.

48. Approximately two (2) weeks after the Mayweather and TMT purchases in Miami, Rechnitz requested Sulaymanov travel to Las Vegas to meet with Mayweather and TMT again, as well as another client of Rechnitz's, Tyga. Rechnitz explained that the meeting would allow Mayweather and his team to provide Plaintiffs with more publicity, notoriety and sales.

49. Sulaymanov traveled to Las Vegas at Defendants' request and brought ten (10) Rolex Presidential Anniversary watches, a Rolex Day-Date 40,

as well as Richard Mille piece as requested by Defendants as confirmed in text messages from Rechnitz:



50.     While Sulaymanov was in Las Vegas, Tyga agreed to purchase from Plaintiffs the Rolex Day-Date 40 Eisenkiesel for the sum of seventy-nine thousand dollars ($79,000.00).

51.     At that time, Defendants did not make any payments to Plaintiffs on their account balance but did purchase more merchandise luring Plaintiffs into a false sense of security that they would have an ongoing business relationship that would benefit everyone involved. Defendants also promised to provide Plaintiffs with publicity but conditioned the publicity on the Plaintiffs' agreement to delay enforcing their rights.  However, as days passed and no wires were being received, Plaintiffs got concerned and started exchanging text messages with

Defendants through their agent, Rechnitz, about when payment could be expected.

52.    After Plaintiffs received cash from Mayweather, they issued an invoice setting forth the fact that Mayweather and TMT owed Plaintiffs $4,151,157.00. See Invoices attached hereto as **Exhibit A**. Rechnitz also confirmed receipt of the aforementioned invoices, and Mayweather and TMT's agreement to pay Plaintiffs $4,151,157.00.

53.    Rechnitz, acting as the agent for Defendants, confirmed that Defendants owed Plaintiffs one million eight hundred and eighty-two thousand ($1,882,000.00) dollars for the watches that had been purchased and delivered. This did not include the necklace and ring.



54.    Despite Defendants' written promises to wire $774,000 "like promised within 2 weeks" and $320,000 "2-3 weeks in full," as well as additional payments of four hundred thousand ($400,000) dollars in a period of

approximately five (5) days with the "balance" being paid the "following week," Defendants made no payments to Plaintiffs.

55.    Defendants also owe Plaintiffs $2,001,657.00 for the diamond ring and necklace. See Exhibit A.

56.    Defendants have never paid the remaining balance on the purchases made and are indebted to the Plaintiffs for over three million eight hundred and eighty-three thousand six hundred and fifty-seven dollars ($3,883,657.00).

57.    Rechnitz, again, acting as the agent of Mayweather and TMT, confirmed the debt and sent Plaintiffs a text message claiming that his father was going to pay Plaintiffs the money because he was too weak and sick to pay. That statement was knowingly false and intended to lull Plaintiffs into a false sense of security regarding payment. No monies were ever wired to Plaintiffs by Rechnitz's father.



58.     Defendants, instead of acting on their promises to pay the money owed, when confronted by Plaintiffs with the failure to pay the money, Rechnitz and Mayweather's bodyguards threatened Plaintiffs with physical harm, bad publicity or a criminal investigation.

59.     For several years Plaintiffs attempted to collect the amounts that were due and owed to them by Mayweather and TMT. On each occasion, however, Plaintiffs were threatened by Rechnitz, who told Plaintiffs that he was a well-connected FBI informant and had significant relationships with judges, and that he would use his status as an FBI informant to cause Plaintiffs to be investigated.

60.     Rechnitz and Mayweather also threatened to use Mayweather's celebrity status to cause Plaintiffs to be cancelled and suffer financial ruin, when they never provided the promised publicity that, in addition to Rechnitz and Mayweather's promises of future payment, caused Plaintiffs to allow them to take possession of Plaintiffs' jewelry.

61.     Moreover, Mayweather never provided any of the promised publicity, aside from the introduction to Tyga, which, as set forth above, was another attempt to further deprive Plaintiffs of their property.

62.     Ultimately, and after Rechnitz's and Mayweather's repeated promises of financial benefits and lucrative introductions were never provided, and no effort to make any repayment was ever made, Plaintiffs were forced to commence the instant lawsuit.

63.     Immediately after the lawsuit was filed, Rechnitz purposefully contacted various associates of Plaintiffs and made sure that these associates

notify Plaintiffs that Rechnitz would use his status as an FBI informant to have Plaintiffs investigated unless they immediately dropped the instant lawsuit.

## DEFENDANTS' QUASI-CRIMINAL ENTERRPISE

64.    Through investigation, publications and discussions with multiple lawyers throughout the country, Defendants, Mayweather, Rechnitz, TMT, and possibly others have systematically created, participated and engaged in what can be described as a quasi-criminal, money laundering scheme involving high-end, rare and exclusive luxury watches, diamonds and jewelry.

65.    The Defendants acting in concert and with other financially incentivized third parties, will purchase/acquire luxury watches by soliciting watch brokers, like Plaintiffs herein, and offering them upfront cash with payment terms in exchange for the purchase of watches and jewelry, with no intention of paying off the total balances.

66.    Defendants lure bona fide watch brokers, diamond dealers and jewelers into their scheme with promises to not only buy timepieces and jewelry themselves, but to refer such brokers, like Plaintiffs, to their high-net worth friends, celebrities and professional athletes.

67.    Rechnitz, acting as Mayweather, TMT and Tyga's agent, servant, and/or workman, helps effectuate Defendants' plan by traveling with Mayweather and TMT on their private jets, staying in luxury penthouse accommodations with them, driving their Bentleys and Rolls Royce cars, and through posting countless photos on social media sites (Instagram, TikTok, Facebook, Twitter) with Mayweather and TMT.

68.    Rechnitz, a convicted felon who is awaiting sentencing in the matter of *United States of America v. Jona Rechnitz;* USDC (S.D.N.Y) 1:16-cr-00389, casually and without worry, can be seen lounging on Mayweather's private jet while Mayweather flashes packages of cash in his Instagram story. According to the docket and various filings in Rechnitz's criminal case, he faces up to $11,685,000 in restitution.



69.    Once Defendants have placed the proverbial "hook" into the unsuspecting watch or jewelry broker/dealer they begin a series of meetings and purchases to give the impression of a strong, lasting business relationship.

70.    Defendants then take possession of watches and jewelry, demanding formal paperwork, boxes and warranties, request repayment terms with upfront

cash deposits, only to refuse to pay the full price for said items and in some instances, claim they never "purchased" the item but rather it was "gifted" to them because of their fame and status.

71.    Lawsuits around the country have been filed in recent years against Rechnitz and Mayweather for engaging in similar quasi-criminal conduct as alleged herein, to wit:

a. Romain, et al v. Seabrook, et al; U.S. Dist. Ct (SDNY) 1:16-cv-08470

b. Over Anter, et al v. Jona Rechnitz, et al (LA County Super Court; 20STCV23877; filed 6/24/2020

c. Time Design, LLC v. Jona Rechnitz, et al (LA County Super Court; 20STCV27119; filed 7/20/2020

d. Victor Franco Noval v. Jona Rechnitz, et al (LA County Super Court; 20SMCV00216; filed 2/10/2020

e. Chronostore Luxxstyle, Inc v. Jona Rechnitz, (LA County Super Court; 21SMCV00339; filed 2/17/2021

f. Israel Sam Gorodistian v. Jadelle Jewelry and Diamonds LLC and Jona Rechnitz, et al (LA County Super Court; 20STCV07425; filed 2/20/2020

g. Yogi Securities Holdings, LLC v. Floyd Mayweather and Jona Rechnitz, et al (LA County Super Court; 22STCV03944; filed 2/01/2022

h. Pierre Ladow v. Jona Rechnitz (USDC; 2:20-cv-10059; filed 11/2/2020)

i. Eric & Co Trading Group, LLC v Floyd Mayweather, Jr.; U.S. District Court for the Southern District of Florida; 1:23-cv-20045-RKA (1/05/2023)

j. Peter Marco LLC vs Rechnitz - USDC # 2:20-cv-02580-ODW-AS.

72.     A cursory review of these cases shows a pattern and practice of activity whereby Rechnitz and Mayweather participate in transactions usually involving diamonds, jewelry, time pieces and crypto currency, all of which are hard to trace, easily transported without detection and commonly liquidated for cash.  And almost all of these transactions as alleged by the Plaintiffs in those cases occurred AFTER Rechnitz pleaded guilty to criminal charges in New York where he is facing incarceration and severe financial penalties in the millions.

73.     Based upon Defendants' known and publicized legal issues, which includes to date a $17,000,000 civil judgment in California, the potential $11,685,000 restitution judgment in New York and tens of millions of dollars in claims still pending in the aforementioned case, Plaintiffs fear that the luxury items which were purchased and taken by Defendants  may have been re-sold or pawned for cash in other parts of the United States and/or throughout the world with the sale proceeds being retained by Defendants.  Meanwhile, no additional money has ever been paid to Plaintiffs, all to Plaintiffs' financial detriment.

74.     Defendants have acknowledged, in writing on multiple occasions, the debt which is owed to Plaintiffs for the merchandise Defendants acquired, (see ¶53, supra), but they have refused to pay and as such their statements and text messages were intentionally false and misleading and made with actual malice.

75.     Accordingly, all of Defendants' actions and statements were part of their scheme to deprive Plaintiffs of Plaintiffs' property and convert said property to Defendants' own uses with actual malice and criminal intent.

<div align="center">

**COUNT I**
**VIOLATIONS OF RICO**

</div>

76.     Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

77.     Defendants have violated the Racketeer Influenced and Corrupt Organization Act, as codified in 18 U.S.C. §1962 *et seq*, in that Defendants conducted or participated, directly or indirectly, in the conduct of the enterprises' affairs through a pattern of racketeering activity, exercised significant control over and within the enterprise, and/or participated in the conduct of the enterprises' affairs resulting in injury to the Plaintiffs.

78.     Defendants and Plaintiffs are "persons" as defined in 18 U.S.C. §1961(3).

79.     Defendants, along with others, willfully combined, conspired and agreed to/for, an association in fact which constitutes an "enterprise" as defined by 18 U.S.C. §1691(4) and said enterprise was and is engaged in, and its activities affect, interstate commerce.

80.     Defendants knowingly devised and participated in a scheme whereby Defendants (1) deceived Plaintiffs about their financial stability and ability to pay for very rare, exclusive, high-end watches and jewelry; (2) made cash deposits on account of the full purchase price of said luxury items knowing they had no intention of paying anything further; (3) deceived Plaintiffs about

<div align="center">23</div>

payments being made and/or wire transfers forthcoming; (4) made willfully false statements that others (like Jona's father) would send wire transfers for the full balances owed; (5) converted the items to their own property and then liquidated the items on the secondary market for cash, far in excess of the initial deposit Defendants made; (6) effectively laundered money through the acquisition of watches and jewelry which they later sold for cash on secondary markets and deposited said cash into accounts or other vehicles (such as cryptocurrency) that cannot be easily tracked or located through conventional banking methods.

81.     Defendants conspiracy and participation in securing these luxury items and paying some upfront cash deposits also had the effect of luring Plaintiffs into a false sense of security on the sale of additional luxury items locking Plaintiffs into the relationship because it would be almost impossible for Plaintiffs to simply recover the watches or jewelry from Defendants' wrist or neck and nearly impossible if not totally impossible for Plaintiffs to find out if Defendants have resold the items and thus converted watches and jewelry into cash for Defendants.

82.     Defendants devised and participated in this scheme with the intent to defraud Plaintiffs, enhance their own income and defraud subsequent watch and jewelry brokers and dealers.

83.     To implement their scheme, Defendants committed and/or caused a pattern of acts by way of, *inter alia*, making intentional misrepresentations, altering documents, confusing Plaintiffs, knowingly providing small sums of cash relative to the total purchase price designed to delay Plaintiffs while Defendants

converted the items as their own personal property and then sold said items on secondary markets for cash.

84.    Defendants engaged in a pattern of racketeering activity by committing a pattern or acts of wire fraud, bank fraud, and/or money laundering in violation of 18 U.S.C. §1341 in the use of telephone for advancing, furthering or carrying out the scheme to defraud Plaintiffs.  Phone calls, text messages and WhatsApp messages to Plaintiffs were essential elements, or incident to essential elements of the unlawful racketeering scheme and these acts had the same or similar purpose, results, participants and scheme and were not isolated events.

85.    Defendants concealed the pattern of racketeering from Plaintiffs through their acts and omissions and the acts and omissions of their employees, servants, agents and independent contractors.

86.    There is a real and definite threat that this pattern of activity will continue in the future unless Defendants are enjoined by this Court, because numerous predicate acts continue to occur. Further, Plaintiffs are not the first victims of Defendants' pattern of racketeering activity and this conduct is injurious to any and all people who deal with and sell luxury items (movable property) such as watches, jewelry and diamonds to this Enterprise.

87.    As a direct and proximate result of the acts alleged herein, Plaintiffs have suffered substantial economic injury and injury to their property.

## COUNT II
### FRAUD

88.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

89.    Plaintiffs were fraudulently induced into entering into the purchase agreements and transactions orchestrated by and entered into with Defendants.

90.    Defendants made numerous false and misleading representations to Plaintiffs as described in greater detail above including representations that Defendants would perform future acts that Defendants had no intention of performing, including providing publicity, endorsements and introductions, wiring funds that Defendant had no intention of wiring, having others pay Defendants' debts who never agreed to have such responsibility and concealing facts from Plaintiffs with the intent to deceive them.

91.    Defendants' representations created a duty to disclose facts material to the transactions as they deliberately represented that they were financially solvent to purchase the luxury items, they had national and international social and celebrity status making them famous, trustworthy and financially secure, and that Plaintiffs' accepting payment of cash deposits and subsequent wire transfers was safe, secure, valid and legal, without any risk and would result in the eventual full payment for all luxury items acquired.

92.    Defendants' false representations and concealments were material to all aspects of the transactions including all financing/payment terms.

93.    Defendants knew at the time of the making of the representations that they were false, and that Defendants had no intention of paying the full price of all items acquired.

94.    Defendants, through their false representations and knowing concealments, intended to induce Plaintiffs to enter into the sales transactions by accepting initial cash deposits and offering the Defendants payment terms.

95.    Plaintiffs relied on the Defendants' misrepresentations and concealments in entering into these transactions.

96.    As a direct and foreseeable consequence of entering into these transactions, Plaintiffs have suffered economic, consequential and emotional injuries.

## COUNT III
## CONVERSION

97.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

98.    Defendants knowingly and intentionally misrepresented to Plaintiffs that they would arrange for the payment of all luxury items purchased from Plaintiffs.

99.    Defendants, by their representations, were bound to disburse funds, make payments and deliver monies immediately upon their due date.

100.    Defendants instead retained all the luxury items (watches and diamond jewelry) without full payment to Plaintiffs.

101.    Defendants unlawfully, wrongfully and fraudulently exercised dominion and control over the property/inventory of Plaintiffs and Defendants failed and refused to pay the full price for same and have failed to comply with the payment terms.

102.    Defendants have refused to return the luxury items to Plaintiffs, and it is very likely that Defendants have unlawfully, wrongfully and fraudulently sold the luxury items on the secondary market for cash.

103.    Through Defendants' actions, Plaintiffs have been deprived of the beneficial use and fair market value of their property and have been caused to incur more substantial financial loss.

104.    Defendants have committed, among others, the common law tort of conversion.

## COUNT IV
## CIVIL CONSPIRACY

105.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

106.    More than one of the Defendants named herein acted maliciously to injure the Plaintiffs and others, without reasonable or lawful cause or excuse, resulting in harm to the Plaintiffs and others. The combined acts of the Defendants rise to a level of tortious nature.

107.    Defendants conspired to defraud Plaintiffs of inventory (luxury items) for the Defendants' own respective benefits and profits, with reckless disregard for the adverse effect of their actions upon Plaintiffs.

108.    As a result of the conspiracy, Plaintiffs have been damaged and are entitled to compensatory damages in an amount to be determined at trial together with punitive damages in excess of four million dollars ($4,000,000.00).

## COUNT V
## EXTORTION

109.  Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

110.  Defendants acting individually, in concert with, or as an agent for other named Defendants have notified Plaintiffs that if they continue to pursue this lawsuit and their claim for money, they will be subject to physical harm and possible criminal investigations.

111.  In the past Defendants have sent bodyguards and physically imposing individuals to the homes and businesses of people who have filed lawsuits against these Defendants, identified above, threatening them and their family members with harm unless they withdraw the lawsuit.

112.  Rechnitz has told people unequivocally that he has "connections in the FBI" and that as an "informant" Rechnitz can have anyone he wants investigated for anything he wants even if it is willfully false.

113.  Rechnitz's threats hold validity as any member of the public can google search "Jona Rechnitz" and see he is an FBI informant, and they can also review the criminal docket and learn Rechnitz has been a cooperating witness. Defendant Rechnitz uses said "status" to intimidate people that have valid legal claims against him and Mayweather.

114.  After the initial complaint was filed in this matter on Friday, August 30, 2024, Sulaymanov received a phone call from a colleague who told him Rechnitz called him and told him that Rechnitz was going to have Lenny and his

businesses investigated by the FBI for bringing a lawsuit against Floyd Mayweather.

115. Defendants also called unrelated third parties (jewelers in Miami) asking them if Plaintiffs owed them any money or ever defaulted on purchases so that Defendants may gain some type of leverage over Plaintiffs.

116. Defendants routinely utilize these tactics, in a pattern and practice that allows them to extort money, watches and jewelry from legitimate businesses without Defendants having to pay for same, with creditors fearing either physical violence or some type of governmental reprisal.

117. As a result of the extortion, Plaintiffs have been damaged and are entitled to compensatory damages in an amount to be determined at trial together with punitive damages in excess of four million ($4,000,000.00) dollars.

## REQUESTS FOR RELIEF FOR COUNTS I THRU V

a.    Declaring the sale transactions for each subject luxury item null and void;

b.    Entering injunctive relief directing Defendants, specifically by returning all items to Plaintiffs and to take all affirmative steps necessary to remedy the effects of their conduct as alleged in this Complaint and to prevent any similar occurrences in the future;

c.    Enter a permanent injunction staying any sale, disposition, gifting, assigning or encumbering of Plaintiffs' items until a final adjudication of the merits of Plaintiffs' claims can be made;

d.    Compensatory damages in an amount that would fully compensate Plaintiffs for all economic losses resulting from Defendants' conduct;

e.    Compensatory damages for humiliation, embarrassment, physical and emotional distress and mental anguished caused by Defendants' violation of law as alleged in their Complaint;

f.    Treble damages pursuant to 18 U.S.C. §1964 and O.R.C 2923.34;

g.    Declaratory judgment finding the Defendants' actions violate 42 U.S.C. §§3604, 3605 and 15 U.S.C. §1691(a)(1);

h.    Such damages and other relief so as to prevent unjust enrichment and compensate Plaintiffs for the injuries arising out of Defendants' violations of federal, state, and common law, including disgorgement of ill-gotten gains;

i.    Award of punitive damages that will punish Defendants for the willful, wanton and reckless conduct and would effectively deter Defendants from future acts of unlawful behavior;

j.    Award Plaintiffs reasonable attorney fees and court costs;

k.    Any other equitable relief deemed just by this Court.

## COUNT VI
### Breach of Contract

118.   Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

119.   Defendants ordered and received certain goods and luxury items from Plaintiffs. Said goods and luxury items were provided by Plaintiffs to Defendants from May, 2021 through the end of July, 2021, as evidenced by a certain book account and invoices attached hereto.

120.   To date, Defendants' overdue account balance with Plaintiffs exceeds three million eight hundred and eighty-three thousand six hundred and fifty-seven dollars ($3,883,657.00).

121.   Plaintiffs have made multiple demands for payment of the sum due and owing, however, Defendants have refused to make payment to Plaintiffs.

122.  As evidenced by the text messages submitted above, Defendants acknowledge the debts that are owed and repeatedly state they are wiring money and even one Defendant stated his father would be wiring the money.

WHEREFORE, Plaintiffs demand judgment against the Defendants individually, jointly, severally and/or in the alternative, for damages in an amount of $3,883,657.00 together with interest, costs of suit and attorney's fees.

<div align="center">

**COUNT VII**
**Unjust Enrichment**
</div>

123.  Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

124.  The Plaintiffs sue the Defendants for goods and luxury items provided to the Defendants upon the promise by the Defendants to pay for said products.  Payment has been demanded and has not been made.

125.  Defendants have been unjustly enriched by retaining control and possession of said goods and luxury items without having paid the fair market value of said items.

WHEREFORE, Plaintiffs demand judgment against the Defendants for damages in an amount of $3,883,657.00, together with interest, costs of suit and attorney's fees.

<div align="center">

**COUNT VIII**
**Amount Owed Upon a Book Account**
</div>

126.  Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

127.  The Plaintiffs sue the Defendants for the reasonable value of the goods and luxury items rendered by the Plaintiffs to the Defendants, upon the promise by the Defendants to make payments for said good and luxury items. After two (2) initial payments were made, Defendants stopped paying on their account.

128.  Plaintiffs have demanded payments, Defendants have promised, in writing, to make said payments and as of this date no more payments have been made.

WHEREFORE, Plaintiffs demand judgment against the Defendants, individually, jointly, severally, and/or in the alternative, for damages in an amount of $3,883,657.00 together with interest, costs of suit and attorney's fees.

## COUNT IX
### Civil Theft

129.  Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

130.  As set forth in greater detail above, Defendants made a series of misrepresentations to Plaintiffs, intended to cause Plaintiffs to provide Defendants with possession of merchandise totaling over $4 million dollars on credit with repayment terms.

131.  Defendants made these false and misleading statements with the knowledge that they were false, with malicious intent to deprive Plaintiffs of the value of the merchandise provided to Defendants.

132.  By engaging in such conduct Defendants have effectively engaged in conversion of Plaintiffs' merchandise.

133.   Pursuant to Fla. Stat. § 772.11 Plaintiffs have notified Defendants that Plaintiffs demand the return of three (3) times the value of the merchandise taken.

134.   To date, Defendants have refused to respond to any demand, have refused to pay Plaintiffs treble damages and have refused to return the unpaid merchandise.

135.   As a result of Defendants' actions Plaintiffs have suffered real and actual damages.

WHEREFORE, Plaintiffs demand judgment against the Defendants, individually, jointly, severally, and/or in the alternative, finding that said Defendants have (i) Engaged in civil theft; (ii) Awarding treble damages pursuant to Fla. Stat. 772.11, plus attorney fees and costs as a result of said civil theft; and (iii) granting further such relief as this Honorable Court deems just and appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury with respect to all issues so triable.

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on: __10.11.2024__

_____

LEONARD SULAYMANOV, individually
and as President of JLZ CONSULTING,
INC. d/b/a LENZO & CO,

Respectfully submitted,

**SMITHBRIDGE, LLP**                          **MILLENNIAL LAW, INC.**

BY: _s/Andrew M. Smith_                       BY: _s/Zachary Hyman_
     Andrew M. Smith, Esquire               Zachary Hyman, Esquire
     FL Bar PHV No: 1048061                 Fla. Bar No. 98581
     *(Pro hac vice*)                       zach@millenniallaw.com
     Andrew@Smithbridgellp.com             jessica@millenniallaw.com
     1878 Route 70, #8                     assistant@millenniallaw.com
     Cherry Hill, NJ 08003                 501 E. Las Olas Blvd
     Tel. 609-410-2830                     Suite 200/314
     Fax 215-646-1047                      Ft. Lauderdale, FL 33301
     *Lead Counsel for Plaintiffs*         Tel. 954-271-2719
                   *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing was filed on this ___ day of October, 2024, via the CM/ECF filing system, which in turn set a true and correct copy to: Yaniv Adar, Esq., Mark Migdal & Hayden, Attorneys for Floyd Mayweather, Jr., 80 SW 8th Street, Suite 1999, Miami, Florida 33130, yaniv@markmigdal.com.

                          BY: _s/Zachary Hyman_
                              Zachary Hyman, Esquire
                              Fla. Bar No. 98581

Electronically FILED by Superior Court of California, County of Los Angeles on 05/20/2022 02:33 PM Sherri R. Carter, Executive Officer/Clerk of Court, by C. Coleman,Deputy Clerk

Case 1:16-cr-00389-KPF    Document 260-23    Filed 03/06/26    Page 239 of 439

Assigned for all purposes to: Beverly Hills Courthouse, Judicial Officer: Helen Zukin

BROWN RUDNICK LLP
LEO J. PRESIADO, #166721
lpresiado@brownrudnick.com
STEPHEN R. COOK, #204446
scook@brownrudnick.com
2211 Michelson Drive, 7th Floor
Irvine, California 92612
Telephone:     (949) 752-7100
Facsimile:     (949) 252-1514

Attorneys for Plaintiff
GOVERNMENT OF THE STATE OF KUWAIT

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES – WEST DISTRICT

| GOVERNMENT OF THE STATE OF KUWAIT | CASE NO. |
|---|---|
| Plaintiff, | COMPLAINT FOR: |
| vs. | |
| KHALED J. AL-SABAH, an individual, individually and as Trustee of The Awal Trust, Dated February 23, 2012; and JARRAH KHALED AL-SABAH, an individual; VICTORINO NOVAL, an individual, also known as VICTOR JESUS NOVAL and as VICTOR P. NOVAL and as VICTOR DEAN NOVAL; VICTOR FRANCO NOVAL, an individual, individually and as Trustee of the REXFORD TRUST; HUNTER NOVAL, an individual; SECURED CAPITAL PARTNERS, LLC, a California limited liability company; SAMIR MAHALLAWY, an individual; LA STARS, LLC, a California limited liability company; TOWER FINANCIAL, LLC, a Delaware limited liability company; BEVERLY HILLS REAL ESTATE HOLDINGS LLC, a California limited liability company; 8484 WILSHIRE BLVD, LLC, a California limited liability company; 1141 SUMMIT DRIVE, LLC, a California limited liability company; MARSH CAPITAL GROUP, INC., an entity of unknown origin; JONA S. RECHNITZ, an individual; RACHEL RECHNITZ, an individual; JADELLE, INC., a California corporation; JADELLE JEWELRY AND DIAMONDS, LLC, a Delaware limited liability company; LEVIN PRADO aka | **(1) FRAUDULENT CONCEALMENT** <br><br> **(2) CONVERSION** <br><br> **(3) BREACH OF FIDUCIARY DUTY** <br><br> **(4) FRAUDULENT TRANSFER** <br><br> **(5) CONSTRUCTIVE FRAUDULENT TRANSFER** <br><br> **(6) MONEY HAD AND RECEIVED** <br><br> **(7) IMPOSITION OF CONSTRUCTIVE TRUST** <br><br> **(8) UNJUST ENRICHMENT** <br><br> **DEMAND FOR JURY TRIAL** |

COMPLAINT

1 | LEVON PRADO, an individual;
XIOMARA CORTEZ, an individual; and
2 | DOES 1-260, inclusive,

3 |     Defendants.

4

5      Plaintiff GOVERNMENT OF THE STATE OF KUWAIT ("**Plaintiff**" or "**Kuwait**")

6 hereby submits this Complaint and Demand for Jury Trial against Defendants KHALED J. AL-

7 SABAH, an individual, individually and as Trustee of The Awal Trust, Dated February 23, 2012;

8 JARRAH KHALED AL-SABAH, an individual; VICTORINO NOVAL, an individual, also

9 known as VICTOR JESUS NOVAL and as VICTOR P NOVAL and as VICTOR DEAN

10 NOVAL; VICTOR FRANCO NOVAL, an individual, individually and as Trustee of the

11 REXFORD TRUST; HUNTER NOVAL, an individual; SECURED CAPITAL PARTNERS,

12 LLC, a California limited liability company; SAMIR MAHALLAWY, an individual; LA STARS,

13 LLC, a California limited liability company; TOWER FINANCIAL, LLC, a Delaware limited

14 liability company; BEVERLY HILLS REAL ESTATE HOLDINGS, LLC, a California limited

15 liability company; 8484 WILSHIRE BLVD, LLC, a California limited liability company; 1141

16 SUMMIT DRIVE, LLC, a California limited liability company; MARSH CAPITAL GROUP,

17 INC., an entity of unknown origin; JONA S. RECHNITZ, an individual; RACHEL RECHNITZ,

18 an individual; JADELLE, INC., a California corporation; JADELLE JEWELRY AND

19 DIAMONDS, LLC, a Delaware limited liability company; LEVIN PRADO aka LEVON PRADO,

20 an individual; XIOMARA CORTEZ, an individual; and DOES 1-260, inclusive (collectively,

21 "**Defendants**").  Plaintiff alleges as follows:

22                               **PARTIES**

23      1.  Kuwait is a sovereign nation.

24      2.  On information and belief, Defendant KHALED J. AL-SABAH ("**Al-Sabah**") is an

25 individual who conducts business in Los Angeles, California and internationally, generally.  The

26 Awal Trust, Dated February 23, 2012, is a trust established by Al-Sabah as grantor, for his own

27 use and benefit, and of which trust Al-Sabah is trustee.

28 */ / /*

2
COMPLAINT

3.    On information and belief, Defendant JARRAH KHALED AL-SABAH, the son of Al-Sabah, was and is an individual residing in Los Angeles, California within the jurisdiction of this court.

4.    On information and belief, Defendant VICTORINO NOVAL, also known as VICTOR JESUS NOVAL and as VICTOR P. NOVAL and as VICTOR DEAN NOVAL ("**Victorino**"), was and is an individual residing and doing business within the jurisdiction of this Court.

5.    On information and belief, Defendant VICTOR FRANCO NOVAL ("**Franco**"), the son of Victorino, was and is an individual residing and doing business within the jurisdiction of this Court.  Plaintiff is further informed and believes and thereupon alleges that Franco is also the grantor and trustee of the REXFORD TRUST.

6.    On information and belief, Defendant the REXFORD TRUST was created under the laws of California in or about 2009.

7.    On information and belief, Defendant HUNTER NOVAL, another son of Victorino, was and is an individual residing and doing business within the jurisdiction of this Court.

8.    On information and belief, Defendant SECURED CAPITAL PARTNERS, LLC was and is a limited liability company duly organized and existing under and by virtue of the laws of the State of California.

9.    On information and belief, Defendant SAMIR MAHALLAWY was and is an individual residing and doing business within the jurisdiction of this Court.

10. On information and belief, Defendant LA STARS, LLC was and is a limited liability company duly organized and existing under and by virtue of the laws of the State of California, with its principal place of business within the jurisdiction of this Court.

11. On information and belief, Defendant TOWER FINANCIAL, LLC was and is a limited liability company duly organized and existing under and by virtue of the laws of the State of Delaware and operating and doing business in California within the jurisdiction of this Court.

12. On information and belief, Defendant BEVERLY HILLS REAL ESTATE HOLDINGS, LLC was and is a limited liability company duly organized and existing under and

/ / /

1  by virtue of the laws of the State of California, with its principal place of business within the

2  jurisdiction of this Court.

3       13. On information and belief, Defendant 8484 WILSHIRE BLVD, LLC was and is a

4  limited liability company duly organized and existing under and by virtue of the laws of the State

5  of California, with its principal place of business within the jurisdiction of this Court.

6       14. On information and belief, Defendant 1141 SUMMIT DRIVE, LLC was and is a

7  limited liability company duly organized and existing under and by virtue of the laws of the State

8  of California, with its principal place of business within the jurisdiction of this Court.

9       15. On information and belief, Defendant MARSH CAPITAL GROUP, INC. is an entity

10  of unknown origin.

11       16. On information and belief, Defendant JONAH S. RECHNITZ was and is an individual

12  who resides in Los Angeles, California.

13       17. On information and belief, Defendant RACHEL RECHNITZ ("**Rachel**") was and is an

14  individual who resides in Los Angeles, California.

15       18. On information and belief, Defendant JADELLE, INC. was and is a corporation duly

16  organized and existing under and by virtue of the laws of the State of California, with its principal

17  place of business within the jurisdiction of this Court.

18       19. On information and belief, Defendant JADELLE JEWELRY AND DIAMONDS, LLC

19  was and is a limited liability company duly organized and existing under the laws of the State of

20  Delaware and operating and doing business in California within the jurisdiction of this Court.

21  Rachel is the managing member.

22       20. On information and belief, Defendant LEVIN PRADO, also known as LEVON

23  PRADO, is an individual believed to reside in the Los Angeles County who is the agent for

24  service of process and controller for JADELLE, INC. and JADELLE JEWELRY AND

25  DIAMONDS, LLC.

26       21. On information and belief, Defendant XIOMARA CORTEZ is an individual believed

27  to reside in the Los Angeles County who is employed by Wells Fargo Bank.

28  / / /

COMPLAINT

22. The true names and capacities, whether individual, corporate, associate or otherwise, of defendants, DOES 1 through 260, inclusive, are unknown to Kuwait, who therefore sues these defendants by their fictitious names.  Kuwait is informed and believes, and based upon this information and belief alleges, that each of the defendants designated herein as a fictitiously named defendant is in some manner responsible for the events and happenings herein referred to, either contractually or tortiously, and caused damage to Kuwait as herein alleged. When Kuwait ascertains the true names and capacities of DOES 1 through 260, inclusive, it will ask leave of this Court to amend this Complaint by setting forth the same.

23. Upon information and belief, at all material times, each of the Defendants was, or may have been, an agent, servant, employer, employee, joint venturer, partner and/or alter ego of one or more of each of the remaining Defendants, and were at all times acting within the purpose and scope of such agency, joint venture, alter ego, partnership or employment, and with the authority, consent, approval, and/or ratification of each remaining Defendant.

## **JURISDICTION AND VENUE**

24. The real properties which are the subject of this action are located within the judicial boundaries of the above-entitled Court.  The above-entitled Court is the proper Court for the trial of this action.

25. Venue is proper in Los Angeles County pursuant to (i) Code of Civil Procedure section 392 because the real properties that are the subject matter of this action or some part thereof, are situated in Los Angeles County, and (ii) Code of Civil Procedure section 395 because some of the defendants reside in Los Angeles County.

## **STATEMENT OF FACTS**

26. Al-Sabah was the Minister of Defense of Kuwait between 2013 and 2017.  He served as the Chief of General Staff of the Kuwaiti Armed Forces from 2012 to 2013, and prior to that, was a Lieutenant General in the Kuwaiti Armed Forces.  During these periods, Al-Sabah was a public official of Kuwait, and occupied a position of trust to Kuwait.

27. Kuwait is informed and believes, and thereupon alleges that, in or about 2010, Al-Sabah conspired with others to conceal from Kuwait the fact that certain bank accounts existed in

the name of the Military Attaché Office ("**MAO**") of Kuwait, and that such accounts were in use by unauthorized individuals in violation of Kuwaiti law.

28. Kuwait is informed and believes, and thereupon alleges that, in addition to actively concealing the existence of such bank accounts from Kuwait, Al-Sabah conspired with others to open additional accounts in the name of the MAO, without authorization from Kuwait, and proceeded to fund these accounts with Kuwaiti public funds for unauthorized uses.

29. Kuwait is informed and believes, and thereupon alleges that, without Kuwait's knowledge or consent, Al-Sabah conspired with others to open at least six accounts in the name of the MAO (the "**Unauthorized Accounts**").  Kuwait is informed and believes, and thereupon alleges that, once opened, Al-Sabah conspired with others to fund the Unauthorized Accounts with tens of millions of dollars, Euros, and British Pounds in transfers from Kuwait's other accounts.

30. Kuwait is informed and believes, and thereupon alleges that, Al-Sabah and his conspirators did not inform Kuwait of the transfers, nor were the transfers recorded with Kuwait, in violation of Kuwaiti law.

31. Kuwait is informed and believes, and thereupon alleges that, Al-Sabah conspired with others to liquidate Kuwait's funds held on fixed deposit in other MAO accounts and to deposit those funds into the Unauthorized Accounts.  Kuwait did not approve the liquidations.

32. Kuwait is informed and believes, and thereupon alleges that, Al-Sabah and his conspirators did not inform Kuwait of the liquidations, nor were the liquidations recorded with Kuwait, in violation of Kuwaiti law.

33. Al-Sabah filed a complaint in the Superior Court of the State of California, Los Angeles County, Case No. 19STCV32775 (the "**32775 Action**") against Victorino Noval; Victor Franco Noval; Ronald Richards; Secured Capital Partners, LLC; Hunter Noval; Jake Noval; Samir Mahallawy; Jeffrey Hyland; LA Stars, LLC; Farzad Tony Toutouni; Rexford Trust; Sherbourne Trust; Beverly Hills Real Estate Holdings, LLC; 8484 Wilshire Blvd., LLC; 1141 Summit Drive, LLC; Marsh Capital Group, Inc.; Jona S. Rechnitz; Rachel Rechnitz; Jadelle, Inc.; Jadelle Jewelry and Diamonds, LLC; Levin Prado; Xiomara Cortez; Michael Tusken; David Ross; and Does 1-290, inclusive, alleging the following causes of action: (1) Breach of Contract; (2) Fraud and

1  Deceit; (3) Negligent Misrepresentation; (4) Breach of the Implied Covenant of Good Faith and

2  Fair Dealing; (5) Promissory Estoppel; (6) Unjust Enrichment; (7) Conversion; (8) Intentional

3  Infliction of Emotional Distress; (9) Violation of Business and Professions Code section 17200, et

4  seq.; (10) Breach of Fiduciary Duty; (11) Failure to Use Reasonable Care; (12) Constructive

5  Fraud; (13) Money Had and Received; (14) Injunction; (15) Imposition of Constructive Trust; and

6  (16) Quiet Title.

7        34. Al-Sabah also filed a complaint in the Superior Court of the State of California, Los

8  Angeles County, Case No. 19STCV42446 (the "**42446 Action**," and collectively with the 32775

9  Action, the "**State Actions**") against Victorino Noval; Victor Franco Noval, individually and as

10  Trustee of the Rexford Trust; Hunter Noval; Secured Capital Partners, LLC; Samir Mahallawy;

11  LA Stars, LLC; Beverly Hills Real Estate Holdings LLC; 8484 Wilshire Blvd, LLC; 1141 Summit

12  Drive, LLC; Marsh Capital Group, Inc.; Jona S. Rechnitz; Rachel Rechnitz; Jadelle, Inc.; Jadelle

13  Jewelry and Diamonds, LLC; Levin Prado; Xiomora Cortez; and Does 1-260, inclusive.

14        35. Al-Sabah then filed a First Amended Complaint in the 42446 Action alleging the

15  following causes of action: (1) Breach of Contract; (2) Breach of Fiduciary Duty; (3) Promissory

16  Estoppel; (4) Breach of Fiduciary Duty; (5) Fraud and Deceit; (6) Civil Theft – Violation of Penal

17  Code Section 496; (7) Negligence; (8) Money Had and Received; (9) Constructive Fraud; (10)

18  Quiet Title; (11) Involuntary Dissolution of Limited Liability Company; (12) Appointment of

19  Receiver and Injunctive Relief; (13) Conversion –Rechnitz Defendants; and (14) Declaratory

20  Relief – Rechnitz Defendants.

21        36. Upon information and belief, at least a portion of the funds that are the subject of the

22  State Actions were misappropriated and embezzled by Al-Sabah and others from Kuwait.  As set

23  forth in the complaints, the State Actions brought by Al-Sabah relate to at least $163 million

24  transferred or otherwise paid by Al-Sabah to Defendants for purported investments for Al-Sabah's

25  benefit.  According to the complaints, Al-Sabah and/or Defendants used these funds to purchase,

26  among other things, the following assets (the "**Disputed Properties**"):

27        a.  Real property in Los Angeles, California (APN 4360-033-012) (the "**Wilshire 402**

28        **Property**");

<div align="center">7</div>
<div align="center">COMPLAINT</div>

b.  Real property in Los Angeles, California (APN 4360-033-112) (the "**Wilshire Penthouse Property**");

c.  Real property in Los Angeles, California (APN 4328-019-004) (the "**Bedford Property**");

d.  Real property in Beverly Hills, California (APN 4348-013-030) (the "**Summit Property**"); and

e.  Real property in Beverly Hills, California (APN 4350-001-018) (the "**Alta Property**").

37.  Upon information and belief, the Wilshire 402 Property, the Wilshire Penthouse Property, the Bedford Property, the Summit Property, and the Alta Property were purchased with funds that were embezzled and misappropriated by Al-Sabah and others from Kuwait.

38.  Upon information and belief, the above properties are not an exhaustive list of all transactions at issue (the "**Other Transactions**," together with the Disputed Properties, the "**Disputed Transactions**").

39.  Kuwait filed this Complaint within one year of discovering and sufficiently verifying the facts that form the basis of Kuwait's claims.

## **FIRST CAUSE OF ACTION**

### **(Fraudulent Concealment against Al-Sabah)**

40.  Kuwait re-alleges and incorporates herein by reference, as if fully set forth here, each and every allegation contained in all preceding paragraphs.

41.  As a public official of Kuwait, Kuwait and Al-Sabah were in a fiduciary relationship, and at all times relevant herein, Al-Sabah held a position of trust in Kuwait.

42.  Al-Sabah intentionally failed to disclose to Kuwait that certain MAO accounts existed, or that additional accounts were created under the name of the MAO for Al-Sabah's personal use. Al-Sabah further failed to disclose to Kuwait his wrongful embezzlement and misappropriation of public funds from Kuwait for his personal use.  As Minister of Defense of Kuwait—a public official—Al-Sabah was under a duty to disclose the foregoing facts to Kuwait under the laws of

/ / /

the state of Kuwait.  He had a further duty to disclose the foregoing facts by virtue of his position of trust vis-à-vis Kuwait.

43. Al-Sabah prevented Kuwait from discovering his wrongful conduct and Kuwait did not know of the concealed facts.  Significantly, Kuwait could not become aware of Al-Sabah's wrongful conduct without disclosure of such conduct by Al-Sabah and his conspirators.  Al-Sabah intended to deceive Kuwait by concealing the facts.

44. Kuwait was harmed in an amount to be proved at trial, but not less than $104 million, and Al-Sabah's conduct was a substantial factor in causing Kuwait's harm.

## SECOND CAUSE OF ACTION

### (Conversion against Al-Sabah)

45. Kuwait re-alleges and incorporates herein by reference, as if fully set forth here, each and every allegation contained in all preceding paragraphs.

46. Kuwait owned and had a right of possession to the funds misappropriated and embezzled by Al-Sabah from Kuwait, which were public funds that Al-Sabah siphoned off for his own personal use in violation of Kuwaiti law.  Al-Sabah and/or Defendants used the misappropriated and embezzled funds in connection with the Disputed Transactions.

47. Al-Sabah substantially interfered with Kuwait's public funds by knowingly and intentionally taking possession of the funds, misappropriating and embezzling such funds out of Kuwait, and preventing Kuwait from having access to the funds.

48. Kuwait did not have knowledge of, approve of, or consent to Al-Sabah's interference with Kuwait's funds.

49. Kuwait was harmed in an amount to be proved at trial, but not less than $104 million, and Al-Sabah's conduct was a substantial factor in causing Kuwait's harm.

## THIRD CAUSE OF ACTION

### (Breach Of Fiduciary Duty against Al-Sabah)

50. Kuwait re-alleges and incorporates herein by reference, as if fully set forth here, each and every allegation contained in all preceding paragraphs.

///

51. As a public official of Kuwait, Kuwait and Al-Sabah were in a fiduciary relationship, and at all times relevant herein, Al-Sabah held a position of trust in Kuwait. As a military officer and as Minister of Defense of Kuwait, Al-Sabah acted on Kuwait's behalf.

52. Al-Sabah intentionally failed to disclose to Kuwait that certain MAO accounts existed, or that additional accounts were created under the name of the MAO for Al-Sabah's personal use. Al-Sabah further failed to disclose to Kuwait his wrongful embezzlement and misappropriation of public funds from Kuwait for his personal use. As Minister of Defense of Kuwait—a public official—Al-Sabah was under a duty to disclose the foregoing facts to Kuwait under the laws of the state of Kuwait. He had a further duty to disclose the foregoing facts by virtue of his position of trust vis-à-vis Kuwait.

53. By misappropriating and embezzling public funds from Kuwait for his personal use, Al-Sabah failed to act as a reasonably careful public official would have acted under the same or similar circumstances.

54. Kuwait was harmed in an amount to be proved at trial, but not less than $104 million, and Al-Sabah's conduct was a substantial factor in causing Kuwait's harm.

## FOURTH CAUSE OF ACTION

### (Fraudulent Transfer—Cal. Civ. Code §3430.04(a)(1) against Defendants)

55. Kuwait re-alleges and incorporates herein by reference, as if fully set forth here, each and every allegation contained in all preceding paragraphs.

56. The funds that Al-Sabah misappropriated and embezzled from Kuwait are public funds of Kuwait and rightfully belong to Kuwait. As such, Kuwait has a right to payment from Al-Sabah in the amount to be proved at trial, but not less than $104 million. Al-Sabah transferred Kuwait's property to Defendants, and Al-Sabah and/or Defendants ultimately used Kuwait's funds in connection with the Disputed Transactions.

57. Al-Sabah transferred the funds to Defendants with the intent to hinder, delay, or defraud Kuwait. Specifically, by failing to inform Kuwait of the wrongful actions and seek Kuwait's approval or consent to the transfers and liquidation of Kuwaiti public funds, Al-Sabah

/ / /

intended to remove or conceal assets to make it more difficult for Kuwait to collect Kuwait's property.

58. Kuwait was harmed in an amount to be proved at trial, but not less than $104 million. Al-Sabah and Defendants' conduct was a substantial factor in causing Kuwait's harm.

<div align="center"><u>FIFTH CAUSE OF ACTION</u></div>

**(Constructive Fraudulent Transfer—Cal. Civ. Code §3429.04(a)(2) against Defendants)**

59. Kuwait re-alleges and incorporates herein by reference, as if fully set forth here, each and every allegation contained in all preceding paragraphs.

60. The funds that Al-Sabah misappropriated and embezzled from Kuwait are public funds of Kuwait and rightfully belong to Kuwait. As such, Kuwait has a right to payment from Al-Sabah in the amount to be proved at trial, but not less than $104 million. Al-Sabah transferred Kuwait's property to Defendants, and Al-Sabah and/or Defendants ultimately used Kuwait's funds in connection with the Disputed Transactions.

61. Al-Sabah was about to enter into the transaction with Defendants relating to the Disputed Transactions when Al-Sabah's remaining assets were unreasonably small for the transaction. Al-Sabah believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

62. Kuwait was harmed in an amount to be proved at trial, but not less than $104 million. Al-Sabah and Defendants' conduct was a substantial factor in causing Kuwait's harm.

<div align="center"><u>SIXTH CAUSE OF ACTION</u></div>

**(Constructive Fraudulent Transfer—Cal. Civ. Code §3439.05 against Defendants)**

63. Kuwait re-alleges and incorporates herein by reference, as if fully set forth here, each and every allegation contained in all preceding paragraphs.

64. The funds that Al-Sabah misappropriated and embezzled from Kuwait are public funds of Kuwait and rightfully belong to Kuwait. As such, Kuwait has a right to payment from Al-Sabah in the amount to be proved at trial, but not less than $104 million. Al-Sabah transferred Kuwait's property to Defendants, and Al-Sabah and/or Defendants ultimately used Kuwait's funds

///

<div align="center">11<br>COMPLAINT</div>

in connection with the Disputed Transactions.  Kuwait's right to payment from Al-Sabah arose before Al-Sabah transferred the funds to Defendants.

65. Al-Sabah did not receive reasonably equivalent value for the transfer.

66. Al-Sabah was insolvent at the time the transfer was made, or became insolvent as a result of the transfer.

67. Kuwait was harmed in an amount to be proved at trial, but not less than $104 million. Al-Sabah and Defendants' conduct was a substantial factor in causing Kuwait's harm.

## SEVENTH CAUSE OF ACTION

### (Money Had and Received against Defendants)

68. Kuwait re-alleges and incorporates herein by reference, as if fully set forth here, each and every allegation contained in all preceding paragraphs.

69. Al-Sabah wrongfully misappropriated and embezzled funds from Kuwait in an amount to be proved at trial, but not less than $104 million.

70. Al-Sabah and Defendants received money that was intended to be used for the benefit of Kuwait and the people of the State of Kuwait.

71. The money was not used for the benefit of Kuwait or the people of Kuwait.

72. Al-Sabah and Defendants have not returned the money to Kuwait.

73. Kuwait was harmed in an amount to be proved at trial, but not less than $104 million.

## EIGHTH CAUSE OF ACTION

### (Imposition of Constructive Trust against Defendants)

74. Kuwait re-alleges and incorporates herein by reference, as if fully set forth here, each and every allegation contained in all preceding paragraphs.

75. Al-Sabah wrongfully misappropriated and embezzled funds from Kuwait in an amount to be proved at trial, but not less than $104 million.

76. Al-Sabah and Defendants received public funds from Kuwait that belong to Kuwait and were intended to be used for the benefit of the people of the State of Kuwait.

77. Al-Sabah and Defendants are not the rightful owners of the funds and/or Disputed Properties and are involuntary trustees for the benefit of Kuwait.

## NINTH CAUSE OF ACTION

### (Unjust Enrichment against Defendants)

78. Kuwait re-alleges and incorporates herein by reference, as if fully set forth here, each and every allegation contained in all preceding paragraphs.

79. Al-Sabah wrongfully misappropriated and embezzled funds from Kuwait in an amount to be proved at trial, but not less than $104 million.

80. Al-Sabah and Defendants received public funds from Kuwait that belong to Kuwait and were intended to be used for the benefit of the people of the State of Kuwait.

81. Al-Sabah and Defendants wrongfully possess Kuwait's property and as a result, have been unjustly enriched at Kuwait's expense.

WHEREFORE, Kuwait prays for judgment as follows:

1.    For damages in an amount according to proof;

2.    For an order compelling Defendants to transfer legal title to and possession of the Disputed Properties to Kuwait;

3.    For the imposition of a constructive trust; and

4.    For costs of suit and such other relief as the Court deems just.


DATED:  May 13, 2022                    Respectfully submitted,

BROWN RUDNICK LLP

By: _____
LEO J. PRESIADO
Attorneys for Kuwait
GOVERNMENT OF THE STATE OF KUWAIT



COURT OF APPEAL – SECOND DIST.

**FILED**

Feb 19, 2026

EVA McCLINTOCK, Clerk

rgonis                    Deputy Clerk

Filed 2/19/26

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

|  |  |
|---|---|
| PAY UP JR, LLC, | B332788 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 20SMCV00216) |
| v. | |
| JONA RECHNITZ et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Mark Epstein, Judge.  Affirmed.

Robert W. Hirsh & Associates and Robert W. Hirsh for Defendants and Appellants.

Frandzel Robins Bloom & Csato, Michael Gerard Fletcher, and Hal D. Goldflam for Plaintiff and Respondent.

_____

## INTRODUCTION

Defendants Jona Rechnitz and Jadelle Jewelry & Diamonds, LLC (Jadelle Jewelry) appeal from the trial court's judgment entered in favor of plaintiff Victor Franco Noval[1] after a bench trial.  Defendants contend insufficient evidence supports several of the court's findings, and that the court abused its discretion in admitting certain pieces of evidence.  Due to serious defects in their appellate briefs, defendants have forfeited all the claims of error that they raise on appeal.  Accordingly, we affirm.

## BACKGROUND

### 1.    The loans

In 2019, Noval loaned about $6 million, through a series of installments, to Jadelle Jewelry.  Before Noval advanced each installment of the loan to Jadelle Jewelry, Rechnitz pledged some jewelry as collateral for the loan.  Rechnitz assured Noval that the total value of the jewelry was higher than the total value of the loan.

In March 2019, Noval and Jadelle Jewelry executed a document entitled, "DEBT ACKNOWLEDGMENT, PROMISSORY NOTE AND SECURITY AGREEMENT" (Promissory Note).  The Promissory Note memorializes a portion of the loan, specifically four installments totaling $2.85 million that Noval advanced to Jadelle Jewelry between January and March 2019.  The Promissory Note sets forth the terms of repayment for those installments, including the maturity date for

---

[1]    After the judgment was entered, Noval assigned his interest in the judgment to Pay Up Jr, LLC (Pay Up).  We granted Pay Up's application to substitute itself as the real party in interest for Noval.

each installment and the monthly interest payments Jadelle Jewelry was required to make on each installment.  The Promissory Note also includes a guaranty, which states that Jadelle Jewelry's payment obligations are secured by, among other things, the jewelry that the company pledged as collateral.

Around December 2019, Rechnitz asked Noval to return the jewelry that he was holding as collateral because Rechnitz wanted to display it at a show in Los Angeles.  Rechnitz told Noval that he would use the money he obtained from any sales at the show to pay off the money that Noval loaned to Jadelle Jewelry.  Rechnitz promised to return to Noval any unsold jewelry the day after the show.  Noval agreed to allow Rechnitz to display the jewelry at the show.  Rechnitz did not sell any jewelry at the show.

The day after the show, Rechnitz asked if he could keep the jewelry while he tried to sell it to a potential buyer.  Noval allowed Rechnitz to hold the jewelry.  Over the next several weeks, Rechnitz repeatedly told Noval that he would return the jewelry or pay off the money that Noval lent to him.

In January 2020, Rechnitz gave Noval three checks, one for $1.3 million, one for $2.5 million, and one for $4.5 million, which were intended to repay Noval's loan to Jadelle Jewelry.  Noval was not able to cash any of the checks.  Jadelle Jewelry never repaid Noval's loan, and Rechnitz never returned the jewelry that he pledged as collateral to secure the loan.

## 2.    The lawsuit

In February 2020, Noval sued Rechnitz, Rechnitz's wife, Jadelle Jewelry, and a company called "Jadelle Inc."  Noval's operative first amended complaint asserted claims for fraud, civil

3

theft, breach of contract, and conspiracy to commit theft, fraud, and fraud by concealment.

In February 2023, the trial court held a bench trial on Noval's claims. Noval and his brother were the only witnesses who testified. Rechnitz and his wife did not testify because they invoked their Fifth Amendment right against self-incrimination.

In May 2023, the court issued a final statement of decision. The court found Rechnitz and Jadelle Jewelry liable for fraud and civil theft, and Jadelle Jewelry liable for breach of contract. The court found Noval suffered $5.9 million in actual damages with respect to his civil theft cause of action, which tripled to $17.7 million under Penal Code section 496, subdivision (c). Although the court found Noval also suffered nearly $6 million in damages for each of his fraud and breach of contract causes of action, it found those damages were duplicative of the damages he suffered for his civil theft cause of action. The court found in favor of Rechnitz's wife and Jadelle Inc. on all of Noval's causes of action.

In June 2023, the court entered judgment in Noval's favor against defendants for $17.7 million, plus prejudgment and postjudgment interests, costs, and attorney fees. The court later denied defendants' motions for a new trial and to vacate the judgment.

Defendants appeal.

## DISCUSSION

At the outset, we highlight some serious defects in defendants' appellate briefs. These defects include a failure to cite and discuss relevant evidence that was presented at trial, and a failure to provide reasoned legal argument supported by factual analysis and citations to relevant authority. As we

explain, these defects undermine all the arguments that defendants raise on appeal.

It is a fundamental rule of appellate review that the challenged judgment or order is presumed to be correct and that the appellant carries the burden to affirmatively demonstrate error. (*Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 799 (*Dietz*).)  To overcome this burden, the appellant must, among other things, tailor each argument raised in its appeal to the applicable standard of review (*Sonic Mfg. Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465); support each claim with "reasoned argument and citations to authority" (*Dietz*, at p. 799); and set forth, discuss, and analyze all the evidence, both favorable and unfavorable to the appellant's position, that supports the trial court's factual findings that are challenged on appeal (*Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218 (*Roman Catholic Archbishop*)). An appellant's failure to comply with any of these requirements may result in a waiver of the appellant's claims on appeal.  (See *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295–1296; *Sonic Mfg.*, at p. 465; *Dietz*, at p. 799; *Roman Catholic Archbishop*, at p. 218.)

As a threshold matter, we note that at oral argument, defendants withdrew the argument raised in their opening brief challenging the trial court's decision to admit into evidence the Promissory Note, because it was not authenticated and contained hearsay statements.  Because defendants have withdrawn this argument, we need not address it.

The next defect—defendants' failure to discuss Noval's testimony—undermines defendants' remaining arguments.  An appellant challenging the "sufficiency of the evidence to support a finding must set forth, discuss, and analyze all the evidence on

that point, both favorable and unfavorable." (*Roman Catholic Archbishop*, *supra*, 177 Cal.App.4th at p. 218.)  If the appellant fails to discuss and analyze evidence that is relevant to the court's challenged finding, the appellant waives any claim that the finding is not supported by substantial evidence.  (*Ibid*.)

Defendants argue the record does not support the following findings made by the trial court:  (1) Noval was Jadelle Jewelry's lender and creditor; (2) the jewelry that Jadelle Jewelry pledged as collateral to secure Noval's loan was worth more than the total value of the loan; (3) defendants acted with the requisite criminal intent for civil theft; and (4) Noval and Jadelle Jewelry entered into an enforceable written contract.  Because these findings are not supported by the evidence, defendants claim the court erred in finding them liable for fraud, civil theft, and breach of contract.  As we explain, Noval's testimony is relevant to each of these findings.

First, Noval's testimony supports the court's finding that he was Jadelle Jewelry's creditor.  Noval testified that he agreed to loan money to Jadelle Jewelry, that he made each of the payments advancing money to the company under that loan, and that the company wrote unfunded checks to him in an effort to repay him for the loan.

Second, Noval's testimony supports the court's finding that the jewelry that Jadelle Jewelry pledged as collateral to secure the loan was worth more than the total value of the loan.  Noval testified that before he advanced each installment of the loan to Jadelle Jewelry, the company gave him jewelry as collateral to secure each installment of the loan.  According to Noval, he "was sure to get more collateral and make sure that it was of a value that would keep [him] safe in this loan."  Noval testified that

Rechnitz assured him that the total value of the jewelry that was pledged as collateral was "more than sufficient to cover the value of the loan."

Third, Noval's testimony could support a finding that defendants acted with the criminal intent needed to establish liability for civil theft under Penal Code section 496. Under subdivision (c) of that statute, any person who is injured by a violation of subdivision (a) "may bring an action for three times the amount of actual damages . . . sustained by the plaintiff." (Pen. Code, § 496, subd. (c).) To establish a violation of subdivision (a), the plaintiff must prove: (1) the property was stolen; (2) the defendant knew the property was stolen; and (3) the defendant had possession of the stolen property. (*Lacagnina v. Comprehend Systems, Inc.* (2018) 25 Cal.App.5th 955, 970.)

To prove civil theft, "a plaintiff must establish criminal intent on the part of the defendant beyond 'mere proof of nonperformance or actual falsity.' " (*Siry Investment, L.P. v. Farkhondehpour* (2022) 13 Cal.5th 333, 361–362.) Evidence that the defendants "acted not innocently or inadvertently, but with careful planning and deliberation" will support a finding of criminal intent. (*Id*. at p. 362.)

Noval testified in detail about how Rechnitz convinced him to relinquish possession of the jewelry that Jadelle Jewelry had pledged as collateral to secure the underlying loan. Noval also testified about how defendants refused to return the jewelry, despite Noval's repeated requests for them to do so, and how Rechnitz tried to prevent Noval from contacting law enforcement to help recover the jewelry. Although defendants attempted to address this evidence at oral argument, they made no effort to do

so in their opening brief.  By failing to address Noval's testimony in their opening brief, defendants have forfeited any claim that it does not support an inference that Rechnitz acted with the requisite criminal intent.  (See *Collins v. Navistar, Inc.* (2013) 214 Cal.App.4th 1486, 1508, fn. 8.)

Finally, the court expressly relied on Noval's testimony when it found there was an enforceable contract between himself and Jadelle Jewelry.  As the court explained, Noval "testified that he made the payments at issue," including writing the checks through which the money was advanced to Jadelle Jewelry.  The court also explained that it found Noval's testimony was credible about the formation of the loan agreement with Jadelle Jewelry.  Our review of the record confirms that Noval's testimony was consistent with the court's findings.  To the extent defendants argue that the court erred in finding Jadelle Jewelry liable for breach of contract based on Noval's testimony, they have forfeited that argument by failing to develop it.  (*Dietz*, *supra*, 177 Cal.App.4th at p. 799.)

In short, Noval's testimony is relevant to each of the trial court's findings that defendants challenge on appeal.  But defendants do not discuss, let alone cite, any of Noval's testimony in their appellate briefs.  By failing to discuss that testimony, defendants have forfeited any claim of error related to the court's findings that they challenge on appeal.  (*Roman Catholic Archbishop*, *supra*, 177 Cal.App.4th at p. 218.)

## DISPOSITION

The judgment is affirmed.  Pay Up shall recover its costs on appeal.

VIRAMONTES, J.

WE CONCUR:

STRATTON, P. J.

SCHERB, J.

Andres F. Quintana (SBN 190525)
**QUINTANA LAW GROUP**
A Professional Law Corporation
26135 Mureau Road, Suite 101
Calabasas, California 91302
Telephone: (818) 914-2100
Facsimile: (818) 914-2101
E-mail: andres@qlglaw.com

Attorneys for Plaintiff Pierre Ladow

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

PIERRE LADOW, an individual,

       Plaintiff,

   vs.

JONA RECHNITZ, an individual,

       Defendant.

CASE NO. 2:20-cv-10059

**COMPLAINT FOR BREACH OF CONTRACT AND PERSONAL GUARANTEE**

Quintana Law
Group, APC

Plaintiff Pierre Ladow files this Complaint, and the cause of action herein, against Defendant Jona Rechnitz as follows:

## THE PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Pierre Ladow ("LADOW") is, and was, at all relevant times mentioned herein, an individual domiciled in Monaco, and a citizen of France.

2.      Plaintiff LADOW is informed and believes and therefore alleges Defendant Jona Rechnitz ("RECHNITZ") is an individual domiciled, at all relevant times mentioned herein, in the State of California.

3.      This Court has subject matter jurisdiction over the claim alleged below under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c), as the controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different foreign states.

4.      Venue is proper under 28 U.S.C. §§1391(b) and (c) since Defendant RECHNITZ is domiciled in and may be found in this District.

## GENERAL ALLEGATIONS

5.      On or about October 3, 2019, Plaintiff LADOW loaned $500,000 to Jadelle Jewelry and Diamonds, LLC ("Jadelle") under a Debt Acknowledgement and Promissory Note (the "Note").

6.      Based on information and belief, Defendant RECHNITZ is the owner of Jadelle.

7.      Plaintiff LADOW contended that Jadelle breached the Note and that Defendant RECHNITZ is also responsible for payment of the amount due under the Note, among other potential claims, causes of action and rights.

8.      On August 31, 2020, Plaintiff LADOW and Defendant RECHNITZ entered into a Settlement Agreement, in which, among other things: (1) Defendant RECHNITZ agreed to personally guarantee the Note and the repayment of the Note back to Plaintiff LADOW; and (2) Defendant RECHNITZ agreed to pay $500,000 (the "Settlement Amount") to Plaintiff LADOW within forty-five (45) days

1  following the execution of the Settlement Agreement.  A true and correct copy of

2  the executed Settlement Agreement is attached hereto as Exhibit A.

3        9.    Further, Paragraph 4 of the Settlement Agreement states the following,

4  in pertinent part:

> <u>Consent Judgment</u>.  In the event that Rechnitz does not make timely payment of the Settlement Amount as provided in accordance with Paragraph 3 of this Agreement, the Parties agree that Ladow's sole remedy shall be Ladow's immediate right, ability, and authority to seek entry of a consent judgment ("Consent Judgment") against Rechnitz in favor of Ladow, in the amount of US$500,000, in the form attached as Exhibit 2 (the "Stipulation for Entry of Consent Judgment").  If Ladow elects to seek the entry of the Consent Judgment, he shall do so as follows:
>
> a.    Ladow shall file a Complaint (the "Complaint") in the United States District Court for the Central District of California, against Rechnitz as the sole defendant (the "Action") Rechnitz agrees to accept service of the Complaint in the Action via electronic mail at the following address: jona@jadellebh.com; or by regular United States mail at the following address: 9533 Sawyer Street, Los Angeles, CA 90035;
>
> b.    The Complaint shall consist of a single cause of action against Rechnitz for breach of the contract and personal guarantee;
>
> c.    Rechnitz agrees not to file any motion authorized under Federal Rules of Civil Procedure 12 or 15, nor file a responsive pleading to the Complaint;

d.   After the Complaint is filed, Ladow shall seek entry the Consent Judgment by any means provided by the United States District for the Central District of California, the Local Rules of the Central District of California, or the Federal Rules of Civil Procedure; and

e.   Rechnitz agrees not to oppose or challenge entry of the Consent Judgment.

## FIRST CAUSE OF ACTION

### (For Breach of Contract and Personal Guarantee)

11.   Plaintiff LADOW realleges and incorporates by this reference, as if fully set forth herein, all of the allegations set forth in each of the preceding paragraphs of this Complaint.

12.   Plaintiff LADOW, on the one hand, and Defendant RECHNITZ, on the other, entered into a written settlement agreement, pursuant to which Defendant RECHNITZ agreed to pay and personal guarantee to Plaintiff LADOW the amount of $500,000.00 within forty-five (45) days following the execution of the Settlement Agreement.  The Settlement Agreement was executed on August 31, 2020.  Thus, the Settlement Payment of $500,000.00 was due by October 15, 2020.

13.   Plaintiff LADOW did all, or substantially all, of the significant things that the Settlement Agreement required of him except those that were excused due to the actions of Defendant RECHNITZ.

14.   Defendant RECHNITZ breached the Settlement Agreement by failing to tender the Settlement Payment of $500,000.00 to Plaintiff LADOW by October 15, 2020, that was personally guaranteed by Defendant RECHNITZ.

15.   As a direct and proximate result of that breach, Plaintiff LADOW has been harmed in an amount no less than $500,000.00.

## **PRAYER FOR RELIEF ON THE COMPLAINT**

WHEREFORE, Plaintiff LADOW prays for the following relief against Defendant RECHNITZ:

1.    For compensation in the amount owed to Plaintiff LADOW in the amount of $500,000.00, and was personally guaranteed by Defendant RECHNITZ;

2.    For costs of suit incurred herein;

3.    For pre- and post-judgment interest according to proof;

4.    For entry of the Consent Judgment attached to the Settlement Agreement; and

5.    Such other and further relief as the Court may deem just and proper.


DATED: October 29, 2020          QUINTANA LAW GROUP
                                 A Professional Law Corporation



                                 By: */Andres F. Quintana/*
                                 _____
                                 Andres F. Quintana, Esq.
                                 Attorneys for Plaintiff Pierre Ladow

# EXHIBIT "A"

# FINAL SETTLEMENT AGREEMENT

This Final Settlement Agreement (he`. Agreement") is entered into as of the date of the last signature below (the "Execution Date"), by and between Jona Rechnitz ("Rechnitz"), on the one hand, and Pierre Ladow ("Ladow"), on the other hand. Rechnitz and Ladow are referred to in this Agreement collectively as the "Parties" or individually as a "Party."

## RECITALS

**WHEREAS**, on or about October 3, 2019, Ladow loaned $500,000 to Jadelle Jewelry and Diamonds, LLC ("Jadelle") under a Debt Acknowledgement and Promissory Note (the "Note");

**WHEREAS**, Ladow alleges that Jadelle has breached the Note and claimed that Rechnitz is also responsible for payment of the amount due under the Note, among other potential claims, causes of action and rights;

**WHEREAS**, the Parties, without making any admissions whatsoever, wish to avoid litigation and secure a final settlement and resolution of any and all claims, causes of action, controversies, and disputes that exist or may exist between or among them, whether known or unknown, as of August 31, 2020 (the "Effective Date"); and

**WHEREAS**, Rechnitz agrees to personally guarantee the Note and the repayment of the Note back to Ladow.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual covenants, promises, and undertakings set forth herein, the receipt and adequacy of which the Parties hereby acknowledge, the Parties agree as follows:

1.      Incorporation of Recitals.  The foregoing preamble, the Recitals, and all defined terms set forth in both are hereby incorporated into, and made part of, this Agreement as if set forth herein in full.

2.      No Admission of Liability.  Nothing contained in this Agreement will be taken or construed to be an admission on the part of any Party of any of the claims alleged or amounts claimed by any other Party, and each Party expressly denies any such claims and amounts claimed.

3. <u>Payment to Ladow.</u> Within forty-five (45) days following the Execution Date, Rechnitz shall pay US$500,000 (the "Settlement Amount") to Ladow according to the attached wiring instructions.

4. <u>Consent Judgment.</u> In the event that Rechnitz does not make timely payment of the Settlement Amount as provided in accordance with Paragraph 3 of this Agreement, the Parties agree that Ladow's sole remedy shall be Ladow's immediate right, ability, and authority to seek entry of a consent judgment ("Consent Judgment") against Rechnitz in favor of Ladow, in the amount of US$500,000, in the form attached as Exhibit 1 (the "Stipulation for Entry of Consent Judgment"). If Ladow elects to seek the entry of the Consent Judgment, he shall do so as follows:

   a. Ladow shall file a Complaint (the "Complaint") in the United States District Court for the Central District of California, against Rechnitz as the sole defendant (the "Action");

   b. Rechnitz agrees to accept service of the Complaint in the Action via electronic mail at the following address: Jona@jsrcap.com; or by regular United States mail at the following address: 9533 Sawyer Street, Los Angeles, CA 90035;

   c. The Complaint shall consist of a single cause of action against Rechnitz for breach of the contract and personal guarantee;

   d. Rechnitz agrees not to file any motion authorized under Federal Rules of Civil Procedure 12 or 15, nor file a responsive pleading to the Complaint;

   e. After the Complaint is filed, Ladow shall seek entry the Consent Judgment by any means provided by the United States District for the Central District of California, the Local Rules of the Central District of California, or the Federal Rules of Civil Procedure; and

   f. Rechnitz agrees not to oppose or challenge entry of the Consent Judgment.

The Jadelle Parties shall receive a credit against the Consent Judgment for any amounts paid towards the Settlement Amount prior to entry of the Consent Judgment.

5. <u>Costs of Dispute.</u> In consideration of the covenants, agreements, and undertakings of the Parties under the Agreement, the Parties shall assume and bear their own costs and attorneys' fees incurred in connection with this matter, including but not limited to the negotiation of this Agreement and all costs and attorney's fees incurred in connection with the Action, the Complaint, and seeking entry of the Consent Judgment.

6.     <u>Mutual Release of Claims</u>.  In consideration of the covenants, agreements, and undertakings of the Parties under the Agreement, and except as to their rights and obligations arising from this Agreement, the Parties fully, mutually, and generally release one another from all claims, causes of actions, rights, and obligations, legal, contractual, and otherwise, as between them, as set forth below.  It is the intention of the Parties to effectuate a complete resolution of all claims, rights, and obligations between them of every kind and nature whatsoever, except the obligations arising from this Agreement.

a.     Ladow and each of his affiliates, related entities, and family members ("Ladow Releasors") hereby waive, release, acquit, and forever discharge Rechnitz and each of his and Jadelle's past and present employees, officers, shareholders, members, managers, directors, agents, attorneys, insurers, predecessors, successors, assigns, parents, subsidiaries, partners, joint venture partners, affiliates, and family members (including Rachel Rechnitz and Robert Rechnitz) but excluding Jadelle (the "Rechnitz Releasees") from any and all claims, counterclaims, cross-claims, charges, complaints, rights, obligations, demands, actions, causes of action, controversies, disputes, liabilities, losses, damages, attorneys' fees, and/or any other form of claim, whether based in federal, state, local, statutory, contract, tort, equity, common law, or any other law, which Ladow Releasors have, may have, or claim to have had against any of the Rechnitz Releasees, prior to the Effective Date, whether known or unknown, including but not limited to any and all claims based upon or relating to the Note (collectively, the "Ladow Released Claims").  Except as otherwise permitted in Paragraph 4 if this Agreement, above, Ladow Releasors further agree not to initiate any action or arbitration, including any legal, administrative, or other proceeding, to assert any Ladow Released Claims against any of the Rechnitz Releasees, and Ladow Releasors covenant not to sue any of the Rechnitz Releasees on account of any such Ladow Released Claim.  Should Rechnitz tender the full Settlement Amount by the date described above, Ladow agrees not to sue Jadelle relating to the Note.  Otherwise, nothing in this Agreement shall constitute as a release, waiver, or discharge of any claims against Jadelle.

b.     Rechnitz and each of his affiliates, related entities, and family members ("Rechnitz Releasors") hereby waive, release, acquit, and forever discharge Ladow and each of his past and present employees, officers, shareholders, members, managers, directors, agents, attorneys, insurers, predecessors, successors, assigns, parents, subsidiaries, partners, joint venture partners, affiliates, and family members (the "Ladow Releasees") from any and all claims, counterclaims, cross-claims, charges, complaints, rights, obligations, demands, actions, causes of action, controversies, disputes, liabilities, losses, damages, attorneys' fees, and/or any other form of claim, whether based in federal, state, local, statutory, contract, tort,

equity, common law, or any other law, which Jadelle Releasors have, may have, or claim to have had against any of the Ladow Releasees, prior to the Effective Date, whether known or unknown (collectively, the "Rechnitz Released Claims"). Rechnitz Releasors further agree not to initiate any action or arbitration, including any legal, administrative, or other proceeding, to assert any Rechnitz Released Claims against any of the Ladow Releasees, and Jadelle Releasors covenant not to sue any of the Ladow Releasees on account of any such Rechnitz Released Claim.

c. <u>Waiver of Unknown Claims.</u> The foregoing mutual releases extend to and include claims that the Parties do not know or suspect to exist in their favor, which if known by them would have materially affected their decision to enter into this Agreement. The Parties acknowledge that they have negotiated this Agreement taking into account all released claims and further acknowledge that they are familiar with California Civil Code section 1542, and have specifically been advised by legal counsel as to its provisions. Section 1542 provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

The Parties voluntarily and with full knowledge of its significance, expressly waive and relinquish any and all rights they may have under Section 1542, as well as under any other similar federal or state statute, rule or common law principle, in law or equity, relating to limitations on general releases. In connection with such waiver and relinquishment, each of the Parties acknowledges that they are aware that they may hereafter discover claims or facts in addition to or different from those which they now know or believe to exist with respect to the subject matter of this Agreement, but that it is the Parties' mutual intention hereby fully, finally, and forever to settle disputes and differences known or unknown, suspected or unsuspected, which now exist, may exist, or heretofore have existed between the Parties pertaining to the specific releases in this Agreement notwithstanding the discovery or existence of any such additional or different claims or facts. The Parties

affirm that this waiver of Section 1542 is not a mere recital. Rather, by their signatures to this Agreement, the Parties acknowledge and agree that this waiver under Section 1542 is an essential and material term of this Agreement that was separately and independently bargained for, without which this Agreement would not have been made, and which was included by the Parties in this Agreement in order to procure certainty in their affairs.

d. For the avoidance of doubt, nothing in the foregoing mutual releases shall operate to prevent a Party from enforcing its rights under this Agreement, including Ladow seeking a Consent Judgment as provided under Paragraph 4 of this Agreement.

7. **NOTWITHSTANDING THE RELEASES SET FORTH IN PARAGRAPH 6 ABOVE,** Rechnitz expressly agrees that until the payment of all of the payments promised by Rechnitz in Paragraph 3 above have been made, if Rechnitz voluntarily or involuntarily commences a case under Title 11 U.S.C., then in that event Ladow shall have the right to file a complaint to determine the dischargeability of Ladow's claims against the Rechnitz in his bankruptcy case asserting the same general set of facts set forth in the Action that were not previously adjudicated, ordered, or decided by the judge in the Action. Rechnitz expressly waives any right to assert against Ladow any defense that the non-dischargeability complaint is barred by the applicable State statute of limitations.

8. <u>Representations and Warranties.</u> The Parties and their respective signatories each represent and warrant, as of the Execution Date, as follows:

a. Such Party has not pledged, transferred or assigned to any third party any right, interest, or claim being transferred, conveyed, released, or compromised pursuant to this Agreement, and such Party shall indemnify all other Parties from and against a third party asserting such a pledge, transfer or assignment of any such right, interest, or claim;

b. Such Party has thoroughly read and reviewed the terms and provisions of this Agreement and Exhibit 1, and in executing this Agreement it has relied solely upon its own knowledge and judgment, and the advice and recommendations of its own independently selected counsel concerning the nature, extent, and duration of the Party's rights and claims, and the advisability of making the settlement provided for in this Agreement and of executing this Agreement;

c. Such Party has not been subjected to any duress, undue influence, or inequality of bargaining power in connection with the negotiation or execution of this Agreement;

    d.    Such Party enters into this Agreement at arm's length, in good faith, voluntarily and without reliance upon any statements, actions, or promises of any kind by any other Party, except the definitions, terms, and conditions set forth in this Agreement;

    e.    The consideration received by the Party under this Agreement is actual and adequate; and

    f.    Each business entity Party represents and warrants that the person executing this Agreement on its behalf has the full power and authority to do so and bind the business for whom it is signing and that the execution, delivery, and performance of this Agreement has been duly and validly authorized.

9.    <u>Entire Agreement.</u>  This Agreement: (a) constitutes the entire agreement between the Parties concerning all subject matters, (b) supersedes any previous oral or written agreements between the Parties concerning any subject matter, and (c) shall not be modified except by a writing executed by the Party or Parties to be bound thereby.

10.    <u>No Implied Waivers.</u>  No waiver of any right, obligation, or breach under this Agreement shall be deemed effective unless in writing and signed by the party sought to be charged with a waiver.  No failure or delay on the part of any Party to enforce any right or obligation under this Agreement, nor acceptance of any payment, shall be deemed a waiver of such right or obligation.  No waiver will be effective as to any other right, obligation, or breach other than as specifically stated in the written waiver.

11.    <u>Further Assurances.</u>  The Parties shall take all steps and execute all instruments as may be reasonably necessary to carry out the terms and purpose of this Agreement.

12.    <u>Severability.</u>  In the event that any provision of this Agreement, or the application of any such provision, is held by a court of competent jurisdiction to be unenforceable, the remaining provisions of this Agreement will remain in full force and effect, and this Agreement will be interpreted as if said invalid provision was omitted.  The Parties agree that a court of competent jurisdiction shall have authority to modify any invalid or unenforceable provision to the minimum extent necessary to render it valid and enforceable.

13.    <u>Successors Bound.</u>  This Agreement shall be binding upon and inure to the benefit of each of the Parties and their respective affiliates, representatives, heirs, devisees, successors, and assigns.

14.    <u>Construction, Choice of Law, and Arbitration.</u>  The terms of this Agreement are the product of arms-length negotiations between the Parties, through their respective

counsel of choice, and no provision shall be construed against the drafter thereof. This Agreement shall be governed by and construed in accordance with the laws of the State of California. All Parties each hereby expressly and irrevocably consent to the jurisdiction of the Superior Court for the State of California, County of Los Angeles for all purposes in connection with any action or proceeding which arises out of or relates to this Agreement and agree that any action instituted under this Agreement shall be commenced, prosecuted and continued only in the Superior Court for the State of California, County of Los Angeles, which shall be the exclusive and only proper forum for adjudicating such a claim.

15. <u>Counterparts and Electronic Execution.</u> This Agreement may be executed in counterparts which, taken together, shall constitute one and the same agreement. This Agreement may also be executed and/or delivered by facsimile and/or email transmission and in such event all facsimile and/or email signatures shall be deemed originals for all purposes hereof.

**AGREED TO AND ACCEPTED AS OF THE DATE STATED BELOW:**

_____
Jona Rechnitz

Dated: ___8/31/2020___, 2020

_____
Pierre Ladow

Dated: ___8/31/2020___, 2020

# WIRING

# INSTRUCTION

# EXHIBIT "1"

**EXHIBIT 1**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PIERRE LADOW, an individual, | Case No. |
| Plaintiff, | **STIPULATION FOR ENTRY OF CONSENT JUDGMENT; CONSENT JUDGMENT** |
| vs. | |
| JONA RECHNITZ, an individual, | |
| Defendant. | |

## **STIPULATION FOR ENTRY OF JUDGMENT**

Plaintiff Pierre Ladow ("Plain.iff"), on the one hand, and Defendant Jona Rechnitz ("Rechnitz"), on the other hand ("Defendant"), through their undersigned counsel, hereby stipulate and agree to entry of judgment as follows (this "Stipulation"). Plaintiff and Defendant are referred to herein collectively as the "Parties" and each as a "Party." The effective date of this Stipulation is August 31, 2020.

WHEREAS, Plaintiff initiated this action against Defendant asserting a single cause of action for breach of contract relating to a $500,000 loan that Plaintiff made to Jadelle Jewelry and Diamonds, LLC under a Debt Acknowledgement and Promissory Note (the "Note"), and which Defendant personally guaranteed;

WHEREAS, the Parties tentatively resolved their dispute relating to the Note by a Settlement Agreement, under which Defendant agreed to pay $500,000 to Plaintiff on or before October 15, 2020; and

WHEREAS, under the Settlement Agreement, Defendant agreed to stipulate to a judgment in the amount of $500,000 in the event he did not pay $500,000 to Plaintiff on or before October 15, 2020.

WHEREAS, as of the date the above-captioned action was filed, Defendant has not paid $500,000 to Plaintiff.

NOW, THEREFORE, the Parties agree and stipulate to entry of judgment as follows:

1.    This Court has subject-matter and personal jurisdiction over the Defendant.

2.    The Complaint states a claim upon which relief may be granted against the Defendant;

3.    Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) and 31 U.S.C. § 3732(a).

4.    The Defendant has agreed to waive service of the Complaint and

1   summons and hereby acknowledges the same;

2       5.    The Defendant has agreed not to file any motion authorized under

3 Federal Rules of Civil Procedure 12 or 15 and hereby acknowledges the same;

4       6.    Judgment is hereby entered against the Defendant, and in favor of

5 Plaintiff in the above-captioned case;

6       7.    The entry of this Consent Judgment accurately expresses the intent of the

7 parties with respect to the settlement of this action.

8       8.    Upon filing of this Stipulation, the Parties jointly consent to and request

9 that the Court enter judgment in favor of Plaintiff and against Defendant, in the

10 amount of Five-Hundred Thousand Dollars and No Cents ($500,000.00), in the form

11 attached hereto as **Exhibit 1-1** (the "Consent Judgment").

12       9.    The Consent Judgment may be entered on a noticed motion basis as

13 provided under any applicable Federal Rule of Civil Procedure or Local Rule of the

14 Central District of California. Defendant agrees not to oppose or challenge Plaintiff's

15 motion for entry of the Consent Judgment. No evidentiary hearing or trial shall be

16 required before entry of the Consent Judgment and Defendant waives his right to such

17 a hearing or trial. A declaration from Plaintiff in substantially the form attached as

18 **Exhibit 1-2** shall be sufficient to enter the Consent Judgment.

19      10.   Following entry, Defendant may apply for a reduction in the Consent

20 Judgment for any amounts previously paid towards the Note.

21      11.   The Defendant has consented to entry of this Consent Judgment without

22 trial or adjudication of any issue of fact or law.

23      12.   The parties waive the entry of findings of fact and conclusions of law

24 under Rules 52 and 65 of the Federal Rules of Civil Procedure.

25      13.   The Defendant waives the right to have a new trial, for relief from

26 forfeiture, to request or have an appeal from this judgment and will bear his respective

27 costs, including any attorney's fees or other expenses of this litigation.

28      14.   This Stipulation shall further constitute Defendant's acceptance of the

STIPULATION FOR ENTRY OF JUDGMENT AND STIPULATED JUDGMENT

jurisdiction of the Court to enter all Orders and take any other action allowed by law. A judge may hear any proceedings arising out of this Stipulation, and may issue any judgment or order necessary to effect the agreement of the parties.

15.    The parties at all times material hereto have had the opportunity to consult with legal counsel of their own choosing concerning their rights under this Stipulation, the form and content of this Stipulation, and the advisability of executing it.

16.    This Stipulation for Entry of Judgment is being executed pursuant to the terms of that Settlement Agreement.

17.    The Parties stipulate and jointly request that the Court retain jurisdiction to enforce this Stipulation and Consent Judgment and to make any modifications to the same as provided in this Stipulation.

18.    The Parties may execute this Stipulation in counterparts which, taken together, shall constitute one and the same agreement.  This Stipulation may also be executed and/or delivered by facsimile and/or email transmission and in such event all facsimile and/or email signatures shall be deemed originals for all purposes hereof.

19.    Nothing in this Consent Judgment shall relieve Defendant of their obligation to comply with applicable state and federal law.  The District Court is not required to enter a document separate from the Consent Judgment under Rule 58 since this Consent Judgment is entitled a judgment, and it states "IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED".

The Parties agree to the foregoing Stipulation by their signatures below.

Dated:  _____8/31/2020_____

**PLAINTIFF**

PIERRE LADOW, an individual

By:  _____
Name:  Pierre Ladow

**DEFENDANT**

Dated: 8/31/2020 _____

JONA RECHNITZ, an individual

By: _____

Name: Jona Rechnitz

STIPULATION FOR ENTRY OF JUDGMENT AND STIPULATED JUDGMENT

**EXHIBIT 1-1**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PIERRE LADOW, an individual, | Case No. |
| Plaintiff, | **CONSENT JUDGMENT** |
| vs. | |
| JONA RECHNITZ, an individual, | |
| Defendants | |

This matter is before the Court on the Stipulation for Entry of Consent Judgment (the "Stipulation") entered between Plaintiff Pierre Ladow ("Plaintiff"), on the one hand, and Defendant Jona Rechnitz ("Rechnitz"), on the other hand.

Having reviewed the Stipulation, the Court hereby enters judgment on the Stipulation as follows:

IT IS HEREBY ORDERED, ADJUDGED, and DECREED:

Judgment is for Plaintiff PIERRE LADOW, an individual, and against Defendant JONA RECHNITZ in the amount of Five-Hundred Thousand U.S. Dollars and No Cents ($500,000.00).

The Court hereby retains jurisdiction to enforce the parties' Stipulation and this

STIPULATION FOR ENTRY OF JUDGMENT AND STIPULATED JUDGMENT

1  Judgment.

2

3  Dated: _____

4                              _____
                               UNITED STATES DISTRICT COURT JUDGE
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATION FOR ENTRY OF JUDGMENT AND STIPULATED JUDGMENT

**EXHIBIT 1-2**
**<u>DECLARATION OF PLAINTIFF</u>**

I, Pierre Ladow, declare:

1.     I am the Plaintiff in this matter.  I have personal knowledge of the facts below and could testify competently to these facts if called upon to do so.

2.     This declaration is submitted in support of Plaintiff's request for entry of a consent judgment.

3.     A true copy of the Stipulation for Entry of Judgment in this action is attached as **Exhibit A** hereto.

4.     Defendants Jadelle Jewelry and Diamonds, LLC and Jona Rechnitz have not paid me $500,000 on or before October 15, 2020.


I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.


Dated:     8/31/2020                                      _____

                                                                        Pierre Ladow

STIPULATION FOR ENTRY OF JUDGMENT AND STIPULATED JUDGMENT

Electronically FILED by Superior Court of California, County of Los Angeles on 02/20/2020 04:54 PM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Clifton, Deputy Clerk

Case 1:16-cr-00389-KPF    Document 260-2    Filed 03/06/26    Page 284 of 439

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Teresa Beaudet

1  NEAL S. SALISIAN, SBN 240277
   neal.salisian@salisianlee.com
2  H. HAN PAI, SBN 258928
   han.pai@salisianlee.com
3  **SALISIAN | LEE LLP**
   550 South Hope Street, Suite 750
4  Los Angeles, California 90071-2627
   Telephone:    (213) 622-9100
5  Facsimile:    (800) 622-9145

6  Attorneys for Plaintiff
   ISRAEL SAM GORODISTIAN
7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              COUNTY OF LOS ANGELES – CENTRAL DISTRICT

10

11  ISRAEL SAM GORODISTIAN, an          Case No.  20STCV07425
    individual,
12                                       [Assigned to the Hon. _____,
               Plaintiff,                Dept. ___]
13
               vs.                       **ISRAEL SAM GORODISTIAN'S**
14                                       **COMPLAINT FOR:**
    JADELLE JEWELRY AND DIAMONDS,
15  LLC, a Delaware limited liability company;   **1.  CONVERSION;**
    JADELLE INC., a California corporation;      **2.  CIVIL THEFT (PEN. CODE § 496);**
16  JONA RECHNITZ, an individual; RACHEL         **3.  FRAUD – FALSE PROMISE;**
    RECHNITZ, an individual; ROBERT             **4.  NEGLIGENT MISREPRESENTATION;**
17  RECHNITZ, an individual; and DOES 1          **5.  CIVIL CONSPIRACY TO DEFRAUD;**
    through 10, inclusive,                       **6.  BREACH OF ORAL CONTRACT (2**
18                                                   **COUNTS);**
               Defendants.                       **7.  BREACH OF IMPLIED-IN-FACT**
19                                                   **CONTRACT (2 COUNTS);**
20                                               **8.  MONEY LENT;**
                                                 **9.  ACCOUNT STATED; and**
21                                               **10. BREACH OF WRITTEN GUARANTY**
22

23

24

25

26

27

28

Salisian|Lee LLP              ISRAEL SAM GORODISTIAN'S COMPLAINT

Plaintiff Israel Sam Gorodistian hereby alleges the following against defendants Jadelle Jewelry and Diamonds, LLC; Jadelle Inc.; Jona Rechnitz; Rachel Rechnitz; Robert Rechnitz; and Does 1 through 10, inclusive (collectively, "Defendants"), as follows:

## THE PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Israel Sam Gorodistian ("Plaintiff" or "Gorodistian") is, and at all times mentioned was, an individual residing in Los Angeles County, State of California.

2.      Plaintiff is informed and believes, and so alleges, that defendant Jadelle Jewelry and Diamonds, LLC ("Jadelle LLC") is, and at all times mentioned was, a Delaware limited liability company authorized to do business in the state of California, and maintains its principal place of business in the County of Los Angeles, State of California.

3.      Plaintiff is informed and believes, and so alleges, that defendant Jadelle Inc. ("Jadelle Inc.") is, and at all times mentioned was, a California corporation authorized to do business in the state of California, and maintains its principal place of business in the County of Los Angeles, State of California.  Jadelle LLC and Jadelle Inc. are collectively referred to as the "Jadelle Parties."

4.      Plaintiff is informed and believes, and so alleges, that defendant Jona Rechnitz ("Jona") is, and at all times mentioned was, an individual residing in Los Angeles County, State of California.

5.      Plaintiff is informed and believes, and so alleges, that defendant Rachel Rechnitz ("Rachel") is, and at all times mentioned was, an individual residing in Los Angeles County, State of California.  Rachel is the managing member of Jadelle LLC and the Chief Executive Officer for Jadelle Inc.  Rachel is also Jona's wife.

6.      Plaintiff is informed and believes, and so alleges, that defendant Robert Rechnitz ("Robert") is, and at all times mentioned was, an individual residing in Los Angeles County, State of California.  Robert is Jona's father, and Jona, Rachel, and Robert are collectively referred to as the "Rechnitzes."

7.      Defendants DOES 1 through 10, inclusive, are persons or entities whose acts, activities, misconduct, or omissions at all times material hereto make them jointly and severally

1

1    liable under the causes of action set forth herein.  The true names and capacities of the Doe

2    defendants are presently unknown, but when ascertained, Plaintiff will request leave of the Court

3    to amend the operative pleading to substitute their true names and capacities.

4        8.      Plaintiff is informed and believes, and so alleges, that, at all times mentioned, each

5    of the Defendants was the agent, servant, joint venturer, co-conspirator, and/or employee of some

6    or all of the remaining Defendants, and in doing the things hereinafter alleged, was acting within

7    the course and scope of that relationship and with the full permission and consent of such

8    Defendants.  Plaintiff is informed and believes, and so alleges, that each Defendant ratified,

9    approved, and adopted as its own some or all of the acts of each of the other Defendants.  Plaintiff

10   is informed and believes, and thereon alleges, that each of the Defendants materially aided in

11   some or all of the violations of the other Defendants.

12       9.      Plaintiff is informed and believes, and so alleges, that the Defendants are the alter

13   egos of each other and there exists, and at all relevant times herein there existed, a unity of

14   interest and ownership and control among the Defendants, such that any individuality and

15   separateness among them has ceased to exist, and they are alter egos of each other, and thus one

16   or more Defendants' business is nothing more than a shell, instrumentality, or conduit through

17   which the remaining Cross Defendants carry on certain of their business.

18       10.     Venue is proper in this Court because all events described in this Complaint took

19   place within the jurisdictional boundaries of the Court.  This Court has personal jurisdiction over

20   Defendants because all have done and currently are doing business in the County of Los Angeles,

21   State of California, and/or some or all of the Defendants reside within the County of Los Angeles.

22                          **GENERAL ALLEGATIONS**

23       11.     Gorodistian met Jona through a mutual friend with whom he has known for many

24   years.  In or around June 2019, Jona pitched a lending opportunity for Gorodistian in connection

25   with Rechnitz's jewelry business, the Jadelle Parties, which companies are managed and run by

26   Rachel.

27       12.     In particular, Jona represented and promised that (a) as part of their business, the

28   Jadelle Parties make short-term loans to borrowers, which are secured by jewelry from the

Salisian|Lee_LLP

1  borrowers as collateral; (b) once the loan funds are repaid by the borrowers, the jewelry is
2  returned to them; (c) outside, private lenders fund the loans made by the Jadelle Parties, who are
3  entitled monthly interest payments until the principal loan is repaid.

4       13.    In reliance on Jona's promises, Gorodistian entered into a verbal agreement with
5  Defendants to participate in the lending opportunity, and ultimately lent a total of $1,573,333.33
6  from June 2019 to November 2019, broken down as follows (the "Lending Agreement"):

7         a.  $200,000.00 lent on June 28, 2019;
8         b.  $100,000.00 lent on July 24, 2019;
9         c.  $500,000.00 lent on August 28, 2019;
10        d.  $100,000.00 lent on September 3, 2019;
11        e.  $300,000.00 lent on September 16, 2019; and
12        f.  $373,333.33 lent on November 4, 2019.

13      14.    Under the Lending Agreement, Defendants agreed to repay each loan in a
14 reasonable amount of time, together with interest.  Defendants did make periodic interest
15 payments to Gorodistian for some of the above loans, but those interest payments stopped in or
16 around January 2020.

17      15.    Prior to each of Gorodistian's loans, Jona, on behalf of Defendants, convinced
18 Gorodistian that each loan was a great deal, that he had numerous contacts in the jewelry
19 business, there was solid and more than sufficient collateral, and he otherwise ingratiated himself
20 with Gorodistian to better position himself to defraud Gorodistian.

21      16.    For example, prior to the September 16, 2019 loan, Jona represented to
22 Gorodistian that he had a great deal where a borrower needed a $300,000.00 loan which would be
23 secured against valuable jewelry as collateral, and it would only be a 10-day loan.  Gorodistian
24 relied on those representations and promises and funded that loan.

25      17.    As another example, on October 31, 2019, Gorodistian attended a meeting with
26 Jona and his father Robert.  At the meeting, the Rechnitzes further ingratiated themselves with
27 Gorodistian, attempting to place him at ease in furtherance of the Defendants' fraudulent scheme.
28

18.     Several days later, Jona represented that the same borrower on the $300,000.00 loan now needed a $1,200,000.00 loan, which would be funded 1/3 each by himself, Robert, and Gorodistian. Gorodistian relied on those representations and promises and funded his 1/3 share.

19.     On January 2, 2020, Jona asked Gorodistian for a personal favor to borrow $86,000.00 on a seven-day loan to cover a shortfall Jona needed to close escrow on a real property investment. Based on the personal relationship that Jona had cultivated with Gorodistian by this point, Gorodistian verbally agreed to the loan, and lent $86,000.00 that day (the "Personal Loan").

20.     None of the principal amounts lent under the Lending Agreement or loaned under the Personal Loan were repaid. Over the ensuing weeks, Gorodistian repeatedly attempted to obtain repayment from Defendants – including exchanging multiple communications and/or attending in-person meetings with Jona and Robert – for the full amount of his unpaid funds due under the Lending Agreement and the Personal Loan, but has thus far been unsuccessful.

21.     During this time, Gorodistian discovered that (a) Jona was charged by the United States Attorney in the Southern District of New York for wire fraud, for which Jona entered a guilty plea; and (b) on or around December 16, 2019, Jona was sentenced to 10 months in custody, and was granted release pending appeal.

22.     In response to Gorodistian's repeated inquiries made to Defendants as to the outstanding repayment, Defendants assured Gorodistian that they would make the repayments, and that Gorodistian would be fully repaid all of his funds due under the Lending Agreement and Personal Loan.

23.     As part of these repeated assurances, Robert also represented and promised that Jona would retain an attorney to assist with the repayment, and on January 17, 2020, Jona signed a personal guaranty of all funds lent under the Lending Agreement (the "Jona Guaranty").

24.     Contrary to, and in repudiation of, the repeated representations, assurances, and promises by Defendants, the payments under the Lending Agreement and Personal Loan stopped completely. In fact, to date, Gorodistian has not received a single dollar from Defendants in

4

1   principal repayment of his lent funds under the Lending Agreement or the Personal Loan, despite

2   Defendants' repeated promises to do so.

3       25.     On February 7, 2020, Defendants' attorney, Reuven Cohen, spoke to Gorodistian

4   by telephone and informed Gorodistian that Defendants would not be repaying any of his funds.

5                                    **FIRST CAUSE OF ACTION**

6                                          **Conversion**

7                             **(Against Defendants Jadelle Parties and Jona)**

8       26.     Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as

9   though fully set forth.

10      27.     At all times relevant, Gorodistian has owned, possessed, or had a right to receive

11  and possess his assets, including the funds lent pursuant to the Lending Agreement and the

12  Personal Loan.

13      28.     Gorodistian recently discovered that the Jadelle Parties and Jona have intentionally

14  and substantially interfered with Gorodistian's property by means of false and fraudulent activity,

15  including, but not limited to, misappropriating Gorodistian's funds for their own personal use and

16  other theft according to proof.  The Jadelle Parties and Jona engaged in this conduct with the

17  intention of wrongfully benefitting themselves at the expense of Gorodistian.

18      29.     Gorodistian did not consent to said activities.

19      30.     As a direct and proximate result of the foregoing acts, the Jadelle Parties and Jona

20  intended to cause, and have in fact caused, actual harm to Gorodistian, and are liable to

21  Gorodistian for damages in an amount to be proven at trial, but no less than $1,659,333.33.

22      31.     During, and as a further proximate result of, the Jadelle Parties and Jona's

23  wrongful possession and detention of Gorodistian's property, Gorodistian has suffered the loss of

24  the deterioration of his property and resulting business losses in an amount to be proven at trial.

25      32.     Furthermore, Gorodistian is informed and believes, and so alleges, that the Jadelle

26  Parties and Jona's aforementioned acts were taken with malice, fraud, and oppression and in

27  conscious disregard for Pratt's rights, and were done willfully and with the intent to cause injury

28  to Gorodistian.  The Jadelle Parties and Jona were aware at all times that Gorodistian was owed

5

Solision|Lee

1  repayment of his funds and intended to surreptitiously misappropriate Gorodistian's funds for
2  their own personal use, seeking only to intentionally and maliciously deceive Gorodistian.
3  Accordingly, Gorodistian is entitled to an award of exemplary and punitive damages against the
4  Jadelle Parties and Jona.

5  **SECOND CAUSE OF ACTION**

6  **Civil Theft (Pen. Code § 496)**

7  **(Against All Defendants)**

8      33.    Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as
9  though fully set forth.

10     34.    Defendants received property that had been stolen or that had been obtained in a
11 manner constituting theft or extortion, knowing the property to be so stolen or obtained and/or
12 concealed or withheld, or aided in concealing or withholding property from Gorodistian, knowing
13 the property to be so stolen or obtained.

14     35.    Defendants have received property from Gorodistian in a manner constituting
15 "theft," as that term is defined in California Penal Code, section 484(a).

16     36.    As a direct and proximate result of the foregoing acts, Defendants intended to
17 cause, and have in fact caused, actual harm to Gorodistian, and are liable to Gorodistian for
18 damages in an amount to be proven at trial, but no less than $1,659,333.33.

19     37.    Gorodistian is also entitled to recover treble damages and reasonable attorneys'
20 fees and costs from Defendants under Penal Code section 496(c).

21  **THIRD CAUSE OF ACTION**

22  **(Fraud – False Promise)**

23  **(Against Defendants Jadelle Parties and Jona)**

24     38.    Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as
25 though fully set forth.

26     39.    Beginning in or around June 2019, and continuing thereafter, the Jadelle Parties
27 and Jona promised Gorodistian that they would perform their obligations under the Lending

28

6

1    Agreement and Personal Loan, including, but not limited to, their promise to re-pay the full

2    amount of Gorodistian's lent funds of at least $1,659,333.33.

3        40.    Theses promises were in fact 100% false. At the time they made these promises,

4    the Jadelle Parties and Jona had no intention of re-paying the full amount of Gorodistian's lent

5    funds of at least $1,659,333.33. The true facts were that the Jadelle Parties and Jona knew they

6    would not perform their obligations under, or abide by the terms of, the Lending Agreement and

7    Personal Loan at the time of they were made, and knew that they would not perform their

8    promises pursuant to the Lending Agreement and Personal Loan.

9        41.    The promises made by the Jadelle Parties and Jona were material, and Gorodistian

10   would have acted differently had the Jadelle Parties and Jona not made their promises.

11       42.    The Jadelle Parties and Jona made their promises with the intent to induce

12   Gorodistian to enter into the Lending Agreement and Personal Loan and lend his funds to them,

13   but without making full re-payment, as demonstrated by, among other things, the Jadelle Parties

14   and Jona's hasty repudiation of their promises and/or their continued assurances after it was clear

15   they would not perform, all with full knowledge of Gorodistian's urgent situation regarding his

16   need for repayment of his funds.

17       43.    Gorodistian had a right to rely on the Jadelle Parties and Jona's promises, acted in

18   reasonable reliance on those promises, and, in ignorance of their falsity, entered into the Lending

19   Agreement and Personal Loan. Had Gorodistian known the true facts, Gorodistian would not

20   have entered into the Lending Agreement and Personal Loan with the Jadelle Parties and Jona.

21       44.    As a direct and proximate result of the foregoing acts, the Jadelle Parties and Jona

22   intended to cause, and have in fact caused, actual harm to Gorodistian, and is liable to Gorodistian

23   for damages in an amount to be proven at trial.

24       45.    Furthermore, Gorodistian is informed and believes, and so alleges, that the Jadelle

25   Parties and Jona's aforementioned acts were taken with malice, fraud, and oppression and in

26   conscious disregard for Gorodistian's rights, and were done willfully and with the intent to cause

27   injury to Gorodistian. The Jadelle Parties and Jona, and each of them, were aware at all times that

28   they had no intention of -paying the full amount of Gorodistian's funds of at least $1,659,333.33,

7

Solision|Lee

1  despite their promises and assurances, and instead, sought only to intentionally and maliciously
2  deceive Gorodistian. Accordingly, Gorodistian is entitled to an award of exemplary and punitive
3  damages against the Jadelle Parties and Jona.

**FOURTH CAUSE OF ACTION**

**(Negligent Misrepresentation)**

**(Against Defendants Jadelle Parties and Jona)**

7  46.    Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as
8  though fully set forth.

9  47.    Beginning in or around June 2019, and continuing thereafter, the Jadelle Parties
10  and Jona verbally made false material representations and omissions to Gorodistian that they
11  would perform their obligations under the Lending Agreement and the Personal Loan, including,
12  but not limited to, their promise to re-pay the full amount of Gorodistian's lent funds of at least
13  $1,659,333.33.

14  48.    Theses representations and omissions were in fact 100% false. The true facts were
15  that the Jadelle Parties and Jona knew they would not perform their obligations under, or abide by
16  the terms of, the Lending Agreement and Personal Loan at the time they were made, and knew
17  that they would not perform their promises pursuant to the Lending Agreement and Personal
18  Loan.

19  49.    The Jadelle Parties and Jona made the false representations and omissions without
20  a reasonable belief in their truth, but Gorodistian only recently discovered their falsehood.

21  50.    The representations and omissions made by the Jadelle Parties and Jona were
22  material, and Gorodistian would have acted differently had the Jadelle Parties and Jona not made
23  their false representations and omissions.

24  51.    The Jadelle Parties and Jona made their false representations and omissions with
25  the intent to induce Gorodistian to enter into the Lending Agreement and lend his funds to the
26  Jadelle Parties and Jona, but without receiving full re-payment, all with full knowledge of
27  Gorodistian's urgent situation regarding his need for repayment of his funds.

28

52. Gorodistian had a right to rely on the Jadelle Parties and Jona's representations and omission, acted in reasonable reliance on those representations and omission, and, in ignorance of their falsity, entered into the Lending Agreement and Personal Loan. Had Gorodistian known the true facts, Gorodistian would not have entered into the Lending Agreement and Personal Loan with the Jadelle Parties and Jona.

53. As a direct and proximate result of the foregoing acts, the Jadelle Parties and Jona intended to cause, and have in fact caused, actual harm to Gorodistian, and are liable to Gorodistian for damages in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION

### (Civil Conspiracy to Defraud)

### (Against Defendants All Defendants)

54. Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as though fully set forth.

55. Defendants knowingly and willfully conspired and agreed among themselves to defraud Gorodistian by making made false promises and false material representations and omissions to Gorodistian that Defendants would perform their obligations under the Lending Agreement and Personal Loan, including, but not limited to, their promise to re-pay the full amount of Gorodistian's funds of at least $1,659,333.33. Defendants each expressly authorized, and approved, participated, and/or tacitly assented and acquiesced to this arrangement.

56. In furtherance of this arrangement and to further induce Gorodistian to lend to the Jadelle Parties and make the Personal Loan, Defendants verbally made false promises and false material representations and omissions.

57. Theses promises were in fact 100% false. At the time they made these promises, Defendants had no intention of re-paying the full amount of Gorodistian's funds of at least $1,659,333.33. The true facts were that Defendants knew they would not perform their obligations under, or abide by the terms of, the Lending Agreement and the Personal Loan at the time they were made, and knew that they would not perform their promises pursuant to the Lending Agreement and the Personal Loan.

9

58.     Gorodistian is informed and believes, and so alleges, that Defendants were aware
of these representations and/or promises being made, and were aware of their falsity at the time
made, but nevertheless expressly authorized, approved, participated in, and/or tacitly assented and
acquiesced to them.  Defendants' conduct was carried out for their own financial gain.

59.     Defendants did the acts and things alleged pursuant to, and in furtherance of, the
conspiracy.  Each of the Defendants were aware of the other's actions and engaged in a
conspiracy to defraud Gorodistian.

60.     As a direct and proximate result of the foregoing acts, Defendants intended to
cause, and have in fact caused, actual harm to Gorodistian, and are liable to Gorodistian for
damages in an amount to be proven at trial.

61.     Furthermore, Gorodistian is informed and believes, and so alleges, that
Defendants' aforementioned acts were taken with malice, fraud, and oppression and in conscious
disregard for Gorodistian's rights, and were done willfully and with the intent to cause injury to
Gorodistian.  Defendants, and each of them, were aware at all times that they had no intention of -
paying the full amount of Gorodistian's funds of at least $1,659,333.33, despite their promises
and assurances, and instead, sought only to intentionally and maliciously deceive Gorodistian.
Accordingly, Gorodistian is entitled to an award of exemplary and punitive damages against
Defendants.

### SIXTH CAUSE OF ACTION

**(Breach of Oral Contract – Lending Agreement)**

**(Against Defendants Jadelle Parties and Jona)**

62.     Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as
though fully set forth.

63.     Gorodistian, the Jadelle Parties, and Jona are parties to a binding contract, the
Lending Agreement.

64.     At all times, Gorodistian has performed all conditions, covenants, and promises
required by him in accordance with the terms of the Lending Agreement, except as he has been

10

1  prevented or excused from performing by the acts and/or omissions of the Jadelle Parties and
2  Jona.

3      65.    Under the Lending Agreement, the Jadelle Parties and Jona agreed to make full
4  repayment of Gorodistian's lent funds, totaling $1,573,333.33, along with interest.

5      66.    The Jadelle Parties and Jona breached the Lending Agreement by failing to make
6  full repayment of the lent funds, totaling $1,573,333.33. As of the date of filing of this complaint,
7  the full amount of Gorodistian's lent funds in the amount $1,573,333.33 are past due and owing.
8  In addition, accrued and ongoing interest, remains due, owing, and unpaid from the Jadelle
9  Parties and Jona to Gorodistian.

10     67.    As a direct and proximate result of the foregoing acts, Gorodistian has been
11  damaged in an amount to be proven at trial, together with interest at the maximum legal rate
12  according to proof. The Jadelle Parties and Jona would receive unjust enrichment if allowed to
13  retain the benefits of Gorodistian's performance under the Lending Agreement without abiding
14  by the Jadelle Parties and Jona's own repayment obligations under the Lending Agreement,
15  and/or Gorodistian detrimentally relied on the Lending Agreement and would suffer an
16  unconscionable injury if the Lending Agreement was not enforced.

17                          **SEVENTH CAUSE OF ACTION**

18              **(Breach of Implied-in-Fact Contract – Lending Agreement)**

19                    **(Against Defendants Jadelle Parties and Jona)**

20     68.    Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as
21  though fully set forth.

22     69.    The Jadelle Parties and Jona requested that Gorodistian lend funds, which would
23  be fully repaid with interest, in the total amount of $1,573,333.33.

24     70.    Gorodistian accepted the Jadelle Parties and Jona's offer and provided them funds
25  totaling $1,573,333.33.

26     71.    At all times, Gorodistian has performed all conditions, covenants, and promises
27  required by it in accordance with the terms of the Lending Agreement, except as he has been
28

                                          11

Solision|Lee

1  prevented or excused from performing by the acts and/or omissions of the Jadelle Parties and
2  Jona.

3      72.   By their conduct, the Jadelle Parties and Jona accepted the benefits that accrued to
4  it as a result of the Lending Agreement, and therefore entered into an implied-in-fact contract
5  with Gorodistian, but have nevertheless failed to re-pay the entire $1,573,333.33.

6      73.   This failure to re-pay is a breach of the implied-in-fact contract between
7  Gorodistian and the Jadelle Parties and Jona.

8      74.   As a direct and proximate result of the foregoing acts, Gorodistian has been
9  damaged in an amount to be proven at trial, together with interest at the maximum legal rate
10 according to proof.

11 **EIGHTH CAUSE OF ACTION**

12 **(Money Lent)**

13 **(Against Defendants Jadelle Parties and Jona)**

14     75.   Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as
15 though fully set forth.

16     76.   In Los Angeles County, State of California, the Jadelle Parties and Jona became
17 indebted to Gorodistian in the sum of $1,659,333.33 as result of the Lending Agreement and
18 Personal Loan, for money lent by Gorodistian to the Jadelle Parties and Jona at their request,
19 which the Jadelle Parties and Jona agreed to repay.  The Jadelle Parties and Jona agreed to pay to
20 Gorodistian said balance in full.

21     77.   Although demanded by Gorodistian from the Jadelle Parties and Jona, the Jadelle
22 Parties and Jona have failed to fully reply repaid the Lending Agreement and Personal Loan.
23 Repeated demands were made beginning in January 2020.  As of the date of filing of this
24 complaint, $1,659,333.33 is the current principal amount past due and owing.  In addition,
25 accrued and ongoing interest remains due, owing, and unpaid from the Jadelle Parties and Jona to
26 Gorodistian.

27     78.   Gorodistian has incurred attorneys' fees in connection with this matter, in an
28 amount to be determined at trial.  Because the agreement on which this action is based is a

12

1  contract on a book account, Gorodistian is entitled to recover attorneys' fees from the Jadelle
2  Parties and Jona pursuant to Civil Code section 1717.5.

3                              **NINTH CAUSE OF ACTION**

4                                    **(Account Stated)**

5                     **(Against Defendants Jadelle Parties and Jona)**

6         79.    Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as
7  though fully set forth.

8         80.    In Los Angeles County, State of California, an account was stated orally by and
9  between Gorodistian and the Jadelle Parties and Jona, and on such statement, a balance of
10  $1,659,333.33 was found due to Gorodistian from the Jadelle Parties and Jona.  The Jadelle
11  Parties and Jona agreed to pay to Plaintiff said balance in full.

12         81.    Although demanded by Gorodistian from Jadelle and Jona, they have failed to
13  fully repay the Lending Agreement and Personal Loan.  Repeated demands were made beginning
14  in January 2020.  As of the date of filing of this complaint, $1,659,333.33 is the current principal
15  amount past due and owing.  In addition, accrued and ongoing interest remains due, owing, and
16  unpaid from the Jadelle Parties and Jona to Gorodistian.

17         82.    Gorodistian has incurred attorneys' fees in connection with this matter, in an
18  amount to be determined at trial.  Because the agreement on which this action is based is a
19  contract on a book account, Gorodistian is entitled to recover attorneys' fees from the Jadelle
20  Parties and Jona pursuant to Civil Code section 1717.5.

21                              **TENTH CAUSE OF ACTION**

22                     **(Breach of Oral Contract – Personal Loan)**

23                                **(Against Defendant Jona)**

24         83.    Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as
25  though fully set forth.

26         84.    Gorodistian and Jona are parties to a binding contract, the Personal Loan.

27

28

1    85.    At all times, Gorodistian has performed all conditions, covenants, and promises

2    required by him in accordance with the terms of the Personal Loan, except as he has been

3    prevented or excused from performing by the acts and/or omissions of Jona.

4    86.    Under the Personal Loan, Jona agreed to make full repayment on the Personal

5    Loan, totaling $86,000.00.

6    87.    Jona breached the Personal Loan by failing to make full repayment, totaling

7    $86,000.00.  As of the date of filing of this complaint, the full amount of the Personal Loan in the

8    amount of $86,000.00 is past due and owing.

9    88.    As a direct and proximate result of the foregoing acts, Gorodistian has been

10    damaged in an amount to be proven at trial, together with interest at the maximum legal rate

11    according to proof.  Jona would receive unjust enrichment if allowed to retain the benefits of

12    Gorodistian's performance under the Personal Loan without abiding by Jona's own repayment

13    obligations under the agreement, and/or Gorodistian detrimentally relied on the Personal Loan

14    and would suffer an unconscionable injury if the Personal Loan was not enforced.

15    **ELEVENTH CAUSE OF ACTION**

16    **(Breach of Implied-in-Fact Contract – Personal Loan)**

17    **(Against Defendant Jona)**

18    89.    Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as

19    though fully set forth.

20    90.    Jona requested that Gorodistian loan him funds, which would be fully repaid, in

21    the total amount of $86,000.00.

22    91.    Gorodistian accepted Jona's offer and provided him funds totaling $86,000.00.

23    92.    At all times, Gorodistian has performed all conditions, covenants, and promises

24    required by him in accordance with the terms of the Personal Loan, except as he has been

25    prevented or excused from performing by the acts and/or omissions of Jona.

26    93.    By his conduct, Jona accepted the benefits that accrued to it as a result of the

27    Personal Loan, and therefore entered into an implied-in-fact contract with Gorodistian, but has

28    nevertheless failed to re-pay the entire $86,000.00.

94.     This failure to re-pay is a breach of the implied-in-fact contract between Gorodistian and Jona.

95.     As a direct and proximate result of the foregoing acts, Gorodistian has been damaged in an amount to be proven at trial, together with interest at the maximum legal rate according to proof.

## TWELFTH CAUSE OF ACTION

### (Breach of Written Guaranty)

### (Against Defendant Jona)

96.     Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as though fully set forth.

97.     On or about January 17, 2020, Jona unconditionally agreed to guaranty in writing all the obligations and duties owed by the Jadelle Parties under the Lending Agreement in the Jona Guaranty.

98.     The Jadelle Parties have defaulted on the Lending Agreement, and Jona has defaulted on the Jona Guaranty, by failing to re-pay the outstanding balance of the Lending Agreement. As of the date of filing of this complaint, $1,573,333.33 is the current principal amount past due and owing. In addition, accrued and ongoing interest remains due, owing, and unpaid to Gorodistian.

99.     Gorodistian has performed all conditions and promises required on his part to be performed under the Lending Agreement and the Jona Guaranty.

100.    Gorodistian relied on Jona's credit and assets in order for him to lend under the Lending Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief against Defendants, and each of them, jointly and severally, as follows:

**On the First Cause of Action for Conversion Against Defendants Jadelle Parties and Jona:**

1.     For compensatory and consequential damages in an amount to be proven at trial, in the amount of at least $1,659,333.33;

1  2.  For prejudgment interest at the highest allowable legal rate;

2  3.  For costs of suit;

3  4.  For punitive damages arising from Jadelle and Jona's intentional torts;

4  5.  For such other or further relief as the Court deems just and proper.

5  **On the Second Cause of Action for Civil Theft (Pen. Code § 496) Against All Defendants:**

6  1.  For treble damages in an amount to be proven at trial;

7  2.  For prejudgment interest at the highest allowable legal rate;

8  3.  For reasonable attorneys' fees and costs of suit;

9  4.  For such other or further relief as the Court deems just and proper.

10  **On the Third Cause of Action For Fraud – False Promise Against Defendants Jadelle**

11  **Parties and Jona:**

12  1.  For compensatory and consequential damages in an amount to be proven at trial;

13  2.  For prejudgment interest thereon at the highest legal rate;

14  3.  For punitive damages;

15  4.  For costs of suit; and

16  5.  For such other or further relief as the Court deems just and proper.

17  **On the Fourth Cause of Action For Negligent Misrepresentation Against Defendants Jadelle**

18  **Parties and Jona:**

19  1.  For compensatory and consequential damages in an amount to be proven at trial;

20  2.  For prejudgment interest thereon at the highest legal rate;

21  3.  For costs of suit; and

22  4.  For such other or further relief as the Court deems just and proper.

23  **On the Fifth Cause of Action For Civil Conspiracy to Defraud Against All Defendants:**

24  1.  For compensatory and consequential damages in an amount to be proven at trial;

25  2.  For prejudgment interest thereon at the highest legal rate;

26  3.  For costs of suit; and

27  4.  For such other or further relief as the Court deems just and proper.

28

ISRAEL SAM GORODISTIAN'S COMPLAINT

**On the Sixth Cause of Action For Breach of Oral Contract – the Lending Agreement Against Defendants Jadelle Parties and Jona:**

1. For compensatory and consequential damages in an amount to be proven at trial, in the amount of at least $1,573,333.33;

2. For costs of suit;

3. For prejudgment interest thereon at the highest legal rate;

4. For such other or further relief as the Court deems just and proper.

**On the Seventh Cause of Action For Breach of Implied-in-Fact Contract – the Lending Agreement Against Defendants Jadelle Parties and Jona:**

1. For compensatory and consequential damages in an amount to be proven at trial, in the amount of at least $1,573,333.33;

2. For costs of suit;

3. For prejudgment interest thereon at the highest legal rate; and

4. For such other or further relief as the Court deems just and proper.

**On the Eighth Cause of Action For Money Lent Against Defendants Jadelle Parties and Jona:**

1. For compensatory and consequential damages in an amount to be proven at trial, in the amount of at least $1,659,333.33;

2. For reasonable attorney's fees and costs of suit;

3. For prejudgment interest thereon at the highest legal rate; and

4. For such other or further relief as the Court deems just and proper.

**On the Ninth Cause of Action For Account Stated Against Defendants Jadelle Parties and Jona:**

1. For compensatory and consequential damages in an amount to be proven at trial, in the amount of at least $1,659,333.33;

2. For reasonable attorney's fees and costs of suit;

3. For prejudgment interest thereon at the highest legal rate; and

4. For such other or further relief as the Court deems just and proper.

ISRAEL SAM GORODISTIAN'S COMPLAINT

Salsian|Lee

**On the Tenth Cause of Action For Breach of Oral Contract – Personal Loan Against Defendant Jona:**

    1.    For compensatory and consequential damages in an amount to be proven at trial, in the amount of at least $86,000.00;

    2.    For costs of suit;

    3.    For prejudgment interest thereon at the highest legal rate;

    4.    For such other or further relief as the Court deems just and proper.

**On the Eleventh Cause of Action For Breach of Implied-in-Fact Contract – Personal Loan Against Defendant Jona:**

    1.    For compensatory and consequential damages in an amount to be proven at trial, in the amount of at least $86,000.00;

    2.    For costs of suit;

    3.    For prejudgment interest thereon at the highest legal rate; and

    4.    For such other or further relief as the Court deems just and proper.

**On the Twelfth Cause of Action For Breach of Written Guaranty Against Defendant Jona:**

    1.    For compensatory and consequential damages in an amount to be proven at trial, in the amount of at least $1,659,333.33;

    2.    For costs of suit;

    3.    For prejudgment interest thereon at the highest legal rate; and

    4.    For such other or further relief as the Court deems just and proper.

DATED: February 20, 2020        SALISIAN | LEE LLP

                        By: _____
                              Neal S. Salisian

                        Attorneys for Plaintiff
                        ISRAEL SAM GORODISTIAN

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No.:

LEONARD SULAYMANOV,
JLZ CONSULTING, INC. D/B/A
LENZO & CO., SMITHBRIDGE LIMITED
LIABILITY PARTNERSHIP, a Pennsylvania
limited liability partnership,

       Plaintiffs,

v.

FLOYD MAYWEATHER JR. and
JONA RECHNITZ,

       Defendants.

_____/

## **COMPLAINT**

Plaintiffs, (i) Lenny Sulaymanov ("Mr. Sulaymanov"), (ii) JLZ Consulting, Inc. ("JLZ"), and (iii) Smithbridge Limited Liability Partnership ("Smithbridge" or "Smithbridge LLP"), a Pennsylvania limited liability partnership (collectively, the "Plaintiffs"), hereby sue (collectively, the "Defendants") (a) Floyd Mayweather Jr. ("Mr. Mayweather"), and (b) Jona Rechnitz ("Mr. Rechnitz"), and in support thereof allege:

## **NATURE OF THE ACTION**

1.    This case arises from Mayweather and Rechnitz's breach and circumvention of a written contract. Specifically, Mr. Sulaymanov, JLZ, Smithbridge, Mr. Mayweather and Mr. Rechnitz are all Parties to an agreement (the "Contract") that resolved certain federal litigation among those Parties. The Defendants have (i) breached the Contract on at least three (3) occasions, (ii) have been provided an opportunity to cure their default (without penalty) and (iii) they have refused to cure same.

## THE PARTIES

2.       Smithbridge, LLP is a Pennsylvania limited liability partnership with its principal place of business located at 1878 Route 70, #8, Cherry Hill, Camden County, New Jersey 08003.

3.       Mr. Sulaymanov is an individual who resides in the state of Florida.

4.       JLZ is a Delaware corporation that is registered to do business in the state of Florida and has listed its principal address as 323 Sunny Isles Blvd, Suite 501, Sunny Isles, Florida. Mr. Sulaymanov is the owner and managing member of JLZ.

5.       Upon information and belief, Mr. Mayweather is an individual who is a resident of California.

6.       Upon information and belief, Mr. Rechnitz is an individual who is a California resident.

## JURISDICTION AND VENUE

7.       This Court has diversity jurisdiction under 28 U.S.C. §1332, because this is a civil action between citizens of different states and the amount in controversy exceeds the sum or value of $75,000.00.

8.       Venue is proper in the Southern District of Florida because Section 12 of the Contract, which is at issue, provides as follows: "[a]ny dispute between the Parties or proceeding to enforce this Agreement shall be filed in the United States District Court for the Southern District of Florida[.]"

9.       The Court may exercise jurisdiction over Mayweather, because (i) Mayweather executed a contract and breached such contract that required performance in Florida; (ii) owns real property in the state of Florida; (iii) committed a tortious act in the state of Florida; (iv) caused injury to a person or entity in Florida while engaging in substantial business activities in the state

of Florida; (v) engaged in a business venture in the state of Florida, including, without limitation having an indirect or direct ownership interest in Frist Apex Ventures, LLC; and (vi) has systematic but not isolated contact with the State of Florida. Mayweather has also consented to jurisdiction in the state of Florida pursuant to the terms of the Contract.

10.     The Court may exercise jurisdiction over Rechnitz, because (i) Rechnitz executed a contract and breached such contract that required performance in Florida; (ii) owns real property in the state of Florida; (iii) committed a tortious act in the state of Florida; (iv) caused injury to a person or entity in Florida while engaging in substantial business activities in the state of Florida; (v) engaged in a business venture in the state of Florida, including, without limitation having an indirect or direct ownership interest in Frist Apex Ventures, LLC; and (vi) has systematic but not isolated contact with the State of Florida. Rechnitz has also consented to jurisdiction in the state of Florida pursuant to the terms of the Contract.

## STATEMENT OF FACTS

11.     Smithbridge, LLP was retained to pursue a matter on behalf of Mr. Sulaymanov and JLZ against Mr. Mayweather and Mr. Rechnitz.

12.     On or about August 23, 2024, an initial Federal action was filed in the United States District Court for the Southern District of Florida by Smithbridge, LLP (and its local counsel) on behalf of Mr. Sulaymanov and JLZ. See *Sulaymanov v. Mayweather Jr.*, Case No. 24-CV-23229 ("Initial Federal Action").

13.     The Initial Federal Action and related claims were resolved through the execution of the Contract on January 8, 2025, by Mr. Sulaymanov and JLZ, along with Smithbridge, LLP, on the one hand, and Mr. Mayweather and Mr. Rechnitz on the other. A copy of the Contract is **in**

the possession of each Defendant (or their counsel) and it is not attached hereto because the

Contract[1] provides, in relevant part:

> …Plaintiffs' Counsel agree to keep the existence of this Agreement … and all documents and things exchanged during … negotiations leading up to this Agreement … strictly confidential …

14.     Pursuant to the Contract, Mr. Mayweather and Mr. Rechnitz are jointly and severally obligated to pay the total sum specified in the Contract in three (3) installments: the first lump sum payment was due by no later than March 30, 2025 (the "First Installment"); the second lump sum payment was due by no later than June 30, 2025 (the "Second Installment"); and the third and final lump sum payment is due by no later than June 30, 2026 (the "Final Installment" and collectively, the "Contract Payments").

15.     Pursuant to the Contract, all of the Contract Payments were to be made "**payable to the IOLTA trust account of Smithbridge, LLP**". Contract at §2.d. (emphasis added).

16.     Subsection 2.e. of the Contract expressly provides that Smithbridge, LLP (and local counsel) "**shall be solely responsible for the remittance or distribution of the --------- Payment to Plaintiffs**". Contract at §2.e. (emphasis added).

17.     Section 11 of the Contract provides that it "**shall be binding upon, and inure to the benefit of the Parties and their respective. . . . attorneys. This Agreement shall be binding, enforceable, discoverable and admissible to establish the rights, obligations and duties of the Parties in any action brought to enforce this Agreement**." Contract at §11 (emphasis added).

18.     Pursuant to Section 11 of the Contract, Smithbridge, LLP was an intended third-party beneficiary to the Agreement. Contract at §11.

---

[1] The Agreement includes an exception for "as may be required in connection with any action to enforce the Agreement (provided that the parties shall seek to treat any filing regarding such enforcement confidential and under seal).

19.     The first installment was due on or before March 30, 2025, and Defendants failed to pay such installment into the IOLTA account as required under the Contract. This was the Defendants' first default under the Contract.

20.     On March 31, 2025, Defendants were placed on notice of their default.

21.     In response and over the next few weeks, Defendants asserted that under Section 5(a)(10) of the Contract, they had thirty (30) days to cure any default. Plaintiffs in this action disputed the Defendants' liberal interpretation of the Contract and continued to demand payment. Notwithstanding the foregoing, and despite the specious nature of Defendants' claim to being entitled to an additional thirty (30) days to pay the first installment, the Defendants still defaulted on the First Installment by failing to pay the First installment on or before April 30, 2025 (Defendants "cure" deadline).

22.     While the First Installment was eventually paid on or before on May 30, 2025, such payment was not made in compliance with the requirements specified in the Contract. Specifically, Defendants eventually made a series of incremental payments, which in aggregate, amounted to the First Installment, but Defendants' failure to pay the full First Installment as and when due constituted a default under the Contract.

23.     The Second Installment was due on or before June 30, 2025, and Defendants again failed to timely make that payment. This was Defendants' second breach of the Contract.

24.     On or about October 8, 2025, Defendants were provided with written notice that they were in default of the June 30, 2025, payment (or the Second Installment), for which, in an abundance of caution Plaintiffs again applied Section 5(a)(10) of the Contract and gave Defendants yet another thirty (30) days to cure (or until November 8, 2025).

25.     While Defendants did not cure the default by November 8, 2025, they were still given yet another series of additional, penalty free, extensions (as detailed below) to cure the default by making the payment by November 30, 2025, which was extended to December 15, 2025, and then extended again to December 22, 2025.

26.     On or around November 30, 2025, Mr. Rechnitz contacted Mr. Sulaymanov and requested another extension until December 15, 2025, and Mr. Sulaymanov agreed.

27.     Yet, on December 15, 2025, payment was not made into the IOLTA trust account of Smithbridge, LLP as required by the Contract.

28.     Instead, starting on December 15th and then extending through the filing of this complaint, Mr. Rechnitz has advanced a series of lies and acted in bad faith in order to delay and avoid payment of the funds now long overdue under the Contract, to wit:

  i.      On December 11, 2025, Mr. Rechnitz emailed all parties confirming the wire would be sent 12/15/2025 when he knew no payment was being made.

  ii.     On December 15, 2025, Mr. Rechnitz emailed all parties stating "its going out later. It will reflect in your account tomorrow morning. Please confirm tomorrow by 10am PST once received…".

  iii.    On December 16, 2025, Mr. Rechnitz emailed all parties to "Hang on. Funds hitting our account today then shooting wire. Give it until 11 am PST tomorrow then Do your thing. You'll have the wire."

  iv.     On December 17, 2025, Mr. Rechnitz emailed all parties that "It's being handled thanks".

  v.      Later, on December 17, 2025, Mr. Rechnitz emailed the parties again assuring Plaintiffs and counsel that payment was "Being handled today".

vi.     On December 17, 2025, Mr. Rechnitz and Yaniv Adar, Esquire (counsel for Mayweather) called Plaintiff's counsel requesting Smithbridge, LLP confirm proper wire instructions, despite, the fact that Defendants previously sent 4 wires to the exact IOLTA account without any problems, evidencing more bad faith and gamesmanship by Defendants.

vii.    On December 18, 2025, no payment was made despite the phone call from Rechnitz the night before.

viii.   On December 18, 2025, counsel for the parties exchanged emails promising payment would be made by close of business Friday, knowing that Defendants had no intention of paying on that date.

ix.     On December 19, 2025, counsel for the parties had a phone call and exchanged emails, where once again Defendants requested a further extension of time to pay until Monday, December 22, 2025.

x.      On December 22, 2025, no payment was made but Mr. Rechnitz face-timed Mr. Sulaymanov to show him an account which contained $2,100,000.00 earmarked to address the defaulted payment which he promised would be wired into the IOLTA account by 2 PM PST on 12/23/25.

xi.     On December 23, 2025, no wire was made by Mr. Rechnitz. Counsel exchanged emails and Mr. Rechnitz and Mr. Sulaymanov texted, where Mr. Sulaymanov asked "what was the point of all these promises again..." and Mr. Rechnitz responded "I needed to gather it. Finally, you'll see in the am, let them be surprised".

29.     As further evidence of Defendants' intentional, reckless and bad faith handling of their obligations under the Contract that governed the resolution of the Initial Federal Action, the Court need only consider the following facts:

i.   After the settlement was reached Mr. Mayweather and Mr. Rechnitz
     enjoyed a multi-million dollar birthday week in Miami and bragged
     about it in the newspapers and to media outlets.



*Sulaymanov & Smithbridge v. Mayweather, et. al.*
*Page 9 of 13*

ii.     Then on June 30, 2025, while failing to make the Second Installment payment Defendants Mr. Mayweather and Mr. Rechnitz were enjoying a vacation in the South of France and bragging about how much money they were spending.



iii.    Further evidencing Defendants' arrogant, cavalier attitude about court cases, settlements, contracts and monetary obligations, on November 26, 2025, while still being in default of the Contract, Mr. Mayweather posted this audacious photo behind millions in cash, saying he "just be minding [his] own business" while ignoring his legal and contractual obligations.

*Sulaymanov & Smithbridge v. Mayweather, et. al.*
*Page 10 of 13*



iv.    Later, on that same date, Mr. Mayweather boasted about having a $400,000 Richard Mille watch on, while again ignoring his legal and contractual obligations to Plaintiffs.



30.     Pursuant to the Contract, ALL the installments due under the Contract (which should have been paid by Mr. Mayweather and Mr. Rechnitz into the IOLTA trust account of Smithbridge, LLP, but were not), far exceed the $75,000.00 jurisdictional minimum of this Court.

31.     All the Defendants' respective breaches of the Contract have caused and continue to cause damages to Plaintiffs in the form of, including but not limited to, attorneys' fees, the expenses of suit in the Initial Federal Action, consequential damages, as well as attorneys' fees and expenses in this action, and the consequential damages arising therefrom.

32.     Smithbridge, LLP has engaged its undersigned counsel to represent it in this action and is obliged to pay its counsel a reasonable fee for services rendered.

33.     JLZ and Mr. Sulaymanov have also retained its undersigned counsel and will be forced to incur legal fees and expenses for services rendered in this action.

34.     All conditions precedent to the filing or pursuit of the instant action have occurred, been performed, or have been waived.

### COUNT I – BREACH OF CONTRACT
### (Against Floyd Mayweather)

Plaintiffs repeat and incorporate herein the allegations of paragraphs 1 through 34 above as if fully set forth herein.

35.     Mr. Mayweather entered and is a party to the Contract.

36.     Mr. Mayweather breached Subsections 2.d. and 2.e. of the Contract by virtue of the acts set forth above, including, without limitation, failure to timely effectuate payment.

37.     As a direct and proximate result of Mr. Mayweather's breaches of the Contract, Plaintiffs have suffered substantial damages.

WHEREFORE, Plaintiffs prays that this Honorable Court will enter Judgment against Defendant FLOYD MAYWEATHER, JR (jointly and severally with Mr. Rechnitz) as follow: (i) finding that the Mr. Mayweather breached the Contract; (ii) awarding Plaintiffs their actual and consequential damages plus interest, legal fees and costs; and (iii) Granting such further relief as the Court deems just and proper.

### COUNT II – BREACH OF CONTRACT
### (AGAINST MR. RECHNITZ)

Plaintiffs repeats and incorporates herein the allegations of paragraphs 1 through 34 above as if fully set forth herein.

38.     Mr. Rechnitz entered and is a party to the Contract.

39.     Mr. Rechnitz breached Subsections 2.a., 2.b., and 2.d. of the Contract by virtue of the acts set forth above, including, without limitation failure to timely effectuate payment.

*Sulaymanov & Smithbridge v. Mayweather, et. al.*
*Page 13 of 13*

40.     As a direct and proximate result of Mr. Rechnitz's breaches of the Contract, Plaintiffs have suffered substantial damages.

WHEREFORE, Plaintiff prays that this Honorable Court will enter Judgment against Defendant, JONA RECHNITZ (jointly and severally with Mr. Mayweather) as follow: (i) finding that the Mr. Rechnitz breached the Contract; (ii) awarding Plaintiffs their actual and consequential damages, plus interest, legal fees and costs; and (iii) Granting such further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury as to all issues so triable.

Respectfully submitted on January 14, 2026

| | |
|---|---|
| */s/Peter M. Bernhardt* | */s/ Zachary Hyman* |
| Peter M. Bernhardt, Esq. | Zachary Hyman, Esq. |
| Florida Bar No. 969771 | Florida Bar No. 98581 |
| pbernhardt@mcdonaldhopkins.com | zach@millenniallaw.com |
| klundstrom@mcdonaldhopkins.com | jessica@millenniallaw.com |
| Laura G. Nguyen, Esq. | assistant@millenniallaw.com |
| Florida Bar No. 1018826 | **MILLENNIAL LAW** |
| lnguyen@mcdonaldhopkins.com | 320 SE 11th Street |
| klundstrom@mcdonaldhopkins.com | Fort Lauderdale, Florida 33316 |
| **MCDONALD HOPKINS, LLC** | Phone: 954-271-2719 |
| 501 S. Flagler Drive, Suite 200 | *Attorneys for Sulaymanov and JLZ* |
| West Palm Beach, FL 33401 | |
| *Attorneys for Smithbridge* | |

Electronically FILED by Superior Court of California, County of Los Angeles on 06/24/2020 02:11 PM Sherri R. Carter, Executive Officer/Clerk of Court, by N. Alvarez,Deputy Clerk

Case 1:16-cr-00389-KPF     Document 288-7     Filed 03/06/26     Page 316 of 439

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Mark Mooney

Baruch C. Cohen, Esq. (SBN 159455)
**LAW OFFICE OF BARUCH C. COHEN**
     A Professional Law Corporation
4929 Wilshire Boulevard, Suite 940
Los Angeles, California 90010
(323) 937-4501          Fax (888) 316-6107
e-mail: baruchcohen@baruchcohenesq.com

*Attorney for Plaintiffs Oved Anter & First International Diamond, Inc.*

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF LOS ANGELES

| | |
|---|---|
| OVED ANTER, an individual; & FIRST INTERNATIONAL DIAMOND, INC., a California corporation, | LASC # _____ 20STCV23877 |
| | **COMPLAINT FOR:** |
| Plaintiffs, | |
| | **1.    INTENTIONAL MISREPRESENTATION & FRAUD;** |
| vs. | **2.    CIVIL THEFT (PENAL CODE, § 496);** |
| | **3.    CIVIL CONSPIRACY TO COMMIT THEFT, FRAUD, AND FRAUD BY CONCEALMENT;** |
| JONA S. RECHNITZ, an individual; RACHEL RECHNITZ, an individual; ROBERT RECHNITZ, an individual; LEVIN PRADO aka LEVON PRADO, an individual and DOES 1-20 | **4.    CONVERSION;** |
| | **5.    BREACH OF CONTRACT;** |
| | **6.    BREACH OF WRITTEN GUARANTY** |
| | **7.    BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;** |
| Defendants. | **8.    ACCOUNT STATED;** |
| | **9.    UNETHICAL BUSINESS PRACTICES IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §17200** |
| | **10.   ISSUANCE OF BAD CHECKS (CIVIL CODE § 1719)** |
| | **11.   PROMISSORY FRAUD** |
| | **DEMAND FOR A JURY TRIAL** |

          Plaintiffs OVED ANTER, & FIRST INTERNATIONAL DIAMOND, INC., ("Plaintiffs")

hereby allege the following against defendants JONA S. RECHNITZ, RACHEL RECHNITZ,

ROBERT RECHNITZ,  LEVIN PRADO aka LEVON PRADO, and DOES 1-20 (collectively

"Defendants") as follows:

**THE PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff OVED ANTER ("Anter") is an individual residing in Los Angeles County, State of California.

2. Plaintiff FIRST INTERNATIONAL DIAMOND, INC ("First International") is, and at all times mentioned was, a California corporation authorized to do business in the state of California, and maintains its principal place of business in the County of Los Angeles, State of California.

3. Defendant JONA S. RECHNITZ ("Jona") is an individual residing in Los Angeles County, State of California. Jona is also Rachel's husband and Robert's son.

4. Defendant RACHEL RECHNITZ ("Rachel") is an individual residing in Los Angeles County, State of California. Rachel is the managing member and promoter of Jadelle LLC and the Chief Executive Officer for Jadelle Inc. Rachel is also Jona's wife.

5. Defendant ROBERT RECHNITZ ("Robert") is an individual residing in Los Angeles County, State of California. Robert is Jona's father, and Jona, Rachel, and Robert are collectively referred to as the "Rechnitzes."

6. Jona and Rachel Rechnitz operate a jewelry business through two similarly named entities, Jadelle Inc. and Jadelle Jewelry and Diamonds, LLC, herein the Jadelle Entities, whose marquee client is the Kardashian family. Both Jona and Rachel Rechnitz promote and advertise political and powerful celebrity connections to create a false sense of credibility about themselves and their business, posting photos on their social media of Kylie Jenner and Kim Kardashian.

7. On information and belief, the frauds committed by Jona were committed with Rachel's knowledge and ratification, making her personally liable. Without Rachel setting up the entities for Jona to commit the frauds, and Jona's lying to steal Anter's Consigned Jewelry, none of the below referenced offenses could have occurred.

8. On 6-16-2020, the United State Bankruptcy Court for the Central District of California entered an order for relief under Chapter 7 of the Bankruptcy Code approving the involuntary chapter 7 bankruptcy proceeding of the Rechnitz's company Jadelle Jewelry

and Diamonds, LLC, a Delaware limited liability company, Jadelle Jewelry, LLC, and Jadelle Inc., a California corporation, USBC # 2:20-bk-13530-BR. See, *Corrupt de Blasio donor Jona Rechnitz's alleged victims trying to force him into bankruptcy*" (https://nypost.com/2020/04/07/de-blasio-donor-jona-rechnitzs-alleged-victims-trying-to-bankrupt-him/), and *Creditors File Petition to Put Jadelle Jewelry in Bankruptcy*" (https://www.jckonline.com/editorial-article/jadelle-jewelry-bankruptcy/).  Presently, Plaintiffs are currently stayed from pursuing the Jadelle entities in this Court by virtue of the automatic stay of bankruptcy (11 U.S. Code § 362). Anter will be filing claims against the Jadelle entities debtors in the United States Bankruptcy Court.

9.       Non-party JADELLE JEWELRY AND DIAMONDS, LLC ("Jadelle LLC," collectively with Jadelle Inc., the "Jadelle Entities") is a Delaware limited liability company qualified to do business in California. Rachel is the managing member of Jadelle LLC.

10.      Non-party JADELLE JEWELRY, LLC,  ("Jadelle LLC," collectively with Jadelle Inc., the "Jadelle Entities") is a California limited liability company qualified to do business in California. Rachel is the managing member of Jadelle LLC.

11.      Non-party JADELLE INC. ("Jadelle Inc.") is a California corporation whose principle office is in Beverly Hills and whose CEO, CFO, and Secretary is Rachel.

12.      Defendant LEVIN PRADO AKA LEVON PRADO ("Prado") is the agent for service of process, controller, and check signer for the Jadelle Entities. It is alleged on information and belief that Prado has a girlfriend named Xiomara Cortez at the Wells Fargo Bank Beverly Hills branch who assisted him in furthering Jona's fraud by stopping payment on checks and allowing numerous improper check transactions to occur on both of the Jadelle Entities' accounts.

13.      Defendants DOES 1 through 20, inclusive, are persons or entities whose acts, activities, misconduct, or omissions at all times material hereto make them jointly and severally liable under the causes of action set forth herein. The true names and capacities of the Doe defendants are presently unknown, but when ascertained, Plaintiffs will request leave of the Court to amend the operative pleading to substitute their true names and capacities.

14.    Plaintiffs are informed and believe, and so allege, that, at all times mentioned, each of the Defendants was the agent, servant, joint venturer, co-conspirator, and/or employee of some or all of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the course and scope of that relationship and with the full permission and consent of such Defendants. Plaintiffs are informed and believe, and so allege, that each Defendant ratified, approved, and adopted as its own some or all of the acts of each of the other Defendants. Plaintiffs are informed and believe, and thereon allege, that each of the Defendants materially aided in some or all of the violations of the other Defendants.

15.    Plaintiffs are informed and believe, and so allege, that the Defendants are the alter egos of each other and there exists, and at all relevant times herein there existed, a unity of interest and ownership and control among the Defendants, such that any individuality and separateness among them has ceased to exist, and they are alter egos of each other, and thus one or more Defendants' business is nothing more than a shell, instrumentality, or conduit through which the remaining Defendants carry on certain of their business.

16.    Venue is proper in this Court pursuant to California Code of Civil Procedure, §§ 395 et seq., because all events described in this Complaint took place within the jurisdictional boundaries of the Court. This Court has personal jurisdiction over Defendants because all have done and currently are doing business in the County of Los Angeles, State of California, and/or some or all of the Defendants reside within the County of Los Angeles.

**GENERAL ALLEGATIONS**

**JONA RECHNITZ'S BLAZING TRAIL OF PONZI SCHEME FRAUDS**

17.    Jona is no stranger to fraud and Ponzi schemes defrauding and bilking innocent victims of millions of dollars. In fact, he is a criminal mastermind at it.

18.    **$45,000,000.00 Ponzi Scheme**:  Unbeknownst to Plaintiff, on 6-3-2019, Jona Rechnitz was sued in the United States Bankruptcy Court Southern District of New York (Manhattan), Adv. Case No, # 19-01236-jlg by Kenneth P. Silverman, Esq., the Chapter 7 Trustee of the Jointly Administered Estates of National Events Holdings, LLC, Chapter 7 Case No.: 17-11556 (JLG) on 35 counts of receiving fraudulent conveyances through an

1    elaborate Ponzi scheme, pursuant to New York Debtor and Creditor Law §276, and (b)

2    pursuant to 11 U.S.C. §§550(a) and 551, 11 U.S.C. §548(a)(1)(A), and (b), 11 U.S.C.

3    §548(a)(1)(B), and (b),  totaling $45,000,000.00.

4    19.    **$12,000,000.00 Peralta Ponzi Scheme**: Unbeknownst to Plaintiff, Jona was the criminal

5    mastermind behind the "$12,000,000.00 Peralta Ponzi Scheme" charging rates of 125% per

6    annum and then claiming he thought it was legitimate business. *USA V. Hamlet Peralta*,

7    1:16-cr-00354-KBF-1. See, New York Times 9-8-2017 article, *Harlem Restaurateur Is*

8    *Sentenced to 5 Years for $12 Million Ponzi Scheme*, by Vivian Wang,

9    https://www.nytimes.com/2017/09/08/nyregion/hamlet-peralta-ponzi-police.html.

10    20.    **$80,000,000.00 Jason Nissen Ticket Ponzi Scheme**: Also unbeknownst to Plaintiff,

11    Plaintiff subsequently discovered that Jona was the criminal mastermind behind the

12    "$80,000,000.00 Jason Nissen Ticket Ponzi Scheme" where Nissen himself gave direct

13    evidence to the government that Jona Rechnitz was part of the Ponzi scheme which

14    defrauded investors of over $80 million with Rechnitz himself receiving over $10 million

15    in commissions including receiving over one million dollars post his cooperation

16    agreement paid directly to his AmEx account June 2016- Dec 2016. See, the 6-8-2017

17    NYT article, "*Star Witness in Corruption Cases Is Entangled in Unrelated Prosecution*"

18    by Alan Feuer,

19    https://www.nytimes.com/2017/06/08/nyregion/jona-rechnitz-witness-nypd-corruption-sca

20    ndal.html. The criminal case is *USA vs Jason Nissen*, 1:17-cr-00477-PAE-1; Nissen's

21    company National Events Holdings filed bankruptcy, In re: *National Events Holdings LLC*,

22    case number 11:17-bk-11556, in the U.S. Bankruptcy Court for the Southern District of

23    New York; One of the creditors Taly USA Holdings Inc, filed a parallel case against

24    Nissen in New York Supreme Court, claiming that Taly invested roughly $32 million with

25    Nissen and is still owed more than $16 million. The NY Supreme Court case is *Taly USA*

26    *Holdings Inc., et al. v. Jason Nissen*, et al., case number 652865/2017, in the Supreme

27    Court of the State of New York. Taly's complaint against Nissen also contains a major

28    bombshell that Jona Rechnitz is identified as a longtime recruiter for Nissen in a secretly

taped conversation between Nissen and several Taly executives, in which he confessed to
running National Events as a Ponzi scheme. Rechnitz is referred to as "John," "Joan" and
"Jonah" in the transcript, and that Nisen is talking about Jona Rechnitz.

21.    **USA vs. Jona Rechnitz, 1:16-cr-00389-AKH**: As detailed in his criminal case in NY,
entitled: *United States of America vs. Jona Rechnitz*, 1:16-cr-00389-AKH, before the
United States District Court Southern District of New York, Jona Rechnitz has an
extensive history of fraudulent conduct, a history highlighted at trial by both the
prosecution and defense. On direct examination, for example, the government elicited
testimony from Jona Rechnitz describing instances in which he had lied to law
enforcement officials, failed to report certain income, fostered illegal relationships with
members of the New York City Police Department, bribed New York police officers in
exchange for various illegal privileges, bribed New York politicians in order to secure
access and the promise of future benefits from said politicians and their staffs, violated
election laws by fundraising by way of "straw donors," procured a police chaplaincy
despite not having religious credentials, and solely for purposes of obtaining the prestige
and privileges associated with that title, and lied about owning certain properties in order
to impress others. Likewise, on cross examination, the defense elicited testimony from
Jona Rechnitz detailing instances in which Jona Rechnitz reported a $59,000 watch lost,
received proceeds from his insurance to cover the loss, found the watch, and did not notify
his insurance company, fraudulently obtained an insurance policy for his family, submitted
false documents in a firearm application, pretended to hold no interest in a real estate
property (when in fact he did hold an interest) to deceive the property's tenant in a
purchase negotiation, gave Christmas presents and jewelry to the family of a police officer
in exchange for a private police escort to the airport and a dedicated private lane in a
crowded tunnel, and had even invoked the fact that his grandparents were Holocaust
survivors to mislead FBI investigators in their investigation of his illegal relationships with
police officers. According to the Court's papers, Jona Rechnitz is "somebody who looked
out for himself above all costs, that Jona Rechnitz was always in it for Jona. That Jona

Rechnitz[, in] other words, was a creature of incentive."

22.    Jona's criminal biography begins back in 2013, when he was caught up in a federal probe into corruption in the NYPD and the Bill de Blasio mayoral campaign. Not only did Jona funnel money into the 2013 campaign and bribe police commanders, but he also admitted to directing campaign donations to Mayor de Blasio in exchange for access to City Hall and showering NYPD leaders with prostitutes and other bribes to cultivate them as allies. Eventually, Jona pleaded guilty to charges of providing financial and personal benefits and political contributions to public officials including law enforcement officials in exchange for official action in March of 2017. On 6-6-2016, a sealed information was filed against Jona for wire fraud, who then entered a guilty plea. On 3-15-2017, the information against Jona was unsealed, and Jona was released on bond pursuant to release conditions imposed by Judge Alvin K. Hellerstein. On 12-6-2019, Jona was sentenced to 10 months of custody, and was granted release pending appeal. When asked about Jona, Mayor de Blasio called him "*a liar and a felon*." Those words proved to be most accurate.

23.    Tellingly, among the mandatory conditions of Jona's release was that he not commit another federal, state, or local crime.[1] Jona subsequently breached the court's condition many times over.

24.    Indeed, Jona Rechnitz'z 10-21-2019 *Sentencing Memorandum* in his criminal case [Doc-71] describes how Jona "***ultimately veered off a path of integrity and into a world where he was unable to distinguish between right and wrong.***"

25.    Jona Rechnitz'z 10-21-2019 *Sentencing Memorandum* contains Jona's 10-16-2019 letter to Judge Hellerstein seeking a reduced sentence, Jona wrote the Court:

> *Dear Judge Hellerstein: **I am a felon. I am a criminal**. I am the ONLY person to blame for that. **I have caused tremendous pain and embarrassment to my family, my religion, and to myself**. There is no way to undo what's been done. It's permanent, and for that I am truly sorry to everyone hurt by my crimes and actions. It eats me alive each and every day. When I wake up, when I go to sleep, it is always on my mind for the past 4 years. **My actions harmed the people of New***

---

[1]A true and correct copy of Jona's 3-3-2020 *Judgement In a Criminal Case* in *United States of America vs. Jona Rechnitz*, 1:16-cr-00389-AKH is attached hereto as Exhibit "1" and is incorporated herein by this reference.

*York, The people of Correction Officers Benevolent Association, my friends, my family and my community. I will forever carry this burden, as I deserve to. I have read of your Honor asking at various sentencings, why do good people do bad things?* In my case, not assuming I'm a good person, I can answer this question. ***Arrogance, greed, and insecurity. Arrogance. I felt I was above the law.*** At this young age in my late 20's I was busy accepting honors at dinners and board positions at prestigious institutions. ***It got to my head. Greed. I wanted to gain contacts to grow my business, to make money and gain stature in the long run.*** ***Insecurity. I wanted to gain popularity by my peers and become a big shot in my community and business circles.*** [Emphasis added].

***Shame on me.*** *Finally, I couldn't wiggle my way out of this one. It changed my life as I knew it forever.* ***As a supposed religious man, I have been a disgrace to my religion. The only way to fix this is to make serving G-d my main focus for the rest of my life. I try to every day. I have changed as a person religiously, through prayer, my public and private behavior, and I always stop and think before I'm about to do something to see if it is something my parents, my family, and G-d would approve of.*** [Emphasis added].

*Your Honor, there are so many examples that I am omitting* ***as I don't want to portray myself as the victim here. I caused a lot of pain and harm to others through my criminal activity and don't want to detract from that.*** *JONA RECHNITZ.* [Emphasis added].[2]

26.    **Jona Rechnitz'z** 10-21-2019 *Sentencing Memorandum* contains his own father Robert's 10-21-2019 letter to Judge Hellerstein acknowledging his son Jona's sordid and fraudulent past:

"I'm sorry to say that ***Jona by his acts, lost his integrity and acted hypocritically to his faith.*** Notwithstanding his goodness and affinity for helping others, ***he crossed the line that could never be reversed for the rest of his life.***"

"***He continues to apologize to us and express his regret to this date. He carries the burden of shame for what he caused our family.***"

"***It was unfair of me to allow Jona to take so many responsibilities upon himself without my guidance and involvement.***"

"I believe that is another good lesson for Jona to learn. ***You don't wear religion on your sleeve you wear it in your heart. How you act from one person to another reflects who you are.***"

"***The move*** (back to Los Angeles) ***has done them well and Jona is building a new business. He lives with the shame and the pain of what he did and what he caused to others.***"[3]

---

[2]A true and correct copy of Jona's 10-16-2019 letter to Judge Hellerstein seeking a reduced sentence [Doc-71-1, filed 10-21-12019, Pages 64-67 of 92] is attached hereto as Exhibit "2" and is incorporated herein by this reference.

[3]A true and correct copy of Robert Rechnitz's 10-21-2019 letter to Judge Hellerstein seeking a reduced sentence is attached hereto as Exhibit "3" and is incorporated herein by this reference.

27.    Jona Rechnitz'z 10-21-2019 *Sentencing Memorandum* claims that he recognized the shamefulness of his conduct:

> **"[T]his [the conduct] is something that of course disgusts me looking back on it now**."

> "***Jona writes that he feels shame for his crimes, that it "eats me alive each and every day," and is "always on my mind for the past 4 years." App. Ex. 19, Jona Rechnitz Letter at 1. He goes on to write that "[a]s a supposed religious man, I have been a disgrace to my religion." Id. at 2. He has learned that "doing the right thing isn't always the easiest, but it is the only choice," and is resolved to continue doing the right thing for his family and his community. Id. at 2, 4. He now reflects before acting, "to see if it is something my parents, my family, and G-d would approve of." Id. at 2. Rachel, who has been at his side throughout, writes that "I can see that my husband has become a much better, more open and truthful person," who is "much more involved as a father and as a husband," has "revamped his priorities," and has exhibited "dramatic changes" for the better since resolving to cooperate with the Government. App. Ex. 21, Rachel Rechnitz Ltr. at 1. The Government also has witnessed Jona's shame and remorse: "Rechnitz's expressions of regret and embarrassment that he lost his footing on a moral level square with sentiments that he has expressed to us during his prep sessions, and in a fashion that we credit."*** 5K1.1 Motion at 47.

> Footnote: ***"Jona's repentance is also demonstrated by his renewed dedication to his family***. Jona writes that the highlight of his week "used to be sitting in the NYPD Headquarters like a big Macher," but today, "my highlight is walking to Synagogue with my children every week, and I let them know it every time we walk." App. Ex 19, Jona Rechnitz Ltr. at 3. Rachel also attests to Jona's renewed focus on the family, writing that ***Jona "has become a much better, humble, more open and truthful person,"*** and is now "much more involved as a father and as a husband." App. Ex. 21, Rachel Rechnitz Ltr. at 1."

> ***"Jona writes of the "disgusting feeling" he had waking up each morning during his testimony in the trials, sometimes for a week and a half straight***. App. Ex. 19, Jona Rechnitz Ltr. at 2. Moreover, the decision to cooperate fundamentally altered the story of his life in a way that a private and quiet plea of guilty never would have. Formerly a fixture of the Upper West Side Jewish community, with leadership roles in his children's school and his synagogue, ***he has now been forced to retreat to his hometown, living close to his parents in Los Angeles, in fear of being accosted on the street by friends of the men he cooperated against***. And formerly unknown to the public, ***he is now known in New York as a "rat" and a "snitch,"*** whose every embarrassing episode has been reported in the tabloid press, no matter how insignificant."

28.    Jona Rechnitz'z 10-21-2019 *Sentencing Memorandum* further claims that he endured a "**torrent of scorn, abuse and public shame, and downright intimidation**" from the Westside Jewish Community of NY, because he was branded a "rat" a "snitch" and a "*Moser*" (Hebrew for someone who informs on a fellow Jew resulting in criminal prosecution).

1    "*To escape shunning and harassment that he received in New York as a result of
     his outing as a cooperating witness, Jona moved to Los Angeles in June 2017.*"

2

3    "*Jona was forbidden from being called up to the Torah and was asked to step
     down from organizations he had helped build and support. He went from being
     the most sought after guest to being literally shunned and even yelled at by
     acquaintances.*"

4

5    "*If he dared enter a restaurant to order dinner, pictures quickly circulated of
     him, demeaning him as if he had no right to live.*"

6

7    "*Jona could not go anywhere without receiving a dirty look or a malicious
     comment.*"

8    29.    On 12-19-19, as reported in the New York Times, *'Liar,' and Star Witness in City Graft*

9    *Cases, Gets 10-Month Sentence*"

10   (https://www.nytimes.com/2019/12/19/nyregion/jona-rechnitz-corruption-sentencing.html)

11   Jona was sentenced to five months in prison and five months of house arrest, followed by

12   three years on parole, apologized to Judge Alvin K. Hellerstein for his criminal and

13   immoral behavior, and asked the judge for leniency at his sentencing hearing.

14

15   "*I've been a real fraud to God, a fraud to my wife and family, a fraud as an
     American, a fraud as a businessman, and a fraud to the people of New York,
     namely, the hard-working COBA members, and I'm truly sorry for that. My actions
     have hurt many people, and I'm very sorry for that. I continue to pay for my
     mistakes on a daily basis.* [Emphasis added].

16

17   "*While living in New York City, **I wrongly felt pressure to become a bigshot**. I was
     working for one of the largest real restate companies in 2007, and it got to my
     head. I was in my late 20's, and big people in the real estate industry were dealing
     with me. **My ego was big, and I so badly wanted to impress these people in order
     to advance my career and profile**. This is where things started to spiral out of
     control. This is where I went so off the rails for a number of years. **I assure your
     Honor that these past years and the experience I've gone through has changed
     me. I will never act that way again.***" [Emphasis added].

18

19

20

21

22   "**I've been a big hypocrite to my religion. I failed to conduct myself properly
     between myself and my fellow man and between myself and my relationship with
     God. I have strayed. I did all of these horrible things without worrying about God
     or the consequences that come with this sort of behavior**. *I cannot express to your
     Honor how ashamed I am for desecrating my religion. **I have and will continue to
     repent to God every single day. I have and continued to make amends. Part of my
     efforts to make right included cooperating as a first step. I have a lot more work
     to do.***" [Emphasis added].

23

24

25

26

27   "*This is one of several jobs that I have in the coming months **as I continue to sort
     out my life in a lawful path. In fact, I will spend the rest of my life trying to make
     amends for my criminal behavior**. I will try to make a better name for my family,
     for my religion, and for myself. **I am on the path to recovery, your Honor. I am a***

28

*better family man; I am a better friend; I am a more religious person. I am working again to make an honest living."* [Emphasis added].

"THE COURT: What is the new business? Jadelle?

"Jadelle, yes. I really paid a hefty price for cooperating with the government for my crimes. Most recently, the New York Post put up an article that was mentioned this morning -- your Honor may not be aware – accusing me of hobnobbing and flirting with the rich and famous at a time when I claim I am a pariah to society. In fact, Jadelle Jewelery hosted a jewelery show to promote the brand and new jewelry collection. The event was to make sales and increase business. One attendee was a Kim Kardashian, a client of Jadelle."

"Within my community, within the media, and through self-introspection. In New York City, I am persona non grata. I am to blame. **I burnt a lot of bridges and relationships and had to relocate to California. I am so truly sorry for my behavior. I am a changed man**..."

"**I don't see any way to start over a third time. I'm on my second chance**..."

"THE COURT: ... And yet in the life that's been depicted in this court, **he cheapens people. He works on their insecurities and their quest for material possessions and just does the opposite. He diminishes people**...."[4]

30.    Jona made numerous false statements to the federal sentencing judge because by 12-19-2019, Jona's frauds against Plaintiffs (below) were well under way. Jona Rechnitz perjured himself by testifying to his compliance with the cooperation agreement's bar against further criminality, while concurrently "intending, planning, and/or perpetrating new frauds," as evidenced by his frauds committed against Plaintiffs and other defrauded creditors. In fact, while Jona was telling Judge Hellerstein how he was a changed man, he was fleecing Plaintiffs and other innocent parties. Jona simply had no compunction about lying to a federal judge or his handlers at the United States Attorney's Office. The only reason Jona is not behind bars (yet) is that he has no formal pre-trial officer as his supervision is in the hands of New York prosecutors. Thus, Jona has been allowed to run free to ravage Plaintiffs with impunity and without consequences to himself.

31.    On information and belief, rather than atone for his past crimes, Jona (along with his wife Rachel through Jadelle), have continued to further defraud innocent parties, such as Plaintiffs. They also have employed a legion of lawyers as part of their collective effort to

---

[4]A true and correct copy of the relevant portions of the transcript of Jona's 12-19-2019 Sentencing Hearing is attached hereto as Exhibit "4" and is incorporated herein by this reference.

1    illegally "lull" victims into sitting on their rights, hoping to gain tactical advantages in

2    litigation and allowing more time for the Rechnitz's to further transfer and conceal assets.

3    32.    One of the primary reasons for documenting Jona's criminal and fraudulent activities with

4    specificity and by the attachments to this Complaint is to properly expose his fraud and to

5    preempt the "spin" that he and his family will inevitably spin to the community of his

6    innocence and that he is unfairly being pursued. Jona's house of fraudulent cards needs to

7    be exposed. "*The only thing necessary for the triumph of evil is for good men to do*

8    *nothing*." (Edmund Burke, in a letter addressed to Thomas Mercer). Abuse thrives in a

9    culture of silence. Additionally, the backdrop of Jona's crimes and fraudulent history is

10    relevant to the Rechnitz's fraudulent personal guaranties of $12,000,000.00 to Plaintiffs at

11    a time that they were hopelessly in debt and had no financial wherewithal to pay it.

12    **PLAINTIFF AND JONA RECHNITZ/JADELLE**

13    33.    During this time, Plaintiffs consigned large amounts of diamonds and jewelry to Jadelle

14    and Jona Rechnitz, not aware of his sordid fraudulent past.

15    34.    In 3-6-2019, Plaintiffs recorded and perfected a UCC Financing Statement, Document

16    Number: 77246760002, Filing Number: 19-7700745484, to secure:

17    "All property, Goods and merchandise which have been, are now, or may at any
time be delivered on consignment consigned or entrusted by First International to
18    Jadelle Jewelry and Diamonds LLC, including without limitation, diamonds,
gemstones and other precious and semi-precious jewelery, rings, bracelets and all
19    other property, goods and merchandise in which diamonds, gemstones, precious or
semi-precious metals or stones are processed, mounted, included or converted and
20    any accessory items, and the proceeds (including without limitation, insurance
proceeds and proceeds from sale or other disposition)and receivables arising there
21    from, wheresoever located, future consignment and deliveries are covered. As
related to or connected with the property described above, all accounts, accounts
22    receivables, other receivables, contract rights, chattel paper, general intangibles,
whether now owned or hereafter acquired by the debtor or in which the debtor may
23    now or hereafter acquire an interest and proceeds from all the foregoing. This
financing statement covers consignments made by secured party to any of the
24    debtor's affiliated companies, stores or DBAs wherever located."[5]  [Emphasis
added]

25    35.    This UCC Financing Statement confirmed the consignment relationship and created for

26

27    ───────────────

     [5]A true and correct copy of First International's 3-6-2019, *UCC Financing Statement*,
Document Number: 77246760002, Filing Number: 19-7700745484 to Jadelle is attached hereto as
28    Exhibit "5" and is incorporated herein by this reference.

1    Plaintiffs an enforceable security interest in the consigned jewelry that are still in Jadelle's

2    possession, and created a "purchase-money security interest" in the consigned goods. That

3    means that Jadelle's debts owed to Plaintiffs has higher priority for payment than Jadelle's

4    other debts, and puts Plaintiffs ahead of any other secured creditors in relation to the

5    consigned jewelry. Plaintiffs' perfected security interest entails "putting the world on

6    notice" of its security interest, informing prospective lenders, and existing lenders, that the

7    consigned jewelry is collateral for Jadelle's debt to Plaintiffs.

8    36.    On 6-25-2019, Jona & Robert Rechnitz personally guaranteed up to $12,000,000.00 debt to

9    Plaintiffs. Their 6-25-2019 Personal Guaranty reads as follows:

10   *Dear Oved / First International Diamonds Inc., I very much enjoyed speaking to*
     *you by phone. Jona has shared some of your conversations with me. Thank you for*
11   *being a confidant for Jona. He mentioned to me about how your Father had a*
     *special bond and relationship with you. I was also privileged to have a close*
12   *relationship with my Father, as did Jona. I'm sure you will find much success in*
     *your dealings together. I completely understand your desire to know that Jona's*
13   *family is aware of his dealings with you and stands behind him. **I am pleased to***
     ***confirm that I stand behind Jona and all his dealing with you**. **You have***
14   ***indicated that you have extended memos up to the amount of $12,000,000.00. If***
     ***for some reason you need to callback your credit line, all merchandise will be***
15   ***returned to you, and any cash deficiencies will be repaid by me.** . May your*
     *confidence in Jona and your extension of credit be profitable for both of you.*
16   BOBBY RECHNITZ / CC: JONA RECHNITZ [Emphasis added] [6]

17   37.    Jona personally handed this Personal Guaranty letter to Anter several days after Robert

18   orally promised to personally guaranty Jona's debts to Plaintiffs, while all three were

19   meeting at Pat's Kosher Restaurant on Pico Boulevard.

20   38.    What is absolutely fascinating is the pathology here: on the one hand, on 6-25-2019,

21   Robert lulled Anter into the $12,000,00.00 Personal Guaranty, ***"pleased to stand behind***

22   ***Jona and all of his dealings**,"* while 90 days later, on 10-21-2019, Robert described his

23   son Jona as a man who ***"lost his integrity and acted hypocritically to his faith**."*

24   39.    On 6-25-19 at 16:22:18, Jona Whatsapp texted Plaintiff Oved Anter - confirming Robert's

25   Personal Guaranty:

26

27   ───────────────
     [6]A true and correct copy of Jona & Robert Rechnitz's 6-25-2019 Personal Guaranty of up to
     $12,000,000.00 in debt to Plaintiffs is attached hereto as Exhibit "6" and is incorporated herein by this
28   reference.

1    *"It's good to know **I'm worth 12mm to my Dad** not 10mm lol."* [Emphasis added].

2    40.    On 6-27-2019, Jona & Rachel Rechnitz jointly and severally personally guaranteed up to

3    $12,000,000.00 to Plaintiffs and specifically represented that their personal guaranty was to

4    ***induce*** Plaintiffs to enter into the Consignment Memos below as follows.

5    Guarantor is financially interested in Consignee and ***in order to induce Consigner***
     ***to enter into those certain jewelry memos for diamonds and jewelry, on***
6    ***consignment,*** in the approximate amount of Twelve Million Dollars ($12,000,000),
     at wholesale, between Consigner and Consignee (the "Jewelry Memos"), and
7    Guarantor is willing to enter into this Guaranty.

8    1. Guaranty. ***In order to induce Consigner to enter into the Jewelry Memos***,
     Guarantor unconditionally, absolutely. and irrevocably guarantees and promises to
9    Consigner full and complete payment and/or performance by Consignee in the
     event that: (I) Consigner calls back the consigned goods. (2) there is a theft of
10   goods, (3) the goods arc lost in shipment or transit (4) the goods arc damaged, or
     (5) in the event that Consignee has filed a p1mding insurance claim for the
11   consigned goods and there is a shortage owing to Consigner from any insurance
     settlement proceeds. Consigner shall notify in writing to Consignee that it requires
12   Consignee's payment and/or performance and within 60 (sixty) business days from
     notice, Consignee is required to make such payment and/or performance. If the
13   goods are damaged, Consignee agrees to repair the consigned goods to the original
     condition in which it was received by Consignee. If Consignee is awaiting
14   insurance settlement proceeds for any loss/damage to the consigned goods, then
     payment is due from Consignee to Consigner within 60 (sixty) business days from
15   Cons.igner's notice of any shortage between the wholesale amount listed in the
     Jewdry Memo and the insurance proceeds received by Consignee. Items (1)-(5)
16   above shall hereinafter be referred as the "Guaranteed Items."[7]

17   41.    On 7-3-19 at 21:58:14 Jona Whatsapp texted Anter again, confirming the UCC Financing

18   Statement and the Personal Guaranties:

19   *"OK also I filled out the application so Monday let's go through it I am away until*
     *Monday I will come see you Monday I will take care of that and I will get the*
20   *application filled out with you. No worries. **In meantime you have UCC. My Dad***
     ***guarantee in writing. My guarantee. My wife. Everything and the legal document***
21   ***that's owns me. I want you to feel protected and will make it happen**."* [Emphasis
     added].

22
23   42.    On 12-13-2019 and on 12-31-2019, and relying on the Personal Guarantees of Jona, Rachel

     and Robert, Plaintiff First International consigned to Jadelle & Jona $2,826,890,00 worth
24
     of the following seven pieces of jewelry (the "Consigned Jewelry"):
25

26

27        [7]A true and correct copy of Jona & Rachel Rechnitz's 6-27-2019 Personal Guaranty of up to
     $12,000,000.00 in debt to Plaintiffs is attached hereto as Exhibit "7" and is incorporated herein by this
28   reference.

| Date | Memo # | Item | Cost |
|------|--------|------|------|
| 12-13-2019 | Memo #8415 | 5 rows PR 27.48 ct, 370 diamonds | $36,225.00 [8] |
| 12-30-2019 | Memo #8431 | 13. 62 PS D-VVSl GIA, Harry Winston Mt/tr | $1,200,000.00 |
| 12-30-2019 | Memo #8431 | RD E IF 11923922166 | $907,715.00 [9] |
| 12-31-2019 | | 8.05 j vs2 emerald cut ring with 2 side stones | $163,565.00 |
| 12-31-2019 | | 7.01 g vs1 square emerald cut ring with 2 side stones | $193,970.00 |
| 12-31-2019 | | 6.86 I vs1 emerald cut ring with 2 side stones | $138,915.00 |
| 12-31-2019 | | 31.86 ct ascher cut bracelet | $186,500.00 |
| TOTAL | | | **$2,826,890,00** |

43.    Prior to 12-13-2019 and on 12-31-2019, and thereafter, Jona repeatedly represented to

Anter that he had a buyer and sold the two pieces of Consigned Jewelry: (1) the 13 62 PS

D-VVSl GIA, Harry Winston Mt/tr ($1,200,000.00); and (2) DIAM RD E IF 11923922166

($907,715.00) and was awaiting receipt of payment from his "client"and the rest remained

in his possession on consignment.

44.    On 1-2-2020 at 11:52:42am, Jona texted Anter confirming that he would not release

Anter's merchandise to Jona's buyer until Anter would get paid.

**Jona Rechnitz**: Please confirm the following agreement: 1) you're my lunch date
every Friday. That's the day we review the goods on hand every week and settle up
bills. 2) *I am authorized to ship the 3 emerald cut rings and Ascher bracelet to
Loren ridinger my client in miami*. Anything she buys will be paid next Friday
anything she doesn't buy is back in my office next week. 3) the Harry Winston 13ct
and 10ct eif *are both in my possession* and I'm busy with the stones through next
Wednesday. Next Wednesday *they will be returned wherever you instruct me. If
they are sold I will collect payment before releasing them and pay you first*.  4) I
will see your stupid movie next week with YOU.  5) this is our understanding that
we will both stick to and I look forward to doing good healthy business together

---

[8]A true and correct copy of the 12-13-2019 Consignment Memorandum # 8415,  for
$36,225.00 to Jadelle is attached hereto as Exhibit "8" and is incorporated herein by this reference.

[9]A true and correct copy of the 12-30-2019 Consignment Memorandum # 8431, for
$2,107,715.00 ($1,200,000.00 + $907,715.00) to Jadelle is attached hereto as Exhibit "9" and is
incorporated herein by this reference.

this year. [Emphasis added].

**Oved Anter**: Deal

**Jona Rechnitz**: Deal and we are never discussing this type of stuff ever again won't need to and won't.

45.      Notwithstanding Jona Rechnitz's promise of 1-2-2020, not to release Plaintiffs'

merchandise to Jadelle/Jona's buyer until Plaintiffs would get paid, on 1-15-2020 - 1-24-

2020, Jona Rechnitz on behalf of Jadelle, texted Anter, admitting that he gave Plaintiffs'

merchandise away, and then lulled Anter with stories back and forth about his mother

being ill, and how he will still pay Anter (while lengthy, the text transcript provides insight

into Jona's pathological lying, his mind-games and manipulation of Plaintiff):

| | |
|---|---|
| [1/15/20, 02:53:03] Oved Anter: | All good , you ? |
| [1/15/20, 08:11:47] Jona Rechnitz: | 70%. Hoping wire hits today of it was sent Sunday afternoon should arrive this afternoon I think. Bank said can take up to 3-5 days |
| [1/15/20, 08:16:33]    Oved Anter: | Never heard 3 to 5 days for a wire from Absolutely nonsense |
| [1/15/20, 08:16:43] Oved Anter: | Wire is a press of a button |
| [1/15/20, 08:17:22] Oved Anter: | Please call me when you're able to, hope you're feeling better |
| [1/15/20, 08:17:37] Jona Rechnitz: | ***It should hit today I think let's see*** |
| [1/15/20, 08:21:22] Oved Anter: | Please call Biton if you don't mind |
| [1/15/20, 08:21:29] Oved Anter: | By 10 |
| [1/15/20, 08:21:36] Oved Anter: | How do you feel |
| [1/15/20, 08:22:54] Jona Rechnitz: | Not great will call now |
| [1/15/20, 08:40:03] Oved Anter: | Gm, I need huge favor my daughter SHIRA needs  a live in, Hers is leaving in a few days going back to her country, please help if you know any |
| [1/15/20, 08:41:42] Jona Rechnitz: | Ok |
| [1/15/20, 12:34:39] Oved Anter: | FYI spoke to Helen Dayan to double Check myself, why from Israel comes in the next day, please let me know what's going on |
| [1/15/20, 12:59:08] Jona Rechnitz: | ***I am sure it will hit tomorrow*** |
| [1/15/20, 15:47:55] Oved Anter: | ***Did you ship the Emeralds back*** |
| [1/15/20, 15:49:29] Jona Rechnitz: | Yes |
| [1/15/20, 15:50:03] Oved Anter: | Thanks, did she keep anything |
| [1/15/20, 18:49:03] Oved Anter: | Call me |
| [1/15/20, 19:07:31] Jona Rechnitz: | Missed voice call |
| [1/15/20, 19:07:50] Jona Rechnitz: | Missed voice call |
| [1/15/20, 19:07:58] Jona Rechnitz: | Tried you back. |
| [1/15/20, 19:08:02] Jona Rechnitz: | School event |
| [1/15/20, 19:08:07] Jona Rechnitz: | Talk tomorrow am |
| [1/15/20, 19:14:34] Oved Anter: | Ok |
| [1/15/20, 19:17:38] Jona Rechnitz: | Around 10 or earlier |
| [1/15/20, 19:21:53] Oved Anter: | Sorry was on the other line , wil speak am , I really need to have you wire am so I can take care of certain obligations |

| | | |
|---|---|---|
| 1 | [1/15/20, 19:23:39] Jona Rechnitz: | *If wire hits as it should you'll get it* |
| | [1/15/20, 19:24:19] Jona Rechnitz: | *If it doesn't we will call them and see what's going on but I believe it will hit - ever since my sentencing my bank has been very slow ok international wires* |
| 2 | | |
| 3 | [1/15/20, 19:24:24] Jona Rechnitz: | Happened last week too |
| | [1/15/20, 19:25:02] Oved Anter: | ***There is no if you were not supposed to let go of merchandise until we get paid*** |
| 4 | | |
| | [1/15/20, 19:25:52] Jona Rechnitz: | What |
| 5 | [1/15/20, 19:26:19] Jona Rechnitz: | *I closed deal told you Mazal asked for invoices and finalized deal with you* |
| 6 | [1/15/20, 19:26:29] Jona Rechnitz: | ***I gave them the stones*** |
| | [1/15/20, 19:26:36] Jona Rechnitz: | These are people I know very well |
| 7 | [1/15/20, 19:26:39] Jona Rechnitz: | *I guarantee it* |
| | [1/15/20, 19:26:58] Oved Anter: | ***Yeah but we have an agreement that you don't release Merch until we get Paid*** |
| 8 | | |
| | [1/15/20, 19:27:08] Oved Anter: | I appreciate it guarantees will you be able to cough up the money |
| 9 | | |
| | [1/15/20, 19:27:13] Jona Rechnitz: | Yes |
| 10 | [1/15/20, 19:28:09] Oved Anter: | Ok because I really need to get paid tomorrow |
| | [1/15/20, 19:28:36] Jona Rechnitz: | *1) wire comes in you get paid 2) I get the stones back if issue 3) I pay you don't get stiffed. Only 3 options. I don't foresee any issue. I have sold them before. Never had any problem whatsoever. And after they pay they need the certificates and I also need invoices reflective of our prices we agreed upon.* |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | [1/15/20, 19:28:58] Jona Rechnitz: | *If they pay me tomorrow it is not able to wire until next day you know that. Pending and not useable until overnight* |
| 15 | | |
| | [1/15/20, 19:29:03] Jona Rechnitz: | I want to be very clear |
| 16 | [1/15/20, 19:29:13] Jona Rechnitz: | I can give a check if their Wire arrives |
| | [1/15/20, 19:30:18] Oved Anter: | What happens if the wire does not arrive |
| 17 | [1/15/20, 19:30:45] Oved Anter: | If it's not in your account tomorrow that means it was not sent |
| 18 | [1/15/20, 19:31:00] Oved Anter: | It was sent on Sunday as you said the latest would have been in your account on Tuesday |
| 19 | [1/15/20, 19:31:06] Oved Anter: | Anyway we will talk tomorrow |
| | [1/15/20, 19:31:46] Jona Rechnitz: | Ok done guessing. It's eating me alive. *They told me they sent it.* International wired take few days always for me. Sometimes 5 days. Check it out yourself. Wells Fargo |
| 20 | | |
| 21 | | |
| | [1/15/20, 19:32:03] Oved Anter: | Does not |
| 22 | [1/15/20, 19:32:30] Jona Rechnitz: | I'm not arguing |
| | [1/15/20, 19:32:57] Jona Rechnitz: | It's been 3 days |
| 23 | [1/15/20, 19:33:08] Jona Rechnitz: | I expect and hope it comes tomorrow |
| | [1/15/20, 19:33:11] Jona Rechnitz: | That's all |
| 24 | [1/15/20, 19:34:08] Jona Rechnitz: | If you need me to undo this deal tell me I can't deal with the pressure every time I sell something. Or |
| 25 | | Let's just see what happens tomorrow |
| | [1/16/20, 09:28:57] Jona Rechnitz: | *Sent bank the swift* they see it coming in today you were right will be in touch once it hits |
| 26 | | |
| | [1/16/20, 09:29:04] Jona Rechnitz: | Going to shul |
| 27 | [1/16/20, 09:32:50] Oved Anter: | So I don't understand what you're saying *they are saying that it coming in* |
| 28 | [1/16/20, 09:34:43] Jona Rechnitz: | *Yes* |

| | | |
|---|---|---|
| 1 | [1/16/20, 09:34:48] Jona Rechnitz: | *They tracked it* |
| 2 | [1/16/20, 09:35:15] Oved Anter: | Good , so can you send me a check before noon please |
| | [1/16/20, 09:35:56] Jona Rechnitz: | No |
| 3 | [1/16/20, 09:36:13] Jona Rechnitz: | When funds hit my account I will let you know then wire you |
| 4 | [1/16/20, 09:36:21] Jona Rechnitz: | *I'm not writing a check for money I don't have yet* |
| 5 | [1/16/20, 09:36:40] Jona Rechnitz: | And not writing a check and being pressured like this. Money will hit then I will wire |
| 6 | [1/16/20, 09:37:05] Oved Anter: | OK let me know when it hits II'd rather have a wire anyway |
| | [1/16/20, 09:37:13] Jona Rechnitz: | Ok |
| 7 | [1/16/20, 10:53:48] Jona Rechnitz: | I keep checking account. Will update you |
| 8 | [1/16/20, 14:10:22] Oved Anter: | I just want to confirm you received the money and I will have it tomorrow for sure by 10 AM a wire to me |
| 9 | [1/16/20, 14:17:09] Jona Rechnitz: | *I told you you'll have it wired tomorrow morning already* |
| 10 | [1/16/20, 14:19:23] Oved Anter: | OK and don't be a bitch please to me |
| 11 | [1/17/20, 00:13:33] Jona Rechnitz: | Please send me total amounts in The morning for both payments and I need invoices as well thx Shirin can send the invoices anytime  but please make sure I have them for my records |
| 12 | | |
| 13 | [1/17/20, 07:49:37] Oved Anter: | Call me please |
| | [1/17/20, 08:53:35] Oved Anter: | ? |
| 14 | [1/17/20, 09:14:36] Jona Rechnitz: | Missed voice call |
| | [1/17/20, 09:15:21] Jona Rechnitz: | Missed voice call |
| 15 | [1/17/20, 09:30:44] Oved Anter: | Can shirin pick up the check from your office at 10:30 so she can take it downtown |
| 16 | [1/17/20, 09:32:00] Oved Anter: | Or f he can bring to my office by 10:30 |
| | [1/17/20, 09:34:13] Jona Rechnitz: | *It will be done on next hour or so* |
| 17 | [1/17/20, 09:59:33] Oved Anter: | ShirahS maid just quit I need help urgent if you know anyone or can ask around |
| 18 | [1/17/20, 10:17:28] Oved Anter: | Are the ec back |
| | [1/17/20, 10:19:15] Jona Rechnitz: | I'll ask |
| 19 | [1/17/20, 10:19:33] Jona Rechnitz: | She's choosing over weekend and sending for Monday |
| 20 | [1/17/20, 10:19:36] Jona Rechnitz: | She's taking 1 |
| | [1/17/20, 10:20:07] Oved Anter: | I thought you said she Past I need the one that she doesn't want for sure right away please |
| 21 | [1/17/20, 10:20:33] Oved Anter: | That's ridiculous |
| 22 | [1/17/20, 10:24:22] Jona Rechnitz: | I can never please you. It's not ever enough. I can't deal this way. I didn't tell you in with my. Other don't say a word paramedics were here. So I'm not in the mood. My siblings don't know. She had blood clot. Please. |
| 23 | | |
| 24 | [1/17/20, 10:24:36] Jona Rechnitz: | This message was deleted. |
| 25 | [1/17/20, 10:25:20] Oved Anter: | I explained to the urgency why I need the money in my account today and you said you were in the morning, you're not doing it, I need check immediately so I can send somebody downtown so they can clear it for me as soon as possible, I'm sorry about this but that does not stop you guys from signing a check |
| 26 | | |
| 27 | | |
| 28 | [1/17/20, 10:25:50] Jona Rechnitz: | What are you talking about!!!!!!! |

| | | |
|---|---|---|
| 1 | [1/17/20, 10:25:53] Oved Anter: | You told me you gave him instructions yesterday |
| | [1/17/20, 10:25:54] Jona Rechnitz: | *I said it's on way to you* |
| 2 | [1/17/20, 10:25:58] Jona Rechnitz: | Stop it oved |
| | [1/17/20, 10:26:04] Jona Rechnitz: | This is ridiculous!!!!!! |
| 3 | [1/17/20, 10:37:41] Jona Rechnitz: | Watch the video of my mother! Don't tell anyone. *Checks are on the way to you*. We will talk before shabbos if everything is ok on my end - Oved if you really love me like I think you Then read our texts again and you will understand how I feel |
| 4 | | |
| 5 | | |
| | [1/17/20, 10:38:11] Oved Anter: | What video |
| 6 | [1/17/20, 10:38:27] Jona Rechnitz: | My mother I sent you !! |
| | [1/17/20, 10:38:40] Oved Anter: | I didn't realize it's your mom |
| 7 | [1/17/20, 10:38:40] Jona Rechnitz: | I texted you dealing with emergency with paramedics and my mother blood clot |
| 8 | [1/17/20, 10:38:58] Oved Anter: | You already use that excuse a few days ago with somebody else |
| 9 | [1/17/20, 10:39:03] Jona Rechnitz: | Yes yesterday |
| | [1/17/20, 10:39:09] Jona Rechnitz: | It happened |
| 10 | [1/17/20, 10:39:12] Jona Rechnitz: | I'm woth her |
| | [1/17/20, 10:39:17] Jona Rechnitz: | R u serious?????? |
| 11 | [1/17/20, 10:39:55] Jona Rechnitz: | You're not embarrassed right now. I'm with her now I can't believe you |
| 12 | [1/17/20, 10:40:02] Jona Rechnitz: | I don't need any excuses! |
| | [1/17/20, 10:40:07] Jona Rechnitz: | *I sent your checks!!!!!* |
| 13 | [1/17/20, 10:40:18] Jona Rechnitz: | Why are you pressuring me like this it's ridiculous |
| | [1/17/20, 10:42:18] Oved Anter: | I explained it to you last night and you're putting me in an extremely bad predicament if the monies not there on Monday |
| 14 | | |
| 15 | [1/17/20, 10:42:18] Oved Anter: | And I thought you understood that's why I was happy you wiring me before 10 o'clock today as you said before |
| 16 | | |
| | [1/17/20, 10:42:18] Oved Anter: | And now I'm not sure it's going to be cleared on time |
| 17 | [1/17/20, 10:44:10] Jona Rechnitz: | *I told you that checks on way to you momentarily*. This is extremely unpleasant. I'm don't texting you now. Everything is my fault. Shabbat Shalom |
| 18 | | |
| 19 | [1/20/20, 05:48:53] Oved Anter: | Gm , please make sure I will get the ec rings latest tomorrow |
| 20 | [1/20/20, 09:28:39] Oved Anter: | Let me know if you got the message, and call meet and talk today please |
| 21 | [1/20/20, 10:10:22] Jona Rechnitz: | Message Received. Not working today with family kids off from school |
| | [1/20/20, 10:11:58] Oved Anter: | Ok thank you |
| 22 | [1/20/20, 10:17:50] Oved Anter: | *Please make sure the ec are here tomorrow please* |
| | [1/20/20, 10:21:42] Jona Rechnitz: | *Ok* |
| 23 | [1/20/20, 22:13:30] Jona Rechnitz: | Good night. Sorry for my sensitivity and attitude lately. I've been going through a lot personally and in my family. You know I feel very close to you. Good night. |
| 24 | | |
| 25 | [1/21/20, 13:39:07] Oved Anter: | Call me |
| | [1/21/20, 14:49:23] Oved Anter: | I need the ec |
| 26 | [1/21/20, 14:51:08] Jona Rechnitz: | *Tomorrow you'll have it. So sorry*. |
| | [1/21/20, 14:55:16] Oved Anter: | Ok thank you |
| 27 | [1/22/20, 11:28:32] Oved Anter: | Before I go nuts please send me now whatever leftovers you have with you, but now |
| 28 | [1/22/20, 11:28:52] Oved Anter: | Whatever amount it is |

| | | |
|---|---|---|
| 1 | [1/22/20, 11:31:46] Jona Rechnitz: | *Ok* |
| | [1/22/20, 11:37:17] Jona Rechnitz: | *Oved please give me until tomorrow to get your* |
| 2 | | *items back and returned safely. Please I beg you* |
| | | *keep this between us and give me until tomorrow.* |
| 3 | [1/22/20, 11:37:56] Jona Rechnitz: | *I'm working with my family now to get it please* |
| | | *bottom of my heart* |
| 4 | [1/22/20, 11:38:15] Oved Anter: | *Send what you have now , I will hold off till* |
| | | *tomorrow and will talk about rest* |
| 5 | [1/22/20, 11:38:18] Jona Rechnitz: | I'm not well but have big heart for you and helped |
| | | your family when o could please help me |
| 6 | [1/22/20, 11:38:20] Jona Rechnitz: | Thx |
| | [1/22/20, 11:38:21] Jona Rechnitz: | Ok |
| 7 | [1/22/20, 13:01:06] Jona Rechnitz: | You also have 5 rows bracelet with princess cut |
| | [1/22/20, 13:32:29] Oved Anter: | Do you have the 18 ct fy |
| 8 | [1/22/20, 13:34:41] Jona Rechnitz: | The yellow I returned to you? |
| | [1/22/20, 13:35:03] Jona Rechnitz: | I never took it back |
| 9 | [1/22/20, 13:42:44] Oved Anter: | Sorry you're right |
| | [1/22/20, 14:57:09] Jona Rechnitz: | *You know I really do love you and that's why I* |
| 10 | | *helped you from my heart with Andrew and other* |
| | | *things. I feel so close to you and I'm trying to get* |
| 11 | | *this all resolved now. Just know you mean a lot to* |
| | | *me.* |
| 12 | [1/22/20, 14:59:26] Oved Anter: | Thank you Jona and it's same here , stay strong for |
| | | your kids and parents, try to resolve this with help of |
| 13 | | your cousin, when the fog goes away let's sit down |
| | | and figure out..... |
| 14 | [1/22/20, 15:00:16] Jona Rechnitz: | Ok thx |
| | [1/22/20, 15:04:02] Oved Anter: | Are you still there |
| 15 | [1/22/20, 15:07:16] Jona Rechnitz: | Ya |
| | [1/22/20, 15:07:44] Oved Anter: | Ok let me know when done and update please |
| 16 | [1/22/20, 15:08:05] Jona Rechnitz: | Ok |
| | [1/22/20, 16:57:45] Jona Rechnitz: | In a meeting |
| 17 | [1/22/20, 16:58:06] Oved Anter: | Ok call me when done |
| | [1/22/20, 21:19:59] Oved Anter: | Hi , what's new |
| 18 | [1/22/20, 21:39:52] Jona Rechnitz: | *Will have good news hopefully tomorrow just* |
| | | *finished meeting* |
| 19 | [1/22/20, 21:41:23] Oved Anter: | Ok good , really wishing you good |
| | [1/22/20, 21:43:14] Jona Rechnitz: | I know thx |
| 20 | [1/23/20, 08:56:56] Oved Anter: | Gm,Give me a call when you have a chance please |
| | [1/23/20, 09:09:11] Jona Rechnitz: | *Please give me a few hours everything is safe and* |
| 21 | | *being resolved* |
| | [1/23/20, 09:09:27] Jona Rechnitz: | *I really wish you kept this to yourself. Please* |
| 22 | | *continue.* |
| | [1/23/20, 09:09:46] Oved Anter: | Ok np But call me because I want to ask you a couple |
| 23 | | of questions |
| | [1/23/20, 10:15:36] Oved Anter: | Come give me a hug and I have to run to the doctors |
| 24 | | I'm downstairs |
| | [1/23/20, 19:29:51] Oved Anter: | Sorry Forgot your charger in my pocket |
| 25 | [1/23/20, 19:31:01] Jona Rechnitz: | Missed voice call |
| | [1/23/20, 19:33:05] Jona Rechnitz: | Enjoy it. It's the best |
| 26 | [1/24/20, 08:37:24] Oved Anter: | Call me please |
| | [1/24/20, 08:37:34] Jona Rechnitz: | 30 min ok? |
| 27 | [1/24/20, 08:37:41] Oved Anter: | Yes |
| | [1/24/20, 08:57:26] Jona Rechnitz: | imma.pdf • 1 page  document omitted |
| 28 | [1/24/20, 08:57:49] Jona Rechnitz: | IMMA INTERNATIONAL INVOICE.pdf •  1 page |

1
                                                           document omitted

2
[1/24/20, 15:17:03] Jona Rechnitz:    Shabbat Shalom thank you
[1/24/20, 15:17:12] Jona Rechnitz:    You're a true friend and great person
[1/24/20, 15:17:43] Oved Anter:      Shabbat shalom , I think it was on the text to text that

3
                                                      to you
[1/24/20, 15:17:58] Oved Anter:      Relax and enjoy Shabbat

4
[1/24/20, 15:18:10] Oved Anter:      My finger was on the text
[1/24/20, 15:39:24] Jona Rechnitz:    You're more than a friend and mentsch

5
[1/24/20, 15:39:35] Jona Rechnitz:    You may have saved my life
[1/24/20, 15:57:42] Oved Anter:      Thank you

6
[1/24/20, 15:58:12] Oved Anter:      Now shut the phone   Shabbat shalom [Emphasis
                                                      added].

7

8
46.    On 1-17-2020 Jona issued two checks to First International totaling $2,122,760.00: (1)

9
       Check # 2200 for $922,760.00; and (2) Check # 2201 for $1,200,000.00.  Both checks

10
       were NSF at the time of tender. Both checks were NSF at the time of tender, in violation of

11
       the California Civil Code § 1719 and the California Penal Code §476a.[10]

12
47.    On information and belief, Jona's representations to Anter were false, in that he had no

13
       intention or financial wherewithal to honor his $12,000,000.00 personal guaranty, he had

14
       no intention of honoring the terms of the Consignment Memos, he did not have a buyer

15
       and did not sell Plaintiffs' Consigned Jewelry, and instead of reselling First International's

16
       two pieces of Consigned Jewelry and repaying Plaintiffs, and returning the rest that he held

17
       on consignment, Jona absconded with all pieces of Plaintiffs' Consigned Jewelry, and

18
       either pawned them off, or used them as collateral for loans to various lenders, and has not

19
       repaid Plaintiffs the $2,826,890,00. On information and belief, Jona liquidated Plaintiffs'

20
       Consigned Jewelry.

21
48.    On information and belief, at this same time, Jona Rechnitz on behalf of Jadelle defrauded

22
       other diamond dealers and insurance companies in Southern California, including but not

23
       limited to: Sotheby's, Leon Landver, Ben Adhoot, and Yehuda Gamzo, Oved Anter, Moti

24
       Klein, and Julius Klein. The amount of losses to these various parties is alleged to be over

25
       $30,000,000.00.  See, the NY Post: *Ex-de Blasio crony used Kardashian ties for fraud*

26

27
              [10]A true and correct copy of First International's 1-22-2020 Notice of Returned Item for: (1)

28
Check # 2200 for $922,760.00; and (2) Check # 2201 for $1,200,000.00, totaling $2,122,760.00 is attached hereto as Exhibit "10" and is incorporated herein by this reference.

1     *scheme, lawsuit claims*,"

2     (https://nypost.com/2020/02/09/ex-de-blasio-crony-used-kardashian-ties-for-fraud-scheme-

3     lawsuit-claims/), and as reported in the 3-6-2020 article in JCK: *"The Troubling Case of*

4     *Jona Rechnitz"*

5     (https://www.jckonline.com/editorial-article/the-troubling-case-jona-rechnitz/), and as

6     reported in the 3-10-2020 NY Daily News article *"Corrupt Mayor de Blasio donor Jona*

7     *Rechnitz faces new FBI probe in L.A.: court papers"*

8     (https://www.nydailynews.com/new-york/ny-rechnitz-los-angeles-probe-20200310-nrzbb6

9     263nga3hkcyob2lw46wq-story.html).

10    49.    Since then, on 2-3-2020, Plaintiffs caused buyback payments to be made to Jona's lender

11    in order to mitigate their losses, and paid $440,000.00 to recover a package of the

12    following four pieces of jewelry (including Anter's 10.03 EIF Stone GIA #11923922166

13    (($907,715.00))(Jona's lender refused to sell Plaintiffs just the 10.03 EIF Stone GIA

14    #11923922166 and insisted that Plaintiffs buy the complete package of jewelry):

| Item | Unit Price |
|---|---|
| Diamond Bracelet 38.87ct TW | $125,000.00 |
| Eternity Band - Old Miners Cut 11. 70ct TW | $30,000.00 |
| Reverse Diamond Earrings 1.20ct0512 + 1. 08ct FDBGY + 1.22 ctES12 + 1.24 ctFDBGY (the DIAM RD E IF 11923922166) | $35,000.00 |
| 10.03 EIF Stone GIA #11923922166 | $250,000.00 |
| TOTAL | **$440,000.00** |

22    50.    In addition, on 2-3-2020, Plaintiffs caused buyback payments to be made to Jona's lender

23    in order to further mitigate their losses, and paid **$300,000.00** for:

| Item | Unit Price |
|---|---|
| 8.05 j vs2 emerald cut ring with 2 side stones | $163,565.00 |
| 7.01 g vs1 square emerald cut ring with 2 side stones | $193,970.00 |
| 6.86 I vs1 emerald cut ring with 2 side stones | $138,915.00 |

| | |
|---|---|
| 31.86 ct ascher cut bracelet | $186,500.00 |
| TOTAL | $682,950.00 |
| Plaintiffs' paid: | **$300,000.00** |

51.    Therefore, Jona's adjusted balance to Plaintiffs is as follows:

| Date | Memo # | Item | Cost |
|---|---|---|---|
| 12-13-2019 | Memo #8415 | 5 rows PR 27.48 ct, 370 diamonds | $36,225.00 |
| 12-30-2019 | Memo #8431 | 13. 62 PS D-VVSl GIA, Harry Winston Mt/tr | $1,200,000.00 |
| 12-30-2019 | Memo #8431 | *DIAM RD E IF 11923922166* | **$440,000.00** |
| | | *Diamond Bracelet 38.87ct TW* | |
| | | *Eternity Band - Old Miners Cut 11. 70ct TW* | |
| | | *10.03 EIF Stone GIA #11923922166* | |
| 12-31-2019 | | *8.05 j vs2 emerald cut ring with 2 side stones* | **$300,000.00** |
| 12-31-2019 | | *7.01 g vs1 square emerald cut ring with 2 side stones* | |
| 12-31-2019 | | *6.86 I vs1 emerald cut ring with 2 side stones* | |
| 12-31-2019 | | *31.86 ct ascher cut bracelet* | |
| TOTAL | | | **$1,976,225.00** |

52.    As Jona, Rachel & Robert all personally guaranteed Jadelle/Jona's debts up to
$12,000,000.00, they are all personally liable to Plaintiffs in the amount of $1,976,225.00.

53.    Further, and true to form, in a 17-day period, from 1-5-2020 - 1-22-2020, Jona (and Jadelle
and Prado) issued $13,372,760.00 of worthless checks to his defrauded creditors from
Jadelle's Wells Fargo Bank # 8649261313.

| Check # | Date | To | $ |
|---|---|---|---|
| 8630 | 1-5-2020 | Peter Marco | $2,950,000.00 |

| 8817 | 1-14-2020 | Franco Noval | $2,500,000.00 |
| 8820 | 1-16-2020 | Franco Noval | $1,300,000.00 |
| 2200 | 1-17-2020 | First International | $922,760.00 |
| 2201 | 1-17-2020 | First International | $1,200,000.00 |
| 8823 | 1-22-2020 | Franco Noval | $4,500,000.00 |
| Total NSF Checks issued by Jadelle/Jona to Plaintiffs, Marco & Noval | | | **$13,372,760.00** |

54.     On 1-17-2020 Jona Rechnitz (and Jadelle and Prado) issued two checks to First International totaling $2,122,760.00: (1) Check # 2200 for $922,760.00; and (2) Check # 2201 for $1,200,000.00.  Both checks were NSF at the time of tender. Both checks were NSF at the time of tender, in violation of the California Civil Code § 1719 and the California Penal Code §476a.

| Check # | Date | To | $ |
| --- | --- | --- | --- |
| 2200 | 1-17-2020 | First International | $922,760.00 |
| 2201 | 1-17-2020 | First International | $1,200,000.00 |
| Total NSF Checks issued by Jadelle/Jona to  First International | | | **$2,122,760.00** |

55.     Based upon information and belief, defendant Prado, acting in concert with Jona, and to further his scheme, had his girlfriend or another representative at Wells Fargo Bank issue a stop payment on the checks, that Plaintiffs were going to deposit.

56.     During this entire time, Jona repeatedly lied to Plaintiffs about his intentions and abilities to honor the $12,000,000.00 Personal Guaranty, lied to Plaintiffs about honoring the terms of the Consignment Memos, lied to Plaintiffs that the deals with his clients were consummated, lulled, and attempted to fabricate one excuse after another to delay paying Plaintiffs, and hid the truth from Plaintiffs through stonewalling and lies. Repeated demands have been made to Jona to return the Consigned Jewelry and/or to pay the balance. Instead, Jona, took numerous steps to lull Plaintiffs into a false sense of security to buy more time, and to keep this matter secret via phone calls and WhatsApp texts.

57.     On 1-30-2020 at 11:35am, Jona introduced Anter to an attorney at Williams & Cohen

about the Rechnitz family's proposed bailout to pay Plaintiffs in full:

*"Oved meet Reuven. Reuven oved is a vendor I owe and used his goods for loans.* **He has been the single biggest force in helping keep people calm.** *He needs to hear from you in order to continue please. Thank you."* [Emphasis added].

58.    On 2-4-2020 at 2:06:00, Jona wrote Anter about how his family is trying to bail him out:

*"I gave your email address. Late tonight you will get an email from the lawyer in charge of this for me. So you have someone communicating besides me to get this situation resolved that you can be in touch with. Please confirm receipt of this message.*

59.    That night, on 2-4-2020 at 9:40pm, attorneys from Williams & Cohen wrote Plaintiffs about the purported bailout:

*"We write with an update on Jona Rechnitz. A family member of Mr. Rechnitz has informed our law firm that the family member is seeking to refinance certain real property in order to satisfy Mr. Rechnitz's outstanding liabilities. We currently have no visibility into the family member's interest in the property, the value of the property, or what, if any equity, the family member has in it. If you are represented by counsel, please let us know and provide your counsel's contact information. Our client's desire is to resolve this matter amicably."*[11]

60.    Meanwhile, on 2-10-2020, as reported in the NY Post: *"Ex-de Blasio crony used Kardashian ties for fraud scheme, lawsuit claims,"* (https://nypost.com/2020/02/09/ex-de-blasio-crony-used-kardashian-ties-for-fraud-scheme-lawsuit-claims/), and as reported in the 3-6-2020 article in JCK: *"The Troubling Case of Jona Rechnitz"* (https://www.jckonline.com/editorial-article/the-troubling-case-jona-rechnitz/), and as reported in the 3-10-2020 NY Daily News article *"Corrupt Mayor de Blasio donor Jona Rechnitz faces new FBI probe in L.A.: court papers"* (https://www.nydailynews.com/new-york/ny-rechnitz-los-angeles-probe-20200310-nrzbb6 263nga3hkcyob2lw46wq-story.html), one of Jona's recently defrauded victims filed a lawsuit entitled: *Victor Franco Norval vs Jona S. Rechnitz, Rachel Rechnitz, Jadelle Inc., a California Corporation; Jadelle Jewelry and Diamonds, LLC, a Delaware Limited Liability Company; Levin Prado Aka Levon Prado, an Xiomara Cortez,* LASC #

---

[11]A true and correct copy of the 2-4-2020 lulling letter from Williams & Cohen is attached hereto as Exhibit "11" and is incorporated herein by this reference.

1    20SMCV00216, for (1) Fraud (2) Civil Theft (Penal Code, § 496), (3) Breach of Contract,

2    (4) Conspiracy to Commit Theft, Fraud, and Fraud by Concealment, (5) Appointment of

3    Receiver seeking damages of $7,000,000.00.

4    61.    And then on 2-20-2020, as reported in the NY Post "*De Blasio donor Jona Rechnitz*

5           *accused of $1M scam in California*,"

6           (https://nypost.com/2020/02/28/de-blasio-donor-jona-rechnitz-accused-of-1m-scam-in-cali

7           fornia/) another one of Jona's defrauded victims filed a lawsuit entitled: *Israel Sam*

8           *Gorodistian vs. Jadelle Jewelry and Diamonds, LLC, a Delaware Limited Liability*

9           *Company; Jadelle Inc., a California Corporation; Jona Rechnitz, Rachel Rechnitz, Robert*

10          *Rechnitz*, LASC # 20STCV07425, for 1. Conversion; 2. Civil Theft (Pen. Code § 496); 3.

11          Fraud – False Promise; 4. Negligent Misrepresentation; 5. Civil Conspiracy to Defraud; 6.

12          Breach of Oral Contract (2 Counts); 7. Breach of Implied-in-fact Contract (2 Counts); 8.

13          Money Lent; 9. Account Stated; and 10. Breach of Written Guaranty seeking damages of

14          $1,659,333.33.

15   62.    On 3-9-2020, and unaware of the extent of Robert's involvement, Plaintiffs' counsel

16          Baruch Cohen ("Cohen") reached out to the Cohen-Williams firm purportedly representing

17          Jona's cousin, in the interests of avoiding this litigation, inquiring as to the status of the

18          proposed bailout of Jona. Was it happening or not, and if so, when? Cohen's clients needed

19          to know whether they will be suing Jona and Robert or not (hopefully not).

20                                    **RACHEL RECHNITZ'S CULPABILITY**

21   63.    On information and belief, it cannot be said that Rachel is an "innocent" spouse. Rachel

22          knew of, participated in some level, and endorsed Jona's frauds. She is the managing

23          member of Jadelle LLC, the Chief Executive Officer for Jadelle Inc., and the sole

24          officer/member of both. She knowingly ceded complete control over Jadelle's finances to

25          her felon partner husband Jona (and Prado) who were not corporate officers, and who had

26          no corporate authority, on her/Jadelle's behalf, stealing millions of dollars from Plaintiffs

27          (and others), and issued millions of dollars in knowingly bad checks. She promoted Jadelle

28          at trade shows and on her website for Jadelle. She has been paying off Jona's defrauded

creditors through her Paypal and personal bank accounts. Simply stated, Jona and Rachel (and Jadelle) are one and the same, Jadelle is nothing more than a conduit through which Jona and Rachel continue to operate their criminal enterprise.

64.     On information and belief, what appeared, at first glance, to be a successful jewelry company was, as it tuns out, a complete sham. In truth, Jadelle was a mere front for Jona and Rachel to run their fraudulent enterprise and for Jona to continue his trail of fraud that has followed him from New York to California. By incorporating Jadelle back in December 2017, Rachel (and Jona) Rechnitz created through Jadelle the perfect vehicle for theft for themselves and those fortunate enough to benefit from their transgressions. Even after Jona pled guilty to fraud charges in New York, Jona traveled back to Los Angeles where he engaged in a massive $30,000,000.00 fraud to enrich themselves and others at the expense of reputable local businessman like Plaintiffs who trusted them, thinking Jona was immune from prosecution due to the plea deal he struck with New York prosecutors.

65.     On information and belief, Jona and Rachel Rechnitz, Jadelle's insiders have sacrificed whatever assets the company may have once had leading to it's collapse, in a quest to not only enrich themselves, but the numerous other insiders and parties who have received illicit and improper transfers.

66.     On information and belief, rather than atone for his past crimes, Jona (along with Rachel), have continued to use Jadelle as a front to further defraud innocent parties, such as Plaintiffs, and employed a legion of lawyers as part of their collective effort to illegally "lull" victims into sitting on their rights, hoping to gain tactical advantages in litigation and allowing more time for the Rechnitz's and Jadelle to further transfer and conceal assets.

67.     Rachel and Jona Rechnitz (and Jadelle) have directed numerous "lulling letters" in furtherance of their scheme to defraud Plaintiffs and other creditors. A lulling letter is "designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make apprehension of the defendants less likely." *United States v. Manarite*, 44 F.3d 1407, 1412 (9th Cir. 1995) (quoting *United States v. Shaw*, 97 F.3d 1463 (9th Cir. 1996). Most specifically, these lulling letters display

-27-

the collective intent of the Rechnitz's and Jadelle to defraud Plaintiffs and other creditors.

68.     On information and belief, Rachel had knowledge of Jona's fraudulent and malicious acts, ratified, adopted, and/or approved them, assented and acquiesced to them (respondeat superior), and failed to disavow them in a reasonable time. She retained the benefits of her felon partner husband Jona's fraudulent acts by living an exorbitant lifestyle Rachel certainly benefitted from Jona's frauds as she was living off her exorbitant and lavish life-style from stolen funds and was living off the fat of the land at the expense of defrauded creditors and Plaintiffs. In Rechnitz's criminal matter the Court observed that the Rechnitz's living expenses were exorbitant, they had no salary, and were using $35,000 to $50,000 a month (or more) in personal loans from Jadelle to cover their living expenses, which: "*show[ed] a degree of lavishness that is hard to understand in relationship to [Rechnitz's] debts," including, $17,000 per month in rent and $5,000 in groceries and supplies*. Further, in the Gorodistian matter, it was reported that Rechnitz was able to provide a *$400,000 2012 Bugatti sports car and $7,000,000 in diamonds* as collateral for loans from Victor Norval totaling $5,800,000." [Emphasis added].

69.     On information and belief, Rachel certainly knew of her partner husband's frauds. She certainly knew of Jona's: **$45,000,000.00** Ponzi Scheme Debt; **$12,000,000.00** Peralta Ponzi Scheme; **$80,000,000.00** Jason Nissen Ticket Ponzi Scheme; **$19,000,000.00** criminal restitution order - totaling **$156,000,000.00** of financial devastation and fraud to innocent victims, knew of Jona's criminal past that he pled guilty, etc. She certainly knew of Jona's other debt of $307,481.28 in the matter of *American Express National Bank vs Jona S Rechnitz*, LASC # 19STCV29830, that he stipulated to a judgment for $295,058.15, for a total of **$156,295,058.15** in debt.

70.     While marriage to Jona or merely owning Jadelle is an inappropriate basis in and of itself for imputing Rachel's fraud, her knowledge of his massive frauds concurrent with her participation in the use or enjoyment of the misappropriated stolen property and funds confers liability on her for fraud.

**JONA AND ROBERT RECHNITZ's $12,000,000.00 PERSONAL GUARANTY**

71.    On information and belief, Jona personally ingratiated himself to Anter, as an Orthodox Jewish diamond dealer, leading Anter to believe that Jona was more trustworthy than others because of his Orthodox faith and belief in Jewish law (and common Orthodox Jewish friends in and out of the Diamond industry), which requires honesty and maximum integrity. These types of internal community relationships such as the Orthodox Jewish diamond community create a vulnerability for affinity fraud to be perpetuated. Jona targeted Anter exploiting his standing in, and knowledge of, the customs and practices of this community to further his fraudulent scheme. This type of illegal activity is commonly referred to as "affinity fraud," and refers to scams that prey upon members of identifiable groups, such as religious or ethnic communities, the elderly, or professional groups. The perpetrators of affinity fraud scams, like Jona, frequently are, or pretend to be, members of the group, and they exploit the trust and friendship that exist in groups of people who have something in common. The conventional thinking is that the religious man doing business with you is unlikely to ruthlessly rip you off.

72.    On information and belief, Jona and his father Robert Rechnitz's ("Robert") *modus operandi* is as follows: Robert would meet Anter at Pat's Kosher Restaurant on Pico, endearing Anter with old school charm warmth & friendship to place him at ease, while Jona would defraud and steal from him. Then, once Jona's fraud was discovered by his victims (including Anter), Robert was there officially trying to clean up Jona's messes, further lulling the defrauded creditors (including Anter), with promises of bailouts, putting his friendships with Jona's victims on the line so-to-speak, in the unspoken understanding that an action against Jona would be tantamount to an action against Robert. The two acted in tandem like a tag-team to further defraud Anter and other victims.

73.    On the one hand, it is laudable for a loving parent to come to the aid of their child in distress, no matter what. On the other hand, in this case, Anter believes that Robert's involvement was too interwoven with Jona's criminal actions to be innocent or laudable. For example, throughout their relationship, Jona constantly brought his father Robert into

1  the conversations and transactions portraying him to Anter as the moral authority and the

2  one overseeing and coaching Jona's affairs, who's presence conferred legitimacy on Jona's

3  wild bragging and transactions, who appeared at the epicenter whenever Jona's frauds were

4  discovered by his victims (including Anter).

5  74.  On 3-6-19 at 13:11:48, Jona texted Plaintiffs, dropping Robert's family connection to

6  Anter to induce him to do business with him:

7  "*That's my wife. **By the way my father knows you he used to give free space on
La Brea to RABBI Dweck. Bobby.**"* [Emphasis added].

8

9  75.  On 4-3-19 at 18:00:56 Jona texted Anter an invitation to come to a lavish party citing

   Robert as one of the inducements for Anter to come, creating a false sense of credibility

10  about himself and his business:

11
12  "*I need you and your wife to come to dinner tomorrow night at the Waldorf Astoria
one of my biggest clients gave $10 million to the aids foundation I had to buy a
table very expensive one I want to fill the seats **my dad will be there too**.*"
13  [Emphasis added].

14  76.  On 6-25-2019, Robert signed a personal Guaranty to Plaintiffs assuring them that Robert

15  "***stand(s) behind Jona and all his dealings***..." [Emphasis added] (a strange and bizarre

16  comment for Robert to make at a time when Jona was being criminally prosecuted in New

17  York).

18  77.  On 7-8-19 at 11:50:24, Jona texted Anter asking him to come to a meeting to partner with

19  his father:

20  "*Also **can my father join us for lunch** I wanted to get to know you a little bit and **I
think we have a good real estate deal to do together**"* and then at 15:21:12, Jona
21  texted Anter: "***My dad** has a meeting **I asked him to include you** he said let's go
see it tomorrow and talk tomorrow.*" [Emphasis added].

22
23  78.  On 8-8-19 at 15:24:03 and at 15:24:12, Jona texted Anter of his father's coaching:

   "***My Dad is a nice guy** doesn't talk when ppl owe him ?? lee. Yossi. **But keeps
24  getting mad I talk to you too much**.*" [Emphasis added].

25  79.  On 9-20-19 at 10:32:16, Jona texted Plaintiffs about his father's religious practices:

26  "*And my family **just my father** does the blessing and then after he does a blessing
of course they go up to the mother as well just to give her a hug and say Shabbat
27  shalom.*" [Emphasis added].

28  80.  Indeed, and as stated above, Robert Rechnitz's 10-21-2019 letter to Judge Hellerstein

reveals the true nature of his son's frauds - and of his oversight:

"***It was unfair of me to allow Jona to take so many responsibilities upon himself without my guidance and involvement.***"

The upshot of his letter is, that now that Jona Rechnitz has returned to Los Angeles, his father Robert is now involved and guided him in his actions.

81.     On information and belief, and parenthetically, Robert was recently placed into an involuntary bankruptcy/receivership by his creditor ITOR 116 SF LLC in Israel, Case # 27255-09-18 for debts in excess of approximately 9,500,000.00 shekel ($2,600,000.00 dollars) ("*Receiving order against businessman Robert Rechnitz, who is close to Netanyahu*"  http://www.calcalist.co.il//articles/0,7340,L-3803076,00.html) but the Israeli bankruptcy does not stay Plaintiffs' claims against him in this country.

**ROBERT & RACHEL'S RECHNITZ'S $12,000,000.00 PERSONAL GUARANTY**

82.     Again, on 6-25-2019, Jona & Robert Rechnitz personally guaranteed up to $12,000,000.00 debt to Plaintfffs, and on 6-27-2019, Jona & Rachel Rechnitz personally guaranteed up to $12,000,000.00 to Plaintiffs..

83.     Robert's 6-25-2019 Personal Guaranty reads as follows:

*Dear Oved / First International Diamonds Inc., I very much enjoyed speaking to you by phone. Jona has shared some of your conversations with me. Thank you for being a confidant for Jona. He mentioned to me about how your Father had a special bond and relationship with you. I was also privileged to have a close relationship with my Father, as did Jona. I'm sure you will find much success in your dealings together. I completely understand your desire to know that Jona's family is aware of his dealings with you and stands behind him. **I am pleased to confirm that I stand behind Jona and all his dealing with you**. **You have indicated that you have extended memos up to the amount of $12,000,000.00. If for some reason you need to callback your credit line, all merchandise will be returned to you, <u>and any cash deficiencies will be repaid by me.</u>**  May your confidence in Jona and your extension of credit be profitable for both of you.* BOBBY RECHNITZ / CC: JONA RECHNITZ [Emphasis added]

84.     Jona personally handed Robert's Personal Guaranty letter to Anter several days after Robert orally promised to personally guaranty Jona's debts to Plaintiffs, while all three were meeting at Pat's Kosher Restaurant on Pico Boulevard.

85.     In hindsight, the question that now vexes Plaintiffs is how (or why) on 6-25-2019 did Robert and Jona, and on 6-27-2019 did Robert and Rachel personally guaranty Plaintiffs'

$12,000,000.00 debts when they already knew of Jona's: **$45,000,000.00** Ponzi Scheme Debt; **$12,000,000.00** Peralta Ponzi Scheme; **$80,000,000.00** Jason Nissen Ticket Ponzi Scheme; **$19,000,000.00** criminal restitution order - totaling **$156,000,000.00** of financial devastation and fraud to innocent victims, knew of Jona's criminal past that he pled guilty, etc. Certainly Robert & Rachel knew of Jona's other debt of $307,481.28 in the matter of *American Express National Bank vs Jona S Rechnitz*, LASC # 19STCV29830, that he stipulated to a judgment for $295,058.15, for a total of **$156,295,058.15** in debt. With hindsight being 20/20, it appears that Robert and Rachel were standing behind all of Jona's frauds, and ratifying them.

86.    In further hindsight, the question that further vexes Plaintiffs is how (or why) on 6-25-2019 did Robert personally guaranty up to $12,000,000.00 of Jona's debts to Plaintiffs, when Robert was already deeply in debt as of that date? On information and belief, Robert did not have the financial wherewithal on 6-25-2019 to personally guaranty $12,000,000.00 to Plaintiffs in case Jona defaulted. Based on the recent Israeli involuntary bankruptcy that was filed against Robert, the petitioning creditor ITOR 116 SF LLC sued Robert on 9-13-2013 for fraud and breach of contract, LASC # BC521311, and obtained a $2,655,280.40 judgment against him on 12-30-2015, which was unpaid, forcing ITOR 116 SF LLC to recently apply to the Israeli courts to seize Robert's home in Jerusalem through the Israeli bankruptcy proceeding.

87.    Thus, it appears that Robert and Rachel (and Jona) had absolutely no legitimate basis to personally guarantee Jona's $12,000,000.00 debts to Plaintiffs and lacked the financial wherewithal to personally guaranty them. Hence, Robert and Rachel are liable to Plaintiffs for not only breach of the Personal Guaranty, but also for fraud, promissory fraud, and conspiracy to defraud.

88.    On 3-9-2020, and yet still unaware of the extent of Robert's involvement in Jona's criminal affairs, Cohen extended a professional courtesy to Robert to inform him that Cohen had been retained by (Peter Marco, who was introduced to Cohen by Robert's son Jona) and by Plaintiffs to sue Jona and Robert, inquiring (hoping) that the bailout was

imminent, to avoid the litigation. Cohen told Robert that he personally preferred ***not*** to have to sue Robert, as both pray at the same synagogue in Hancock Park and have known each other for years. Cohen acknowledged that Robert attempted to help Cohen in the past and was gracious in Cohen's time of need, as Cohen was to Robert's. Cohen made it clear that he took no joy in prosecuting this case, as Cohen personally agonized over it for over a month ever since his clients were being pursued by their vendors because of Jona's fraudulent actions.  But, Cohen explained, that Jona placed Cohen's clients in a terrible predicament exposing them to millions of dollars of damages from their vendors, and the scope of Jona's perfidy and betrayal was so breathtaking, overwhelming and devastating, that Cohen's clients absolutely insisted that Cohen protect their interests. While Cohen did not expect Robert to be pleased with this decision, as their attorney, Cohen owed them a 100% duty and must represent their interests.

89.    Cohen initially explained to Robert the basis of the cause of action for Breach of Written Guaranty against him is the 6-25-2019 letter that appears to be written by Robert, and signed by Robert and Jona, personally guarantying up to $12,000,000.00 to Plaintiffs. Surprisingly, Robert emphatically denied to Cohen that he ever signed a personal guaranty to Plaintiffs. Cohen told Robert that he has the signed personal guaranty in his file and Robert repeatedly denied it.

90.    3-10-2020 was the Jewish holiday of Purim, and Robert approached Cohen in synagogue that night acknowledging the professional courtesy extended to him, and asked to speak to Cohen under the guise and pretext of wanting to talk about "nothing legal, just as friends." Cohen reiterated the above, and Robert repeatedly denied personally guaranteeing the debts to Plaintiffs.

91.    Robert's denial that he personally guaranteeing the debts to Anter was indeed curious, as Cohen had a copy of Robert's 6-25-2019 Personal Guaranty in his file. So, what was Cohen to make of Robert's denials? Was he involved with Jona's frauds, or was he not? If indeed, Robert did not sign the Personal Guaranty to Anter (as he previously confirmed to Anter) then that would mean that Jona forged his own father's name to Robert's 6-25-2019

1    Personal Guaranty to Anter, and shamelessly exploited Anter's trust and his father's name,

2    using a doctored document to continue to commit crimes while out on bail.

3    92.    On 3-10-2020 at approximately 10:00pm that night, Jona resumed and resorted to his

4    criminal behavior and called Marco, livid that Cohen is "going after his family and his

5    father" threatening him and Anter that unless he receives a letter from Marco and Anter

6    that they will be firing Cohen as their attorney, that Jona will engage in an all out war,

7    "destroy" "rip apart" and "mess and fuck Cohen good" with the State Bar (claiming to

8    have texts that Cohen was his lawyer creating a conflict of interest), and report Anter

9    criminally. Jona repeated his bogus pledge that his cousin is still working on bailing him

10   out to make Marco whole within one week, but that it was conditional on them firing

11   Cohen. Jona brazenly assured Marco that his role as one of the single most important and

12   prolific white collar cooperating witnesses in the recent history of the Southern District of

13   New York, with his working closely with the FBI as an informant, along with the fact that

14   he only received 10 months custody time with 5 months house arrest, that since the FBI

15   needs him as an informant so badly in the New York case that they would never do

16   anything to him no matter what he did, making him immune from any further prosecution

17   (mistakenly believing that this provides him some kind of ill-conceived immunity from

18   committing criminal acts of fraud and extortion in California [ie., Penal Code 518]). [See,

19   the NY Daily News 4-15-2020 article "*Mayor de Blasio donor Jona Rechnitz boasted of*

20   *FBI ties to scammed diamond dealer: suit*"

21   (https://www.nydailynews.com/new-york/ny-rechnitz-diamond-dealer-suit-20200415-olvc

22   wcmkzfeuljb7olc4xwmtwy-story.html)]. Tragically, Jona learned nothing from his life of

23   crime and resorted to his old tricks of extortion and blackmail, and if anything, has become

24   emboldened by it.

25   93.    In said late night conversation, Jona immediately conferenced-in his father Robert into the

26   late night conversation under the guise and pretext of wanting to talk about "nothing legal,

27   just as friends" (the same ploy as with Cohen).

28   94.    Obviously, whatever good will Cohen was prepared to extend to Robert disintegrated by

1        Jona's extortion call and Robert's convenient joinder late that night.

2   95.  After Jona finished threatening Marco, Cohen and Anter, Jona texted Marco at 10:55pm a

3        veiled confirmation of the conversation:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



96.    As to Jona's threats to report Cohen to the State Bar, Jona merely introduced Cohen to

Peter Marco and nothing more. Jona was never Cohen's client, and Cohen was never

Jona's lawyer, as evidenced by Jona's texts to Cohen.





97.    Obviously, by this lawsuit, Cohen is not resigning and will remain counsel of record for plaintiffs, and he and Plaintiffs will not be scared away or intimidated by Jona's criminal threats of extortion.

98.    As reported in the 2-12-2020 NY Post article "*DeBlasio Donor Jona Rechnitz Used Kardashian Ties to Further His Schemes*" (http://thejewishvoice.com/2020/02/deblasio-donor-jona-rechnitz-used-kardashian-ties-to-f urther-his-schemes/) and in the 4-15-2020 NY Post article "*Jona Rechnitz headed for self destruction like Adam Sandler in 'Uncut Gems': suit*" (https://nypost.com/2020/04/15/jona-rechnitz-headed-for-self-destruction-like-adam-sandle r-in-uncut-gems-suit/) Jona Rechnitz's dark dealings is eerily similar of the character Howard Ratner, played by actor Adam Sandler, in the 2019 film "Uncut Gems," of a charismatic debt-ridden gambling addict, a wheeling, dealing, greedy Jewish diamond dealer, scheming, ripping people off, swearing and making bold plays to try and advance his own life, clearly headed toward self-destruction.

### FIRST CAUSE OF ACTION

### INTENTIONAL MISREPRESENTATION & FRAUD

(*On behalf of Plaintiffs as to Jona Rechnitz, Rachel Rechnitz, Robert Rechnitz*)

99.    Plaintiffs hereby incorporate by reference as though fully set forth in full herein, all preceding Paragraphs of this Complaint.

100.    The foregoing representations made by Jona Rechnitz, Rachel Rechnitz, Robert Rechnitz, and Levin Prado were false when they were made, and Defendants knew the representations to be false. Defendants did not intend to comply with the promises and representations when they were made.

101.    Specifically, Jona made the following misrepresentations to Plaintiffs:

    a.    On 6-25-2019, Jona (and Robert Rechnitz)) personally guaranteed Plaintiff's $12,000,000.00 in debt, at a time when Jona was in at least **$156,295,058.15** in debt and had no possible way of honoring that promise.

    b.    On 6-27-2019, Jona (and Rachel Rechnitz) personally guaranteed Plaintiff's

1    $12,000,000.00 in debt, at a time when Jona was in at least **$156,295,058.15** in

2    debt and had no possible way of honoring that promise. Their 6-27-2019 Personal

3    Guaranty included the following representations:

4        i.    That Jona (and Jadelle) accepted Plaintiffs' Consigned Jewelry for

5            inspection purposes only,

6        ii.    That Plaintiffs' Consigned Jewelry shall remain in the name of Plaintiffs

7            (and not in Jona & Jadelle's names),

8        iii.    That Jona  (and Jadelle) would return Plaintiffs' Consigned Jewelry upon

9            Plaintiff's demand,

10       iv.    That Jona  (and Jadelle) would return Plaintiffs' Consigned Jewelry to

11           Plaintiff in good condition,

12       v.    That if Jona  (and Jadelle) failed to return Plaintiffs' Consigned Jewelry

13           upon demand, then Jona (and Jadelle, Rachel & Robert) would pay

14           Plaintiffs $2,107,715.00 and $36,225.00.

15       vi.    That Jona (and Jadelle, Rachel & Robert) would liable to Plaintiffs for any

16           loss or damage to Plaintiffs' Consigned Jewelry resulting from fire, theft,

17           breakage, or any other cause whatsoever,

18       vii.    That Jona (and Jadelle, Rachel & Robert) immediately named Plaintiffs as

19           an additional insured on any and all applicable insurance policies with

20           respect to Plaintiffs' Consigned Jewelry.

21   c.    On 7-3-19 at 21:58:14 Jona Whatsapp texted Plaintiffs confirming the

22       representations made in the UCC Financing Statement and the Personal Guaranties

23       were valid and that Plaintiffs were 'protected.'

24   d.    Prior to 12-13-2019 and on 12-30-2019, and thereafter, Jona Rechnitz repeatedly

25       represented to Plaintiffs: (1) that he had a buyer, (2) that he sold the two pieces of

26       Plaintiffs' Consigned Jewelry to said buyer, (3) that he was awaiting receipt of

27       payment from said buyer, & (4) that the rest of Plaintiffs' Consigned Jewelry

28       remained in his possession on consignment.

e.    On 12-13-2019 and on 12-30-2019, Jona represented to Plaintiffs that he would pay Plaintiffs $2,107,715.00 and $36,225.00.

f.    On 1-2-2020 at 11:52:42am, Jona texted Anter confirming that he would not release Anter's merchandise to Jona's buyer until Anter.

g.    On 1-15-2020 at 19:28:36, Jona texted Anter confirming:

*1) wire comes in you get paid 2) I get the stones back if issue 3) I pay you don't get stiffed. Only 3 options. I don't foresee any issue. I have sold them before. Never had any problem whatsoever. And after they pay they need the certificates and I also need invoices reflective of our prices we agreed upon*.

h.    On 1-15-2020 at 19:28:58, Jona Rechnitz Jona texted Anter confirming:

*If they pay me tomorrow it is not able to wire until next day you know that. Pending and not useable until overnight*.

i.    On  2-4-2020 at 9:40pm, Jona's attorneys' lulling letter from Williams & Cohen to Plaintiffs about the purported bailout.

102.    The foregoing representations were made by Jona with the intent to deceive Plaintiffs and with knowledge that Plaintiffs would rely on them.

a.    Jona's (and Robert's) 6-25-2019 Personal Guaranty of $12,000,000.00 to Plaintiffs was false because at that time, Jona was in at least **$156,295,058.15** in debt and had no possible way of paying Plaintiffs $12,000,000.00.

b.    Jona's (and Rachel's) 6-27-2019 Personal Guaranty of $12,000,000.00 to Plaintiffs was false because at that time, Jona was in at least **$156,295,058.15** in debt and had no possible way of paying Plaintiffs $12,000,000.00.

c.    Jona's (and Rachel's) 6-27-2019 Personal Guaranty of $12,000,000.00 to Plaintiffs was false because Jona (and Jadelle) did not keep to their promise of accepting Plaintiffs' Consigned Jewelry for inspection purposes only, and instead, stole Plaintiffs' Consigned Jewelry by giving it away to a 3rd party as collateral and borrowed money from that third party.

d.    Jona's (and Rachel's) 6-27-2019 Personal Guaranty of $12,000,000.00 to Plaintiffs was false because Jona (and Jadelle) did not keep to their promise of keeping Plaintiffs' Consigned Jewelry in the name of Plaintiffs (and not in Jona & Jadelle's

1    names), and instead  stole Plaintiffs' Consigned Jewelry by giving it away to a 3rd

2    party as collateral and borrowed money from that third party.

3    e.    Jona's (and Rachel's) 6-27-2019 Personal Guaranty of $12,000,000.00 to Plaintiffs

4    was false because Jona (and Jadelle) did not return Plaintiffs' Consigned Jewelry

5    upon Plaintiff's demand,

6    f.    Jona's (and Rachel's) 6-27-2019 Personal Guaranty of $12,000,000.00 to Plaintiffs

7    was false because Jona (and Jadelle) did not return Plaintiffs' Consigned Jewelry to

8    Plaintiff in good condition,

9    g.    Jona's (and Rachel's) 6-27-2019 Personal Guaranty of $12,000,000.00 to Plaintiffs

10    was false because Jona (and Jadelle) did not pay Plaintiffs $2,107,715.00 and

11    $36,225.00.

12    h.    Jona's (and Rachel's) 6-27-2019 Personal Guaranty of $12,000,000.00 to Plaintiffs

13    was false because Jona (and Jadelle) did not immediately named Plaintiffs as an

14    additional insured on any and all applicable insurance policies with respect to

15    Plaintiffs' Consigned Jewelry.

16    i.    Jona's 7-3-19 at 21:58:14 Whatsapp text to Plaintiffs confirming the

17    representations made in the UCC Financing Statement and the Personal Guaranties

18    were valid and that Plaintiffs were 'protected' was false because Jona did not have

19    a buyer for the Consigned Jewelry, did not sell to them before, was not awaiting a

20    wire payment from this non-existent client, had no intention of returning the

21    Consigned Jewelry to Plaintiffs, and instead, stole Plaintiffs' Consigned Jewelry by

22    giving it away to a 3rd party as collateral and borrowed money from that third party.

23    j.    Jona's 1-2-2020 at 11:52:42am, text to Anter confirming that he would not release

24    Anter's merchandise to Jona's buyer until Anter would get paid, was false because

25    Jona did not have a buyer for the Consigned Jewelry, did not sell to them before,

26    was not awaiting a wire payment from this non-existent client, had no intention of

27    returning the Consigned Jewelry to Plaintiffs, and instead, stole Plaintiffs'

28    Consigned Jewelry by giving it away to a 3rd party as collateral and borrowed

1    money from that third party.

2    k.    Jona's 1-15-2020 at 19:28:36, text to Plaintiffs was false because Jona did not have

3    a buyer for the Consigned Jewelry, did not sell to them before, was not awaiting a

4    wire payment from this non-existent client, had no intention of returning the

5    Consigned Jewelry to Plaintiffs, and instead, stole Plaintiffs' Consigned Jewelry by

6    giving it away to a 3rd party as collateral and borrowed money from that third party.

7    l.    Jona's attorneys' 2-4-2020 at 9:40pm, lulling letter from Williams & Cohen to

8    Plaintiffs about the purported bailout, was false, as the Rechnitz family member

9    never offered Plaintiffs the promised bailout.

10   103.    Plaintiffs detrimentally and reasonably relied on the foregoing representations by Jona.

11   104.    Plaintiffs have been damaged by Jona's false, intentional, and fraudulent representations

12   and concealing of material information, as alleged above, in an amount to be proven at

13   trial, but at least $1,976,225.00, which represents the consigned jewelry Jona lied to steal

14   as well as tendered worthless instruments for.

15   105.    Specifically, Rachel made the following misrepresentations to Plaintiffs:

16   a.    On 6-27-2019, Rachel (and Jona  Rechnitz) personally guaranteed Plaintiff's

17   $12,000,000.00 in debt, at a time when Jona & Rachel were in at least

18   **$156,295,058.15** in debt and had no possible way of honoring that promise. Their

19   6-27-2019 Personal Guaranty included the following representations:

20   i.    That Rachel (Jona and Jadelle) accepted Plaintiffs' Consigned Jewelry for

21   inspection purposes only,

22   ii.    That Plaintiffs' Consigned Jewelry shall remain in the name of Plaintiffs

23   (and not in Jona, Rachel & Jadelle's names),

24   iii.    That Rachel (Jona and Jadelle) would return Plaintiffs' Consigned Jewelry

25   upon Plaintiff's demand,

26   iv.    That Rachel (Jona and Jadelle) would return Plaintiffs' Consigned Jewelry

27   to Plaintiff in good condition,

28   v.    That if Rachel (Jona  and Jadelle) failed to return Plaintiffs' Consigned

Jewelry upon demand, then Rachel (Jona and Jadelle) would pay Plaintiffs $2,107,715.00 and $36,225.00.

vi.  That Rachel (Jona and Jadelle) would liable to Plaintiffs for any loss or damage to Plaintiffs' Consigned Jewelry resulting from fire, theft, breakage, or any other cause whatsoever,

vii.  That Rachel (Jona and Jadelle) immediately named Plaintiffs as an additional insured on any and all applicable insurance policies with respect to Plaintiffs' Consigned Jewelry.

106.  The foregoing representations were made by Rachel with the intent to deceive Plaintiffs and with knowledge that Plaintiffs would rely on them.

a.  Rachel's (and Jona's) 6-27-2019 Personal Guaranty of $12,000,000.00 to Plaintiffs was false because at that time, Jona and Rachel were in at least **$156,295,058.15** in debt and had no possible way of paying Plaintiffs $12,000,000.00.

b.  Rachel's (and Jona's) 6-27-2019 Personal Guaranty of $12,000,000.00 to Plaintiffs was false because Rachel (Jona and Jadelle) did not keep to their promise of accepting Plaintiffs' Consigned Jewelry for inspection purposes only, and instead, Jona stole Plaintiffs' Consigned Jewelry by giving it away to a 3rd party as collateral and borrowed money from that third party.

c.  Rachel's (and Jona's) 6-27-2019 Personal Guaranty of $12,000,000.00 to Plaintiffs was false because Rachel (Jona and Jadelle) did not keep to their promise of keeping Plaintiffs' Consigned Jewelry in the name of Plaintiffs (and not in Jona & Jadelle's names), and instead stole Plaintiffs' Consigned Jewelry by giving it away to a 3rd party as collateral and borrowed money from that third party.

d.  Rachel's (and Jona's) 6-27-2019 Personal Guaranty of $12,000,000.00 to Plaintiffs was false because Rachel (Jona and Jadelle) did not return Plaintiffs' Consigned Jewelry upon Plaintiff's demand,

e.  Rachel's (and Jona's) 6-27-2019 Personal Guaranty of $12,000,000.00 to Plaintiffs was false because Rachel (Jona and Jadelle) did not return Plaintiffs' Consigned

Jewelry to Plaintiff in good condition,

f.  Rachel's (and Jona's) 6-27-2019 Personal Guaranty of $12,000,000.00 to Plaintiffs was false because Rachel (Jona and Jadelle) did not pay Plaintiffs $2,107,715.00 and $36,225.00.

g.  Rachel's (and Jona's) 6-27-2019 Personal Guaranty of $12,000,000.00 to Plaintiffs was false because Rachel (Jona and Jadelle) did not immediately named Plaintiffs as an additional insured on any and all applicable insurance policies with respect to Plaintiffs' Consigned Jewelry.

107.  Plaintiffs detrimentally and reasonably relied on the foregoing representations by Jona.

108.  Plaintiffs have been damaged by Jona's false, intentional, and fraudulent representations and concealing of material information, as alleged above, in an amount to be proven at trial, but at least $1,976,225.00, which represents the consigned jewelry Jona lied to steal as well as tendered worthless instruments for.

109.  Specifically, Robert made the following misrepresentations to Plaintiffs:

a.  On 6-25-2019, Robert (and Jona Rechnitz) personally guaranteed Plaintiff's $12,000,000.00 in debt, at a time when Jona was in at least **$156,295,058.15** in debt and had no possible way of honoring that promise, and at the time that Robert was placed into an involuntary bankruptcy/receivership by his creditor ITOR 116 SF LLC in Israel, Case # 27255-09-18 for debts in excess of $2,600,000.00 shekel ($9,500,000.00 dollars), and had no possible way of honoring that promise.

110.  The foregoing representations was made by Robert  with the intent to deceive Plaintiffs and with knowledge that Plaintiffs would rely on them.

111.  Plaintiffs detrimentally and reasonably relied on the foregoing representations.

112.  Plaintiffs have been damaged by Defendants' false, intentional, and fraudulent representations and concealing of material information, as alleged above, in an amount to be proven at trial, but at least $1,976,225.00, which represents the consigned jewelry Jona lied to steal as well as tendered worthless instruments for.

113.  Plaintiffs further request the imposition of a constructive trust against all Defendants who

1  are in possession of the Consigned Jewelry set forth in the Consignment Memos and for an

2  order and judgment that they hold the consigned jewelry and/or all proceeds therefrom as

3  constructive trustees for the benefit of Plaintiffs.

4  114.  In doing the things herein alleged, Defendants acted willfully, maliciously, and with the

5  intent to cause injury and harm to Plaintiffs. Defendants are therefore guilty of malice

6  and/or fraud in conscious disregard of Plaintiffs' rights, thereby warranting an assessment

7  of punitive and exemplary damages in an amount appropriate to punish Defendants, and

8  each of them, and deter them and others from engaging in similar misconduct.

9  **SECOND CAUSE OF ACTION**

10  **CIVIL THEFT (Cal. Penal Code, § 496)**

11  (*On behalf of Plaintiff as to Jona Rechnitz*)

12  115.  Plaintiffs hereby incorporate by reference as though fully set forth in full herein, all

13  preceding Paragraphs of this Complaint.

14  116.  As a result of Jona conduct as alleged herein, they have violated California Penal Code,

15  §496 that provides: "[e]very person who buys or receives any property that has been stolen

16  or that has been obtained in any manner constituting theft or extortion, knowing the

17  property to be so stolen or obtained, or who conceals, sells, withholds, or aids in

18  concealing, selling, or withholding any property from the owner, knowing the property to

19  be so stolen or obtained, shall be punished by imprisonment in a county jail for not more

20  than one year, or imprisonment pursuant to subdivision (h) of Section 1170. However, if

21  the value of the property does not exceed nine hundred fifty dollars ($950), the offense

22  shall be a misdemeanor, punishable only by imprisonment in a county jail not exceeding

23  one year, if such person has no prior convictions for an offense specified in clause (iv) of

24  subparagraph (C) of paragraph (2) of subdivision (e) of Section 667 or for an offense

25  requiring registration pursuant to subdivision (c) of Section 290.

26  117.  Jona obtained and received property from Plaintiffs, the $1,976,225.00 of Consigned

27  Jewelry, in a manner constituting "theft," as that term is defined in California Penal Code,

28  § 484(a) that provides: "[e]very person who shall feloniously steal, take, carry, lead, or

drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft."

118.    As a direct and proximate result of Defendants' civil theft, Plaintiffs have been damaged in an amount to be proven at trial, but at least $1,976,225.00.

119.    Pursuant to California Penal Code, §496(c), Plaintiffs are also entitled to recover treble damages from Defendants.

120.    Pursuant to California Penal Code, §496(c), Plaintiffs are also entitled to recover attorneys' fees from Defendants.

121.    Plaintiffs further request the imposition of a constructive trust against all Defendants who are in possession of the consigned jewelry set forth in the Consignment Memos and for an order and judgment that they hold the consigned jewelry and/or all proceeds therefrom as constructive trustees for the benefit of Plaintiffs.

122.    In doing the things herein alleged, Defendants acted willfully, maliciously, and with the intent to cause injury and harm to Plaintiffs. Defendants are therefore guilty of malice and/or fraud in conscious disregard of Plaintiffs' rights, thereby warranting an assessment of punitive and exemplary damages in an amount appropriate to punish Defendants, and each of them, and deter them and others from engaging in similar misconduct.

### THIRD CAUSE OF ACTION

### CIVIL CONSPIRACY TO COMMIT THEFT, FRAUD, AND FRAUD BY CONCEALMENT

*(On behalf of Plaintiff as to Jona Rechnitz, Rachel Rechnitz. Robert Rechnitz, Levin Prado)*

123.    Plaintiffs hereby incorporate by reference as though fully set forth in full herein, all preceding Paragraphs of this Complaint.

124.  The frauds committed by Jona were committed with Rachel's & Robert's knowledge and direction, along with the assistance of Prado, making them personally liable. Without Rachel setting upon the entities to commit the frauds, Jona lying to steal the Consigned Jewelry, and Prado signing the checks, and Robert conning Plaintiffs into the Personal Guaranty, none of the below referenced offenses could have occurred.

125.  Upon information and belief, Plaintiffs believe, that at all times relevant hereto Defendants, including but not limited to Jona, Rachel, Robert and Prado, formed a civil conspiracy and engaged in acts in operation and furtherance of that conspiracy

126.  Jona and Prado conspired to make an illegal agreement to defraud Plaintiffs of the consigned jewelry and to commit civil theft.

127.  Jona, with his wife Rachel, have set up companies to solicit consigned jewelry based upon the false premise they have clients to sell them to. Meanwhile they took Plaintiffs' consigned jewelry, swindled Plaintiffs in a large scale fraud by absconding with the three pieces of jewelry, and either pawned them off, or used them as collateral for loans to various questionable sources, and has not repaid Plaintiffs the $1,976,225.00. In reality, Jona liquidated Plaintiffs' consigned jewelry, and refused to tell Plaintiffs how he spent the proceeds. Plaintiffs asked Jona to provide an accounting of the proceeds, and Jona refused to do so.

128.  Jona deceived Plaintiffs to consign them the $1,976,225.00 in jewelry, with false promises of personal guaranties, that Robert denied ever making.

129.  Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto, Defendants formed a civil conspiracy and engaged in the foregoing acts in operation and furtherance of that conspiracy.

130.  Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto, Defendants committed the foregoing misrepresentations, wrongs, theft, and fraud for the purpose and in furtherance of a fraudulent conspiracy and scheme to defraud Plaintiffs, as alleged herein.

131.  As a result of the civil conspiracy, each and every Defendant is liable and responsible for

1    the acts of the other Defendants in furtherance of the conspiracy and all damages resulting

2    therefrom.

3    132.    As a result of the civil conspiracy, Defendants are jointly and severally liable for

4    $1,976,225.00.

5    133.    The egregious nature of the Defendants/conspirators' collective conduct is malicious,

6    wanton, and willful. Plaintiffs need to be awarded punitive damages plus a judgment of

7    joint and several liability.

8    **FOURTH CAUSE OF ACTION**

9    **CONVERSION**

10    (*On behalf of Plaintiff as to Jona Rechnitz*)

11    134.    Plaintiffs hereby incorporate by reference as though fully set forth in full herein, all

12    preceding Paragraphs of this Complaint.

13    135.    At all times relevant, by virtue of their Consignment Memos and UCC-1 Financing

14    Statement, Plaintiffs owned, possessed, or had a right to receive and possess their

15    $1,976,225.00 in consigned jewelry.

16    136.    Plaintiffs recently discovered that the Defendants have intentionally and substantially

17    interfered with Plaintiffs' property by means of false and fraudulent activity, including, but

18    not limited to, misappropriating Plaintiffs' Consigned Jewelry for their own personal use

19    and other theft according to proof. The Defendants engaged in this conduct with the

20    intention of wrongfully benefitting themselves at the expense of Plaintiffs.

21    137.    Defendants sold, encumbered, or otherwise transferred Plaintiffs' Consigned Jewelry to

22    third parties, subject to Plaintiffs' security interest without the knowledge of Plaintiffs.

23    These transferees took possession of Plaintiffs' Consigned Jewelry subject to Plaintiffs'

24    security interest. Once Plaintiffs discover the identities of these fraudulent transferees,

25    Plaintiffs will amend this Complaint to add them as defendants to a claim and delivery

26    (replevin) cause of action.

27    138.    Plaintiffs did not consent to said activities.

28    139.    As a direct and proximate result of the foregoing acts, Defendants intended to cause, and

1    have in fact caused, actual harm to Plaintiffs, and are liable to Plaintiffs for damages in an

2    amount to be proven at trial, but no less than $1,976,225.00.

3    140.    During, and as a further proximate result of, the Defendants' wrongful possession and

4    detention of Plaintiffs' property, Plaintiffs have suffered the loss of the deterioration of

5    their property and resulting business losses in an amount to be proven at trial.

6    141.    Furthermore, Plaintiffs are informed and believe, and so allege, that the Defendants'

7    aforementioned acts were taken with malice, fraud, and oppression and in conscious

8    disregard for Plaintiffs' rights, and were done willfully and with the intent to cause injury

9    to Plaintiffs. The Defendants were aware at all times that Plaintiffs were owed either return

10   of the consigned goods or repayment of $1,976,225.00 and intended to surreptitiously

11   misappropriate Plaintiffs' consigned goods and funds for their own personal use, seeking

12   only to intentionally and maliciously deceive Plaintiffs. Accordingly, Plaintiffs are entitled

13   to an award of exemplary and punitive damages against the Defendants.

14   <center>**FIFTH CAUSE OF ACTION**</center>

15   <center>**BREACH OF CONTRACT**</center>

16   <center>(*On behalf of Plaintiff as to Jona Rechnitz, Rachel Rechnitz, Robert Rechnitz*)</center>

17   142.    Plaintiffs hereby incorporate by reference as though fully set forth in full herein, all

18   preceding Paragraphs of this Complaint.

19   143.    Plaintiffs, the Jadelle Parties, Jona, Rachel and Robert are parties to binding contracts, the

20   Consignment Memos, the UCC Financing Statement and Personal Guaranties.

21   144.    At all times, Plaintiffs have performed all conditions, covenants, and promises required by

22   them in accordance with the terms of the Consignment Memos, UCC Financing Statement

23   and Personal Guaranties, except as they have prevented or excused from performing by the

24   acts and/or omissions of the Jadelle Parties, Jona, Rachel and Robert.

25   145.    Under the 12-13-2019 Consignment Memo #8415, Jadelle and Jona were to either return

26   the 5 rows PR 27.48 ct, 370 diamonds to Plaintiffs or pay them $36,225.00.

27   146.    Under the 12-30-2019 Consignment Memo #8431, Jadelle and Jona were to either return

28   the 13. 62 PS D-VVSl GIA, Harry Winston Mt/tr to Plaintiffs or pay them $1,200,000.00.

147.  Under the 12-30-2019 Consignment Memo #8431,  Jadelle and Jona were to either return the DIAM RD E IF 11923922166 to Plaintiffs or pay them $740,000.00.

148.  Under the 6-25-2019 Personal Guaranty, Jona and Robert personally guaranteed Jadelle's $1,976,225.00 debt to Plaintiffs (up to $12,000,000.00).

149.  Under the 6-27-2019, Personal Guaranty, Jona & Rachel Rechnitz personally guaranteed Jadelle's $1,976,225.00 debt to Plaintiffs (up to $12,000,000.00).

150.  (The Jadelle Parties) Jona, Rachel and Robert breached the Consignment Memos, the UCC Financing Statement and Personal Guaranties by failing to return the consigned jewelry and make full repayment of the $1,976,225.00. As of the date of filing of this complaint, the full amount of Plaintiffs' debt in the amount  $1,976,225.00 is past due and owing. In addition, accrued and ongoing interest, remains due, owing, and unpaid from (the Jadelle Parties), Jona, Rachel and Robert to Plaintiffs.

151.  As a direct and proximate result of the foregoing acts, Plaintiffs have been damaged in an amount to be proven at trial, together with interest at the maximum legal rate according to proof. (The Jadelle Parties), Jona, Rachel and Robert would receive unjust enrichment if allowed to retain the benefits of Plaintiffs' performance under the Consignment Memos, the UCC Financing Statement and Personal Guaranties without abiding by (the Jadelle Parties), Jona's, Rachel's and Robert's own repayment obligations under the  Consignment Memos, the UCC Financing Statement and Personal Guaranties, and/or Plaintiffs detrimentally relied on the  Consignment Memos, the UCC Financing Statement and Personal Guaranties and would suffer an unconscionable injury if the Consignment Memos, the UCC Financing Statement and Personal Guaranties were not enforced.

### SIXTH CAUSE OF ACTION

### BREACH OF WRITTEN GUARANTIES

*(On behalf of Plaintiffs as to Jona Rechnitz, Rachel Rechnitz, Robert Rechnitz)*

152.  Plaintiffs hereby incorporate by reference as though fully set forth in full herein, all preceding Paragraphs of this Complaint.

153.  On or about 6-25-2019 Jona and Robert unconditionally agreed to guaranty in writing all

1    the obligations and duties owed by the Jadelle Parties under the Consignment Memos, the

2    UCC Financing Statement and Personal Guaranties up to $12,000,000.00.

3    154.    On or about 6-27-2019 Jona and Rachel unconditionally agreed to guaranty in writing all

4    the obligations and duties owed by the Jadelle Parties under the Consignment Memos, the

5    UCC Financing Statement and Personal Guaranties up to $12,000,000.00.

6    155.    The Jadelle Parties have defaulted on the Consignment Memos, the UCC Financing

7    Statement and Personal Guaranties, by failing to either return the consigned jewelry or to

8    re-pay the outstanding balance of $1,976,225.00. As of the date of filing of this complaint,

9    $1,976,225.00 is the current principal amount past due and owing. In addition, accrued and

10    ongoing interest remains due, owing, and unpaid to First International.

11    156.    Plaintiffs have performed all conditions and promises required on their part to be

12    performed under the Consignment Memos, the UCC Financing Statement and Personal

13    Guaranties. Plaintiffs relied on  the Consignment Memos, the UCC Financing Statement

14    and Personal Guaranties in order for them to consign the jewelry to Jadelle and Jona.

15    **SEVENTH CAUSE OF ACTION**

16    **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

17    (*On behalf of Plaintiff as to Jona Rechnitz, Rachel Rechnitz, Robert Rechnitz, Levin Prado*)

18    157.    Plaintiffs hereby incorporate by reference as though fully set forth in full herein, all

19    preceding Paragraphs of this Complaint.

20    158.    Based on the foregoing, Plaintiffs are informed and believe, and on such information and

21    belief allege,  Defendants breached the implied covenant of good faith and fair dealing

22    continuously throughout the business relationship with Plaintiffs.

23    159.    Plaintiffs are informed and believe, and on such information and belief allege, that there

24    may be other facts constituting breach of the implied covenant of good faith and fair

25    dealing which will be presented through discovery or at the time of trial.

26    160.    As a direct and proximate cause of the acts of Defendants, Plaintiffs have suffered damage

27    in an amount according to proof at the time of trial of at least $1,976,225.00.

28    161.    Plaintiffs are informed and believe, and on such information and belief allege, that

1   Defendants acted despicably, willfully, wantonly, oppressively, fraudulently, or in

2   conscious disregard of Plaintiffs' rights. Plaintiffs seek recovery of exemplary damages  in

3   an amount according to proof at the time of trial.

4   162.   As a result of Defendants' actions, Plaintiffs have been damaged in an amount according to

5   proof, plus interest, costs, and attorneys' fees as permitted by law.

6                              **EIGHTH CAUSE OF ACTION**

7                                **ACCOUNT STATED**

8        (*On behalf of Plaintiff as to Jona Rechnitz, Rachel Rechnitz, Robert Rechnitz*)

9   163.   Plaintiffs hereby incorporate by reference as though fully set forth in full herein, all

10   preceding Paragraphs of this Complaint.

11   164.   Based on the foregoing, in Los Angeles County, State of California, an account was stated

12   in writing by and between Plaintiffs and (the Jadelle Parties), Jona, Rachel, and Robert

13   Rechnitz and on such statement, a balance of $1,976,225.00 was found due to Plaintiffs

14   from (the Jadelle Parties), Jona, Rachel, Robert Rechnitz, who all agreed to pay to

15   Plaintiffs said balance in full.

16   165.   Although demanded by Plaintiffs from (the Jadelle Parties), Jona, Rachel, Robert Rechnitz,

17   they have failed to fully repay the balance of $1,976,225.00. Repeated demands were made

18   and ignored by Defendants. As of the date of filing of this complaint, $1,976,225.00 is the

19   current principal amount past due and owing. In addition, accrued and ongoing interest

20   remains due, owing, and unpaid from (the Jadelle Parties), Jona, Rachel, Robert Rechnitz

21   to Plaintiffs.

22   166.   Plaintiffs have incurred attorneys' fees in connection with this matter, in an amount to be

23   determined at trial. Because the Consignment Memos, the UCC Financing Statement and

24   Personal Guaranties are contracts on a book account, Plaintiffs are entitled to recover

25   attorneys' fees from the Jadelle Parties, Jona, Rachel, Robert Rechnitz pursuant to Civil

26   Code section 1717.5.

27

28

**NINTH CAUSE OF ACTION**

**UNETHICAL BUSINESS PRACTICES IN VIOLATION OF CALIFORNIA BUSINESS &**

**PROFESSIONS CODE §17200**

*(On behalf of Plaintiff as to Jona Rechnitz, Rachel Rechnitz, Robert Rechnitz, Levin Prado)*

167.    Plaintiffs hereby incorporate by reference as though fully set forth in full herein, all preceding Paragraphs of this Complaint.

168.    Based on the foregoing, Plaintiffs are informed, believe, and thereupon allege , that Defendants intentionally conspired with each other to restrain competition and deprive Plaintiffs of the benefit of their contracts.

169.    As a direct and proximate result of the aforementioned conduct of Defendants, and each of them, Plaintiffs have been damaged in a sum in excess of the jurisdiction of this Court, to be determined according to proof at the time of trial of at least $1,976,225.00.

170.    In engaging in the conduct described above, Defendants, and each of them, acted willfully and intending to deprive Plaintiffs of their property or legal rights, thereby committing acts of fraud, within the meaning of Civil Code §3924(c), so as to entitle Plaintiffs to punitive damages in an amount sufficient to punish or make an example of Defendants, and each of them.

**TENTH CAUSE OF ACTION**

**ISSUANCE OF BAD CHECKS (CIVIL CODE § 1719)**

*(On behalf of Plaintiff as to Jona Rechnitz, Rachel Rechnitz, Levin Prado)*

171.    Plaintiffs hereby incorporate by reference as though fully set forth in full herein, all preceding Paragraphs of this Complaint.

172.    Based on the foregoing, Plaintiffs are informed, believe, and thereupon allege, that on 1-17-2020 Jona, with Rachel and Prado's involvement, issued two worthless checks to First International totaling $2,122,760.00 that he had no intention of honoring: (1) Check # 2200 for $922,760.00; and (2) Check # 2201 for $1,200,000.00.  Both checks were NSF at the time of tender, in violation of the California Civil Code § 1719 and the California Penal Code §476a

| Check # | Date | To | $ |
|---------|------|-----|---|
| 2200 | 1-17-2020 | First International | $922,760.00 |
| 2201 | 1-17-2020 | First International | $1,200,000.00 |
| Total NSF Checks issued by Jona to Plaintiffs | | | **$2,122,760.00** |

173. Pursuant to California Civil Code § 1719(a)(6)(A), to "pass a check on insufficient funds" means to make, utter, draw, or deliver any check, draft, or order for the payment of money upon any bank, depository, person, firm, or corporation that refuses to honor the check, draft, or order for lack of funds or credit in the account to pay the check.

174. Pursuant to California Civil Code § 1719(a) Defendants are liable for full amount of the $2,122,760.00 checks plus a service charge of $25.00.00 for the first bounced check and $35.00 for each subsequent bounced check. Defendants shall also be liable for damages equal to 3x the amount of each check, if they fail to pay within thirty (30) days from the date the notice is mailed the amount of the checks in cash, plus the amount of the service charge ($25.00 for the first bounced check and $35.00 for the second bounced check), together with the cost of mailing this notice.

175. On 3-17-2020, Plaintiffs mailed via certified letters to Defendants demanding payment.[12] Jona's checks to Plaintiffs were dishonored not due to a good faith dispute.

176. The statutory 30-days have passed and Defendants failed to respond.

### ELEVENTH CAUSE OF ACTION

### PROMISSORY FRAUD

*(On behalf of Plaintiff as to Jona Rechnitz, Rachel Rechnitz, & Robert Rechnitz)*

177. Plaintiffs hereby incorporate by reference as though fully set forth in full herein, all preceding Paragraphs of this Complaint.

178. On or about 6-25-2019 Jona and Robert unconditionally agreed to guaranty in writing all the obligations and duties owed by the Jadelle Parties to Plaintiffs under the Consignment

---

[12]A true and correct copy of Plaintiffs' Notice Pursuant to California Civil Code § 1719 of $2,122,760.00 Bad Checks is attached hereto as Exhibit "12" and is incorporated herein by this reference.

Memos, the UCC Financing Statement and Personal Guaranties up to $12,000,000.00.

179.  On or about 6-27-2019 Jona and Rachel unconditionally agreed to guaranty in writing all the obligations and duties owed by the Jadelle Parties to Plaintiffs under the Consignment Memos, the UCC Financing Statement and Personal Guaranties up to $12,000,000.00.

180.  Jona and Robert did not intend to honor and/or perform the 6-25-2019 Personal Guaranty to Plaintiffs when they signed it.

181.  Jona and Rachel did not intend to honor and/or perform the 6-27-2019 Personal Guaranty to Plaintiffs when they signed it.

182.  Jona and Robert signed the 6-25-2019 Personal Guaranty with the intent to deceive Plaintiffs and with knowledge that Plaintiffs would rely on them.

183.  Jona and Rachel signed the 6-27-2019 Personal Guaranty with the intent to deceive Plaintiffs and with knowledge that Plaintiffs would rely on them.

184.  Plaintiffs detrimentally and reasonably relied on the 6-25-2019 Personal Guaranty and on the 6-27-2019 Personal Guaranty.

185.  Jona and Robert have defaulted on the 6-25-2019 Personal Guaranty to Plaintiffs by failing to pay the outstanding balance of $1,976,225.00 to Plaintiffs.

186.  Jona and Rachel have defaulted on the 6-27-2019 Personal Guaranty to Plaintiffs by failing to pay the outstanding balance of $1,976,225.00 to Plaintiffs.

187.  Plaintiffs have been damaged by Defendants' false, intentional, and fraudulent representations and concealing of material information, as alleged above, in an amount to be proven at trial, but at least $1,976,225.00, which represents the consigned jewelry Jona lied to steal as well as tendered worthless instruments for.

188.  (The Jadelle Parties), Jona, Rachel and Robert have defaulted on the Consignment Memos, the UCC Financing Statement and Personal Guaranties, by failing to either return the consigned jewelry or to re-pay the outstanding balance of $1,976,225.00. As of the date of filing of this complaint, $1,976,225.00 is the current principal amount past due and owing. In addition, accrued and ongoing interest remains due, owing, and unpaid to First International.

189.    In doing the things herein alleged, Defendants acted willfully, maliciously, and with the intent to cause injury and harm to Plaintiffs. Defendants are therefore guilty of malice and/or fraud in conscious disregard of Plaintiffs' rights, thereby warranting an assessment of punitive and exemplary damages in an amount appropriate to punish Defendants, and each of them, and deter them and others from engaging in similar misconduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek a judgment in their favor and an order granting the following relief:

1.    That Plaintiffs be awarded compensatory damages in the amount of at least $1,976,225.00;

2.    That Plaintiffs be awarded $2,122,760.00 for their NSF checks pursuant to California Civil Code § 1719;

3.    That Plaintiffs be awarded treble damages pursuant to California Penal Code, §496(c);

4.    That Plaintiffs be awarded reasonable attorneys' fees pursuant to California Penal Code, §496©;

5.    That Plaintiffs be awarded attorneys' fees pursuant to Civil Code section 1717.5.

6.    For a constructive trust over the Consigned Jewelry and all proceeds therefrom;

7.    That Plaintiffs be awarded punitive damages in an amount to be proven at trial;

8.    That Plaintiffs be awarded costs of suit; and

9.    That Plaintiffs be awarded such further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury to the full extent permitted by law.

DATED:        June 24, 2020            LAW OFFICE OF BARUCH C. COHEN
                                       A Professional Law Corporation

                                       By _____/S/ *Baruch C. Cohen*_____
                                       Baruch C. Cohen, Esq.
                                       *Attorneys for Plaintiffs Plaintiffs Oved Anter & First*
                                       *International Diamond, Inc.*

# EXHIBIT - 1

AO 245B (Rev. 09/19)   Judgment in a Criminal Case   (form modified within District on Sept. 30, 2019)
Sheet 1

# UNITED STATES DISTRICT COURT

## Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) |
| Jona Rechnitz | ) Case Number:  1: 16 cr. 00389-01(AKH) |
| | ) USM Number:  77751-054 |
| | ) Alan Levine/ AUSA, Martin Bell |
| | ) Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)   1

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☐ was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 1349 | Conspiracy to Commit Honest Services Wire Fraud | 6/6/2016 | 1 |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

12/19/2019
Date of Imposition of Judgment

_Signature of Judge_

Hon. Alvin K. Hellerstein, U.S. District Judge
Name and Title of Judge

March 3, 2020
Date

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/3/2020

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

DEFENDANT:  Jona Rechnitz
CASE NUMBER:  1: 16 cr. 00389-01(AKH)

Judgment — Page ___2___ of ___7___

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

5 months.  Defendant is notified of his right to appeal.

☑ The court makes the following recommendations to the Bureau of Prisons:
that the defendant be confined at the Lompac or Taft facility outside of Los Angeles.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m.  ☐ p.m.  on _____ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on _____ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page **3** of **7**

DEFENDANT:  Jona Rechnitz
CASE NUMBER:   1: 16 cr. 00389-01(AKH)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

3 years, of which the first 5 months shall be home confinement.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    - ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
            Sheet 3A — Supervised Release

| | Judgment—Page | 4 | of | 7 |

DEFENDANT:  Jona Rechnitz
CASE NUMBER:  1: 16 cr. 00389-01(AKH)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

### U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____   Date _____

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

DEFENDANT: Jona Rechnitz
CASE NUMBER: 1: 16 cr. 00389-01(AKH)

Judgment—Page __5__ of __7__

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall provide the probation officer with access to any requested financial information.

2. The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer unless he/she is in compliance with the installment payment schedule.

3. The defendant shall continue to cooperate with the U.S. Attorney's Office.

4. The defendant's duty to pay restitution in the amount of $19,000,000.00 is joint and several with co-conspirators Norman Seabrook (16 Cr. 467) and Murray Huberfeld (16 Cr. 467) provided, however, that defendant Rechnitz' payments shall be capped at $10,000,000.00. The defendant shall make payments of $500,000 per year, payable in equal monthly installments, due on the last day of each month.

5. The defendant shall be supervised by the district of residence.

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
            Sheet 5 — Criminal Monetary Penalties

| | Judgment — Page | 6 | of | 7 |
|---|---|---|---|---|

DEFENDANT: Jona Rechnitz
CASE NUMBER: 1: 16 cr. 00389-01(AKH)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 19,000,000.00 | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Correction Officers' Benevolent Association | $19,000,000.00 | $19,000,000.00 | |
| 77-10 21st Avenue | | | |
| East Elmhurst, NY 11370 | | | |
| **TOTALS** | $    19,000,000.00 | $    19,000,000.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the    ☐ fine   ☐ restitution.

    ☐ the interest requirement for the    ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___7___ of ___7___

DEFENDANT:  Jona Rechnitz
CASE NUMBER:  1: 16 cr. 00389-01(AKH)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A   ☑   Lump sum payment of $ __100.00__ due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with  ☐  C,   ☐  D,   ☐  E, or   ☐  F below; or

B   ☐   Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

C   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E   ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   ☑   Special instructions regarding the payment of criminal monetary penalties:
    The defendant shall pay restitution in the amount of $10,000,000.00, joint and several with the $19,000,000.00 restitution obligation of co-conspirators Norman Seabrook (16 Cr. 467) and Murray Huberfeld (16 Cr. 467).  The defendant shall make payments of $500,000 per year, payable in equal monthly installments, due on the last day of each month.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

| Case Number Defendant and Co-Defendant Names (including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

# EXHIBIT - 2

Jona Rechnitz
███████████████
Los Angeles, CA ████
October 16, 2019

Honorable Alvin K Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Hellerstein:

I am a felon. I am a criminal. I am the ONLY person to blame for that.

I have caused tremendous pain and embarrassment to my family, my religion, and to myself.

There is no way to undo what's been done. It's permanent, and for that I am truly sorry to everyone hurt by my crimes and actions. It eats me alive each and every day. When I wake up, when I go to sleep, it is always on my mind for the past 4 years.

My actions harmed the people of New York, The people of Correction Officers Benevolent Association, my friends, my family and my community. I will forever carry this burden, as I deserve to.

I have read of your Honor asking at various sentencings, why do good people do bad things?

In my case, not assuming I'm a good person, I can answer this question. Arrogance, greed, and insecurity.

Arrogance. I felt I was above the law. At this young age in my late 20's I was busy accepting honors at dinners and board positions at prestigious institutions. It got to my head.

Greed. I wanted to gain contacts to grow my business, to make money and gain stature in the long run.

Insecurity. I wanted to gain popularity by my peers and become a big shot in my community and business circles.

Shame on me.

Finally, I couldn't wiggle my way out of this one. It changed my life as I knew it forever.

As a supposed religious man, I have been a disgrace to my religion. The only way to fix this is to make serving G-d my main focus for the rest of my life. I try to every day. I have changed as a person religiously, through prayer, my public and private behavior, and I always stop and think before I'm about to do something to see if it is something my parents, my family, and G-d would approve of.

Making the decision to come forward was the right decision. A very tough decision with tremendous repercussions, but the appropriate decision. It has come with a hefty price. I did not foresee what I was signing up for, and it has been a brutal four years, but I made the right decision. I learned that doing the right thing isn't always the easiest, but it is the only choice. There is right and wrong and nothing in between. It has changed me for the better. It has forced me to change, which I have.

I had to testify in three separate trials. Not an easy task. Outside of the regular pressures a crucial witness deals with, these circumstances were even tougher. There was a lot of press coverage, a lot of community pressure, and a lot of threats and comments made to me. The press put me on trial instead of the defendants. The press called me a snitch and paid more attention to me and my testimony then on the actual trials. They made calls to my friends, my family, and waited outside my home for me to walk outside.

Parts of the community shunned me and my family. Your honor, I can not stress the amount of pain and suffering that we received during this time. Unimaginable pain. Eventually we had to leave town. Leave our lives. Leave immediately.

Then there were the threats and private investigators after me. Threatening voice messages, windows smashed at home, windows smashed in my car several times and my parents cars on the same day at their home, people following me and sitting outside of my home in Los Angeles for periods of time. My wife and I were harassed and video taped at the mall, humiliated in our Synagogue, and embarrassed in public at a local LA high school charity event.

Your Honor, there are so many examples that I am omitting as I don't want to portray myself as the victim here. I caused a lot of pain and harm to others through my criminal activity and don't want to detract from that.

Even at various trials there were intimidation tactics. An attorney representing a defendant yelled at me in the hallway walking in to court and shoved the prosecutor when he confronted him.

The disgusting feeling I had waking up in the morning to go to trial after trial after trial. Sometimes for a week and a half straight.

One of the toughest moments was when a mistrial was declared. I remember feeling like I wanted to tap out. But I could not. I made this decision for me and my beautiful family with the hope of staying together with them at the end of this nightmare. This has been the key factor keeping me going. My family. My amazing, incredible wife and my beautiful 6 children.

The highlight of my week used to be sitting in NYPD Headquarters like a big Macher. Today, my highlight is walking to Synagogue with my children every week, and I let them know it every time we walk. When I ask them what my favorite part of the week is, they say, Daddy! You know the answer, but I still make them repeat it.

Your Honor, I can now tell you proudly I am a hands-on father and husband. I am more of a mentsch. I was not during my criminal years. For that alone, I am grateful to this situation. My wife is an amazing woman. She had a bad feeling about the people I was hanging out with and the people I wanted to impress. She was right. I should have listened to her. I do now.

I had real estate holdings which I had to give up throughout this ordeal. Many investors didn't want to be associated with me, nor do I blame them. In a few cases, some partners viewed my situation as an opportunity forcing me to give up different holdings and assets, taking management decisions and authority from me, ultimately removing me entirely. Starting to make a living again was a struggle for a period of time. Fortunately my wife and I started a new business endeavor, which looks promising. As your Honor can imagine it is hard to find a bank to work with me, so I have secured private loans and financing from family and friends. I finally have a business going that has provided stability and a way to make a living. This case has left me in a big financial hole - I have had to borrow millions of dollars to get this business going and to support my family. I am finally in a position to dedicate myself again to supporting my family. I don't see any way possible to start over a third time. I beg you to allow me to continue on this second journey of life.

This has been a difficult time. I don't feel healthy at all. I am on anti depressant medication, I wake up in the middle of the night in pain and my neck and hands are burning, and I will forever carry this guilt.

Family is everything to me. Cuddling with my children is everything to me. Being a community member and helping others is everything to me. Since this entire ordeal my wife gave birth to two beautiful baby girls. A decision that we made to not put life on hold but to continue with life in the right path and be optimistic that doing the right thing will not hinder our future.

I am a changed man. I suffered a lot. I have been severely punished. My family has suffered a lot. I beg your Honor, please allow me to continue on the path I'm on, together with my family, my wife and 6 young children. They need their Daddy, I need my family together with me, and I promise your Honor, to continue to make

my family proud, my community proud, and your Honor proud.

With humility and sincerity,

Jona

# EXHIBIT - 3

Robert Rechnitz

Beverly Hills, CA

Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl St.
New York, NY 10007

Dear Judge Hellerstein

I am sorry to say that Jona by his acts, lost his integrity and acted hypocritically to his faith. Notwithstanding his goodness and his affinity for helping others, he crossed the line that could never be reversed for the rest of his life. Regardless of his state of maturity at the time, his decision impacted him and his entire family as it has consumed us for the past nearly four years.

When Jona decided to come forward and notify the government, he immediately called a family meeting and apologized to my wife, myself, and each sibling for his transgressions. He continues to apologize to us and express regret until this date. He carries the burden of shame for what he caused our family.

Growing up, Jona was always a great source of pride for us. My wife and I constantly enjoyed compliments from parents of friends, elderly people, the New York community on the West Side once they moved there, and business associates. Never would I have believed that Jona could be involved in the crimes that took place.
I offer no excuses for his actions which were contrary to the way that he was brought up and to the examples in our family.
I do, however, understand that with his business success at a young age, came a lot of immaturity and impulsive decisions. I too, share in the responsibility for so many of Jona's actions. It was unfair of me to allow Jona to take so many responsibilities upon himself without my guidance and involvement. In a quest to prove himself independent and become a mover and shaker in the New York community, we saw his personality take a different course. I should have seen the warning signs and intervened early on. Everything happens for a reason and no doubt G-d sent him a message that will serve him well for the rest of his life. Jona is a bit codependent and is happy to always come through for people and organizations. Sadly he had a dose of reality by watching those organizations turn their back on him because you are only as good as the last favor you did for them. This too was a very good lesson for him going forward.
Your Honor, with all the pain this experience has brought, I have seen Jona repent on every level. He suffered tremendous financial losses in real estate as a result of partners taking advantage of his position as a felon to take away his promoted equity on investments. The group that took this away from him are supposedly Jewish community leaders. I believe that is another good lesson for Jona to learn. You don't wear religion on your sleeve you wear it in your heart. How you act from one person to another reflects who you are. There is no concept of " Between man and G-d, "If there is no respect "Between man and fellow man."

Jona lost his direction but he is now solidly back on track practicing and appreciating the most important elements of being a self-respecting person.

He together with Rachel and their six children have relocated to LA. They have established a much more humble life for themselves. He is back to the basics of living and maintaining a family. He still participates together with Rachel in all their acts of kindness to others. He is still a friend that anyone can lean on. The quality time that he spends with Rachel and the children, by far exceeds the time that he spent with them when he was moving at a fast pace in New York.

The move has done them well and Jona is building a new business. He lives with the shame and the pain of what he did and what he caused to others. On the other hand he did not wait for any further action on behalf of the government but he immediately took ownership of his crimes and offered his full support and cooperation with the government. Out of concern for Halacha, he sought guidance from his friend and Rabbi, Shlomo Einhorn who sought guidance from Rabbi Herschel Shachter.
Jona is a very sensitive individual and is always concerned about doing the right thing. Your Honor, I must say that the way that he is repenting and has changed his life and learned from his mistakes, is doing the right thing. Jona has a wife and six children and they need him to be home and a constant part of their life after these last turbulent four years.

Your Honor, I plead for leniency for my dear son, so that he can continue to maintain the stable family and not lose the improvements that he has made. Six children need two parents care.

Humbly,

Robert Rechnitz

# EXHIBIT - 4

JCJYRECS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x

UNITED STATES OF AMERICA,

            v.                          16 CR 389 (AKH)

JONA RECHNITZ,

               Defendant.

                              Sentence

------------------------------------------------x

                              New York, N.Y.
                              December 20, 2019
                              10:15 a.m.

Before:

                 HON. ALVIN K. HELLERSTEIN,

                              District Judge

                     APPEARANCES

GEOFFREY S. BERMAN
      United States Attorney for the
      Southern District of New York
BY: MARTIN S. BELL
      JESSICA LONERGAN
      KIMBERLY RAVENER
      LAURA POMERANTZ
      Assistant United States Attorneys

COOLEY LLP
      Attorneys for Defendant
BY: ALAN LEVINE

Also Present:
Andrew Hamilton, Government Paralegal Specialist
Marc Klausner, NYPD

              SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

23    Joseph Downs, FBI

24

25

64

JCJYRECS

1   and, Judge, appearing before judges of this court, including

2   yourself, we either gain or lose credibility.  My hope is that

3   I personally have kept faith with not just a certain caliber of

4   advocacy but also with the truth and with the way things really

5   are.

6           To the extent that I have amassed that credibility

7   over a period of time, I am laying it entirely on not only the

8   quality of Mr. Rechnitz's cooperation but the value of what

9   that means to the mechanism of justice working with respect to

10  future cooperators.

11          THE COURT:  I have your point, Mr. Bell.

12          MR. BELL:  Thank you, Judge.

13          THE COURT:  Mr. Levine.

14          MR. LEVINE:  Your Honor, I think it might be helpful

15  if the Court hears from Mr. Rechnitz first.

16          THE COURT:  Sure.

17          Mr. Rechnitz.

18          THE DEFENDANT:  Your Honor, I stand before your Honor

19  and this court with respect for the law, tremendous remorse for

20  my actions and behavior, and with great humility.

21          Growing up, my parents raised me in a very loving

22  environment --

23          THE COURT:  Don't worry about the microphone,

24   Mr. Rechnitz.  Speak to me.  I'll hear you.

25          THE DEFENDANT:  Growing up, my parents raised me in a

JCJYRECS                                                              65

1    very loving environment.

2            THE COURT:  That's okay, Mr. Levine.  I can hear him.

3            Go ahead.

4            THE DEFENDANT:  Growing up, my parents raised me in a

5    very loving environment with an emphasis on religion and  doing

6    the right thing.  Here I am.  I did not start off this way, and

7    I was raised differently.

8            I have let down my family, my parents, my in-laws,  my

9    wife, my children, friends, and my community in a big way.  I

10   made very poor choices, and many people have suffered  because

11   of them.  I didn't always appreciate the fact that I had the

12   blessing to have six beautiful children in my home and a

13   beautiful wife.

14           When you get into trouble, you realize the  blessings

15   of life and what's important.  I took my blessings for granted.

16   I've been a real fraud to God, a fraud to my wife and family,  a

17   fraud as an American, a fraud as a businessman, and a fraud  to

18   the people of New York, namely, the hard-working COBA  members,

19   and I'm truly sorry for that.  My actions have hurt many

20   people, and I'm very sorry for that.  I continue to pay for my

21   mistakes on a daily basis.

22           While testifying before your Honor during the  Norman

23    Seabrook trial, a tape was played for the jury.  It had

24    recorded a conversation where I was going to attend an  Mincha

25    prayer service as a Shiva.  Your Honor asked me to explain what

JCJYRECS                                                                66

1   Shiva and Mincha were for the jury.  In fact, your Honor

2   explained it much better than I did afterwards.

3          At that moment is when it really hit me what a

4   hypocrite I've been.  It was that exact moment.  Here I am

5   going to pray to God and visiting a mourner to comfort them,

6   and then I turn around and commit these crimes and sins.  It is

7   not the way I was raised and not the way I was educated.

8          While living in New York City, I wrongly felt pressure

9   to become a bigshot.  I was working for one of the largest real

10  estate companies in 2007, and it got to my head.

11         I was in my late 20's, and big people in the real

12  estate industry were dealing with me.  My ego was big, and I so

13  badly wanted to impress these people in order to advance my

14  career and profile.  This is where things started to spiral out

15  of control.  This is where I went so off the rails for a number

16  of years.

17         I assure your Honor that these past years and the

18  experience I've gone through has changed me.  I will never act

19  that way again.  My family and I have been through too much.

20         I have been forced to self-reflect, and I have

21  identified many of my flaws in order to grow from my mistakes.

22  I apologize for my criminal and immoral behavior for trying to

23    bribe my way through these years of my life.

24              I left the moral way of going about business and my

25    religious beliefs.  I bestowed gifts upon police officers in

JCJYRECS                                                                        67

1    exchange for favors in return.   I raised and contributed large

2    sums of money for the mayor of New York City and his projects

3    in the hope of obtaining benefit in return.

4              I introduced Norman Seabrook and Murray Huberfeld to

5    each other for the purposes of COBA to invest funds into

6    Murrey's fund, Platinum Partners, so that they could both

7    mutually financially benefit from one another and to elevate my

8    status with them.

9              I knowingly delivered a $60,000 kickback payment to

10   Norman Seabrook from Murray Huberfeld.   This corrupt bargain is

11   something that continues to haunt me.   I have struggled with

12   how it is I let my life go astray this way and how I took leave

13   of my adherence of the law and spirituality.

14             I've been a big hypocrite to my religion.   I failed to

15   conduct myself properly between myself and my fellow man and

16   between myself and my relationship with God.   I have strayed.

17             I did all of these horrible things without worrying

18   about God or the consequences that come with this sort of

19   behavior.   I cannot express to your Honor how ashamed I am for

20   desecrating my religion.

21             I have and will continue to repent to God every single

22   day.   I have and continued to make amends.   Part of my efforts

23    to make right included cooperating as a first step.  I have a

24    lot more work to do.

25              I did the best I could for the government and told the

JCJYRECS                                                                    68

1   truth about myself, and I realize that I will have to make

2   financially right those that I hurt.

3          Please allow me just a few more minutes to discuss the

4   cooperation.  I hired Mr. Levine in 2016, May 2016.  When I

5   realized that there was an investigation heating up, I knew I

6   had not told the truth to the New York City police officers and

7   Internal Affairs Bureau a few months earlier.

8          Right away, based on my initial conversations with

9   Mr. Levine and Ms. Laura Birger, I authorized them to meet  with

10  the assistant U.S. attorneys and begin the process of making  a

11  proffer, agreeing to plead guilty and signing a  cooperation

12  agreement.

13         I understood from those initial meetings with both  my

14  lawyers and the government, if I was going to cooperate with

15  the government, I needed to be 100 percent truthful.

16         I have been completely forthcoming in all my meetings

17  and on the witness stand throughout three separate  trials.

18  There is not any question that I was asked that I did not

19  answer truthfully, and there are many events and conduct that  I

20  told the government that they did not know.

21         Included in my early proffer sessions with the

22  government -- this was in the spring of 2016.  I gave the

23      government information about two different hard-lending

24      businesses that I was involved in.

25              One turned into a criminal case in which Peralta was

JCJYRECS                                                                    69

1   charged with a Ponzi scheme, and the second one also turned

2   into a criminal case charging Nissen with the same scheme.

3           At the time, I was unaware these were both Ponzi

4   schemes and, as a result, personally lost money for myself and

5   others.  Since then, I am more cautious and conservative in my

6   business dealings.

7           My financial dealings with both were a mess with lots

8   of transactions, paying and receiving, some on my own behalf

9   and some on behalf of third parties, including cash

10  transactions.

11          I was simply unable to sort all those transactions

12  out, and I have yet to file a 2015 tax return.  I told my

13  lawyers and the government about that at the time immediately.

14          After speaking with my accountant during 2016, I

15  realized I cannot file my 2015 tax returns accurately because I

16  did not have a handle on all the transactions, and I can't

17  provide my accountant with complete information.

18          The situation got more complex in 2017 for 2016

19  because criminal charges were filed.  I was scheduled to

20  testify in one of the trials, and there was no way to sort out

21  the transactions.

22          As I testified in all three trials, I have yet to file

23    the returns for these years up through 2018.  I was sued in the

24    Peralta bankruptcy and settled paying over $350,000 to the

25    state.

JCJYRECS                                                                    70

1          I have been sued in the Nissen bankruptcy, but that

2    has not moved forward yet, and I do not know what my exposure

3    will be at that bankruptcy.  I understand my obligation to

4    resolve that bankruptcy and have filed tax returns for those

5    years.  And I also understand the additional problems I have

6    created in my inability to file those returns, including the

7    financial consequences they will cause.

8          This is one of several jobs that I have in the coming

9    months as I continue to sort out my life in a lawful path.

10   In fact, I will spend the rest of my life trying to make amends

11   for my criminal behavior.

12         I will try to make a better name for my family, for my

13   religion, and for myself.  I am on the path to recovery,

14   your Honor.  I am a better family man; I am a better friend; I

15   am a more religious person.  I am working again to make an

16   honest living.

17         Please allow me to continuing on this course

18   undisrupted in order to provide for my large family.  I really

19   want to do good, please.  I failed myself in a number of ways.

20   I am humbly asking your Honor to stop the bleeding, to continue

21   in this new business I've started in order to provide for my

22   family and to enable me to take care of my financial

23     responsibilities.

24            THE COURT:  What is the new business?  Jadelle?

25            THE DEFENDANT:  Jadelle, yes.  I really paid a hefty

JCJYRECS                                                                    71

1  price for cooperating with the government for my crimes.  Most

2  recently, the New York Post put up an article that was

3  mentioned this morning -- your Honor may not be aware --

4  accusing me of hobnobbing and flirting with the rich and  famous

5  at a time when I claim I am a pariah to society.

6          In fact, Jadelle Jewelery hosted a jewelery show  to

7  promote the brand and new jewelry collection.  The event was to

8  make sales and increase business.  One attendee was a Kim

9  Kardashian, a client of Jadelle.

10         If one were to read the article, I am portrayed as  a

11 hobnobber with no concern in the world, no remorse  whatsoever,

12 and like a party animal.  I urge your Honor to watch the  video

13 that was attached to the article online, and your Honor  will

14 see a very different picture.

15         Your Honor will see me dressed in a suit and a tie

16 trying to sell jewelry, no partying, no hobnobbing, just a  man

17 trying to make an honest living.

18         I am not here to complain about my suffering in the

19 past few years, but I can promise your Honor I have been

20 punished in so many ways I can't begin to describe.

21         Within my community, within the media, and through

22 self-introspection.  In New York City, I am persona non grata.

23   I am to blame.  I burnt a lot of bridges and relationships and

24   had to relocate to California.

25             I am so truly sorry for my behavior.  I am a changed

JCJYRECS                                                                    72

1    man.  I have had years to make this change.  It did not happen

2    overnight, your Honor.  I have had four years, close to four

3    years, since this ordeal started.

4            I beg your Honor, please allow me to remain with my

5    family, my beautiful wife and children, and allow me to

6    continue working so that I can continue to provide for them  and

7    make good on my financial obligations.

8            I don't see any way to start over a third time.  I'm

9    on my second chance.  Please allow me to continue on this path.

10   Thank you.

11           THE COURT:  Mr. Levine.

12           MR. LEVINE:  Your Honor, I was just going to ask.  The

13   hour is late.  If the Court would want to take a recess, I

14   would certainly appreciate that.

15           THE COURT:  It's very tempting.

16           MR. LEVINE:  If the Court wishes to proceed, I'd like

17   to proceed.

18           THE COURT:  Keep going, Mr. Levine.

19           MR. LEVINE:  So, your Honor, we're finally here for

20   the day of Mr. Rechnitz's sentence.  How did he get here.  And

21   I think an important question on the mind of the Court is has

22   he shown remorse.

23          Your Honor, we've submitted a lot of letters, and what

24     comes out from those letters is the personality of an

25     individual wanting and needing to help people.

JCJYRECS                                                                    73

1         THE COURT:  I've read the letters.  They depict a

2    person who enlarges others by charity, by friendship to others

3    and makes other people feel better.

4         And yet in the life that's been depicted in this

5    court, he cheapens people.  He works on their insecurities and

6    their quest for material possessions and just does the

7    opposite.  He diminishes people.

8         How can you square both?

9         MR. LEVINE:  Your Honor, that's what I was going to

10   say.  So this personality that has done so much good for so

11   many people before these events, during these events, and  since

12   these events -- it collided with his desire to be  independent,

13   to establish himself in Manhattan, and not to take the

14   comfortable road going back to Los Angeles.

15        It also collided with his desire for immediate  success

16   by staying in Manhattan in his late 20's.  It introduced him to

17   a world of Jeremy Reichberg.  And he realized in that world

18   that with his money, he could do good for police officials  and

19   others, to have them at his beck and call for his community and

20   for himself.

21        What he perceived, incorrectly, would be a  win/win,

22   and it turned into a bad/bad.  He never should have offered

# EXHIBIT - 5



### SECRETARY OF STATE
### STATE OF CALIFORNIA

### UCC Filing Acknowledgement

03/06/2019

Page 1 of 2

FIRST INTERNATIONAL DIAMOND INC
P.O. BOX 3765
BEVERLY HILLS CA 90212

Filing Fee:          $5.00

Total Fee:          **$5.00**

The California Secretary of State's Office has received and filed your document. The information below reflects the data that was indexed in our system. Please review the information for accuracy. Included is an image of the filed document to assist you in your review. If you find a potential error, please notify the UCC Section at the number listed below at your earliest convenience.

Filing Type: **Financing Statement**          File Date: **03/06/2019**          File Time: **13:44**

Filing Number: **19-7700745484**          Lapse Date: **03/06/2024**

Debtor(s):
ORGANIZATION          **JADELLE JEWELRY AND DIAMONDS LLC**

                      **9621 BRIGHTON WAY BEVERLY HILLS CA USA 90210**

ORGANIZATION          **JADELLE JEWELRY AND DIAMONDS LLC**

                      **9454 WILSHIRE BLVD #PHG01 BEVERLY HILLS CA USA 90210**
ORGANIZATION          **JADELLE JEWELRY AND DIAMONDS LLC**

                      **5700 WILSHIRE BLVD #355 LOS ANGELES CA USA 90036-3659**

Secured Party(ies):
ORGANIZATION          **FIRST INTERNATIONAL DIAMOND INC**

                      **P.O. BOX 3765 BEVERLY HILLS CA USA 90212**

Filing by the Secretary of State is not conclusive proof that all conditions for securing priority have been met. Ensuring that accurate information is on the document to be filed is the responsibility of the filing party. If this filing is challenged, the Secretary of State does not guarantee that the filing is legally sufficient to secure priority under UCC Article 9 and expressly disclaims any liability for failure of the filing party to secure priority resulting from the information contained in the filed document, or the lack of information on the filed document.

UNIFORM COMMERCIAL CODE 1500 11TH STREET, 2ND FL. · SACRAMENTO, CA 95814  · P.O BOX 942835  · SACRAMENTO, CA 94235-0001  · (916) 653-3516  · HTTPS://UCCCONNECT.SOS.CA.GOV

PROGRAMS   ARCHIVES, BUSINESS PROGRAMS, ELECTIONS, INFORMATION TECHNOLOGY, CALIFORNIA STATE HISTORY MUSEUM,
MANAGEMENT SERVICES, SAFE AT HOME, DOMESTIC PARTNERS REGISTRY, NOTARY PUBLIC, POLITICAL REFORM

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

3102751200

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

FIRST INTERNATIONAL DIAMOND INC
P.O. BOX 3765
BEVERLY HILLS, CA 90212
USA

DOCUMENT NUMBER: 77246760002
FILING NUMBER: 19-7700745484
FILING DATE: 03/06/2019 13:44

IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| JADELLE JEWELRY AND DIAMONDS LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 9621 BRIGHTON WAY | BEVERLY HILLS | CA | 90210 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| JADELLE JEWELRY AND DIAMONDS LLC | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 9454 WILSHIRE BLVD #PHG01 | BEVERLY HILLS | CA | 90210 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| FIRST INTERNATIONAL DIAMOND INC | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| P.O. BOX 3765 | BEVERLY HILLS | CA | 90212 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

This Financing statement covers the following collateral:
All property, Goods and merchandise which have been, are now, or may at any time be delivered on consignment consigned or entrusted by
First International Diamond Inc to JADELLE JEWELRY AND DIAMONDS LLC, including without limitation,diamonds,gemstones and other
precious and semi-precious jewelery,rings,bracelets and all other property, goods and merchandise in which diamonds,gemstones,precious
or semi-precious metals or stones are processed,mounted,included or converted and any accessory items, and the proceeds (including
without limitation, insurance proceeds and proceeds from sale or other disposition)and receivables arising there from, wheresoever
located, future consignment and deliveries are covered.
As related to or connected with the property described above, all accounts, accounts receivables, other receivables, contract rights,
chattel paper, general intangibles, whether now owned or hereafter acquired by the debtor or in which the debtor may now or hereafter

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions)     ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box: |
|---|---|
| ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien   ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY

# UCC FINANCING STATEMENT **ADDENDUM**

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because individual
Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME
JADELLE JEWELRY AND DIAMONDS LLC

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)                                    SUFFIX

DOCUMENT NUMBER: 77246760002

IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit,
modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME
JADELLE JEWELRY AND DIAMONDS LLC

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)                        SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5700 WILSHIRE BLVD #355 | LOS ANGELES | CA | 90036-3659 | USA |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

OR

11a. ORGANIZATION'S NAME

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (collateral):
acquire an interest and proceeds from all the foregoing.
This financing statement covers consignments made by secured party to any of the debtor's affiliated companies, stores or DBAs
wherever located.

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE
RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of RECORD OWNER of real estate described in item 16 (if Debtor
does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY

# EXHIBIT - 6

6/25/19

Dear Oved / First International Diamonds Inc.,

 I very much enjoyed speaking to you by phone. Jona has shared some of your conversations with me. Thank you for being a confidant for Jona. He mentioned to me about how your Father had a special bond and relationship with you. I was also privileged to have a close relationship with my Father, as did Jona. I'm sure you will find much success in your dealings together.

I completely understand your desire to know that Jona's family is aware of his dealings with you and stands behind him. I am pleased to confirm that I stand behind Jona and all his dealing with you.

You have indicated that you have extended memos up to the amount of $12,000,000.00. If for some reason you need to callback your credit line, all merchandise will be returned to you, and any cash deficiencies will be repaid by me.

May your confidence in Jona and your extension of credit be profitable for both of you.

BOBBY RECHNITZ

CC: JONA RECHNITZ

# EXHIBIT - 7

## GUARANTY

This Guaranty ("Guaranty") is entered into this **27** day of **July** , 2019, by JONA RECHNITZ, an individual and RACHEL RECHNITZ, an individual (collectively, "Guarantor") in favor of FIRST INTERNATIONAL DIAMOND INC, a California corporation, and OVED ANTER, an individual (collectively, the "Consigner") with respect to certain obligations of JADELLE JEWELRY & DIAMOND, LLC, a Delaware limited liability company ("Consignee"). Guarantor is financially interested in Consignee and in order to induce Consigner to enter into those certain jewelry memos for diamonds and jewelry, on consignment, in the approximate amount of Twelve Million Dollars ($12,000,000), at wholesale, between Consigner and Consignee (the "Jewelry Memos"), and Guarantor is willing to enter into this Guaranty.

**1. Guaranty.**     In order to induce Consigner to enter into the Jewelry Memos, Guarantor unconditionally, absolutely, and irrevocably guarantees and promises to Consigner full and complete payment and/or performance by Consignee in the event that: (1) Consigner calls back the consigned goods, (2) there is a theft of goods, (3) the goods are lost in shipment or transit, (4) the goods are damaged, or (5) in the event that Consignee has filed a pending insurance claim for the consigned goods and there is a shortage owing to Consigner from any insurance settlement proceeds. Consigner shall notify in writing to Consignee that it requires Consignee's payment and/or performance and within 60 (sixty) business days from notice, Consignee is required to make such payment and/or performance. If the goods are damaged, Consignee agrees to repair the consigned goods to the original condition in which it was received by Consignee. If Consignee is awaiting insurance settlement proceeds for any loss/damage to the consigned goods, then payment is due from Consignee to Consigner within 60 (sixty) business days from Consigner's notice of any shortage between the wholesale amount listed in the Jewelry Memo and the insurance proceeds received by Consignee. Items (1)-(5) above shall hereinafter be referred as the "Guaranteed Items".

**2. This** is a continuing guaranty of payment and/or performance of the Guaranteed Items and not of collectability, which shall remain in full force and effect during the term of the Jewelry Memos, as renewed or extended, and thereafter until Consignee's obligations are fully satisfied, and Guarantor waives any right under California Civil Code §2815 to revoke this Guaranty based upon a failure of continuing consideration or otherwise. If all or any portion of the obligations guaranteed are paid or performed, this Guaranty shall continue in full force and effect in the event that all or any part of such payment or performance of the Guaranteed Items is avoided or recovered directly or indirectly from Consigner as a preference, fraudulent transfer or otherwise.

**3. Changes Do Not Affect Liability.** Guarantor consents and agrees that Consigner may, without affecting Guarantor's liability under this Guaranty, from time to time (a) renew, compromise or extend, accelerate, grant extensions of time or otherwise change or amend the Jewelry Memos or any of Consignee's obligations under the Jewelry Memos; (b) take, hold, release, waive, exchange, modify or enforce any security for the payment and performance of the Guaranteed Items and make elections under the federal bankruptcy laws concerning any such security (c) apply such security and direct the order or manner of sale thereof as Consigner in its discretion may determine; (d) release or substitute any one or more of the persons liable for Consignee's obligations under the Jewelry Memos or guarantors of the Guaranteed Items, including but not limited to any other person signing this Guaranty; (e) accept or make compositions or other arrangements or file or refrain from filing a claim in any bankruptcy proceeding of Consignee or any other guarantor or pledgor; and (f) otherwise deal with Consignee or any other guarantor or pledgor or party related to the Jewelry Memos or any security or collateral in such manner as Consigner may determine in its sole and absolute discretion.

**4. Independent Liability; Joint and Several Liability.** Guarantor agrees that one or more successive or concurrent actions may be brought on this Guaranty against Guarantor, in the same action in which Consignee may be sued or in separate actions, as often as deemed advisable by Consigner. The obligations under this Guaranty are joint and several, and independent of the

obligations of Consignee.

**5. Remedies Cumulative; No Waiver.** Consigner agrees they first need to seek payment or performance from Consignee of the Guaranteed Items. If the obligation under the Guaranteed Item is not paid or performed when due, then Guarantor will pay or perform it according to its tenor. Consigner shall have the right to seek recourse against Guarantor to the full extent provided for in this Guaranty and in any other instrument or agreement evidencing obligations of Guarantor to Consigner, and against Consignee to the full extent of the obligations guaranteed hereby. No election in one form of action or proceeding, or against any party, or on any obligation, shall constitute a waiver of Consigner's right to proceed in any other form of action or proceeding or against any other party. All remedies under this Guaranty shall be cumulative and shall be in addition to all rights, powers and remedies given to Consigner by law or under any other instrument or agreement.

**6. Bankruptcy of Consignee.**     Guarantor shall not commence or join with any other person in commencing any bankruptcy, reorganization or insolvency proceedings against Consignee or any person liable for Consignee's obligations under the Jewelry Memos. Guarantor shall file in any bankruptcy or other proceeding in which the filing of claims is required or permitted by law all claims which Guarantor may have against Consignee relating to any indebtedness of Consignee to Guarantor and will assign to Consigner all rights of Guarantor thereunder. Consigner shall have the sole right to accept or reject any plan proposed in such proceedings and to take any other action which a party filing a claim is entitled to do. In all such cases, whether in administration, bankruptcy, or otherwise, the person or persons authorized to pay such claim shall pay to Consigner the amount payable on such claim and, to the full extent necessary for that purpose, Guarantor hereby assigns to Consigner all of Guarantor's right to any such payments or distributions to which Guarantor would otherwise be entitled; provided, however, that Guarantor's obligations hereunder shall not be satisfied except to the extent that Consigner receives cash and anything hereunder other than cash by reason of any such payments or distribution.

**7. Successors and Assigns; Amendment.** All rights, benefits and privileges under this Guaranty shall inure to the benefit of and be enforceable by Consigner and its successors and assigns and shall be binding upon Guarantor and his heirs, representatives, successors and assigns. Neither the death of Guarantor nor notice thereof to Consigner shall terminate this Guaranty as to his estate, and, notwithstanding the death of Guarantor or notice thereof to Consigner, this Guaranty shall continue in full force and effect. The provisions of this Guaranty may not be waived or amended except in a writing executed by Guarantor and a duly authorized representative of Consigner.

**8. Construction; Severability; Integration.** When this Guaranty is executed by more than one Guarantor, the word "Guarantor" shall mean all and any one or more of them. Words used in this Guaranty in the masculine or neuter gender shall include the masculine, neuter and feminine gender, and words used in this Guaranty in the singular shall include the plural and vice versa, wherever the context so reasonably requires. If any provision of this Guaranty or the application thereof to any party or circumstance is held invalid, void, inoperative, or unenforceable, the remainder of this Guaranty and the application of such provision to other parties or circumstances shall not be affected thereby, the provisions of this Guaranty being severable in any such instance. This Guaranty is the entire and only agreement between Guarantor and Consigner respecting the guaranty of the Guaranteed Items, and all representations, warranties, agreements, or undertakings heretofore or contemporaneously made.

**9. Governing Law; Jurisdiction.**     This Guaranty is governed by and construed according to the laws of the State of California applicable to contracts made and to be performed in such state. In order to induce Consigner to accept this Guaranty, and as a material part of the consideration therefor, Guarantor (i) agrees that all actions or proceedings relating directly or indirectly to this Guaranty shall, at the option of Consigner, be litigated in courts located within the State of California, and (ii) consents to the jurisdiction of any such court and consents to the service of process in any such action or proceeding by personal delivery or any other method permitted by law.

**10. Paragraph Headings.**     Paragraph headings are used in this Guaranty for convenience only and shall not be used in any manner to construe, limit, define or interpret any provision of this Guaranty.

11. Time of Essence. Time is of the essence in the performance by Guarantor of each and every obligation under this Guaranty.

12. Notices. Any notice which a party shall be requested or shall desire to give to the other under this Guaranty shall be given by personal delivery or by depositing the same in the United States mail, first class postage pre-paid, addressed to Consigner at its address set forth in the Lease and to Guarantor at its address set forth below, and such notices shall be deemed duly given on the date of personal delivery or three (3) days after the date of mailing as aforesaid. Consigner and Guarantor may change their address for purposes of receiving notices under this Guaranty by giving written notice thereof to the other party in accordance with this Section. Guarantor shall give Consigner immediate written notice of any change in its address.

13. Advice of Counsel. Guarantor has had the opportunity to review this Guaranty with its counsel, and such counsel has explained to it the meaning and significance of the provisions of this Guaranty, including but not limited to the waivers and consents contained in this Guaranty, and answered any questions that it had regarding the meaning, significance and effect of the provisions of this Guaranty.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty the day and year first above written.

GUARANTOR:

JONA RECHNITZ, an individual
Address:

Cell Phone: 4628332 283

GUARANTOR:

RACHEL RECHNITZ, an individual
Address: 9633 Sawyer Street
LA. CA. 90035
Cell Phone  551 4860869

2

*NOTE: THE TERMS & CONDITIONS, AND GUARANTY, ON THIS SIDE ARE*
*INCORPORATED BY REFERENCE INTO THE REVERSE SIDE.*
*READ ALL TERMS CAREFULLY BEFORE SIGNING ON THE REVERSE*

### TERMS AND CONDITIONS

This consignment creates a contract of bailment between First International Diamond, Inc., ("FID" or Bailor") and Customer ("Bailee"). FID agrees to deliver, and bailee agrees to accept, for inspection only the merchandise described on the reverse of this document. For purposes of this agreement the place of the making of the contract, and the place of delivery of the merchandise, shall be the offices of FID located in Los Angeles County. Bailee hereby grants to FID a security interest in the merchandise being delivered and consents to the filing of a Form UCC-1, or similar form, in all appropriate jurisdictions. The Merchandise shall be returned to FID upon demand and, if not so promptly returned, the amounts referred to on the reverse of this document shall become immediately due and owing. Title to merchandise delivered pursuant to this consignment shall remain in the name of FID until FID has delivered to Bailee a written bill of sale. Bailee agrees to return the merchandise in good condition. Bailee shall be liable to FID and to FID's successors in interest for any loss or damage to the merchandise resulting from fire, theft, breakage, or any other cause whatsoever. Bailee shall immediately name FID as an additional insured on any and all applicable insurance policies with respect to the merchandise. Delinquent accounts shall be charged the highest legal rate permissible under California law, or 1.5% per month, whichever is lower. In case legal action is required to enforce the terms of this consignment the prevailing party shall be entitled to recover costs and reasonable attorney's fees. All amounts due and owing to, or for the benefit of, FID by Bailee shall be referred to as the "indebtedness". California law shall govern this agreement; and the exclusive venue for suit shall be in the courts located in Los Angeles County, California. Bailee hereby consents to the jurisdiction of the courts located in Los Angeles County, California.

### GUARANTY

By my signature on the reverse, I also agree in my individual capacity (even though I may place a title or other designation next to my signature) to jointly and severally pay to FID all indebtedness of the Customer at any time arising under, or relating to, any purchases or merchandise delivered hereunder, whether by bailment, purchase, or consignment, including but not limited to, attorney's fees, costs, loss or damage. As guarantor I consent to FID's release or substitution of any other guarantor, or the Customer, or any extension, modification, accelerate, renewal or increase of the Customer's duty to make payment or return the merchandise. As guarantor I waive: (a) presentment, demand, notice, protest, notice of protest, and notice of non-payment; (b) any rights that I might have had under California common law; or (c) the right to insist that FID to first proceed against the Bailee, or any security posted by the Bailee. In case legal action is required to enforce the terms of this guaranty the prev ailing party shall be entitled to recover costs and reasonable attorney's fees. California law shall govern this agreement; and the exclusive venue for suit shall be in the courts located in Los Angeles County, California. Guarantor hereby consents to the jurisdiction of the courts located in Los Angeles County, California.

THE DIAMONDS HEREIN MEMOED OR INVOICED HAVE BEEN PURCHASED FROM A LEGITIMATE SOURCE not involved in funding conflict and with the united nations resolutions. The seller hereby guarantees that these diamonds are CONFLICT FREE, based on personal knowledge and/or written guarantee provided by the supplier of these diamonds.

*NOTE: THE TERMS & CONDITIONS, AND GUARANTY, ON THIS SIDE ARE*
*INCORPORATED BY REFERENCE INTO THE REVERSE SIDE.*
*READ ALL TERMS CAREFULLY BEFORE SIGNING ON THE REVERSE*

### TERMS AND CONDITIONS

This consignment creates a contract of bailment between First International Diamond, Inc., ("FID" or Bailor") and Customer ("Bailee"). FID agrees to deliver, and bailee agrees to accept, for inspection only the merchandise described on the reverse of this document. For purposes of this agreement the place of the making of the contract, and the place of delivery of the merchandise, shall be the offices of FID located in Los Angeles County. Bailee hereby grants to FID a security interest in the merchandise being delivered and consents to the filing of a Form UCC-1, or similar form, in all appropriate jurisdictions. The Merchandise shall be returned to FID upon demand and, if not so promptly returned, the amounts referred to on the reverse of this document shall become immediately due and owing. Title to merchandise delivered pursuant to this consignment shall remain in the name of FID until FID has delivered to Bailee a written bill of sale. Bailee agrees to return the merchandise in good condition. Bailee shall be liable to FID and to FID's successors in interest for any loss or damage to the merchandise resulting from fire, theft, breakage, or any other cause whatsoever. Bailee shall immediately name FID as an additional insured on any and all applicable insurance policies with respect to the merchandise. Delinquent accounts shall be charged the highest legal rate permissible under California law, or 1.5% per month, whichever is lower. In case legal action is required to enforce the terms of this consignment the prevailing party shall be entitled to recover costs and reasonable attorney's fees. All amounts due and owing to, or for the benefit of, FID by Bailee shall be referred to as the "indebtedness". California law shall govern this agreement; and the exclusive venue for suit shall be in the courts located in Los Angeles County, California. Bailee hereby consents to the jurisdiction of the courts located in Los Angeles County, California.

### GUARANTY

By my signature on the reverse, I also agree in my individual capacity (even though I may place a title or other designation next to my signature) to jointly and severally pay to FID all indebtedness of the Customer at any time arising under, or relating to, any purchases or merchandise delivered hereunder, whether by bailment, purchase, or consignment, including but not limited to, attorney's fees, costs, loss or damage. As guarantor I consent to FID's release or substitution of any other guarantor, or the Customer, or any extension, modification, accelerate, renewal or increase of the Customer's duty to make payment or return the merchandise. As guarantor I waive: (a) presentment, demand, notice, protest, notice of protest, and notice of non-payment; (b) any rights that I might have had under California common law; or (c) the right to insist that FID to first proceed against the Bailee, or any security posted by the Bailee. In case legal action is required to enforce the terms of this guaranty the prev ailing party shall be entitled to recover costs and reasonable attorney's fees. California law shall govern this agreement; and the exclusive venue for suit shall be in the courts located in Los Angeles County, California. Guarantor hereby consents to the jurisdiction of the courts located in Los Angeles County, California.

THE DIAMONDS HEREIN MEMOED OR INVOICED HAVE BEEN PURCHASED FROM A LEGITIMATE SOURCE not involved in funding conflict and with the united nations resolutions. The seller hereby guarantees that these diamonds are CONFLICT FREE, based on personal knowledge and/or written guarantee provided by the supplier of these diamonds.

# EXHIBIT - 8

**First International Diamond Inc.**
2220 Avenue Of The Stars, Suite 1005
Los Angeles, CA 90067
Tel: (310) 275-1200   Fax: (310) 276-3700

**MEMORANDUM**
**8415**

Date:   12/13/2019

MEMO IS GIVEN OUT
FOR 5 DAYS.

| ACCOUNT NO. | 2119 | PHONE NO. | 310-721-5151 | SHIP VIA | | | SP | OV |
|---|---|---|---|---|---|---|---|---|

MEMO TO:
**Jadelle Jewelry LLC**
9454 Wilshire Blvd
PH1
Beverly Hills, CA 90212

SHIP TO:
**Jadelle Jewelry LLC**
9454 Wilshire Blvd
PH1
Beverly Hills, CA 90212

| NO | LOT NUMBER | CARAT | UNITS | DESCRIPTION | • | % | PRICE | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 1 | REBBR0001 | | 1 | 5 rows PR 27.48 ct, 370 diamonds | | | $36,225.00 | $36,225.00 |
| | | 0.00 | 1 | | | | | |

| | |
|---|---|
| SUB TOTAL | $36,225.00 |
| SHIPPING | $0.00 |
| MEMO TOTAL | $36,225.00 |

See Back Side For Full Terms & Conditions    SIGNATURE: _____.

Page 1 of 1

# EXHIBIT - 9

**First International Diamond Inc.**
2220 Avenue Of The Stars, Suite 1005
Los Angeles, CA 90067
Tel: (310) 275-1200  Fax: (310) 276-3700

**MEMORANDUM**
**8431**

Date: 12/30/2019

MEMO IS GIVEN OUT
FOR 5 DAYS.

| ACCOUNT NO. | 2119 | PHONE NO. | 310-721-5151 | SHIP VIA | | SP | OV |
|---|---|---|---|---|---|---|---|

MEMO TO:
**Jadelle Jewelry LLC**
9454 Wilshire Blvd
PH1
Beverly Hills, CA 90212

SHIP TO:
**Jadelle Jewelry LLC**
9454 Wilshire Blvd
PH1
Beverly Hills, CA 90212

| NO | LOT NUMBER | CARAT | UNITS | DESCRIPTION | % | PRICE | AMOUNT |
|---|---|---|---|---|---|---|---|
| 1 | MT-5072 | | 1 | 13.62 PS D-VVS1 GIA, Harry Winston Mt/tr | | ,200,000.00 | $1,200,000.00 |
| 2 | OVEL101 | 10.03 | 1 | DIAM RD E IF 11923922166 | | $90,500.00 | $907,715.00 |
| | | 10.03 | 2 | | | | |

| | |
|---|---|
| SUB TOTAL | $2,107,715.00 |
| SHIPPING | $0.00 |
| MEMO TOTAL | $2,107,715.00 |

See Back Side For Full Terms & Conditions   SIGNATURE: _____.

Page 1 of 1

# EXHIBIT - 10



**BANK LEUMI USA**
MEMBER FDIC
**350 Madison Avenue - 4th Flr**
**New York, NY 10017**

Date:  01/22/20
Account:  8300418101
Page:  1 of 1

## Notice Of Returned Item
## CHARGEBACK

**FIRST INTERNATIONAL DIAMOND INC**
**PO BOX 3765**
**BEVERLY HILLS CA 90212**

The deposited item(s) listed below were returned unpaid and the Transaction Clearing Account noted above was debited for the amount of the item(s) returned.

| Date | Amount | Deposit Amt | Reason |
|------|--------|-------------|--------|
| 01/17/2020 | 922,760.00 | 2,122,760.00 | NSF - Not Sufficient Funds |
| 01/17/2020 | 1,200,000.00 | 2,122,760.00 | NSF - Not Sufficient Funds |

Please call Bank Leumi Customer Service (800-892-5430) with any questions regarding this notice.

---

**WELLS FARGO BANK**     2200
WILSHIRE CRESCENT  9354 WILSHIRE BLVD   BEVERLY HILLS, CA 90212     11-4248/1210
DATE 1/17/2020

PAY TO THE ORDER OF First International Diamond Inc     $ 922,760.00

Nine hundred twenty two thousand seven hundred sixty    DOLLARS

JADELLE JEWELRY AND DIAMONDS, LLC
9454 WILSHIRE BLVD PH G01
BEVERLY HILLS   CA 90212-2931

⑈121042882⑈86492613130⑈2200

Item# 5250005545274  01/22/2020  $922,760.00
Reason: NSF - Not Sufficient Funds

**WELLS FARGO BANK**     2201
WILSHIRE CRESCENT  9354 WILSHIRE BLVD   BEVERLY HILLS, CA 90212     11-4248/1210
DATE 1/17/2020

PAY TO THE ORDER OF First International Diamond Inc     $ 1,200,000.00

One Million two hundred thousand dollars    DOLLARS

JADELLE JEWELRY AND DIAMONDS, LLC
9454 WILSHIRE BLVD PH G01
BEVERLY HILLS   CA 90212-2931

⑈121042882⑈86492613130⑈2201

Item# 5250005545276  01/22/2020  $1,200,000.00
Reason: NSF - Not Sufficient Funds

NSF

*026002794*
01/22/2020
5250005545274

This is a LEGAL COPY of your
check. You can use it the same way
you would use the original check.

RETURN REASON (A)
NOT SUFFICIENT FUNDS

**Bank Leumi**

## WELLS FARGO BANK          2200
WILSHIRE CRESCENT   9354 WILSHIRE BLVD   BEVERLY HILLS, CA 90212

11-4268/1210

DATE 1/17/2020

PAY TO THE ORDER OF   First International Diamond Inc          $ 922,760.00

Nine hundred twenty two thousand seven hundred sixty          DOLLARS

JADELLE JEWELRY AND DIAMONDS, LLC
9454 WILSHIRE BLVD PH G01
BEVERLY HILLS   CA 90212-2931

⑈121042882⑈8649261313⑈2200

⑈121042882⑈ 8649261313⑈2200          "0092276000"

---

NSF

*026002794*
01/22/2020
5250005545276

This is a LEGAL COPY of your
check. You can use it the same way
you would use the original check.

RETURN REASON (A)
NOT SUFFICIENT FUNDS

**Bank Leumi**

## WELLS FARGO BANK          2201
WILSHIRE CRESCENT   9354 WILSHIRE BLVD   BEVERLY HILLS, CA 90212

11-4268/1210

DATE 1/7/2020

PAY TO THE ORDER OF   First International Diamond Inc          $ 1,200,000.00

One Million two hundred thousand dollars          DOLLARS

JADELLE JEWELRY AND DIAMONDS, LLC
9454 WILSHIRE BLVD PH G01
BEVERLY HILLS   CA 90212-2931

⑈121042882⑈8649261313⑈2201

⑈121042882⑈ 8649261313⑈2201          "0120000000"





# EXHIBIT - 11

**Ronald Richards**

| | |
|---|---|
| From: | Reuven Cohen <rcohen@cohen-williams.com> |
| Sent: | Tuesday, February 4, 2020 9:40 PM |
| To: | Reuven Cohen; Marc Williams |
| Subject: | Jona Rechnitz |

We write with an update on Jona Rechnitz. A family member of Mr. Rechnitz has informed our law firm that the family member is seeking to refinance certain real property in order to satisfy Mr. Rechnitz's outstanding liabilities. We currently have no visibility into the family member's interest in the property, the value of the property, or what, if any equity, the family member has in it.

If you are represented by counsel, please let us know and provide your counsel's contact information.

Our client's desire is to resolve this matter amicably.

Sincerely,

Reuven L. Cohen
Cohen Williams LLP
724 South Spring Street, 9th Floor
Los Angeles, CA 90014
Tel: 213-232-5163
Fax: 213-232-5167
rcohen@cohen-williams.com
www.cohen-williams.com

1

EXHIBIT D   033

# EXHIBIT - 12

Law Office of

# Baruch C. Cohen, Esq.

A Professional Law Corporation

---

4929 Wilshire Boulevard, Suite 940
Los Angeles, California 90010-3823

Telephone: (323) 937-4501
Facsimile: (323) 937-4503

March 17, 2020

*Sent via Certified Mail Return Receipt Requested*

Jadelle Jewelry and Diamonds LLC, a
Delaware Limited Liability Company
9621 Brighton Way
Beverly Hills CA 90210

Jadelle Jewelry and Diamonds LLC, a
Delaware Limited Liability Company
c/o Corporate Creations California Inc.
11380 Prosperity Farms Road, Suite 221e
Palm Beach Gardens FL 33410

Jadelle Jewelry, LLC
9621 Brighton Way
Beverly Hills CA 90210

Jadelle Jewelry, LLC
c/o Corporate Creations California Inc.
11380 Prosperity Farms Road, Suite 221e
Palm Beach Gardens FL 33410

Jona & Rachel Rechnitz
9533 Sawyer St.
Beverlywood, CA 90035

Jadelle, Inc., c/o Levin Prado
9454 Wilshire Boulevard, Penthouse 1
Beverly Hills, CA 90212

Re:    **Notice Pursuant to California Civil Code § 1719 of $2,122,760.00 Bad Checks**

Dear Jona & Rachel Rechnitz, Jadelle Jewelry and Diamonds LLC, Jadelle Jewelry, LLC, and
Jadelle, Inc.:

This office is litigation counsel for First International Diamond, Inc ("First International"). This
letter is being sent to you pursuant to California Civil Code § 1719. Please direct any and all
future inquiries, responses, or other communications to my attention.

On 1-17-2020 Jona Rechnitz on behalf of Jadelle Jewelry and Diamonds LLC, Jadelle Jewelry,
LLC, and Jadelle, Inc., issued the following two checks to First International totaling
$2,122,760.00:

| Check # | Date | To | $ |
|---------|------|-----|---|
| 2200 | 1-17-2020 | First International | $922,760.00 |
| 2201 | 1-17-2020 | First International | $1,200,000.00 |
| Total NSF Checks issued by Jona to Plaintiffs | | | **$2,122,760.00** [1] |

---

[1]A true and correct copy of First International's 1-22-2020 Notice of Returned Item for:
(1) Check # 2200 for $922,760.00; and (2) Check # 2201 for $1,200,000.00, totaling
$2,122,760.00 is attached hereto as Exhibit "1" and is incorporated herein by this reference.

The two checks were not paid because of insufficient funds ("NSF") in your account with Wells Fargo # 8649261313, and First International demands payment.

Pursuant to California Civil Code § 1719(a)(6)(A), to "pass a check on insufficient funds" means to make, utter, draw, or deliver any check, draft, or order for the payment of money upon any bank, depository, person, firm, or corporation that refuses to honor the check, draft, or order for lack of funds or credit in the account to pay the check.

Pursuant to California Civil Code § 1719(a) you are liable for full amount of the $2,122,760.00 checks plus a service charge of $25.00.00 for the first bounced check and $35.00 for each subsequent bounced check. You shall also be liable for damages equal to 3x the amount of each check, (totaling $6,368,280.00), if you fail to pay within thirty (30) days from the date this notice is mailed the amount of the checks ($2,122,760.00) in cash, plus the amount of the service charge ($25.00 for the first bounced check and $35.00 for the second bounced check), together with the cost of mailing this notice.

If you have any questions or comments regarding the above, please do not hesitate to call.

Respectfully,

*Baruch Cohen*

BARUCH C. COHEN
cc:    First International
Enclosure
D:\DATA\DOCS\FIRST INTERNATIONAL JONA - BAD CHECK DEMAND California Civil Code § 1719.wpd
3:17-3:42pm



**BANK LEUMI USA**
MEMBER FDIC
**350 Madison Avenue - 4th Flr**
**New York, NY 10017**

Date:  01/22/20
Account:  8300418101
Page:  1 of 1

## Notice Of Returned Item
## CHARGEBACK

**FIRST INTERNATIONAL DIAMOND INC**
**PO BOX 3765**
**BEVERLY HILLS CA 90212**

The deposited item(s) listed below were returned unpaid and the Transaction Clearing Account noted above was debited for the amount of the item(s) returned.

| Date | Amount | Deposit Amt | Reason |
|------|--------|-------------|--------|
| 01/17/2020 | 922,760.00 | 2,122,760.00 | NSF - Not Sufficient Funds |
| 01/17/2020 | 1,200,000.00 | 2,122,760.00 | NSF - Not Sufficient Funds |

Please call Bank Leumi Customer Service (800-892-5430) with any questions regarding this notice.

---

**WELLS FARGO BANK**    2200
WILSHIRE CRESCENT  9354 WILSHIRE BLVD  BEVERLY HILLS CA 90213
DATE *1/17/2020*    11-4281/1210

PAY TO THE ORDER OF *First International Diamond Inc*    $ *922,760.00*

*Nine hundred twenty two thousand seven hundred sixty*    DOLLARS

JADELLE JEWELRY AND DIAMONDS, LLC
9454 WILSHIRE BLVD PH G01
BEVERLY HILLS  CA 90212-2931

⑈12104288 2⑆8649 2613 13⑈ 2200

Item# 5250005545274 01/22/2020 $922,760.00
Reason: NSF - Not Sufficient Funds

**WELLS FARGO BANK**    2201
WILSHIRE CRESCENT  9354 WILSHIRE BLVD  BEVERLY HILLS, CA 90212
DATE *1/17/2020*    11-4281/1210

PAY TO THE ORDER OF *First International Diamond Inc*    $ *1,200,000.00*

*One Million two hundred thousand dollars*    DOLLARS

JADELLE JEWELRY AND DIAMONDS, LLC
9454 WILSHIRE BLVD PH G01
BEVERLY HILLS  CA 90212-2931

⑈12104288 2⑆8649 2613 13⑈ 2201

Item# 5250005545276 01/22/2020 $1,200,000.00
Reason: NSF - Not Sufficient Funds

NSF

*026002794*
01/22/2020
5250005545274

This is a LEGAL COPY of your check. You can use it the same way you would use the original check.

RETURN REASON (A)
NOT SUFFICIENT FUNDS

Bank Leumi

**WELLS FARGO BANK**    2200
WILSHIRE CRESCENT  9354 WILSHIRE BLVD  BEVERLY HILLS, CA 90212
11-4288/1210
DATE 1/17/2020

PAY TO THE ORDER OF  First International Diamond Inc    $ 922,760.00

Nine hundred twenty two thousand seven hundred sixty DOLLARS

JADELLE JEWELRY AND DIAMONDS, LLC
9454 WILSHIRE BLVD PH G01
BEVERLY HILLS  CA 90212-2931

⑆121042882⑆ 8649261313⑈2200

⑆121042882⑆ 8649261313⑈2200        ⑈0092276000⑈

---

NSF

*026002794*
01/22/2020
5250005545276

This is a LEGAL COPY of your check. You can use it the same way you would use the original check.

RETURN REASON (A)
NOT SUFFICIENT FUNDS

Bank Leumi

**WELLS FARGO BANK**    2201
WILSHIRE CRESCENT  9354 WILSHIRE BLVD  BEVERLY HILLS, CA 90212
11-4288/1210
DATE 1/17/2020

PAY TO THE ORDER OF  First International Diamond Inc    $ 1,200,000.00

One Million two hundred thousand dollars        DOLLARS

JADELLE JEWELRY AND DIAMONDS, LLC
9454 WILSHIRE BLVD PH G01
BEVERLY HILLS  CA 90212-2931

⑆121042882⑆8649261313⑈2201

⑆121042882⑆ 8649261313⑈2201        ⑈0120000000⑈





**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

7015 0640 0000 9428 2057

For delivery information, visit our website at www.usps.com®

OFFICIAL USE

Certified Mail Fee

$

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)          $ _____
☐ Return Receipt (electronic)        $ _____
☐ Certified Mail Restricted Delivery $ _____
☐ Adult Signature Required           $ _____
☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

Postage
$
Total Postage and Fees
$

Sent To   *Jonas Rachel*

Street and Apt. No., or PO Box No.   *Brentwood CA*

City, State, ZIP+4®

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*Jona + Rachel Rechnitz*
*9533 Sawyer St.*
*Brentwood CA 90035*

9590 9402 5465 9249 9711 53

2. Article Number (Transfer from service label)

7015 0640 0000 9428 2057

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____   ☐ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
                                *3/21/20*

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

*T 19*

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053    Domestic Return Receipt

Baruch C. Cohen, Esq.
Law Office of Baruch C. Cohen, APLC
4929 Wilshire Boulevard, Suite 940
Los Angeles, CA 90010

7015 0640 0000 9428 2064

CERTIFIED MAIL

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

---

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com*

OFFICIAL USE

Certified Mail Fee $

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)      $ _____
☐ Return Receipt (electronic)    $ _____       Postmark
☐ Certified Mail Restricted Delivery $ _____      Here
☐ Adult Signature Required       $ _____
☐ Adult Signature Restricted Delivery $ _____

Postage $

Total Postage and Fees $

Sent To   Jodelle Jewelry

Street and Apt. No., or PO Box No.

City, State, ZIP+4   Beverly Hills, CA

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

7015 0640 0000 9428 2064

---

$7.400
US POSTAGE
FIRST-CLASS
FROM 90010
MAR 17 2020
stamps
endicia

BARUCH C. COHEN ESQ.
LAW OFFICE OF BARUCH C. COHEN APLC
4929 WILSHIRE BLVD. STE 940
LOS ANGELES CA 90010

LOS ANGELES
CA 900
18 MAR 20

NMR

BC: 90010653940

JADELLE JEWELRY AND DIAMONDS LLC A DEL AWARE LLC
9621 BRIGHTON WAY
BEVE

NIXIE    910   DE 1  0040       0003/22/20

RETURN TO SENDER
NO MAIL RECEPTACLE
UNABLE TO FORWARD

BC: 90010653940      *1562-02155-18-33*