**From:** Andrew Smith
**To:** Pomerantz, Lara (USANYS)
**Cc:** Bernhardt, Peter M.
**Subject:** [EXTERNAL] Jona Rechnitz
**Date:** Friday, March 6, 2026 3:37:11 PM
**Attachments:** image001.png
FILED_complaint_Mayweather.pdf
Amended Complaint_FILED.pdf
[DE 1] 2026 01 14 EFILED Complaint(37394932.1).pdf

Ms. Pomerantz:

After our brief phone call, I have done some reflecting and spoken to a few colleagues.  Considering everything, I decided to provide you with some information on Mr. Rechnitz.  I have read all his submission to the Court as well as the Government's and I believe that the Court is not truly informed about Jona Rechintz.

Attached are three civil complaints I am personally involved in against Jona and what I would characterize as quasi-criminal activities.  Over the past 5 years he has been sued at least eleven (11) times.  These lawsuits paint a far different picture than Mr. Rechnitz as an honest, moral man handling his business with integrity.

Although these cases are civil, I believe the Court would consider his business dealings over the past five (5) years to very interesting considering he was out on pre-sentence release.

Thank you for your time. If you have any questions, please feel free to contact me.

Respectfully

Andrew M Smith, Esquire

1878 Route 70, Unit 8
Cherry Hill, NJ 08002
Tel 609.534.7244
Cell 609.410.2830

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| LEONARD SULAYMANOV and JLZ CONSULTING, INC. d/b/a LENZO & CO, | : : : : | |
| Plaintiffs, | : | **CASE NO.: 24-CV-23229** |
| v. | : : | |
| FLOYD MAYWEATHER JR., MICHAEL RAY STEVENSON (a.k.a TYGA) and THE MONEY TEAM LLC, | : : : : | |
| Defendants. | : : | |

## <u>COMPLAINT</u>

AND NOW, the above-named Plaintiffs, Leonard Sulaymanov ("Sulaymanov") and JLZ Consulting, Inc. d/b/a Lenzo Co ("JLZ") (collectively, "Plaintiffs"), by and through their undersigned counsel, initiate this complaint against the Defendants, Floyd Mayweather Jr. ("Mayweather"), Michael Ray Stevenson a.k.a TYGA ("Tyga"), and The Money Team LLC ("TMT" or "The Money Team") (collectively, "Defendants"), and in support thereof aver as follows:

## <u>INTRODUCTION</u>

1.     Defendants are a group of individuals and celebrities who, in essence, live lavish lifestyles, purchasing all sorts of extravagant and luxurious personal items for themselves, their family, friends and even bodyguards such as watches, necklaces, and rings.

2.     These Defendants individually, jointly, severally and/or in concert with each other solicited Plaintiffs to meet with them privately and present to

them such luxury items for sale upon promises that the Defendants would purchase selected items from Plaintiffs.

3.    All of the scheduling of meetings and discussion of the financial matters for this relationship were handled, processed and set up by and through Jona Rechnitz, who claimed himself to be the agent, broker and friend of Defendants.

4.    Defendants controlled all aspects of the transactions from selecting the meeting locations, to their choice of watch brands to be displayed, the types of jewelry they wanted to see, the deposit terms for items purchased, the delivery locations of the luxury items and finally to invoicing and payment of all balances due.

5.    This action arises out of a pattern of predatory, unfair, improper, fraudulent and unscrupulous practices through which Defendants used Plaintiffs' reputation, business and its inventory to systematically steal and convert Plaintiffs' watches and jewelry to their own, without paying the full and fair price for same all to Plaintiffs' extreme financial loss.

6.    Defendants mislead, deceived, defrauded and misrepresented their true intentions and relationships with each other to induce Plaintiffs to deliver and display millions of dollars of inventory that Plaintiff had for sale, all outside the purview of cameras, security systems and traditional store sale methods.

7.    Defendants then mislead, coerced and defrauded Plaintiffs into accepting fractional cash deposits toward the full purchase price for the luxury items the Defendants selected and purchased.

8. Defendants have engaged in illegal, improper, fraudulent and/or racketeering and other activities which include but are not limited to:

- Targeting high-end jewelers and watch brokers who work with high-net-worth celebrities and sports athletes and offer financial terms on purchases;

- Misrepresenting to Plaintiffs the terms and conditions of sales;

- Misrepresenting to Plaintiffs who was in charge of the funds for the purchases;

- Misrepresenting to Plaintiffs that they all paid Jona Rechnitz the total invoiced amounts due for the luxury items the individually possessed;

- Misrepresenting that they did not accept/take possession of certain luxury items, all while posting on social media accounts wearing Plaintiffs' inventory/items;

9. Plaintiffs bring this action under various Federal and State laws to obtain temporary, preliminary and/or permanent injunctive relief, writs or replevin, disgorgement of ill-gotten luxury items, unjust enrichment and other equitable relief for Defendants' acts and practices hereinafter described in greater detail.

10. Alternatively, in the event equitable relief is unattainable, then Plaintiffs seek compensatory and punitive damages for Defendants' breach of contract, fraud, theft and conversion.

## THE PARTIES TO THIS ACTION

11. Plaintiff, Leonard Sulaymanov (hereafter, "Sulaymanov"), is a resident of Florida and operates a high-end watch and jewelry business at 169 E. Flagler Street, Suite 1012, Miami, Florida 33131.

12. Plaintiff, JLZ Consulting, Inc., is a duly organized and registered corporation, doing business as "Lenzo & Co" with a business address located at 169 E. Flager St, Suite 1012, Miami, Florida 33131 (hereafter, "JLZ"). Sulaymanov is the owner and managing member of JLZ. Plaintiffs are hereinafter collectively referred to as "Plaintiffs".

13. Defendant, Floyd Mayweather Jr. (hereinafter, "Mayweather"), is a world champion boxer, celebrity and social media influencer who owns real property located at 288 S. Coconut Lane, Miami Beach, Florida 33139. Mayweather has at all times material hereto, acted alone or in concert with other named Defendants to solicit Plaintiffs for inventory, to select luxury items from Plaintiffs and to convert said items as his own personal possessions without compensating Plaintiffs.

14. Defendant, The Money Team LLC (hereinafter, TMT), is a corporate entity created by Mayweather, which employs Mayweather's staff of bodyguards, agents, servants, and workmen.

15. Defendant, Michael Ray Stevenson a.k.a Tyga (hereinafter, "Tyga"), is a world-renowned musical artist commonly known as 'TYGA", with an address located at 801 S. Figueroa St, Suite 1000, Los Angeles, CA 90017, and he hired, employed, engaged, and/or contracted with Jona Rechnitz to solicit Plaintiffs and to acquire certain luxury items from Plaintiffs all as part of Defendants' fraudulent scheme.

## JURISDICTION AND VENUE

16.     Plaintiffs bring this civil action against Defendants, individually, jointly, severally and in the alternative for crimes under the Racketeer Influenced and Corrupt Organization Act, as codified in 18 USC§1962 *et seq*, and various State actions including civil theft, fraud, breach of contract, conversion and collection upon a book account.

17.     This Court has original jurisdiction over this matter under the U.S. Constitution and the laws of the United States pursuant to 28 U.S.C. §1331.

18.     This Court has pendent jurisdiction over Plaintiffs' state law claims pursuant to 28 USC § 1367.

19.     The amount in controversy exceeds the sum of $4,000,000.00.

20.     Venue in this District is proper under 28 U.S.C. §1391 (b)(2) in that Plaintiffs and Defendants transacted business within Miami-Dade County, Florida.   Furthermore, the unlawful acts and practices of Defendants were committed by, and/or upon the direction, and with the knowledge of Defendants within the State of Florida and more specifically the City of Miami.

21.     Plaintiffs complied with any and all the jurisdictional prerequisites and the amount in controversy exceeds all jurisdictional limits exclusive of interest and costs.

## FACTS PERTIENT TO ALL COUNTS OF THE COMPLAINT

22.     In or around June 28, 2021, Dan Roden, an individual jeweler, contacted Plaintiffs about attending a meeting with himself, Moshe Rivs and Jona Rechnitz to make an introduction so that Jona Rechnitz ("Rechnitz") could

discuss the purchase of luxury watches and jewelry from Plaintiffs for some of his alleged clients.

23.     At that time, Rechnitz stated that he was soliciting high-end watches and diamond jewelry specifically on behalf of Defendants Mayweather and TMT.

24.     Rechnitz represented himself as the exclusive agent, consultant and buyer of luxury items for Defendants Mayweather and TMT.

25.     Sulaymanov met with Rechnitz that evening for dinner, at which time Sulaymanov showcased a Richard Mile 29 with factory diamonds and Richard Mille 10 Lemans Classic to Rechnitz to highlight some of Plaintiffs' more extravagant inventory.

26.     After the dinner meeting Rechnitz requested Sulaymanov go back to their office and gather more high-end watch inventory and bring it to Mayweather's hotel room at the Fontainebleau in Miami Beach.

27.     Rechnitz stated Mayweather was in a "shopping mood" and so Sulaymanov should bring a variety of luxury watches to showcase.

28.     During the late hours of June 28, 2021, and into the early morning hours of June 29, 2021, Sulaymanov attended the Fontainebleau meeting with Rechnitz, Mayweather and members of TMT.

29.     Sulaymanov arrived at the hotel carrying a secure case containing Richard Mille (hereinafter "RM"), Patek Philippe (hereinafter "Patek"), Rolex, and Audemars Piguet (hereinafter "AP") watches and were taken up to Mayweather's suite.

30. Upon entering the suite, Sulaymanov was met by Mayweather and his bodyguards.[1] The bodyguards instructed Sulaymanov to surrender his cell phone to them because they said no photos, calls or texts are allowed while in the presence of Mayweather.

31. After inspecting the merchandise in the hotel suite, Defendants asked Sulaymanov to meet them at his office later that morning (June 29, 2021) so they could inspect and select even more merchandise in order for Plaintiffs to make a "grand presentation" to Mayweather that evening back at his hotel suite.

32. On June 29, 2021, Rechnitz brought members of TMT to Plaintiffs' office, and acting on behalf of Mayweather, they selected items they believed Mayweather would purchase that evening. Plaintiffs captured Rechnitz and TMT members selecting all the items for the "grand presentation" to Mayweather later that evening.



---

[1] Plaintiffs will discuss in greater detail the role of the bodyguards in Defendants' scheme later in the complaint.

32.    On the evening of June 29, 2021, Sulaymanov returned to the Fontainebleau with all the merchandise that had been selected by Mayweather and TMT over the past 24 hours. Unbeknown to Mayweather and TMT, Sulaymanov carried two (2) cell phones with him this time for security and insurance purposes so he could document the inventory in his possession and any business transactions that occurred.[2] Sulaymanov was able to capture the meeting, the attendees and Plaintiffs' inventory as follows:





---

[2] At the first meeting the evening before, the bodyguards took Sulaymanov's phone to prevent any photos or video recordings of his meeting with Mayweather and Rechnitz.

8

33.     On that evening Rechnitz selected for Mayweather a Rolex Presidential date, in rose gold with a black dial and ruby begets for an agreed-upon purchase price of $75,000.  Mayweather and TMT also selected a series of additional watches.

34.     To confirm/secure the purchases of the watches, Rechnitz was instructed by Mayweather to pull out stacks of cash from Mayweather's satchel bags to pay Plaintiffs an "initial down payment."  Specifically, Rechnitz gave Sulaymanov $90,000 in cash from Mayweather and TMT, as confirmed in the following photographs:



35.     On June 30, 2024, Rechnitz and two of Mayweather's security guards arrived at Plaintiffs' office to pick up the Rolex Presidential and the merchandise that Mayweather and TMT purchased the night before.  Once again, TMT demanded that Plaintiffs surrender all cell phones and turn off any video cameras, however, Plaintiffs documented the sales meeting and transaction as follows:



36.     At that time, Mayweather and TMT purchased and took physical possession of a Patek Philip 5980/1R watch; an RM 35–02 red NT Petey watch; an AP 37 yellow gold watch; an RM 35–02 black watch; one diamond ring and one diamond necklace. Plaintiffs provided all the boxes and warranty paperwork to Mayweather and TMT for their purchases as evidenced in the photographs above.

37.     On the evening of June 30, 2024, Sulaymanov again presented to the Fontainebleau prior to Mayweather and TMT's departure to Las Vegas, at which time Plaintiffs were paid an additional $177,000 in cash. This was a second "down payment" towards the overall purchase price of the items taken by Mayweather and TMT.

38.     Mayweather was wearing the diamond necklace and diamond ring riding in his TMT van departing from Miami and more recently, Mayweather posted a photograph wearing the necklace with his agent, Jona Rechnitz.



39.     The agreed upon price for all the luxury items acquired by Mayweather and TMT was $4,151,157.00. See Invoices attached hereto as **Exhibit A**. Several text messages between Sulaymanov and Jona Rechnitz, the agent for Mayweather and TMT, confirm these transactions, the prices, and repayment terms for the luxury items.

40.     Approximately two (2) weeks after the Mayweather and TMT purchases in Miami, Jona Rechnitz requested Sulaymanov travel to Las Vegas to meet with Mayweather and TMT again, as well as another client of Rechnitz's, Tyga.

41.     Sulaymanov traveled to Las Vegas at Defendants' request and brought ten (10) Rolex Presidential Anniversary watches, a Rolex Day-Date 40, as well as Richard Mille piece as requested by Defendants as confirmed in text messages from Rechnitz;



42.     While Sulaymanov was in Las Vegas, Tyga agreed to purchase from Plaintiffs the Rolex Day-Date 40 Eisenkiesel for the sum of seventy-nine thousand dollars ($79,000.00).

43.     At that time, Defendants did not make any payments to Plaintiffs on their account balance but did purchase more merchandise luring Plaintiffs into a false sense of security that they would have an ongoing business relationship that would benefit everyone involved.  However, as days passed and no wires were being received, Plaintiffs got concerned and started exchanging text messages with Defendants through their agent, Rechnitz, about when payment could be expected.

44.     In a series of text messages Rechnitz, acting as the agent for Defendants, confirmed that Defendants owed Plaintiffs one million eight hundred

and eighty-two thousand ($1,882,000.00) dollars for the watches that had been purchased and delivered.

 

45.  Despite Defendants written promise to wire four hundred thousand ($400,000) dollars in a period of approximately five (5) days with the "balance" being paid the "following week," Defendants made no payments to Plaintiffs.

46.  Defendants also owed Plaintiffs $2,001,657.00 for the diamond ring and necklace. See Exhibit A.

47.  Defendants have never paid the remaining balance on the purchases made and are indebted to the Plaintiffs for over three million eight hundred and eighty-three thousand six hundred and fifty-seven dollars ($3,883,657.00).

**DEFENDANTS' QUASI-CRIMINAL ENTERRPISE**

48.  Through investigation, publications and discussions with multiple lawyers throughout the country, Mayweather, TMT, and possibly others have systematically created, participated and engaged in what can be described as a

13

quasi-criminal, money laundering scheme involving high-end, rare and exclusive luxury watches and jewelry.

49.     The Defendants acting in concert and with other financially incentivized third parties, will purchase/acquire luxury watches by soliciting watch brokers, like Plaintiffs herein, and offering them upfront cash with payment terms in exchange for the purchase of watches and jewelry, with no intention of paying off the total balances.

50.     Defendants lure bona fide watch brokers and jewelers into their scheme with promises to not only buy timepieces and jewelry themselves, but to refer such brokers, like Plaintiffs, to their high-net worth friends, celebrities and professional athletes.

51.     Jona Rechnitz, acting as Defendants' agent, servant, and/or workman, helps effectuate Defendants' plan by traveling with Mayweather and TMT on their private jets, staying in luxury penthouse accommodations with them, driving their Bentleys and Rolls Royce cars, and through posting countless photos on social media sites (Instagram, TikTok, Facebook, Twitter) with Mayweather and TMT.

52.     Once Defendants have placed the proverbial "hook" into the unsuspecting watch or jewelry broker/dealer they begin a series of meetings and purchases to give the impression of a strong, lasting business relationship.

53.     Defendants then take possession of watches and jewelry, demanding formal paperwork, boxes and warranties, request repayment terms with upfront cash deposits, only to refuse to pay the full price for said items and in some

instances, claim they never "purchased" the item but rather it was "gifted" to them because of their fame and status.

54.     Lawsuits around the country have been filed in recent years against said Defendants for engaging in similar quasi-criminal conduct as alleged herein, to wit:

a. <u>Over Anter, et al v. Jona Rechnitz, et al</u> (LA County Super Court; 20STCV23877; filed 6/24/2020)

b. <u>Time Design, LLC v. Jona Rechnitz, et al</u> (LA County Super Court; 20STCV27119; filed 7/20/2020)

c. <u>Victor Franco Noval v. Jona Rechnitz, et al</u> (LA County Super Court; 20SMCV00216; filed 2/10/2020)

d. <u>Chronostore Luxxstyle, Inc v. Jona Rechnitz,</u> (LA County Super Court; 21SMCV00339; filed 2/17/2021)

e. <u>Israel Sam Gorodistian v. Jadelle Jewelry and Diamonds LLC and Jona Rechnitz, et al</u> (LA County Super Court; 20STCV07425; filed 2/20/2020)

f. <u>Yogi Securities Holdings, LLC v. Floyd Mayweather and Jona Rechnitz, et al</u> (LA County Super Court; 22STCV03944; filed 2/01/2022)

g. <u>Pierre Ladow v. Jona Rechnitz</u> (USDC; 2:20-cv-10059; filed 11/2/2020)

h. <u>Eric & Co Trading Group, LLC v Floyd Mayweather, Jr.</u>; U.S. District Court for the Southern District of Florida; 1:23-cv-20045-RKA (1/05/2023)

55.     Based upon Defendants' known and publicized legal issues and activities, Plaintiffs fear that the luxury items which were purchased by Defendants (who also took possession of same) may have been re-sold or pawned for cash in other parts of the United States and/or throughout the world with

the sale proceeds being retained by Defendants. No additional money has ever been paid to Plaintiffs all to Plaintiffs' financial detriment.

56. Defendants have acknowledged the debt which is owed to Plaintiffs for the merchandise Defendants acquired, but they have refused to pay and as such their statements and text messages were intentionally false and misleading and made with actual malice.

57. Accordingly, all of Defendants' actions and statements were part of their scheme to deprive Plaintiffs of Plaintiffs' property and convert said property to Defendants' own uses with actual malice and criminal intent.

## COUNT I
## VIOLATIONS OF RICO

58. Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

59. Defendants have violated the Racketeer Influenced and Corrupt Organization Act, as codified in 18 USC§1962 *et seq*, in that Defendants conducted or participated, directly or indirectly, in the conduct of the enterprises' affairs through a pattern of racketeering activity, exercised significant control over and within the enterprise, and/or participated in the conduct of the enterprises' affairs resulting in injury to the Plaintiffs.

60. Defendants and Plaintiffs are "persons" as defined in 18 USC§1961(3).

61. Defendants, along with others, willfully combined, conspired and agreed to/for, an association in fact which constitutes an "enterprise" as defined

16

by 18 USC§1691(4) and said enterprise was and is engaged in, and its activities affect, interstate commerce.

62.     Defendants knowingly devised and participated in a scheme whereby Defendants (1) deceived Plaintiffs about their financial stability and ability to pay for very rare, exclusive, high-end watches and jewelry; (2) made cash deposits on account of the full purchase price of said luxury items knowing they had no intention of paying anything further; (3) deceived Plaintiffs about payments being made and/or wire transfers forthcoming; (4) made willfully false statements that others (like Jona's father) would send wire transfers for the full balances owed; (5) converted the items to their own property and then liquidated the items on the secondary market for cash, far in excess of the initial deposit Defendants made; (6) effectively laundered money through the acquisition of watches and jewelry which they later sold for cash on secondary markets and deposited said cash into accounts or other vehicles (such as cryptocurrency) that cannot be easily tracked or located through conventional banking methods.

63.     Defendants conspiracy and participation in securing these luxury items and paying some upfront cash deposits also had the effect of luring Plaintiffs into a false sense of security on the sale of additional luxury items locking Plaintiffs into the relationship because it would be almost impossible for Plaintiffs to simply recover the watches or jewelry from Defendants' wrist or neck and nearly impossible if not totally impossible for Plaintiffs to find out if Defendants have resold the items and thus converted watches and jewelry into cash for Defendants.

64.     Defendants devised and participated in this scheme with the intent to defraud Plaintiffs, enhance their own income and defraud subsequent watch and jewelry brokers and dealers.

65.     To implement their scheme, Defendants committed and/or caused a pattern of acts by way of, *inter alia*, making intentional misrepresentations, altering documents, confusing Plaintiffs, knowingly providing small sums of cash relative to the total purchase price designed to delay Plaintiffs while Defendants converted the items as their own personal property and then sold said items on secondary markets for cash.

66.     Defendants engaged in a pattern of racketeering activity by committing a pattern or acts of wire fraud, bank fraud, and/or money laundering in violation of 18 USC§1341 in the use of telephone for advancing, furthering or carrying out the scheme to defraud Plaintiffs.  Phone calls, text messages and WhatsApp messages to Plaintiffs were essential elements, or incident to essential elements of the unlawful racketeering scheme and these acts had the same or similar purpose, results, participants and scheme and were not isolated events.

67.     Defendants concealed the pattern of racketeering from Plaintiffs through their acts and omissions and the acts and omissions of their employees, servants, agents and independent contractors.

68.     There is a real and definite threat that this pattern of activity will continue in the future unless Defendants are enjoined by this Court, because numerous predicate acts continue to occur. Further, Plaintiffs are not the first victims of Defendants' pattern of racketeering activity and this conduct is

injurious to any and all people who deal with and sell luxury items (movable property) such as watches, jewelry and diamonds to this Enterprise.

69.     As a direct and proximate result of the acts alleged herein, Plaintiffs have suffered substantial economic injury and injury to their property.

## COUNT II
## FRAUD

70.     Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

71.     Plaintiffs were fraudulently induced into entering into the purchase agreements and transactions orchestrated by and entered into with Defendants.

72.     Defendants made numerous false and misleading representations to Plaintiffs as described in greater detail above including representations that Defendants would perform future acts that Defendants had no intention of performing, wiring funds that Defendant had no intention of wiring, having others pay Defendants' debts who never agreed to have such responsibility and concealing facts from Plaintiffs with the intent to deceive them.

73.     Defendants' representations created a duty to disclose facts material to the transactions as they deliberately represented that they were financially solvent to purchase the luxury items, they had national and international social and celebrity status making them famous, trustworthy and financially secure and that Plaintiff accepting payment of cash deposits and subsequent wire transfers was safe, secure, valid and legal, without any risk and would result in the eventual full payment for all luxury items acquired.

74.     Defendants' false representations and concealments were material to all aspects of the transactions including all financing/payment terms.

75.     Defendants knew at the time of the making of the representations that they were false, and that Defendants had no intention of paying the full price of all items acquired.

76.     Defendants, through their false representations and knowing concealments, intended to induce Plaintiffs to enter into the sales transactions by accepting initial cash deposits and offering the Defendants payment terms.

77.     Plaintiffs relied on the Defendants misrepresentations and concealments in entering into these transactions.

78.     As a direct and foreseeable consequence of entering into these transactions, Plaintiffs have suffered economic, consequential and emotional injuries.

### COUNT III
### CONVERSION

79.     Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

80.     Defendants knowingly and intentionally misrepresented to Plaintiffs that they would arrange for the payment of all luxury items purchased from Plaintiffs.

81.     Defendants by their representations were bound to disburse funds, make payments and deliver monies immediately upon their due date.

82.     Defendants instead retained all the luxury items (watches and diamond jewelry) without full payment to Plaintiffs.

20

83.     Defendants unlawfully, wrongfully and fraudulently exercised dominion and control over the property/inventory of Plaintiffs and Defendants failed and refused to pay the full price for same and have failed to comply with the payment terms.

84.     Defendants have refused to return the luxury items to Plaintiffs, and it is very likely that Defendants have unlawfully, wrongfully and fraudulently sold the luxury items on the secondary market for cash.

85.     Through Defendants' actions, Plaintiffs have been deprived of the beneficial use and fair market value of their property and have been caused to incur more substantial financial loss.

86.     Defendants have committed, among others, the common law tort of conversion.

## COUNT IV
## CIVIL CONSPIRACY

87.     Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

88.     More than one of the Defendants named herein acted maliciously to injure the Plaintiffs and others, without reasonable or lawful cause or excuse, resulting in harm to the Plaintiffs and others. The combined acts of the Defendants rise to a level of tortious nature.

89.     Defendants conspired to defraud Plaintiffs of inventory (luxury items) for the Defendants' own respective benefits and profits, with reckless disregard for the adverse effect of their actions upon Plaintiffs.

90.     As a result of the conspiracy, Plaintiffs have been damaged and are entitled to compensatory damages in an amount to be determined at trial together with punitive damages in excess of four million dollars ($4,000,000.00).

## REQUESTS FOR RELIEF FOR COUNTS I THRU IV

a.     Declaring the sale transactions for each subject luxury item null and void;

b.     Entering injunctive relief directing Defendants, specifically by returning all items to Plaintiffs and to take all affirmative steps necessary to remedy the effects of their conduct as alleged in this Complaint and to prevent any similar occurrences in the future;

c.     Enter a permanent injunction staying any sale, disposition, gifting, assigning or encumbering of Plaintiffs' items until a final adjudication of the merits of Plaintiffs' claims can be made;

d.     Compensatory damages in an amount that would fully compensate Plaintiffs for all economic losses resulting from Defendants' conduct;

e.     Compensatory damages for humiliation, embarrassment, physical and emotional distress and mental anguished caused by Defendants' violation of law as alleged in their Complaint;

f.     Treble damages pursuant to 18 USC §1964 and O.R.C 2923.34;

g.     Declaratory judgment finding the Defendants' actions violate 42 USC §3604, 3605 and 15 USC §1691(a)(1);

h.     Such damages and other relief so as to prevent unjust enrichment and compensate Plaintiffs for the injuries arising out of Defendants' violations of federal, state, and common law, including disgorgement of ill-gotten gains;

i.     Award of punitive damages that will punish Defendants for the willful, wanton and reckless conduct and would effectively deter Defendants from future acts of unlawful behavior;

j.     Award Plaintiffs reasonable attorney fees and court costs;

k.     Any other equitable relief deemed just by this Court.

## COUNT V
## Breach of Contract

91.     Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

92.     Defendants ordered and received certain goods and luxury items from Plaintiffs.  Said goods and luxury items were provided by Plaintiffs to Defendants from May, 2021 through the end of July, 2021, as evidenced by a certain book account and invoices attached hereto.

93.     To date, Defendants' overdue account balance with Plaintiffs exceeds three million eight hundred and eighty-three thousand six hundred and fifty-seven dollars ($3,883,657.00).

94.     Plaintiffs have made multiple demands for payment of the sum due and owing, however, Defendants have refused to make payment to Plaintiffs.

95.     As evidenced by the text messages submitted above, Defendants acknowledge the debts that are owed and repeatedly state they are wiring money and even one Defendant stated his father would be wiring the money.

WHEREFORE, Plaintiffs demand judgment against the Defendants individually, jointly, severally and/or in the alternative, for damages in an amount of $3,883,657.00 together with interest, costs of suit and attorney's fees.

## COUNT VI
## Unjust Enrichment

96.     Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

97.    The Plaintiffs sue the Defendants for goods and luxury items provided to the Defendants upon the promise by the Defendants to pay for said products.  Payment has been demanded and has not been made.

98.    Defendants have been unjustly enriched by retaining control and possession of said goods and luxury items without having paid the fair market value of said items.

WHEREFORE, Plaintiffs demands judgment against the Defendants for damages in an amount of $3,883,657.00, together with interest, costs of suit and attorney's fees.

## COUNT VII
### Amount Owed Upon a Book Account

99.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

100.  The Plaintiffs sue the Defendants for the reasonable value of the goods and luxury items rendered by the Plaintiffs to the Defendants, upon the promise by the Defendants to make payments for said good and luxury items. After two (2) initial payments were made, Defendants stopped paying on their account.

101.  Plaintiffs have demanded payments, Defendants have promised, in writing, to make said payments and as of this date no more payments have been made.

WHEREFORE, Plaintiffs demand judgment against the Defendants, individually, jointly, severally, and/or in the alternative, for damages in an amount of $3,883,657.00 together with interest, costs of suit and attorney's fees.

## COUNT VIII
### Civil Theft

102. Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

103. As set forth in greater detail above, Defendants made a series of misrepresentations to Plaintiffs, intended to cause Plaintiffs to provide Defendants with possession of merchandise totaling over $4 million dollars on credit with repayment terms.

104. Defendants made these false and misleading statements with the knowledge that they were false, with malicious intent to deprive Plaintiffs of the value of the merchandise provided to Defendants.

105. By engaging in such conduct Defendants have effectively engaged in conversion of Plaintiffs' merchandise.

106. Pursuant to Fla. Stat. § 772.11 Plaintiffs have notified Defendants that Plaintiffs demanded the return of three (3) times the value of the merchandise taken.

107. To date, Defendants have refused to respond to any demand, have refused to pay Plaintiffs treble damages and have refused to return the unpaid merchandise.

108. As a result of Defendants' actions Plaintiffs have suffered real and actual damages.

WHEREFORE, Plaintiffs demand judgment against the Defendants, individually, jointly, severally, and/or in the alternative, finding that said Defendants have (i) Engaged in civil theft; (ii) Awarding treble damages pursuant

to Fla. Stat. 772.11, plus attorney fees and costs as a result of said civil theft; and (iii) granting further such relief as this Honorable Court deems just and appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury with respect to all issues so triable.

Dated this **23rd** day of August, 2024.

Respectfully submitted,

**SMITHBRIDGE, LLP**

BY: _s/Andrew M. Smith_
    Andrew M. Smith, Esquire
    FL Bar PHV No: 1048061
    *(Pro hac vice*)
    Andrew@Smithbridgellp.com
    1878 Route 70, #8
    Cherry Hill, NJ 08003
    Tel. 609-410-2830
    Fax 215-646-1047
    *Counsel for Plaintiffs*

**MILLENNIAL LAW, INC.**

BY: _s/Zachary Hyman_
    Zachary Hyman, Esquire
    Fla. Bar No. 98581
    zach@millenniallaw.com
    jessica@millenniallaw.com
    assistant@millenniallaw.com
    501 E. Las Olas Blvd
    Suite 200/314
    Ft. Lauderdale, FL 33301
    Tel. 954-271-2719
    *Counsel for Plaintiffs*

# EXHIBIT A

# LenZo & Co.

JLZ Consulting

Business Number (317) 412-2297

169 E Flagler St

Suite 1012

Miami, FL 33131

718-724-3008

https://lenzoandco.com

luis@jlzconsultinginc.com

**DATE**

06/30/2021

**BALANCE DUE**

USD $2,001,657.00

---

BILL TO

## Jona Rechnitz, Floyd Mayweather & Associates

Jona Rechnitz

☎ +1 310-854-2342

▫ +1 310-854-2342

---

| DESCRIPTION | RATE | QTY | AMOUNT |
|---|---|---|---|
| Solitare Eternity Diamond Necklace - 200 Carat, 40 Stones | $900,870.00 | 1 | $900,870.00 |
| Diamond Ring - 16 Carat | $1,100,787.00 | 1 | $1,100,787.00 |

## Payment Info

PAYMENT INSTRUCTIONS

JL Z CONSULTING INC

169 East Flagler, Unit 1012

Miami, Florida 33131

Routing #256 074 974

Account # 716 859 6927

Bank name: NFCU

BY CHECK

JLZ Consulting Inc.

| | |
|---|---|
| TOTAL | $2,001,657.00 |
| **BALANCE DUE** | **USD $2,001,657.00** |

OTHER

Signature: _____

# LenZo & Co.

**INVOICE**

INV0108

Leonard Sulaymanov

Business Number (317) 412-2297

**DATE**

07/11/2021

169 E Flagler St

Suite 1012

Miami, FL 33131

**BALANCE DUE**

USD $2,149,500.00

📞 718-724-3008

⬚ EIN: 85-0952577

https://lenzoandco.com

leonard@jlzconsultinginc.com

BILL TO

## Jona Rechnitz, Floyd Mayweather & Associates

+1 310-854-2342

| DESCRIPTION | RATE | QTY | AMOUNT |
|---|---|---|---|
| **Rolex Presidential Anniversary - Unworn**<br>All Dated: 2021<br>Box & Cards | $58,250.00 | 10 | $582,500.00 |
| **Richard Mille 35-02 Red NTPT**<br>Dated: 11/20/2016<br>Serial: 1213<br>Box & Papers | $525,000.00 | 1 | $525,000.00 |
| **Richard Mille 35-02 Black NTPT - Unworn**<br>Dated: 1/17/2021<br>Serial: 1221<br>Box & Papers | $650,000.00 | 1 | $650,000.00 |
| **Patek Phillipe 5980/1R**<br>Dated: 08/17/2019<br>Serial: 7245734<br>Box & Papers | $225,000.00 | 1 | $225,000.00 |
| **Rolex Day-Date 40 Eisenkiesel Diamond Dial President Bracelet**<br>Reference: 228235 | $79,000.00 | 1 | $79,000.00 |

Case 1:24-cv-23520-KMB Document 1-1 Filed 06/26 Page 32 of 85

| DESCRIPTION | RATE | QTY | AMOUNT |
|---|---|---|---|
| **Rolex Presedential 41mm Ruby Dial**<br>Reference: 218235 | $88,000.00 | 1 | $88,000.00 |

| | |
|---|---|
| TOTAL | $2,149,500.00 |

| | |
|---|---|
| BALANCE DUE | USD **$2,149,500.00** |

## Payment Info

PAYMENT INSTRUCTIONS

JL Z CONSULTING INC

169 East Flagler, Unit 1012

Miami, Florida 33131

Routing #256 074 974

Account # 716 859 6927

Bank name: NFCU

BY CHECK

JLZ Consulting Inc.

OTHER

Signature: _____

JS 44 (Rev. 04/21) FLSD Revised 07/01/2022

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

**I. (a) PLAINTIFFS**
LEONARD SULAYMANOV and JLZ CONSULTING, INC. d/b/a LENZO CO

**DEFENDANTS**
FLOYD MAYWEATHER JR., MICHAEL RAY STEVENSON (aka TYGA) and THE MONEY TEAM LLC

**(b)** County of Residence of First Listed Plaintiff MIAMI-DADE COUNTY, FL
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant MIAMI-DADE COUNTY, FL
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Andrew M. Smith, Smithbridge LLP, 1878 Route 70, #8, Cherry Hill, NJ 08003; 609-410-2830
Zachary Hyman, Millennial Law, 501 E, Las Olas Blvd #200/314, Ft. Lauderdale, FL 33301; 954-271-2719

Attorneys *(If Known)*

**(d)** Check County Where Action Arose: ☒ MIAMI-DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question *(U.S. Government Not a Party)*
☐ 2 U.S. Government Defendant
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff)* *(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

Click here for: Nature of Suit Code Descriptions

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 367 Health Care/ | | | 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & / Pharmaceutical Personal Injury | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability / ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 340 Marine | | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 460 Deportation |
| (Excl. Veterans) | | | ☐ 840 Trademark | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Acts | | ☐ 485 Telephone Consumer Protection Act (TCPA) |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability / ☐ 370 Other Fraud | ☐ 720 Labor/Mgmt. Relations | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury / ☐ 371 Truth in Lending | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Med. Malpractice / ☐ 380 Other Personal Property Damage | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| | / ☐ 385 Property Damage Product Liability | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education / ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | ☐ 550 Civil Rights | | | |
| | ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee – Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Re-filed *(See VI below)* ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district *(specify)* ☐ 6 Multidistrict Litigation Transfer ☐ 7 Appeal to District Judge from Magistrate Judgment ☐ 8 Multidistrict Litigation – Direct File ☐ 9 Remanded from Appellate Court

**VI. RELATED/ RE-FILED CASE(S)** (See instructions): a) Re-filed Case ☐ YES ☒ NO    b) Related Cases ☐ YES ☒ NO
JUDGE: _____ DOCKET NUMBER: _____

**VII. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:
Racketeer Influenced and Corrupt Organization Act, as codified in 18 USC §1962 et seq
LENGTH OF TRIAL via 5 days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE
DATE  8/23/2024
SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY : RECEIPT #_____ AMOUNT_____ IFP_____ JUDGE_____ MAG JUDGE_____

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| LEONARD SULAYMANOV and JLZ CONSULTING, INC. d/b/a LENZO & CO. <br><br>_____<br>*Plaintiff(s)*<br>v.<br>FLOYD MAYWEATHER, JR.<br>MICHAEL RAY STEVENSON (a.k.a TYGA) and<br>THE MONEY TEAM LLC<br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 24-CV-23229

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  FLOYD MAYWEATHER JR.
288 S. COCONUT LANE
MIAMI BEACH, FLORIDA 33139

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Andrew M Smith, Esquire                    Zachary Hyman, Esquire
Smithbridge LLP                            Millennial Law, Inc.
1878 Route 70, #8                          501 E. Las Olas Blvd, Suite 200/314
Cherry Hill, NJ 08003                      Fort Lauderdale, FL 33301
Andrew@smithbridgellp.com                  zach@millenniallaw.com
                                           millenniallawforms@gmail.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____                    _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

### PROOF OF SERVICE
#### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| LEONARD SULAYMANOV and JLZ CONSULTING, INC. d/b/a LENZO & CO. <br><br> _____ <br> *Plaintiff(s)* <br> v. <br> FLOYD MAYWEATHER, JR. MICHAEL RAY STEVENSON (a.k.a TYGA) and THE MONEY TEAM LLC <br> _____ <br> *Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Civil Action No. 24-CV-23229 |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  MICHAEL RAY STEVENSON (a.k.a TYGA)
                                 801 S. FIGUEROA STREET, SUITE 1000
                                 LOS ANGELES, CA 90017

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

| | |
|---|---|
| Andrew M Smith, Esquire <br> Smithbridge LLP <br> 1878 Route 70, #8 <br> Cherry Hill, NJ 08003 <br> Andrew@smithbridgellp.com | Zachary Hyman, Esquire <br> Millennial Law, Inc. <br> 501 E. Las Olas Blvd, Suite 200/314 <br> Fort Lauderdale, FL 33301 <br> zach@millenniallaw.com <br> millenniallawforms@gmail.com |

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

                                            _____
                                                *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $  0.00  .


I declare under penalty of perjury that this information is true.


Date: _____          _____
                                              *Server's signature*

                                       _____
                                              *Printed name and title*


                                       _____
                                              *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| LEONARD SULAYMANOV and JLZ CONSULTING, INC. d/b/a LENZO & CO.<br><br>_____<br>*Plaintiff(s)*<br>v.<br>FLOYD MAYWEATHER, JR.<br>MICHAEL RAY STEVENSON (a.k.a TYGA) and THE MONEY TEAM LLC<br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 24-CV-23229

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  THE MONEY TEAM LLC
C/O MAYWEATHER PROMOTIONS LLC
ATTN: JEFFREY MORSE & ASSOC., LTD.
3753 HOWARD HUGHES PKWY, #200-416
LAS VEGAS, NV 89169

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Andrew M Smith, Esquire
Smithbridge LLP
1878 Route 70, #8
Cherry Hill, NJ 08003
Andrew@smithbridgellp.com

Zachary Hyman, Esquire
Millennial Law, Inc.
501 E. Las Olas Blvd, Suite 200/314
Fort Lauderdale, FL 33301
zach@millenniallaw.com
millenniallawforms@gmail.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

**PROOF OF SERVICE**
***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO.: 2025-001656-CA-01
SECTION: 22

JAYSON WINER a/k/a "Mr. Black",
and THE EYES LLC,

      Plaintiffs,

v.

FLOYD MAYWEATHER,
JONA RECHNITZ,
FRIST APEX VENTURES, LLC,
YITZI FRID, and
AYAL FRIST,

      Defendants.

_____/

## AMENDED COMPLAINT

Plaintiffs, JAYSON WINER a/k/a Mr. Black ("Winer") and THE EYES LLC ("The Eyes") (collectively, "Plaintiffs"), by and through undersigned counsel, sue Defendants, FLOYD MAYWEATHER ("Mayweather"), JONA RECHNITZ ("Rechnitz"), FRIST APEX VENTURES LLC ("Apex"), YITZI FRID ("Frid"), and AYAL FRIST ("Frist") (collectively, "Defendants"), and allege as follows:

## INTRODUCTION

1.    From the beginning, Defendants acted in concert to exploit Winer's trust and financial resources under the guise of providing access to celebrities who could promote Plaintiffs' art collection, "The Eyes Are Always Watching."

2.    Defendants' actions reflect a premeditated and coordinated conspiracy to defraud Plaintiffs. The scheme involved identifying Plaintiffs'

vulnerabilities, creating a credible but false narrative, and securing significant payments and assets of Plaintiffs.

3.     Rechnitz claimed to be Mayweather's, exclusive agent, broker, and friend, and offered endorsements from Mayweather and other celebrities to induce Plaintiffs to allow Defendants to convert Plaintiffs' cash and luxury watches for Defendants' benefit and to advance their scheme.

4.     Defendants controlled all aspects of the transactions from communication means (text and WhatsApp), meeting locations, delivery methods (sending Mayweather's bodyguards) to Defendants' choice of which watch brands Mayweather would accept in lieu of cash. Defendants identified and preyed upon Plaintiffs' dependence on social media to market Plaintiffs' art collection and exploited it after Plaintiffs' @mrblack4384 Twitter (also known as "X") account and profile ("Mr. Black's X Account") was shadow banned.

5.     By presenting themselves as connected to influential figures—most notably Elon Musk ("Musk"), the majority owner and Executive Chairman of X, Defendants created a veil of credibility to lure Winer in their scheme.

6.     Defendants fabricated agreements purportedly involving Musk, crafted to extract substantial sums of money and high-value assets (such as luxury watches) from Plaintiffs, all while never intending to deliver any service or benefit in return.

7.     Defendants have engaged in fraudulent and/or tortious activities which include but are not limited to:

- Misrepresenting to Plaintiffs that the Defendants had direct access to and control over Musk;

- Purposefully shadow banning Plaintiffs' Mr. Black's X Account so that Plaintiffs would require immediate assistance from Defendants, especially Mayweather and Rechnitz who claimed they could get in touch with Musk at any time;

- Falsely claiming that they had direct access to Musk and could persuade Musk to engage with Mr. Black's X Account's post regarding Plaintiffs' "The Eyes Are Always Watching" collection.

- Threatening financial harm if Plaintiffs didn't pay the money they had agreed to pay;

- Threatening or engaging in extortion by threatening to "go to the Feds" and have Plaintiffs investigated for crimes if Plaintiffs didn't pay Defendants;

8.     Defendants worked in tandem to create a facade of credibility, access and control.

9.     This conduct, is an ongoing systematic, pattern and practice of activity by these Defendants.

10.     Among other things, Rechnitz made false assurances and promises that Mayweather would use his "close ties" and access to Musk to influence Musk to reinstate Mr. Black's X Account.

11.     Meanwhile Defendant Frid had manipulated access to Mr. Black's X Account, falsely claiming it was shadow banned to increase Plaintiffs' dependency on Defendants' alleged services and influence over Musk.

12.     Each Defendant played a distinct role in reinforcing the false narrative, creating a seamless appearance of a legitimate operation, and each was paid for their role in the conspiracy.

13.     After receiving Plaintiffs' payments and assets, Defendants failed to deliver any of the promised services, including arranging contact with Musk.

14.     Defendants ceased all communication with Winer, and Defendants collectively attempted to evade accountability.

## **THE PARTIES**

15.     Plaintiff Winer is an individual and resident of Miami-Dade County, Florida, and is otherwise *sui juris*.

16.     Plaintiff The Eyes is a Delaware limited liability company with its principal office in Miami-Dade County, Florida.

17.     Defendant Mayweather is an individual and resident of Clark County, Nevada, and is otherwise *sui juris*.

18.     Defendant Apex is a Florida limited liability company with its principal office in Palm Beach County, Florida.

19.     Defendant Rechnitz is an individual and resident of Los Angeles County, California, and is otherwise *sui juris*.

20.     Defendant Frid is an individual and resident of Palm Beach County, Florida, and is otherwise *sui juris*.

21.     Defendant Frist is an individual and resident of Palm Beach County, Florida, and is otherwise *sui juris*.

**JURISDICTIONAL ALLEGATIONS AND VENUE**

22.    This Court has subject matter jurisdiction over this action because this is an action for damages, which, in the aggregate, exceed $50,000.00 exclusive of interest, costs and attorneys' fees.

25.    This Court has personal jurisdiction over Rechnitz under § 48.193(1)(a)2., Fla. Stat.

26.    This Court has personal jurisdiction over Mayweather under § 48.193(1)(a)2., Fla. Stat.

27.    Venue is proper in this Court pursuant to Fla. Stat. § 47.011 because the causes of action alleged herein accrued in Miami-Dade County.

**ALLEGATIONS GIVING RISE TO ALL COUNTS**

28.    Plaintiff Jayson Winer is a businessman and entrepreneur. His creativity and talent have allowed him to achieve great success despite his dyslexia and life-long battles with depression and substance abuse. Winer is a digital artist renowned for his enigmatic global street art, operating in the digital art realm under the artistic pseudonym "Mr. Black." https://x.com/mrblack4384?lang=en

**The Eyes Collection**

29.    In or around November 2023, Winer was inspired to create and develop a digital art collection titled "The Eyes Are Always Watching," which consists of 21,000 unique ordinal pieces inscribed on Bitcoin ("**The Eyes Collection**").

30.         Many of the pieces in The Eyes Collection depict public figures, including politicians, celebrities, and athletes.



31.    The Eyes Collection conveys its deep political, social, and religious themes and commentary via skeletal portraits that evoke today's visceral polarization and accompanying doomsday psyche. The Eyes Collection connects those feelings to their roots and shades in moral and religious dogma and juxtaposes the inherent human desire to control one's destiny (including by exercising political control) with the fatalist desire to surrender to the will of a religious figure or idol via faith.



32.     In addition, The Eyes Collection examines faith in a digital age. The art raises timely and important questions. For example, many believe that it has become impossible to determine fact from fiction online, so, who should you believe? Who is telling the truth? What is truth? The viewer's preferred politicians, celebrities, arm-chair reporters, or news organizations? Forced to rely at least to some degree on faith, do we fall unwittingly into the trap of worshiping false saviors?

33.     Though skeletal, the portraits' facial expressions are rich and often either sinister, joyful, or both, depending on the viewer's political, social, and religious convictions. This evokes the irony of faith—can you believe what you see when what you see is distorted by your strongly held beliefs?

34.     The arts' clean lines, "pop" feel, and (what some may see as extreme messages) force some viewers to question whether the pieces are intended to promote or mock the underlying political message. Again, can you trust what

you see? Do you believe that this image is promoting Donald Trump or criticizing him for supporting Israel? Is Bernie Sander's shock warranted by his stated fears of an emerging oligarchy in America or is he shocked because the viewer has just exposed him as the enemy? The answer likely depends on your beliefs.





35.     The themes and features of The Eyes Collection—polarization, morality, faith, distrust, perspective, idolatry, doomsday extremes—have reached peak levels on a global scale because of social media, which has allowed people to spread opinion, fact, and misinformation (depending on your perspective) with a speed and scope never before seen or even contemplated in history.

36.     Therein lies the importance of social media to The Eyes Collection—it harnesses social media and exists in a digital form to properly reflect the effects of social media and the digitalization of our "reality."

37.     In other words, the marketing and medium—social media and digital—are as much a part of the art as the images themselves.

38.     Indeed, placement of The Eyes Collection on Bitcoin is itself intended to reflect the purchaser's faith in a new monetary system that has no physical personification, existing only in images on a screen, dependent on a system built by a person or persons no one can see or even identify, and deriving its value in proportion to the number of people who have enough faith to use and accept it.

39.     The marketing and placement of The Eyes Collection on X (formerly Twitter) is as much a part of the art as its images. X is not just a social media platform. It is a global phenomenon, the world's town square, a place to raise questions about whether there is a difference between information and misinformation, and the deities in whom we place our faith as a society. Depending on one's political persuasion, X's owner, Musk, either is a deity who has single-handedly saved the concept of free speech or a demon who has utilized his staggering wealth to blur fact and fiction, imposing his will on the world.

40.     How society views X and Musk—as encapsulated by The Eyes Collection—
is a matter of faith and perspective and begs the viewer to question whether it is
possible to see beyond the horizon of their own narrow worldview. Ironically,
while social media has made new ideas readily available to everyone, The Eyes
Collections posits that its effect has been to weld us to our pre-existing
prejudices and beliefs rather than open our "Eyes" to new perspectives. In sum,
the Eyes Collection reminds us that everyone can find "evidence" to support their
perspective or theory on social media, no matter how outrageous.

### Plaintiffs Employ Frid

41.     Recognizing the scope and complexity of the project, Winer reached out to
Frid, to explore his interest in helping Plaintiffs market The Eyes Collection via
X. Since December 2021, Winer had employed Frid to help him with other
business ventures and trusted him with his new project, which Winer was
working on in secret.

42.     Frid agreed to assist Plaintiffs with the digital aspects of the project and,
in or around January 2024, started working with Winer to create an artist profile
on X under the artistic pseudonym "Mr. Black" or @mrblack4384—i.e., Mr.
Black's X Account.

43.     Frid assumed responsibility for creating Mr. Black's X Account and
retained full access as the primary account holder, granting Winer access
through a secondary login.

44.     Plaintiffs maintained full control over the substantive and creative aspects
of Mr. Black's X Account, including posting all content or directing its

publication, and quickly built a following on Mr. Black's X Account , utilizing the platform to promote The Eyes Collection.

## The Auction

45.     Plaintiffs ultimately planned to sell The Eyes Collection via an online auction (the "Auction").

46.     Each of the 21,000 pieces in The Eyes Collection was digital and was preserved uniquely and in perpetuity by association with a specific "satoshi," the smallest unit of Bitcoin.

47.     Mr. Black's X Account provided information about the Auction and a link to a protocol on the Eyes4384.com website (the "Protocol"). The Protocol would inscribe each art piece on a satoshi. Frid setup his Bitcoin wallet to control the Protocol, which is Plaintiffs' property.

48.     The Auction would start the evening of September 16, 2024 and last seven days. Each of the 21,000 pieces would start at .7 Bitcoin, the equivalent of approximately $100,000 per piece or $2.1 billion for the entire collection. The price of each unsold piece would decrease by .1 Bitcoin each day until the price reached 0 Bitcoin at the end of the Auction.

49.     The Auction was scheduled to start on September 16, 2024. The Auction commenced as scheduled on September 16, 2024, and proceeded over the designated seven-day period. The Auction progressed ultimately reaching the floor price and is now available for free.

## Initial Efforts to Market the Eyes Collection

50.    In late April or early May 2024, Plaintiffs launched a marketing campaign to coincide with President Donald Trump's criminal trial at the New York County Courthouse, employing trucks adorned with images from The Eyes Collection and QR codes that directed viewers to the Mr. Black's X Account.

51.    Shortly after this marketing campaign, however, Winer received what appeared to be a message from X stating that he could not market the Auction on X. In addition, Winer believed that Mr. Black's X Account was "shadow banned," which refers to a situation where a user's content or activity on a social media platform is deliberately restricted or made less visible by the platform, often without the user being explicitly informed.

52.    The irony was that X was suppressing The Eyes Collection, which is in part a commentary on the impacts that free-flowing communication via social media on a global scale have had on society.

53.    Unable to advertise his artwork through X, the circumstances became increasingly more urgent because the September 16, 2024 Auction was fast approaching.

54.    Frid pitched to Winer the opportunity to enter into a potential agreement with professional boxer Ryan Garcia, to promote the artwork and auction. Defendant Frist represented Garcia, who ultimately signed an agreement with Frid to promote the art and auction.

55.    As part of that agreement, and relying on Frid's representations, Winer wired $175,000 of his personal funds to Frid on August 28, 2024, and wired

$100,000 of his personal funds to Frist on September 6, 2024, to be held by Frist in escrow, with the understanding that the funds would only be released upon Garcia fulfilling his obligations under the agreement.

56.    Winer realized that Garcia was not performing his obligations under the agreement and expressed these concerns to Frid and Frist, who pitched an alternative plan.

**Defendants Promote and Sell Mayweather's Access to Musk**

57.    Frid texted Winer on September 2, 2024 saying that he "Spoke to [Frist]. He [c]an get [Musk] and [Mayweather] on a FaceTime call for around 5mm [i.e. $5 million]." According to Frid and Frist, Mayweather could communicate with Musk about promoting The Eyes Collection and the Auction.

58.    Winer responded that he did not have $5 million, did not need a meeting with Musk, and that a text message from Mayweather informing Musk about Mr. Black's X Account shadow ban and advertising issues on X would suffice to meet his twin aims of accessing X's marketing platform and promoting the collection to Musk personally, so long as the message included certain photos from The Eyes Collection.

59.    Frid and Frist arranged a call between Winer, Rechnitz, and Mayweather on or about September 16 or 17, 2024. Frid and Frist also were on the call. Rechnitz, Mayweather's agent, confirmed that Mayweather had become close to Musk, including because Mayweather helped train Musk for his "Cage Match" against Mark Zuckerberg, and that Mayweather and Musk had remained close ever since.

60.    Plaintiffs proposed an alternative arrangement in which Mayweather would send a text message and seven (7) images to Musk in exchange for One Million Dollars ($1,000,000.00).

### THE SEPTEMBER 16 AGREEMENT

61.    Relying on Defendants' representations, Winer entered into a September 16, 2024 agreement (the "September 16 Agreement") with Defendant Apex, "representing Floyd Mayweather/Mayweather Promotions." Exhibit A.

62.    Pursuant to the September 16 Agreement, Apex "agreed to arrange for Floyd Mayweather to send [a] specific text message to Elon Musk" along with seven images from The Eyes Collection. The exact language of Mayweather's text message to Musk as well as the seven images Mayweatherwere expressly identified and included the September 16 Agreement.

63.    The September 16 Agreement also provided that it "shall be governed by and constructed in accordance with the laws of the State of Florida, without regard to its conflict of law provisions" and that it "may be amended only by a written *instrument* executed by both parties."

64.    Pursuant to the September 16 Agreement, the text message and seven images were to be sent to Musk had to be sent within two hours of executing the agreement. Time was of the essence because the Auction was about to go online at 7:40 pm that night.

65.    The September 16 Agreement required that Mayweather send the following text message to Musk:

"Hey Elon, you should check this out. They're censoring an artist who's a friend of mine on your platform. If they take away freedom of expression, we really have no rights left. Here's the proof that they barred him from advertising on X."

66.    In exchange for sending the text message (including all seven photos of the art), Winer agreed to pay Apex a total of $1 million, with $100,000 to be paid upon execution of the September 16 Agreement via transfer from the escrowed funds held by Frist and the remaining $900,000 to be paid upon the maturity of a specific life insurance policy identified in the September 16 Agreement (the "Insurance Policy") and subsequent payment of the Insurance Policy funds to Winer.

67.    Immediately after the execution of the September 16th Agreement Rechnitz contacted Winer and informed him that Mayweather preferred to only send Three (3) messages, so as to not overwhelm Musk.

68.    The afternoon of September 16, 2024, Rechnitz sent Winer a message saying, "He read it he's checking," intending to mean that Musk had read the text message from Mayweather and was checking into the situation.

69.    At approximately 1:07 am on September 17, 2024, Rechnitz sent Winer a screenshot purporting to show that Mayweather sent the text message and some of the photos to Musk, who purportedly responded: "Ok. Is his account suspended?" Mayweather purportedly replied, "Bc of these messages," referring to some photos of The Eyes Collection he attached to the message thread.

70.    However, Mr. Black's X Account remained shadow banned and there was no apparent follow up from Musk.

71.    In the alternative, even if Mayweather had sent the text message to Musk, Apex breached the September 16 Agreement because Mayweather failed to send all seven images specifically identified in the September 16th Agreement to Musk as expressly required under the September 16 Agreement.

**Defendants Continue Their Predatory Fraud**

72.    On the evening of September 17, 2024, Rechnitz contacted Winer via FaceTime with Mayweather.



73.    Rechnitz pretended to be excited for Winer, telling him that Musk wanted to talk to him. Frid told Winer that, for $4 million, Mayweather could arrange a call with Musk about The Eyes Collection.

74.    Winer told the Defendants that he didn't agree to pay Four Million Dollars ($4,000,000.00) to speak with Elon Musk and he wanted to stick with the original agreement.

75.    Rechnitz became enraged and began intimidating Winer and his business partner in the life insurance business.

76.    Nonetheless, Winer attempted to make peace with Rechnitz and Frist, and even tried to meet them in Boca Raton on September 18, 2024.

77.    Rechnitz and Frist refused to see Winer and did not respond to his text messages.

78.     On or about September 20, 2024, Winer sent Rechnitz 48 bottles of a new tequila brand he had started called Casa Malka. https://casamalka.com/. Winer did so in an effort to make peace with Rechnitz.



## **THE SEPTEMBER 22 AGREEMENT**

79.     On or about September 22, 2024, with only 1 day left in the Auction, Winer sent Rechnitz a message desperately pleading for help because he was out of options and out of cash.

80.     Rechnitz responded: "[D]o you have any expensive watches or anything. I have an idea for you to get short-term cash."

81.     In response, Winer sent Rechnitz a message saying that he did not need cash, only a chance to speak with Musk about The Eyes Collection. Winer also sent Rechnitz a picture of his Audemars Piguet watch.



82.     Rechnitz then asked Winer if he owned any other watches, to which Winer

replied that he had a Patek Philippe.



83. Together, the watches are worth at least $150,000.

84. Rechnitz responded, "Floyd is a huge watch guy. Let me work, give me 15 minutes" and "My idea will work and will be cheaper than $4 million."

85. Rechnitz's idea was to pitch Mayweather on accepting the watches as payment for sending a text message from Winer to Musk and arranging a FaceTime call between Winer and Musk.

86.     Rechnitz claimed that he needed a third watch for his idea. To make himself appear like he wanted to help Winer and make the deal appear legitimate, Rechnitz claimed that he would supply the third watch. He also encouraged Winer to make the deal by trying to obtain an interest in the sale of The Eyes Collection.





87.    Shortly after, Rechnitz sent a message to Winer claiming that he was about to speak with Mayweather (who Rechnitz claimed was bowling at that time) and could get the deal done for Winer's two watches and $20,000 cash.

88.    Rechnitz also asked Winer to keep the deal "private," except for Frist and Frid.



89.    Just after midnight on September 22, 2024, Rechnitz sent a message to Winer claiming that he had gotten the deal done and that he was going to send Mayweather's security to pick up the watches and $20,000 from Winer in Miami, Florida.





90.    Furthermore, Rechnitz sent multiple text messages to Winer, including one stating, "Let's get this done for real now because you can make crazy money. I know how this game works."

91.    Winer agreed, and Rechnitz informed him that he had spoken with Floyd Mayweather and "got it done."

92.    Promptly thereafter, Rechnitz directed Winer to prepare the $20,000 in cash and the watches for pickup in Miami by Mayweather's security guard within a few hours.



93.    On September 22, 2024, at approximately 1:30 a.m., someone purporting to be part of Mayweather's security team arrived at Winer's home and collected the $20,000 in cash and the two watches from Winer.





94.     At approximately 2:30 am on September 22, 2024, Rechnitz sent Winer messages claiming that he and Mayweather had an initial video call with Musk and that Musk was interested, would review everything, and would get back to them on his vision for The Eyes Collection.



He said he will look over everything on his flight and come back to us with his vision for it. He may want to do something with it. Stay tuned. I'm actually shocked. I didn't think he would bite. Just thought I would show it and that's all                                        2:42 AM

He also said take the sale offline in his opinion                                                    2:42 AM

And launch properly     2:42 AM

With the right partner     2:43 AM

On my way! To miami now     2:43 AM

I'm only the messenger     2:43 AM

Does any of this make sense to you
                                                            2:44 AM

95.     Later that day, Rechnitz claimed that Musk had advised Winer to take the Auction offline and reschedule it after obtaining other celebrity endorsements, which, of course, Rechnitz promised Winer he could provide.



96.    Rechnitz further claimed that Musk said that The Eyes Collection was "powerful" and that "every MAGA will buy it."





97.    Rechnitz also claimed that Musk "said he may want to buy entire collection."



98.    Rechnitz told Winer that he was heading to Miami that night so that Winer could have the call with Musk the following morning.



99.   Ultimately, Plaintiffs could not stop the Auction from going forward.

100.   After Winer informed Rechnitz that he could not take the Auction offline, Rechnitz refused to arrange the call between Winer and Musk, even though there was still time to promote The Eyes Collection before it automatically would become free.

101.   Over the following months, Winer sought to address with Rechnitz the wrongful conduct and conspiracy directed against him. In response, Rechnitz reacted with hostility, issuing threats against Winer.

102.   Indeed, Rechnitz acted on several of his threats by intimidating and harassing Winer's brother-in-law and orchestrating the blockage of Winer's ex-wife's business Instagram account.

103.   All conditions precedent have been performed, have occurred, or have been excused.

**COUNT I**
**COMMON LAW FRAUD**
**(against Frid, Frist, Apex, and Rechnitz)**

104.  Plaintiffs re-allege and incorporate by this reference the allegations set forth in Paragraphs 1–103 above as if specifically set forth herein.

105.  On or about September 2024, Defendants Frid, Frist, Apex, and Rechnitz ("Fraud Defendants") made false representations of material fact to Plaintiffs Winer and/or The Eyes

106.      Specifically, on or about September 2024, Fraud Defendants made, *inter alia*, the following statements of material fact to Plaintiffs Winer and/or The Eyes: (a) the Fraud Defendants could get Mayweather to contact Musk on Plaintiffs Winer and/or The Eyes' behalf; (b) that Mayweather had both the ability and intention to contact Musk on Plaintiffs Winer and/or The Eyes' behalf ; and (c) that Mayweather's relationship with Musk was such that Musk would actually read the communications and understand that Mayweather had sent them in earnest. All these statements of material fact were false.

107. Plaintiffs Winer and/or The Eyes detrimentally relied on Fraud Defendants' false statements of material fact, including by agreeing to pay Apex $1 million, and by paying $100,000 toward that amount on or about September 6, 2024.

108.   On or about September 2024, Fraud Defendants made additional false statements of material fact to Plaintiffs Winer and/or The Eyes when they provided Plaintiffs Winer and/or The Eyes  with supposed proof that Mayweather had sent the messages to Musk, and when they claimed that Musk was

interested in the art and was looking into Plaintiffs Winer's and/or The Eyes' advertising issues on X. These false statements were both an effort to conceal and perpetuate their fraud, and part of a broader scheme to steal more from Winer.

109.  Specifically, Fraud Defendants knew that telling Plaintiffs Winer and/or The Eyes that Mayweather had successfully sent the message, and telling Plaintiffs Winer and/or The Eyes that Musk was interested in potentially purchasing The Eyes Collection, would induce Plaintiffs Winer and/or The Eyes to want follow-up communications with Musk. However, Mayweather never communicated with Musk, and they never even asked Mayweather to do so.

110.  Through these lies, Fraud Defendants tried to entice Plaintiffs Winer and/or The Eyes  to give them $4 million to have Mayweather send a message to Musk and to arrange a video call between Winer and Musk.

111.  Realizing that Plaintiffs Winer and/or The Eyes did not have the $4 million available, Fraud Defendants decided instead to get as much out of Plaintiffs Winer and/or The Eyes  as they possibly could.

112.  To that end, Rechnitz falsely represented to Plaintiffs Winer and/or The Eyes that he could get Mayweather to agree to set up the video call between Winer and Musk in exchange for Plaintiffs Winer' and/or The Eyes' watches and Plaintiffs Winer's and/or The Eyes' remaining $20,000 in cash.

113.  Rechnitz further lied when he told Winer that he was on his way to Miami to see Winer and arrange the video call with Musk.

114.  Fraud Defendants further (a) represented to Plaintiffs Winer and/or The Eyes that they could get Mayweather to contact Musk on Plaintiffs Winer's and/or The Eyes' behalf; (b) that Mayweather had both the ability and intention to contact Musk on Plaintiffs Winer's and/or The Eyes' behalf; (c) that Mayweather could arrange the video call between Winer and Musk; and (d) that Mayweather's relationship with Musk was such that Musk would actually read the communications and understand that Mayweather had sent them in earnest. All these representations were false.

115. Fraud Defendants made these misrepresentations with the intent to defraud Plaintiff Winer and/or Plaintiff The Eyes and to induce Plaintiff Winer and/or Plaintiff The Eyes to enter into the September 16 and September 22 Agreements, and to hand over $20,000 in cash and two watches under false pretenses.

116.  Within 48 hours of obtaining Plaintiff Winer and/or Plaintiff The Eyes $20,000 and watches: (a) Rechnitz met with Frist and Mayweather in South Florida: and (b) Rechnitz, Frist, and/or Mayweather sold Plaintiffs' watches (worth approximately $150,000) for cash in South Florida and divided the cash proceeds from the sale—together with Plaintiff Winer's and/or The Eyes' $20,000—the fruits of Defendants' heist—among themselves.

117.  At the time Fraud Defendants made the false statements of material fact described above to Plaintiff Winer and/or Plaintiff The Eyes, Fraud Defendants: a) knew the statements were false; b) made the statements without knowledge as to their truth or falsity; and/or c) made the statements under circumstances

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No.:

LEONARD SULAYMANOV,
JLZ CONSULTING, INC. D/B/A
LENZO & CO., SMITHBRIDGE LIMITED
LIABILITY PARTNERSHIP, a Pennsylvania
limited liability partnership,

       Plaintiffs,

v.

FLOYD MAYWEATHER JR. and
JONA RECHNITZ,

       Defendants.

_____/

## COMPLAINT

Plaintiffs, (i) Lenny Sulaymanov ("Mr. Sulaymanov"), (ii) JLZ Consulting, Inc. ("JLZ"), and (iii) Smithbridge Limited Liability Partnership ("Smithbridge" or "Smithbridge LLP"), a Pennsylvania limited liability partnership (collectively, the "Plaintiffs"), hereby sue (collectively, the "Defendants") (a) Floyd Mayweather Jr. ("Mr. Mayweather"), and (b) Jona Rechnitz ("Mr. Rechnitz"), and in support thereof allege:

## NATURE OF THE ACTION

1.    This case arises from Mayweather and Rechnitz's breach and circumvention of a written contract. Specifically, Mr. Sulaymanov, JLZ, Smithbridge, Mr. Mayweather and Mr. Rechnitz are all Parties to an agreement (the "Contract") that resolved certain federal litigation among those Parties. The Defendants have (i) breached the Contract on at least three (3) occasions, (ii) have been provided an opportunity to cure their default (without penalty) and (iii) they have refused to cure same.

## THE PARTIES

2.      Smithbridge, LLP is a Pennsylvania limited liability partnership with its principal place of business located at 1878 Route 70, #8, Cherry Hill, Camden County, New Jersey 08003.

3.      Mr. Sulaymanov is an individual who resides in the state of Florida.

4.      JLZ is a Delaware corporation that is registered to do business in the state of Florida and has listed its principal address as 323 Sunny Isles Blvd, Suite 501, Sunny Isles, Florida. Mr. Sulaymanov is the owner and managing member of JLZ.

5.      Upon information and belief, Mr. Mayweather is an individual who is a resident of California.

6.      Upon information and belief, Mr. Rechnitz is an individual who is a California resident.

## JURISDICTION AND VENUE

7.      This Court has diversity jurisdiction under 28 U.S.C. §1332, because this is a civil action between citizens of different states and the amount in controversy exceeds the sum or value of $75,000.00.

8.      Venue is proper in the Southern District of Florida because Section 12 of the Contract, which is at issue, provides as follows: "[a]ny dispute between the Parties or proceeding to enforce this Agreement shall be filed in the United States District Court for the Southern District of Florida[.]"

9.      The Court may exercise jurisdiction over Mayweather, because (i) Mayweather executed a contract and breached such contract that required performance in Florida; (ii) owns real property in the state of Florida; (iii) committed a tortious act in the state of Florida; (iv) caused injury to a person or entity in Florida while engaging in substantial business activities in the state

of Florida; (v) engaged in a business venture in the state of Florida, including, without limitation having an indirect or direct ownership interest in Frist Apex Ventures, LLC; and (vi) has systematic but not isolated contact with the State of Florida. Mayweather has also consented to jurisdiction in the state of Florida pursuant to the terms of the Contract.

10. The Court may exercise jurisdiction over Rechnitz, because (i) Rechnitz executed a contract and breached such contract that required performance in Florida; (ii) owns real property in the state of Florida; (iii) committed a tortious act in the state of Florida; (iv) caused injury to a person or entity in Florida while engaging in substantial business activities in the state of Florida; (v) engaged in a business venture in the state of Florida, including, without limitation having an indirect or direct ownership interest in Frist Apex Ventures, LLC; and (vi) has systematic but not isolated contact with the State of Florida. Rechnitz has also consented to jurisdiction in the state of Florida pursuant to the terms of the Contract.

## STATEMENT OF FACTS

11. Smithbridge, LLP was retained to pursue a matter on behalf of Mr. Sulaymanov and JLZ against Mr. Mayweather and Mr. Rechnitz.

12. On or about August 23, 2024, an initial Federal action was filed in the United States District Court for the Southern District of Florida by Smithbridge, LLP (and its local counsel) on behalf of Mr. Sulaymanov and JLZ. See *Sulaymanov v. Mayweather Jr.*, Case No. 24-CV-23229 ("Initial Federal Action").

13. The Initial Federal Action and related claims were resolved through the execution of the Contract on January 8, 2025, by Mr. Sulaymanov and JLZ, along with Smithbridge, LLP, on the one hand, and Mr. Mayweather and Mr. Rechnitz on the other. A copy of the Contract is **in**

the possession of each Defendant (or their counsel) and it is not attached hereto because the

Contract[1] provides, in relevant part:

> …Plaintiffs' Counsel agree to keep the existence of this Agreement … and all documents and things exchanged during … negotiations leading up to this Agreement … strictly confidential …

14.     Pursuant to the Contract, Mr. Mayweather and Mr. Rechnitz are jointly and severally obligated to pay the total sum specified in the Contract in three (3) installments: the first lump sum payment was due by no later than March 30, 2025 (the "First Installment"); the second lump sum payment was due by no later than June 30, 2025 (the "Second Installment"); and the third and final lump sum payment is due by no later than June 30, 2026 (the "Final Installment" and collectively, the "Contract Payments").

15.     Pursuant to the Contract, all of the Contract Payments were to be made "**payable to the IOLTA trust account of Smithbridge, LLP**". Contract at §2.d. (emphasis added).

16.     Subsection 2.e. of the Contract expressly provides that Smithbridge, LLP (and local counsel) "**shall be solely responsible for the remittance or distribution of the --------- Payment to Plaintiffs**". Contract at §2.e. (emphasis added).

17.     Section 11 of the Contract provides that it "**shall be binding upon, and inure to the benefit of the Parties and their respective. . . . attorneys**. **This Agreement shall be binding, enforceable, discoverable and admissible to establish the rights, obligations and duties of the Parties in any action brought to enforce this Agreement**." Contract at §11 (emphasis added).

18.     Pursuant to Section 11 of the Contract, Smithbridge, LLP was an intended third-party beneficiary to the Agreement. Contract at §11.

---

[1] The Agreement includes an exception for "as may be required in connection with any action to enforce the Agreement (provided that the parties shall seek to treat any filing regarding such enforcement confidential and under seal).

19.     The first installment was due on or before March 30, 2025, and Defendants failed to pay such installment into the IOLTA account as required under the Contract. This was the Defendants' first default under the Contract.

20.     On March 31, 2025, Defendants were placed on notice of their default.

21.     In response and over the next few weeks, Defendants asserted that under Section 5(a)(10) of the Contract, they had thirty (30) days to cure any default. Plaintiffs in this action disputed the Defendants' liberal interpretation of the Contract and continued to demand payment. Notwithstanding the foregoing, and despite the specious nature of Defendants' claim to being entitled to an additional thirty (30) days to pay the first installment, the Defendants still defaulted on the First Installment by failing to pay the First installment on or before April 30, 2025 (Defendants "cure" deadline).

22.     While the First Installment was eventually paid on or before on May 30, 2025, such payment was not made in compliance with the requirements specified in the Contract. Specifically, Defendants eventually made a series of incremental payments, which in aggregate, amounted to the First Installment, but Defendants' failure to pay the full First Installment as and when due constituted a default under the Contract.

23.     The Second Installment was due on or before June 30, 2025, and Defendants again failed to timely make that payment. This was Defendants' second breach of the Contract.

24.     On or about October 8, 2025, Defendants were provided with written notice that they were in default of the June 30, 2025, payment (or the Second Installment), for which, in an abundance of caution Plaintiffs again applied Section 5(a)(10) of the Contract and gave Defendants yet another thirty (30) days to cure (or until November 8, 2025).

25.    While Defendants did not cure the default by November 8, 2025, they were still given yet another series of additional, penalty free, extensions (as detailed below) to cure the default by making the payment by November 30, 2025, which was extended to December 15, 2025, and then extended again to December 22, 2025.

26.    On or around November 30, 2025, Mr. Rechnitz contacted Mr. Sulaymanov and requested another extension until December 15, 2025, and Mr. Sulaymanov agreed.

27.    Yet, on December 15, 2025, payment was not made into the IOLTA trust account of Smithbridge, LLP as required by the Contract.

28.    Instead, starting on December 15th and then extending through the filing of this complaint, Mr. Rechnitz has advanced a series of lies and acted in bad faith in order to delay and avoid payment of the funds now long overdue under the Contract, to wit:

 i. On December 11, 2025, Mr. Rechnitz emailed all parties confirming the wire would be sent 12/15/2025 when he knew no payment was being made.

 ii. On December 15, 2025, Mr. Rechnitz emailed all parties stating "its going out later. It will reflect in your account tomorrow morning. Please confirm tomorrow by 10am PST once received…".

 iii. On December 16, 2025, Mr. Rechnitz emailed all parties to "Hang on. Funds hitting our account today then shooting wire. Give it until 11 am PST tomorrow then Do your thing. You'll have the wire."

 iv. On December 17, 2025, Mr. Rechnitz emailed all parties that "It's being handled thanks".

 v. Later, on December 17, 2025, Mr. Rechnitz emailed the parties again assuring Plaintiffs and counsel that payment was "Being handled today".

    vi.    On December 17, 2025, Mr. Rechnitz and Yaniv Adar, Esquire (counsel for Mayweather) called Plaintiff's counsel requesting Smithbridge, LLP confirm proper wire instructions, despite, the fact that Defendants previously sent 4 wires to the exact IOLTA account without any problems, evidencing more bad faith and gamesmanship by Defendants.

    vii.    On December 18, 2025, no payment was made despite the phone call from Rechnitz the night before.

    viii.    On December 18, 2025, counsel for the parties exchanged emails promising payment would be made by close of business Friday, knowing that Defendants had no intention of paying on that date.

    ix.    On December 19, 2025, counsel for the parties had a phone call and exchanged emails, where once again Defendants requested a further extension of time to pay until Monday, December 22, 2025.

    x.    On December 22, 2025, no payment was made but Mr. Rechnitz face-timed Mr. Sulaymanov to show him an account which contained $2,100,000.00 earmarked to address the defaulted payment which he promised would be wired into the IOLTA account by 2 PM PST on 12/23/25.

    xi.    On December 23, 2025, no wire was made by Mr. Rechnitz. Counsel exchanged emails and Mr. Rechnitz and Mr. Sulaymanov texted, where Mr. Sulaymanov asked "what was the point of all these promises again..." and Mr. Rechnitz responded "I needed to gather it. Finally, you'll see in the am, let them be surprised".

29.    As further evidence of Defendants' intentional, reckless and bad faith handling of their obligations under the Contract that governed the resolution of the Initial Federal Action, the Court need only consider the following facts:

*Sulaymanov & Smithbridge v. Mayweather, et. al.*
*Page 8 of 13*

    i.       After the settlement was reached Mr. Mayweather and Mr. Rechnitz enjoyed a multi-million dollar birthday week in Miami and bragged about it in the newspapers and to media outlets.





ii.    Then on June 30, 2025, while failing to make the Second Installment payment Defendants Mr. Mayweather and Mr. Rechnitz were enjoying a vacation in the South of France and bragging about how much money they were spending.



iii.   Further evidencing Defendants' arrogant, cavalier attitude about court cases, settlements, contracts and monetary obligations, on November 26, 2025, while still being in default of the Contract, Mr. Mayweather posted this audacious photo behind millions in cash, saying he "just be minding [his] own business" while ignoring his legal and contractual obligations.



iv.     Later, on that same date, Mr. Mayweather boasted about having a $400,000 Richard Mille watch on, while again ignoring his legal and contractual obligations to Plaintiffs.

*Sulaymanov & Smithbridge v. Mayweather, et. al.*
*Page 11 of 13*



30.     Pursuant to the Contract, ALL the installments due under the Contract (which should have been paid by Mr. Mayweather and Mr. Rechnitz into the IOLTA trust account of Smithbridge, LLP, but were not), far exceed the $75,000.00 jurisdictional minimum of this Court.

31.     All the Defendants' respective breaches of the Contract have caused and continue to cause damages to Plaintiffs in the form of, including but not limited to, attorneys' fees, the expenses of suit in the Initial Federal Action, consequential damages, as well as attorneys' fees and expenses in this action, and the consequential damages arising therefrom.

32.     Smithbridge, LLP has engaged its undersigned counsel to represent it in this action and is obliged to pay its counsel a reasonable fee for services rendered.

33.     JLZ and Mr. Sulaymanov have also retained its undersigned counsel and will be forced to incur legal fees and expenses for services rendered in this action.

34.     All conditions precedent to the filing or pursuit of the instant action have occurred, been performed, or have been waived.

### COUNT I – BREACH OF CONTRACT
**(Against Floyd Mayweather)**

Plaintiffs repeat and incorporate herein the allegations of paragraphs 1 through 34 above as if fully set forth herein.

35.     Mr. Mayweather entered and is a party to the Contract.

36.     Mr. Mayweather breached Subsections 2.d. and 2.e. of the Contract by virtue of the acts set forth above, including, without limitation, failure to timely effectuate payment.

37.     As a direct and proximate result of Mr. Mayweather's breaches of the Contract, Plaintiffs have suffered substantial damages.

WHEREFORE, Plaintiffs prays that this Honorable Court will enter Judgment against Defendant FLOYD MAYWEATHER, JR (jointly and severally with Mr. Rechnitz) as follow: (i) finding that the Mr. Mayweather breached the Contract; (ii) awarding Plaintiffs their actual and consequential damages plus interest, legal fees and costs; and (iii) Granting such further relief as the Court deems just and proper.

### COUNT II – BREACH OF CONTRACT
**(AGAINST MR. RECHNITZ)**

Plaintiffs repeats and incorporates herein the allegations of paragraphs 1 through 34 above as if fully set forth herein.

38.     Mr. Rechnitz entered and is a party to the Contract.

39.     Mr. Rechnitz breached Subsections 2.a., 2.b., and 2.d. of the Contract by virtue of the acts set forth above, including, without limitation failure to timely effectuate payment.

40.     As a direct and proximate result of Mr. Rechnitz's breaches of the Contract, Plaintiffs have suffered substantial damages.

WHEREFORE, Plaintiff prays that this Honorable Court will enter Judgment against Defendant, JONA RECHNITZ (jointly and severally with Mr. Mayweather) as follow: (i) finding that the Mr. Rechnitz breached the Contract; (ii) awarding Plaintiffs their actual and consequential damages, plus interest, legal fees and costs; and (iii) Granting such further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury as to all issues so triable.

Respectfully submitted on January 14, 2026

*/s/Peter M. Bernhardt*
Peter M. Bernhardt, Esq.
Florida Bar No. 969771
pbernhardt@mcdonaldhopkins.com
klundstrom@mcdonaldhopkins.com
Laura G. Nguyen, Esq.
Florida Bar No. 1018826
lnguyen@mcdonaldhopkins.com
klundstrom@mcdonaldhopkins.com
**MCDONALD HOPKINS, LLC**
501 S. Flagler Drive, Suite 200
West Palm Beach, FL 33401
*Attorneys for Smithbridge*

*/s/ Zachary Hyman*
Zachary Hyman, Esq.
Florida Bar No. 98581
zach@millenniallaw.com
jessica@millenniallaw.com
assistant@millenniallaw.com
**MILLENNIAL LAW**
320 SE 11th Street
Fort Lauderdale, Florida 33316
Phone: 954-271-2719
*Attorneys for Sulaymanov and JLZ*